**MARKS & KLEIN, LLP**
Brent M. Davis, Esq.
Justin M. Klein, Esq.
63 Riverside Avenue
Red Bank, N.J. 07701
Tel: (732) 747-7100
Fax: (732) 219-0625
justin@marksklein.com
brent@marksklein.com
*Attorneys for Plaintiff*
*APFA, Inc.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **APFA, INC.** ) | |
| ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case No.** |
| ) | |
| ) | |
| **UATP MANAGEMENT, LLC,** ) | |
| ) | |
| **Defendant.** ) | |

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff, APFA, INC., commonly known as the Adventure Park Franchisee Association ("APFA"), by and through its attorneys, for its Complaint for Declaratory Judgment against Defendant UATP MANAGEMENT, LLC ("Urban Air") hereby states as follows:

## INTRODUCTION

1.    Defendant, Urban Air, a national franchisor of indoor adventure parks,

has unilaterally and unfairly forced a series of system-wide changes on its franchisees in violation of its form franchise agreement and the law, including, without limitation, the imposition of undisclosed fees and the implementation of programs, mandatory vendors and suppliers and material changes to the franchise system in bad faith and with complete disregard for franchisee profitability.

2.      The mandatory vendor relationships and changes, programs and initiatives compelled by Urban Air have materially diminished and impaired franchisee profitability to the substantial detriment of franchisees and the significant benefit of Urban Air who is, upon information and belief, collecting millions of dollars in fees, payments, revenues and rebates as a result of these forced relationships and wholesale, material changes which have been imposed.

3.       As detailed herein, Urban Air's conduct runs directly afoul of Urban Air's disclosures in its federally mandated Franchise Disclosure Document[1] and the express terms of the franchise agreements signed by Urban Air franchisees.

4.      The forced vendor relationships and material changes, which have recently been proposed or already unfairly implemented: (i) amount to unreasonable standards of performance on all of Urban Air franchisees to their financial detriment, (ii) substantially strip Urban Air franchisees of their contractually-based autonomy

---

[1]      The Federal Trade Commission governs the offer and sale of franchises in accordance with 16 CFR 436, which requires franchisors to provide pre-sale disclosures to a prospective franchisee to consider in connection with making an investment decision.

in running their respective businesses, fundamentally change the nature of each Urban Air franchisee's business, and (iii) render the disclosures in the FDD and the terms and provisions of the franchise agreements upon which investment decisions were made to be illusory and meaningless.

5.    The APFA brings this action for declaratory relief on behalf of its members to preserve and protect their rights under the franchise agreements.

## PARTIES

6.    The APFA is a corporation formed under the laws of the state of Delaware.  APFA was formed in or around 2019 in an effort to, *inter alia*, foster enhanced franchisor-franchisee relations and communications for the betterment of the franchisee experience and increased opportunity for operational success. This action resulted from a direct result of its members' commonly themed grievances pertaining to certain practices and operations of Urban Air, its representatives and principals.  The APFA was organized and exists for the purpose of protecting and preserving the rights of Urban Air franchisees and was created to serve as an official voice of the Urban Air franchise community.  APFA and its members' concerns generally regard various internal systems, practices and newly implemented mandates that Urban Air has unfairly thrust upon its franchisees.

7.    The APFA currently represents in excess of fifty (50) Urban Air franchised locations located throughout the United States.

8.    Urban Air franchisees execute franchise agreements with Urban Air which are substantially similar in form and substance.  The Urban Air form franchise agreements are typically non-negotiable.  Urban Air franchisees operate indoor adventure parks featuring wall-to-wall trampolines, foam pits, climbing walls, go-karts, and related activities.  Each Urban Air franchise generally requires an investment of over $1,500,000 to open a single location.

9.    Defendant, Urban Air, is a limited liability company formed in 2013, organized and existing under the laws of the State of Texas, 2350 Airport Freeway, Suite 505, Bedford, Texas 76022. UA Holdings, LLC is the sole member of Urban Air.  UA Holdings, LLC is a Texas limited liability company.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction over this action under diversity of citizenship jurisdiction, 28 U.S.C. § 1332, as Plaintiff APFA, Inc. is Delaware corporation and Defendant is a Texas limited liability company whose sole member is also a Texas limited liability company.  Upon information and belief, none of the members of UA Holdings, LLC are residents of the State of Delaware.

11.    Plaintiff has satisfied the amount in controversy requirement as the value of the requested declaratory relief exceeds the jurisdictional threshold of $75,000.

12.    This Court has subject matter jurisdiction pursuant to 28 USC § 1331.

13.    Venue is proper in this jurisdiction as certain members of the APFA are residents of New Jersey and events giving rise to the complained of conduct herein occurred in New Jersey.   Likewise, New Jersey franchisees of Urban Air are authorized to file suit in this venue despite an out-of-state forum selection provision because such forum selection clauses are presumptively invalid because they fundamentally conflict with the basic legislative objectives of protecting franchisees from the superior bargaining power of franchisors and providing swift and effective judicial relief against franchisors that violate the New Jersey Franchise Practices Act, N.J.S.A. §56:10-1 *et seq.*

## ASSOCIATIONAL STANDING

14.    The APFA has standing to maintain this action.   At least one of its members (indeed, all of its members) will suffer injury in fact by the real and immediate threatened harm from Defendant's conduct.

15.    Further, the interests sought to be protected by this action are germane to the APFA's purpose.

16.    The interests sought to be protected are the rights of Urban Air's franchisees to prevent Urban Air from unfairly and unilaterally modifying the terms of the franchise agreement and the relationship of the parties, from charging fees which are not authorized by the franchise agreement and from negotiating vendor agreements which are not for the benefit of Urban Air franchisees and from changing

system standards in a manner so as to render the terms of the parties' franchise contracts commercially impracticable.

17.    Pursuant to Article III of the APFA's bylaws, the purposes of the APFA are as follows:

> The purposes of the Association are to encourage franchisor-franchisee communications and relations, increase franchisee awareness through publications and seminars, improve franchised business conditions, and promote and foster the interests of franchisees of UATP Management, LLC (together with any successor, assign or affiliate thereof which sells Urban Air Adventure Park franchises, collectively referred to as the "Franchisor"). In addition, the purposes of the Association is: (1) To increase the profitability of APFA members; (2) To provide Urban Air Customers with the best possible customer experience; (3) To protect and promote the rights of Urban Air franchise owners in their franchised business; (4) To safeguard and enhance APFA members' business interests and equity; (5) To provide access to free and open communication among APFA members; (6) To represent the interests of APFA members in discussions with the management of the Franchisor; (7) To improve communication between APFA members and the Franchisor; (8) To promote fairness in the franchise relationship between APFA members and the Franchisor; and, (9) To assist the Franchisor in identifying the needs of the APFA members.

18.    Finally, neither the claim asserted nor the relief requested requires the participation of individual members of the APFA (i.e. the Urban Air franchisees), since the APFA can prove its allegations of Urban Air's misconduct, which is both contractual and implied by law, and other franchisee abuses through Urban Air's own internal documents and data, and through expert testimony.  The claim for relief involves issues that are common to all members of the APFA and do not require

determination on an individual basis. The claim is for declaratory relief only and does not involve any potentially differing claims for monetary compensation.

## BACKGROUND FACTS

### FTC REGULATIONS AND URBAN AIR'S FRANCHISE DISCLOSURE DOCUMENT

19.    The FTC has promulgated certain laws requiring the delivery to prospective franchisees of a prescribed disclosure document, known as a Franchise Disclosure Document ("FDD"), concerning the franchisor, its management, and the material terms and conditions of the franchise agreement, among other things, prior to the execution of any agreement by a prospective franchisee. Prior to July 1, 2007, this is was known as the Franchise Rule, and the Amended Franchise Rule became effective as of July 1, 2007. The FDD is a disclosure format accepted by the FTC for conveying such information to prospective franchisees.

20.    The Amended Franchise Rule requires a franchisor to provide prospective franchisees with FDD disclosures that "present all material facts accurately, clearly, concisely and legibly in plain English." 16 C.F.R. § 436.1(d).

21.    "It is an unfair and deceptive act or practice" for any franchisor to violate a provision of the Amended Franchise Rule. 16 C.F.R. § 436.2.

## URBAN AIR'S FAILURE TO PROPERLY DISCLOSE FEES AND IMPOSITION OF NEW, UNDISCLOSED FEES IN CONNECTION WITH THE URBAN AIR MEMBERSHIP PROGRAM AND FOR LOCAL MARKETING

22.     Pursuant to the Amended Franchise Rule, a franchisor is obligated to provide every prospective franchisee with an FDD, and related agreement, that details any and all of the initial and ongoing fees that a franchisor will charge to the franchisee.  16 C.F.R. § 436.5(f).

23.     16 C.F.R. § 436.5(f) expressly provides as follows:

> Item 6: Other Fees. Disclose, in the following tabular form, all other fees that the franchisee must pay to the franchisor or its affiliates, or that the franchisor or its affiliates impose or collect in whole or in part for a third party. State the title "OTHER FEES" in capital letters using bold type. Include any formula used to compute the fees.

> If fees may increase, disclose the formula that determines the increase or the maximum amount of the increase. For example, a percentage of gross sales is acceptable if the franchisor defines the term "gross sales."

24.     In April 2019, Urban Air initiated a Membership Program without proper or sufficient due diligence, testing, evaluation or analysis prior to its implementation.

25.     In connection with the Membership Program, Urban Air collects all revenues for memberships sold by franchisees and is responsible for distributing such revenues to individual franchisees.

26.     Section 6 of the form Franchise Agreement sets forth the fees which Urban Air is authorized to charge franchisees. (Exemplar copies of Urban Air's FDD (which contain the form Franchise Agreement) for the years 2016 and 2017 are attached hereto as Exhibits A and B, respectively).

27.     In the 2016 FDD, pursuant to Section 6.B. and 6.C of the Urban Air franchise agreement, Urban Air is authorized to charge a Royalty Fee in the amount of "6% of weekly Gross Sales" and a Development Fund Fee in the amount of "1% of weekly Gross Sales," respectively. (See Exh. A and B).

28.     In the 2016 FDD, pursuant to Section 6.D. of the Urban Air franchise agreement, Urban Air is authorized to charge an Administrative Fee of the "[p]ro-rata portion of call centers hourly rate plus a $5.00 commission", which same fee was set forth in Section 6.C of the Urban Air franchise agreement in the 2017 FDD. (See Exh. A and B).

29.     In the 2017 FDD, Urban Air removed the Development Fund Fee of 1% and increased the Royalty Fee to "7% of weekly Gross Sales" in Section 6.B of the Urban Air franchise agreement.   (*See* Exh. B).

30.     Nowhere in the Urban Air FDD of any currently operating location is there any disclosure of any "Membership Program Fee" or any "NAF Fee" payable by franchisees.

31.     Likewise, no Urban Air franchise agreement for any currently operating location authorizes Urban Air to charge or obligate any franchisee to pay a "Membership Program Fee" of 2.5% or a "NAF Fee" of 5% to Urban Air.

32.     Consequently, *neither* the "Membership Program Fee" of 2.5% nor the "NAF Fee" of 5% were disclosed in the FDD or agreed to in the Urban Air franchise agreement of any operating location as required by law in violation of Amended Franchise Rule, 16 C.F.R. § 436.5(f).

33.     Even though the Urban Air franchise agreement does not obligate any franchisee to pay a "Membership Program Fee" of 2.5% or a "NAF Fee" of 5% or authorize Urban Air to charge such fees, since April 2019, Urban Air has been wrongfully imposing a "Membership Program Fee" of 2.5% and a "NAF Fee" of 5% upon all franchisees, which violates the express terms and provisions of the Urban Air franchise agreement.

34.     Likewise, Urban Air is wrongfully charging fees to franchisees in order to fund Urban Air's development and implementation of the Membership Program, which total cost is estimated to be approximately $4,000,000, and which amounts to approximately $40,000 per franchised location and is essentially the cost of an additional initial franchise fee, which no franchisee agreed to pay.  (*See* Exhibit C which is an exemplar copy of the "Amendment to Franchise Agreement (Membership Program)").

35.    In connection with the implementation of the Membership Program, Urban Air improperly and fraudulently induced various franchisees to execute an "Amendment to Franchise Agreement (Membership Program)" under false pretenses and in bad faith.  (*See* Exh. C).

36.    Specifically, Urban Air misrepresented to franchisees that execution of the "Amendment to Franchise Agreement (Membership Program)" solely related to the implementation of the Membership Program and was immediately necessary in order for the franchisee to receive payment of Membership Revenues collected by Urban Air.

37.    However, the "Amendment to Franchise Agreement (Membership Program)" materially altered and modified the Urban Air franchise agreement in several respects and is unenforceable for lack of consideration.   (*See* Exh. C).

38.    To date, many franchisees have not executed the "Amendment to Franchise Agreement (Membership Program)," yet they have been charged a "Membership Program Fee" of 2.5% or a "NAF Fee" of 5% and have received membership revenue payments from Urban Air even without any such amendment in place.

39.    In addition, neither the Urban Air FDD nor the Urban Air franchise agreement authorize Urban Air to charge marketing or advertising fees to franchisees.  (See Exh. A and B).

40.     Nowhere in the Urban Air FDD is there any disclosure of any marketing or advertising fees payable by franchisees to Urban Air.

41.     Likewise, no Urban Air franchise agreement authorizes Urban Air to charge or obligate any franchisee to pay any marketing or advertising fees.

42.      To the contrary, the Urban Air FDD and franchise agreement merely obligate franchisees to a "Local Marketing Expenditure" of "5% of monthly Gross Sales." (*See* Exh. A and B).

43.     Moreover, Item 6 of the Urban Air FDD expressly provides that the "Local Marketing Expenditure" shall be "***Payable to the person providing the services***, which may be us." (See Exh. A and B (emphasis added)).

44.     Notwithstanding the express disclosure that the "Local Marketing Expenditure" shall be "[p]ayable to the person providing the services," Urban Air recently announced the implementation of a new, mandatory "local" marketing program with Zimmerman as the vendor providing local marketing services but is mandating that franchisees pay "four percent (4%) of monthly Gross Sales" directly to Urban Air in connection with this program.

45.     Urban Air's imposition and collection of "four percent (4%) of monthly Gross Sales" constitutes new, undisclosed fees and runs afoul of the express disclosure set forth in the Urban Air FDD and the express provisions of the Urban Air franchise agreement.

46.     In addition, at no time have Franchisees authorized Urban Air to automatically withdraw or ACH those fees from their accounts.

47.     Instead, once again, under fraudulent and false pretenses, Urban Air has sought the execution of an updated "ACH Authorization" from Urban Air franchisees for this purpose.

48.     Stephen Polozola, EVP/General Counsel for Urban Air, has repeatedly misled and misrepresented to franchisees that "Section 6.F. of your Franchise Agreement requires that 'you must participate in Franchisor's then-current electronic funds transfer program authorizing Franchisor to utilize a pre-authorized bank draft system.' Previously, we sent you the attached ACH form for execution. However, to date, we have not received your executed ACH form."

49.     Contrary to Polozola's claims, the "ACH Authorization" that Urban Air is seeking to have executed greatly exceeds the scope and express terms and provisions of the applicable forms of franchise agreement and the franchisee's obligations thereunder. (A copy of the purported ACH Authorization that Urban Air was seeking to have executed is attached as Exhibit D).

50.     In the form Franchise Agreement for operating locations, there is no obligation for franchisees to allow or provide for funds to be collected via ACH on behalf of "UATP Management, LLC, UA Attractions, LLC and their subsidiaries

and affiliates", which are improperly defined collectively in the ACH Authorization as "Franchisor".

51.    To the contrary, the form Franchise Agreements only permit UATP Management LLC (as "Franchisor" under the Franchise Agreement) to collect the fees which are set forth in the Franchise Agreement.

52.    Consequently, the authorization Urban Air is seeking to procure is overly broad, improper and inconsistent with the express terms and provisions of the Franchise Agreement.

53.    Likewise, virtually all franchisees have already executed an ACH Authorization and Urban Air has been collecting royalties from franchisees under such authorizations.

54.    Therefore, a new authorization is wholly unnecessary and sought for improper purposes and the authorization should be limited to that which is permitted under the applicable provisions of the Franchise Agreement.

55.    In connection with the local marketing services to be provided by Zimmerman, Urban Air has taken the position that it is permitted to mandate Zimmerman as a "vendor" and charge and collect four percent (4%) of monthly Gross Sales from franchisees on behalf of Zimmerman.

56.    However, this ignores the plain language of the form Franchise Agreement drafted by Urban Air which mandates that the "Local Marketing

14

Expenditure" shall be "payable to the person providing the services," which is Zimmerman and not Urban Air.

57.    Moreover, Zimmerman has not been designated as the exclusive vendor.  Rather, Urban Air franchisees are required to use other vendors as well in order to meet the contractually required local marketing spend.

58.    Consequently, Urban Air franchisees are going to be required to spend far in excess of five percent (5%) of monthly Gross Sales on local marketing.

59.    The new program and attendant fees are also inconsistent with Urban Air CEO Michael O. Browning, Jr.'s routine, repeated and consistent proclamations to Urban Air franchisees that the franchisee local marketing expenditure shall be capped at $7,000 per month.

60.    The manner in which this new marketing program is being administered further undermines Urban Air's claims in this regard as Urban Air franchisees are prohibited from directly interfacing with Zimmerman representatives.

61.    To the contrary, all franchisee communications relating to local marketing are required to be directed to Urban Air corporate marketing employees *who have not even been hired yet* despite the anticipated roll out of this program which was scheduled for March 2020, but has been temporarily delayed as a result of Covid-19.

62.    Consequently, Zimmerman is not a true mandatory vendor and the four percent (4%) of monthly Gross Sales is a new, undisclosed fee, which is improper and unlawful.

63.    Furthermore, representatives of Urban Air have made clear that while Urban Air will not allegedly "profit" or otherwise derive revenue by virtue of the relationship with Zimmerman in 2020, representatives of Urban Air have made clear that Urban Air will do so in future years, which is improper and unlawful based on Urban Air's disclosures in the FDD, as detailed and demonstrated below.

## URBAN AIR'S FAILURE TO NEGOTIATE PURCHASE ARRANGEMENTS WITH VENDORS AND SUPPLIERS FOR THE BENEFIT OF FRANCHISEES.

64.    Pursuant to the Amended Franchise Rule, in Item 8 of the FDD, a franchisor is obligated to disclose:

(6) Whether the franchisor or its affiliates will or may derive revenue or other material consideration from required purchases or leases by franchisees. If so, describe the precise basis by which the franchisor or its affiliates will or may derive that consideration by stating:

(i) The franchisor's total revenue.

(ii) The franchisor's revenues from all required purchases and leases of products and services.

(iii) The percentage of the franchisor's total revenues that are from required purchases or leases.

(iv) If the franchisor's affiliates also sell or lease products or services to franchisees, the affiliates' revenues from those sales

or leases.

16 C.F.R. § 436.5(h)(6).

65.    Prior to the issuance of the April 2017 FDD, in connection with all prior versions of Urban Air's FDD, Urban Air vaguely referenced it may receive money or benefits from suppliers and vendors for such things as conference sponsorships, but Urban Air expressly stated in Item 8 that:

### Revenue Derived from Required Purchases and Leases

We do not derive any revenue or material consideration from the sale of products to our franchisees.

(*See* Exh. A and B (Item 8) (emphasis in original)).

66.    Moreover, in connection with all versions of Urban Air's FDD prior to April 2017, Urban Air did not disclose the precise basis of any revenue or other material consideration from required purchases or leases or any of the other information mandated under 16 C.F.R. § 436.5(h)(6)(i) – (iv).

67.    In fact, the "sales pitch" used by Michael O. Browning, Jr. ("Browning"), CEO of Urban Air, and Alix Wren, VP of Sales, to prospective franchisees at that time, and prior, was that Urban Air was different from its competitors because Urban Air 'only' made money on initial franchise fees and royalty fees paid by Urban Air franchisees and not from purchases made by franchisees from vendors and suppliers.

68.    Browning repeatedly touted this fact as a differentiator and routinely

represented that Urban Air did not derive revenue based on franchisee purchases from vendors and suppliers in sales discussions, presentations and communications.

69.    The absence of any markup in connection with franchisee purchases from mandatory vendors and suppliers was a major selling point for Browning, Wren and Urban Air, and was specifically intended to induce franchisees to purchase Urban Air franchises over competitive business opportunities.

70.    These representations were also communicated in connection with Urban Air Trampoline Park Business Plan documents provided to virtually all franchisees prior to execution of the franchise agreement.

71.    In each Urban Air Trampoline Park Business Plan, Urban Air specifically represented:

> Our goal is to get **OPEN** and **PROFITABLE**, as fast as possible that's why UATP Management (Franchisor) does not markup supplies and equipment from vendors.

72.    In all forms of the FDD, Urban Air further represented in Item 8 of the FDD that:

> We [Urban Air] periodically negotiate purchase arrangements with suppliers ***for the benefit of our franchisees***, and we may establish national buying accounts with vendors whose products meet our specifications.

(*See* Exh. A and B (Item 8) (emphasis added)).

73.    Section 22.A of the all forms of Franchise Agreement also expressly stated:

Nothing in this agreement or any related agreement is intended to disclaim the representation [sic] made in the disclosure document provided to you by Franchisor.

(*See* Exh. A and B (Franchise Agreement, Section 22.A)).

74.     Notwithstanding Urban Air's representations in the FDD, the Urban Air Trampoline Park Business Plan documents and the express provisions of the Urban Air Franchise Agreement, Urban Air has not negotiated purchase arrangements with vendors and suppliers "for the benefit of franchisees," but, rather, upon information and belief, has collected and is still collecting millions of dollars in payments, revenues and rebates based on franchisee purchases from mandatory vendors and suppliers.

75.     Urban Air franchisees are being charged supra-competitive prices for various mandatory goods, products, services, supplies and equipment.

76.     Urban Air has mandated vendors for various mandatory goods, products, services, supplies and equipment to charge these above-market prices, despite Urban Air's various claims to the contrary.

**URBAN AIR'S WRONGFUL AND BAD FAITH CONDUCT.**

77.     Urban Air has failed to support franchisees and has implemented programs, mandated vendors and suppliers, and imposed fees, charges and costs upon franchisees with complete disregard for franchisee profitability and, as detailed herein, in express violation of the terms and provisions of the franchise agreements

signed by Urban Air franchisees and the disclosures contained in the FDD which formed the basis of franchisee investment decisions.

78.    For example, as noted above, Urban Air unilaterally forced franchisees, who have already invested millions of dollars, to fund the development of and implementation of a Membership Program.

79.    Urban Air has undertaken this action in bad faith to drive its own revenues and without performing sufficient due diligence or analysis on the impact it would have on unit economics.

80.    The membership program is materially diminishing and impairing franchisee profitability to the substantial detriment of franchisees and the significant benefit of Urban Air who is collecting millions of dollars in membership fees.

81.    Another example involves Urban Air's mandatory vendor for socks. Urban Air has mandated that franchisees purchase socks from an approved vendor at above-market prices where alternative suppliers are available to provide socks of the same make and/or quality to Urban Air franchisees at approximately $0.50 less per pair.

82.    In light of the fact that franchisees purchase upwards of 8,000 to 10,000 pairs of socks per month, allowing purchases from alternate vendors, or if the mandatory vendor charged at-market cost, franchisees would save between $4,000 and $5,000 per month.

83.     Instead, Urban Air mandates the more expensive vendor in bad faith so that it may reap the benefit of substantial rebates from its sock vendor to its sole significant benefit and the substantial detriment of franchisees.

84.     In fact, upon information and belief, the current sock vendor is making $0.04 per pair of socks purchased and Urban Air is making $0.25 per pair of socks purchased.

85.     Another example involved Urban Air's mandatory vendor for construction and installation of attractions.  Previously, Urban Air mandated that franchisees use a company named Leap of Faith for the construction and installation and attractions.

86.     Generally, the franchisee cost for the construction and installation of attractions greatly exceeds $500,000.

87.     Despite express representations in the FDD, the Urban Air Trampoline Business Park documents and Browning's repeated, specific and affirmative representations touting the benefits of choosing Urban Air over competitive business opportunities because Urban Air did not make any money off of franchisee purchases or "markup supplies and equipment from vendors", unbeknownst to franchisees, Urban Air did not negotiate the vendor arrangement with Leap of Faith for the benefit of franchisees, but negotiated this vendor arrangement for their own benefit.

88.     To that end, upon information and belief, in order to be recognized as the mandatory vendor to Urban Air franchisees, Urban Air mandated that Leap of Faith pay significant revenues and rebates to Urban Air totaling approximately 50%-60% of its contract price on the franchised locations it built.

89.     Consequently, the construction and installation price for attractions was substantially inflated and should have been considerably less.

90.     Egregiously, in various instances, Urban Air then financed the inflated price for the construction and installation of attractions with promissory notes to "help" franchisees with Leap of Faith's invoices when such financing should never have been needed.

91.     However, the promissory notes were a sham.  Franchisees sought "help" from Urban Air in order to pay Leap of Faith's invoices.  In connection with this scheme, Urban Air agreed to "help" by "loaning" funds to the franchisee so that the franchisee's Leap of Faith invoice could be paid.

92.     Unbelievably, however, upon information and belief, in many instances, Urban Air never paid the Leap of Faith invoices on behalf of the franchisees after allegedly "loaning" those funds to cover the invoices.

93.     The promissory notes in connection with such financing were likewise illusory and usurious.  For example, in connection with such financing, Urban Air required franchisees to pay an additional one and half percent (1.5%) royalty on

gross sales (following the grand opening of the location when sales are exceedingly strong) in order to obtain the alleged benefit of the financing which, as stated, should never have been required in the first instance if the cost for the construction and installation of attractions were not marked up as was represented and promised.

94.    When questioned about the usurious fees charged in connection with the sham promissory notes, Stephen Polozola, Urban Air's EVP/General Counsel, often flippantly told franchisees "Our money is not cheap."

95.    Urban Air would "finance" these amounts even though the FDD expressly disclosed in Item 10 that "Neither [Urban Air] nor any of [Urban Air's] affiliates offer direct or indirect financing."

96.    Notably, Leap of Faith was terminated as a mandatory vendor because, upon information and belief, among other things, it refused to increase the amount of rebates payable to Urban Air in connection with franchise construction and installation projects.

97.    Another example involves Urban Air's mandatory vendor for insurance.  Urban Air mandated an insurance broker who took advantage of the mandatory vendor relationship by devising a vast scheme and artifice to defraud by which the insurance broker failed to properly counsel and advise Urban Air franchisees in connection with the procurement of various insurance coverages, overcharged Urban Air franchisees and then financed the inflated premiums it

procured with an entity the insurance broker owned and controlled, which relationship between the insurance brokerage company and the premium finance company was concealed and never disclosed to Urban Air franchisees.

98.    The insurance broker held itself out as an industry expert possessing specialized knowledge and expertise to assist adventure park owners, including Urban Air franchisees.

99.    In designating the insurance broker as the mandatory and only approved vendor for insurance solutions, Urban Air forced its franchisees to rely on the insurance broker as an expert in providing insurance solutions, assistance, advice, counsel and guidance.

100.    Urban Air franchisees relied on and trusted the insurance broker to provide guidance, counsel and advice, to act in their best interests in procuring insurance coverages, and not to mislead them.

101.    Urban Air franchisees relied on and trusted the insurance broker to advocate for them in connection with the procurement of insurance coverages and to use its specialized knowledge to procure the best possible insurance coverages at the best price.

102.    However, the insurance broker lacked the specialized knowledge it proclaimed to possess and intentionally engaged in a scheme to: (1) overcharge Urban Air franchisees; and (2) "double dip" by virtue of the fact that the insurance

broker's affiliate financed the very premiums which the insurance broker caused to be inflated, which relationship was concealed.

103.    Urban Air franchisees have identified various mistakes, errors and omissions in connection with mandatory insurance broker's procurement of various insurance coverages.

104.    As a result, Urban Air franchisees have made numerous, reasonable requests to use alternative vendors for insurance – which insurance coverages are specifically detailed and mandated in the franchise agreement.

105.    However, Urban Air has unreasonably rejected the use of various alternative insurance vendors in bad faith.  Urban Air's position in this regard is wholly unreasonable and unjustified.  Such a mandate is akin to mandating the purchase of a specific make, model and specification of a vehicle but refusing to allow the franchisee to purchase the vehicle meeting those make, model and specification requirements from an automobile dealer of the franchisee's own choosing.

106.    In the face of the Covid-19 pandemic, Urban Air has even gone so far as to initiate a litigation matter for tortious interference against an insurance broker who worked with several Urban Air franchisees to procure alternative, superior property and workers' compensation insurance at a lower cost claiming in that case that the broker was not an approved vendor.

107.    However, Urban Air's claims have been asserted in bad faith, further demonstrate that Urban Air is not actually interested in its franchisees' profitability and runs directly afoul of Urban Air's December 18, 2019 systemwide announcement to the entire franchise system that "Franchisees are free to shop all other insurance through the broker of their choice, assuming such policies contain the various terms and endorsements required by Urban Air."

108.    There is no sound business justification or rationale for refusing to allow a franchisee to procure the insurance specifically proscribed in the Franchise Agreement from a broker of its own choosing, particularly where superior coverage can be procured at a lower cost.

109.    Likewise, Urban Air recently announced its intention to implement a "captive" insurance program, which will provide Urban Air with a substantial windfall and millions of dollars of additional revenues at the expense of Urban Air franchisees.

110.    Urban Air is touting the "captive" insurance program as a significant benefit to Urban Air franchisees; however, it is Urban Air itself that stands to benefit from the "captive" insurance program, not Urban Air franchisees as the cost of insurance will not materially decrease, if it will decrease at all.  Likewise, such a program runs afoul of various disclosures in the FDD.

111.   The "captive" insurance program is not really a "captive" at all. Instead, Urban Air is merely creating its own insurance company and it is actually a carefully designed wealth transfer scheme to further profit from Urban Air franchisees to the tune of millions and millions of dollars.

112.   Upon information and belief, the insurance company being formed by Urban Air is not licensed in every state in which a franchise is located and does not possess an A.M. Best rating of not less than A-VII.  Consequently, upon information and belief, it does not meet the requirements for acceptable insurance carriers as set forth by Urban Air in its own Franchise Agreement.

113.   Urban Air has repeatedly boasted about the availability of "good driver" benefits under the program for franchisees who participate.  When pressed, Urban Air disclosed that the "good driver" benefit would only amount to approximately $1,000 per year to the franchisee compared to the millions of dollars that Urban Air would make under the new insurance program.

114.   Vendors and suppliers have advised franchisees that Urban Air is repeatedly mandating that such vendors and suppliers pay significant fees, payments, revenues and rebates to Urban Air in order to continue to be recognized as a mandatory vendor and supplier to Urban Air franchisees.

115.    Vendors and suppliers have advised franchisees that franchisee costs for goods, products, services, supplies and equipment could be lower if Urban Air did not mandate payment of fees, payments, revenues and rebates to Urban Air

116.    Since June 2019, the APFA has repeatedly attempted to engage with Urban Air management and Urban Air's equity stakeholders in a dialogue to address the significant and substantial issues, concerns and challenges facing Urban Air franchisees, which requests for such dialogue have been repeatedly rejected by Urban Air.

117.    The franchisee concerns include but are not limited to the following:

a. Memberships – issues with pricing, data, program details, the funding of the development of the membership program (which, as noted, the fees and costs associated with the development of the membership program were unilaterally implemented and charged to franchisees in violation of the Franchise Agreement).

b. Marketing – Urban Air's mandatory implementation of an alleged new marketing "vendor" and the imposition of additional fees associated with same, which fees were neither disclosed in the FDD or agreed upon in the franchise agreements.

c. Return on Investment/Profitability Issues and challenges facing Urban Air franchisees.

28

d. Above-market pricing on various goods, products, supplies and equipment.

e. Franchisor's receipt of substantial rebates to its own benefit and the substantial detriment of Urban Air franchisees demonstrating that Urban Air is not negotiating vendor and supplier arrangements for the benefit of franchisees.

f. Unavailability of replacement parts - attractions are down in virtually every park leading to negative social media reviews and demands for refunds; some parks have had parts on order for two (2) years.

g. Delays, construction costs, cost overruns - despite having built over 100 parks, such issues are still being experienced by franchisees on every project and Urban Air has failed to solve these challenges and problems.

h. Terms of current franchise agreements. Urban Air has materially modified and changed the terms of the Urban Air franchise agreement. The agreement now contains broad, unfair and aggressive repurchase rights, broad reservations of rights to compete within protected territories, and higher and additional fees, among other problematic provisions. Such terms and issues

greatly impact resale value and marketability of existing locations.

i.  Lack of transparency in connection with Urban Air's fees, royalty statements and reports. Franchisees are unable to decipher the amounts charged by Urban Air and requests for clarifications and explanations are often ignored.

j.  Insurance – overpriced insurance premiums and various issues with Urban Air's mandatory insurance vendor's procurement of insurance coverages for franchisees and that vendor's wrongful financing of those premiums through their affiliate, which relationship between the vendor and the finance company was concealed and not disclosed to franchisees.

k.  "Captive" Insurance Program – the "captive" insurance program is not a true "captive" insurance program but rather is a carefully tailored wealth transfer scheme designed to further line Urban Air's pockets with millions of dollars of revenue at the expense of the franchisees. The "captive" program does not offer any financial savings or additional benefits to the current insurance program in place.

l.  Cannibalization – Urban Air continues to sell areas and approve sites in very close proximity to existing locations without performing sufficient due diligence, analysis and examination of critical market demographics to determine if the locations are too close together which greatly impacts the success and profitability of both locations.

118.  Despite repeated requests, Urban Air management and its equity stakeholders have failed and refused to address the significant challenges, issues and concerns of the APFA and continue to implement changes and modifications to the Urban Air franchise system in bad faith and in violation of the Franchise Agreement, and which in the aggregate, unfairly and materially change the system for franchisees.

119.  Urban Air's extensive, unilateral and unfair implementation of mandatory, material and wholesale changes to the Urban Air system and business model have served to drastically change the nature of the business and the contractual relationship between the parties and further have served to render the franchise agreements illusory.

120.  The imposition of fees, charges and costs associated with Urban Air's Membership Program and Zimmerman, among other things, were not properly disclosed to Urban Air franchisees, run afoul of Urban Air's contractual rights under

the franchise agreement, violate the FTC's Amended Franchise Rule and constitute a clear violation of the express regulations and disclosure requirements governing franchisors that have been promulgated by the FTC.

121.    Likewise, Urban Air's egregious collection of fees, payments, revenues and rebates and failure to negotiate purchase arrangements with mandatory vendors and suppliers for the benefit of Urban Air franchisees runs directly counter to Urban Air's disclosures in the Urban Air FDD and Urban Air's contractual obligations under the franchise agreement, violate the FTC's Amended Franchise Rule and constitute a clear violation of the express regulations and disclosure requirements governing franchisors that have been promulgated by the FTC.

122.    Over the years, Urban Air has also engaged in a pattern and practice of aggressive communications, retaliatory conduct, bullying tactics and non-responsiveness to franchisees who have challenged, criticized or taken issue with Urban Air's mandates, programs and initiatives.

123.    Such action by Urban Air has been intended to send a message to all of the Urban Air franchisees, muzzle franchisee communications and interfere with them from associating with one another.

124.    On January 9, 2020, one franchisee posted a message on the Urban Air franchisee Facebook group page concerning Urban Air's new contemplated marketing program and fees discussed above.

125.    Urban Air immediately removed the Facebook message which was critical about the marketing program and which contradicted specific representations that Browning had made previously that franchisees were not required to spend in excess of $7,000 per month on local marketing.

126.    Urban Air also immediately proceeded to revoke and terminate that franchisee's access to the Urban Air franchisee Facebook group page in direct violation of laws prohibiting franchisees from associating with one another and the concept of good faith.

127.    On January 13, 2020, *four days later*, in further retaliation for the franchisee's comments on the Urban Air franchisee Facebook group page, Urban Air initiated a lawsuit against the franchisee seeking to terminate his franchise agreement claiming that the franchisee owed "unpaid" royalties, which claims for non-payment of fees were manufactured, baseless, unfounded and in bad faith.

128.    Contrary to Urban Air's claims, at that time, *the franchisee was actually owed money by Urban Air* in the form of Membership Program revenues, which Urban Air was wrongfully withholding.

129.    Subsequent to the filing of that lawsuit seeking declaratory judgment that Urban Air was authorized to terminate that franchisee's franchise agreement based on the alleged non-payment, on February 6, 2020, Urban Air issued an improper and unlawful Notice of Termination of the franchisee's franchise

agreement.

130.    Urban Air's pattern and practice of bad faith, retaliatory and bullying tactics are designed to put all Urban Air franchisees on notice not to challenge, disagree with or speak out against Urban Air's programs or initiatives or they will face significant consequences for such actions, including termination of their franchise agreement and litigation.

## COUNT I – DECLARATORY JUDGMENT

131.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs of this Complaint with the same force and effect as though fully set forth at length.

132.    The Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, grants the Court, in cases of actual controversy such as this one, the power to issue judgments declaring the rights and other legal relations of any interested party, whether or not further relief is or could be sought.

133.    Certain disputes have arisen between the APFA, on behalf of its members and Urban Air franchisees, on the one hand, and Urban Air, on the other, arising out of and relating the franchise agreement between Urban Air and its franchisees.

134.    These disputes include:

    a.  Whether Urban Air may, without franchisee consent, unilaterally

amend the franchise agreements and require the payment of the "Membership Program Fee" of 2.5% to Urban Air.

b.  Whether Urban Air may, without franchisee consent, unilaterally amend the franchise agreements and require the payment of the "NAF Fee" of 5% to Urban Air.

c.  Whether Urban Air may, without the franchisees consent, unilaterally amend the franchise agreements and require the payment of the fees and costs for the development and implementation of the Urban Air Membership Program.

d.  Whether Urban Air's implementation of the Membership Program and associated fees is permitted under Urban Air's franchise agreement.

e.  Whether the "Amendment to Franchise Agreement (Membership Program)" was procured fraudulently and under false pretenses and is therefore unenforceable.

f.  Whether the "Amendment to Franchise Agreement (Membership Program) is unenforceable for lack of consideration.

g.  Whether Urban Air may require franchisees to execute new ACH Authorizations which are inconsistent with terms and provisions of the franchise agreement and impose obligations which are

greater than those agreed upon in the franchise agreement and whether such authorizations which have been previously signed are unenforceable and in violation of the terms of the franchise agreement.

h. Whether Urban Air may, without the franchisees consent, unilaterally amend the franchise agreements and require the payment of four percent (4%) of monthly Gross Sales directly to Urban Air for local store marketing services provided by Zimmerman.

i. Whether Urban Air has negotiated purchase agreements "for the benefit of franchisees."

j. Whether Urban Air through its various actions, as fully detailed herein, abused its authority under the franchise agreements, failed to exercise such authority in good faith and in a commercially reasonable manner, and has dealt with Urban Air franchisees in bad faith, in an unfair manner and in contravention of the intention and spirit of the franchise agreements.

k. Whether Urban Air may unilaterally implement a "captive" insurance program which is, in actuality, not a "captive" insurance program based on the disclosures set forth in the

Franchise Disclosure Document and the Franchise Agreement.

l.  Whether the insurance company that Urban Air is establishing meets the minimum requirements of an acceptable insurance carrier as set forth in the Franchise Disclosure Document and the Franchise Agreement.

m.  Whether Urban Air may mandate vendors for insurance and whether Urban Air is unreasonably withholding approval of alternative insurance brokers that are industry experts who can arrange for more comprehensive coverages at lower cost.

n.  Whether Urban Air's implementation of undisclosed fees violates the registration and disclosure regulations of the FTC thereby constituting a violation of the Texas Deceptive Trade Practices and Consumer Protection Act ("DTPCPA"), Texas Bus. & Comm. Code § 17.41, et. seq., which prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce, entitling APFA to injunctive and declaratory relief pursuant to the DTPCPA.

o. Whether, as to New Jersey franchisee members of the APFA, Urban Air's conduct as detailed herein constitutes violations of the violate the New Jersey Franchise Practices Act, N.J.S.A. §56:10-1 *et seq.*

135.    Urban Air has already implemented, effectuated and/or evidenced its intent to take additional and continued actions in furtherance of the drastic, material system-wide changes detailed above.

136.    Therefore, an actual controversy has arisen and now exists between the APFA, on the one hand, and Urban Air, on the other, concerning the rights of Urban Air franchisees under the express terms of their franchise agreements, and Urban Air's right, if any, to take the actions, engage in the conduct and implement the changes detailed herein.

137.    Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, the APFA accordingly desires a judicial determination declaring that:

a. Urban Air may not, without franchisee consent, unilaterally amend the franchise agreements and require the payment of the "Membership Program Fee" of 2.5% to Urban Air.

b. Urban Air may not, without franchisee consent, unilaterally amend the franchise agreements and require the payment of the "NAF Fee" of 5% to Urban Air.

c.  Urban Air may not, without the franchisees consent, unilaterally amend the franchise agreements and require the payment of the fees and costs for the development and implementation of the Urban Air Membership Program.

d.  Urban Air's implementation of the Membership Program and associated fees is not permitted under Urban Air's franchise agreement.

e.  The "Amendment to Franchise Agreement (Membership Program)" was procured fraudulently and under false pretenses and is therefore unenforceable.

f.  The "Amendment to Franchise Agreement (Membership Program) is unenforceable for lack of consideration.

g.  Urban Air may not require franchisees to execute new ACH Authorizations which are inconsistent with terms and provisions of the franchise agreement and that impose obligations which are greater than those agreed upon in the franchise agreement and declare that such authorizations which have been previously signed are unenforceable and in violation of the terms of the franchise agreement.

h.  Urban Air may not, without the franchisees consent, unilaterally amend the franchise agreements and require the payment of four percent (4%) of monthly Gross Sales directly to Urban Air for local store marketing services provided by Zimmerman.

i.  Urban Air has not negotiated purchase agreements "for the benefit of franchisees" by virtue of the substantial fees, payments, rebates and revenues it has derived and continues to derive based on franchise purchases from mandatory vendors and suppliers.

j.  Urban Air through its various actions, as fully detailed herein, abused its authority under the franchise agreements, failed to exercise such authority in good faith and in a commercially reasonable manner, and has dealt with Urban Air franchisees in bad faith, in an unfair manner and in contravention of the intention and spirit of the franchise agreements.

k.  Urban Air may not unilaterally implement a "captive" insurance program which is, in actuality, not a "captive" insurance program based on the disclosures set forth in the Franchise Disclosure Document and the Franchise Agreement.

l.  The insurance company that Urban Air is establishing does not meets the minimum requirements of an acceptable insurance carrier based on the applicable terms and provisions of the Franchise Disclosure Document and the Franchise Agreement.

m.  Urban Air may not mandate vendors for insurance and that Urban Air is unreasonably withholding approval of alternative insurance brokers that are industry experts who can arrange for more comprehensive coverages at lower cost.

n.  Urban Air's implementation of undisclosed fees constitutes a violation of the registration and disclosure regulations of the FTC thereby constituting a violation of the Texas Deceptive Trade Practices and Consumer Protection Act ("DTPCPA"), Texas Bus. & Comm. Code § 17.41, et. seq., which prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce, entitling APFA to injunctive and declaratory relief pursuant to the DTPCPA.

o.  As to New Jersey franchisee members of the APFA, Urban Air's conduct as detailed herein constitutes violations of the violate the New Jersey Franchise Practices Act, N.J.S.A. §56:10-1 *et seq.*

138.    There is a justiciable controversy between Urban Air and the APFA as to the issues detailed herein.

139.    A judicial declaration is necessary and appropriate at this time under the circumstances so that the parties to this action may ascertain their rights and duties under the franchise agreements.

140.    Given Urban Air's announcements, communications and actions concerning the changes and modifications detailed above, the facts have sufficiently crystallized to permit an intelligent and useful decision to be made, and the issues are fit for a judicial determination.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff APFA respectfully prays for the following relief against Respondents:

1.    For a judicial declaration that:

   a.    Urban Air may not, without franchisee consent, unilaterally amend the franchise agreements and require the payment of the "Membership Program Fee" of 2.5% to Urban Air.

   b.    Urban Air may not, without franchisee consent, unilaterally amend the franchise agreements and require the payment of the "NAF Fee" of 5% to Urban Air.

42

c. Urban Air may not, without the franchisees consent, unilaterally amend the franchise agreements and require the payment of the fees and costs for the development and implementation of the Urban Air Membership Program.

d. Urban Air's implementation of the Membership Program and associated fees is not permitted under Urban Air's franchise agreement.

e. The "Amendment to Franchise Agreement (Membership Program)" was procured fraudulently and under false pretenses and is therefore unenforceable.

f. The "Amendment to Franchise Agreement (Membership Program) is unenforceable for lack of consideration.

g. Urban Air may not require franchisees to execute new ACH Authorizations which are inconsistent with terms and provisions of the franchise agreement and that impose obligations which are greater than those agreed upon in the franchise agreement and declare that such authorizations which have been previously signed are unenforceable and in violation of the terms of the franchise agreement.

h.  Urban Air may not, without the franchisees consent, unilaterally amend the franchise agreements and require the payment of four percent (4%) of monthly Gross Sales directly to Urban Air for local store marketing services provided by Zimmerman.

i.  Urban Air has not negotiated purchase agreements "for the benefit of franchisees" by virtue of the substantial fees, payments, rebates and revenues it has derived and continues to derive based on franchise purchases from mandatory vendors and suppliers.

j.  Urban Air through its various actions, as fully detailed herein, abused its authority under the franchise agreements, failed to exercise such authority in good faith and in a commercially reasonable manner, and has dealt with Urban Air franchisees in bad faith, in an unfair manner and in contravention of the intention and spirit of the franchise agreements.

k.  Urban Air may not unilaterally implement a "captive" insurance program which is, in actuality, not a "captive" insurance program based on the disclosures set forth in the Franchise Disclosure Document and the Franchise Agreement.

l.  The insurance company that Urban Air is establishing does not meets the minimum requirements of an acceptable insurance carrier based on the applicable terms and provisions of the Franchise Disclosure Document and the Franchise Agreement.

m.  Urban Air may not mandate vendors for insurance and that Urban Air is unreasonably withholding approval of alternative insurance brokers that are industry experts who can arrange for more comprehensive coverages at lower cost.

n.  Urban Air's implementation of undisclosed fees constitutes a violation of the registration and disclosure regulations of the FTC thereby constituting a violation of the Texas Deceptive Trade Practices and Consumer Protection Act ("DTPCPA"), Texas Bus. & Comm. Code § 17.41, et. seq., which prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce, entitling APFA to injunctive and declaratory relief pursuant to the DTPCPA.

o.  As to New Jersey franchisee members of the APFA, Urban Air's conduct as detailed herein constitutes violations of the violate the New Jersey Franchise Practices Act, N.J.S.A. §56:10-1 *et seq*.

2.    An award of costs and expenses, including reasonable attorneys' fees, incurred by Plaintiff in connection with this action; and

3.    For such other and further relief as the Court deems just and proper.

Dated: April 23, 2020

Respectfully Submitted,

**MARKS & KLEIN, LLP**
Attorneys for Plaintiff


*s/ Brent M. Davis*

Justin M. Klein
Brent M. Davis
63 Riverside Avenue
Red Bank, N.J. 07701
Tel: (732) 747-7100
Fax: (732) 219-0625
justin@marksklein.com
brent@marksklein.com

Andrew P. Bleiman (to be admitted *pro hac vice*)
Mark I. Fishbein (to be admitted *pro hac vice*)
1363 Shermer Road, Suite 318
Northbrook, Illinois 60062
Tel: (312) 206-5162
Fax: (732) 219-0625
andrew@marksklein.com
mark@marksklein.com

EXHIBIT A

# FRANCHISE DISCLOSURE DOCUMENT



UATP MANAGEMENT, LLC
317 S. Jenkins, Suite C
Grapevine, Texas 76051
Telephone: (800) 908-1383
michael@urbanairtrampolinepark.com
www.urbanairtrampolinepark.com

The franchisee will operate an indoor trampoline and adventure parks featuring wall-to-wall trampolines, foam pits, and related activities under the name URBAN AIR TRAMPOLINE PARK®.

The total investment necessary to begin operation of a URBAN AIR TRAMPOLINE PARK® franchised business ranges from $1,152,000 to $1,609,500. This includes a franchise fee of $30,000 that must be paid to franchisor and affiliate.

This disclosure document summarizes certain provisions of your franchise agreement and other information in plain English. Read this disclosure document and all accompanying agreements carefully. You must receive this disclosure document at least 14 calendar days before you sign a binding agreement with, or make any payment to, the franchisor or an affiliate in connection with the proposed franchise sale. **Note, however, that no governmental agency has verified the information contained in this document.**

You may wish to receive your disclosure document in another format that is more convenient for you. To discuss the availability of disclosures in different formats, contact Alix Wren, Vice President Franchise Sales, at 317 S. Jenkins, Suite C, Grapevine, Texas 76051, (972) 965-7327.

The terms of your contract will govern your franchise relationship. Don't rely on the disclosure document alone to understand your contract. Read your entire contract carefully. Show your contract and this disclosure document to an advisor, like a lawyer or an accountant.

Buying a franchise is a complex investment. The information in this disclosure document can help you make up your mind. More information on franchising, such as *"A Consumer's Guide to Buying a Franchise,"* which can help you understand how to use this disclosure document, is available from the Federal Trade Commission. You can contact the FTC at 1-877-FTC-HELP or by writing to the FTC at 600 Pennsylvania Avenue, NW, Washington, D.C. 20580. You can also visit the FTC's home page at *www.ftc.gov* for additional information. Call your state agency or visit your public library for other sources of information on franchising.

There may also be laws on franchising in your state. Ask your state agencies about them.

Issuance Date: April 5, 2016, as amended July 29, 2016.

## STATE COVER PAGE

Your state may have a franchise law that requires a franchisor to register or file with a state franchise administrator before offering or selling in your state. REGISTRATION OF A FRANCHISE BY A STATE DOES NOT MEAN THAT THE STATE RECOMMENDS THE FRANCHISE OR HAS VERIFIED THE INFORMATION IN THIS DISCLOSURE DOCUMENT.

Call the state franchise administrator listed in Exhibit B for information about the franchisor, or about franchising in your state.

MANY FRANCHISE AGREEMENTS DO NOT ALLOW YOU TO RENEW UNCONDITIONALLY AFTER THE INITIAL TERM EXPIRES. YOU MAY HAVE TO SIGN A NEW AGREEMENT WITH DIFFERENT TERMS AND CONDITIONS IN ORDER TO CONTINUE TO OPERATE YOUR BUSINESS. BEFORE YOU BUY, CONSIDER WHAT RIGHTS YOU HAVE TO RENEW YOUR FRANCHISE, IF ANY, AND WHAT TERMS YOU MIGHT HAVE TO ACCEPT IN ORDER TO RENEW.

Please consider the following RISK FACTORS before you buy this franchise:

1. THE FRANCHISE AGREEMENT REQUIRES YOU TO RESOLVE DISPUTES WITH US BY LITIGATION ONLY IN TEXAS. OUT-OF-STATE LITIGATION MAY FORCE YOU TO ACCEPT A LESS FAVORABLE SETTLEMENT FOR DISPUTES. IT MAY ALSO COST YOU MORE TO LITIGATE WITH US IN TEXAS THAN IN YOUR OWN STATE.

2. THE FRANCHISE AGREEMENT STATES THAT TEXAS LAW GOVERNS THE AGREEMENT, AND THIS LAW MAY NOT PROVIDE THE SAME PROTECTIONS AND BENEFITS AS LOCAL LAW. YOU MAY WANT TO COMPARE THESE LAWS.

3. YOUR SPOUSE MUST SIGN A DOCUMENT THAT MAKES YOUR SPOUSE LIABLE FOR YOUR FINANCIAL OBLIGATIONS UNDER THE FRANCHISE AGREEMENT, EVEN THOUGH YOUR SPOUSE HAS NO OWNERSHIP INTEREST IN THE BUSINESS. THIS GUARANTEE WILL PLACE BOTH YOUR AND YOUR SPOUSE'S MARITAL AND PERSONAL ASSETS, PERHAPS INCLUDING YOUR HOUSE, AT RISK IF YOUR FRANCHISE FAILS.

4. THERE MAY BE OTHER RISKS CONCERNING THIS FRANCHISE.

Effective Date:  See State Effective Dates Page

**STATE EFFECTIVE DATES**

The following states require that the disclosure document be registered or filed with the state or be exempt from registration: California, Hawaii, Illinois, Indiana, Maryland, Michigan, Minnesota, New York, North Dakota, Rhode Island, South Dakota, Virginia, Washington and Wisconsin.

This disclosure document is registered, on file, or exempt from registration in the following states having franchise registration and disclosure laws, with the following effective dates:

| State | Effective Date |
|---|---|
| Illinois | July 8, 2016 |
| Indiana | April 14, 2016 |
| Maryland | July 15, 2016 |
| Michigan | April 5, 2016 |

In all other states, the effective date of this disclosure document is the issuance date of April 5, 2016, as amended July 29, 2016.

## MICHIGAN NOTICE

**THE STATE OF MICHIGAN PROHIBITS CERTAIN UNFAIR PROVISIONS THAT ARE SOMETIMES IN FRANCHISE DOCUMENTS. IF ANY OF THE FOLLOWING PROVISIONS ARE IN THESE FRANCHISE DOCUMENTS, THE PROVISIONS ARE VOID AND CANNOT BE ENFORCED AGAINST YOU:**

(a)     A prohibition on the right of a franchisee to join an association of franchisees.

(b)     A requirement that a franchisee assent to a release, assignment, novation, waiver, or estoppel that deprives a franchisee of rights and protections provided in this act. This shall not preclude a franchisee, after entering into a franchise agreement, from settling any and all claims.

(c)     A provision that permits a franchisor to terminate a franchise before the expiration of its term except for good cause. Good cause shall include the failure of the franchisee to comply with any lawful provision of the franchise agreement and to cure such failure after being given written notice thereof and a reasonable opportunity that in no event need be more than 30 days, to cure such failure.

(d)     A provision that permits a franchisor to refuse to renew a franchise without fairly compensating the franchisee by repurchase or other means for the fair market value at the time of expiration of the franchisee's inventory, supplies, equipment, fixtures, and furnishings. Personalized materials that have no value to the franchisor and inventory, supplies equipment, fixtures, and furnishings not reasonably required in the conduct of the franchise business are not subject to compensation. This subsection applies only if: (i) The term of the franchise is less than 5 years and (ii) the franchisee is prohibited by the franchise or other agreement from continuing to conduct substantially the same business under another trademark, service mark, trade name, logotype, advertising, or other commercial symbol in the same area after to the expiration of the franchise or the franchisee does not receive at least 6 months advance notice of franchisor's intent not to renew the franchise.

(e)     A provision that permits the franchisor to refuse to renew a franchise on terms generally available to other franchisees of the same class or type under similar circumstances. This section does not require a renewal provision.

(f)     A provision requiring that arbitration or litigation be conducted outside this state. This shall not preclude the franchisee from entering into an agreement, at the time of arbitration, to conduct arbitration at a location outside this state.

(g)     A provision that permits a franchisor to refuse to permit a transfer of ownership of a franchise, except for good cause. This subdivision does not prevent a franchisor from exercising a right of first refusal to purchase the franchise. Good cause shall include, but is not limited to:

    (i)     The failure of the proposed transferee to meet the franchisor's then current reasonable qualifications or standards.

    (ii)     The fact that the proposed transferee is a competitor of the franchisor or subfranchisor.

    (iii)     The unwillingness of the proposed transferee to agree in writing to comply with all lawful obligations.

    (iv)     The failure of the franchisee or proposed transferee to pay any sums owing to the franchisor or to cure any default in the franchise agreement existing at the time of the proposed transfer.

(h)     A provision that requires the franchisee to resell to the franchisor items that are not uniquely identified with the franchisor. This subdivision does not prohibit a provision that grants to

franchisor a right of first refusal to purchase the assets of a franchise on the same terms and conditions as a bona fide third party willing and able to purchase those assets, nor does this subdivision prohibit a provision that grants the franchisor the right to acquire the assets of a franchise for the market or appraised value of such assets if the franchisee has breached the lawful provisions of the franchise agreement and has failed to cure the breach in the manner provided in subdivision (c).

(i)    A provision that permits the franchisor to directly or indirectly convey, assign, or otherwise transfer its obligations to fulfill contractual obligations to the Franchisee unless provision has been made for providing the required contractual services.

**THE FACT THAT THERE IS A NOTICE OF THIS OFFERING ON FILE WITH THE ATTORNEY GENERAL DOES NOT CONSTITUTE APPROVAL, RECOMMENDATION, OR ENDORSEMENT BY THE ATTORNEY GENERAL.**

Any questions regarding this notice should be directed to: Michigan Department of Attorney General, Consumer Protection Division, Franchise Unit, 525 W. Ottawa Street, G. Mennen Williams building, 1st Floor, Lansing, Michigan 48913 (517) 373-7117.

# FRANCHISE DISCLOSURE DOCUMENT
## TABLE OF CONTENTS

**ITEM**                                                                                    **PAGE**

ITEM 1    THE FRANCHISOR AND ANY PARENTS, PREDECESSORS AND AFFILIATES ........ 1
ITEM 2    BUSINESS EXPERIENCE ................................................................................................ 2
ITEM 3    LITIGATION ...................................................................................................................... 3
ITEM 4    BANKRUPTCY .................................................................................................................. 3
ITEM 5    INITIAL FEES ................................................................................................................... 3
ITEM 6    OTHER FEES ...................................................................................................................... 4
ITEM 7    ESTIMATED INITIAL INVESTMENT ........................................................................... 8
ITEM 8    RESTRICTIONS ON SOURCES OF PRODUCTS AND SERVICES .............................. 11
ITEM 9    FRANCHISEE'S OBLIGATIONS ...................................................................................... 13
ITEM 10   FINANCING ........................................................................................................................ 14
ITEM 11   FRANCHISOR'S ASSISTANCE, ADVERTISING, COMPUTER SYSTEMS, AND
          TRAINING ........................................................................................................................... 15
ITEM 12   TERRITORY ....................................................................................................................... 21
ITEM 13   TRADEMARKS ................................................................................................................... 23
ITEM 14   PATENTS, COPYRIGHTS AND PROPRIETARY INFORMATION ............................... 24
ITEM 15   OBLIGATION TO PARTICIPATE IN THE ACTUAL OPERATION OF THE
          FRANCHISE BUSINESS ..................................................................................................... 25
ITEM 16   RESTRICTIONS ON WHAT THE FRANCHISEE MAY SELL ...................................... 25
ITEM 17    RENEWAL, TERMINATION, TRANSFER AND DISPUTE RESOLUTION THE
          FRANCHISE RELATIONSHIP ........................................................................................... 27
ITEM 18   PUBLIC FIGURES .............................................................................................................. 30
ITEM 19   FINANCIAL PERFORMANCE REPRESENTATIONS ..................................................... 30
ITEM 20   OUTLETS AND FRANCHISEE INFORMATION ............................................................ 30
ITEM 21   FINANCIAL STATEMENTS .............................................................................................. 34
ITEM 22   CONTRACTS ....................................................................................................................... 35
ITEM 23   RECEIPT .............................................................................................................................. 35

**STATE SPECIFIC APPENDIX**

**EXHIBITS**

A       Operations Manual Table of Contents
B       List of State Administrators
C       List of Agents for Service of Process
D-1     Site Selection Agreement
D-2     Franchise Agreement
E       Financial Statements
F       List of Franchisee Locations and Affiliate-Owned Locations
G       Franchise Disclosure Questionnaire
H       General Release (Sample form only)
I       Receipt

## ITEM 1
## THE FRANCHISOR AND ANY PARENTS, PREDECESSORS AND AFFILIATES

To simplify the language in this disclosure document, the terms "we" or "us" or "our" mean UATP MANAGEMENT, LLC, the franchisor.  The terms "you" and "your" mean the individual, company, corporation, or partnership who buys the franchise, the franchisee. If the franchisee will operate through a corporation or other business entity, "you" does not include the business entity's owners unless otherwise stated. The business that is operated under the franchise agreement is referred to as the "franchise" or the "Franchised Business" and the right to operate granted by the franchise agreement is sometimes referred to as the "license" or "franchise."

### The Franchisor and any Parents, Predecessors and Affiliates

We are a Texas limited liability company, formed on May 31, 2013, and do business only under our corporate name, UATP Management, LLC. Our principal business address is 317 Jenkins, Suite C, Grapevine, Texas 76051.  Our agents for service of process are identified in Exhibit C to this disclosure document.  We have no predecessors or parent companies.

We grant single-unit and multi-unit franchises for the operation of an indoor trampoline park featuring wall-to-wall trampolines, foam pits, and related activities under the name URBAN AIR TRAMPOLINE PARK® ("Brand").  We call this the "Franchised Business."  We have never offered franchises in any other line of business.

We have operated similar businesses in Texas since 2011.

Our affiliate, UATP IP, LLC, a Texas limited liability company, ("UAIP"), owns all the trademarks, copyrights, and proprietary information and products related to the operation of URBAN AIR TRAMPOLINE PARK® Franchised Businesses, and has granted us the exclusive license to offer and sell URBAN AIR TRAMPOLINE PARK® franchises.  None of our affiliates have ever offered franchises in any line of business and, as of the date of these disclosures, none currently provides products or services to our franchisees.

### The Franchise Offered

You will operate your Franchised Business according to the terms and conditions of our standard franchise agreement ("Franchise Agreement," see Exhibit D-2 to this disclosure document) and our operational standards, specifications, policies, and procedures, which we will communicate to you through our confidential operations manual and other written directives (collectively, our "Manual").  As a franchisee, you will have the right to use our proprietary business format and system ("System") and to do business under our trademarks and service marks ("Marks").

Our System includes distinctive interior and exterior design, décor, color scheme, graphics, fixtures, and furnishings ("Indicia"); our proprietary products, merchandise, and offerings which incorporate our trade secrets and proprietary information ("Proprietary Products"); our operation and customer service standards and procedures, our advertising and marketing specifications and requirements, and our other standards, specifications, techniques, and procedures which we designate from time to time for developing, operating, and managing a URBAN AIR TRAMPOLINE PARK® Franchised Business ("Standards"); all of which we may change, improve, and additionally develop from time to time.  A typical URBAN AIR TRAMPOLINE PARK® Franchised Business will have 25,000 square feet of commercial space in a street front space.

In most cases, you will first sign a Site Selection Agreement (see <u>Exhibit D-1</u> to this disclosure document) before you sign the Franchise Agreement to help in identifying a proper site for your Franchised Business. The Site Selection fee is $500. If you request, and if we grant you, the right to develop multiple URBAN AIR TRAMPOLINE PARK® Franchised Businesses, you will sign a standard Franchise Agreement for each Franchised Business and you will pay us the initial franchise fee of $30,000. We reserve the right to limit the number of Franchised Businesses to be developed based on our sole discretion in evaluating the geographical territory in which you desire to operate your Franchised Businesses.

### <u>Market and Competition</u>

The market for indoor trampoline parks is quickly developing and has become highly competitive. We are a part of the amusement, recreation and entertainment industry. Your Franchised Business will compete with other trampoline and family fun businesses. Recreational activities are subject to changes in local, regional or national economic conditions, changes in consumer spending, and increases in the number of, and location of competing industries. Various factors can adversely affect the trampoline park industry, including increases in labor and energy costs, availability and cost of suitable sites, fluctuating insurance and interest rates, local, state and federal regulations and licensing requirements, and the availability of an adequate number of hourly-paid employees.

### <u>Industry Specific Regulations</u>

Among the licenses and permits you may be required to obtain are, without limitation: zoning or land use approvals, Sunday sale permits, sales and use tax permits, fire department permits, food establishment permits, health and safety permits, alarm permits, occupational permits, retail sales licenses, and wastewater discharge permits. There may be other laws, rules, and regulations which could affect your Franchised Business.

You are solely responsible for determining the local, state, and federal laws and regulations to which you will be subject, and you must ensure that you operate your Franchised Business in full compliance with all such laws and regulations at all times. These include local laws, rules, and regulations that apply to business generally, such as the federal and state anti-discrimination laws, federal wage and hour laws, National Labor Relations Act, and the Occupational Safety and Health Act. As such, you should consult an attorney and consider all of these laws and regulations when evaluating your purchase of a franchise.

### ITEM 2
### BUSINESS EXPERIENCE

#### <u>Michael Browning, Jr. – Chief Executive Officer</u>

Michael is our co-founder and has served as our Chief Executive Officer since its inception in January 2011.

#### <u>Mike Browning, Sr. – Chief Financial Officer</u>

Mike is one of our co-founders and has served as our Chief Financial Officer since January 2011.

#### <u>Stephen Polozola – Vice President And General Counsel</u>

Stephen is one of the co-founders and has served as our Vice President and General Counsel since January 2011. He is a practicing attorney in good standing and shareholder of Decker Jones, PC in Fort Worth, Texas, where he has practiced since April 2007.

<u>Alix Wren – Vice President Of Franchise Sales</u>

Alix has served as our Special Events Coordinator since January 2014. In addition to her duties as a Special Events Coordinator, Alix is now our Vice President of Franchise Sales as of January 2015. For the period from May 2013 through January 2015, Ms. Wren was engaged in home-based entrepreneurial sales through Stella & Dot in Frisco, Texas.

## ITEM 3
## LITIGATION

There is no litigation required to be disclosed in this Item.

## ITEM 4
## BANKRUPTCY

No bankruptcy information is required to be disclosed in this Item.

## ITEM 5
## INITIAL FEES

In most cases, we and you will sign a Site Selection Agreement to determine a suitable site for the Franchised Business. You must pay us a $500 Site Selection fee when you sign the Site Selection Agreement. We may terminate the Site Selection Agreement anytime during the 120-day term of this agreement, in which case we will refund all of the $500 to you upon termination.

When you sign a Franchise Agreement, you will pay us a $30,000 initial franchise fee.  Except as described in the "Franchise Fee Discounts" section below, the initial franchise fee is uniform for all franchisees.  The initial franchise fee is considered fully earned by us and nonrefundable upon payment.

We may, in our sole discretion, grant you the right to enter into additional franchise agreements. If you request, and if we grant you, the right to develop more than one URBAN AIR TRAMPOLINE PARK® franchise, then, upon signing the Franchise Agreement each additional location, you will pay us an additional franchise fee of $30,000 for each additional URBAN AIR TRAMPOLINE PARK® location we grant you the right to develop.  We reserve the right to limit the number of Franchised Businesses to be developed based on our sole discretion in evaluating the geographical territory in which you desire to operate your Franchised Businesses.  The initial franchise fee for additional locations is also considered fully earned by us and nonrefundable upon payment.

We may offer other reduced or deferred Initial Franchisee Fees in special circumstances, such as to franchisees that commit to and have the ability to develop a large number of parks. And, we may provide exclusivity agreements. Additionally, we may have special incentive officers in certain markets, such as new and developing markets, which include reduced or deferred Initial Franchise Fees. These special incentives may be offered to existing and/or new franchisees. You will be notified by us in advance if any reduced fees are available to you. We reserve the right to cancel or modify any incentive program or discount at any time.

**ITEM 6**
**OTHER FEES**

| Type of Fee[1] | Amount | Due Date | Remarks |
|---|---|---|---|
| Royalty Fee | 6% of Gross Sales | Monthly on the 15th of the month following performance or sale beginning on the established Opening Date | See Note 2 for a definition of "Gross Sales." Payment is made by automatic electronic funds withdrawal. |
| Development Fund | 1% of Gross Sales | Same as above | See Item 11 for information about our right to administer the Development Fund. Payment made by automatic electronic withdrawal. |
| Local Marketing Fee | 5% of Gross Sales | As incurred. | You must expend this amount monthly for local media advertising. It is payable to the person providing the services, which may be us. [3] |
| Grand Opening Marketing | At least $15,000 | See Item 11 | You must expend this amount for advertising the Grand Opening. It is payable to the person providing the services, which may be us. |
| Advertising Cooperative (if established) [4] | Amount determined by majority vote of cooperative | As incurred | We have the right to establish and administer. We may require you to pay by electronic funds transfer. |
| Technology Fee | .25% of Gross Sales | Monthly | We have the right to establish and administer a technology fee. |
| Initial Training | Currently no additional charge for Designated Manager and one additional person | If applicable, before training | You must attend one week of training. We will train 2 persons at our facility. We can charge for additional personnel. |

| Type of Fee[1] | Amount | Due Date | Remarks |
|---|---|---|---|
| Opening Assistance | Reimbursement of our travel, lodging, and dining costs for the trainer(s) who provide opening assistance and, in some cases, our then-current training fee (as published in the Manual) | Upon demand | See Item 11 for more information about our initial training program and training requirements. |
| Additional/Remedial Training | Reimbursement of our travel, lodging, and dining costs for the trainer(s) who provide opening assistance, plus our then-current training fee (as published in the Manual) | Before training | See Item 11 for more information about our initial training program and training requirements. |
| Compliance Review Fee | Actual cost of program | Upon demand | Payable only when we implement a mystery shop, customer satisfaction, or similar program. |
| Alternate Supplier Product Testing Fee | Reimbursement of our product testing | Upon Demand | See Item 8. Payable only if you request to purchase products from an alternative supplier that require testing. |
| Insurance premium | Reimbursement of our cost of the premium plus administrative fee equal to 10% of the annual premium | Upon demand | Payable only if you fail or refuse to maintain required insurance coverage and we procure coverage for you. |
| Franchise Renewal Fee | $3,000 flat fee plus reimbursement of our legal and professional expenses | Submitted with notice of intent to renew | Payable only if you request and we approve a renewal term for your location. |
| Relocation Fee | 25% of our then-current initial franchise fee | Before relocation | Payable only if you request and we approve your relocation. |

| Type of Fee[1] | Amount | Due Date | Remarks |
|---|---|---|---|
| Transfer Fee | 50% of our then-current initial franchise fee, or 25% of our then-current initial franchise fee if transferred to an approved existing franchisee; plus reimbursement of our legal and professional expenses. | Before transfer | Payable before transfer of your franchise. No charge if franchise is transferred to a corporation which you control. |
| Interest/Late Fee | 18% per year or the highest interest rate permitted by the jurisdiction in which the Franchised Businesses located, whichever is less | Upon demand | Payable only if you fail to make payments by the applicable due date. |
| Nonsufficient Funds Fee | $100 per occurrence, not to exceed maximum allowed by applicable law | Upon demand | Payable only if there are insufficient funds in your account to process payment of fees due to us. |
| Audit Costs | Actual cost of audit | 30 days after billing | Payable only if results of audit differ by more than 2% from reported Gross Revenues. |
| Indemnification | An amount equal to the value of all losses and expenses that we incur | Upon demand | You must reimburse the amount of our damages and pay our attorneys' fees and related costs if we are held liable for claims from your operation of the Franchised Business. |
| Public offering or private placement of your securities | Reimbursement of our actual costs and expenses incurred in having our legal and professional counsel review offering materials | 60 days before offering the securities | Payable only if you offer your securities in a public or private offering. |

| Type of Fee[1] | Amount | Due Date | Remarks |
|---|---|---|---|
| Site Evaluation Fee | There is no charge to you for the first site you propose for the Franchised Business, but Franchisor may charge you its then-current Site Evaluation Fee for each additional proposed site, as published in the Manual from time to time. | Upon Demand | Payable only you require us to review multiple site proposals. |
| Administrative Fee[5] | If you receive a party booking from our national call center then we may charge you an administrative fee equal to the pro-rata portion of the hourly call center rate plus a commission per booked party as set out in the Manual. The current commission is $5 per party. | Monthly on the 15th of the month following performance or sale beginning on the established Opening Date | Payable to us. |

Notes:

Note 1.     Unless otherwise noted, all fees in this Item 6 are uniformly imposed by and are payable to us.  All fees are nonrefundable.

Note 2.     "Gross Sales" means the dollar aggregate of: (1) the sales price of all items, goods, wares and merchandise sold, and the charges for all services you perform, whether made for cash, on credit or otherwise, without reserve or deduction for inability or failure to collect, including sales and services (A) originating at the Franchised Business' premises even if delivery or performance is made offsite from the Franchised Business premises, (B) placed by mail, facsimile, telephone, the internet and similar means if received or filled at or from the Franchised Business premises, and (C) that you in the normal and customary course of your operations would credit or attribute to the operation of the Franchised Business; and (2) all monies, trade value or other things of value that you receive from Franchised Business operations at, in, or from the Franchised Business premises that are not expressly excluded from Gross Sales.  Gross Sales does not include: (1) the exchange of merchandise between Franchised Businesses  (if you operate multiple franchises) if the exchanges are made solely for the convenient operation of your business and not for the purpose of depriving us of the benefit of a sale that otherwise would have been made at, in, on or from the Franchised Business premises; (2) returns to shippers, vendors, or manufacturers; (3) sales of fixtures or furniture after being used in the conduct of the Franchised Business; (4) the sale of gift certificates and stored value cards (the redemption value will be included in Gross Sales at the time of redemption); (5) insurance proceeds; (6) sales to employees at a discount; (7) cash or credit refunds for transactions included within Gross Sales (limited, however, to the selling price of merchandise returned by the purchaser and accepted by

you); (8) the amount of any city, county, state or federal sales, luxury or excise tax on such sales that is both (A) added to the selling price or absorbed therein and (B) paid to the taxing authority.

Note 3.    You must pay to us the fees charged in connection with any copying and use of television, radio, and internet web site advertising and commercial tapes furnished by us. We may also charge a reasonable fee for promotional material provided to you. There are currently no franchisee cooperatives, and no fees imposed by cooperatives.

Note 4.    There are currently no franchisee cooperatives, and no fees imposed by cooperatives.

Note 5.    We operate a national call center that schedules parties for all locations. The center will schedule a party at an Urban Air location based on the proximity to the address of the customer.

**ITEM 7**
**ESTIMATED INITIAL INVESTMENT**
**YOUR ESTIMATED INITIAL INVESTMENT**

| Type of Expenditure | Amount | Method of Payment | When Due | To Whom Payment is to be Made |
|---|---|---|---|---|
| Initial Franchise Fee[1] | $30,000 | Lump sum | When Franchise Agreement is signed | Us |
| Travel and Living Expenses[2] | $1,500-$4000 | As incurred | As Incurred | Airlines, travel, hotel, restaurants |
| Real Estate and Business Licenses[3] | $15,000 – $50,000 | As arranged | As incurred | Landlord, utility providers, licensing authorities, etc. |
| Leasehold Improvements (not including a café) [4] | $450,000 – $650,000 | As arranged | As required | Contractors and third party suppliers |
| Café[5] | $30,000-$100,000 | As arranged | As incurred | Contractors and third party suppliers |
| Signage | $10,000 – $25,000 | As arranged | As incurred | Approved suppliers |
| Furniture and Fixtures | $35,000 – $50,000 | As arranged | As incurred | Approved suppliers |
| Point of Sale and Computer Systems[6] | $8,000 – $12,000 | As arranged | As incurred | Approved suppliers |
| Attraction Equipment | $450,000 – $550,000 | As arranged | As incurred | Approved suppliers |

| Type of Expenditure | Amount | Method of Payment | When Due | To Whom Payment is to be Made |
|---|---|---|---|---|
| Professional Fees | $8,000 – $12,000 | As arranged | As incurred | Your accountant, attorney, and other professionals |
| Initial Inventory[7] | $4,000 – $6,000 | As arranged | As incurred | Approved suppliers |
| Insurance[8] | $15,000 – $25,000 | As agent requires | Before opening | Insurance carriers |
| Grand Opening Advertising | $15,000 | Lump sum | Before opening | Third party vendors, and service and media providers |
| Site Selection Fee[9] | $500 | Lump sum | When the Site Selection Agreement is signed | Us |
| Additional Funds (3 months)[10] | $80,000 | As arranged | As incurred | Various |
| **Total**[11] | $1,152,000 – $1,609,500 | | | |

Notes:

Note 1.    The figures shown for the initial Franchise Fee are for a single franchised location.  This payment is made to us at signing and is not refundable. See Item 5 for more information about the initial franchise fee and available discounts.

Note 2.    For your first Franchised Business, we do not charge a fee for initial training for you or your Designated Manager and up to one of your employees.  During the training period, you will be responsible for all transportation, lodging and meals for you and your employees.  Low estimates are based on you attending alone (as the Designated Manager) and commuting locally to attending one week of training.  High estimates are based on the Designated Manager and one additional employee traveling by airplane and attending one week of training.  Any salaries for your employees will be your expense and are not included in the estimates.  Payment will be to airlines, hotels and restaurants, and are generally not refundable.  These amounts are payable as incurred to the providers of these services.  If that Franchisor provides an on-site evaluation of a proposed location you must reimburse us for any out of pocket costs that it incurs in connection with performing the evaluation, such as travel, lodging, and dining expenses for each individual performing the evaluation.

Note 3.    Real property costs cannot be estimated in a low-high range due to variability in markets. This document presumes a typical franchised location, which occupies 25,000 square feet of leased commercial space.  Security deposits generally are required by utilities, the landlord, and equipment leasing companies.  Amounts will vary depending on the provisions of various leases, utilities' policies, and your credit rating.  The figures in the chart assume a lease security deposit equal to one to two months' rent and that rental payments will begin after the improvements have been made to the property.  Construction and remodeling costs vary widely, depending upon the location, design,

configuration and condition of the premises, the condition and configuration of existing services, any existing facilities such as air conditioning, electrical, and plumbing, and the terms of your lease.

Note 4.    Leasehold improvements. Leasehold improvement costs vary depending on whether a landlord provides an improvement allowance. The cost of purchasing or leasing and developing a site for a franchise will vary considerably depending on the location, size, local real estate market and other factors.

Note 5.    You are not required to have a café as your location may be limited as to size or approvals from local jurisdictions. However, if you choose to include a café, you must operate the café in conformity with the methods and standards as set out in the Manual. The cost of a café will vary considerably depending on the size, build-out requirements, and governmental regulations.

Note 6.    We do not engage in the sale of hardware. Payments will be to third parties and are generally not refundable. The hardware costs include point of sale computers or tablets, the cost of sale will depend on the number of stations your location needs. Hardware includes, up to five desktops, 4 iPad Airs and 6 RCA tablets. The CPU will need to be a quad-core with a 2.4 ghz processor, 4 gigs of RM. You will need to secure software licenses for an operating system, Windows 7 is preferred, however we do support Windows 8.1. Additionally you will have to purchase a cash drawer, acceptable versions are the MMF Val-u Line Series with Epson Interface, M-S Cash Drawer Economy w/ Epson or M-S Cash Drawer EP-102N. A Receipt Printer Epson TM-T20 USB or Epson TM-T88V USB. See Item 11 for more information about computer hardware and software requirements.

Note 7.    Assumes sufficient inventory to operate for 30 days.

Note 8.    See Item 8 for information about minimum insurance requirements.

Note 9.    Payable to us only if you sign the Site Selection Agreement. See Item 11 for information about the Site Selection Agreement.

Note 10.    The Additional Funds estimate includes various expenditures in addition to those otherwise listed in this Item for the first three months including, but not limited to the following:  (a) state and local licensing fees, if any; (b) taxes, such as sales, use and similar taxes levied or required by city, local, county, parish, state or federal laws or regulations by virtue of the operation of a business; (c) deposits and costs of utilities, telephone; (d) background checks on employees; and (e) uniform costs for employees.  The figures given are estimates and may vary from area to area. There may be other expenditures that are not listed above which may be incurred in certain areas and not others. Payments will be to third parties and are generally not refundable. These estimates do not include managerial salaries or any payment to you.  These estimates also do not take into account finance payments, charges, interest, and related costs you may incur if any portion of the initial investment is financed. These amounts are the minimum recommended levels to cover operating expenses, including your employees' salaries for three months.  However, we cannot guarantee that those amounts will be sufficient. Additional working capital may be required if sales are low or fixed costs are high.  In compiling these estimates, we relied on our franchisees' and our affiliates' experience in operating URBAN AIR TRAMPOLINE PARK® locations.

Note 11.    Unless otherwise noted, all amounts are non-refundable.

## ITEM 8
## RESTRICTIONS ON SOURCES OF PRODUCTS AND SERVICES

To ensure high and uniform standards of service and quality are maintained at all Urban Air businesses, you must operate your franchise in conformity with our methods, standards and specifications and you must purchase services, supplies, fixtures, equipment, merchandise, goods, and inventory only from suppliers which we have approved. Although you are not required to purchase or lease real estate from us or our affiliates, we must approve your location.

### Purchases from Approved or Designated Suppliers; Purchases According to Specifications

You must purchase the following items from us or from suppliers we designate (each a "Designated Supplier"): (1) fixtures, furniture, equipment, signs, items of décor, and architect services; (2) uniforms, shirts, and all merchandise and items intended for retail sale (whether or not bearing our Proprietary Marks); (3) advertising, point-of-purchase materials, and other printed promotional materials; (4) gift certificates and stored value cards; (5) stationery, business cards, contracts, and forms; (6) bags, packaging, and supplies bearing the Proprietary Marks; and (7) other products and services that we require. See Item 11 for information about our computer system requirements. In addition to Designated Suppliers, we may require you to purchase certain supplies from approved or designated third party distributors ("Designated Distributors"). We may receive money or other benefits, such as rebates or conference sponsorships, from Designated Suppliers and Designated Distributors based on your purchases. UAIP and any person affiliated with us is not an approved supplier. At this time, neither we nor our affiliates are approved suppliers of any products or services.

If you propose to purchase from a previously unapproved source, you must first obtain our approval. Our criteria for supplier approval are not available to franchisees. We may require, as a condition of granting approval, that our representatives be permitted to inspect the supplier's facilities, and that all information, specifications, and samples as we reasonably require be delivered to us or to an independent, certified laboratory for testing. We may require you to pay a fee for the testing, which will not exceed our reasonable testing costs. We will notify you within 120 days of your request as to whether you are authorized to purchase such products from that supplier.

We may prescribe procedures for the submission of requests for approval and impose obligations on approved suppliers, which will be incorporated in a written license agreement with the supplier. Our criteria for approving suppliers are not available to the franchisees. We may obtain from you and/or the supplier reimbursement of actual costs and expenses incurred in the approval process and on-going monitoring of the suppliers compliance with our requirements. We do not act as an agent, representative, fiduciary or other intermediary for you in our relationship with an alternative supplier you propose and we approve. We have the right to monitor the quality of the services provided by approved suppliers in a manner we deem appropriate and may terminate any supplier who does not meet our qualify standards and specifications, as may be in effect periodically.

You may purchase from any supplier those items and services for which we have not designated approved suppliers or distributors, if the items and services meet our specifications, which may include brand requirements. If brand requirements have been identified, you may purchase and use only those brands approved by us. Our standards and specifications, and our modifications to our standards and specifications, are communicated to our franchisees in the Manual.

### Location and Lease

You must acquire a site for the Franchised Business which meets our site selection criteria, as described in the Manual, within 120 days of signing the Site Selection Agreement or, if you did not sign the Site

Selection Agreement, within 120 days after the Franchise Agreement has been signed. You may not acquire a site for the Franchised Business until we approve that site. If you occupy the Franchised Business according to a commercial lease, the lease must contain terms we specify. (See Lease Rider attached as <u>Attachment G</u> to the Franchise Agreement).

## Insurance

You must procure and maintain in force from an insurance company which has and maintains a Best's Insurance Guide rating of "A-VII" or better insurance in types and amounts as listed below. It is recommended that you utilize the services of the recommended brokers listed in the Manual. We do not receive money or other benefits, such as rebates from the recommended brokers. Each insurance policy must name us and our affiliates, and each company's respective officers, directors, shareholders, partners, members, agents, representatives, independent contractors, servants, and employees, as additional insureds and must also include a waiver of subrogation in favor of us and our affiliates, and each company's respective officers, directors, company managers, and partners. Unless otherwise noted, you must maintain general liability insurance that includes the following minimum coverages:

| Limits of Liability | Description |
|---|---|
| $1,000,000 | Per Occurrence |
| $2,000,000 | Annual Aggregate, Other Than Products |
| $2,000,000 | Annual Aggregate, Products & Completed Operations |
| $1,000,000 | Personal And Advertising Injury Aggregate |
| $100,000 | Tenants Legal Liability for damage to the part of the premises you occupy |
| Excluded | Medical Expense Each Claim |
| $1,000,000 | Employee Benefits Liability Annual Aggregate – Retro 12/15/2014 |
| $1,000,000 | Hired & Non Owned Auto Liability |

(*) Workers' Compensation insurance is not required, but is highly recommended, if your Franchised Business is located in a state which does not mandate Workers' Compensation coverage as a matter of law.

We have the right to establish and modify the minimum coverages required, and require different or additional kinds of insurance to reflect inflation, changes in standards of liability, higher damage awards, and other relevant changes in circumstances.

## Revenue Derived from Required Purchases and Leases

We do not derive any revenue or material consideration from the sale of products to our franchisees. None of our officers currently own an interest in any privately-held supplier, or a material interest in any publicly-held supplier, though our officers may occasionally own non-material interests in publicly-held companies that may be suppliers to our franchise system

We offer franchises the opportunity to enter into an outlet management agreement. You are not obligated to enter into a management agreement with us. As of December 31, 2015, we manage six outlets. We derive $648,000 per year in revenue from our existing outlet management agreements.

We estimate that the cost of purchasing from approved and designated suppliers and the cost of purchasing according to our specifications will represent 75% to 90% of your total purchases in establishing the business and 25% to 40% of your total purchases during operation of the Franchised Business.

**Purchasing Cooperatives; Supplier Negotiations and Arrangements**

There currently are no purchasing or distribution cooperatives in existence connected to our franchise system. We periodically negotiate purchase arrangements with suppliers for the benefit of our franchisees, and we may establish national buying accounts with vendors whose products meet our specifications. We do not provide you any material benefits (such as renewal rights or the right to acquire additional franchises) based on your purchases from approved or designated suppliers.

**Computer Hardware and Software**

You must purchase all computer systems we prescribe for use by our franchisees, including point of sale systems, franchise management systems, and general computer equipment, as fully described in Item 11.

**Accounting Systems**

You must purchase and utilize the accounting systems we prescribe for use by our franchisees, including third-party accounting services, as fully described in Item 11.

## ITEM 9
## FRANCHISEE'S OBLIGATIONS

**This table lists your principal obligations under the franchise and other agreements. It will help you find more detailed information about your obligations in these agreements and in other items of this disclosure document.**

| Obligation | Sections in agreement | Disclosure Document Items |
|---|---|---|
| a. Site selection and acquisition/lease | Article 4 and Attachment A of the Site Selection Agreement; Section 3 and Attachment G of the Franchise Agreement | Items 6, 11, and 12 |
| b. Pre-opening purchases/leases | Section 4 of the Franchise Agreement | Items 7 and 8 |
| c. Site development and other pre-opening requirements | Sections 4 and 5 of the Franchise Agreement | Item 7 |
| d. Initial and ongoing training | Sections 2.B(3) and 8 of the Franchise Agreement | Item 11 |
| e. Opening | Section 5 of the Franchise Agreement | Item 11 |
| f. Fees | Article 3.1 and Attachment A of the Site Selection Agreement; Section 6 of the Franchise Agreement | Items 5 and 6 |
| g. Compliance with standards and policies/Operating Manual | Sections 9, 10, and 11 of the Franchise Agreement | Item 11 |
| h. Trademarks and proprietary information | Article 5 of the Site Selection Agreement; Sections 9, 13.A, and 14.A of the Franchise Agreement | Items 1, 13, and 14 |

| Obligation | Sections in agreement | Disclosure Document Items |
|---|---|---|
| i.   Restrictions on products/services offered | Sections 9, 10, 11.B-11.D of the Franchise Agreement | Items 8 and 16 |
| j.   Warranty and customer service requirements | Section 15.F of the Franchise Agreement | Item 16 |
| k.   Territorial development and sales quota | Section 1.B of the Franchise Agreement | Item 12 |
| l.   Ongoing product/service purchases | Sections 11.B-11.F of the Franchise Agreement | Item 8 and 16 |
| m.   Maintenance, appearance and remodeling requirements | Sections 2.B(2), 10, and 11.B of the Franchise Agreement | Items 7 and 8 |
| n.   Insurance | Section 16 of the Franchise Agreement | Items 6, 7, and 8 |
| o.   Advertising | Section 15 of the Franchise Agreement | Items 6, 7, and 11 |
| p.   Indemnification | Section 20 of the Franchise Agreement | Item 6 |
| q.   Owner's participation/ management/staffing | Sections 11.J-11.K of the Franchise Agreement | Item 15 |
| r.   Records and reports | Section 7 of the Franchise Agreement | Items 6 and 11 |
| s.   Inspections and audits | Sections 4.D, 4.E, 7, and 11.G of the Franchise Agreement | Items 6 and 11 |
| t.   Transfer | Section 17 of the Franchise Agreement | Item 17 |
| u.   Renewal | Section 2.B of the Franchise Agreement | Items 6 and 17 |
| v.   Post-termination obligations | Articles 5 of the Site Selection Agreement; Section 19 of the Franchise Agreement | Item 17 |
| w.   Non-competition covenants | Article 5.4 of the Site Selection Agreement; Sections 14.B-14.F of the Franchise Agreement | Items 15 and17 |
| x.   Dispute resolution | Section 23 of the Franchise Agreement | Item 17 |
| y.   Guaranty | Attachment D-1 of the Franchise Agreement | Item 15 |

## ITEM 10
## FINANCING

Neither we nor any of our affiliates offer direct or indirect financing, but we may develop relationships with preferred lenders or financing sources which we may, when established, make available to you. Neither we nor any of our affiliates will guarantee your lease, note, or other obligations.  Additionally, neither we nor our affiliates can predict if you will be able to obtain financing for any part of your investment in the Franchised Business or, if you are able, the terms of such financing.

Third party lenders may assign their rights under their loan documents to us or to any other party. If any third party lender assigns its rights to a party other than us, that third party may be immune under the law to claims or defenses you may have against either the third party lender or us.

We do not know what waivers or other provisions may appear in any financing that you may arrange with third party lenders. Third party loan documents may include provisions by which you confess judgment or which bar you from asserting a defense against us or our assigns, and may include provisions by which you waive some rights you might have, such as rights to notice or demand, presentment, protest, notice of dishonor, consent to extension of time for payment, rights of marshalling of collateral, bonds and other forms of security relating to repossessed collateral, etc.

## ITEM 11
## FRANCHISOR'S ASSISTANCE, ADVERTISING, COMPUTER SYSTEMS, AND TRAINING

**Except as listed below, we are not required to provide you with any assistance.**

Before you begin operating the Franchised Business, we will:

1.      Review your Franchise Site Application and notify you of site approval within 14 days after receiving all requested information.   (Site Selection Agreement, Section 4.3; Franchise Agreement, Section 3.B)  Factors considered in selection and approval of a site includes, but is not limited to, traffic count, visibility, demographics, competition in the area, and occupancy cost.

2.      Provide to you sample drawings and specifications for a Franchised Business, including requirements for dimensions, design, image, interior layout, décor, fixtures, equipment, signs, furnishings, storefront, signage, graphics, and color schemes. (Franchise Agreement, Section 4.A)  You must have all required construction plans and specifications prepared to suit the shape and dimensions of the Franchised Business and ensure that the plans and specifications comply with applicable ordinances, building codes, permit requirements, and any lease requirements and restrictions.

3.      Conduct a one week initial training program and admit you or your Designated Manager and up to one additional individual (see Item 15) without charge.  (Franchise Agreement, Section 8.A)

4.      Loan you one copy of our confidential Manual containing information and knowledge necessary and material to the System.  (Franchise Agreement, Section 9)  The table of contents for the current version of our Operations Manual is attached as Exhibit A.  The current version of our Operations Manual contains a total of 323 pages.  We will also lend to you various other training manuals, videos, and materials.

5.      For the first Franchised Business you open, we will provide you with one member of our training team for 5 days of pre-opening assistance and training at your Franchised Business; there is no fee for the service.  We may, or at your request will, provide the same pre-opening assistance for subsequent Franchised Businesses you open, in which case we may require you to reimburse us for our training-related expenses, including travel, lodging and dining costs for the individual who provides opening assistance.  (Franchise Agreement, Section 8.B)

6.      For all Franchised Businesses you open, we may, or at your request will, provide you with additional members of our training team to provide pre-opening assistance, subject to the availability of personnel, in which case we may require you to pay our then-current training fee (as published in the Manual) and to reimburse us for our training-related expenses, including

travel, lodging and dining costs for those additional trainers who provide opening assistance. (Franchise Agreement, Section 8.B)

7.    Provide consultation and advice to you, as we deem appropriate, with regard to the development and operation of the Franchised Business, building layout, furnishings, fixtures, and equipment plans and specifications, employee recruiting, selection and training, purchasing and inventory control, and such other matters as we deem appropriate.

During the operation of the Franchised Business, we will:

1.    Periodically, as we deem appropriate, advise and consult with you in connection with the operation of the Franchised Business.  (Franchise Agreement, Section 8.C)

2.    Provide to you our knowledge and expertise regarding the System and pertinent new developments, techniques, and improvements in the areas of management, sales promotion, service concepts, and other areas. We may provide these services through on-site visits, through the distribution of printed or filmed material or electronic information, meetings or seminars, telephone communications, email communications, or other communications.   (Franchise Agreement, Section 8.C)

3.    Use good faith efforts to approve or disapprove your proposed promotional and marketing materials within 10 business days after we receive them.  (Franchise Agreement, Section 15.A)

4.    Administer the Development Fund and, at your request, provide an annual unaudited statement of contributions and expenses of the Development Fund.  (Franchise Agreement, Section 15.C)

## Initial Training Program

We will admit you or your Designated Manager and up to one other of your employees to our initial training program.  Our initial training program is offered by our training team before commencing operation on an as needed basis, and is conducted by or under the supervision of Michael Browning, Jr., our President. Mr. Browning has been with the company since its inception in 2011 and has over four years' experience in the industry.  He has been involved with developing the procedures and management implemented in all existing locations.

The classroom portion of our initial training program is held at our training facility located in Mansfield, Texas and the on the job training portion is held at one or more of our affiliate-owned locations in North Texas. The Franchised Business Operations portion of our initial training program includes hands-on operations training, and the Franchise Operations portion focuses on business operations.  The entire initial training program and is held over a one week period.

The following is a summary of our initial training program:

### TRAINING PROGRAM

| Subject[1] | Hours of Classroom Training | Hours of on the Job Training | Location |
|---|---|---|---|
| Court Maintenance & Monitoring | 2 | 12 | Mansfield, Texas and Designated on-site Location |
| Office Management/ Operations | 4 | 6 | Mansfield, Texas and Designated on-site Location |

| Subject[1] | Hours of Classroom Training | Hours of on the Job Training | Location |
|---|---|---|---|
| Events (Booking, check-in, hosting) | 4 | 4 | Mansfield, Texas and Designated on-site Location |
| Front Desk, Point of Sale, Waivers | 2 | 3 | Mansfield, Texas and Designated on-site Location |
| Observation/Shadowing | 0 | 18 | Mansfield, Texas and Designated on-site Location |
| Inventory Management/Concessions | 4 | 2 | Mansfield, Texas and Designated on-site Location |
| Cleaning & General Facility Maintenance | 2 | 1 | Mansfield, Texas and Designated on-site Location |
| Sound & Lighting System | 1 | 1 | Mansfield, Texas and Designated on-site Location |
| Marketing | 4 | 4 | Mansfield, Texas and Designated on-site Location |
| Handling an Incident/Report | 2 | 0 | Mansfield, Texas and Designated on-site Location |
| **Totals** | **25** | **51** | |

Note 1:  Instruction will be taken from the Manual and other instructional forms.

We do not charge tuition for you or your Designated Manager and up to one other of your employees to attend our initial training program, but you are responsible for all training-related expenses, including travel, lodging, and dining expenses for these individuals and wages and salaries payable during the training period. The initial training is mandatory, and you must successfully complete the initial training to our satisfaction before opening.  At your request, we may permit additional individuals to attend the same training program, subject to space availability.

You and your designated employees must successfully complete our initial training program to our satisfaction before you may open your Franchised Business(es).

**Other Training**

Your Designated Manager and other personnel also must attend and successfully complete all safety training courses as required by law or as we may periodically require, to the satisfaction of and as may be required by the state and municipality where your franchise is located; you must maintain all required certifications throughout the franchise term. Unless otherwise noted, we may charge a reasonable tuition for all courses and programs that we provide. You are responsible for all training-related expenses, including travel, lodging, and dining expenses for these individuals, as well as any wages and salaries payable during the training period.

We may also require your Designated Manager and other of your employees to attend and complete additional and/or remedial training as we may periodically deem necessary.  If we require additional or remedial training, you must pay our then-current training fee (as published in the Manual) and reimburse us for all of our training-related expenses, including travel, lodging and dining costs for the individuals who provide opening assistance.  If such training takes place in our training facilities, you are also responsible for travel, lodging, and dining expenses for individuals who attend additional and remedial training, as well as any wages and salaries payable to these individuals during the training period.

We may also conduct, and require you to attend, periodic conferences to discuss System developments, including operational efficiency, personnel training, bookkeeping, account, inventory control,

performance standards, advertising programs, and merchandising procedures. Your Designated Manager must attend all mandatory conferences. You are responsible for all conference-related expenses, including travel, lodging, and dining expenses for conference attendees, as well as any wages and salaries payable to these individuals during the conference.

## Site Selection

If you sign a Site Selection Agreement, we will agree on a "Site Selection Area" within which you may locate the Franchised Business. You must secure a lease for an acceptable site for the Franchised Business within 120 days of the Site Selection Agreement being signed. If you sign a Franchise Agreement without having first selected a site for the Franchised Business, a "Site Selection Area" will be identified on the Summary Page of the Franchise Agreement. You must secure a lease for an acceptable site within 120 of the Franchise Agreement being signed.

We will provide you with our standard site selection criteria or an on-site evaluation of your proposed site, as we deem appropriate. We will approve or disapprove your proposed site within 14 business days after we receive all information that we reasonably request. The criteria we use to evaluate the selected site include, but are not limited to, cost, visibility, accessibility, demographics, and local competition. We reserve the right to develop and implement various site-selection technologies, software, or systems, in which case we may charge, and you must pay, our then-current Site Evaluation Fee as published in the Manual periodically. Once a site is secured, you will sign and deliver to us the Franchise Agreement and pay any initial franchise fee owed to us before signing the lease for the site.

Our approval of a proposed site signifies that we are willing to grant a franchise for an Urban Air location at the site. Your location may not be relocated without first obtaining our written consent.

## Typical Time between Signing (or First Payment) and Opening for Business

The typical length of time between the signing of the Franchise Agreement (or your first payment to us, if that occurs first) and the opening of your business ranges from three to seven months, depending on whether the site is known at the time the Franchise Agreement is signed. Factors affecting this range include site availability, city zoning and permitting, and construction time. We can refuse to award you a franchise if you fail to secure a location for the Franchised Business (by purchase or lease) within 120 days after the Site Selection Agreement is signed, or terminate the Franchise Agreement if you fail to open for business within 120 days after securing a location for the Franchised Business.

## Development Fund

You will contribute to a Development Fund ("Fund") administered by us. Your required Fund contribution will be an amount equal to 1% of Gross Sales, to be calculated and paid monthly on the 15th of the month following the month of the sale.

The Fund is intended for the common benefit of all URBAN AIR TRAMPOLINE PARK® Franchised Businesses. We may use Fund monies to pay for creative development services (including creation and modification of logos and graphics); preparing or procuring market studies; providing or obtaining marketing services (including conducting customer surveys and focus groups); developing, producing, distributing, and placing advertising (including developing and producing point-of-sale advertising and promotional materials); developing and organizing annual URBAN AIR TRAMPOLINE PARK® conferences; developing product packaging; developing, updating, and hosting our web site (including development of interior pages featuring franchised and affiliate-owned Franchised Businesses and development of locator programs); developing, updating, and hosting an intranet or extranet system; obtaining sponsorships and endorsements; preparing and conducting sweepstakes, contests, and other

prize promotions; making charitable donations; establishing and funding scholarships; and providing and procuring public relations services and conducting public relations activities. We also may use Fund monies to reimburse ourselves for our costs of personnel and other administrative and overhead costs associated with providing these services. Although the Fund is intended to be perpetual, we may terminate the Fund at any time. The Fund will not be terminated, however, until all monies in the Fund have been spent for authorized purposes or returned to the contributors of the Fund on a proportional basis of their respective contributions. Any amounts paid to the Fund that are not spent in the year they are collected will remain in the Fund for future expenditures.

We will have sole control over the creative concepts, content, form, and media placement of all advertising and promotional materials developed with Fund monies, and the allocations of Fund monies to production, placement, and other costs. We are not required to spend any Fund monies for placement of advertising in your trading area, and we need not ensure that your Franchised Business benefits directly or *pro rata* from any Fund expenditures. We will not use Fund monies for creating or placing any advertisement that is principally a solicitation for new franchisees, but we may include in all advertising prepared using Fund monies (including Internet advertising) information concerning franchise opportunities, and we may use a portion of Fund monies to create and maintain one or more pages on our web site devoted to advertising franchise opportunities and identifying and screening inquiries and applications submitted by franchise candidates. Fund contributions are not held in trust, and we have no fiduciary obligation to our franchisees for collecting or spending Fund monies.

The amount of the Fund contribution will not vary during the term of this Agreement. All franchisees currently contribute to the Fund at the same rate. Neither we nor our affiliates are contractually required to contribute to the Fund. There is no requirement that the fund be audited. Upon your reasonable request, however, we will provide you with an annual unaudited statement of Fund contributions and expenditures.

As of the issuance date of this disclosure document, expenditures have been made on behalf of the Fund as reflected in the following expenditure amounts:

        60 % were spent on production;

        10 % were spent on media placement;

        30 % were spent on administrative expenses; and

        0 % were used for other expenses (please describe "other")

        For a total of 100%.

## Advertising

You will be expected to spend at least 5% of your monthly Gross Sales on local marketing and advertising. Our current advertising program for the products and services offered by Franchised Businesses consists of community and charitable involvement, a web site, and proprietary merchandise. Our advertising materials are currently created primarily in-house, with some graphics assistance from outside agencies. Currently, there is no advertising council composed of franchisees, but we reserve the right to form such council(s) at any time. You may use your own advertising and promotional materials if they conform to our Standards and we have approved them before first publication or use. We will use good faith efforts to approve or disapprove your proposed advertising and promotional materials within 10 business days after we receive them.

## Grand Opening Advertising

You must conduct Grand Opening advertising and promotional programs for your Urban Air business

before opening. You may use your own advertising and promotional materials if they conform to our Standards and we have approved them before first publication or use. We will use good faith efforts to approve or disapprove your proposed advertising and promotional materials within 10 business days after we receive them.

## Advertising Cooperatives

If we believe that two or more Franchised Businesses may benefit by pooling their advertising dollars, we may form a local or regional advertising cooperative for this purpose. If we form an advertising cooperative for the region in which your Franchised Business is located, you must participate in the advertising cooperative. We have the exclusive right to create, dissolve, and merge advertising cooperatives. We will also have the exclusive right to create and amend their governing documents. No advertising cooperative has yet been created and, therefore, no governing documents are available for your review.

Governing documents will provide that any advertising cooperative created under authority of the Franchise Agreement will (1) operate by majority vote, with each Franchised Business (including our affiliate-owned locations ) being entitled to one vote, (2) entitle us to cast one vote (in addition to any votes we may cast for affiliate-owned locations), (3) permit the members of the advertising cooperative, by majority vote, to determine the amount of required contributions, and (4) provide that any funds left in the advertising cooperative at the time of its dissolution be returned to the members in proportion to their contributions made during the 12-month period immediately preceding dissolution.

## Computer and Cash Register Requirements

You must acquire and use all computer systems that we prescribe for use by our franchisees, and may not use any computer system or components or software applications that do not conform to the Standards or that we have not approved in writing. Requirements may include, among other things, hook up to remote servers, off-site electronic repositories, and high-speed Internet connections and service. We may require you to update or upgrade computer hardware components and/or software applications as we deem necessary, but not more than three times per calendar year. You must enter into all applicable software license agreements and software maintenance agreements, in the form and manner we prescribe, and pay all fees charged by third party software and software service providers. At our request, you must sign or consent to a "terms of use" agreement regarding all software applications that we designate. We may independently access from a remote location, at any time, all information input to, and compiled by, your computer system or an off-site server, including information concerning sales, purchase orders, inventory, and expenditures. There are no contractual limitations to our right to access the information and data

We require all franchisees to purchase a desktop computer and printer for back of the house needs, and we reserve the right to require all franchisees to acquire and use the same Point of Sale ("POS") system. Neither we nor any of our affiliates or any third party is obligated to provide ongoing maintenance, repairs, upgrades or updates to any computer hardware or software. We estimate that the cost of your required computer systems will be approximately $8,000-$12,000, and the annual cost of optional or required maintenance of the POS system and computer systems to be $2000. See Note 6 to Item 7 for additional information.

We may also require that you connect to a web-based application, such as franchise management software, which enables us to independently access and poll the information on your POS System. There is no contractual limitation on our right to independently access this information. We will not have independent access to the information generated by or stored on your personal computer.

We reserve the right to develop and implement various technologies, software, or systems for the benefit of the System and Franchised Businesses , in which case we may require you to adopt and use such technologies, software, or systems and require you to pay, our then-current Technology Fee as published in the Manual from time to time.  There is no contractual limitation on our right to implement such programs.

Neither we, nor any of our affiliates, nor any third party is required to provide ongoing maintenance repairs, upgrades to the system. You must, at your own expense, maintain your computer systems and network in good repair and working order and properly update and otherwise change your computer hardware and software systems as we may require.  You must pay all amounts charged by any licensor of the systems and programs you use, including charges for use, maintenance, support and/or update of these systems or programs.  There is no contractual limitation on our ability to require the hardware and any software programs be updated.

You may not register a domain name or operate a website containing the Marks. We have the right to determine the content and use of any website or social media associated with the Marks. Your general conduct on the Internet or other electronic media, including your use of the Marks in advertising, is subject to the terms and conditions of the Franchise Agreement, Manual or other requirements that we may determine from time to time.

**Operations Manual**

We will lend to you a copy of our Operations Manual and other materials which contain mandatory and suggested specifications, standards and procedures.  We will also lend to you various other training manuals, videos, and materials.  The Operations Manual and other materials provided by us are confidential and remain our property and must be kept confidential.  We may modify this Manual, on occasion, and you must abide by those modifications (Franchise Agreement Article 9).  A copy of the Table of Contents of the complete Operations Manual, as of our most recent fiscal year end which indicates the number of pages devoted to each topic and the total number of pages in the Operations Manual, is attached as Exhibit A to this disclosure document. The Operations Manual has a total of 323 pages.

**ITEM 12**
**TERRITORY**

You will receive an exclusive territory. You will operate one Franchised Business at a location we have approved ("Approved Location"), and may relocate the Franchised Business only with our written consent. If your lease expires or terminates through no fault of yours, or if the Franchised Business premises are destroyed or materially damaged by fire, flood, or other natural catastrophe, we will permit you to relocate to another location within the Protected Area (described below).  If we grant relocation rights for this reason, you must open the Franchised Business for business at the new location within 180 days of closing the original location.  If we permit you to relocate the Franchised Business for any other reason, then you must open the Franchised Business for business at the new location within thirty business days of closing the original location.

**Site Selection Agreement**

If you sign the Site Selection Agreement, we and you will identify a Site Selection Area in this agreement. You will focus your site selection activities within the Site Selection Area, as described in the Site Selection Agreement. You only have the right to look for a potential site to be located in the Site Selection Area and have no options, rights of first refusal or similar rights for other areas.

After the Site Selection Agreement expires or is terminated, regardless of the reason (even if we and you sign a Franchise Agreement), we and our affiliates may engage, and allow others to engage, in any activities we desire within and outside the Site Selection Area without any restrictions whatsoever, subject only to your rights under franchise agreements with us then in effect. We may not alter your Site Selection Area or territorial rights.

**Protected Area under the Franchise Agreement**

After you have identified a site for the Franchised Business, we will mutually agree on a Protected Area surrounding the Franchised Business, which will be described as a radius surrounding the Franchised Business (or may be defined by ZIP codes or geographic boundaries). Typically, but not in all cases, available Protected Territories will encompass a population of approximately 250,000 people at the time the Franchise Agreement is executed.

During the franchise term, you will receive exclusive rights within your Protected Area, and we will neither operate nor grant others the right to operate another URBAN AIR TRAMPOLINE PARK® Franchised Business in your Protected Area. The boundaries of your Protected Area may be altered only by written consent of the parties.

We may operate and grant others the right to operate URBAN AIR TRAMPOLINE PARK® Franchised Businesses or similar businesses at any location outside the Protected Area, and we may operate and grant others the right to operate businesses under a name other than URBAN AIR TRAMPOLINE PARK® outside the Protected Area. We also may offer, grant, and support franchises in similar and different lines of business under any name other than URBAN AIR TRAMPOLINE PARK® outside the Protected Area. We are not required to compensate you for any sales made in the Protected Area.

We reserve the right to distribute any and all products and services and/or their components identified by the Proprietary Marks, through alternative channels of distribution, including, mail order, catalog sales, the Internet, World Wide Web or any other form of electronic commerce, both within and outside the Protected Area. We are not required to compensate you for any sales made in the Protected Area.

You must focus your marketing activities within your Protected Area, and you may not solicit or accept orders outside of the Protected Area without our prior consent. You may not use any alternative channels of distribution, such as the Internet, catalog sales, telemarketing, or other direct marketing, to make sales outside your territory without our consent.

Continuation of your territorial protection under the Franchise Agreement does not depend on your achieving a certain sales volume, market penetration, or other contingency.

**Additional Franchise Rights**

We do not regularly grant any right of first refusal to obtain additional franchises. If you wish to obtain an additional franchise location, you must enter into a separate Franchise Agreement. We may offer a right

of first refusal in special circumstances, such as to franchisees that commit to and have the ability to develop a large number of facilities, or to franchisees in new and developing markets.

## ITEM 13
## TRADEMARKS

Our affiliate, UAIP, owns the following Marks and has applied to register the following Marks on the Principal Register of the U.S. Patent and Trademark Office.

| Mark | Registration Number | Registration Date | International Class |
|------|---------------------|-------------------|--------------------|
| URBAN AIR TRAMPOLINE PARK (Standard Character Word Mark) | 4807427 | September 8, 2015 | 25, 41 |
| GET UP. GET FLY. (Standard Character Word Mark) | 4799297 | August 25, 2015 | 41 |

There is presently no effective determination of the Unites States Patent and Trademark Office ("USPTO"), any trademark trial and appeal board, the trademark administrator of any state or any court, nor any pending infringement, opposition, or cancellation proceeding, nor any pending material litigation involving the Marks which is relevant to their ownership, use, or licensing. There is no pending material federal or state court litigation regarding our use or ownership rights in any trademark. All required affidavits have been filed.

## Use of Marks

UAIP has granted us the perpetual right to use and sublicense the use of the Marks, including those listed above and those developed in the future, together with other intellectual property critical to the System pursuant to a written license agreement dated March 1, 2014 ("License Agreement"). If the License Agreement terminates, then UAIP will assume all of our rights and obligations under your Franchise Agreement. Except for the License Agreement, there are no agreements currently in effect that significantly limit our rights to use or to license the use of the Marks in any manner material to the Franchised Business. We are not aware of any superior prior rights or infringing uses that could materially affect your use of the Marks in any state. We know of no other agreements currently in effect which significantly limit our rights to use or license the use of the Marks in any manner material to you.

You must use the Marks in full compliance with provisions of the Franchise Agreement and according to the trademark usage guidelines and rules we periodically prescribe. You may not use any Mark as a part of your corporate name or with any prefix, suffix, or other modifying words, terms, designs, or symbols (other than logos licensed by us to you) and you may not use them to incur any obligation or indebtedness on our behalf. You may not use any name or mark associated with the sale of any unauthorized product or services in any other manner not explicitly authorized in writing by us.

You may use only the Marks that we designate, must use them only in the manner that we authorize and permit, and must use them with the symbols, "®", "™", or "SM", as appropriate. You may use the Marks only in connection with the operation and promotion of the Franchised Business, and only in the manner we prescribe. You may not contest ownership or validity of the Marks or any registration of the Marks, or our right to use or to sublicense the use of the Marks. You must sign all documents that we require in order to protect the Marks and to maintain their validity and enforceability.

## Internet and Social Media Usage

You may not establish or maintain a web site or other presence or advertise on the World Wide Web portion of the Internet that reflects any of the Marks or our copyrighted works, or that includes the term

"URBAN AIR TRAMPOLINE PARK" as part of any URL or domain name, or that otherwise states or suggests your affiliation with us or our franchise system.  This prohibition includes use of the Marks or any derivative of the Marks as part of any URL, domain name, or unauthorized email addresses, as well as their registration as part of any user name on any gaming website or social media or networking website, including, but not limited to, INSTAGRAM, FACEBOOK, LINKEDIN, FOURSQUARE, YELP, URBANSPOON, or TWITTER, except as we expressly permit or prescribe.  Our social media and networking policies will be provided to you in the Manual, and may be modified, amended, or terminated by us at any time.

### Infringement

If there is any infringement of, or challenge to, your use of any name, mark, or symbol, you must immediately notify us, and we may take any action that we deem appropriate, in our sole discretion.  The Franchise Agreement does not require us to take affirmative action if notified of the claim.  We have the right to control all administrative proceedings or litigation involving your use of the Marks.  The Franchise Agreement does not require us to participate in your defense or to indemnify you for expenses or damages if you are a party to an administrative or judicial proceeding based on your use of the Marks, or if the proceeding is resolved unfavorably to you.

We have the right to designate one or more new, modified or replacement Marks for your use and to require you to use the new, modified or replacement Marks in addition to or in lieu of any previously designated Marks. You must comply with the directive, at your expense, within 60 days following your receipt of written notice of the change.

The Site Selection Agreement does not grant you rights to use the Marks. These rights arise only under the Franchise Agreement.

## ITEM 14
## PATENTS, COPYRIGHTS AND PROPRIETARY INFORMATION

There are no patents or registered copyrights material to the franchise, but we claim copyright protection in many elements of the System including the Manual, the design elements of the Marks, our product packaging, signage our advertising and promotional materials, and the content and design of our web site ("Copyrighted Works").

You and your owners and employees must maintain the confidentiality of all trade secrets, the Standards and all other elements of the System, all customer information, all information contained in the Manual, and any other information that we designate as confidential ("Confidential Information").  Each of your owners must sign the Undertaking and Guaranty Agreement attached as <u>Attachment D-1</u> to the Franchise Agreement and the Confidentiality and Non-Competition Agreement attached as <u>Attachment D-2</u> to the Franchise Agreement.  All of your employees with access to Confidential Information must also sign a confidentiality and non-competition agreement in the form designated by us.

You must promptly notify us of any apparent infringement of, or challenge to, your use of any of the Copyrighted Works or Confidential Information.  We are not required to take affirmative action when notified of a claim, or to participate in your defense or indemnify you for expenses or damages if you are a party to an administrative or judicial proceeding involving any of the Copyrighted Works or Confidential Information, or if the proceeding is resolved unfavorably to you, but will take whatever action we determine to be appropriate under the circumstances.  We have the right to control all administrative proceedings or litigation involving the Copyrighted Works and Confidential Information. If we or our affiliate undertakes the defense or prosecution of any litigation pertaining to any of the Copyrighted Works or Confidential Information, you must sign all documents and perform such acts and things as, in the opinion of our legal counsel, may be necessary to carry out the defense or prosecution.

If you or any of your owners develops any new concept, product, sales technique, or improvement in the operation or promotion of the Franchised Business, you must promptly notify us, and provide to us all necessary related information.  By signing the Franchise Agreement, you and each owner permanently and irrevocably assign your respective rights in and to the concept, product, sales technique, or improvement and permit us to use or disclose the information to our affiliates and other URBAN AIR TRAMPOLINE PARK® franchisees as we determine appropriate, without providing you any compensation.

## ITEM 15
## OBLIGATION TO PARTICIPATE IN THE ACTUAL OPERATION
## OF THE FRANCHISE BUSINESS

Each URBAN AIR TRAMPOLINE PARK® Franchised Business must be supervised at all times by a Designated Manager, who must attend and complete to our satisfaction our initial training program and all other training that we require, and who must devote substantial full-time and best efforts, in person on a daily basis, to the supervision, operation, and conduct of the Franchised Business.  We must approve your Designated Manager. We highly recommend, but do not require, that your Designated Manager own an equity interest in you if you are a corporation, partnership, limited liability company, or other legal entity. If your Designated Manager changes, you must immediately appoint a new Designated Manager, subject to our approval, and he or she must complete all training requirements within 60 days.  (See Item 11)

Neither you nor any of your Designated Managers may own, maintain, advise, operate, engage in, be employed by, make loans to, invest in, provide any assistance to, or have any direct or indirect interest in (as owner or otherwise) or relationship or association with, any business that competes with URBAN AIR TRAMPOLINE PARK® Franchised Businesses or any of the products or services of URBAN AIR TRAMPOLINE PARK® Franchised Businesses.  You also may not disclose any information contained in our Manual or other information proprietary to the System.  Each Owner (regardless of the limitation of their ownership percentage in the Franchised Business), Designated Manager, any supervisors, and other key employees having access to our Manual and proprietary information must sign a Confidentiality and Non-competition Agreement substantially in the form of Attachment D-2 to the Franchise Agreement to covenant to us that you will not disclose our proprietary information and that you will conform to the covenant not to compete described in Item 17.

Each Owner of the franchise or the franchisee entity must sign an Undertaking and Guaranty substantially in the form of Attachment D-1 to the Franchise Agreement to personally guarantee to us that you will perform all obligations under the Franchise Agreement in a timely manner according to the respective terms of the Franchise Agreement.

An "Owner" is defined as you and your spouse if you are an individual, or any person with a five percent or greater equity interest in you (regardless of voting rights) if you are a corporation, partnership, limited liability company, or other legal entity.

## ITEM 16
## RESTRICTIONS ON WHAT THE FRANCHISEE MAY SELL

You may offer and sell only the products, goods, and services specifically authorized by us in writing; conversely, you may not offer or sell any products, goods, or services not specifically authorized by us in writing.  We may, at any time and in our sole and absolute discretion, add, eliminate, or modify authorized products, goods, and services; there are no contractual limitations on our rights to make such changes.

We reserve the right to establish policies and programs regarding pricing of products and services, including, but not limited to, establishing the maximum and/or minimum retail prices, recommending retail prices, advertising specific retail prices for some or all products or services sold at your Franchised Business, and developing and advertising price promotions or package promotions. We may compel you to observe, honor, and participate in any such policies or programs we establish.

The Franchise Agreement gives you the right to operate a single URBAN AIR TRAMPOLINE PARK® Franchised Business and to offer approved products, goods, and services only at the approved Franchised Business location. To the extent that we, from time to time, expand our service offerings to provide delivery or similar services, you may provide such services in the Protected Area (or other area that we may authorize) according to the Franchise Agreement and our then-current standards, policies, and procedures.

You must focus your marketing activities within your Protected Area. You must participate in and offer to your customers all customer loyalty and reward programs and all contests, sweepstakes, and other prize promotions. We will provide you the details of each program and promotion, and you must promptly display all point-of-sale advertising and promotion-related information at such places within the Franchised Business as we may designate. You must purchase and distribute all coupons, clothing, toys, and other collateral merchandise (and only the coupons, clothing, toys, and collateral merchandise) we designate for use in connection with each such program or promotion.

You may only use marketing and promotional materials that we have approved. You are not limited in the type of customers to whom you may sell approved products or services.

## ITEM 17
## RENEWAL, TERMINATION, TRANSFER AND DISPUTE RESOLUTION
## THE FRANCHISE RELATIONSHIP

**This table lists certain important provisions of the Site Selection and Franchise Agreements. You should read these provisions in the Site Selection Agreement and Franchise Agreement attached to this disclosure document.**

| Provision | Section in agreement | Summary |
|---|---|---|
| a. Length of the franchise term | Section 2.A of the Franchise Agreement | 10 years. |
| b. Renewal or extension of the term | Section 2.B of the Franchise Agreement | If you are in good standing you may elect to continue operating the franchise for up to three additional ten-year successor terms. You must pay us a renewal fee of $3,000 plus reimbursement of our legal and professional expenses. |
| c. Requirements for franchisee to renew or extend | Section 2.B of the Franchise Agreement | Provide notice; may not be in default of the Franchise Agreement or any other agreement; must renovate and modernize the Franchised Business to conform to our then-current image; you and employees must be in compliance with our then-current training requirements; you must have the right to possess the Franchised Business premises or have secured a substitute location; you and all guarantors must sign a release; must have operated substantially in accordance with the Franchise Agreement throughout the term. If we permit you to renew, you must sign our then-current form of franchise agreement, which may be materially different than the current form and may reflect different royalty fee and advertising obligations. |
| d. Termination by franchisee | No provision | Not applicable. |
| e. Termination by franchisor without cause | No provision | Not applicable. |
| f. Termination by franchisor with cause | Section 18 of the Franchise Agreement | We can terminate only if you are in default. |
| g. "Cause" defined – curable defaults | Section 18.C of the Franchise Agreement | Your failure to pay monies owed to us or to our affiliates; misuse of the Marks or our copyrighted works or other intellectual property not cured within five days after delivery of written notice; Franchised Business is cited for violation of health, sanitation or safety laws or regulations not cured within five days after receipt of citation; failure to comply with any other provision of the Franchise Agreement, except as described in h, below. |

| Provision | Section in agreement | Summary |
|---|---|---|
| h. "Cause" defined – non-curable defaults | Section 18.A and 18.B of the Franchise Agreement | The Franchise Agreement will terminate automatically without notice and without an opportunity to cure upon the happening of certain bankruptcy or insolvency-related events, or upon foreclosure or lien against the assets of the Franchised Business.<br>We may terminate the Franchise Agreement without providing you an opportunity to cure if you fail to identify a site for the Franchised Business or to open the Franchised Business when required; you abandon the Franchised Business; you have made any false or misleading representations in your franchise application; you or any owner is convicted or pleads no contest to certain types of crimes; you or any owner violates confidentiality obligations; the Franchised Business fails quality assurance inspections; termination of any other franchise agreement between you or your affiliates and us; we deliver to you three or more notices of defaults during any rolling 24-month period, whether or not the defaults describes in the notices ultimately are cured. |
| i. Franchisee's obligations on termination/nonrenewal | Article 5 of the Site Selection Agreement<br><br>Section 19 of the Franchise Agreement | Under the Site Selection Agreement, you must stop using and maintaining confidentiality of all confidential information; refrain from leasing or otherwise acquiring any real estate identified as a potentially suitable site for your franchise; refrain from diverting or attempting to divert prospective customers of ours to any Competitive Business; and refrain from owning, maintaining, advising, operating, engaging in, and being employed by any Competitive Business.<br>Under the Franchise Agreement, obligations include ceasing to hold yourself out as a franchisee or former franchisee; canceling fictitious or assumed name; transferring the Franchised Business' telephone number to us; at our option, assigning us your interest in the lease for the Franchised Business premises; sell to us any of the Franchised Business' assets we elect to purchase; and comply with post term obligations (also see r, below). |
| j. Assignment of contract by franchisor | Article 6.1 of the Site Selection Agreement<br><br>Section 17.A of the Franchise Agreement | No restriction on our right to assign our interest in the Site Selection Agreement and the Franchise Agreement, or to transfer any of our assets. |
| k. "Transfer" by franchisee – defined | Section 17.B of the Franchise Agreement | Includes transfer of Franchise Agreement, transfer of the assets of the Franchised Business, and ownership changes. |
| l. Franchisor approval of transfer by franchisee | Section 17.B of the Franchise Agreement | We have the right to approve all transfers but will not unreasonably withhold approval. |
| m. Conditions for franchisor approval of transfer | Section 17.B of the Franchise Agreement | We may condition approval on satisfaction of the following: all monetary obligations must be satisfied; you must be in full compliance with the Franchise Agreement and all other agreements; you and each |

| Provision | Section in agreement | Summary |
|---|---|---|
| | | owner must sign a release; the transferee must meet our criteria for new franchisees; the transferee must sign our then-current form of franchise agreement for the remainder of the franchise term left on your agreement; the transferee must agree to refurbish the Franchised Business; you must agree to remain liable for all pre-transfer obligations; the transferee must comply with our then-current training requirements; the economic terms of the transfer may not, in our opinion, materially and adversely affect the post transfer viability of the Franchised Business. |
| n.  Franchisor's right of first refusal to acquire franchisee's business | Section 17.E of the Franchise Agreement | We may match any bona fide offer to purchase your business. |
| o.  Franchisor's option to purchase your business | No provision | Not applicable |
| p.  Death or disability of franchisee | Section 17.F of the Franchise Agreement | Transfer of interest to his or her spouse or third party within six months of death or incapacity, subject to our approval and right of first refusal. |
| q.  Non-competition covenants during the term of the franchise | Article 5.4 of the Site Selection Agreement  Section 14 of the Franchise Agreement | Neither you nor any owner may be involved in any Competitive Business. |
| r.  Non-competition covenants after the franchise is terminated or expires | Article 5.4 of the Site Selection Agreement; Section 14 of the Franchise Agreement | For a two-year period following termination of the Site Selection Agreement, neither you nor any owner may divert or attempt to divert to any Competitive Business any of our prospective or present customers and you may not be involved with any Competitive Business. For a two-year period following termination or expiration of the franchise, neither you nor any owner may be involved in any Competitive Business located **(1)** at the former Franchised Business location, **(2)** within the former Protected Area, or **(3)** within 25 miles of any other URBAN AIR TRAMPOLINE PARK® Franchised Business. |
| s.  Modification of the agreement | Section 22.B of the Franchise Agreement | The Franchise Agreement may be modified only by a written document signed by both parties. |
| t.  Integration/merger clause | Article 7.7 of the Site Selection Agreement  Section 22.A of the Franchise Agreement | The Site Selection and Franchise Agreements and its Attachments constitute the full and final agreement and are binding (subject to federal law).  Any other promises or statements may not be enforceable. No claim made in any franchise agreement is intended to disclaim the express representations made in this disclosure document. |
| u.  Dispute resolution by arbitration or mediation | No provision of the Franchise Agreement | Not applicable. |
| v.  Choice of forum | Article 7.2 of the | Litigation must be instituted and maintained in the |

| Provision | Section in agreement | Summary |
|---|---|---|
| | Site Selection Agreement\n\nSection 23.B of the Franchise Agreement | district courts of Tarrant County, Texas (subject to applicable state law). |
| w.  Choice of law | Article 7.2 of the Site Selection Agreement\n\nSection 23.A of the Franchise Agreement | Texas law applies (subject to applicable state law). |

## ITEM 18
## PUBLIC FIGURES

We do not currently use any public figure to promote the franchise.

## ITEM 19
## FINANCIAL PERFORMANCE REPRESENTATIONS

The FTC's Franchise Rule permits a franchisor to provide information about the actual or potential financial performance of its franchised and/or franchisor-owned outlets, if there is a reasonable basis for the information, and if the information is included in the disclosure document. Financial performance information that differs from that included in Item 19 may be given only if: (1) a franchisor provides the actual records of an existing outlet you are considering buying; or (2) a franchisor supplements the information provided in this Item 19, for example, by providing information about possible performance at a particular location or under particular circumstances.

The following chart reflects financial performance information for the five URBAN AIR TRAMPOLINE PARK® facilities (two franchised and three affiliate-owned) that operated for the full calendar year January 1, 2015 to December 31, 2015.

| Full Year 2015 | Average Gross Annual Revenue[1] | Median Revenue | Number of Facilities that Attained or Surpassed Average Annual Gross Revenue | Percentage of Facilities that Attained or Surpassed Average Annual Gross Revenue |
|---|---|---|---|---|
| All five locations | $1,773,881.14 | $1,872,598.29 | 3 | 60% |
| Two franchised locations[2] | $1,528,649.75 | $1,528,649.75 | 1 | 50% |

Note 1: Average Gross Annual Revenue reflects only gross sales. They do not reflect royalty fees, advertising fund contributions, operating expenses, or other costs or expenses that must be deducted from gross sales to obtain net income or profit.

Note 2.  These locations are owned by franchisees, but we manage one facility under a management services agreement, as described below.

The above five outlets are substantially similar to the franchises being offered. The following chart reflects the historical data for a subset of the four facilities (three affiliate-owned and one franchised) that have entered into a separate management services agreement with us. The management services agreement is an optional agreement entered into for managing the day-to-day operations of the franchise. All four facilities operated the entire calendar year ending December 31, 2015.

Under the management services agreement, these facilities pay us a $120,000 annual management fee, which covers management personnel costs. If your franchise will be managed on-premises by a person with an ownership interest in the franchise, it will not pay a third-party management fee, but will compensate the owner for management services. The following chart reflects revenue and EBITDA information for the four units that we manage.

Because results will differ for a franchisee who is an owner/operator, we have presented information in two ways. Columns 4 and 5 reflect the facilities' actual EBITDA, including payment of the management services fee expense. Columns 2 and 3 ignore payment of the management services fee and assume that there is an additional $120,000 available to compensate a managing owner.

**Financial Performance Data[6]**

| Location | Gross Annual Revenue[1] | EBITDA + Mgt. Fee[2] | EBITDA + Mgt. Fee to Revenue Ratio[3] | EBITDA[4] | EBITDA to Revenue Ratio[5] |
|---|---|---|---|---|---|
| Frisco, Texas | $2,011,383.49 | $899,749.00 | 45% | $779,749.00 | 39% |
| Mansfield, Texas | $1,928,124.42 | $774,496.88 | 40% | $654,496.88 | 34% |
| Southlake, Texas | $1,872,598.29 | $757,710.36 | 40% | $637,710.40 | 34% |
| Rockwall, Texas[7] | $1,484,877.18 | $441,374.00 | 30% | $321,374.00 | 22% |
| **Average** | $1,937,368.73 | $718,332.56 | 39% | $598,332.57 | 32% |

Note 1:  "Gross Annual Revenue" is the total gross revenue (including sales tax) realized during calendar year ended December 31, 2015.

Note 2:  "EBITDA + Mgt. Fee" is earnings before interest, taxes, depreciation, and amortization, and includes deduction for all business expenses (including rent, payroll, payroll taxes, royalty fees, advertising fund contributions, and operating expenses) except the $120,000 management services fee.

Note 3:  "EBITDA + Mgt. Fee to Revenue Ratio" was calculated by dividing EBITDA + Mgt. Fee by Gross Annual Revenue for each location. This column reflects the additional amount that would have been available for managing owner compensation if the third party management service fee were not paid to us.

Note 4: "EBITDA" is earnings before interest, taxes, depreciation, and amortization, and includes deduction of the $120,000 management services fee expense.

Note 5: "EBITDA to Revenue Ratio" was calculated by dividing EBITDA (which includes deduction of the $120,000 management services fee expense) by Gross Annual Revenue.

Note 6: Sales are affected by a number of factors including local demographics (including daytime and residential population and income levels), site characteristics (*i.e.*, visibility, traffic count, ease of ingress and egress, parking availability), seasonality, local competition, brand and product awareness in the geographic area in which the Franchised Business is located, and your individual marketing efforts.

Note 7: This franchised location differs from other locations managed by us because the franchisee owns the real estate and leases to the Franchised Business at above-market rent, and uses company funds for non-franchised-location related expenses.

Written substantiation for this financial performance representation will be made available to prospective franchisees upon reasonable request.

New franchisees are likely to realize financial results that are different from the financial information contained in this Item 19.

Some franchises have earned these amounts. Your individual results may differ. There is no assurance that you will sell as much. We cannot estimate the results of any particular location or event.

Other than the preceding financial performance representation, UATP Management, LLC does not make any financial performance representations. We also do not authorize our employees or representatives to make any such representations either orally or in writing. If you are purchasing an existing outlet, however, we may provide you with the actual records of that outlet. If you receive any other financial performance information or projections of your future income, you should report it to the franchisor's management by contacting Michael Browning, Jr., 317 S. Jenkins, Suite C Grapevine, Texas 76051 (800) 960-4778, the Federal Trade Commission, and the appropriate state regulatory agencies.

## ITEM 20
## OUTLETS AND FRANCHISEE INFORMATION

### Table No. 1
### System-Wide Outlet Summary
### For Years 2013 to 2015

| Outlet Type | Year | Outlets at the Start of the Year | Outlets at the End of the Year | Net Change |
|---|---|---|---|---|
| Franchised[1] | 2013 | 0 | 0 | 0 |
|  | 2014 | 0 | 3 | +3 |
|  | 2015 | 3 | 7 | +4 |
| Company Owned | 2013 | 2 | 1 | 3 |
|  | 2014 | 3 | 0 | 3 |
|  | 2015 | 3 | 0 | 3 |
| Total Outlets | 2013 | 1 | 2 | +1 |
|  | 2014 | 2 | 5 | +3 |
|  | 2015 | 5 | 9 | +4 |

Note 1: The Rockwall, Texas franchised location is managed by us under a management services agreement.

**Table No. 2**
**Transfers of Outlets from Franchisee to New Owners (other than the Franchisor)**
**For years 2013 to 2015**

| State | Year | Number of Transfers |
|---|---|---|
| Kansas | 2013 | 0 |
| | 2014 | 0 |
| | 2015 | 0 |
| Texas | 2013 | 0 |
| | 2014 | 0 |
| | 2015 | 0 |
| Total | 2013 | 0 |
| | 2014 | 0 |
| | 2015 | 0 |

**Table No. 3**
**Status of Franchised Outlets[1]**
**For Years 2013 to 2015**

| State | Year | Outlets at Start of Year | Outlets Opened | Terminations | Non-Renewals | Reacquired by Franchisor | Ceased Operations-Other Reasons | Outlets at End of the Year |
|---|---|---|---|---|---|---|---|---|
| Kansas | 2013 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2014 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2015 | 1 | 1 | 0 | 0 | 0 | 0 | 2 |
| Texas | 2013 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2014 | 0 | 2 | 0 | 0 | 0 | 0 | 2 |
| | 2015 | 2 | 4 | 0 | 0 | 0 | 0 | 6 |
| Total | 2013 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2014 | 0 | 3 | 0 | 0 | 0 | 0 | 3 |
| | 2015 | 3 | 5 | 0 | 0 | 0 | 0 | 8 |

**Table No. 4**
**Status of Company Owned Outlets**
**For Years 2013 to 2015**

| State | Year | Outlets at Start of Year | Outlets Opened | Outlets Reacquired from Franchisees | Outlets Closed | Outlets Sold to Franchisees | Outlets at End of the Year |
|---|---|---|---|---|---|---|---|
| Texas | 2013 | 2 | 1 | 0 | 0 | 0 | 3 |
| | 2014 | 3 | 0 | 0 | 0 | 0 | 3 |
| | 2015 | 3 | 0 | 0 | 0 | 0 | 3 |
| Total | 2013 | 2 | 1 | 0 | 0 | 0 | 3 |
| | 2014 | 3 | 0 | 0 | 0 | 0 | 3 |
| | 2015 | 3 | 0 | 0 | 0 | 0 | 3 |

**Table No. 5**
**Projected Openings**
**As of December 31, 2015**

| State | Franchise Agreements Signed But Outlet Not Opened | Projected New Franchised Outlets In the Next Fiscal Year | Projected New Company-Owned Outlets in the Next Fiscal Year |
|---|---|---|---|
| Alabama | 1 | 1 | 0 |
| Arkansas | 0 | 2 | 0 |
| Arizona | 0 | 1 | 0 |
| Colorado | 0 | 2 | 0 |
| Florida | 0 | 1 | 0 |
| Georgia | 0 | 2 | 1 |
| Indiana | 0 | 2 | 0 |
| Iowa | 0 | 1 | 0 |
| Kansas | 0 | 2 | 0 |
| Louisiana | 0 | 1 | 0 |
| Maine | 0 | 1 | 0 |
| Maryland | 0 | 3 | 0 |
| Michigan | 1 | 0 | 0 |
| Mississippi | 0 | 1 | 0 |
| Montana | 0 | 1 | 0 |
| Pennsylvania | 1 | 2 | 0 |
| North Carolina | 0 | 2 | 0 |
| New Hampshire | 0 | 1 | 0 |
| Ohio | 0 | 3 | 0 |
| Oklahoma | 0 | 1 | 0 |
| Tennessee | 0 | 3 | 1 |
| Texas | 4 | 6 | 3 |
| Total | 7 | 39 | 5 |

See Exhibit F to this disclosure document for a list of our current franchisee locations and current affiliate-owned locations. No franchisee has had a Franchised Business terminated, cancelled, not renewed or otherwise voluntarily or involuntarily ceased to do business under a Franchise Agreement during the most recently completed fiscal year or has failed to communicate with us within ten weeks of the application date. If you buy this franchise, your contact information may be disclosed to other buyers when you leave the franchise system.

During the last three fiscal years, we have not signed confidentiality clauses with any current or former franchisee.

We are not aware of any trademark-specific franchisee organization associated with this franchise system.

## ITEM 21
## FINANCIAL STATEMENTS

Attached as Exhibit E are our audited balance sheets as of December 31, 2015, 2014, and 2013, and the related statements of operations and changes in members' equity (deficit), and cash flows for the years ended December 31, 2015, and December 31, 2014, and the period from May 31, 2013 (inception) through December 31, 2013.

We have not been in business for three years or more and cannot provide all financial statements as required by this Item.

## ITEM 22
## CONTRACTS

Attached as <u>Exhibit D-1</u> to this disclosure document is a copy of the Site Selection Agreement and the following attachments to the Site Selection Agreement:

| | |
|---|---|
| <u>Attachment A</u> | Description of the Site Selection Area |
| <u>Attachment B</u> | Franchise Agreement |
| <u>Attachment C</u> | Lease Rider |

Attached as <u>Exhibit D-2</u> to this disclosure document is a copy of the Franchise Agreement and the following attachments to the Franchise Agreement:

| | |
|---|---|
| <u>Attachment A</u> | Glossary of Additional Terms |
| <u>Attachment B</u> | Approved Location and Protected Territory |
| <u>Attachment C</u> | Franchisee's Owners and Key Personnel |
| <u>Attachment D-1</u> | Undertaking and Guaranty |
| <u>Attachment D-2</u> | Confidentiality and Non-Competition Agreement |
| <u>Attachment E</u> | Electronic Debit Authorization |
| <u>Attachment F</u> | Telephone Assignment Agreement |
| <u>Attachment G</u> | Lease Rider |

Attached as <u>Exhibit H</u> to this disclosure document is a sample form of the General Release.

## ITEM 23
## RECEIPT

The last two pages of this disclosure document are detachable duplicate Receipts.  Please sign and date both copies of the Receipt.  Keep one signed copy of the Receipt for your file and return to us the other signed copy of the Receipt.  The Receipt page also contains the names, addresses and telephone numbers of our franchise sellers or brokers.

**UATP MANAGEMENT, LLC**

**STATE SPECIFIC APPENDIX**

## FOR THE STATE OF ILLINOIS

Item 17 is supplemented by the following:

Section 705/4 of the Illinois Franchise Disclosure Act of 1987 (the "Act") provides that any provision in the Franchise Agreement that designates venue outside of Illinois is void with respect to any cause of action that is otherwise enforceable in Illinois; however, the Agreement may provide for arbitration in a forum outside of Illinois.

Notwithstanding the provisions of the Franchise Agreement and the Store Development Agreement that Texas law shall govern, Illinois law shall apply to and govern any claim between the parties under the Franchise Agreement and the Store Development Agreement that alleges violation of the Act.

The conditions under which your franchise can be terminated and your rights on renewal may be affected by Illinois law, 815 ILCS 705/19 and 705/20.

## FOR THE STATE OF MARYLAND

Item 17 of the disclosure document is supplemented as follows:

The Franchise Agreement provides for termination upon bankruptcy. These provisions may not be enforceable under federal bankruptcy law.

Any provisions requiring you to sign a general release of claims against us, including upon renewal, transfer or any amendment of the Franchise Agreement, does not release any claim you may have under the Maryland Franchise Registration and Disclosure Law.

Any claims arising under the Maryland Franchise Registration and Disclosure Law must be brought within 3 years after the grant of the franchise.

You may bring a lawsuit in Maryland for claims arising under the Maryland Franchise Registration and Disclosure Law.

Nothing in this General Release attached as Exhibit H shall operate to release us from any liability under the Maryland Franchise Registration and Disclosure Law.

**EXHIBIT A**

**FRANCHISE DISCLOSURE DOCUMENT**

**OPERATIONS MANUAL TABLE OF CONTENTS**

Table of Contents to Operations Manual

## SECTION A: INTRODUCTION

**WELCOME LETTER FROM THE FOUNDER**                               1
**MISSION STATEMENT**                                             2
**HISTORY OF URBAN AIR**                                          3

**SERVICES PROVIDED TO FRANCHISEES**
Territorial Exclusivity                                           4
Site Selection                                                   5
Initial Training                                                 6
Initial Onsite Assistance                                        7
Ongoing Training and Support                                     8
Approved Suppliers                                               9
Advertising Materials and Sales Aids                             10
Ongoing Research and Development                                 11

**FRANCHISEE RESPONSIBILITIES**
Responsibilities to Your Customers                               12
Responsibilities to -Your Staff                                  13
Responsibilities to Your Fellow Franchisees                      14
Responsibilities to the Franchisor                               15

**VISITS FROM THE CORPORATE OFFICE**                             16

**PAYING OTHER FEES**
Additional Training                                              17
Transfer                                                         18
Audits                                                           19
Late Payments                                                    20
Supplier Inspection/Testing                                      21
Indemnification                                                  22
Enforcement                                                      23
Replacement Fee for Manual                                       24

## SECTION B: PRE·OPENING PROCEDURES

**PRE-OPENING RESPONSIBILITIES**
Pre-Opening Checklists                                           25

**SITE SELECTION  PROCESS**
Site Select ion Criteria                                         30
Market Analysis                                                  31
Gaining Site Selection Approval                                  32
Lease Considerations                                             33
**SETTING UP THE TRAMPOLINE & ADVENTURE PARK**
Building Out the Facility                                        34
Construction Specifications                                      35
Selecting a Contractor                                           36

Design Criteria                                                      37
Required Equipment, Fixtures, and Furnishings                        38
Exterior and Interior Signage Requirements                          48

**INITIAL INVENTORY**                                               58

**REQUIRED UTILITIES AND SERVICES**                                 68

**SETTING UP BANK ACCOUNTS**
Accounts to Open                                                    69

**SETTING UP INTERNAL SYSTEMS**
Point Of Sale                                                       70
Waiver System                                                      71
Online Ticketing                                                   72
Marketing Systems                                                  73
HR & Payroll                                                       74
TV & Internet                                                      75
Music Services & Licensing                                         76

**PROCURING REQUIRED INSURANCE**                                   77

**CONDUCTING YOUR GRAND OPENING**
Selecting A Grand Opening Date                                     78
Soft Opening                                                       79
Planning                                                           80
Pre-Marketing Facility                                             81
Grand Opening Specials/Promotions                                  82

**SECTION C: HUMAN RESOURCES**

**PROFILE OF IDEAL URBAN AIR EMPLOYEE**

**JOB DESCRIPTIONS**
General Manager                                                    83
Park Lead                                                          84
Event Coordinator                                                  85
Fitness Coordinator                                                86
Court Engineer                                                     87
Fitness Instructor                                                 88
Front Desk                                                         89
Court Monitor
Party Host                                                         90
                                                                  91

**RECRUITING EMPLOYEES**
Determining Hiring Needs                                           92
Getting the Word Out                                               93
Evaluating the Applications                                        94
Conducting Interviews                                              95
Sample Interview Questions                                         96
Testing Procedures                                                 97

Background Reference Checks                                    98
Job Offer                                                      99

**HIRING ON A TRIAL PERIOD**                                  100

**COMPLETING NECESSARY PAPERWORK**
Online Paperwork Process                                      101

**TRAINING EMPLOYEES**
Training Tips                                                 102
Orienting New Employees                                       103
Initial Training of New Employees                             104
Ongoing Training Process                                      105

**PERSONNEL POLICIES**                                        106

**TIME TRACKING PROCEDURES**
Time Clock Correction Sheet                                   107

**UNIFORM AND DRESS CODE**                                    108

**PERFORMANCE EVALUATIONS**
Evaluation Process                                            109
Review Meeting                                                110

**EMPLOYEE DISCIPLINE**
Termination                                                   111
Suspension                                                    112

**SECTION D: SALES PROCEDURES**
**HANDLING INQUIRIES**
Properly Greeting Customers                                   113
Explanation of What Is Urban Air                              114
Trampoline Activity Area Descriptions                         115
Frequently Asked Questions and Answers                        116

**EXPLAINING URBAN AIR POLICIES**
Waiver Requirement                                            117
Capacity Restriction                                          118
Birthday Party Policies                                       119
    -   No outside food or drinks
    -   Cancellation policy
    -   Counting Of Jumpers
    -   Coupon Policy
                                                              120
**SELLING OPEN-.JUMP TICKETS**

**SELLING BIRTHDAY PARTIES**
Overview of the Birthday Party Offering                       121
Guidelines for Booking Parties                                122
Sample Script                                                 123

Follow-up Procedures                                        124
Typical Questions and Their Answers                        125
Handling Objections                                        126
How To Book A Birthday Party                               127

**SELLING FITNESS CLASSES**
Overview of the Classes                                    137
Sample Script                                              138
Follow-up Procedures                                       139
Typical Questions and Their Answers                        140

**SELLING SPECIAL EVENTS**
Overview of the various event types                        141
Pricing Guidelines                                         142
Sample Script                                              152
Follow-up Procedures                                       153
Typical Questions and Their Answers                        154

<strong>SECTION E: DAILY OPERATING PROCEDURES</strong>

**SUGGESTED HOURS OF OPERATION**                           155

**DAILY PROCEDURES**
Opening Procedures & Checklist                             156
On-going Procedures & Checklist                            157
Administrative Procedures & Checklist                      158
Closing Procedures& Checklist                              159

**CUSTOMER SERVICE PROCEDURES**
Urban Air Customer service Philosophy                      160
Maintaining Client Relations                               161
Handling Customer Complaints                               162
    -    Email Script
    -    Phone Script
    -    In Person Script
Handling Refund Requests                                   165
Handling Negative Reviews Online                           166

**PRE-BIRTHDAY PARTY PROCEDURES**
Online Orders Pending Review                               167
Party Confirmations Week Of                                168
Completing Party Sheets                                    169
Completing Party Block Report                              170
Completing Pizza Sheets                                    171

**DAY OF BIRTHDAY PARTY PROCEDURES**
Room/Table set Up                                          172
Check-in Time                                              173
How to Check-In Guests                                     174
    -    Greeting
    -    Check Waiver

How to keep tabs on additional items                                    175
How To Checkout a Party                                                 176
Party Cleanup                                                           177

**FRONT DESK PROCEDURES**
General Rules For Front Desk Personnel                                   178
-   Greeting Customers At The Door
-   Thanking Customers As They Leave
Cash Handling Procedures At Register                                     179
Accepting Checks                                                        180
Accepting Credit and Debit Cards                                        181
Post-transaction Procedures                                             182
Petty Cash Transactions                                                 183

<u>POINT OF SALE SYSTEM</u>
How to Log Into POS System                                              184
How to Ring Up Transactions                                             185
-   Cash
-   Credit
-   With Coupons
-   Split Payments: Cash and Credit
-   Using A Gift Card
How To Book A Birthday Party                                            190
How To Checkout  A Birthday Party                                       195
How To Move A Party To A New Date & Time                                200
How to Cancel A Party                                                   202
How To Sell A Gift Card                                                 204

<u>WAIVER SYSTEM</u>
How to Log Into Waiver System                                           205
How to look up a customer                                               206
How to check-in a customer                                              207
How to verify a customer has a membership                               208

<u>HOW TO REDEEM VOUCHERS</u>
Groupon, Living Social, Alike                                          210
LocBox

**COURT SAFETY**
Daily Trampoline Inspection                                             211
Wristband Requirements                                                  212
Rules Signage                                                          213
How To Enforce The Rules                                               220
Court Monitor Responsibilities                                         221
Court Monitor Positioning                                              222

**INCIDENTS**
Dealing with an Incident In the Moment                                 223
Reporting Incidents                                                    224
-   Incident Report
-   Waiver

- Video

**SECURITY ISSUES**
Unruly Customers                                                    230
Robbery                                                            230
Burglary                                                           230
Bomb Threat                                                        230

**SECTION F: MANAGING AN URBAN AIR**

**MANAGING PERSONNEL**
Motivating Employees                                              231
Communicating with Employees                                     232
Hosting Employee Meetings                                        233
Setting Up Employees In HR System                                234

**SHIFT PLANNING OVERVIEW**
Adding and Deactivating Employees                                236
Efficient Schedule Strategies                                    238
Setting Up A Schedule                                            245
Publishing A Schedule                                            246
Managing Time Off Requests                                       247
Managing Trades                                                  248
Time Clock Correction Sheets                                     250

**PAYROLL PROCESSING**
Connection Between Shift Planning System & Payroll System        251
Reviewing Schedule                                               252
Exporting Hours                                                  253
Exporting Tips                                                   254
Payroll Process                                                  255

**MANAGING POINT OF SALE SYSTEM**
How to Issue A Refund                                            256
Hot to add, edit and delete employees from Point Of Sale System  258
How to change staff permission levels                            260
Features of the POS System                                       262
Reports                                                          264

**MANAGING THE CUSTOMER EXPERIENCE**
Communicating with Customers As Manager                          265
Using Customer Service Card                                      266
Recommended Owners Information Policy                            267
Maintaining Positive Environment                                268

**INVENTORY MANAGEMENT**
Product Ordering Procedures                                      269
Ordering from Approved Suppliers                                 270
Changing Approved Suppliers                                      271
Product Receiving Procedures                                     272
Labeling and Rotating Inventory                                  273

Storing Procedures                                              274
Tracking Inventory                                             275

**OPERATIONAL AND FINANCIAL REPORTING**
Generating All Necessary Reports                               276
Analyzing the Reports                                          277

**LOSS PREVENTION TECHNIQUES**
Change Bag                                                     278
Drop Safe                                                      279
Employee Safe                                                  280
Inventory                                                      281

**FRANCHISE REPORTING**
Royalty Payment                                               282
Advertising Contributions                                     283
Required Weekly Reports                                       284
Electronic Funds Transfer                                     285
Financial Statements                                         286

## SECTION G: CLEANING & MAINTENANCE

**CLEANING PROCEDURES**
Recommended Cleaning Products                                287
Daily Procedures                                             288
Weekly Procedures                                            289
Monthly Procedures                                           290
Cleaning Checklists                                          291

**MAINTENANCE PROCEDURES**
Required Maintenance Schedule                                292
Conducting Court and Materials Inspections                   293
Changing Out A Bed                                            294
Fixing A Basketball Rim                                       295
Fixing Holes in Netting                                      296

## SECTION H: MARKETING AND PROMOTION

**DONATIONS PROGRAM**
Goal Of Donations Program                                    297
How To Trade Donations For Sponsorships                       298
Birthday Party Donations                                     299
Family Fun Pack Donations                                    300
Class Fun Pack Donations                                     301

**FUNDRAISERS**                                              302

**INTERNAL MARKETING**
In-Store Signage                                             303
Brochures                                                    304
Audio Files / Announcements                                  305

**EXTERNAL MARKETING**
Creating A Street Team                                    306
Community Events                                          307
Magazines – Editorial                                     308
Magazines – Coupons                                       309
Email Marketing                                           310
Social Media Marketing                                    311
TV                                                        312
Direct Mail                                               313
Radio                                                     314
Google Ad words                                           315
Search Engine Optimization                                316

**BRAND GUIDELINES**                                      317

**LOGO SPECIFICATIONS**                                   320

**REQUIRED ADVERTISING EXPENDITURES**
Grand Opening Advertising Requirement                     321
Monthly Advertising Requirements                          322

**OBTAINING ADVERTISING APPROVAL**                        323

**ADDENDUM: FORMS**

**EXHIBIT B**
**FRANCHISE DISCLOSURE DOCUMENT**

**LIST OF STATE ADMINISTRATORS**

## LIST OF STATE ADMINISTRATORS

| STATE | STATE ADMINISTRATOR |
|---|---|
| **CALIFORNIA** | Department of Business Oversight<br>320 West 4th Street, Suite 750<br>Los Angeles, California  90013<br>(213) 576-7505<br>(866) 275-2677 |
| **HAWAII** | Commissioner of Securities of the State of Hawaii<br>Department of Commerce and Consumer Affairs<br>Business Registration Division<br>Securities Compliance Branch<br>335 Merchant Street<br>Honolulu, Hawaii  96813<br>(808) 586-2722 |
| **ILLINOIS** | Franchise Bureau<br>Office of the Attorney General<br>500 South Second Street<br>Springfield, Illinois  62706<br>(217) 782-4465 |
| **INDIANA** | Securities Commissioner<br>Indiana Securities Division<br>302 West Washington St., Room E-111<br>Indianapolis, Indiana  46204<br>(317) 232-6681 |
| **MARYLAND** | Office of the Attorney General<br>Securities Division<br>200 St. Paul Place<br>Baltimore, Maryland  21202-2021<br>(410) 576-6360 |
| **MICHIGAN** | Michigan Department of Attorney General<br>Consumer Protection Division<br>Franchise Unit<br>525 West Ottawa Street<br>G. Mennen Williams Building, 1st Floor<br>Lansing, Michigan  48909<br>(517) 373-1837 |
| **MINNESOTA** | Minnesota Department of Commerce<br>85 7th Place East, Suite 500<br>St. Paul, Minnesota  55101-2198<br>(651) 296-4026 |
| **NEW YORK** | New York State Department of Law<br>Bureau of Investor Protection and Securities<br>120 Broadway, 23rd Floor<br>New York, New York  10271-0332<br>(212) 416-8000 |
| **NORTH DAKOTA** | North Dakota Securities Department<br>600 East Blvd. Avenue<br>State Capitol, Fifth Floor, Dept. 414<br>Bismarck, North Dakota 58505-0510<br>(701) 328-4712 |

| STATE | STATE ADMINISTRATOR |
|---|---|
| **RHODE ISLAND** | Securities Division<br>Department of Business Regulation<br>1511 Pontiac Avenue<br>John O. Pastore Complex – Building 69-1<br>Cranston, Rhode Island  02920<br>(401) 462-9585 |
| **SOUTH DAKOTA** | Department of Labor and Regulation<br>Division of Securities<br>124 S. Euclid, Suite 104<br>Pierre, South Dakota 57501<br>(605) 773-4823 |
| **VIRGINIA** | State Corporation Commission<br>Division of Securities and Retail Franchising<br>1300 East Main Street, 9th Floor<br>Richmond, Virginia  23219<br>(804) 371-9051 |
| **WASHINGTON** | Department of Financial Institutions<br>Securities Division<br>150 Israel Road SW<br>Tumwater, Washington 98501<br>(360) 902-8760 |
| **WISCONSIN** | Securities and Franchise Registration<br>Wisconsin Securities Commission<br>345 West Washington Street, 4th Floor<br>Madison, Wisconsin  53703<br>(608) 266-3364 |

**EXHIBIT C**
**FRANCHISE DISCLOSURE DOCUMENT**

**LIST OF AGENTS FOR SERVICE OF PROCESS**

## LIST OF AGENTS FOR SERVICE OF PROCESS

**INDIANA:**
Indiana Secretary of State
302 West Washington Street
Room E-111
Indianapolis, Indiana 46204

**MARYLAND:**
Securities Commissioner
Division of Securities
200 St. Paul Place
Baltimore, Maryland 21202-2020

**MICHIGAN:**
Michigan Department of Attorney
General
Consumer Protection Division
Franchise Unit
525 W. Ottawa Street
G. Mennen Williams Bldg., 1st Floor
Lansing, Michigan 48913

**TEXAS:**
Stephen Polozola
801 Cherry Street, Unit#46
Burnett Plaza, Suite 2000
Fort Worth, Texas 76102-6836

**EXHIBIT D-1**
**FRANCHISE DISCLOSURE DOCUMENT**


**SITE SELECTION AGREEMENT**

# SITE SELECTION AGREEMENT

This SITE SELECTION AGREEMENT is entered into and effective as of this ___ day of _____, 20__ ("Effective Date") by and between UATP Management, LLC, a Texas limited liability company, having its principal offices at 317 S. Jenkins St. Suite C Grapevine, TX 76051 ("**Franchisor**"), and _____, having a principal place of business at _____ ("**you**").

## BACKGROUND

A.    Franchisor franchises the right to own and the opportunity to operate an URBAN AIR TRAMPOLINE PARK, which is a family entertainment facility that offers a wide variety of physical activities along its wall-to-wall trampoline areas, trampoline runway, foam pit, slam dunk track, and trampoline dodgeball arena.

B.    You have applied for a franchise to operate an URBAN AIR TRAMPOLINE PARK in the Site Selection Area identified in Attachment A, and Franchisor desires to grant you a franchise, based on the information contained in your franchise application.

C.    Operating an URBAN AIR TRAMPOLINE PARK requires leasing at least 25,000 square feet of space, which the parties understand may not be available in the Site Selection Area, and Franchisor desires to provide certain assistance in connection with this search.

D.    The parties are entering into this Agreement to govern their relationship during the real estate search, with the intention that, if and when an appropriate and desirable site is found, the parties will enter into a franchise agreement for an URBAN AIR TRAMPOLINE PARK, in the form attached as Attachment B (the "**Franchise Agreement**").

NOW, THEREFORE, for and in consideration of the mutual promises contained in this Agreement, the parties agree as follows:

## ARTICLE 1
### Definitions

Capitalized words shall have the meanings ascribed to them in the body of this Agreement.

## ARTICLE 2
### Site Selection Rights

2.1    Term. The term of this Agreement begins on the Effective Date and expires one-hundred twenty (120) days after the Effective Date. At your request and at Franchisor's sole discretion, Franchisor may grant an extension of up to sixty (60) days after the expiration of the Term. The term may be extended only by a written agreement signed by both parties.  This Agreement will expire automatically upon execution of the Franchise Agreement by the parties. Expiration, nonrenewal, or termination of this agreement, for any reason, does not affect your obligations under Article 5 below.

2.2    No License.  This Agreement is not a franchise or license agreement, and grants you no right to develop or operate an URBAN AIR TRAMPOLINE PARK. Such rights may only be granted by a franchise agreement.

## ARTICLE 3
### Fees

3.1    Site Selection Fee. Upon execution of this Agreement, you shall pay to Franchisor a Site Reservation Fee in the amount of $500, which is fully earned upon payment.

## ARTICLE 4
### Site Selection

4.1    Franchise Site Application.  For each proposed site that you identify, you must submit to Franchisor a Franchise Site Application including such information about the site as Franchisor may

reasonably request to perform its evaluation. This information may include, among other things, a description of the proposed site, demographic characteristics, traffic patterns, parking, character of the neighborhood, competition from other businesses in the area, the proximity to other businesses, the nature of other businesses in proximity to the site, and other commercial characteristics (including the purchase price, rental obligations and other lease terms for the proposed site) and the size, appearance, other physical characteristics and a site plan of the premises.

4.2    <u>Assistance</u>. To assist you with identifying and evaluating proposed sites for your URBAN AIR TRAMPOLINE PARK, Franchisor will make available to you demographic reports from its then-current site evaluation software. There is no charge to you for the first site you propose, but Franchisor may charge you its then-current site evaluation fee for each additional proposed site, as published in the Manual from time to time. Franchisor will also make available to you site feasibility studies from its then-current architectural firm. There is no charge to you for the first site feasibility study, but Franchisor may charge you its then-current site feasibility fee for each additional proposed site, as published in the Manual from time to time.

4.3    <u>Approval</u>. Franchisor will approve or refuse to approve a proposed site within 14 days after the receipt of these documents and any additional information as Franchisor may reasonably require. Franchisor's failure to provide notification within this time period shall not be considered either approval or disapproval. To the extent that Franchisor provides onsite evaluations, you must reimburse Franchisor for any out of pocket costs that it incurs in connection with performing the evaluation, such as travel, lodging, and dining expenses for each individual performing the evaluation.

4.4.    <u>Your Acknowledgments</u>.

(a)    The parties acknowledge and agree that Franchisor's approval of your proposed site DOES NOT AND WILL NOT constitute, directly or implicitly, an assurance that your URBAN AIR TRAMPOLINE PARK will achieve a certain sales volume or level of profitability; it means only that the proposed site meets Franchisor's minimum criteria. Franchisor assumes no liability or responsibility for: (1) evaluation of the site's soil for hazardous substances; (2) inspection of any structure for asbestos or other toxic or hazardous materials; (3) compliance with the Americans With Disabilities Act ("ADA"); or (4) compliance with any other applicable law. It is your sole responsibility to obtain satisfactory evidence and/or assurances that the site (and any structures thereon) is free from environmental contamination and is in compliance with the requirements of the ADA and other applicable laws.

(b)    Franchisor's operational standards, specifications, policies, and procedures are communicated to URBAN AIR TRAMPOLINE PARK franchisees through Franchisor's confidential operations manual and other written directives (collectively, "**Manual**"). You acknowledge you are not a franchisee and that Franchisor may share only certain portions of the Manual with you to aid you in this search for a suitable site. You also acknowledge that only after entering into a Franchise Agreement will you obtain the complete Manual and other confidential information.

(c)    The parties acknowledge and agree that, after the Site Selection Agreement expires or is terminated, regardless of the reason (even if Franchisor and you sign a Franchise Agreement), Franchisor and its affiliates may engage, and allow others to engage, in any activities we desire within and outside the Site Selection Area without any restrictions whatsoever, subject only to your rights under franchise agreements with Franchisor then in effect.

## ARTICLE 5
### Lease

5.1    <u>Execution of Franchise Agreement</u>. You shall sign and deliver to Franchisor the Franchise Agreement, and pay the initial franchise fee due thereunder, prior to signing a lease.

5.2    <u>Franchisor's Approval of Lease Terms</u>. Franchisor must approve the lease for the site before you sign it. Franchisor will not withhold approval arbitrarily, but may condition its approval on the lease containing any or all of the terms set forth in the Lease Rider attached hereto as <u>Attachment C</u>. You shall provide to Franchisor a fully executed copy of the lease within 10 days after its execution.

5.3     Acceptance of Lease; Countersignature of Franchise Agreement. Upon Franchisor's acceptance of your lease terms, Franchisor shall countersign the Franchise Agreement and accept payment of the initial franchise fee. You shall deliver to Franchisor a fully executed copy of your lease within five (5) days after receipt.

5.4     Your Acknowledgment.  The parties acknowledge and agree that Franchisor's approval of a lease does not mean that the economic terms of the lease are favorable; it means only that the lease contains the lease terms that Franchisor requires.

## ARTICLE 5
## Confidentiality, Non-Circumvention, and Non-Competition

5.1     Confidential Information. You and your owners (if you are a business entity) acknowledge that, during the site selection process, you will receive some of Franchisor's proprietary, confidential, and trade secret information and business strategies, as well as market information concerning the availability of suitable real estate in the Site Selection Area, rental rates, and lease negotiation procedures and strategies (collectively, "**Confidential Information**").

5.2     Confidentiality and Use. You and your owners (if you are a business entity) agree to maintain the confidentiality of all Confidential Information, and to refrain from disclosing any Confidential Information to any third party. You and your owners (if you are a business entity) shall refrain from using any Confidential Information for any purpose other to search for suitable real estate for your URBAN AIR TRAMPOLINE PARK franchised business.  The parties acknowledge and agree that your disclosure of Confidential Information to aid a Competitive Business would constitute an unfair method of competition.

5.3     Non-Circumvention.  For a period of three (3) years from the Effective Date of this Agreement, you and your owners (if you are a business entity) shall refrain from leasing or otherwise acquiring any real estate identified as a potentially suitable site for your URBAN AIR TRAMPOLINE PARK. Specifically, but without limiting the generality of the foregoing, you and your owners shall refrain from acquiring, attempting to acquire, or assisting anyone else in acquiring, such real estate for purposes of operating a Competitive Business.

5.4     Covenant Not to Compete.  Neither you nor any of your owners (if you are a business entity) may, directly or indirectly, for yourselves or through, on behalf of, or in conjunction with any person, or legal entity, at any time during the term of this Agreement, or at any time during the uninterrupted two-year period (which will be tolled during any period of noncompliance) after expiration or termination of this Agreement:

(a)     Divert or attempt to divert any present or prospective customer of any URBAN AIR TRAMPOLINE PARK business to any Competitive Business, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act that is harmful, injurious, or prejudicial to the goodwill associated with Franchisor or the URBAN AIR TRAMPOLINE PARK family of businesses; or

(b)     Own, maintain, advise, operate, engage in, be employed by, make loans to, invest in, provide any assistance to, or have any direct or indirect interest in (as owner or otherwise) or relationship or association with, any Competitive Business.

5.5.    Geographic Scope of Restriction. During the Term of this Agreement, the restrictions contained in Section 5.4(b) shall apply to any location within the United States, its territories or commonwealths, and any other country, province, state, or geographic area in which Franchisor, Franchisor's affiliates, or Franchisor's franchisees have operated or licensed others to operate an indoor or outdoor trampoline park business or any related line of business; after expiration or termination of this Agreement, this restriction shall apply to any Competitive Business that is or is intended to be located within the Site Selection Area or within a 15-mile radius of URBAN AIR TRAMPOLINE PARK business then operating in existence or under development at the time.

5.6.    Reformation. If all or any portion of any covenant contained in this Article 6 is held to be unreasonable or unenforceable by a court or agency having valid jurisdiction in an un-appealed final decision to which Franchisor is a party, you and your owners (if you are a business entity) will be bound by any lesser covenant subsumed within the terms of such covenant which imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Article 6. Notwithstanding the foregoing, Franchisor has the unilateral right, in its sole and absolute discretion, to reduce the scope of any covenant set forth in Section 5.4, or any portion thereof, which reduction will become effective immediately upon delivery of notice of the reduction.

5.7    Definition of Competitive Business. "Competitive Business" means any trampoline park or similar entertainment facility, other than an URBAN AIR TRAMPOLINE PARK business.

## ARTICLE 6
## Assignment

6.1    Assignment by Franchisor. Franchisor may freely assign its rights and interest in this Agreement.

6.2    Assignment by You.  The rights granted under this Agreement are personal to you, and were granted in reliance on the information contained in your franchise application. Therefore, you may not assign your rights or interest in this Agreement without the prior written consent of Franchisor, which may be granted or withheld in Franchisor's discretion.

## ARTICLE 7
## General Provisions

7.1    Notices.  Any notices contemplated or required under this Agreement shall be deemed effectively given when personally delivered or when received through certified mail posted to the addresses first listed above, unless other addresses have been designated by written notice in the manner prescribed by this Section 7.1.

7.2    Governing Law.  This Agreement shall be governed by and construed in accordance with the domestic laws of the State of Texas without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any jurisdiction other than the State of Texas.  The exclusive venue for disputes arising out of this Agreement shall be the state or federal, as applicable, district courts situated in Tarrant County, Texas.

7.3    Waiver.  No delay or omission by either party to exercise any right or remedy under this Agreement shall be construed to be either acquiescence or the waiver of the ability to exercise any right or remedy in the future.

7.4    Enforcement.  The prevailing party (being defined as a party that is awarded actual relief in the form of damages, declaratory relief, or injunctive relief, as well as a party that successfully defends a legal action commenced against it) in any litigation will be entitled to recover from the non-prevailing party its all of its costs and expenses, including attorneys' fees.

7.5    Severability.  If any provision of this Agreement is held invalid or unenforceable by a court of competent jurisdiction, then the remainder of this Agreement shall continue to remain valid and enforceable as though the invalid or unenforceable provision had not been included.  If any provision is held invalid or unenforceable, then a suitable and equitable provision shall be substituted for the invalid provision so as to carry out so far as possible the intent and purpose of the invalid or unenforceable provision.  If any provision of this Agreement is susceptible to more than one construction, only one of which would render the provision valid and enforceable, then the provision shall be given the meaning that renders it valid and enforceable.

7.6    Third party Beneficiaries.  There are no intended third parties of this Agreement.

7.7    Entire Agreement.  This Agreement (including its Schedules) constitutes the entire, fully integrated agreement between the parties with regard to the subject matter of this Agreement. Nothing in

this agreement or any related agreement is intended to disclaim the representation made in the Franchise Disclosure Document provided to you by Franchisor.

**IN WITNESS WHEREOF**, the undersigned have duly executed this Site Selection Agreement to be effective on the date set forth above.

**UATP MANAGEMENT, LLC,**
a Texas limited liability company.

 

By: _____                By: _____
    Michael O. Browning, Jr., President                    [Name], [Title]

**Attachment A**

**Description of Site Selection Area**

**Attachment B**

**Franchise Agreement**

**Attachment C**

**Lease Rider**

**EXHIBIT D-2**
**FRANCHISE DISCLOSURE DOCUMENT**

**FRANCHISE AGREEMENT**

**URBAN AIR TRAMPOLINE PARK®**
**FRANCHISE AGREEMENT**

**URBAN AIR TRAMPOLINE PARK®**
**FRANCHISE AGREEMENT**

## SUMMARY PAGES

**EFFECTIVE DATE:**

**EXPIRATION DATE:**

**FRANCHISEE(S):**

**ADDRESS FOR NOTICES:**

**TELEPHONE NUMBER:**

**FACSIMILE NUMBER:**

**E-MAIL ADDRESS:**

**FRANCHISOR:** UATP MANAGEMENT, LLC

**ADDRESS FOR NOTICE:** 317 South Jenkins, Suite C, Grapevine, Texas 76051

**SITE SELECTION AREA:**

**INITIAL FRANCHISE FEE:** $30,000

**ADMINISTRATIVE FEE:** Pro-rata portion of call centers hourly rate plus a $5.00 commission

**GRAND OPENING ADVERTISING AMOUNT:** $15,000.00

**MONTHLY ROYALTY FEE:** 6% of weekly Gross Sales

**MONTHLY DEVELOPMENT FUND CONTRIBUTION:** 1% of weekly Gross Sales

**TRANSFER FEE:** 50% of our then-current initial franchise fee if transferred to a new approved franchisee or 25% of our then-current initial franchise fee if transferred to an approved existing franchisee; plus reimbursement of legal and professional fees and cost incurred by Franchisor in connection with the transfer

**RENEWAL FEE:** $3,000 plus reimbursement of legal and professional fees and cost incurred by Franchisor in connection with the renewal (option of three 10- year renewals)

**TECHNOLOGY FEE:** .25% of monthly Gross Sales

**OPENING DATE:** Three months after the lease is signed

_____
Franchisor Initial

_____
Franchisee Initial

URBAN AIR TRAMPOLINE PARK®
FRANCHISE AGREEMENT

**TABLE OF CONTENTS**

| | | | |
|---|---|---|---|
| 1. | | GRANT OF FRANCHISE | 1 |
| | A. | Grant. | 1 |
| | B. | Protected Area. | 2 |
| 2. | | TERM | 2 |
| | A. | Initial Term. | 2 |
| | B. | Successor Term. | 2 |
| 3. | | DEVELOPMENT PROCEDURES | 3 |
| | A. | Site Selection. | 3 |
| | B. | Franchise Site Application. | 3 |
| | C. | Lease Terms. | 4 |
| | D. | Relocation. | 4 |
| 4. | | DRAWINGS, CONSTRUCTION, AND RENOVATION | 5 |
| | A. | Specifications and Drawings. | 5 |
| | B. | Commencement and Completion of Construction and Build Out. | 5 |
| | C. | Acquisition of Necessary Furnishings, Fixtures and Equipment. | 5 |
| | D. | Inspection, Cooperation. | 6 |
| | E. | Final Inspection. | 6 |
| 5. | | OPENING | 6 |
| 6. | | FEES | 7 |
| | A. | Initial Franchise Fee. | 7 |
| | B. | Royalty Fee. | 7 |
| | C. | Development Fund Contribution. | 7 |
| | D. | Administrative Fee. | 7 |
| | E. | Payment of Fees. | 7 |
| | F. | Interest; Non-Sufficient Funds Charge. | 8 |
| | G. | Partial Payments. | 8 |
| | H. | Collection Costs and Expenses. | 8 |
| 7. | | RECORDKEEPING AND REPORTS | 8 |
| | A. | Recordkeeping. | 8 |
| | B. | Periodic Reports. | 9 |
| | C. | Annual Reports. | 9 |
| | D. | Other Reports. | 9 |
| | E. | Audit Rights. | 9 |
| | F. | Accounting Practices. | 9 |
| 8. | | TRAINING AND ASSISTANCE | 10 |
| | A. | Training. | 10 |
| | B. | Pre-Opening Assistance. | 10 |
| | C. | Ongoing Assistance. | 11 |
| | D. | Conferences. | 11 |

9. MANUAL ................................................................................................................ 11
10. MODIFICATIONS OF THE SYSTEM .................................................................. 11
11. PERFORMANCE REQUIREMENTS ..................................................................... 12
  A. Best Efforts. ........................................................................................................ 12
  B. Standards, Specifications and Procedures.......................................................... 12
  C. Approved Suppliers and Distributors. ................................................................ 13
  D. Authorized Products and Services. ..................................................................... 14
  E. Computer Systems and Intranet/Extranet Systems. ........................................... 14
  F. Non-Cash Payment Systems. .............................................................................. 15
  G. Franchisor Inspections. ...................................................................................... 15
  H. Upkeep of the Franchised Business. ................................................................... 16
  I. Franchised Business Operations. ........................................................................ 16
  J. Management and Personnel. ............................................................................... 16
  K. Designated Manager. .......................................................................................... 17
  L. Signs and Logos.................................................................................................. 17
  M. Entertainment Equipment. .................................................................................. 17
  N. Compliance with Laws and Good Business Practices. ....................................... 17
  O. Payment of Taxes and Other Indebtedness. ....................................................... 18
12. ORGANIZATION OF THE FRANCHISEE .......................................................... 18
  A. Representations................................................................................................... 18
  B. Governing Documents. ....................................................................................... 18
  C. Ownership Interests. ........................................................................................... 18
  D. Restrictive Legend. ............................................................................................. 19
  E. Guarantees. ......................................................................................................... 19
13. PROPRIETARY MARKS AND COPYRIGHTED WORKS................................... 19
  A. Acknowledgments. .............................................................................................. 19
  B. Modification of the Proprietary Marks and Copyrighted Works........................ 19
  C. Use of the Proprietary Marks and Copyrighted Works. ..................................... 19
  D. Internet and Social Media Usage. ...................................................................... 20
  E. Assignment of Rights. ......................................................................................... 20
  F. Infringement; Notice of Claims. ......................................................................... 20
  G. Remedies and Enforcement. ............................................................................... 20
14. CONFIDENTIALITY OBLIGATIONS AND RESTRICTIVE COVENANTS ................. 21
  A. Confidential Information. .................................................................................... 21
  B. Covenants of the Franchisee. ............................................................................. 21
  C. Covenants of the Franchisee's Owners............................................................... 22
  D. Reformation and Reduction of Scope of Covenants............................................ 23
  E. Acknowledgments. .............................................................................................. 23
  F. No Undue Hardship. ........................................................................................... 23
  G. Injunctive Relief. ................................................................................................ 23
15. BRAND DEVELOPMENT; MARKETING............................................................ 24
  A. General Requirements. ....................................................................................... 24

B. Grand Opening Advertising. ................................................................................ 24

C. Development Fund. ............................................................................................... 24

D. Advertising Cooperatives. ................................................................................... 25

E. Restriction Against Internet Advertising. ............................................................ 25

F. Loyalty Programs, Prize Promotions, and Promotional Literature ...................... 25

16. INSURANCE ............................................................................................................. 26

A. Obligation to Maintain Insurance. ...................................................................... 26

B. Minimum Insurance Coverage. ........................................................................... 26

C. Insurance Policy Requirements. ......................................................................... 27

D. Delivery of Certificate. ....................................................................................... 27

E. Minimum Insurance Requirements Not a Representation of Adequacy ............... 27

F. Franchisor's Right to Procure Insurance. ........................................................... 27

17. TRANSFER ................................................................................................................ 27

A. Transfer by Franchisor. ....................................................................................... 27

B. Transfer by Franchisee. ....................................................................................... 28

C. Security Interest. ................................................................................................. 29

D. Public and Private Offerings. .............................................................................. 29

E. Right of First Refusal .......................................................................................... 29

F. Transfer Upon Death or Mental Incapacity. ........................................................ 29

G. Non-Waiver of Claims. ........................................................................................ 30

18. DEFAULT AND TERMINATION ............................................................................. 30

A. Automatic Termination. ...................................................................................... 30

B. Termination without Opportunity to Cure. .......................................................... 30

C. Termination with Opportunity to Cure. ............................................................... 31

D. Other Remedies. .................................................................................................. 31

E. Step-In Rights. ..................................................................................................... 31

19. OBLIGATIONS UPON EXPIRATION OR TERMINATION .................................... 31

A. Expiration or Termination of Franchise. ............................................................. 31

B. Franchisor's Option to Assume Lease and Purchase Assets. ............................... 32

C. Compliance with Post Term Obligations. ........................................................... 33

20. INDEPENDENT CONTRACTOR AND INDEMNIFICATION ................................ 33

A. Independent Contractor. ...................................................................................... 33

B. Indemnification. .................................................................................................. 34

21. NOTICES ................................................................................................................... 36

22. SEVERABILITY AND CONSTRUCTION ............................................................... 36

A. Entire Agreement. ............................................................................................... 36

B. Modification. ....................................................................................................... 36

C. Written Consent. .................................................................................................. 36

D. No Waiver. ........................................................................................................... 36

E. Severability. ......................................................................................................... 37

F. Captions and Headings; References to Gender; Counterparts. ............................. 37

G. Persons Bound. .................................................................................................... 37

H.  Franchisor's Judgment.................................................................................. 37
23.     GOVERNING LAW AND FORUM SELECTION ............................................. 37
A.  Governing Law. ....................................................................................... 37
B.  Jurisdiction and Venue. ........................................................................... 37
C.  Remedy..................................................................................................... 38
D.  Waiver of Jury Trial................................................................................. 38
E.  Contractual Limitations Period................................................................ 38
F.  Waiver of Punitive Damages. .................................................................. 38
G.  Attorneys' Fees........................................................................................ 38
24.     ACKNOWLEDGMENTS ..................................................................................... 39
A.  Receipt of Disclosure Document. ............................................................ 39
B.  Receipt of Agreement. ............................................................................. 39
C.  Independent Investigation........................................................................ 39
D.  No Representations; No Reliance. ............................................................ 39
E.  No Financial Performance Representations; No Reliance......................... 39
F.  No Licensure Representations; No Reliance. ........................................... 40
G.  Reasonable Restrictions........................................................................... 40

**STATE SPECIFIC AMENDMENT TO FRANCHISE AGREEMENT**

**ATTACHMENTS**

| | |
|---|---|
| <u>Attachment A</u> | Glossary of Additional Terms |
| <u>Attachment B</u> | Approved Location and Protected Territory |
| <u>Attachment C</u> | Franchisee's Owners and Key Personnel |
| <u>Attachment D-1</u> | Undertaking and Guaranty |
| <u>Attachment D-2</u> | Confidentiality and Non-competition Agreement |
| <u>Attachment E</u> | Electronic Debit Authorization |
| <u>Attachment F</u> | Telephone Assignment Agreement |
| <u>Attachment G</u> | Lease Rider |

# URBAN AIR TRAMPOLINE PARK®
## FRANCHISE AGREEMENT

This FRANCHISE AGREEMENT ("**Agreement**") is made and entered into on the Effective Date reflected in the Summary Pages ("**Effective Date**"), by and between UATP MANAGEMENT, LLC, a Texas limited liability company, with its principal business address at 317 S. Jenkins, Suite C, Grapevine, Texas 76051 ("**we**" or "**Franchisor**") and the Franchisee identified on the Summary Page ("**you**" or "**Franchisee**").

## BACKGROUND

A.      Franchisor and its Affiliates have, as the result of the expenditure of time, skill, effort, and money, developed a distinctive business system relating to the development, establishment, and operation of indoor trampoline and adventure park businesses featuring wall-to-wall trampolines, foam pits, and related activities (each a "**Franchised Business**") under the name URBAN AIR TRAMPOLINE PARK™ ("**Brand**"), which are based on the Proprietary Products, Proprietary Marks, Indicia, and Standards ("**System**").

B.      The distinguishing characteristics of the System include, without limitation, the services, products, and merchandise, which incorporate Franchisor's Proprietary Marks, trade secrets, and proprietary information ("**Proprietary Products**"); distinctive exterior and interior design, decor, color scheme, graphics, fixtures, and furnishings ("**Indicia**"); standards and specifications for products and supplies; service standards; uniform standards, specifications, and procedures for operations; procedures for inventory and management control; training and assistance; and advertising and promotional programs ("**Standards**"); all of which may be changed, improved, and further developed by Franchisor from time to time.

C.      The System is identified and recognized by means of certain trade names, service marks, trademarks, logos, emblems, and indicia of origin, including, but not limited, to the word mark "URBAN AIR TRAMPOLINE PARK" and the list of marks set forth in <u>Attachment A</u> to this Agreement, and such other trade names, service marks, trademarks, logos, emblems, and indicia of origin as Franchisor may hereafter designate in writing for use in connection with the System ("**Proprietary Marks**"). Franchisor obtained from its Affiliate, UATP IP, LLC, the right to use and sublicense to others to use the Proprietary Products, Proprietary Marks, Indicia, Standards, and the System.

D.      Franchisor and its Affiliates continue to develop, establish, use, and control the use of the Proprietary Products, Proprietary Marks, Indicia, Standards, and System in order to identify for the public the source of services and products marketed under this Agreement and under the System, and to represent the System's high standards of quality, appearance, and service.

E.      You have applied for the right to operate a Franchised Business using the System and the Proprietary Products, Proprietary Marks, Indicia, and Standards, and Franchisor has approved your application in reliance on the representations contained therein, including those concerning your financial resources, your business experience and interests, and the manner in which the Franchised Business will be owned and operated.

## AGREEMENT

IN CONSIDERATION OF the mutual promises contained in this Agreement, including the recitals set forth above, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

## 1.      GRANT OF FRANCHISE

### A.      Grant.

Subject to the provisions of this Agreement, Franchisor hereby grants you the exclusive right ("**Franchise**") to continuously operate a URBAN AIR TRAMPOLINE PARK™ Franchised Business at the Approved Location identified (or to be identified) in <u>Attachment B</u> to this Agreement and to use the Proprietary Marks in the operation and promotion of the Franchised Business. You hereby undertake the obligation and agree to continually operate the Franchised Business during the term hereof and strictly according to the terms and conditions of this Agreement.

**B.**     **Protected Area.**

During the initial term and all successor terms, and provided that you are in full compliance with this Agreement and all other agreements between you and Franchisor, Franchisor shall neither operate nor grant others the right to operate another URBAN AIR TRAMPOLINE PARK™ Franchised Business in the Protected Area.

Franchisor retains for itself and/or its Affiliates all other rights in and to the Proprietary Products, Proprietary Marks, Indicia, and System including, without limitation: (a) the right to own and operate and to grant others the right to own and operate Franchised Businesses at any location outside the Protected Area, regardless of proximity to the Protected Area; and (b) the right to distribute any and all products and services and/or their components identified by the Proprietary Marks, including those used or sold in your Franchised Business, including, without limitation, proprietary merchandise (such as shirts, hats, jackets, etc.) and pre-packaged products, through alternative channels of distribution, including, without limitation, mail order, catalog sales, the Internet, World Wide Web or any other form of electronic commerce, or any other channel of distribution whatsoever except a Franchised Business, whether or not such sales occur within your Protected Area; you are not entitled to compensation for any such sales made in your Protected Area.  Franchisor also may offer, grant and support franchises under any name other than URBAN AIR TRAMPOLINE PARK®, whether or not in the same, similar, or different line of business as your Franchised Business.

Nothing in this Agreement prohibits or restricts Franchisor or its Affiliates from owning, acquiring, establishing, operating, or granting franchise rights for (a) one or more other businesses at any location outside of the Protected Area under a different trademark or service mark (i.e., a mark other than URBAN AIR TRAMPOLINE PARK), whether or not the business is the same as, similar to, or competitive with the Franchised Businesses; or (b) one or more indoor trampoline park businesses featuring wall-to-wall trampolines, foam pits, and related activities under the name URBAN AIR TRAMPOLINE PARK™ or some derivative of the Proprietary Marks at any location outside of the Protected Area.

**2.**     **TERM**

**A.**     **Initial Term.**

The initial term of this Agreement ("**Initial Term**") shall begin on the Effective Date and shall expire at midnight on the Expiration Date, unless this Agreement is terminated at an earlier date pursuant to Section 18 of this Agreement.

**B.**     **Successor Term.**

At the expiration of the Initial Term, you will have an option to remain a franchisee at the Approved Location for up to three additional, 10-year successor terms.  You must give Franchisor written notice of whether or not you intend to exercise your successor term option no less than eight months, nor more than 12 months, before expiration of the then-current term.  Failure to timely provide the required written notice constitutes a waiver of your option to remain a franchisee beyond the expiration of the then-current term.  If you desire to exercise this option, you must comply with all of the following conditions prior to and at the end of the then-current term:

(1)     You may not be in default under this Agreement or any other agreement between you and Franchisor or its Affiliates; you may not be in default beyond the applicable cure period of any real estate lease, equipment lease or financing instrument relating to the Franchised Business; you may not be in default beyond the applicable cure period with any vendor or supplier to the Franchised Business; and, for the 12 months before the date of your notice and the 12 months before the expiration of the then-current term, you may not have been in default beyond the applicable cure period under this Agreement or any other agreements between you and Franchisor or its Affiliates;

(2)     If reasonably deemed necessary by Franchisor, you must renovate and upgrade the Franchised Business premises and all fixtures, furniture, equipment, signage and graphics, at your expense, to reflect the then-current image of a URBAN AIR TRAMPOLINE PARK™ Franchised Business, which renovations may include structural changes, remodeling, redecoration, and modifications to existing improvements;

(3)     You and your employees must be in compliance with Franchisor's then-current training requirements;

(4)     You must have the right to remain in possession of the Franchised Business premises, or have secured other premises acceptable to Franchisor, for the renewal term and all monetary obligations owed to your landlord, if any, must be current;

(5)     You and each Owner shall have executed a general release, in a form satisfactory to Franchisor, of any and all claims against Franchisor and its Affiliates and their respective past and present officers, directors, shareholders, agents, and employees, in their corporate and individual capacity, including, without limitation, claims arising under federal, state, or local laws, rules, or ordinances, and claims arising out of, or relating to, this Agreement, any other agreements between you and Franchisor or its Affiliates and your operation of the Franchised Business and the offer and grant of the URBAN AIR TRAMPOLINE PARK™ franchise opportunity; and

(6)     As determined by Franchisor in its sole discretion, you have operated the Franchised Business in accordance with this Agreement and with the System (as set forth in the Manual or otherwise and as revised from time to time by Franchisor) and that you have operated any other URBAN AIR TRAMPOLINE PARK™ franchises in which you have an interest in accordance with the applicable franchise agreement.

Within four months after Franchisor's receipt of written notice of your desire for a successor term, Franchisor shall advise you whether or not you are entitled to remain a franchisee for the successor term. If Franchisor intends to permit you to remain a franchisee for the successor term, the notice will contain preliminary information regarding the required renovations and modernizations described in Subsection 2.B(2), above. If Franchisor does not intend to permit you to remain a franchisee for the successor term, the notice shall specify the reasons for non-renewal. If Franchisor chooses not to permit you to remain a franchisee for the successor term, it shall have the right to unilaterally extend the then-current term of this Agreement as necessary to comply with applicable laws.

If you are granted successor term rights, Franchisor will deliver to you for execution a new franchise agreement at least one month prior to the expiration of the then-current term. The form of successor agreement shall be the form then in general use by Franchisor for new URBAN AIR TRAMPOLINE PARK™ franchises (or, if Franchisor is not then granting franchises, then the form of agreement as specified by Franchisor), which may differ from this Agreement and may reflect, among other things, a different royalty fee, development fund fee, and marketing obligations. Your Protected Area under the successor agreement will be the same as under this Agreement, and Franchisor will waive any initial franchise fee imposed under the successor agreement, but you must pay Franchisor the Renewal Fee set forth in the Summary Pages.

You must execute the franchise agreement for the successor term and return the signed agreement and payment of the Renewal Fee to Franchisor prior to expiration of the then-current term. Failure to sign the franchise agreement, pay the Renewal Fee, and to return them to Franchisor within this time shall be deemed a waiver of your successor term option and result in termination of this Agreement and the franchise granted by this Agreement at the expiration of the then-current term. If you have timely complied with all of the conditions set forth in this Section 2, Franchisor shall execute the successor term franchise agreement and promptly return a fully executed copy to you.

**3.     DEVELOPMENT PROCEDURES**

**A.     Site Selection.**

You must acquire an acceptable site for the Franchised Business (by purchase or lease) within 120 days after the Effective Date of this Agreement. The site must be located within the Site Selection Area identified in the Summary Page, must meet Franchisor's site selection Standards, and must be approved by Franchisor.

**B.     Franchise Site Application.**

For each proposed site that you identify, you must submit to Franchisor a Franchise Site Application including such information about the site as Franchisor may reasonably request to perform its evaluation. This

information may include, among other things, a description of the proposed site, demographic characteristics, traffic patterns, parking, character of the neighborhood, competition from other businesses in the area, the proximity to other businesses, the nature of other businesses in proximity to the site, and other commercial characteristics (including the purchase price, rental obligations and other lease terms for the proposed site) and the size, appearance, other physical characteristics and a site plan of the premises.

To assist you with identifying and evaluating proposed sites for the Franchised Business, Franchisor will make available to you its then-current site evaluation software. There is no charge to you for the first site you propose for the Franchised Business, but Franchisor may charge you its then-current Site Evaluation Fee for each additional proposed site, as published in the Manual from time to time.

Franchisor will approve or refuse to approve a proposed site within 14 days after the receipt of these documents and any additional information as Franchisor may reasonably require. Franchisor's failure to provide notification within this time period shall not be considered either approval or disapproval. To the extent that Franchisor provides onsite evaluations, you must reimburse Franchisor for any out of pocket costs that it incurs in connection with performing the evaluation, such as travel, lodging, and dining expenses for each individual performing the evaluation.

**THE PARTIES ACKNOWLEDGE AND AGREE THAT FRANCHISOR'S APPROVAL OF YOUR PROPOSED SITE DOES NOT AND WILL NOT CONSTITUTE, DIRECTLY OR IMPLICITLY, AN ASSURANCE THAT THE FRANCHISED BUSINESS WILL ACHIEVE A CERTAIN SALES VOLUME OR LEVEL OF PROFITABILITY; IT MEANS ONLY THAT THE PROPOSED SITE MEETS FRANCHISOR'S <u>MINIMUM</u> CRITERIA. FRANCHISOR ASSUMES NO LIABILITY OR RESPONSIBILITY FOR: (1) EVALUATION OF THE FRANCHISED BUSINESS LOCATION'S SOIL FOR HAZARDOUS SUBSTANCES; (2) INSPECTION OF ANY STRUCTURE ON THE FRANCHISED BUSINESS LOCATION FOR ASBESTOS OR OTHER TOXIC OR HAZARDOUS MATERIALS; (3) COMPLIANCE WITH THE AMERICANS WITH DISABILITIES ACT ("ADA"); OR (4) COMPLIANCE WITH ANY OTHER APPLICABLE LAW. IT IS YOUR SOLE RESPONSIBILITY TO OBTAIN SATISFACTORY EVIDENCE AND/OR ASSURANCES THAT THE FRANCHISED BUSINESS LOCATION (AND ANY STRUCTURES THEREON) IS FREE FROM ENVIRONMENTAL CONTAMINATION AND IS IN COMPLIANCE WITH THE REQUIREMENTS OF THE ADA AND OTHER APPLICABLE LAWS.**

**C.     Lease Terms.**

Franchisor must approve the Lease for the Franchised Business premises before you sign it. Franchisor will not withhold approval arbitrarily, but may condition its approval on the lease containing any or all of the terms set forth in the Lease Rider attached hereto as <u>Attachment G</u>. You shall provide to Franchisor a fully executed copy of the lease within 10 days after its execution.

**THE PARTIES ACKNOWLEDGE AND AGREE THAT FRANCHISOR'S APPROVAL OF A LEASE DOES NOT MEAN THAT THE ECONOMIC TERMS OF THE LEASE ARE FAVORABLE; IT MEANS ONLY THAT THE LEASE CONTAINS THE LEASE TERMS THAT FRANCHISOR REQUIRES.**

**D.     Relocation.**

You may relocate the Franchised Business within the Protected Area, only with Franchisor's prior written consent. Franchisor will grant its consent if your lease expires or terminates through no fault of yours, or if the Franchised Business premises is destroyed or materially damaged by fire, flood, or other natural catastrophe (an "Innocent Loss or Casualty") and you are not in default of this Agreement or any other agreement between you and Franchisor. Selection of the relocation site and Franchised Business construction, renovation, and opening shall be governed by <u>Sections 3, 4, and 5</u> of this Agreement; provided that: (i) if the relocation occurred as a result of the loss of an Innocent Loss or Casualty, the Franchised Business must be open for business at the new location within 180 days of closing at the previous location; and (ii) if the relocation occurred for any other reason, the Franchised Business must be open for business at the new location within thirty days of closing at the previous location. You are solely responsible for all relocation

costs and expenses, including your payment of Franchisor's then-current Relocation Fee, as published in the Manual from time to time.

**4.     DRAWINGS, CONSTRUCTION, AND RENOVATION**

**A.     Specifications and Drawings.**

You assume all cost, liability, and expense for developing, constructing, and equipping the Franchised Business.    Franchisor will furnish to you sample drawings and specifications for a URBAN AIR TRAMPOLINE PARK™ Franchised Business, including requirements for dimensions, design, image, interior layout, décor, fixtures, equipment, signs, furnishings, storefront, signage, graphics, and color schemes.   It is your responsibility to have prepared all required construction plans and specifications to suit the shape and dimensions of the Franchised Business, and you must ensure that these plans and specifications comply with applicable ordinances, building codes, and permit requirements, and with lease requirements and restrictions. You shall use only registered architects, registered engineers, and professional and licensed contractors, all or some of which Franchisor may specifically designate or approve from time to time in the Manual.

You shall submit proposed construction plans, specifications, and drawings for the Franchised Business ("**Plans**") to Franchisor and shall, upon Franchisor's request, submit all revised or "as built" Plans during the course of such construction.  Franchisor will approve or refuse to approve the Plans and notify you within 30 days after receiving the Plans.  Once Franchisor has approved the Plans, the Plans shall not be substantially changed without Franchisor's prior written approval, which shall not unreasonably be withheld. Franchisor shall approve or disapprove Plan changes within 10 business days after receipt.

You may not begin site preparation or construction before Franchisor has approved the Plans.  All construction must be in accordance with Plans approved by Franchisor and must comply in all respects with the Standards and with applicable laws, ordinances, local rules, and regulations.

**B.     Commencement and Completion of Construction and Build Out.**

Construction shall be performed or supervised by a general contractor or construction manager of your choice, subject to the requirements of 4.A, above.   Once construction has commenced, it shall continue uninterrupted (except for interruption by reason of events constituting Force Majeure) until completed.  "Force Majeure" means any act of God, strike, lock-out, or other industrial disturbance, war (declared or undeclared), riot, epidemic, fire, or other catastrophe, act of any government or other third party, and any other cause not within the control of the party affected thereby.  If events constituting Force Majeure cause a delay in the commencement of the construction or build out of the Franchised Business, Franchisor shall proportionately extend the Opening Date for the Franchised Business.  Notwithstanding the occurrence of any events, except events constituting Force Majeure, construction shall be completed and the Franchised Business shall be furnished, equipped and shall otherwise be ready to open for business in accordance with this Agreement no later than the Opening Date specified in the Summary Page ("**Opening Date**").

You agree, at your sole expense, to do or cause to be done the following, by the Opening Date:

(1)     Obtain and maintain all required building, utility, sign, health, sanitation, business, and other permits and licenses applicable to the Franchised Business;

(2)     Make all required improvements to the Franchised Business location and decorate the exterior and interior of the Franchised Business in compliance with the Plans approved by Franchisor;

(3)     Purchase or lease and install all specified and required fixtures, equipment, furnishings, and interior and exterior signs required for the Franchised Business; and

(4)     Purchase an opening inventory for the Franchised Business of only authorized and approved products and other materials and supplies.

**C.     Acquisition of Necessary Furnishings, Fixtures and Equipment.**

You agree to use in the development and operation of the Franchised Business only the fixtures, furnishings, equipment, signs, and items of décor that Franchisor has approved as meeting its specifications

and Standards for quality, design, appearance, function, and performance. You further agree to place or display at the Franchised Business location (interior and exterior) only those signs, emblems, lettering, logos, and display materials that Franchisor has approved in writing from time to time.

You shall purchase or lease approved brands, types, or models of fixtures, furnishings, equipment, and signs only from suppliers designated or approved by Franchisor. If you propose to purchase, lease or otherwise use any fixtures, furnishings, equipment, signs, or items of décor which have not been approved by Franchisor, you shall first notify Franchisor in writing and shall, at your sole expense, submit to Franchisor upon its request sufficient specifications, photographs, drawings, and/or other information or samples for a determination as to whether those fixtures, furnishings, equipment, and/or signs comply with Franchisor's specifications and Standards. Franchisor will, in its sole discretion, approve or disapprove the items and notify you within 30 days after Franchisor receives the request.

**D.**    **Inspection, Cooperation.**

During the course of construction and/or renovation, you shall (and shall cause your architect, engineer, contractors, and subcontractors to) cooperate fully with Franchisor and its designees for the purpose of permitting Franchisor and its designees to inspect the Franchised Business location and the course of construction or renovation in order to determine whether construction or renovation is proceeding according to the Plans.

**E.**    **Final Inspection.**

You shall notify Franchisor in writing at least 10 days prior to the date you expect construction and/or renovation to be completed and a certificate of occupancy to be issued. Upon Franchisor's request, you shall submit a copy of the certificate of occupancy to Franchisor. Franchisor reserves the right, after receiving your notice, to conduct a final inspection of the Franchised Business and its premises to determine your compliance with this Agreement. You shall not open the Franchised Business for business unless you have satisfied the conditions set forth in <u>Section 5</u>, below.

**5.**    **OPENING**

Franchisor will authorize the opening of the Franchised Business only after all of the following conditions have been met:

(1)    You are not in material default under this Agreement or any other agreements with Franchisor; you are not in default beyond the applicable cure period under any real estate lease, equipment lease, or financing instrument relating to the Franchised Business; and you are not in default beyond the applicable cure period with any vendor or supplier of the Franchised Business;

(2)    You are current on all obligations due to Franchisor;

(3)    Franchisor is satisfied that the Franchised Business was constructed and/or renovated substantially in accordance with approved Plans and with applicable federal, state, and local laws, regulations, and codes;

(4)    If the Franchised Business location is leased, Franchisor has received a copy of the approved and fully executed lease;

(5)    You have obtained a certificate of occupancy and any other required health, safety, or fire department certificates;

(6)    You have certified to Franchisor in writing that the installation of all items of furnishings, fixtures, equipment, signs, computer terminals, and related equipment, supplies, and other items has been accomplished;

(7)    Your Designated Manager has attended and successfully completed Franchisor's initial training program and your personnel have obtained all required safety training and certifications;

(8)    Franchisor has determined that the Franchised Business has been constructed and/or renovated and equipped substantially in accordance with the requirements of this Agreement and that you have

hired and trained personnel in accordance with the requirements of this Agreement; and

(9)    Franchisor has been furnished copies of all insurance policies required by <u>Section 16</u> of this Agreement, and all such insurance is in full force and effect.

**6.    FEES**

**A.    Initial Franchise Fee.**

Upon execution of this Agreement, you shall pay Franchisor an Initial Franchise Fee in the amount specified in the Summary Page.  The parties acknowledge and agree that the Initial Franchise Fee is fully earned by Franchisor when paid and is not refundable.

**B.    Royalty Fee.**

You shall pay to Franchisor a nonrefundable and continuing Royalty Fee in the amount specified in the Summary Page for the right to use the System and the Proprietary Marks at the Franchised Business location and in connection with the Franchised Business.  If any taxes, fees, or assessments are imposed on Royalty Fee payments by reason of Franchisor's acting as franchisor or licensing the Proprietary Marks under this Agreement, you shall reimburse Franchisor the amount of those taxes, fees, or assessments within 30 days after receive of an invoice from Franchisor.

**C.    Development Fund Contribution.**

You shall contribute to the Development Fund in the amount specified in the Summary Pages, which notwithstanding the Franchise Disclosure, shall not adjust annually and you shall participate in any Advertising Cooperative formed for the region in which the Franchised Business operates as described in <u>Section 15</u> of this Agreement.

**D.    Administrative Fee.**

You shall pay to Franchisor an administrative fee in the amount specified on the Summary Page for each party or event scheduled at your location by the Franchisor's national call center.

**E.    Payment of Fees.**

You must participate in Franchisor's then-current electronic funds transfer program authorizing Franchisor to utilize a pre-authorized bank draft system.  All Royalty Fees, Development Fund Contributions, and other amounts owed under this Agreement, including advertising contributions and interest charges, are payable monthly and must be received by Franchisor or credited to Franchisor's account by pre-authorized bank debit before 5:00 p.m. on the date such payment is due, as specified in the Manuals (the "**Due Date**").  On each Due Date, Franchisor will transfer from your commercial bank operating account ("**Account**") the amount reported to Franchisor by you or as determined by Franchisor by the records contained in the cash registers/computer terminals of the Franchised Business.  If you have not reported to Franchisor Gross Sales for any reporting period, Franchisor will transfer from the Account an amount calculated in accordance with its estimate of the Franchised Business' Gross Sales during the reporting period which estimate may be based on, among other things, historical financial performance of the Franchised Business and/or current and historical performance of other Franchisor.  If, at any time, Franchisor determines that you have underreported Gross Sales or underpaid the Royalty Fee, Development Fund Contributions, or other amounts due to Franchisor under this Agreement, or any other agreement, Franchisor shall initiate an immediate transfer from the Account in the appropriate amount in accordance with the foregoing procedure, including interest as provided in this Agreement.  Any overpayment will be credited against future Royalty Fees and other payments due under this Agreement.

In connection with the payment by electronic funds transfer, you shall: (1) comply with procedures specified by Franchisor in the Manual or otherwise in writing; (2) perform those acts and sign and deliver those documents as may be necessary to accomplish payment by electronic funds transfer as described in this <u>Section 6.D</u>; (3) give Franchisor an authorization in the form designated by Franchisor to initiate debit entries and/or credit correction entries to the Account for payments of the Royalty Fee, Development Fund Contributions, and other amounts payable under this Agreement, including any interest charges; and (4) make

sufficient funds available in the Account for withdrawal by electronic funds transfer no later than the Due Date for payment thereof.

Notwithstanding the provisions of this Section 6.D, Franchisor reserves the right to modify, at its option, the method by which you pay the Royalty Fee and other amounts owed under this Agreement, including Development Fund contributions and interest charges, upon receipt of written notice by Franchisor.

Your failure to have sufficient funds in the Account shall constitute a default of this Agreement pursuant to Section 18. You shall not be entitled to set off, deduct, or otherwise withhold any Royalty Fees, Development Fund Contributions, advertising contributions, interest charges, or other monies payable to Franchisor under this Agreement on grounds of any alleged nonperformance by Franchisor of any of its obligations or for any other reason.

**F.      Interest; Non-Sufficient Funds Charge.**

Any payments not received by the Due Date will accrue interest at the rate of 18% per annum or the highest lawful interest rate permitted by the jurisdiction in which the Franchised Business operates, whichever is less. If any check, draft, electronic or otherwise, is returned for nonsufficient funds, you shall pay to Franchisor a nonsufficient funds charge in an amount determined by Franchisor, but not to exceed $100 per transaction or the maximum allowed by applicable law, and shall reimburse Franchisor for all expenses that it incurs on account of such nonsufficient funds.

**G.      Partial Payments.**

No payment by you or acceptance by Franchisor of any monies under this Agreement for a lesser amount than due shall be treated as anything other than a partial payment on account. Your payments of a lesser amount than due with an endorsement, statement, or accompanying letter to the effect that payment of the lesser amount constitutes full payment shall be given no effect and Franchisor may accept the partial payments without prejudice to any rights or remedies it may have against you. Acceptance of payments by Franchisor other than as set forth in this Agreement or a waiver by Franchisor of any other remedies or rights available to it pursuant to this Agreement shall not constitute a waiver of Franchisor's right to demand payment in accordance with the requirements of this Agreement or a waiver by Franchisor of any other remedies or rights available to it pursuant to this Agreement or under applicable law. Notwithstanding any designation by you, Franchisor shall have the sole discretion to apply any payments by you to any of your past due indebtedness for Royalty Fees, advertising contributions, purchases from Franchisor or its Affiliates, interest or any other indebtedness. Franchisor has the right to accept payment from any other entity as payment by you. Acceptance of that payment by Franchisor will not result in that other entity being substituted as franchisee under this Agreement.

**H.      Collection Costs and Expenses.**

You agree to pay Franchisor on demand any and all costs and expenses incurred by Franchisor in enforcing the terms of this Agreement including, without limitation, collecting any monies that you owe to Franchisor. These costs and expenses include, without limitation, costs and commissions due a collection agency, reasonable attorneys' fees, costs incurred in creating or replicating reports demonstrating Gross Sales of the Franchised Business, court costs, expert witness fees, discovery costs, and reasonable attorneys' fees and costs on appeal, together with interest charges on all of the foregoing.

**7.      RECORDKEEPING AND REPORTS**

**A.      Recordkeeping.**

You agree to use computerized cash and data capture and retrieval systems that meet Franchisor's specifications and to record Franchised Business sales electronically or on tape for all sales at or from the Franchised Business premises. You shall keep and maintain, in accordance with any procedures set forth in the Manual, complete and accurate books and records pertaining to the Franchised Business in the format and using the accounting software that Franchisor requires. Your books and records shall be kept and maintained using generally accepted accounting principles ("**GAAP**"). You shall preserve all of your books, records, and state and federal tax returns for at least five years after the later of preparation or filing (or such longer period

as may be required by any governmental entity) and make them available and provide duplicate copies to Franchisor within five days after Franchisor's written request.

**B.    Periodic Reports.**

At Franchisor's request, you shall, at your expense, submit to Franchisor in the form prescribed by Franchisor a monthly profit and loss statement and balance sheet (both of which may be unaudited). Each statement and balance sheet shall be signed by you, your treasurer, or chief financial officer attesting that it is true, correct, and complete and uses accounting principles applied on a consistent basis which accurately and completely reflects the financial condition of the Franchised Business during the period covered.

**C.    Annual Reports.**

You shall, at your expense, submit to Franchisor no later than April 15th of each year, in the form prescribed by Franchisor, an annual profit and loss statement and balance sheet reviewed by a certified public accountant. The statement and balance sheet shall be signed by you, your treasurer, or chief financial officer attesting that it is true, correct, and complete, and uses accounting principles applied on a consistent basis which accurately and completely reflects the financial condition of the Franchised Business during the period covered. Franchisor also shall have the right, in its reasonable discretion, to require that you, at your expense, submit financial statements that have been reviewed by a certified public accounting firm acceptable to Franchisor for any period or periods of a fiscal year.

**D.    Other Reports.**

You shall submit to Franchisor, for review or auditing, such other forms, reports, records, information, and data as Franchisor may reasonably designate, in the form and at times and places reasonably required by Franchisor, upon request and as specified from time to time in the Manual or otherwise in writing. At Franchisor's request, you shall furnish to Franchisor a copy of all federal and state income tax returns reflecting revenue derived from the operation of the Franchised Business, and copies of all sales tax returns, filed with the appropriate taxing authorities.

**E.    Audit Rights.**

Franchisor or its designee shall have the right at all reasonable times, both during and after the term of this Agreement, to inspect, copy, and audit your books, records, and federal, state, and local tax returns, sales tax returns and such other forms, reports, information, and data as Franchisor reasonably may designate, applicable to the operation of the Franchised Business. If an inspection or audit discloses an understatement of Gross Sales, you shall pay Franchisor, within 10 days after receipt of the inspection or audit report, the deficiency in the Royalty Fees and advertising contributions plus interest (at the rate and on the terms provided in Section 6.E) from the date originally due until the date of payment. If an inspection or audit is made necessary by your failure to furnish reports or supporting records as required under this Agreement, or to furnish such reports, records, or information on a timely basis, or if an understatement of Gross Sales for the period of any inspection or audit is determined to be greater than 2%, you also shall reimburse Franchisor for the reasonable cost of the inspection or audit including, without limitation, the charges of attorneys and independent accountants, and the travel expenses, room, board, and compensation of Franchisor's employees or designees involved in the inspection or audit. These remedies shall be in addition to all other remedies and rights available to Franchisor under this Agreement and applicable law.

**F.    Accounting Practices.**

If you fail to comply with any of the reporting requirements described in this Section 7 then Franchisor may require you to engage a bookkeeping service provider, designated or approved by Franchisor, to provide book keeping services for the Franchised Business for such period of time that Franchisor deems appropriate, in its sole discretion.

8.    **TRAINING AND ASSISTANCE**

A.    **Training.**

Franchisor will provide an initial training program at its headquarters or such other location as Franchisor may designate. Your Designated Manager and such other of your employees as Franchisor may reasonably require must attend and successfully complete the initial training program before the Franchised Business may open for business. There is no charge for up to two individuals to attend the initial training program. At your request, Franchisor may permit additional individuals to attend the same training program, subject to space availability and payment of Franchisor's then-current training fee as published in the Manual from time to time.

Your Designated Manager and other Franchised Business personnel shall attend and successfully complete to Franchisor's satisfaction all safety training courses and programs that Franchisor requires from time to time, including, without limitation, all training that may be required by the state or local municipality where your Franchised Business is located, and shall maintain such certifications at all times throughout the term of this Agreement. Franchisor may charge, and you agree to pay, a reasonable tuition for all courses and programs that it provides plus, when applicable, reimbursement of Franchisor's out of pocket costs it incurs in connection with providing such training, including travel, lodging, and dining costs for the individual(s) providing such training.

Your Designated Manager shall be responsible for training your employees in all aspects of Franchised Business operations. Franchisor may, in its sole discretion, develop training and certification programs for your employees. Your Designated Manager shall become familiar with these programs and shall implement and provide instruction and training to your Franchised Business employees.

Franchisor may, in its sole discretion, require your Designated Manager and other of your employees to attend and complete, to Franchisor's satisfaction, such other additional and remedial training as Franchisor may from time to time reasonably deem necessary. By way of example and not limitation, remedial training may be required if you repeatedly fail to comply with the quality and service standards set forth in the Manual, fail to comply with reporting requirements of this Agreement, experience excessive personnel problems, or receive significant customer complaints. Franchisor may charge, and you agree to pay, a reasonable fee for each day of additional and/or remedial training provided plus, when applicable, reimbursement of Franchisor's out of pocket costs it incurs in connection with providing such training, including travel, lodging, and dining costs for the individual(s) providing such assistance.

You are responsible for all costs and expenses of complying with Franchisor's training and certification requirements including, without limitation, tuition, fees, and registration costs, as well as salary, travel, lodging, and dining costs for all employees who participate in the training.

B.    **Pre-Opening Assistance.**

Franchisor will provide consultation and advice to you, as Franchisor deems appropriate, with regard to the development and operation of the Franchised Business, building layout, furnishings, fixtures, and equipment plans and specifications, employee recruiting, selection and training, purchasing and inventory control, and such other matters as Franchisor deems appropriate. If this Agreement is being signed in conjunction with your first Franchised Business, Franchisor will make available one member of Franchisor's training staff to provide you two to three days of on-site Franchised Business opening assistance. There is no additional fee for such assistance for your first Franchised Business; but if such assistance is given with respect to your second or subsequent Franchised Business(es), Franchisor may charge, and you agree to pay, reimbursement of Franchisor's out of pocket costs it incurs in connection with providing such on-site opening assistance, including travel, lodging, and dining costs for the trainer providing such assistance. At your request, or if Franchisor deems necessary, Franchisor will provide additional members of its training staff to provide on-site opening assistance, subject to availability of personnel; in such event, Franchisor may charge, and you agree to pay, a reasonable fee for each additional trainer plus, when applicable, reimbursement of Franchisor's out of pocket costs it incurs in connection with providing such on-site opening assistance, including travel, lodging, and dining costs for the trainer(s) providing such assistance.

C.    **Ongoing Assistance.**

Franchisor periodically, as it deems appropriate, will advise and consult with you in connection with the operation of your Franchised Business, and provide to you its knowledge and expertise regarding the System and pertinent new developments, techniques, and improvements in the areas of management, sales promotion, service concepts, and other areas.    Franchisor may provide these services through visits by Franchisor's representatives to the Franchised Business, the distribution of printed or filmed material, or electronic information, meetings, or seminars, telephone communications, email communications, or other communications.

D.    **Conferences.**

Franchisor may, in its sole discretion, conduct from time to time conferences to discuss System developments including operational efficiency, personnel training, bookkeeping, accounting, inventory control, performance standards, advertising programs, and merchandising procedures.    Attendance at such conferences may be made mandatory by Franchisor, in which event your Designated Manager will be required to attend. You are responsible for all costs and expenses associated with attendance including, without limitation, salary, travel, lodging, and dining costs for conference attendees.

**9.    MANUAL**

Franchisor will loan you one copy of the Manual, which may take the form of one or more of the following: one or more loose-leaf or bound volumes; bulletins; notices; videos; CD-ROMS and/or other electronic media; online postings; e-mail and/or electronic communications; facsimiles; or, any other medium capable of conveying the Manual's contents.    Franchisor may supplement, amend, or modify the Manual from time to time by letter, electronic mail, bulletin, CD, DVD, MP3, or other communications concerning the System to reflect changes in the image, specifications, and standards relating to developing, equipping, furnishing, and operating a URBAN AIR TRAMPOLINE PARK™ Franchised Business, all of which will be considered a part of the Manual and will, upon delivery to you, become binding on you as if originally set forth in the Manual.    You must keep your copy of the Manual current and up to date with all additions and deletions provided by or on behalf of Franchisor and you must purchase whatever equipment and related services (including, without limitation, a CD/DVD player, and/or MP3 player, computer system, internet service, dedicated phone line, facsimile machine, etc.) as may be necessary to receive these communications.    If a dispute relating to the contents of the Manual develops, the master copy maintained by Franchisor at its principal offices shall control. The Manual is material because it will affect the way you operate your Franchised Business, but it will not conflict with or materially alter your rights and obligations under this Agreement.

The Manual contains detailed standards, specifications, instructions, requirements, methods, and procedures for management and operation of the Franchised Business.    The Manual may also contain information relating to the selection, purchase, storage, preparation, packaging, service, and sale of all products, and merchandise sold at your Franchised Business; management and employee training; marketing, advertising, and sales promotions; maintenance and repair of the Franchised Business premises; employee dress attire and appearance standards; graphics; and accounting, bookkeeping, records retention, and other business systems, procedures, and operations.    You agree to at all times operate your Franchised Business in strict compliance with the Manual (as supplemented, amended, or modified by Franchisor from time to time), to maintain the Manual at the Franchised Business, to not reproduce the Manual or any part of it, to treat the Manual as strictly confidential and proprietary, and to disclose the contents of the Manual only to those employees who have a need to know.

Upon termination or expiration of this Agreement, you shall immediately return the Manual without retaining any copies thereof.    If you lose or misplace the Manuals, Franchisor may impose a replacement fee which will not exceed $500 for each volume of the replacement Manual.

**10.    MODIFICATIONS OF THE SYSTEM**

Franchisor may, in its sole discretion, change or modify from time to time the System, any components of this System, and the requirements applicable to you by means of supplements or amendments

to the Manual, including, but not limited to, modifications to the Manual, the required equipment, the signage, the building and premises of the Franchised Business (including the trade dress, décor, and color schemes), the presentation of the Proprietary Marks, and other characteristics to which you are required to adhere (subject to the limitations set forth in this Agreement); adoptions of new administrative forms and methods of report and of payment of any monies owed by Franchisee (including electronic means of reporting and payment); alterations of the products, services, programs, methods, standards, accounting and computer systems, forms, policies and procedures of the System; and additions to, deletions from, or modifications to the products and services which your Franchised Business is authorized and/or required to offer; and additions, changes, improvements, modifications, substitutions to, of, from, or for the Proprietary Marks or copyrighted materials. You must accept and implement at the Franchised Business any such changes or modifications in the System as if they were a part of the System at the time you executed this Agreement, and you must make such expenditures as the changes or modifications in the System reasonably require.

You may set prices in your discretion; however, because enhancing the Brand's competitive position and consumer acceptance for the Brand's products and services is a paramount goal of Franchisor and its franchisees, and because this objective is consistent with the long-term interest of the System overall, Franchisor may exercise certain rights, to the fullest extent permitted by then-applicable law, with respect to pricing of products and services, including, but not limited to, establishing the maximum and/or minimum retail prices which you may charge customers for the products and services offered and sold at your Franchised Business; recommending retail prices; advertising specific retail prices for some or all products or services sold at your Franchised Business, which Franchisor may compel you to observe and honor; and developing and advertising price promotions or package promotions which may directly or indirectly impact your retail prices, and in which Franchisor may compel you to participate.  Franchisor may engage in any such activity periodically or throughout the term of this Agreement, and may engage in such activity in some geographic areas but not others, or with regard to certain subsets of franchisees but not others.  You acknowledge and agree that any maximum, minimum, or other prices Franchisor prescribes or suggests may or may not optimize the revenues or profitability of your Franchised Business, and you irrevocably waive any and all claims arising from or related to our prescription or suggestion of your Franchised Business' retail prices.

You acknowledge that because uniformity may not be possible or practical under many varying conditions, Franchisor reserves the right to materially vary its standards or franchise agreement terms for any franchisee, based on the timing of the grant of the franchise, the peculiarities of the particular territory or circumstances, business potential, population, existing business practices, other non-arbitrary distinctions, or any other condition which Franchisor considers important to the successful operation of the System.  You have no right to require Franchisor to disclose any variation or to grant the same or a similar variation to you.

If you develop any new concepts, processes, or improvements relating to the System, whether or not pursuant to a test authorized by Franchisor, you must promptly notify Franchisor and provide Franchisor with all information regarding the new concept, process, or improvement, all of which will automatically become the property of Franchisor and its Affiliates, and which Franchisor and its Affiliates may incorporate into the System without any payment to you.  You must promptly take, at your expense, all actions deemed necessary or desirable by Franchisor to vest in Franchisor the ownership of such concepts, processes, or improvements.

## 11.    PERFORMANCE REQUIREMENTS

### A.    Best Efforts.

Your Designated Manager (see Section 11.K below) must use full time and best efforts in the operation of the Franchised Business, and must personally supervise the day-to-day operation of the Franchised Business.

### B.    Standards, Specifications and Procedures.

You agree to comply with all System specifications, standards, and operating procedures (whether contained in the Manual or any other written communication) relating to the appearance, function, cleanliness, and operation of a URBAN AIR TRAMPOLINE PARK™ Franchised Business including, without limitation: (1) type, quality, taste, weight, dimensions, uniformity, pricing, and sale of all products sold at the Franchised

V.5

Business; (2) sales and marketing procedures and customer service; (3) advertising and promotional programs; (4) layout, décor, and color scheme of the Franchised Business; (5) appearance and dress of employees; (6) safety, maintenance, appearance, cleanliness, sanitation, standards of service, and operation of the Franchised Business; (7) submission of requests for approval of brands of products, supplies, and suppliers; (8) use and illumination of signs, posters, displays, standard formats, and similar items; (9) use of audio equipment and type and decibel levels of music; (10) use of video equipment and type and decibel level of television broadcasts (including closed captioning requirements); (11) types of fixtures, furnishings, equipment, smallwares, and packaging; and (12) the make, type, location, and decibel level of any game, entertainment, or vending machine. Mandatory specifications, standards, and operating procedures, including upgraded or additional equipment, that Franchisor prescribes from time to time in the Manual or otherwise communicates to you shall constitute provisions of this Agreement as if fully set forth in this Agreement.

All products, merchandise, advertising materials, furniture, fixtures, equipment, smallwares, supplies, and stationery used in connection with the operation of the Franchised Business must meet Franchisor's standards and specifications, as promulgated from time to time. Such specifications may include brand specifications ("**Approved Brands**"), and to the extent that Approved Brands have been identified, you may purchase and use only the Approved Brands. Franchisor may from time to time modify its specifications, and you shall promptly comply with all such modifications.

**C.**     <u>**Approved Suppliers and Distributors.**</u>

You must purchase those products designated by Franchisor only from suppliers approved and designated by Franchisor ("**Designated Suppliers**"), including, but not limited to: (1) fixtures, furniture, equipment, signs, items of décor; (2) uniforms, shirts, and all merchandise and items intended for retail sale (whether or not bearing our Proprietary Marks); (3) advertising, point-of-purchase materials, and other printed promotional materials; (4) gift certificates and stored value cards; (5) stationery, business cards, contracts, and forms; (6) bags, packaging, and supplies bearing the Proprietary Marks; and (7) other products and services that we require. In addition to Designated Suppliers, Franchisor may require you to purchase certain supplies from approved or designated third party distributors ("**Designated Distributors**"), and you agree to comply with all such requirements.

Franchisor may, in its sole discretion, enter into supply contracts either for all Franchised Businesses or a subset of Franchised Businesses situated within one or more geographic regions (each a "**Systemwide Supply Contract**"). Franchisor may enter into Systemwide Supply Contracts with one or more vendors of products, services, or equipment and may require all company-owned and franchised businesses in a geographic area to purchase from, use, or sell to such vendors. If Franchisor enters into such Systemwide Supply Contracts, then immediately upon notification, you and all Franchised Businesses in the geographic area must purchase the specified product, service, or equipment only from the designated supplier; provided, however, that if, at the time of such notification, you are already a party to a non-terminable supply contract with another vendor or supplier for the designated product, service, or equipment, then your obligation to purchase from Franchisor's designated supplier under the Systemwide Supply Contract will not begin until the scheduled expiration or earlier termination of your pre-existing supply contract. Franchisor makes no representation that it will enter into any Systemwide Supply Contracts or other exclusive supply arrangements or, if it does, that you will not otherwise be able to purchase the same products and/or services at a lower price from another supplier. Franchisor may add to, modify, substitute or discontinue Systemwide Supply Contracts or exclusive supply arrangements in the exercise of its sole discretion and business judgment.

Franchisor may also establish commissaries and distribution facilities owned and operated by Franchisor or its affiliate that Franchisor may deem a Designated Supplier or Designated Distributor. Franchisor may receive money or other benefits, such as rebates or conference sponsorships, from Designated Suppliers and Designated Distributors based on your purchases; you agree that Franchisor has the right to retain and use all such benefits as it deems appropriate, in its sole discretion.

Franchisor may approve one or more suppliers for any goods or materials and may approve a supplier only as to certain goods or materials. Franchisor may concentrate purchases with one or more suppliers or distributors to obtain lower prices and/or the best advertising support and/or services for any group of URBAN

AIR TRAMPOLINE PARK™ Franchised Businesses or any other facilities franchised or operated by Franchisor or its Affiliates. Approval of a supplier may be conditioned on requirements relating to the frequency of delivery, reporting capabilities, standards of service, including prompt attention to complaints, or other criteria, and concentration of purchases, as set forth above, and may be temporary pending a further evaluation of such supplier by Franchisor.

If you propose to purchase from a previously unapproved source, you shall submit to Franchisor a written request for such approval, or shall request the supplier to submit a written request on its own behalf. Franchisor has the right to require, as a condition of its approval, that its representatives be permitted to sample the product and inspect the supplier's facilities, and that such information, specifications, and samples as Franchisor reasonably requires be delivered to Franchisor and/or to an independent, certified laboratory designated by Franchisor for testing prior to granting approval. A charge not to exceed the reasonable cost of the inspection and the actual cost of the test shall be paid by you. Franchisor will notify you within 120 days of your request as to whether you are authorized to purchase such products from that supplier. Franchisor reserves the right, at its option, to re-inspect the facilities and products of any such approved supplier and to revoke its approval of any supplier upon the suppliers' failure to meet Franchisor's criteria for quality and reliability.

**D.    Authorized Products and Services.**

You shall cause the Franchised Business to offer and sell all products and services that Franchisor requires, and only products and services that Franchisor approves for sale by URBAN AIR TRAMPOLINE PARK™ Franchised Businesses. Franchisor may add, modify, and discontinue authorized products and services at any time, in its sole discretion, and you shall promptly comply with all directives. The Franchised Businesses shall begin offering for sale additional or modified products, and cease offering discontinued products, within 10 days of the date you receive written notice of the addition, modification, or discontinuance. All products or services offered for sale in connection with the Franchised Business shall meet Franchisor's Standards.

You shall at all times maintain an inventory of approved goods and materials sufficient in quality and variety to realize the full potential of the Franchised Business. Franchisor may, from time to time, conduct market research and testing to determine consumer trends and the salability of new products and services. You agree to cooperate in these efforts by participating in the URBAN AIR TRAMPOLINE PARK™ customer surveys and market research programs if requested by Franchisor. All customer surveys and market research programs will be at Franchisor's sole cost and expense, unless you have volunteered to participate in the survey or market research and to share your proportionate cost. You may not test any new product or service without Franchisor's prior written consent.

**E.    Computer Systems and Intranet/Extranet Systems.**

You shall acquire and use all cash registers, computer hardware and related accessories, and peripheral equipment ("**Computer Systems**") that Franchisor prescribes for use by Franchised Businesses, and may not use any cash registers or computer hardware, accessories, or peripheral equipment that Franchisor has not approved for use by URBAN AIR TRAMPOLINE PARK™ Franchised Businesses. Requirements may include, among other things, connection to remote servers, off-site electronic repositories, and high speed Internet connections and service.

You shall: (1) use any proprietary software programs, system documentation manuals, and other proprietary materials provided to you by Franchisor in connection with the operation of the Franchised Business; (2) input and maintain in your computer such data and information as Franchisor prescribes in the Manual, software programs, documentation, or otherwise; and (3) purchase new or upgraded software programs, system documentation manuals, and other proprietary materials at then-current prices whenever Franchisor adopts such new or upgraded programs, manuals, and materials system-wide. You shall enter into all software license agreements, "terms of use" agreements, and software maintenance agreements, in the form and manner Franchisor prescribes, and pay all fees charged by third party software and software service providers thereunder. In addition, Franchisor has the right to charge, and you agree to pay, a technology fee ("**Technology Fee**") in the amount specified in the Summary Page.

You acknowledge that Franchisor may independently access from a remote location, at any time, all information input to, and compiled by, your Computer System or an off-site server, including information concerning Gross Sales, purchase orders, inventory and expenditures.

You acknowledge that technology is ever changing and that, as technology or software is developed in the future, Franchisor may, in its sole discretion, require you to: (1) add to your Computer System memory, ports, and other accessories or peripheral equipment, or additional, new, or substitute software; (2) replace, update or upgrade your Computer System, including but not limited to computer hardware components and software applications as Franchisor prescribes, but not to exceed three times per calendar year.

To ensure full operational efficiency, you agree to keep your Computer System in good maintenance and repair and to make additions, changes, modifications, substitutions, and replacements to your computer hardware, accessories and peripherals, software, telephone and power lines, high speed Internet connections, and other computer-related facilities as directed by Franchisor. Upon termination or expiration of this Agreement, all computer software, disks, tapes, and other magnetic storage media shall be returned to Franchisor in good operating condition, excepting normal wear and tear.

Franchisor may, at its option, establish and maintain an intranet or extranet system through which members of the URBAN AIR TRAMPOLINE PARK™ franchise network may communicate, and through which Franchisor may disseminate updates to the Manual and other Confidential Information. Franchisor will have no obligation to establish or to maintain the intranet indefinitely, and may dismantle it at any time without liability to you. Franchisor may establish policies and procedures for the intranet's use. Franchisor expects to adopt and adhere to a reasonable privacy policy. However, you acknowledge that, as administrator of the intranet, Franchisor can technically access and view any communication that anyone posts on the intranet. You further acknowledge that the intranet facility and all communications that are posted to it will become Franchisor's property, free of any claims of privacy or privilege that you or any other individual may assert. If you fail to pay when due any amount payable to Franchisor under this Agreement, or if you fail to comply with any policy or procedure governing the intranet, Franchisor may suspend your access to any chat room, bulletin board, listserv, or similar feature the intranet includes until such time as you fully cure the breach.

**F.    Non-Cash Payment Systems.**

Within a reasonable period of time following Franchisor's request, you shall accept debit cards, credit cards, stored value cards, or other non-cash systems specified by Franchisor to enable customers to purchase authorized products, and you shall obtain all necessary hardware and/or software used in connection with these non-cash systems. The parties acknowledge and agree that protection of customer privacy and credit card information is necessary to protect the goodwill of businesses operating under the Proprietary Marks and System. Accordingly, you shall cause the Franchised Business to meet or exceed, at all times, all applicable security standards developed by the Payment Card Industry Standards Council or its successor and other regulations and industry standards applicable to the protection of customer privacy and credit card information. You are solely responsible for your own education concerning these regulations and standards and for achieving and maintaining applicable compliance certifications. You shall defend, indemnify, and hold Franchisor harmless from and against all claims arising out of or related to your violation of the provisions of this Section 11.F.

**G.    Franchisor Inspections.**

Franchisor or its designees shall have the right at any reasonable time and without prior notice to you to: (1) inspect the Franchised Business premises; (2) observe, photograph, and record the operation of the Franchised Business for such consecutive or intermittent periods as Franchisor deems necessary; (3) interview Franchised Business personnel; (4) interview customers; and (5) inspect and copy any books, records, and documents relating to the operation of the Franchised Business or, upon request of Franchisor or its designee, require you to send copies thereof to Franchisor or its designee. You shall present to your customers those evaluation forms as are periodically prescribed by Franchisor and shall participate and/or ask your customers to participate in any surveys performed by or on behalf of Franchisor as Franchisor may direct.

You agree to cooperate fully with Franchisor or its designee in connection with any such inspection, observations, recordings, product removal, and interviews. You shall take all necessary steps to immediately correct any deficiencies detected during these inspections including, without limitation, ceasing further sales of unauthorized items and ceasing further use of any equipment, advertising materials, or supplies that do not conform to the standards and requirements promulgated by Franchisor from time to time. Franchisor shall have the right to develop and implement a grading system for inspections and, to the extent such a system is implemented, if the Franchised Business fails to achieve a passing score on any inspection, Franchisor may require your Key Personnel and other Franchised Business personnel to attend and participate in such additional training as Franchisor deems appropriate. If the Franchised Business fails to achieve a passing score on any two consecutive inspections or if the Franchised Business fails to achieve a passing score three or more times in any 12-month period, Franchisor may terminate this Agreement in accordance with Section 18.

These inspections may take the forms of quality assurance inspections and mystery shops. To the extent Franchisor engages a third party service for conducting quality assurance inspections and mystery shops, you must reimburse Franchisor its actual costs incurred in connection with inspections and mystery shops conducted at your Franchised Business. At Franchisor's request, Franchisor may require you to pay these amounts directly to the applicable services provider.

**H.     Upkeep of the Franchised Business.**

You shall continuously operate the Franchised Business and shall, at all times and at your sole expense, maintain in first class condition and repair (subject to normal wear and tear), in good working order, in accordance with the requirements of the System, and in compliance with all applicable laws and regulations, the interior and exterior of the Franchised Business, including, without limitation, all furniture, fixtures, equipment, furnishings, floor coverings, interior and exterior signage, interior and exterior finishes, and interior and exterior lighting. You shall promptly and diligently perform all necessary maintenance, repairs, and replacements to the Franchised Business premises as Franchisor may prescribe from time to time including periodic interior painting and replacement of obsolete or worn out signage, floor coverings, furnishings, equipment, and décor.

**I.     Franchised Business Operations.**

You shall cause the Franchised Business to be open and operating on the days and during the hours that Franchisor designates, subject to applicable lease and/or local law or licensing limitations. You shall operate and maintain the Franchised Business in conformity with the highest ethical standards and sound business practices and in a manner which will enhance the goodwill associated with the Proprietary Marks.

**J.     Management and Personnel.**

You shall employ a sufficient number of qualified, competent individuals to satisfy the demand for products and services offered by the Franchised Business. You shall hire all employees of the Franchised Business, and be exclusively responsible for the terms of their employment and compensation, and for the proper training of such employees in the operation of the Franchised Business, in human resources and customer relations. You shall employ only suitable individuals of good character and reputation who will at all times conduct themselves in a competent and courteous manner in accordance with the image and reputation of URBAN AIR TRAMPOLINE PARK™ and the System and, while on duty, each employee shall comply with the dress attire, personal appearance and hygiene standards set forth in the Manual. You shall use best efforts to ensure that your employees maintain a neat and clean appearance and render competent and courteous service to all customers and are courteous and respectful to fellow employees. The parties acknowledge and agree that these requirements are necessary to preserve the goodwill identified by the Proprietary Marks. The parties further acknowledge and agree that Franchisor neither dictates nor controls labor or employment matters for you or your employees. You are exclusively responsible for hiring personnel, for determining the number of jobs offered or job vacancies to be filled, for determining and changing employee wages and benefits and work hours, and for disciplining and discharging your employees. You are exclusively responsible for labor relations with your employees. You shall defend and indemnify Franchisor and its Indemnities (as defined in Section 20.B. below) against any and all proceedings, claims, investigations, and causes of action instituted by your employees or by others that arise from your employment practices.

V.5

K.    <u>**Designated Manager.**</u>

You shall designate and retain an individual to serve as your Designated Manager. The Designated Manager as of the date of this Agreement is identified in <u>Attachment C</u> to this Agreement. Unless waived in writing by Franchisor, the Designated Manager shall meet all of the following qualifications:

(1)    He or she, at all times, shall have full control over the day-to-day activities and operations of the Franchised Business and shall devote full time and best efforts to supervising the operation of the Franchised Business (and any other URBAN AIR TRAMPOLINE PARK™ Franchised Business that you own and operate pursuant to a franchise agreement with Franchisor) and shall not engage in any other business or activity, directly or indirectly, that requires substantial management responsibility or time commitment;

(3)    He or she shall successfully complete the initial training program and any additional training required by Franchisor; and

(4)    Franchisor shall have approved him or her as meeting its then-current Standards for such position, and not have later withdrawn such approval.

If the Designated Manager ceases to serve in, or no longer qualifies for such position, you shall designate another qualified person to serve as your Designated Manager within 30 days. Your proposed replacement Designated Manager must successfully complete the initial training program and execute a Confidentiality and Noncompete Agreement in the form prescribed by Franchisor before assuming Designated Manager responsibilities.

L.    <u>**Signs and Logos.**</u>

Subject to any applicable local ordinances, you shall prominently display at the Franchised Business premises such interior and exterior signs, logos, and advertising of such nature, form, color, number, location, and size, and containing the content and information that Franchisor may from time to time direct. You shall not display in or about the Franchised Business premises or otherwise in connection with the Proprietary Marks any unauthorized sign, logo, or advertising media of any kind.

M.    <u>**Entertainment Equipment.**</u>

You shall not permit to be installed at the Franchised Business premises any juke box, vending or game machine, gum machine, game, ride, gambling or lottery device, coin or token operated machine, or any other music, film, or video device not authorized by Franchisor.

N.    <u>**Compliance with Laws and Good Business Practices.**</u>

You shall secure and maintain in full force in your name all required licenses, permits, and certifications relating to the operation of the Franchised Business. You shall operate the Franchised Business in full compliance with all applicable laws, ordinances, and regulations including, without limitation, all laws or regulations governing or relating to immigration and discrimination, occupational hazards, employment laws (including, without limitation, workers' compensation insurance, unemployment insurance, and the withholding and payment of federal and state income taxes and social security taxes) and the payment of sales taxes. All advertising and promotion for the Franchised Business shall be completely factual and shall conform to the highest standards of ethical advertising. In all dealings with the Franchised Business' customers, suppliers, and the public, you shall adhere to the highest standards of honesty, integrity, fair dealing, and ethical conduct. You shall refrain from any business or advertising practices that may be injurious to the good will associated with the Proprietary Marks or to the business of the URBAN AIR TRAMPOLINE PARK™ Brand, Franchisor or its Affiliates, the System, or other System franchisees.

You shall notify Franchisor in writing within five days after the commencement of: (1) any action, suit, or proceeding, or the issuance of any order, writ, injunction, award, or decree of any court, agency, or other governmental instrumentality, which may adversely affect the operation of the Franchised Business or your financial condition; or (2) any notice of violation of any law, ordinance, or regulation relating to health or sanitation at the Franchised Business.

O.      **Payment of Taxes and Other Indebtedness.**

You shall promptly pay, when due, all taxes levied or assessed by any federal, state, or local tax authority and any and all other indebtedness incurred by you in the operation of the Franchised Business.  In the event of any bona fide dispute as to liability for taxes assessed or other indebtedness, you may contest the validity or the amount of the tax or indebtedness in accordance with procedures of the taxing authority or applicable law; provided, however, in no event shall you permit a tax sale or seizure by levy of execution or similar writ or warrant, or attachment by a creditor, to occur against the premises of the Franchised Business or any improvements thereon.

12.      **ORGANIZATION OF THE FRANCHISEE**

A.      **Representations.**

If you are a Business Entity, you make the following representations and warranties: (1) the Business Entity is duly organized and validly existing under the laws of the state of its formation; (2) it is qualified to do business in the state or states in which the Franchised Business is located; (3) execution of this Agreement and the development and operation of the Franchised Business is permitted by its governing documents; and (4) unless waived in writing by Franchisor, its charter documents and its governing documents shall at all times provide that the activities of the Business Entity are limited exclusively to the development and operation of a single URBAN AIR TRAMPOLINE PARK™ Franchised Business.

If you are an individual, or a partnership comprised solely of individuals, you make the following additional representations and warranties: (1) each individual has executed this Agreement; (2) each individual shall be jointly and severally bound by, and personally liable for the timely and complete performance and a breach of, each and every provision of this Agreement; and (3) notwithstanding any transfer for convenience of ownership pursuant to Section 17 of this Agreement, each individual shall continue to be jointly and severally bound by, and personally liable for the timely and complete performance and a breach of, each and every provision of this Agreement.

B.      **Governing Documents.**

If you are a corporation, copies of your Articles of Incorporation, bylaws, other governing documents, and any amendments, including the resolution of the Board of Directors authorizing entry into and performance of this Agreement, and all shareholder agreements, including buy/sell agreements, must be furnished to Franchisor.  If you are a limited liability company, copies of your Articles of Organization, operating agreement, other governing documents and any amendments, including the resolution of the Managers authorizing entry into and performance of this Agreement, and all agreements, including buy/sell agreements, among the members must be furnished to Franchisor.  If you are a general or limited partnership, copies of your written partnership agreement, other governing documents and any amendments, as well as all agreements, including buy/sell agreements, among the partners must be furnished to Franchisor, in addition to evidence of consent or approval of the entry into and performance of this Agreement by the requisite number or percentage of partners, if that approval or consent is required by your written partnership agreement or applicable law.  When any of these governing documents are modified or changed, you must promptly provide copies of the modifying documents to Franchisor.

C.      **Ownership Interests.**

If you are a Business Entity, you represent that all of your equity interests are owned as set forth on Attachment C to this Agreement.  In addition, if you are a corporation, you shall maintain a current list of all owners of record and all beneficial owners of any class of voting securities of the corporation (and the number of shares owned by each).  If you are a limited liability company, you shall maintain a current list of all members (and the percentage membership interest of each member).  If you are a partnership, you shall maintain a current list of all owners of an interest in the partnership (and the percentage ownership interest of each general and limited partner).  You shall comply with Section 17 of this Agreement prior to any change in ownership interests and shall execute any necessary addenda to Attachment C as changes occur in order to ensure the information contained in Attachment C is true, accurate, and complete at all times.

**D.    Restrictive Legend.**

If you are a corporation, you shall maintain stop-transfer instructions against the transfer on your records of any voting securities, and each stock certificate of the corporation shall have conspicuously endorsed upon its face the following statement: "Any assignment or transfer of this stock is subject to the restrictions imposed on assignment by the URBAN AIR TRAMPOLINE PARK™ Franchise Agreement(s) to which the corporation is a party." If you are a limited liability company, each membership or management certificate or other evidence of interest in the limited liability company shall have conspicuously endorsed upon its face the following statement: "Any assignment or transfer of an interest in this limited liability company is subject to the restrictions imposed on assignment by URBAN AIR TRAMPOLINE PARK™ Franchise Agreement(s) to which the limited liability company is a party."  If you are a partnership, your written partnership agreement shall provide that ownership of an interest in the partnership is held subject to, and that further assignment or transfer is subject to, all restrictions imposed on assignment by this Agreement.

**E.    Guarantees.**

If you are a Business Entity, each Owner (and if you are a limited partnership, each of your general partner's Owners) shall execute the Personal Undertaking and Guaranty attached hereto as <u>Attachment D-1</u>.

**13.    PROPRIETARY MARKS AND COPYRIGHTED WORKS**

**A.    Acknowledgments.**

You expressly understand and acknowledge that: (1) as between you and Franchisor, Franchisor is the exclusive owner of all right, title, and interest in and to the Proprietary Marks (and all goodwill symbolized by them) and the Copyrighted Works; (2) the Proprietary Marks are valid and serve to identify the System and those who are licensed to operate a Franchised Business in accordance with the System; (3) your use of the Proprietary Marks and Copyrighted Works pursuant to this Agreement does not give you any ownership interest or other interest in or to them, except the nonexclusive license to use them in accordance with this Agreement and the Standards; (4) any and all goodwill arising from your use of the Proprietary Marks and/or the System shall inure solely and exclusively to Franchisor's benefit, and upon expiration or termination of this Agreement, no monetary amount shall be assigned as attributable to any goodwill associated with your use of the System or the Proprietary Marks; (5) the license and rights to use the Proprietary Marks and Copyrighted Works granted hereunder to you are nonexclusive; (6) Franchisor may itself use, and grant franchises and licenses to others to use, the Proprietary Marks, Copyrighted Works, and the System; (7) Franchisor may establish, develop and franchise other systems, different from the System licensed to you herein, without offering or providing you any rights in, to, or under such other systems; and (8) Franchisor may add to, eliminate, modify, supplement, or otherwise change, in whole or in part, any aspect of the Proprietary Marks or Copyrighted Works.

**B.    Modification of the Proprietary Marks and Copyrighted Works.**

Franchisor reserves the right to add to, eliminate, modify, supplement, or otherwise change any of the Proprietary Marks and Copyrighted Works, in whole or in part.  You must promptly take all actions necessary to adopt all new and modified Proprietary Marks and/or Copyrighted Works and discontinue using obsolete Proprietary Marks and/or Copyrighted Works which may include, among other things, acquiring and installing, at your expense, new interior and exterior signage and graphics.

**C.    Use of the Proprietary Marks and Copyrighted Works.**

You shall use only the Proprietary Marks and Copyrighted Works designated by Franchisor and shall use them only in connection with the operation and promotion of the Franchised Business and in the manner required or authorized and permitted by Franchisor.  Your right to use the Proprietary Marks and Copyrighted Works is limited to the uses authorized under this Agreement and in the Manual, and any unauthorized use thereof shall constitute an infringement of Franchisor's rights and grounds for termination of this Agreement.

You shall not use the Proprietary Marks as part of your Business Entity or other legal name.  You shall comply with all requirements of Franchisor's and applicable state and locals laws concerning use and registration of fictitious and assumed names, and shall execute any documents deemed necessary by Franchisor

or its counsel to obtain protection for the Proprietary Marks or to maintain their continued validity and enforceability.

**D.     Internet and Social Media Usage.**

You may not cause or allow all or any recognizable portion of the Proprietary Marks to be used or displayed as all or part of an e-mail address, Internet domain name, uniform resource locator ("**URL**"), or meta-tag, or in connection with any Internet home page, web site, or any other Internet-related activity without Franchisor's express written consent, and then only in a manner and in accordance with the procedures, standards and specifications that Franchisor establishes. This prohibition includes use of the Proprietary Marks or any derivative of the Proprietary Marks as part of in the registration of any user name on any gaming website or social networking website including, but not limited to, FACEBOOK, MYSPACE, LINKEDIN, FOURSQUARE, YELP, URBANSPOON, or TWITTER. Our social media and networking policies will be provided to you in the Manual, and may be modified, amended, or terminated by us at any time.

**E.     Assignment of Rights.**

To the extent that you or any Owner creates any derivative work based on the Proprietary Marks or Copyrighted Works ("**Derivative Works**"), you and each such Owner hereby permanently and irrevocably assigns to Franchisor all rights, interests, and ownership (including intellectual property rights and interests) in and to the Derivative Works, and agree to execute such further assignments as Franchisor may request. The term "Derivative Works" shall be interpreted to include, without limitation: any and all of the following which is developed by you, or on your behalf, if developed in whole or in part in connection with your Franchised Business: all products or services; all variations, modifications and/or improvements on products or services; your means, manner and style of offering and selling products and services; management techniques or protocols you may develop (or have developed on your behalf); all sales, marketing, advertising, and promotional programs, campaigns, or materials developed by you or on your behalf; and, all other intellectual property developed by you or on behalf of your Franchised Business.

Franchisor may authorize itself, its affiliates, and other Franchised Businesses to use and exploit any such rights assigned by this Section 13.E. The sole consideration for your assignment to Franchisor of the foregoing rights shall be Franchisor's grant of the Franchise conferred to you under this Agreement. You and each Owner shall take all actions and sign all documents necessary to give effect to the purpose and intent of this Section 13.E. You and each Owner irrevocably appoint Franchisor as true and lawful attorney-in-fact for you and each Owner, and authorize Franchisor to take such actions and to execute, acknowledge, and deliver all such documents as may from time to time be necessary to convey to Franchisor all rights granted herein.

**F.     Infringement; Notice of Claims.**

If you become aware of any infringement of the Proprietary Marks or Copyrighted Works or if your use of the Proprietary Marks or Copyrighted Works is challenged by a third party, then you must immediately notify Franchisor. Franchisor shall have the exclusive right to take whatever action it deems appropriate. If Franchisor or its Affiliate undertakes the defense or prosecution of any litigation pertaining to any of the Proprietary Marks or other intellectual property, you must sign all documents and perform such acts and things as, in the opinion of Franchisor's counsel, may be necessary to carry out such defense or prosecution. If it becomes advisable at any time in the sole discretion of Franchisor to modify or discontinue the use of any Mark or Copyrighted Works, or to substitute a new mark or graphic for any Mark or Copyrighted Work, as applicable, you must promptly comply, at your expense (which may include the cost of replacement signage and/or trade dress), with such modifications, discontinuances, or substitutions within 60 days following your receipt of written notice of the change.

**G.     Remedies and Enforcement.**

You acknowledge that in addition to any remedies available to Franchisor under this Agreement, you agree to pay all court costs and reasonable attorneys' fees incurred by Franchisor in obtaining specific performance of, a temporary restraining order and/or an injunction against violation of the provisions of this Section 13.

14.     **CONFIDENTIALITY OBLIGATIONS AND RESTRICTIVE COVENANTS**

A.      **Confidential Information.**

You and each Owner acknowledge that all Confidential Information belongs exclusively to Franchisor. You and each Owner agree to use and permit the use of the Confidential Information only in connection with the operation of your Franchised Business, to maintain the confidentiality of all Confidential Information, to not duplicate any materials containing Confidential Information. You and each Owner further agree that you will not at any time, during the term of this Agreement or after expiration or earlier termination of this Agreement: (i) divulge any Confidential Information to anyone, except to other franchisees, your employees having a need to know, and your professional advisors having a need to know; (ii) divulge or use any Confidential Information for the benefit of yourself, your owners, or any third party (including any person, business entity, or enterprise of any type or nature), except in the operation of your Franchised Business, and then only in strict compliance with the Manual and System; or (iii) directly or indirectly imitate, duplicate, or "reverse engineer" any of our Confidential Information, or aid any third party in such actions.

Upon the expiration or earlier termination of this Agreement, you will return to Franchisor all Confidential Information which is then in your possession, including, without limitation, customer lists and records, all training materials and other instructional content, all financial and non-financial books and records, the Manual and any supplements to the Manual, and all computer databases, software, and manual. Franchisor reserves the right, upon its specific written request, to require you to destroy all or certain such Confidential Information and to certify such destruction to Franchisor. You specifically acknowledge that all customer lists or information adduced by your Franchised Business is not your property, but is Franchisor's property, and you further agree to never contend otherwise.

You shall cause your Designated Manager and any employee with access to Confidential Information, including information contained in the Manuals, to sign a confidentiality agreement in a form prescribed by Franchisor, which identifies Franchisor as a third-party beneficiary of such agreement and gives Franchisor independent rights of enforcement.

The provisions of this <u>Section 14.A</u> will survive expiration or termination of this Agreement.

B.      **Covenants of the Franchisee.**

You acknowledge that you and your Owners will receive valuable specialized training and Confidential Information, including, without limitation, information regarding the operational, sales, promotional, and marketing methods and techniques and trade secrets of Franchisor and the System.

You covenant and agree that during the term of this Agreement, you will not, either directly or indirectly, for yourself, or through, on behalf of, or in conjunction with any person, or legal entity:

(a)  Divert or attempt to divert any present or prospective customer of any URBAN AIR TRAMPOLINE PARK™ Franchised Business to any Competitive Business, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act that is harmful, injurious, or prejudicial to the goodwill associated with the Proprietary Marks and the System;

(b)  Employ or seek to employ any person who is or has within the previous 60 days been employed by Franchisor or an Affiliate of Franchisor, or otherwise directly or indirectly induce such person to leave his or her employment; or

(c)  Own, maintain, advise, operate, engage in, be employed by, make loans to, invest in, provide any assistance to, or have any interest in (as owner or otherwise) or relationship or association with, any Competitive Business other than a URBAN AIR TRAMPOLINE PARK™ Franchised Business operated by you or your Affiliates pursuant to a then-currently effective Franchise Agreement with Franchisor, at any location within the United States, its territories or commonwealths, or any other country, province, state, or geographic area in which Franchisor or its Affiliates have used, sought registration of, or registered the Proprietary Marks or similar marks, or have operated or licensed others to operate a business under the System or the Proprietary Marks or similar marks;

V.5

provided that such restriction shall not apply to less than a 5% beneficial interest in any publicly traded corporation.

You further covenant and agree that for a two-year continuous and uninterrupted period (which shall be tolled during any period of noncompliance) commencing upon expiration or termination of this Agreement, regardless of the reason for termination, you will not, either directly or indirectly, for yourself, or through, on behalf of, or in conjunction with any person, or legal entity:

(a)  Divert or attempt to divert any present or prospective customer of any URBAN AIR TRAMPOLINE PARK™ Franchised Business to any Competitive Business, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act that is harmful, injurious, or prejudicial to the goodwill associated with the Proprietary Marks and the System;

(b)  Employ or seek to employ any person who is or has within the previous 60 days been employed by Franchisor or an Affiliate of Franchisor, or otherwise directly or indirectly induce such person to leave his or her employment; or

(c)  Own, maintain, advise, operate, engage in, be employed by, make loans to, invest in, provide any assistance to, or have any interest in (as owner or otherwise) or relationship or association with, any Competitive Business other than a URBAN AIR TRAMPOLINE PARK™ Franchised Business operated by you or your Affiliates pursuant to a then-currently effective Franchise Agreement with Franchisor, at any location that (i) is, or is intended to be, located at the location of any former URBAN AIR TRAMPOLINE PARK™ Franchised Business; (ii) is within a 25-mile radius of your former Franchised Business location; or (iii) is within a 25-mile radius of any other URBAN AIR TRAMPOLINE PARK™ Franchised Business operating under the System and Proprietary Marks in existence or under development at the time of such termination or transfer.

This two-year period will be tolled during any period of your noncompliance.

**C.    <u>Covenants of the Franchisee's Owners.</u>**

During the term of this Agreement, your Owners will not, either directly or indirectly, for themselves, or through, on behalf of, or in conjunction with any person, or legal entity:

(a)  Divert or attempt to divert any present or prospective customer of any URBAN AIR TRAMPOLINE PARK™ Franchised Business to any Competitive Business, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act that is harmful, injurious, or prejudicial to the goodwill associated with the Proprietary Marks and the System;

(b)  Employ or seek to employ any person who is or has within the previous 60 days been employed by Franchisor or an Affiliate of Franchisor, or otherwise directly or indirectly induce such person to leave his or her employment; or

(c)  Own, maintain, advise, operate, engage in, be employed by, make loans to, invest in, provide any assistance to, or have any interest in (as owner or otherwise) or relationship or association with, any Competitive Business other than a URBAN AIR TRAMPOLINE PARK™ Franchised Business operated by you or your Affiliates pursuant to a then-currently effective Franchise Agreement with Franchisor, at any location within the United States, its territories or commonwealths, or any other country, province, state, or geographic area in which Franchisor or its Affiliates have used, sought registration of, or registered the Proprietary Marks or similar marks, or have operated or licensed others to operate a business under the System or the Proprietary Marks or similar marks; provided that such restriction shall not apply to less than a 5% beneficial interest in any publicly traded corporation.

For a two-year continuous and uninterrupted period (which shall be tolled during any period of noncompliance) commencing upon the earlier of (i) expiration or termination of this Agreement, regardless of the cause for termination, (ii) dissolution of the franchisee entity, or (iii) the transfer or redemption of an Owner's interest in the franchisee entity, your Owners will not, either directly or indirectly, for themselves, or through, on behalf of, or in conjunction with any person, or legal entity:

(a)   Divert or attempt to divert any present or prospective customer of any URBAN AIR TRAMPOLINE PARK™ Franchised Business to any Competitive Business, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act that is harmful, injurious, or prejudicial to the goodwill associated with the Proprietary Marks and the System;

(b)   Employ or seek to employ any person who is or has within the previous 60 days been employed by Franchisor or an Affiliate of Franchisor, or otherwise directly or indirectly induce such person to leave his or her employment; or

(c)   Own, maintain, advise, operate, engage in, be employed by, make loans to, invest in, provide any assistance to, or have any interest in (as owner or otherwise) or relationship or association with, any Competitive Business other than a URBAN AIR TRAMPOLINE PARK™ Franchised Business operated by you or your Affiliates pursuant to a then-currently effective Franchise Agreement with Franchisor, at any location that (i) is, or is intended to be, located at the location of any former URBAN AIR TRAMPOLINE PARK™ Franchised Business; (ii) is within a 25-mile radius of your former Franchised Business location; or (iii) is within a 25-mile radius of any other URBAN AIR TRAMPOLINE PARK™ Franchised Business operating under the System and Proprietary Marks in existence or under development at the time of such termination or transfer.

This two-year period will be tolled during any period of your noncompliance. At Franchisor's request, each Owner shall execute a separate agreement containing the terms contained in this Section 14.C.

**D.      Reformation and Reduction of Scope of Covenants.**

If all or any portion of any covenant contained in this Section 14 is held to be unreasonable or unenforceable by a court or agency having valid jurisdiction in an un-appealed final decision to which Franchisor or its Affiliate is a party, the Owners will be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Section 14.  Notwithstanding the foregoing, Franchisor has the unilateral right, in its sole and absolute discretion, to reduce the scope of any covenant set forth in this Section 14, or any portion thereof, which reduction will become effective immediately upon delivery of notice of the reduction.

**E.      Acknowledgments.**

The parties and each Owner acknowledge and agree that any claims that you or such Owner may have or allege to have against Franchisor shall not constitute a defense to the enforcement of any covenant contained in this Section 14.

**F.      No Undue Hardship.**

You and each Owner acknowledge and agree that the covenants set forth in this Section 14 are fair and reasonable.  You acknowledge and agree that such covenants will not impose any undue hardship on you and that you have other considerable skills, experience, and education affording you the opportunity to derive income from other endeavors.  Each Owner acknowledges and agrees that such covenants will not impose any undue hardship on him or her, and that each has other considerable skills, experience, and education affording him or her the opportunity to derive income from other endeavors.

**G.      Injunctive Relief.**

You and each Owner acknowledge that the violation of any covenant contained in this Section 14 would result in immediate and irreparable injury to Franchisor for which there is no adequate remedy at law. The parties acknowledge and agree that, in the event of a violation of any covenant contained in this Section 14, Franchisor shall be entitled to seek injunctive relief to restrain such violation in accordance with the usual equity principles.  The party in violation of any foregoing covenant shall reimburse Franchisor for any costs that it incurs (including attorneys' fees) in connection with enforcement of the provisions contained in this Section 14.

15.    **BRAND DEVELOPMENT; MARKETING**

A.    **General Requirements.**

All of your promotional and marketing materials shall be presented in a dignified manner and shall conform to Franchisor's standards and specifications related to advertising, marketing, and trademark use. You shall submit to Franchisor samples of proposed promotional and marketing materials, and notify Franchisor of the intended media, before first publication or use. Franchisor will use good faith efforts to approve or disapprove proposed promotional and marketing materials within 10 business days after receipt. You may not use the promotional or marketing materials until Franchisor expressly approves the materials and the proposed media. Once approved, you may use the materials only in connection with the media for which they were approved. Franchisor may disapprove your promotional or marketing materials, or the media for which they were approved, at any time, and you must discontinue using any disapproved materials or media upon your receipt of written notice of disapproval.

B.    **Grand Opening Advertising.**

You agree to spend at least the Grand Opening Advertising Amount in accordance with the Specifications to promote the opening of your Franchised Business. All grand opening advertising and promotional materials shall be submitted to Franchisor for approval pursuant to <u>Section 15.A</u>, above.

C.    **Development Fund.**

Each month during the Term, you shall contribute to the Development Fund the amount set forth on the Summary Page. Franchisor has the right to use Fund monies, in its sole discretion, to pay for creative development services (including creation and modification of logos and graphics); preparing or procuring market studies; providing or obtaining marketing services (including conducting customer surveys and focus groups); developing, producing, distributing, and placing advertising (including developing and producing point-of-sale advertising and promotional materials); developing and organizing annual URBAN AIR TRAMPOLINE PARK™ conferences; developing product packaging; developing, updating, and hosting our web site (including development of interior pages featuring franchised and affiliate-owned URBAN AIR TRAMPOLINE PARK™ Franchised Businesses and development of locator programs); developing, updating, and hosting an intranet or extranet system; obtaining sponsorships and endorsements; preparing and conducting sweepstakes, contests, and other prize promotions; making charitable donations; establishing and funding scholarships; and providing and procuring public relations services and conducting public relations activities. Franchisor also may use Fund monies to reimburse itself for its costs of personnel and other administrative and overhead costs associated with providing the services described in this <u>Section 15.C</u>.

The parties acknowledge that Franchisor owns all rights, and retains all copyrights, in all design and content developed using Fund monies, and that Franchisor will have sole control over the creative concepts, content, form, and media placement of all advertising and promotional materials developed with Fund monies, and the allocations of Fund monies to production, placement, and other costs. Franchisor will own all copyright in any works created using Fund monies. You acknowledge and agree that Franchisor is not obligated to either expend Fund monies for placement of advertising in your trading area or ensure that the Franchised Business benefits directly or *pro rata* from the expenditure of Fund monies. Franchisor will not use Fund monies for creating or placing any advertisement that is principally a solicitation for new franchisees, but Franchisor may include in all advertising prepared using Fund monies (including Internet advertising) information concerning franchise opportunities, and a portion of Fund monies may be used to create and maintain one or more pages on Franchisor's web site devoted to advertising franchise opportunities and identifying and screening inquiries and applications submitted by franchise candidates. Fund contributions are not held in trust. Franchisor has no fiduciary duty to you or to any Owner or to any other Person with respect to the collection or expenditure of Fund monies. Upon your reasonable request, Franchisor will provide you an unaudited annual statement of Fund contributions and expenditures.

Although the Fund is intended to be perpetual, Franchisor may terminate the Fund at any time. The Fund will not be terminated, however, until all monies in the Fund have either been spent as provided in this <u>Section 15.C</u> or returned to the contributors of the Fund on a basis proportional to their respective

contributions. Any amounts contributed to the Fund that are not spent in the year they are collected will remain in the Fund for future expenditures.

**D.    Advertising Cooperatives.**

Franchisor may, from time to time, form local or regional advertising cooperatives ("**Advertising Cooperative**") to pay for the development, placement, and distribution of advertising for the benefit of Franchised Businesses located in the geographic region served by the Advertising Cooperative. Any Advertising Cooperative established by Franchisor will be operated solely as a conduit for the collection and expenditure of Advertising Cooperative fees for the foregoing purposes.

If Franchisor forms an Advertising Cooperative for the region in which the Franchised Business is located, you agree to participate in the Advertising Cooperative pursuant to the terms of this Section 15.D.

Franchisor shall have the exclusive right to create, dissolve, and merge each Advertising Cooperative created, in its discretion, and to create and amend the organizational and governing documents related thereto, provided that such documents shall: (1) operate by majority vote, with each URBAN AIR TRAMPOLINE PARK™ Franchised Business (including those owned by Franchisor or its Affiliates) entitled to one vote; (2) entitle Franchisor to cast one vote (in addition to any votes it may be entitled to on account of its operation of Franchised Businesses in the area served by the Advertising Cooperative); (3) permit the members of the Advertising Cooperative, by majority vote, to determine the amount of required contributions; and (4) provide that any funds left in the Cooperative at the time of dissolution shall be returned to the members in proportion to their contributions during the 12-month period immediately preceding termination.

You agree to be bound by all organizational and governing documents created by Franchisor and, at Franchisor's request, shall execute all documents necessary to evidence or affirm your agreement. The Advertising Cooperative shall begin operating on a date determined in advance by Franchisor.

No advertising or promotional plans or materials may be used by the Advertising Cooperative or furnished to its members without Franchisor's prior approval. All advertising plans and materials must conform to the Standards and must be submitted to Franchisor for approval according to the procedures set forth in Section 15.A of this Agreement.

**E.    Restriction Against Internet Advertising.**

You may not establish or maintain a web site or other presence on the World Wide Web portion of the Internet, including gaming websites or social networking websites such as, but not limited to, FACEBOOK, MYSPACE, LINKEDIN, FOURSQUARE, YELP, URBANSPOON, or TWITTER, which reflects any of the Proprietary Marks or any of Franchisor's copyrighted works, that includes the terms "URBAN AIR TRAMPOLINE PARK" as part of its URL or domain name, that otherwise states or suggests your affiliation with URBAN AIR TRAMPOLINE PARK™ or its franchise system, or that uses or displays any collateral merchandise offered at the Franchised Business, without Franchisor's express written consent, and then only in a manner and in accordance with the procedures, standards and specifications that Franchisor establishes. Our social media and networking policies will be provided to you in the Manual, and may be modified, amended, or terminated by us at any time

**F.    Loyalty Programs, Prize Promotions, and Promotional Literature**

You shall participate in and offer to your customers all customer loyalty and reward programs, and all contests, sweepstakes, and other promotions that Franchisor may develop from time to time. Franchisor will communicate to you in writing the details of each such program and promotion, and you shall promptly display all point-of-sale advertising and promotion-related information at such places within the Franchised Business as Franchisor may designate. You shall purchase and distribute all coupons, clothing, toys, and other collateral merchandise (and only the coupons, clothing, toys, and collateral merchandise) designated by Franchisor for use in connection with each such program and promotion.

To the extent that Franchisor develops or authorizes the sale of gift certificates and/or stored value cards, you shall acquire and use all computer software and hardware necessary to process their sale and to process purchases made using them. All proceeds from the sale of all gift certificates and stored value cards

belong exclusively to Franchisor, and you shall remit the proceeds of such sales to Franchisor according to the procedures that Franchisor prescribes periodically. Franchisor shall reimburse or credit to you (at Franchisor's option) the redeemed value of gift cards and stored value cards accepted as payment for products and services sold by the Franchised Business.

You also shall display at the Franchised Business all promotional literature and information as Franchisor may reasonable require from time to time. This may include, among other things, establishing a bulletin board for posting local school and community events and displaying signage or other literature containing information about the URBAN AIR TRAMPOLINE PARK™ Franchised Business franchise offering.

You also agree to honor such credit cards, courtesy cards, and other credit devices, programs, and plans as may be issued or approved by us from time to time. Any reasonable and customary service charges or discounts from reimbursements charged on such cards or authorizations will be at your sole expense.

## 16.    INSURANCE

### A.    Obligation to Maintain Insurance.

You shall be responsible for all loss or damage arising from or related to your development and operation of the Franchised Business, and for all demands or claims with respect to any loss, liability, personal injury, death, property damage, or expense whatsoever occurring upon the premises of, or in connection with the development or operation of, the Franchised Business. You shall maintain in full force and effect throughout the term of this Agreement that insurance which you determine is necessary or appropriate for liabilities caused by or occurring in connection with the development or operation of the Franchised Business, including the minimum coverages described in <u>Section 16.B</u> below. Franchisor, and any entity with an insurable interest designated by Franchisor, shall be an additional named insured in such policies to the extent each has an insurable interest.

### B.    Minimum Insurance Coverage.

All insurance policies shall be written by an insurance company or companies satisfactory to Franchisor, in compliance with the standards, specifications, coverages, and limits set forth in the Manual or other written directives. Such policy or policies shall include, at a minimum, the following types of coverages, with minimum limits prescribed by Franchisor: comprehensive general liability insurance, including broad form contractual liability, liquor liability, personal injury, advertising injury, completed operations, products liability, and fire damage coverage; "all risks" property insurance and tenant's liability coverage, including coverage for fire, vandalism, and malicious mischief; personal property coverage; automobile liability coverage for owned and non-owned vehicles; workers' compensation insurance; spoilage and business interruption insurance; such insurance as may be required by the landlord of the Franchised Business premises; and such insurance as necessary to provide coverage under the indemnity provisions set forth in <u>Section 20.B</u> below. In connection with any construction, renovation, refurbishment, or remodeling of the Franchised Business, you also shall maintain Builder's All Risks insurance, and in connection with new construction or substantial renovation, refurbishment, or remodeling of the Franchised Business, you shall maintain performance and completion bonds in forms and amounts, and written by carrier(s), reasonably satisfactory to Franchisor.

Franchisor shall have the right to establish and modify the minimum required coverages and to require different or additional kinds of insurance to reflect inflation, changes in standards of liability, higher damage awards, or other relevant changes in circumstances. All insurance requirements will be communicated to you via the Manual. You shall receive written notice of any modifications to the insurance requirements and shall take prompt action to secure the additional coverage or higher policy limits. All such insurance policies shall include a waiver of subrogation in favor of Franchisor and its Affiliates, and their respective officers, directors, shareholders, partners, members, agents, representatives, independent contractors, servants, and employees.

You acknowledge that Franchisor's minimum insurance requirements do not constitute advice or a representation that such coverages are necessary or adequate to protect you from losses in connection with the

Franchised Business. Nothing in this Agreement prevents or restricts you from acquiring and maintaining insurance with higher policy limits or lower deductibles than Franchisor requires.

**C.    Insurance Policy Requirements.**

The following general requirements apply to each insurance policy you are required to maintain under this Agreement:

(1)    Each insurance policy must be specifically endorsed to provide that the coverage must be primary and that any insurance carried by any additional insured will be excess and non-contributory.

(2)    Each insurance policy must name Franchisor and its Affiliates, and their respective partners, officers, subsidiaries, affiliates, shareholders, directors, regional directors, agents, and employees as additional named insureds on a primary non-contributory basis on an Additional Insured Grantor of Franchise Endorsement per form CG2029 (or an endorsement form with comparable wording acceptable to Franchisor).

(3)    No insurance policy may contain a provision that in any way limits or reduces coverage for you in the event of a claim by Franchisor or its Affiliates.

(4)    Each insurance policy must extend to, and provide indemnity for, all of your obligations and liabilities to third parties and all other items for which you are required to indemnify Franchisor under this Agreement.

(5)    Each insurance policy must be written by an insurance company that has received and maintains "A- VII" or better rating by the latest edition of Best's Insurance Rating Service.

(6)    No insurance policy may provide for a deductible amount that exceeds $5,000, unless otherwise approved in writing by Franchisor, and your co-insurance under any insurance policy must be 80% or greater.

**D.    Delivery of Certificate.**

No later than 30 days after this Agreement is executed by Franchisor, and on each policy renewal date thereafter, you shall submit evidence of satisfactory insurance and proof of payment therefore to Franchisor. The evidence of insurance shall include a statement by the issuer that the policy or policies will not be cancelled or materially altered without at least 30 days' prior written notice to Franchisor. Upon request, you also shall provide to Franchisor copies of all or any policies, and policy amendments and riders.

**E.    Minimum Insurance Requirements Not a Representation of Adequacy.**

You acknowledge that no requirement for insurance contained in the Agreement constitutes advice or a representation by Franchisor that only such policies, in such amounts, are necessary or adequate to protect you from losses in connection with your business under this Agreement. Maintenance of this insurance, and the performance of your obligations under this Section 16, shall not relieve you of liability under the indemnification provisions of this Agreement.

**F.    Franchisor's Right to Procure Insurance.**

If you fail to procure or maintain at least the insurance required by this Section 16, as revised from time to time pursuant to the Manual or otherwise in writing, Franchisor shall have the immediate right and authority, but not the obligation, to procure such insurance and charge its cost to you, in which case you shall pay Franchisor, immediately upon demand, reimbursement of all out-of-pocket costs incurred by Franchisor in obtaining such insurance on your behalf plus an administrative fee equal to 10% of the annual premium(s) for all insurance policies obtained by Franchisor on your behalf.

**17.    TRANSFER**

**A.    Transfer by Franchisor.**

Franchisor shall have the right, in its sole discretion and without your consent, to assign this Agreement and/or all of its rights and/or obligations hereunder in a related or third party transaction, may sell any or all of its assets (including its rights in and to the Proprietary Marks and the System); may issue new

shares through an initial public offering and/or private placement; may merge with and/or acquire other companies, or may merge into or be acquired by another company; and may pledge its assets to secure payment of its financial obligations.

**B.**     <u>**Transfer by Franchisee.**</u>

You understand and acknowledge that Franchisor has entered into this Agreement in reliance on your business skill, financial capacity, personal character, experience, and demonstrated or purported ability in customer service operations. Accordingly, you may not sell or transfer your interest in this Agreement or the assets of the Franchised Business (except in the ordinary course of your business) without Franchisor's prior written consent. In addition, if you are a Business Entity, no Owner may transfer or assign his or her equity interest in the Business Entity without Franchisor's prior written consent. For purposes of this <u>Section 17.B</u> the term "transfer" means and includes an actual assignment, sale, or transfer of an interest, or a collateral assignment or pledge of the interest as security for performance of an obligation.

You must notify Franchisor in writing at least 60 days prior to the date of any such intended transfer. Any purported transfer, by operation of law or otherwise, not having the written consent of Franchisor shall be null and void and shall constitute a material breach of this Agreement. Franchisor shall not unreasonably withhold its consent to any transfer, but may, in its sole discretion, require any or all of the following as conditions of its consent:

(1)     All of your accrued monetary obligations and all other outstanding obligations to Franchisor and its Affiliates and your suppliers shall be up to date, fully paid, and satisfied;

(2)     You must be in full compliance with this Agreement and any other agreements between you and Franchisor, its Affiliates, and your suppliers;

(3)     You and each Owner shall have executed a general release, in a form satisfactory to Franchisor, of any and all claims against Franchisor and its Affiliates and their respective officers, directors, shareholders, agents, and employees in their corporate and individual capacities, including, without limitation, claims arising under federal, state, and local laws, rules, and ordinances; provided, however, that any release will not be inconsistent with any state statute regulating franchising;

(4)     The transferee shall demonstrate to Franchisor's satisfaction that the transferee meets Franchisor's then-current educational, managerial, and business standards; possesses a good moral character, business reputation, and credit rating; has the aptitude and ability to operate the Franchised Business; and has sufficient equity capital to operate the Franchised Business;

(5)     The transferee shall sign Franchisor's then-current form of franchise agreement for the remaining term (and if the transferee is a Business Entity, then the transferee's Owners shall jointly and severally guarantee your obligations under this Agreement in writing in a form satisfactory to Franchisor), and you shall pay to Franchisor the Transfer Fee in the amount set forth in the Summary Page;

(6)     If deemed necessary by Franchisor, the transferee shall agree to update, remodel, refurbish, renovate, modify, or redesign the Franchised Business, at transferee's sole expense, to conform to Franchisor's then-current standards and specifications for a URBAN AIR TRAMPOLINE PARK™ Franchised Business;

(7)     You agree to remain liable for all direct and indirect obligations to Franchisor in connection with the Franchised Business prior to the effective date of the transfer, shall continue to remain responsible for its obligations of nondisclosure, noncompetition, and indemnification as provided elsewhere in this Agreement, and all other obligations that survive termination, expiration, or transfer and shall execute any and all instruments reasonably requested by Franchisor to further evidence such obligation;

(8)     The transferee shall comply with Franchisor initial training requirements;

(9)     You or the transferor must provide Franchisor with a copy of the agreements of purchase and sale between the transferor and the transferee. The economic terms of the transfer may not materially and adversely affect, in Franchisor's sole judgment, the post-transfer viability of the Franchised Business.

C.    **Security Interest.**

You may grant a security interest in this Agreement or the franchise represented by this Agreement only to the limited extent permitted by Section 9-408 of the Uniform Commercial Code. Any such security interest may only attach to an interest in the proceeds of the operation of the Franchised Business and may not under any circumstances entitle or permit the secured party to take possession of or operate the Franchised Business or to transfer your interest in the franchise without Franchisor's consent.

D.    **Public and Private Offerings.**

If you are a Business Entity and you intend to issue equity interests pursuant to a public or private offering, you shall first obtain Franchisor's written consent, which consent shall not be unreasonably withheld. You must provide to Franchisor for its review a copy of all offering materials (whether or not such materials are required by applicable securities laws) at least 60 days prior to such documents being filed with any government agency or distributed to investors. No offering shall imply (by use of the Proprietary Marks or otherwise) that Franchisor is participating in an underwriting, issuance, or offering of your securities, and Franchisor's review of any offering shall be limited to ensuring compliance with the terms of this Agreement. Franchisor may condition its approval on satisfaction of any or all of the conditions set forth in Section 17.B and on execution of an indemnity agreement, in a form prescribed by Franchisor, by you and any other participants in the offering. For each proposed offering, you shall pay to Franchisor a retainer in an amount determined by Franchisor, which Franchisor shall use to reimburse itself for the reasonable costs and expenses it incurs (including, without limitation, attorneys' fees and accountants' fees) in connection with reviewing the proposed offering.

E.    **Right of First Refusal.**

If you receive a bona fide offer to purchase your interest in this Agreement or all or substantially all of the assets of the Franchised Business, or if any Owner receives a bona fide offer to purchase his or her equity interests in you, and you or such Owner wishes to accept such offer, you or the Owner must deliver to Franchisor written notification of the offer and, except as otherwise provided herein, Franchisor shall have the right and option, exercisable within 30 days after receipt of such written notification, to purchase the seller's interest on the same terms and conditions offered by the third party. If the bona fide offer provides for the exchange of assets other than cash or cash equivalents, the bona fide offer shall include the fair market value of the assets and you shall submit with the notice an appraisal prepared by a qualified independent third party evidencing the fair market value of such assets as of the date of the offer. Any material change in the terms of any offer prior to closing shall constitute a new offer subject to the same right of first refusal by Franchisor as in the case of an initial offer. If Franchisor elects to purchase the seller's interest, closing on such purchase must occur by the later of: (1) the closing date specified in the third party offer; or (2) within 60 days from the date of notice to the seller of Franchisor's election to purchase. Franchisor failure to exercise the option described in this Section 17.E shall not constitute a waiver of any of the transfer conditions set forth in this Section 17.

F.    **Transfer Upon Death or Mental Incapacity.**

If any Owner dies or becomes incapacitated, Franchisor shall consent to the transfer of the former Owner's interest in this Agreement or equity interest in the franchisee (as applicable) to his or her spouse or heirs, whether such transfer is made by will or by operation of law, if, in Franchisor's sole discretion and judgment, the transferee meets Franchisor's educational, managerial and business standards; possesses a good moral character, business reputation and credit rating; has the aptitude and ability to conduct the Franchised Business herein; has at least the same managerial and financial criteria required by new franchisees; and has sufficient equity capital to operate the Franchised Business. If said transfer is not approved by Franchisor, the executor, administrator, or personal representative of such person shall transfer the former Owner's interest to a third party approved by Franchisor within six months after such death, mental incapacity, or disability. Such transfer shall be subject to Franchisor's right of first refusal and to the same conditions as any *inter vivos* transfer.

G.      **Non-Waiver of Claims.**

Franchisor's consent to a Transfer shall not constitute a waiver of any claims it may have against the transferring party, and it will not be deemed a waiver of Franchisor's right to demand strict compliance with any of the terms of this Agreement, or any other agreement to which Franchisor and the transferee are parties, by the transferee.

**18.     DEFAULT AND TERMINATION**

A.      **Automatic Termination.**

This Agreement will terminate automatically, without notice and without an opportunity to cure, if you become insolvent or make a general assignment for the benefit of creditors; if a petition in bankruptcy is filed by you or such a petition is filed against you and you do not oppose it; if you are adjudicated bankrupt or insolvent; if a bill in equity or other proceeding for the appointment of a receiver or other custodian (permanent or temporary) for you or your business assets, or any part thereof, is filed against you; if any court of competent jurisdiction appoints a receiver or other custodian (permanent or temporary) for you or your business assets, or any part thereof; if proceedings for a composition with creditors under any state or federal law is instituted by or against you; if a final judgment is entered against you and remains unsatisfied or of record for 30 days or longer, unless a *supersedeas* bond is filed; if you are dissolved, voluntarily or involuntarily; if execution is levied against any assets of you or the Franchised Business; if any proceedings to foreclose any lien or mortgage against you, the Franchised Business, or the assets, equipment, or premises of any of the same, is instituted and not dismissed within 30 days; or if the real or personal property of you, the Franchised Business is sold after levy thereupon by any sheriff, marshal, constable, or other authorized law enforcement personnel.

B.      **Termination without Opportunity to Cure.**

Franchisor may terminate this Agreement, by delivering to you written notice of termination, upon the occurrence of any of the following events of default:

(1)     You fail to identify a site for the Franchised Business in accordance with Section 3.A, or your failure to open the Franchised Business for business in accordance with Section 4.B and Section 5;

(2)     Your abandonment of the Franchised Business (for purposes of this provision "abandonment" will be deemed to occur if you fail to operate the Franchised Business on three or more consecutive days or if you otherwise convey an intention to close the Franchised Business), or lose the right to possess the Franchised Business premises;

(3)     The making of any false or materially misleading representations in your franchise application or during the franchise application process;

(4)     Your conviction, or any Owner's, conviction of a felony, a crime involving moral turpitude or any other crime which is likely to materially and adversely affect System or the goodwill associated with the Proprietary Marks, or if you or any Owner is held liable in any civil action involving allegations of fraud or unfair trade practices or similar allegations;

(5)     Violation of any confidentiality or non-compete obligations, as described in Section 14, by you or any Owner;

(6)     The Franchised Business fails two consecutive quality assurance inspections during any rolling 12-month period or fails three quality assurance inspections during any rolling 24-month period;

(7)     Termination for cause of any other franchise agreement between Franchisor and you or your Affiliate; or

(8)     Delivery of three or more notices of default during any rolling 24-month period, whether or not the event(s) of default described in such notices ultimately are cured.

C.    **Termination with Opportunity to Cure.**

Franchisor may terminate this Agreement, by delivery of written notice of default, upon the occurrence of any of the following events of default and your failure to take appropriate corrective action during the applicable cure period:

(1)    You fail to pay any monies owed to Franchisor or its Affiliates or your trade creditors within ten (10) days after delivery of written notice of a deficiency;

(2)    You misuse the Proprietary Marks, the Copyrighted Works, or Franchisor's other intellectual property (which includes, without limitation, offering or selling unauthorized products or services under or in conjunction with the Proprietary Marks), and fail to correct the misuse within five (5) days after delivery of written notice;

(3)    The Franchised Business is cited for violation of health, sanitation, or safety laws or regulations, and fails to cure the violation within five (5) days after receiving the citation; or

(4)    You fail to comply with any provision of this Agreement (except as otherwise provided in this Section 18) and fail to take appropriate corrective action within thirty (30) days after delivery of written notice of a deficiency.

D.    **Other Remedies.**

In addition to its termination rights, Franchisor shall have the right to require the Franchised Business closed during any period in which (1) it is in violation of applicable health, sanitation, or safety laws or regulations, or (2) Franchisor determines, in its sole discretion, that continued operation of the Franchised Business poses a risk to public health or safety.

E.    **Step-In Rights.**

To prevent any interruption of business of the Franchised Business and any injury to the goodwill and reputation thereof which may be caused thereby, you hereby authorize Franchisor, and Franchisor shall have the right, but not the obligation, to operate the Franchised Business for as long as Franchisor deems necessary and practical, and without waiver of any other rights or remedies Franchisor, may have under this Agreement, if you are in default of your obligations under this Agreement.  If Franchisor undertakes to operate the Franchised Business, Franchisor shall have the right to collect and pay from the revenues of the Franchised Business all expenses relating to the operation of the Franchised Business including, without limitation, Royalty Fees and Development Fund contributions, employee salaries, reimbursement of Franchisor's expenses incurred in connection with such operation, and a reasonable management fee.  You shall indemnify and hold Franchisor harmless from any and all claims arising from the alleged acts and omissions of Franchisor and its representatives.

19.    **OBLIGATIONS UPON EXPIRATION OR TERMINATION**

A.    **Expiration or Termination of Franchise.**

Upon termination or expiration of this Agreement, you shall have no further right to use the Proprietary Marks, Copyrighted Works or other intellectual property owned and licensed to you by Franchisor. You may no longer hold yourself out as a URBAN AIR TRAMPOLINE PARK™ franchisee, and you shall refrain from representing any present or former affiliation with Franchisor or the URBAN AIR TRAMPOLINE PARK™ franchise System.  You shall immediately pay all sums due and owing to Franchisor and its Affiliates.

You shall immediately take all actions necessary to cancel any assumed or fictitious name containing the Proprietary Marks, and shall do all things necessary to transfer to URBAN AIR TRAMPOLINE PARK™ or its designee the Franchised Business' telephone number(s).  You hereby grant to Franchisor and its representatives power of attorney for the specific purpose of executing all documents and doing all things necessary to effect such cancellations and transfers.

You shall immediately surrender to Franchisor all copies of all materials in your possession including the Manual and all other documentation relating to the operation of the Franchised Business in your possession, and all copies thereof, and shall retain no copy or record of any of the foregoing, excepting only your copy of this Agreement, any correspondence between the parties and any other documents which you reasonably need for compliance with any provision of law.

Further, you agree that, upon termination or expiration of this Agreement, for any reason, you will immediately comply with our then-current debranding checklist, which shall require you to, among other things:

(1)     Remove and destroy all interior and exterior signage, point of sale materials, business forms, and stationery received from us;

(2)     Delete from all computer hard drives all materials, information, communications, manuals, and marketing and promotion materials received from us;

(3)     Remove all decals containing the Urban Air or Urban Air Trampoline Park name, the Marks, any slogans, or orange, black, and blue color scheme;

(4)     Repaint or remove all orange, black, and blue colors from all equipment, padding, walls, doors, floors, and other surfaces;

(5)     Promptly instruct all third-party internet sites and telephone directories to remove all listings identifying the location as an Urban Air Trampoline Park;

(6)     Return all uniforms, sales materials, operations manuals, and other items that contain any Confidential Information;

(7)     Cancel all fictitious or assumed names or equivalent registrations relating to your use of any of the Proprietary Marks;

(8)     Change your corporate and legal business name, if necessary, so that it does not contain any of the Proprietary Marks; and

(9)     Return to us all signs, sign-faces, sign-cabinets, marketing materials, forms, packaging, and other materials that contain any of the Marks.

**B.     Franchisor's Option to Assume Lease and Purchase Assets.**

Upon termination or expiration of this Agreement, Franchisor shall have the option, but not the obligation, to assume your lease for the Franchised Business premises by delivering to you written notice of its election within 30 days after termination or expiration of this Agreement.  If Franchisor exercises its option, it shall also have the right, but not the obligation, to purchase the Franchised Business' furnishings, equipment, graphics, signage, smallwares, and saleable inventory for the Purchase Price.  Franchisor shall also have the right, but not the obligation, to assume any equipment leases and other contracts relating to the operation of the Franchised Business as Franchisor, in its sole discretion, agrees to assume.  Closing on the purchase of assets shall occur no later than 60 days after Franchisor exercises its option.

With respect to the foregoing paragraph, Purchase Price shall be the fair market value, determined in a manner consistent with reasonable depreciation of the equipment, signs, inventory, materials and supplies, provided that the Franchised Business will be valued as an independent business and its value will not include any value for the Franchise or any rights granted by this Agreement, the Proprietary Marks, or participation in the network of Urban Air Trampoline Park businesses.  The fair market value will not include the goodwill you developed since your commencement of the operations, the goodwill of the Marks, and the System.  The length of the remaining term of the lease will also be considered in determining the Franchised Business' fair market value.

Franchisor may exclude from the assets purchased hereunder cash or its equivalent and any equipment, signs, inventory, materials, and supplies that are not reasonably necessary (in function or quality to the Franchised Business' operations as determined by Franchisor or that Franchisor has not approved as meeting standards for an Urban Air Trampoline Park, and the Purchase Price will reflect such exclusions.

If we are unable to agree on the fair market value of the Franchised Business, the fair market value will be determined by one (1) independent qualified appraiser that Franchisor appoints in our business

judgment. Franchisor will appoint the appraiser within fifteen (15) days after the date we determine we are unable to agree on the Franchised Business' fair market value. Franchisor and Franchisee will share equally the fees and expenses of the appraiser and Franchisor and Franchisee will agree to take reasonable actions to cause the appraiser to complete the appraisal within thirty (30) days after the appraiser's appointment.

The Purchase Price will be paid at the closing of the purchase, which will take place not later than ninety (90) days after determination of the Purchase Price. Franchisor has the right to set off against the Purchase Price and thereby reduce the Purchase Price by, any and all amounts Franchisee owes Franchisor.

At the closing, Franchisee agrees to deliver instruments transferring (1) good and merchantable title to the assets purchased, free and clear of all liens and encumbrances (other than liens and security interests acceptable to us, if any), with all sales and other transfer taxes paid by Franchisee, (2) all licenses and permits of the Franchised Business which may be assigned or transferred, and (3) the leasehold interest in the premises in which the Franchised Business operates and improvements therein.

If you cannot deliver clear title to all of the purchased assets, or if there are other unresolved issues, the closing of the sale will, at our election, be accomplished through an escrow arrangement with an independent escrow agent selected by Franchisor.

Franchisee and its owners agree to execute general releases, in form satisfactory to Franchisor, of any and all claims against Franchisor or its members, officers, directors, managers, employees, agents, successors and assigns.

If Franchisor elects not to assume your lease for the Franchised Business premises, Franchisor shall have the option to purchase, or may require you to destroy, any graphics, signage, or other materials bearing the Proprietary Marks. To the extent that Franchisor elects to purchase any such items, the purchase price shall be equal to fully depreciated book value of such items. You shall immediately remove from the Franchised Business premises all items bearing the Proprietary Marks and Copyrighted Works and modify the trade dress as necessary to distinguish the premises from a URBAN AIR TRAMPOLINE PARK™ Franchised Business. If you fail or refuse to comply with the requirements of this <u>Section 19.B</u>, Franchisor and its representatives shall have the right to enter on the Franchised Business premises, without liability for trespass or other civil tort, for purposes of making such changes, at your expense, which you shall pay upon demand.

Franchisor shall have the right to offset against the purchase price of any items purchased from you pursuant to this <u>Section 19.B</u> any of the following: (1) amounts that you owe to Franchisor or its Affiliates; (2) lease transfer fees (if any), other costs owed to your landlord, and the costs of renovating the Franchised Business premises so that it meets Franchisor's then-current standards and specifications (if Franchisor elects to assume the lease for the Franchised Business premises); (3) the costs of de-identifying the Franchised Business premises in accordance with this <u>Section 19.B</u>, if you fail to do so (if Franchisor does not elect to assume the lease for the Franchised Business premises); and (4) all costs incurred by Franchisor relating to its purchase of the Franchised Business' assets (including the cost of an independent appraiser, if necessary).

C.    <u>Compliance with Post Term Obligations.</u>

You and each Owner shall comply with all covenants and obligations which, by their nature, survive termination of this Agreement including, without limitation, the confidentiality obligations and restrictive covenants set forth and described in <u>Section 14</u> of this Agreement and the indemnification obligations set forth and described in <u>Section 20.B</u> of this Agreement.

20.    **INDEMNIFICATION AND INDEPENDENT CONTRACTOR AND INDEMNIFICATION**

A.    <u>Independent Contractor.</u>

The parties acknowledge and agree that this Agreement does not create a fiduciary relationship between them, that you will operate the Franchised Business as an independent contractor, and that nothing in this Agreement shall be construed to create a partnership, joint venture, agency, employment, fiduciary relationship, master-servant relationship, or legal relationship of any kind.

None of your employees will be considered to be employees of Franchisor or its Affiliates. Neither you nor any of your employees whose compensation you pay may in any way, directly or indirectly, expressly or by implication, be construed to be an employee of Franchisor or its Affiliates for any purpose, including with respect to any mandated or other insurance coverage, tax or contributions, or requirements pertaining to withholdings, levied or fixed by any city, state, or federal governmental agency. Neither Franchisor nor its Affiliates will have the power to hire or fire your employees. You expressly agree, and will never contend otherwise, that Franchisor's authority under this Agreement to certify certain of your employees for qualification to perform certain functions for your Franchised Business does not directly or indirectly vest in Franchisor or its Affiliates the power to hire, fire, or control any such employee. You further acknowledge and agree, and will never contend otherwise, that you alone will exercise day-to-day control over all operations, activities, and elements of your Franchised Business and that under no circumstance shall Franchisor or its Affiliates do so or be deemed to do so. You further acknowledge and agree, and will never contend otherwise, that the various requirements, restrictions, prohibitions, specifications, and procedures of System which you are required to comply with under this Agreement, whether set forth in the Manual or otherwise, do not directly or indirectly constitute, suggest, infer, or imply that Franchisor or its Affiliates controls any aspect or element of the day-to-day operations of your Franchised Business, which you alone control, but constitute only standards to which you must adhere when exercising your control of the day-to-day operations of your Franchised Business.

Except as otherwise expressly authorized by this Agreement, neither party hereto will make any express or implied agreements, warranties, guarantees, or representations or incur any debt in the name of or on behalf of the other party, or represent that the relationship between Franchisor and you are other than that of franchisor and franchisee. Franchisor does not assume any liability, and will not be deemed liable, for any agreements, representations, or warranties made by you which are not expressly authorized under this Agreement, nor will Franchisor be obligated for any damages to any person or property which directly or indirectly arise from or relate to the operation of the Franchised Business.

During the term of this Agreement, you shall identify yourself as the owner of the Franchised Business operating under a franchise granted by Franchisor, and shall apply for all permits, certificates of occupancy, and business licenses in your own name. Additionally, your individual name (if you are an individual) or your corporate name (if you are a Business Entity) must appear prominently on all invoices, order forms, receipts, business stationery, and contracts. You shall not use the Proprietary Marks to incur or secure any obligation or indebtedness on behalf of Franchisor. You shall display at the Franchised Business, in a conspicuous location, a form of notice approved by Franchisor, stating that you are an independent franchised operator of the URBAN AIR TRAMPOLINE PARK™ Franchised Business.

**B.**     **Indemnification.**

You shall defend at your own cost and indemnify and hold harmless to the fullest extent permitted by law, Franchisor and its Affiliates, and their respective directors, officers, employees, agents, shareholders, designees, and representatives (collectively, the "**Franchisor Indemnitees**") from all Losses and Expenses incurred in connection with any action, suit, proceeding, claim, cause of action, demand, investigation, or formal or informal inquiry (regardless of whether any of the foregoing is reduced to judgment), or any settlement of the foregoing, which actually or allegedly, directly or indirectly, arises out of, is based upon, is a result of, or is in any way related to any of the following: (1) any actual or alleged infringement or any other violation or any other alleged violation of any patent, trademark, copyright, or other proprietary right owned or controlled by third parties by you or the Franchised Business or any of their respective the owners, officers, directors, management, employees, agent, servants, contractors, subcontractors, partners, proprietors, affiliates or representatives, or any third party acting on behalf of or at the direction of such persons or entities, whether in connection with the Franchised Business or otherwise; (2) any actual or alleged violation or breach of any contract, federal, state, or local law, regulation, ruling, standard, or directive of any industry standard by you or the Franchised Business or any of their respective the owners, officers, directors, management, employees, agent, servants, contractors, subcontractors, partners, proprietors, affiliates or representatives, or any third party acting on behalf of or at the direction of such persons or entities, whether in connection with the Franchised Business or otherwise; (3) any actual or alleged libel, slander, or any other form of defamation by

you or the Franchised Business or any of their respective the owners, officers, directors, management, employees, agent, servants, contractors, subcontractors, partners, proprietors, affiliates or representatives, or any third party acting on behalf of or at the direction of such persons or entities, whether in connection with the Franchised Business or otherwise; (4) any actual or alleged violation or breach of any warranty, representation, agreement, or obligation in this Agreement by you or the Franchised Business or any of their respective the owners, officers, directors, management, employees, agent, servants, contractors, subcontractors, partners, proprietors, affiliates or representatives, or any third party acting on behalf of or at the direction of such persons or entities, whether in connection with the Franchised Business or otherwise;  (5) any and all acts, errors, or omissions engaged in by you or the Franchised Business or any of their respective the owners, officers, directors, management, employees, agent, servants, contractors, subcontractors, partners, proprietors, affiliates or representatives, or any third party acting on behalf of or at the direction of such persons or entities, whether in connection with the Franchised Business or otherwise, arising out of or related to the design, construction, conversion, build out, outfitting, remodeling, renovation, upgrading, or operation of the Franchised Business, whether any of the foregoing was approved by Franchisor; (6) any and all acts, errors, or omissions engaged in by you or the Franchised Business or any of their respective the owners, officers, directors, management, employees, agent, servants, contractors, subcontractors, partners, proprietors, affiliates or representatives, or any third party acting on behalf of or at the direction of such persons or entities, whether in connection with the Franchised Business or otherwise, including, but not limited to, any personal injury, death, or property damage suffered or caused by any delivery person or vehicle serving your Franchised Business; (7) all liabilities arising from or related to your offer, sale, and/or delivery of products and/or services as contemplated by this Agreement; (8) any and all latent or other defects in the Franchised Business, whether or not discoverable by Franchisor or you; (9) the inaccuracy, lack of authenticity, or nondisclosure of any information by any customer of the Franchised Business; (10) your establishment, construction, opening, or operation of your Franchised Business, including, but not limited to, any personal injury, death, or property damage suffered or caused by any customer, visitor, operator, employee, or guest of the Franchised Business; crimes committed on or near any of the premises or facilities of or vehicles used by your Franchised Business; any services or products provided by you at or from the Franchised Business or otherwise related to the operation of the Franchised Business; (11) any services or products provided by any affiliated or nonaffiliated participating entity; (12) any action by any customer, visitor, operator, employee, or guest of the Franchised Business or any other facility of your Franchised Business; and, (13) any damage to the property of you or Franchisor, their agents, or employees, or any third person, firm, or corporation, whether or not such losses, claims, costs, expenses, damages, or liabilities were actually or allegedly caused wholly or in part through the active or passive negligence of Franchisor or any of its agents or employees, or resulted from any strict liability imposed on Franchisor or any of its agents or employees. You agree to take all steps reasonably necessary to insure that all employees of Franchised Business are competent to perform the tasks required of a franchisee and will not intentionally harm others, including, but not limited to appropriate drug and alcohol tests and background checks for criminal, fraudulent and motor vehicle offenses.

**THE INDEMNIFICATION REQUIRED UNDER THIS SECTION 20.B SHALL APPLY TO ALL CLAIMS, <u>INCLUDING THOSE THAT ARISE, OR ARE ALLEGED TO ARISE, AS A RESULT OF FRANCHISOR'S OWN NEGLIGENCE OR GROSS NEGLIGENCE</u>, IF ANY, WHETHER FRANCHISOR'S NEGLIGENCE OR GROSS NEGLIGENCE IS THE SOLE, CONTRIBUTING, OR CONCURRING CAUSE OF SUCH ALLEGED DAMAGES THAT MIGHT BE ASSERTED.**

For purposes of this Agreement, the term "Losses and Expenses" means, without limitation, all claims, losses, liabilities, costs, and expenses including compensatory, exemplary, incidental, consequential, statutory, or punitive damages or liabilities; fines, penalties, charges, expenses, lost profits, attorneys' fees, expert fees, costs of investigation, court costs, settlement amounts, judgments, compensation for damages to Franchisor's reputation and goodwill, costs of or resulting from delays, and financing; travel, food, lodging, and other expenses necessitated by Franchisor's need or desire to appear before, or witness the proceedings of, courts or tribunals (including arbitration tribunals), or governmental or quasi-governmental entities, including those incurred by Franchisor's attorneys or experts to attend any of the same; costs of advertising material and media/time/space, and costs of changing, substituting, or replacing the same; and any and all expenses of recall, refunds, compensation, public notices, and all other amounts incurred by Franchisor in connection with

the matters described above.  All such Losses and Expenses incurred by Franchisor will be chargeable to and payable by you pursuant to this Section 20.B, regardless of any actions, activities, or defenses undertaken by Franchisor or the subsequent success or failure of such actions, activities, or defenses.

You shall give Franchisor written notice of any event of which you are aware for which indemnification is required within 3 days of your actual or constructive knowledge of such event. At your expense and risk, Franchisor may elect to assume (but under no circumstance is obligated to undertake) the defense and/or settlement thereof, provided that Franchisor will seek your advice and counsel. Any assumption by Franchisor shall not modify your indemnification obligation. Franchisor may, in its sole and absolute discretion, take such actions as it deems necessary and appropriate to investigate, defend, or settle any event, or take other remedial or corrective actions with respect thereof as may be, in Franchisor's sole and absolute discretion, necessary for the protection of the Franchisor Indemnities or the System.  Under no circumstances will Franchisor or the Franchisor Indemnities be required to seek recovery from third parties or to otherwise mitigate their losses to maintain a claim against you; in no event will a failure to pursue recovery from third parties or to mitigate loss reduce the amounts recoverable by Franchisor or the Franchisor Indemnities from you.  The indemnification obligations provided by this Section 20.B will survive the expiration or termination of this Agreement.

**21.    NOTICES**

All notices, requests, and reports required or permitted under this Agreement must be in writing and must be personally delivered, sent by expedited delivery service or certified or registered mail, return receipt requested, first-class postage prepaid, or by facsimile (provided that the sender confirms the facsimile by sending an original confirmation copy by certified mail or expedited delivery service within five calendar days after transmission) to the respective parties at the addresses reflected in the Summary Page, unless and until a different address has been designated by written notice to the other party.  Any notice will be deemed to have been given at the time of personal delivery or receipt; provided, however, that if delivery is rejected, delivery will be deemed to have been given at the time of such rejection.

**22.    SEVERABILITY AND CONSTRUCTION**

**A.    Entire Agreement.**

This Agreement, all attachments to this Agreement, and all ancillary agreements executed contemporaneously with this Agreement constitute the final and fully integrated agreement between the parties with regard to the subject matter of this Agreement and supersede any and all prior negotiations, understandings, representations and agreements. Nothing in this agreement or any related agreement is intended to disclaim the representation made in the disclosure document provided to you by Franchisor.

**B.    Modification.**

This Agreement may be modified only by a written document, signed by both parties.

**C.    Written Consent.**

Whenever this Agreement requires the prior approval or consent of Franchisor, you shall make a timely written request to Franchisor therefore and such approval or consent shall be obtained in writing.

**D.    No Waiver.**

No failure of Franchisor to exercise any power reserved to it by this Agreement, or to insist upon strict compliance by you with any obligation or condition hereunder, and no custom or practice of the parties at variance with the terms hereof, shall constitute a waiver of Franchisor's right to demand exact compliance with any of the terms herein.  Franchisor's waiver of any particular default by you shall not affect or impair Franchisor's rights with respect to any subsequent default of the same, similar, or different nature, nor shall any delay, forbearance, or omission of Franchisor to exercise any power or right arising out of any breach or default by you of any of the terms, provisions, or covenants hereof affect or impair Franchisor's right to exercise the same, nor shall such constitute a waiver by Franchisor of any right hereunder or the right to declare any subsequent breach or default and to terminate this Agreement prior to the expiration of its term.

Subsequent acceptance by Franchisor of any payments due to it hereunder shall not be deemed to be a waiver by Franchisor of any preceding breach by you of any terms, covenants, or conditions of this Agreement.

**E.**     **Severability.**

Except as expressly provided to the contrary herein, each section, part, term, and/or provision of this Agreement shall be considered severable, and if, for any reason, any section, part, term, and/or provision herein is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation by a court or agency having valid jurisdiction, such shall not impair the operation of, or have any other effect upon, such other portions, sections, parts, terms and/or provisions of this Agreement as may remain otherwise intelligible, and the latter shall continue to be given full force and effect and bind the parties hereto, and said invalid sections, parts, terms and/or provisions shall be deemed not to be a part of this Agreement; provided, however, that if Franchisor determines that such finding of invalidity or illegality adversely affects the basic consideration of this Agreement, Franchisor, at its option, may terminate this Agreement.

**F.**     **Captions and Headings; References to Gender; Counterparts.**

All captions in this Agreement are intended solely for the convenience of the parties, and none of the captions shall be deemed to affect the meaning or construction of any provision hereof.  All references herein to the masculine, neuter, or singular shall be construed to include the masculine, feminine, neuter, or plural. This Agreement may be executed in one or more originals, each of which shall be deemed an original.

**G.**     **Persons Bound.**

All acknowledgments, promises, covenants, agreements and obligations herein made or undertaken by you shall be deemed jointly and severally undertaken by all of the parties executing this Agreement as franchisee hereunder.  As used in this Agreement, the term "you" shall include all persons who succeed to the interest of the original franchisee by transfer or operation of law.

**H.**     **Franchisor's Judgment.**

Whenever this Agreement or any related agreement grants, confers, or reserves to Franchisor the right to take action, refrain from taking action, grant or withhold consent, or grant or withhold approval, Franchisor will, unless the provision specifically states otherwise, have the right to engage in such activity at its option taking into consideration its assessment of the long term interests of the System overall.  You acknowledge and recognize, and any court or judge is affirmatively advised, that if those activities and/or decisions are supported by Franchisor's business judgment, neither said court, said judge, nor any other person reviewing those activities or decisions will substitute his, her, or its judgment for Franchisor's judgment. When the terms of this Agreement specifically require that Franchisor not unreasonably withhold approval or consent, any withholding of our approval or consent will be considered reasonable if you are in default or breach under this Agreement.

**23.**     **GOVERNING LAW AND FORUM SELECTION**

**A.**     **Governing Law.**

This Agreement is made in and takes effect upon its acceptance and execution by Franchisor at its headquarters in Fort Worth, Texas.  This Agreement shall be and all claims arising out of or related to the relationship created hereby shall be governed by and interpreted and construed under the substantive laws of the State of Texas, without regard to it conflicts of laws principles, except to the extent governed by the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. Section 1051 et seq.) and U.S. Copyright Act, 17 U.S.C. Section 101 et seq.).

**B.**     **Jurisdiction and Venue.**

Except as expressly provided by applicable state law, the parties agree that  **ANY DISPUTE ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT AND ANY CLAIM AFFECTING ITS VALIDITY, CONSTRUCTION, EFFECT, PERFORMANCE OR TERMINATION SHALL BE RESOLVED EXCLUSIVELY BY THE STATE DISTRICT COURTS LOCATED IN TARRANT COUNTY, TEXAS, TO THE JURISDICTION OF WHICH THE PARTIES HEREBY**

**IRREVOCABLY SUBMIT.**

The parties hereby waive all questions of personal jurisdiction or venue for the purpose of carrying out this provision. Notwithstanding the foregoing, you acknowledge and agree that Franchisor may bring and maintain an action against you in any court of competent jurisdiction for injunctive or other extraordinary relief against threatened conduct that will cause it loss or damages, under the usual equity rules, including the applicable rules for obtaining restraining orders, and preliminary and permanent injunctions.

**C.      Remedy.**

Unless otherwise specified in this Agreement, no right or remedy conferred upon or reserved by Franchisor or you by this Agreement is intended and it shall not be deemed to be exclusive of any other right or remedy provided or permitted herein, by law or at equity, but each right or remedy shall be cumulative of every other right or remedy.

You may not under any circumstances make any claim for money damages based on any claim or assertion that Franchisor has unreasonably withheld or delayed any consent or approval under this Agreement, and you hereby waive any such claim for damages, whether by way of affirmative claim, setoff, counterclaim, or defense. Your sole remedy for any such claim will be an action or proceeding for specific performance of the applicable provision(s) of this Agreement.

**D.      Waiver of Jury Trial.**

**EACH PARTY HEREBY WAIVES TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, INVOLVING FRANCHISOR, WHICH ARISES OUT OF OR IS RELATED IN ANY WAY TO THIS AGREEMENT, THE PERFORMANCE OF ANY PARTY UNDER THIS AGREEMENT, AND/OR THE OFFER OR GRANT OF THE FRANCHISE.**

**E.      Contractual Limitations Period.**

Any and all claims and actions arising out of or relating to this Agreement, the parties' relationship, or the operation of the Franchised Business (including any defenses and any claims of set-off or recoupment), must be brought or asserted before the expiration of the earlier of: (1) the time period for bringing an action under any applicable state or federal statute of limitations; (2) two years after the date upon which a party discovered, or should have discovered, the facts giving rise to an alleged claim; or (3) two years after the first act or omission giving rise to an alleged claim, whichever occurs first; or it is expressly acknowledged and agreed by all parties that such claims or actions shall be irrevocably barred.

**F.      Waiver of Punitive Damages.**

The parties hereby waive to the fullest extent permitted by law any right to or claim of any punitive, exemplary, or multiple damages against the other.

**G.      Attorneys' Fees.**

If either party commences a legal action against the other party arising out of or in connection with this Agreement, the prevailing party shall be entitled to have and recover from the other party its reasonable attorneys' fees and costs of suit; the term "prevailing party" means a party that is awarded actual relief in the form of damages, declaratory relief, or injunctive relief, as well as a party that successfully defends a legal action commenced against it.

24.    **ACKNOWLEDGMENTS**

A.    **Receipt of Disclosure Document.**

You hereby acknowledge that you received from Franchisor its current franchise disclosure document, together with a copy of all proposed agreements related to the sale of the Franchise, at least 14 calendar days prior to the execution of this Agreement or at least 14 days before you paid us any consideration in connection with the sale or proposed sale of the Franchise granted by this Agreement.

**[Please initial to acknowledge that you have read and understand this Section 24.A]** _____

B.    **Receipt of Agreement.**

You hereby acknowledge that you received from Franchisor this Agreement with all blanks filled in at least seven calendar days prior to the execution of this Agreement. You represent that you have read this Agreement in its entirety and that you have been given the opportunity to clarify any provisions that you did not understand and to consult with an attorney or other professional advisor. You further represent that you understand the terms, conditions, and obligations of this Agreement and agree to be bound thereby.

**[Please initial to acknowledge that you have read and understand this Section 24.B]** _____

C.    **Independent Investigation.**

You acknowledge and represent that you are entering into this Agreement, all attachments hereto, and all ancillary agreements executed contemporaneously with this Agreement, as a result of your own independent investigation of all aspects relating to the Franchised Business, and not as a result of any representations about Franchisor or your reliance on any such representations (if made) by its stakeholders, officers, directors, employees, agents, representatives, independent contractors, or franchisees which are contrary to the terms set forth in this Agreement or any franchise disclosure document required or permitted to be given to you pursuant to applicable law. You have been advised and given the opportunity to independently investigate, analyze, and construe the business opportunity being offered under this Agreement, the terms and provisions of this Agreement, and the prospects for the Franchised Business, using the services of legal counsel, accountants, or other advisers of your own choosing; you have either consulted with these advisors or have deliberately declined to do so. You further recognize that the business venture contemplated by this Agreement involves business risks and that its success will be largely dependent upon your skills and ability as an independent business person. This offering is not a security as that term is defined under applicable federal and state securities laws.

**[Please initial to acknowledge that you have read and understand this Section 24.C]** _____

D.    **No Representations; No Reliance.**

You acknowledge and represent that, except for representations made in Franchisor's current franchise disclosure document, neither Franchisor nor its Affiliates, nor any of their respective stakeholders, officers, directors, employees, agents, representatives, independent contractors, has made any representations, warranties, or guarantees, express or implied, as to the potential revenues, profits, expenses, sales volume, earnings, income, or services of the business venture contemplated under this Agreement, and that you have not relied on any such representations (if made) in making your decision to purchase a URBAN AIR TRAMPOLINE PARK™ franchise. You further acknowledge and represent that neither Franchisor nor its representatives have made any statements inconsistent with the terms of this Agreement.

**[Please initial to acknowledge that you have read and understand this Section 24.D]** _____

E.    **No Financial Performance Representations; No Reliance.**

You specifically acknowledge that the only financial performance information furnish by Franchisor is set forth in Item 19 of its current franchise disclosure document; that no officer, director, employee, agent, representative or independent contractor of Franchisor is authorized to furnish you with any other financial performance information; that, if they nevertheless do, you will not rely on any such financial performance information given to you by any such individual; and, that if any such individual attempts to or actually does

V.5

give you any such financial performance information in contravention of this provision, you will immediately communicate such activity to us.  For the purpose of this Section 24.E, "financial performance information" means information given, whether orally, in writing, or visually which states, suggests or infers a specific level or range of historic or prospective sales, expenses and/or profits of franchised or Franchisor-owned facilities.

**[Please initial to acknowledge that you have read and understand this Section 24.E]** _____

**F.**      **No Licensure Representations; No Reliance.**

You acknowledge that neither Franchisor nor its Affiliates, nor any of their respective stakeholders, officers, directors, employees, agents, representatives, independent contractors, has made any representation or statement on which you have relied regarding your ability to procure any required license, permit, certificate or other governmental authorization that may be necessary or required for you to carry out the activities contemplated by this Agreement

**[Please initial to acknowledge that you have read and understand this Section 24.F]** _____

**G.**      **Reasonable Restrictions.**

You have carefully considered the nature and extent of the restrictions upon you set forth in this Agreement, including, without limitation, the covenants not to compete, the restrictions on assignment, and the rights, obligations, and remedies conferred upon you under this Agreement.  You acknowledge that such restrictions, rights, obligations, and remedies: (a) are reasonable, including, but not limited to, their term and geographic scope; (b) are designed to preclude competition which would be unfair to Franchisor; (c) are fully required to protect Franchisor's legitimate business interests; and, (d) do not confer benefits upon Franchisor that are disproportionate to your detriment.

**[Please initial to acknowledge that you have read and understand this Section 24.G]** _____

IN WITNESS WHEREOF, the undersigned, intending to be legally bound, have executed this Franchise Agreement to be effective on the day and year first written above.

**UATP MANAGEMENT, LLC**
a Texas limited liability company.

By:    _____
          MICHAEL BROWNING, JR., President

**FRANCHISEE:**

   ,
a

By:    _____
          , its

**UATP MANAGEMENT, LLC**

**ILLINOIS AMENDMENT TO SITE SELECTION AGREEMENT**

For purposes of complying with the requirements of Illinois law, including the Illinois Franchise Disclosure Act of 1987, Ill. Rev. Stat. ch. 815 para. 705/1 – 705/44 (1994) ("**Illinois Franchise Act**"), UATP Management, LLC ("Franchisor"), a Texas limited liability company, and _____ ("**Developer**") hereby amend the Site Selection Agreement between them dated _____ ("**Agreement**") as follows:

      1.    Illinois Law governs the agreements between parties to this franchise. The Illinois Attorney General's Office requires that certain provisions contained in franchise documents be amended to be consistent with Illinois law, including the Franchise Disclosure Act of 1987, 815 ILCS 705/1-44, (collectively, the "**Act**").  To the extent that this Agreement contains provisions that are inconsistent with the following, such provisions are hereby amended:

      a.    Section 41 of the Act provides that any condition, stipulation or provision purporting to bind any person acquiring any franchise to waive compliance with the Illinois Franchise Disclosure Act or any other law of Illinois is void.

      b.    Any release of claims or acknowledgments of fact contained in the Agreement that would negate or remove from judicial review any statement, misrepresentation or action that would violate the Act, or a rule or order under the Act shall be void and are hereby deleted with respect to claims under the Act.

      c.    Section 4 of the Act provides that, if this Agreement requires litigation to be conducted in a forum other than the State of Illinois, the requirement is void with respect to claims.

      d.    If this Agreement requires that it be governed by a state's law, other than the State of Illinois, to the extent that such law conflicts with the Illinois Franchise Disclosure Act, Illinois law governing claims arising under the Act will control.

      e.    If this Agreement requires a jury trial waiver, to the extent that such provision conflicts with the Illinois Franchise Disclosure Act, the Act will control.

      f.    Your rights upon termination and non-renewal of the Agreement are set forth in Sections 19 and 20 of the Act.

2.    Each provision of this Amendment shall be effective only to the extent, with respect to such provision, that the jurisdictional requirements of the Act are met independently without reference to this Amendment.

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed by its duly authorized representative as of the date indicated below.

**FRANCHISOR:**                               **DEVELOPER:**
**UATP Management, LLC,**               **[Name],**
a Texas limited liability company          a

By: _____      By: _____

Name: _____      Name: _____

Title: _____      Title: _____

Date: _____      Date: _____

## MARYLAND AMENDMENT

## TO URBAN AIR TRAMPOLINE PARK FRANCHISE AGREEMENT

The Urban Air Trampoline Park Franchise Agreement between _____ ("**Franchisee**") and UATP Management, LLC ("**Franchisor**") dated _____ ("**Franchise Agreement**") shall be amended by the addition of the following language, which shall be considered an integral part of the Agreement ("**Amendment**"):

Where and to the extent that any of the provisions of this Amendment are contrary to, in conflict with or inconsistent Maryland Franchise Registration and Disclosure Law, with any provision contained in the Franchise Agreement, the provisions contained in this Amendment shall control. Defined terms contained in the Franchise Agreement shall have the identical meanings in this Amendment.

1.       Any provision requiring you to sign a general release of any and all claims against us shall not apply to claims arising under the Maryland Franchise Registration and Disclosure Law.

2.       Any provision requiring you to bring an action against us in any state other than Maryland shall not apply to claims arising under the Maryland Franchise Registration and Disclosure Law. You may bring an action in Maryland for claims arising under the Maryland Franchise Registration and Disclosure Law.

3.       Section 14-226 of the Maryland Franchise Registration and Disclosure Law, prohibits us from requiring a prospective franchisee to assent to any release, estoppel or waiver of liability as a condition of purchasing a franchise. Any provisions which requires a prospective franchisee to disclaim the occurrence and/or non-occurrence of acts that would constitute a violation of the Maryland Franchise Registration and Disclosure Law, in order to purchase a franchise are not intended to, nor shall they act as a release, estoppel or waiver of any liability incurred under the Maryland Franchise Registration and Disclosure Law.

4.       Notwithstanding anything to the contrary set forth in the Franchise Agreement, any general release the Franchisee is required to assent to is not intended to nor shall it act as a release, estoppel or waiver of any liability we may have incurred under the Maryland Franchise Registration and Disclosure Law.

5.       Section 23.B. of the Franchise Agreement is amended by the addition of the following language to the original language that appears therein:

> "This section shall not in any way abrogate or reduce any of your rights as provided for in Section 14-216(c)(25) of the Maryland Franchise Registration and Disclosure Law, including the right to submit matters to the jurisdiction of the Courts of Maryland."

6.       Notwithstanding anything to the contrary set forth in the Franchise Agreement, any claims arising under the Maryland Franchise Registration and Disclosure Law must be brought within three (3) years after the grant of the franchise.

8.       In the event of any conflict between the terms of this Amendment and the terms of the Franchise Agreement, the terms of this Amendment shall prevail.

9.       Each provision of this Amendment shall be effective only to the extent, with respect to such provision, that the jurisdictional requirements of the Act are met independently without reference to this Amendment.

*(Signature page to follow.)*

**IN WITNESS WHEREOF**, the Franchisee on behalf of itself and its owners acknowledges that it has read and understands the contents of this Amendment, that it has had the opportunity to obtain the advice of counsel, and that it intends to comply with this Amendment and be bound thereby.  The parties have duly executed and delivered this Amendment to the Franchise Agreement on _____, 20__.

| FRANCHISOR: | FRANCHISEE: |
|---|---|
| **UATP Management, LLC,** | **[Name],** |
| a Texas limited liability company | a |

By: _____    By: _____

Name: _____    Name: _____

Title: _____    Title: _____

Date:_____    Date: _____

**URBAN AIR TRAMPOLINE PARK®**
**FRANCHISE AGREEMENT**

**ATTACHMENT A**

**GLOSSARY OF ADDITIONAL TERMS**

Capitalized terms will have the following meanings, unless otherwise defined in this Agreement.

"**Advertising Cooperative**" means a group of URBAN AIR TRAMPOLINE PARK™ Franchised Businesses formed to facilitate marketing and advertising placement in a particular geographic area.

"**Affiliate**" means any entity that is wholly or partly owned by another entity, that shares common ownership with another entity, or that has an ownership interest in another entity.

"**Business Entity**" means a corporation, limited liability company, limited partnership, or other entity created pursuant to statutory authority.

"**Closed Market**" means any facility serving a captive market, including but not limited to, shopping malls, enclosed shopping centers, and any other enclosed or open retail center (including an "outlet mall") with an aggregate gross leasable area in excess of 350,000 square feet amusement parks; airports, train stations and other centers of mass transportation; travel plazas; casinos; public facilities; college and school campuses; arenas, stadiums, and ballparks; hotels and guest lodging facilities; day care facilities of any kind; resorts; condominium and cooperative facilities; office buildings; convention centers; military bases and installations; government facilities; and any other public attraction or venue or mass gathering events or locations.

"**Competitive Business**" means any business or enterprise that engages in, or grants franchises or licenses for, the operation of indoor trampoline park businesses featuring wall-to-wall trampolines, foam pits, and related activities.

"**Confidential Information**" means all information, knowledge, elements, trade secrets, and know-how utilized or embraced by the System, or which otherwise concerns Franchisor's systems of operation, programs, services, products, customers, practices, materials, books, records, financial information, manuals, computer files, databases, or software; including, but not limited to: the Standards and all elements of the System and all products, services, equipment, technologies, policies, standards, requirements, criteria, and procedures which now or in the future are a part of the System; all information contained in the Manual, including supplements to the Manual; Franchisor's standards and specifications for product preparation, packaging, and service; all specifications, sources of supply, all procedures, systems, techniques and activities employed by Franchisor or by you in the offer and sale of products and/or services at or from your Franchised Business; all pricing paradigms established by Franchisor or by you; all of Franchisor's and/or your sources, or prospective sources, of supply and all information pertaining to same, including wholesale pricing structures, the contents of sourcing agreements, and the identity of vendors and suppliers; Franchisor's specifications, and your final plans, for the construction, buildout, design, renovation, décor, equipment, signage, furniture, fixtures and trade dress elements of your Franchised Business; the identify of, and all information relating to, the computer and POS hardware and software utilized by Franchisor and you; all information and data pertaining to Franchisor's and/or your advertising, marketing, promotion, and merchandising campaigns, activities, materials, specifications and procedures; all customer lists and records generated and/or otherwise maintained by your Franchised Business; all internet/web protocols, procedures, and content related to the System and your Franchised Business; Franchisor's training and other instructional programs and materials; all elements of Franchisor's recommended staffing, staff training, and staff certification policies and procedures; all communications between you and Franchisor, including the financial and other reports you are required to submit to Franchisor under this Agreement; additions to, deletions from, and modifications and variations of the components of the System and the other systems and methods of operations which Franchisor employs

now or in the future; all other knowledge, trade secrets, or know-how concerning the methods of operation of your Franchised Business which may be communicated to you, or of which you may be apprised, by virtue of operation under the terms of the Franchise Agreement; and all other information, knowledge, and know-how which either Franchisor or its affiliates, now or in the future, designate as "Confidential Information."

"**Franchise Site Application**" means the form of application prescribed by Franchisor, from time to time, and used to evaluate proposed sites for the Franchised Business premises.

"**Gross Sales**" means the dollar aggregate of: means the dollar aggregate of: (1) the sales price of all items, goods, wares and merchandise sold, and the charges for all services you perform, whether made for cash, on credit or otherwise, without reserve or deduction for inability or failure to collect, including sales and services (A) originating at the Franchised Business premises even if delivery or performance is made offsite from the Franchised Business premises, (B) placed by mail, facsimile, telephone, the internet and similar means if received or filled at or from the Franchised Business premises, and (C) that you in the normal and customary course of your operations would credit or attribute to the operation of the Franchised Business; and (2) all monies, trade value or other things of value that you receive from Franchised Business operations at, in, or from the Franchised Business premises that are not expressly excluded from Gross Sales.  Gross Sales does not include: (1) the exchange of merchandise between Franchised Businesses  (if you operate multiple franchises) if the exchanges are made solely for the convenient operation of your business and not for the purpose of depriving us of the benefit of a sale that otherwise would have been made at, in, on or from the Franchised Business premises; (2) returns to shippers, vendors, or manufacturers; (3) sales of fixtures or furniture after being used in the conduct of the Franchised Business; (4) the sale of gift certificates and stored value cards (the redemption value will be included in Gross Sales at the time of redemption); (5) insurance proceeds; (6) sales to employees at a discount; (7) cash or credit refunds for transactions included within Gross Sales (limited, however, to the selling price of merchandise returned by the purchaser and accepted by you); (8) the amount of any city, county, state or federal sales, luxury or excise tax on such sales that is both (A) added to the selling price or absorbed therein and (B) paid to the taxing authority.  A purchase returned to the Franchised Business may not be deducted from Gross Sales unless the purchase was previously included in Gross Sales.

"**Manual**" means the series of documents, publications, bulletins, materials, drawings, memoranda, CDs, DVDs, MP3s, and other media Franchisor may loan you from time to time, which sets forth the System's operating systems, procedures, policies, methods, standards, specifications, and requirements for operating your Franchised Business, and which contains information and knowledge necessary and material to the System, and designated by Franchisor as the mandatory guide for the development and operation of URBAN AIR TRAMPOLINE PARK™ Franchised Businesses, including, without limitation, the URBAN AIR TRAMPOLINE PARK™ confidential and proprietary Operations Manual, as Franchisor may, in its sole discretion, revise, amend, modify, or update from time to time upon notice of such revisions, amendment, modification, or update to you or your Affiliates.

"**Owners**" means you and your spouse if you are an individual, or each individual or entity holding a beneficial ownership in you and/or the franchisee individual(s) or entity(ies) that enter into any Franchise Agreements pursuant to this Agreement if you are a Business Entity.  It includes all officers, directors, and shareholders of a corporation, all managers and members of a limited liability company, all general and limited partners of a limited partnership, and the grantor and the trustee of the trust.  If any Owner is a Business Entity, then the term "Owner" also includes the Owners of that Business Entity.

"**Person**" means an individual (and the heirs, executors, administrators, or other legal representatives of an individual), a partnership, a corporation, a limited liability company, a government, or any department or agency thereof, a trust, and any other incorporated or unincorporated association or organization.

"**Proprietary Marks**" means the trade names, service marks, trademarks, logos, emblems, and indicia of origin as Franchisor may designate in writing for use in connection with the System, including, but not limited to, the collection of trademarks listed in the chart below for the country in which your Franchised Business is located.

"**Protected Area**" means the geographic or other area identified in <u>Attachment B</u> to this Agreement.

"**Site Selection Area**" means the geographical area identified in the Summary Page.

"**Standards**" means the standards, specifications, policies, procedures, and techniques that Franchisor has developed relating to the location, establishment, operation, and promotion of Franchisor's Franchised Businesses, all of which may be changed by Franchisor in its sole discretion.  The Standards include, among other things: required and recommended business practices; product preparation techniques; presentation standards; standards and specifications for Franchised Business design and appearance; customer service standards; sales techniques and procedures; and other management, operational, and accounting procedures.

"**Term**" means a number of years as reflected on the Summary Page.

**URBAN AIR TRAMPOLINE PARK®**
**FRANCHISE AGREEMENT**

**ATTACHMENT B**

**APPROVED LOCATION AND PROTECTED AREA**

Section 1.A.    The Approved Location is at:

Section 1.B.    The Protected Area is includes the following zip codes: _____

_____

       IN WITNESS WHEREOF, the undersigned, intending to be legally bound, have executed this Attachment B on the date set forth below to be effective on the day and year first written above.

**FRANCHISOR:**

UATP MANAGEMENT, LLC
a Texas limited liability company.

By: _____
     MICHAEL BROWNING, JR.,
     President

**FRANCHISEE:**

    ,
a

By: _____
     , its

**URBAN AIR TRAMPOLINE PARK®**
**FRANCHISE AGREEMENT**

**ATTACHMENT C**

**FRANCHISEE'S OWNERS AND KEY PERSONNEL**

A.    The following is a list of all shareholders, partners, members, or other investors owning a direct or indirect interest in the Franchisee, and a description of the nature of their interest, each of whom shall execute the Undertaking and Guaranty substantially in the form set forth in <u>Attachment D-1</u> to the Franchise Agreement:

| NAME, ADDRESS, AND TELEPHONE NUMBER | OWNERSHIP INTEREST IN FRANCHISEE | NATURE OF INTEREST |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

B.    The following is a list of all of Franchisee's Owners and key personnel, each of whom shall execute the Confidentiality Agreement and Non-Competition Agreement substantially in the form set forth in <u>Attachment D-2</u> to the Franchise Agreement:

| NAME, ADDRESS, AND TELEPHONE NUMBER | POSITION |
|---|---|
|  |  |
|  |  |
|  |  |

C.    Franchisee's Designated Manager is:

Telephone Number:

Email Address:

**URBAN AIR TRAMPOLINE PARK®**
**FRANCHISE AGREEMENT**

**ATTACHMENT D-1**

**UNDERTAKING AND GUARANTY**

By virtue of executing a URBAN AIR TRAMPOLINE PARK™ Franchise Agreement ("Franchise Agreement") dated _____, _____ ("Franchisee"), has acquired the right and franchise from UATP MANGEMENT, LLC ("Franchisor") to establish and operate a URBAN AIR TRAMPOLINE PARK™ Franchised Business ("Franchised Business") and the right to use in the operation of the Franchised Business Franchisor's trade names, trademarks, service marks, including the service mark URBAN AIR TRAMPOLINE PARK™ ("Proprietary Marks") and the system developed by Franchisor and/or its affiliates for operation and management of Franchised Businesses ("System"), as they may be changed, improved, and further developed from time to time in Franchisor's sole discretion.

Pursuant to the terms and conditions of the Franchise Agreement, each of the undersigned hereby acknowledges and agrees as follows:

1.    I have read the terms and conditions of the Franchise Agreement and acknowledge that the execution of this Undertaking and Guaranty and the undertakings of the Owners in the Franchise Agreement are in partial consideration for, and a condition to, the granting of the rights under the Franchise Agreement.  I understand and acknowledge that Franchisor would not have granted such rights without the execution of this Undertaking and Guaranty and the other undertakings of the Owners in the Franchise Agreement.

2.    I own a beneficial interest in the Franchisee, and I am included within the term "Owner" as defined in the Franchise Agreement.

3.    I, individually and jointly and severally with the other Owners, hereby make all of the covenants, representations, warranties, and agreements of the Owners set forth in the Franchise Agreement, and agree that I am obligated to and will perform thereunder, including, without limitation, the provisions regarding compliance with the Franchise Agreement in Section 11, the use of confidential information in Section 14, the covenants in Section 14, the transfer provisions in Section 17, the choice of law and venue provisions in Section 23, and the indemnification obligations in Section 20.

4.    I, individually and jointly and severally with the other Owners, unconditionally and irrevocably guarantee to Franchisor and its successors and assigns that all obligations of the Franchisee under the Franchise Agreement will be punctually paid and performed.  Upon default by the Franchisee or upon notice from Franchisor, I will immediately make each payment and perform each obligation required of the Franchisee under the Franchise Agreement. Without affecting the obligations of any Owner under this or any other Undertaking and Guaranty, Franchisor may, without notice to any Owner, waive, renew, extend, modify, amend, or release any indebtedness or obligation of the Franchisee or settle, adjust, or compromise any claims that Franchisor may have against the Franchisee.  I waive all demands and notices of every kind with respect to the enforcement of this Undertaking and Guaranty, including notices of presentment, demand for payment or performance by the Franchisee, any default by the Franchisee or any guarantor, and any release of any guarantor or other security for this Undertaking and Guaranty or the obligations of the Franchisee.  Franchisor may pursue its rights against me without first exhausting its remedies against the Franchisee and without joining any other guarantor and no delay on the part of Franchisor in the exercise of any right or remedy will operate as a waiver of the right or remedy, and no single or partial exercise by Franchisor of any right or remedy will preclude the further exercise of that or any other right or remedy.  Upon Franchisor's receipt of notice of the death of any Owner, the estate of the deceased will be bound by the foregoing Undertaking and Guaranty, but only for defaults and obligations under the Franchise Agreement existing at the time of death, and in that event, the obligations of the Owners who survive such death will continue in full force and effect.

5.      No modification, change, impairment, or suspension of any of Franchisor's rights or remedies shall in any way affect any of my obligations under this Undertaking and Guaranty. If the Franchisee has pledged other security or if one or more other persons have personally guaranteed performance of the Franchisee's obligations, I agree that Franchisor's release of such security will not affect my liability under this Undertaking and Guaranty.

6.      I agree that any notices required to be delivered to me will be deemed delivered at the time delivered by hand; one Business Day after delivery by Express Mail or other recognized, reputable overnight courier; or three Business Days after placement in the United States Mail by Registered or Certified Mail, Return Receipt Requested, postage prepaid and addressed to the address identified on the signature line below.  I may change this address only by delivering to Franchisor written notice of the change.

7.      I understand that Franchisor's rights under this Undertaking and Guaranty shall be in addition to, and not in lieu of, any other rights or remedies available to Franchisor under applicable law;

8.      I agree to be bound individually to all of the provisions of the Franchise Agreement including, without limitation, the litigation and dispute resolution provisions set forth in <u>Section 23</u>, and I irrevocably submit to the jurisdiction of the state court situated in Tarrant County, Texas, or the U.S. District Court for the Northern District of Texas, Fort Worth Division; and

9.      **<u>I WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, INVOLVING FRANCHISOR, WHICH ARISES OUT OF OR IS RELATED IN ANY WAY TO THE FRANCHISE AGREEMENT, THE PERFORMANCE OF ANY PARTY UNDER THE FRANCHISE AGREEMENT, AND/OR THE OFFER OR GRANT OF THE FRANCHISE</u>.**

10.     This Agreement shall be construed under the laws of the State of Texas.  The only way this Agreement can be changed is in writing signed by Franchisor.  Any capitalized terms contained in but not defined by this Guaranty and Personal Undertaking shall have the same meaning prescribed to that word in the Franchise Agreement.

IN WITNESS WHEREOF, the undersigned, intending to be legally bound, has executed this Undertaking and Guaranty to be effective on the day and year first written above.


**OWNER**


_____
Signature

Name:
Address:        _____
Telephone:      _____

**URBAN AIR TRAMPOLINE PARK®**
**FRANCHISE AGREEMENT**

**ATTACHMENT D-2**

**CONFIDENTIALITY AND NON-COMPETITION AGREEMENT**

      In consideration of my being a _____ of _____ ("Franchisee"), and other good and valuable consideration, the receipt and sufficiency of which is acknowledged, I hereby acknowledge and agree that:

1.    Through a URBAN AIR TRAMPOLINE PARK™ Franchise Agreement dated _____ ("Franchise Agreement"), Franchisee has acquired the right and franchise from UATP MANAGEMENT, LLC ("Franchisor") to establish and operate a URBAN AIR TRAMPOLINE PARK™ franchise facility ("Franchised Business") and the right to use in the operation of the Franchised Business Franchisor's trade names, trademarks, service marks, including the service mark URBAN AIR TRAMPOLINE PARK™ ("Proprietary Marks") and the system developed by Franchisor and/or its affiliates for operation and management of Franchised Businesses ("System"), as they may be changed, improved, and further developed from time to time in Franchisor's sole discretion.

2.    Franchisor possesses certain proprietary and confidential information, knowledge, elements, and know-how which is utilized in the operation of the System, including, without limitation, the Operations Manual, trade secrets, copyrighted materials, methods, and other techniques and know-how which concerns Franchisor's systems of operation, programs, services, products, customers, practices, materials, books, records, financial information, manuals, computer files, databases, or software, as further defined in the Franchise Agreement ("Confidential Information").

3.    Any and all manuals, trade secrets, copyrighted materials, methods, information, knowledge, know-how, and techniques which Franchisor specifically designates as confidential shall be deemed to be Confidential Information for purposes of this Agreement.

4.    I acknowledge that, as a _____ of the Franchisee, Franchisor and Franchisee have or will furnish me with valuable specialized training and will disclose Confidential Information to me in furnishing to me the training program and subsequent ongoing training and other general assistance during the term of this Agreement.

5.    I will not acquire any interest in the Confidential Information, other than the right to utilize it in the operation of the Franchised Business during the term hereof, and I acknowledge that the use or duplication of the Confidential Information for any use outside the System would constitute an unfair method of competition.

6.    The Confidential Information is proprietary, involves trade secrets of Franchisor, and is disclosed to me solely on the condition that I agree, and I do hereby agree, that I shall hold in strict confidence all Confidential Information and all other information designated by Franchisor as confidential. Unless Franchisor otherwise agrees in writing, I will not disclose and/or use the Confidential Information except in connection with the operation of the Franchised Business as a _____ of the Franchisee, and then only in strict compliance with the Manual and System and only to such employees having a need to know; I will not directly or indirectly imitate, duplicate, or "reverse engineer" any Confidential Information or any other information designated by Franchisor as confidential or aid any third party in such actions; and I will continue not to disclose and/or use any Confidential Information or any other information designated by Franchisor as confidential even after I cease to be in that position unless I can demonstrate that such information has become generally known or easily accessible other than by the breach of an obligation of Franchisee under the Franchise Agreement.

7.    Except as otherwise approved in writing by Franchisor, I will not (either directly or indirectly, for myself or through, on behalf of, or in conjunction with any person, or legal entity) at any time while I am employed by or associated with the Franchisee, or at any time during the uninterrupted two-year period (which will be tolled during any period of noncompliance) after I cease to be employed by or

associated with the Franchisee (or the two-year period after the expiration or earlier termination of the Franchise Agreement, whichever occurs first):

(a)    Divert or attempt to divert any present or prospective customer of any URBAN AIR TRAMPOLINE PARK™ Franchised Business to any Competitive Business, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act that is harmful, injurious, or prejudicial to the goodwill associated with the Proprietary Marks and the System defined and described in the Franchise Agreement;

(b)    Employ or seek to employ any person who is or has within the previous 60 days been employed by Franchisor or an Affiliate of Franchisor, or otherwise directly or indirectly induce such person to leave his or her employment; or

(c)    Own, maintain, advise, operate, engage in, be employed by, make loans to, invest in, provide any assistance to, or have any direct or indirect interest in (as owner or otherwise) or relationship or association with, any Competitive Business other than a URBAN AIR TRAMPOLINE PARK™ Franchised Business operated by Franchisee or its Affiliates pursuant to a then-currently effective Franchise Agreement with Franchisor.  While I am employed by or associated with the Franchisee, this restriction shall apply to any location within the United States, its territories or commonwealths, and any other country, province, state, or geographic area in which Franchisor or its Affiliates have used, sought registration of, or registered the Proprietary Marks or similar marks, or have operated or licensed others to operate a business under the System or the Proprietary Marks or similar marks.  After I cease to be employed by or associated with the Franchisee (or after the expiration or earlier termination of the Franchise Agreement, whichever occurs first), this restriction shall apply to any business that is or is intended to be located at the location of any former URBAN AIR TRAMPOLINE PARK™ Franchised Business or within a 25-mile radius of any other URBAN AIR TRAMPOLINE PARK™ Franchised Business then operating under the System and Proprietary Marks in existence or under development at the time of such termination or transfer.

8.    I agree that each of the foregoing covenants shall be construed as independent of any other covenant or provision of this Agreement.  If all or any portion of a covenant in this Agreement is held unreasonable or unenforceable by a court or agency having valid jurisdiction in an un-appealed final decision to which Franchisor is a party, I expressly agree to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Agreement.

9.    I understand and acknowledge that Franchisor shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in this Agreement, or any portion thereof, without my consent, effective immediately upon receipt by me of written notice thereof, and I agree to comply forthwith with any covenant as so modified.

10.    Franchisor is a third-party beneficiary of this Agreement and may enforce it, solely and/or jointly with the Franchisee.  I am aware that my violation of this Agreement will cause Franchisor and the Franchisee irreparable harm; therefore, I acknowledge and agree that the Franchisee and/or Franchisor may apply for the issuance of an injunction preventing me from violating this Agreement, and I agree to pay the Franchisee and Franchisor all the costs it/they incur(s), including, without limitation, legal fees and expenses, if this Agreement is enforced against me.  Due to the importance of this Agreement to the Franchisee and Franchisor, any claim I have against the Franchisee or Franchisor is a separate matter and does not entitle me to violate, or justify any violation of this Agreement.

11.    This Agreement shall be construed under the laws of the State of Texas.  The only way this Agreement can be changed is in writing signed by both the Franchisee and me.  Any capitalized terms contained in but not defined by this Guaranty and Personal Undertaking shall have the same meaning prescribed to that word in the Franchise Agreement.

12. With respect to all claims, controversies and disputes, I irrevocably consent to personal jurisdiction and submit myself to the jurisdiction of the state courts located in Tarrant County, Texas, and the United States District Court for the Northern District of Texas. I acknowledge that this Agreement has been entered into in the state of Texas, and that I am to receive valuable information emanating from Franchisor's headquarters in Fort Worth, Texas. In recognition of the information and its origin, I hereby irrevocably consent to the personal jurisdiction of the state and federal courts of Texas as set forth above. Notwithstanding the foregoing, I acknowledge and agree that Franchisor may bring and maintain an action against me in any court of competent jurisdiction for injunctive or other extraordinary relief against threatened conduct that will cause it loss or damages, under the usual equity rules, including the applicable rules for obtaining restraining orders and preliminary and permanent injunctions.

13. **I WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, INVOLVING FRANCHISOR, WHICH ARISES OUT OF OR IS RELATED IN ANY WAY TO THIS AGREEMENT, THE FRANCHISE AGREEMENT, THE PERFORMANCE OF ANY PARTY UNDER THE FRANCHISE AGREEMENT, AND/OR THE OFFER OR GRANT OF THE FRANCHISE**.

IN WITNESS WHEREOF, the undersigned, intending to be legally bound, have executed this Confidentiality and Non-Competition Agreement to be effective on the day and year first written above.

_____

Signature

Name:
Address:
Telephone:

**ACKNOWLEDGED BY FRANCHISEE**

_____ ,
a

By: _____
      _____ , its

**URBAN AIR TRAMPOLINE PARK®**
**FRANCHISE AGREEMENT**

**ATTACHMENT E**

**ELECTRONIC DEBT AUTHORIZATION**

**Authorization Agreement for Direct Payments (ACH Debits)**

I (we) hereby authorize UATP Management, LLC., a Texas limited liability company, hereinafter called Franchisor, to initiate debit entries to my (our ) ☐ Checking Account/ ☐ Savings Account (select one) indicated below at the depository financial institution named below, hereafter called DEPOSITORY, and to debit the same to such account.  I (we) acknowledge that the origination of ACH transactions to my (our) account must comply with the provisions of U.S. law.

Depository Name:                    Branch:

City:              State:              Zip:

Routing Number:          Account Number:

This authorization is remain in full force and effect until Franchisor has received written notification from me (or either of us) or its termination in such time and in such manner as to afford Franchisor and DEPOSITOR a reasonable opportunity to act on it.

Name(s):_____    ID Number:_____
        (Please Print)

Date:_____        Signature:_____

**NOTE:  DEBIT AUTHORIZATIONS <u>MUST</u> PROVIDE THAT THE RECEIVER MAY REVOKE THE AUTHORIZATION ONLY BY NOTIFYING THE ORIGINATOR IN THE MANNER SPECIFIED IN THE AUTHORIZATION**

**URBAN AIR TRAMPOLINE PARK®**
**FRANCHISE AGREEMENT**

**ATTACHMENT F**

**TELEPHONE ASSIGNMENT AGREEMENT**

THIS TELEPHONE ASSIGNMENT AGREEMENT is made on        , by and between        ("Assignor") and UATP MANAGEMENT, LLC or its designee ("Assignee").

**BACKGROUND**

A.    The Assignee has developed and owns the proprietary system ("**System**") for the operation of a facility under the trademark and logo URBAN AIR TRAMPOLINE PARK™ (the "**Franchised Business**");

B.    The Assignor has been granted a license to operate a Franchised Business pursuant to a Franchise Agreement dated      , in accordance with the System;

C.    In order to operate its Franchised Business, the Assignor shall be acquiring one or more telephone numbers, telephone listings and telephone directory advertisements; and

D.    As a condition to the execution of the Franchise Agreement, the Assignee has required that the Assignor assign all of its right, title and interest in its telephone numbers, telephone listings and telephone directory advertisements to the Assignee in the event of a termination of the Franchise Agreement;

**AGREEMENT**

In consideration of the foregoing, the mutual premises herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

1.    <u>Assignment</u>.  In the event of termination of the Franchise Agreement, and in order to secure continuity and stability of the operation of the System, the Assignor hereby sells, assigns, transfers and conveys to the Assignee all of its rights, title and interest in and to certain telephone numbers, telephone listings and telephone directory advertisements pursuant to which Assignor shall operate its Franchised Business in accordance with the terms of the Franchise Agreement; provided, however, such Assignment shall not be effective unless and until the Franchise Agreement is terminated in accordance with the provisions thereof.

2.    <u>Representation and Warranties of the Assignor</u>.  The Assignor hereby represents, warrants and covenants to the Assignee that:

(a)    As of the effective date of the Assignment, all of the Assignor's obligations and indebtedness for telephone, telephone listing services and telephone directory advertisement services shall be paid and current;

(b)    As of the date hereof, the Assignor has full power and legal right to enter into, execute, deliver and perform this Agreement;

(c)    This Agreement is a legal and binding obligation of the Assignor, enforceable in accordance with the terms hereof;

(d)    The execution, delivery and performance of this Assignment does not conflict with, violate, breach or constitute a default under any contract, agreement or instrument to which the Assignor is a party or by which the Assignor is bound, and no consent of nor approval by any third party is required in connection herewith; and

(e)     The Assignor has the specific power to assign and transfer its right, title and interest in its telephone numbers, telephone listings and telephone directory advertisements, and the Assignor has obtained all necessary consents to this Assignment.

3.     <u>Miscellaneous</u>.  The validity, construction and performance of this Assignment shall be governed by the laws of the State of Texas.  All agreements, covenants, representations and warranties made herein shall survive the execution hereof.  All rights of the Assignee shall inure to its benefit and to the benefit of its successors and assigns.

IN WITNESS WHEREOF, the undersigned, intending to be legally bound, have executed this Telephone Assignment Agreement to be effective on the day and year first written above.

**ASSIGNEE:**

UATP MANAGEMENT, LLC
a Texas limited liability company.


By:    _____
        MICHAEL BROWNING, JR.,
        President


**ASSIGNOR:**


        ,
a 


By:    _____
          , its

**URBAN AIR TRAMPOLINE PARK®**
**FRANCHISE AGREEMENT**

**ATTACHMENT G**

**LEASE RIDER**

THIS AGREEMENT is made and entered into on _____, 2016, by and among UATP MANAGEMENT, LLC, having its principal offices at 317 S. Jenkins, Suite C Grapevine, Texas 76051 ("Franchisor"), _____, having its principal offices at _____ ("Landlord"), and       , having its principal offices at    .    ("Tenant").

**BACKGROUND**

A.  Landlord and Tenant have executed a lease agreement dated _____ ("Lease") for the premises located at      ("Leased Premises") for use by Tenant as a business to be opened pursuant to Franchisor's proprietary marks and system in connection with a Franchise Agreement dated      by and between Franchisor and Tenant  ("Franchise Agreement");

B.  A condition to the approval of Tenant's specific location by Franchisor is that the Lease for the Leased Premises designated for the operation of a URBAN AIR TRAMPOLINE PARK™ franchise facility ("Franchised Business") contain the agreements set forth herein;

C.  Landlord acknowledges that Franchisor requires the modifications to the Lease set forth herein as a condition to its approving the Leased Premises as a site for the Franchised Business, and that Landlord agrees to modify and amend the Lease in accordance with the terms and conditions contained herein; and

D.  According to Section 3.C of the Franchise Agreement, all rights, title and interest in and to the Lease must be assigned to Franchisor, at Franchisor's option, upon the termination of the Franchise Agreement;

**AGREEMENT**

In consideration of the mutual undertakings and commitments set forth herein, the receipt and sufficiency of which are hereby acknowledged, agree as follows:

1.  Use Clause.  The Leased Premises shall be used solely for the operation of a URBAN AIR TRAMPOLINE PARK™ Franchised Business and identified by the mark URBAN AIR TRAMPOLINE PARK™ or such other name as may be specified by Franchisor.  Landlord acknowledges that such use shall not violate any then-existing exclusive rights granted to any existing tenant of Landlord.  Landlord consents to Tenant's use of Franchisor's marks and signs, décor items, color schemes and related components of Franchisor's proprietary system.  Landlord further acknowledges that during the term of this Lease or any extension thereof, Landlord will not lease space to another business operating an indoor trampoline park featuring wall-to-wall trampolines, foam pits, and related activities within the same shopping center in which the Franchised Business is located.

2.  Termination of the Franchise Agreement.  If the Franchise Agreement between Franchisor and Tenant is terminated for any reason during the term of the Lease or any extension thereof,  Tenant, upon the written request of Franchisor, shall assign to Franchisor all of its rights, title and interest in and to the Lease, and Franchisor or any affiliate designated by Franchisor may agree to assume from the date of assignment all of Tenant's obligations remaining under the Lease, and may assume Tenant's occupancy rights, and the right to sublease the premises, for the remainder of the term of the Lease.  If Franchisor elects to accept the assignment of the Lease from Tenant, it shall give Tenant and Landlord written notice of its election to acquire the leasehold interest.  Landlord hereby consents to the assignment of the Lease from Tenant to Franchisor, and shall not charge any fee or accelerate rent under the Lease.  Alternatively, in the event of a termination of the Franchise Agreement, Franchisor

may elect to enter into a new lease with Landlord containing terms and conditions no less favorable than the Lease.  Upon Landlord's receipt of written notice from Franchisor advising Landlord that Franchisor elects to enter into a new lease, Landlord shall execute and deliver such new lease to Franchisor for its acceptance.  Landlord and Tenant shall deliver possession of the Leased Premises to Franchisor, free and clear of all rights of  Tenant or third parties, subject to Franchisor executing an acceptance of the assignment of Lease or new lease, as the case may be.

3.    <u>Tenant's Agreement to Vacate Leased Premises</u>.  Tenant agrees to peaceably and promptly vacate the Leased Premises and, subject to Franchisor's right to acquire any such property pursuant to its Franchise Agreement with Tenant, to remove its personal property therefrom upon the termination of the Franchise Agreement.  Any property not removed or otherwise disposed of by Tenant shall be deemed abandoned.

4.    <u>Delivery of Possession</u>.  If Landlord may not legally obtain possession of the Leased Premises or if Landlord is unable to deliver the Leased Premises to Franchisor within six (6) months from the date Franchisor notifies Landlord of its election to continue the use of the Leased Premises, then Franchisor shall have the right at any time thereafter to rescind its election to acquire a leasehold interest  in the Leased Premises and to terminate the Lease or any new lease between it and Landlord for the Leased Premises, and Landlord shall release Franchisor from all of its obligations under the Lease or any new lease.

5.    <u>Entry</u>.  Franchisor may enter the Leased Premises without the consent of Landlord or Tenant to make any modification necessary to protect Franchisor's proprietary system or marks or to cure any default under the Franchise Agreement or under the Lease, without being guilty of trespass or any other crime or tort.

6.    <u>Amendment of Lease</u>.  Landlord and Tenant agree not to amend the Lease in any respect, except with the prior written consent of Franchisor.

7.    <u>Franchisor Not a Guarantor</u>.  Landlord acknowledges and agrees that notwithstanding any terms or conditions contained in this Agreement or any other agreement, Franchisor shall in no way be construed as a guarantor or surety of Tenant's obligations under the Lease.  Notwithstanding the foregoing, in the event Franchisor becomes the tenant by assignment of the Lease in accordance with the terms hereof or enters into a new lease with Landlord, then Franchisor shall be liable for all of the obligations of Tenant on its part to be performed or observed under the Lease or a new lease.

8.    <u>Document to Govern</u>.  The terms and conditions contained herein modify and supplement the Lease.  Whenever any inconsistency or conflict exists between this Agreement and the Lease, the terms of this Agreement shall prevail.

9.    <u>Waiver.</u>  Failure of Franchisor to enforce or exercise any of its rights hereunder shall not constitute a waiver of the rights hereunder or a waiver of any subsequent enforcement or exercise of its rights hereunder.

10.    <u>Amendment of Agreement</u>.  This Agreement may be amended only in writing signed by all parties hereto.

11.    <u>Notices.</u>  Landlord shall mail to Franchisor copies of any letters and notices it gives to Tenant related to the Lease or the Leased Premises concurrently with giving such letters and notices to Tenant.  If Tenant fails to cure any default within the period provided in the Lease, if any, Landlord shall give Franchisor immediate written notice of such failure to cure.  All notices shall be delivered by certified mail at the addresses designated in the heading of this Agreement or to such other addresses as the parties hereto may, by written notice, designate.

12.    <u>Binding Effect</u>.  This Agreement shall be binding upon the parties hereto, their heirs, executors, successors, assigns and legal representatives.

13.    <u>Severability</u>.  If any provision of this Agreement or any part thereof is declared invalid by any court of competent jurisdiction, such act shall not affect the validity of this Agreement and the remainder of

this Agreement shall remain in full force and effect according to the terms of the remaining provisions or part of provisions hereof.

14. <u>Remedies</u>.  The rights and remedies created herein shall be deemed cumulative and no one such right or remedy shall be exclusive at law or in equity of the rights and remedies which Franchisor may have under this or any other agreement to which Franchisor and Tenant are parties.

15. <u>Attorneys' Fees.</u>  If any of the parties to this Agreement commences a legal action against another party arising out of or in connection with this Agreement, the prevailing party shall be entitled to have and recover from the other party its reasonable attorneys' fees and costs of suit; the term "prevailing party" means a party that is awarded actual relief in the form of damages, declaratory relief, or injunctive relief, as well as a party that successfully defends a legal action commenced against it.

16. <u>Applicable Law.</u>  This Agreement shall be governed by and construed in accordance with the laws of the State of Texas.

17. <u>Certain Acknowledgments</u>.  Landlord and Tenant acknowledge and agree that all interior and exterior signage and related items (collectively, the "Leased/Licensed Assets") are the sole property of Franchisor.  Tenant shall have no rights to pledge in any manner the Leased/Licensed Assets and Landlord shall have no rights to place any liens on or make any claims to the Leased/Licensed Assets.

IN WITNESS WHEREOF, the undersigned, intending to be legally bound, have executed this Lease Rider to be effective on the day and year first written above.

**UATP MANAGEMENT, LLC**
a Texas limited liability company.


By: _____
      MICHAEL BROWNING, JR.,
      President

**LANDLORD NAME**
a _____.


By: _____
      _____ (name)
      _____ (title)

**TENANT NAME**
   ,
a _____


By: _____
      , its

**EXHIBIT E**
**TO URBAN AIR TRAMPOLINE PARK®**
**FRANCHISE DISCLOSURE DOCUMENT**

**FINANCIAL STATEMENTS**

# UATP MANAGEMENT, LLC

## FINANCIAL STATEMENTS

**Years Ended December 31, 2015 and 2014
with Report of Independent Auditors**

# UATP MANAGEMENT, LLC

## FINANCIAL STATEMENTS

### Years Ended December 31, 2015 and 2014

### Table of Contents

Report of Independent Auditors ............................................................................................................ 1

Financial Statements:

    Balance Sheets ................................................................................................................................ 2

    Statements of Income and Changes in Members' Equity (Deficit) ............................................. 3

    Statements of Cash Flows .............................................................................................................. 4

Notes to Financial Statements ............................................................................................................. 5



Fort Worth Office
1400 West 7th Street
Suite 400
Fort Worth, Texas 76102
817.259.9100 Main

whitleypenn.com

# REPORT OF INDEPENDENT AUDITORS

To the Members of
UATP Management, LLC

We have audited the accompanying financial statements of UATP Management, LLC (the "Company"), which comprise the balance sheets as of December 31, 2015 and 2014, and the related statements of income and changes in members' equity (deficit), and cash flows for the years ended, and the related notes to the financial statements.

### *Management's Responsibility for the Financial Statements*

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America ("GAAP"); this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

### *Auditor's Responsibility*

Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

### *Opinion*

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2015 and 2014, and the results of its operations and its cash flows for the years then ended in accordance with GAAP.

*Whitley Penn LLP*

March 28, 2016
Fort Worth, Texas

An Independent
Member of

NEXIA
INTERNATIONAL

**UATP MANAGEMENT, LLC**

**BALANCE SHEETS**

|  | December 31, | |
|---|---|---|
|  | **2015** | **2014** |
| **Assets** | | |
| Current assets: | | |
|    Cash and cash equivalents | $ 140,308 | $ 2,158 |
|    Accounts receivable | 82,620 | 300 |
|    Deposit | - | 1,000 |
| Total current assets | 222,928 | 3,458 |
| | | |
| Property and equipment, net | 5,989 | - |
| Other assets | 1,850 | - |
| | | |
| Total assets | $ 230,767 | $ 3,458 |
| | | |
| **Liabilities and Members' Equity** | | |
|    Accounts payable | $ 13,540 | $ - |
|    Accounts payable, member | 44,940 | - |
| Total liabilities | 58,480 | - |
| | | |
| Commitments and contingencies | | |
| | | |
| Members' equity | 172,287 | 3,458 |
| | | |
| Total liabilities and members' equity | $ 230,767 | $ 3,458 |

See accompanying notes to financial statements.

2

**UATP MANAGEMENT, LLC**

**STATEMENTS OF INCOME AND
CHANGES IN MEMBERS' EQUITY (DEFICIT)**

|  | Year Ended December 31, | |
|  | 2015 | 2014 |
|---|---|---|
| Revenues | $    807,825 | $    440,500 |
| Selling, general, and administrative expenses | 639,496 | 425,616 |
| Net income | 168,329 | 14,884 |
| Members' equity (deficit) at beginning of year | 3,458 | (11,426) |
| Member contribution | 500 | - |
| Members' equity at end of year | $    172,287 | $    3,458 |

See accompanying notes to financial statements.

3

## UATP MANAGEMENT, LLC

## STATEMENTS OF CASH FLOWS

| | | Year Ended December 31, | | |
|---|---|---|---|---|
| | | 2015 | | 2014 |
| **Operating Activities** | | | | |
| Net income | $ | 168,329 | $ | 14,884 |
| Adjustment to reconcile net income to net cash provided by operating activities: | | | | |
| Depreciation | | 1,105 | | - |
| Changes in operating assets and liabilities: | | | | |
| Accounts receivable | | (82,320) | | (300) |
| Deposit | | 1,000 | | (1,000) |
| Other assets | | (1,850) | | - |
| Accounts payable | | 13,540 | | (12,604) |
| Accounts payable, member | | 44,940 | | - |
| Net cash provided by operating activities | | 144,744 | | 980 |
| | | | | |
| **Investing Activities** | | | | |
| Purchases of property and equipment | | (7,094) | | - |
| Net cash used in investing activity | | (7,094) | | - |
| | | | | |
| **Financing Activities** | | | | |
| Contribution from member | | 500 | | - |
| Net cash provided by financing activity | | 500 | | - |
| | | | | |
| Net increase in cash and cash equivalents | | 138,150 | | 980 |
| | | | | |
| Cash and cash equivalents at beginning of year | | 2,158 | | 1,178 |
| | | | | |
| Cash and cash equivalents at end of year | $ | 140,308 | $ | 2,158 |

See accompanying notes to financial statements.

UATP MANAGEMENT, LLC

NOTES TO FINANCIAL STATEMENTS

December 31, 2015 and 2014

### A.  Nature of Business

UATP Management, LLC (the "Company") was organized on May 31, 2013 as a Texas limited liability company.  The Company franchises Urban Air Trampoline Park chains.  The liability of the members of the Company is generally limited to the amount of their capital contributions.  The Company has a perpetual duration unless dissolved earlier in accordance with the Company Agreements.  The Company's corporate offices are located in Southlake, Texas.

### B.  Summary of Significant Accounting Policies

A summary of the Company's significant accounting policies consistently applied in the preparation of the accompanying financial statements follows.

**Basis of Accounting**

The accounts are maintained and the financial statements have been prepared using the accrual basis of accounting in accordance with accounting principles generally accepted in the United States of America ("GAAP").

**Use of Estimates**

The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect certain reported amounts in the financial statements and accompanying notes.  Actual results could differ from these estimates and assumptions.

**Cash and Cash Equivalents**

The Company considers all highly-liquid investments with a maturity of three months or less when purchased to be cash equivalents.  At December 31, 2015 and 2014, the Company had no such investments.  The Company maintains deposits primarily in one financial institution, which may at times exceed amounts covered by insurance provided by the U.S. Federal Deposit Insurance Corporation ("FDIC").  The Company has not experienced any losses related to amounts in excess of FDIC limits.

**Accounts Receivable**

Accounts receivable generally consist of franchise fee receivables and lease deposit receivables.  No allowance for doubtful accounts is considered necessary.

# UATP MANAGEMENT, LLC

## NOTES TO FINANCIAL STATEMENTS *(continued)*

### B. Summary of Significant Accounting Policies – continued

**Property and Equipment**

Property and equipment are carried at cost. Depreciation is provided on the straight-line method over the assets' estimated service lives. Expenditures for maintenance and repairs are charged to expense in the period in which they are incurred, and betterments are capitalized. The estimated useful life of computers is 3 years and the estimate useful life of furniture and office equipment is 5 years.

**Revenue Recognition**

The Company's revenues are currently derived from management fees charged to various Urban Air Trampoline Park locations and franchise fee revenue. The management fees are recognized as revenue when earned from the locations. As of December 31, 2015 and 2014, the Company was receiving management fees from six and four locations, respectively.

Franchise fee revenue is also recognized as revenue when earned. The Company receives an initial franchise fee when the franchise agreement is signed as well as 7% of gross revenues each month. There was no franchise fee revenue for the year ended December 31, 2014. The Company is also reimbursed for various direct expenses by the franchisees for their share of the cost. This reimbursement is recorded as an offset to selling, general, and administrative expenses.

**Advertising Costs**

Advertising costs are expensed as incurred, and approximated $7,000 and $2,000 for the years ended December 31, 2015 and 2014, respectively.

**Income Taxes**

The Company is a limited liability company, and therefore is not a taxpaying entity for federal income tax purposes; accordingly, no income tax expense has been recorded in the accompanying financial statements. Income of the Company is included by the individual members in their respective income tax returns based on their proportionate share of taxable income generated by the Company.

The Company files income tax returns in the United States federal jurisdiction and certain states within the United States. No tax returns are currently under examination by any tax authorities. The Company did not incur any penalties or interest during the years ended December 31, 2015 and 2014.

## UATP MANAGEMENT, LLC

### NOTES TO FINANCIAL STATEMENTS *(continued)*

#### C.  Property and Equipment

Property and equipment at December 31, consisted of the following:

|                               | 2015       | 2014     |
|-------------------------------|-----------:|---------:|
| Computers                     | $   2,060  | $    -   |
| Furniture and equipment       | 5,504      | 470      |
|                               | 7,564      | 470      |
| Less accumulated depreciation | 1,575      | 470      |
|                               | $   5,989  | $    -   |

#### D.  Commitments and Contingencies

The Company leases office space under a non-cancelable operating lease that has an expiration date on March 31, 2017.  The Company can extend the lease at its option.  Expenses associated with this lease approximated $15,000 for the year ended December 31, 2015.

Future minimum annual payments at December 31, 2015 are approximately as follows:

|       |            |
|-------|-----------:|
| 2016  | $   21,600 |
| 2017  | 5,400      |
| Total | $   27,000 |

#### E.  Related Party Transactions

At December 31, 2015, the Company had a payable to a member for approximately $45,000.  The amount was repaid by the Company in January 2016.

For 2015 and 2014, approximately $370,000 and $360,000, respectively, of the Company's revenue was received from locations partially owned by a related party.

The Company pays two related entities for marketing and operations support.  Expenses to these related entities totaled approximately $41,000 and $47,000 for the years ended December 31, 2015 and 2014, respectively.

#### F.  Subsequent Events

In preparing the accompanying financial statements, management of the Company has evaluated all subsequent events and transactions for potential recognition or disclosure through March 28, 2016, the date the financial statements were available for issuance.

# UATP MANAGEMENT, LLC

## FINANCIAL STATEMENTS

**Year Ended December 31, 2014 and Period from
May 31, 2013 (Inception) through December 31, 2013
with Report of Independent Auditors**

# UATP MANAGEMENT, LLC

## FINANCIAL STATEMENTS

### Year Ended December 31, 2014 and Period from
### May 31, 2013 (Inception) through December 31, 2013

## Table of Contents

Report of Independent Auditors ........................................................................................................... 1

Financial Statements:

    Balance Sheets ................................................................................................................................. 2

    Statements of Operations and Changes in Members' Equity (Deficit) ...................................... 3

    Statements of Cash Flows ................................................................................................................ 4

Notes to Financial Statements ............................................................................................................ 5



Fort Worth Office
1400 West 7th Street
Suite 400
Fort Worth, Texas 76102
817.259.9100 Main

whitleypenn.com

# REPORT OF INDEPENDENT AUDITORS

To the Members of
UATP Management, LLC

We have audited the accompanying financial statements of UATP Management, LLC (the "Company"), which comprise the balance sheets as of December 31, 2014 and 2013, and the related statements of operations and changes in members' equity (deficit), and cash flows for the year ended December 31, 2014 and the period from May 31, 2013 (Inception) through December 31, 2013, and the related notes to the financial statements.

### *Management's Responsibility for the Financial Statements*

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America ("GAAP"); this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

### *Auditor's Responsibility*

Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

### *Opinion*

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2014 and 2013, and the results of its operations and its cash flows for the year ended December 31, 2014 and the period from May 31, 2013 (Inception) through December 31, 2013 in accordance with GAAP.

*Whitley Penn LLP*

April 7, 2015
Fort Worth, Texas

An Independent
Member of



**UATP MANAGEMENT, LLC**

**BALANCE SHEETS**

|  | December 31, | | | |
|---|---|---|---|---|
|  | **2014** | | **2013** | |
| **Assets** | | | | |
| Cash and cash equivalents | $ | 2,158 | $ | 1,178 |
| Accounts receivable | | 300 | | - |
| Deposit | | 1,000 | | - |
| Total assets | $ | 3,458 | $ | 1,178 |
| **Liabilities and Members' Equity** | | | | |
| Accounts payable | $ | - | $ | 12,604 |
| Members' equity (deficit) | | 3,458 | | (11,426) |
| Total liabilities and members' equity | $ | 3,458 | $ | 1,178 |

See accompanying notes to financial statements.

**UATP MANAGEMENT, LLC**

**STATEMENTS OF OPERATIONS AND
CHANGES IN MEMBERS' EQUITY (DEFICIT)**

|  | Year Ended December 31, 2014 | | Period from May 31, 2013 (Inception) through December 31, 2013 | |
|---|---|---|---|---|
| Revenues | $ | 440,500 | $ | 70,000 |
| Selling, general, and administrative expenses | | 425,616 | | 81,426 |
| Net income (loss) | | 14,884 | | (11,426) |
| Members' equity (deficit) at beginning of period | | (11,426) | | - |
| Members' equity (deficit) at end of period | $ | 3,458 | $ | (11,426) |

See accompanying notes to financial statements.

3

**UATP MANAGEMENT, LLC**

**STATEMENTS OF CASH FLOWS**

| | | Year Ended December 31, 2014 | | Period from May 31, 2013 through December 31, 2013 |
|---|---|---|---|---|
| **Operating Activities** | | | | |
| Net income (loss) | $ | 14,884 | $ | (11,426) |
| Adjustment to reconcile net income (loss) to net cash provided by operating activities: | | | | |
| Changes in operating assets and liabilities: | | | | |
| Accounts receivable | | (300) | | - |
| Deposit | | (1,000) | | |
| Accounts payable | | (12,604) | | 12,604 |
| Net cash provided by operating activities | | 980 | | 1,178 |
| Net increase in cash and cash equivalents | | 980 | | 1,178 |
| Cash and cash equivalents at beginning of period | | 1,178 | | - |
| Cash and cash equivalents at end of period | $ | 2,158 | $ | 1,178 |

See accompanying notes to financial statements.

# UATP MANAGEMENT, LLC

## NOTES TO FINANCIAL STATEMENTS

### December 31, 2014 and 2013

#### A. Nature of Business

UATP Management, LLC (the "Company") was organized on May 31, 2013 as a Texas limited liability company. The Company franchises Urban Air Trampoline Park chains. The liability of the members of the Company is generally limited to the amount of their capital contributions. The Company has a perpetual duration unless dissolved earlier in accordance with the Company Agreements. The Company's corporate offices are located in Southlake, Texas.

#### B. Summary of Significant Accounting Policies

A summary of the Company's significant accounting policies consistently applied in the preparation of the accompanying financial statements follows.

**Basis of Accounting**

The accounts are maintained and the financial statements have been prepared using the accrual basis of accounting in accordance with accounting principles generally accepted in the United States of America ("GAAP").

**Use of Estimates**

The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect certain reported amounts in the financial statements and accompanying notes. Actual results could differ from these estimates and assumptions.

**Cash and Cash Equivalents**

The Company considers all highly-liquid investments with a maturity of three months or less when purchased to be cash equivalents. At December 31, 2014 and ` 2013, the Company had no such investments. The Company maintains deposits primarily in one financial institution, which may at times exceed amounts covered by insurance provided by the U.S. Federal Deposit Insurance Corporation ("FDIC"). The Company has not experienced any losses related to amounts in excess of FDIC limits.

**Accounts Receivable**

Accounts receivable generally consist of management fees and are stated at amounts management expects to collect from outstanding balances. No allowance for doubtful accounts is considered necessary.

# UATP MANAGEMENT, LLC

## NOTES TO FINANCIAL STATEMENTS *(continued)*

### B.  Summary of Significant Accounting Policies – continued

**Revenue Recognition**

The Company's revenues are currently derived from management fees charged to various Urban Air Trampoline Park locations.  The management fees are recognized as revenue when earned from the locations.  As of December 31, 2014 and 2013, the Company was receiving management fees from four and two locations, respectively.

**Advertising Costs**

Advertising costs are expensed as incurred, which approximated $2,000 for the year ended December 31, 2014.  There were no such expenses incurred for the period from May 31, 2013 (Inception) through December 31, 2013.

**Income Taxes**

The Company is a limited liability company and therefore is not a taxpaying entity for federal income tax purposes; accordingly, no income tax expense has been recorded in the accompanying financial statements.  Income of the Company is included by the individual members in their respective income tax returns based on their proportionate share of taxable income generated by the Company.

GAAP prescribes a comprehensive model for the financial statement recognition, measurement, presentation and disclosure of uncertain tax positions taken or expected to be taken in income tax returns.  Management of the Company must determine whether it is more likely than not that a tax position will be sustained upon examination based on technical merits of the position and management's opinion is that there are no such uncertain positions.

The Company files income tax returns in the United States federal jurisdiction and certain states within the United States.  At December 31, 2014, any of the Company's tax returns related to the period ended December 31, 2013 remains open to possible examination by the tax authorities.  No tax returns are currently under examination by any tax authorities.  The Company did not incur any penalties or interest during the year ended December 31, 2014 and the period from May 31, 2013 (Inception) through December 31, 2013.

### C.  Related Party Transactions

For 2014 and 2013, approximately $360,000 and $70,000, respectively, of the Company's revenue was received from locations partially owned by a related party.

The Company pays two related entities for marketing and operations support.  Expenses to these related entities totaled approximately $47,000 and $6,000 for the year ended December 31, 2013 and the period from May 31, 2013 (Inception) through December 31, 2013, respectively.

**UATP MANAGEMENT, LLC**

**NOTES TO FINANCIAL STATEMENTS** *(continued)*

**D.  Subsequent Events**

In preparing the accompanying financial statements, management of the Company has evaluated all subsequent events and transactions for potential recognition or disclosure through April 7, 2015, the date the financial statements were available for issuance.

**EXHIBIT F**
**TO URBAN AIR TRAMPOLINE PARK®**
**FRANCHISE DISCLOSURE DOCUMENT**

## LIST OF CURRENT FRANCHISEES
## AS OF DECEMBER 31, 2015

| FRANCHISEE | DBA | ADDRESS | CITY | ST | ZIP | PHONE |
|---|---|---|---|---|---|---|
| (B2) bouncing Beckers, LLC<br>John Becker<br>jon@urbanairwichita.com | Urban Air Wichita | 8545 W. Irving Street | Wichita | KS | 67209 | 316-300-6176 |
| Overland Park Urban Air, LLC<br>Adam Jones<br>adamjoneszm@gmail.com | Urban Air Overland Park | 14401 Metcalf Avenue | Overland Park | KS | 66223 | 913-220-5307 |
| Frisco Urban Air, LLC[1]<br>Peter Naus<br>pjnausmd@gmail.com | Urban Air Frisco | 10570 John W. Elliott Drive, Suite 900 | Frisco | TX | 75033 | 817-879-2043 |
| Mansfield Urban Air, LLC[1]<br>Greg Ackard<br>Gak02@yahoo.com | Urban Air Mansfield | 989 N. Walnut Creek Drive | Mansfield | TX | 76063 | 336-420-2961 |
| The Trampoline Park of Rockwall, LLC<br>Darren Rak<br>Drak1112@msn.com | Urban Air Rockwall | 5757 State Highway 205 | Rockwall | TX | 75032 | 972-567-0291 |
| Southlake Urban Air, LLC[1]<br>Michael Browning<br>michael@urbanair trampolinepark.com | Urban Air Southlake | 325 Commerce, Suite 110 | Southlake | TX | 76092 | 817-825-0004 |
| Austin Urban Air, LLC<br>Lee Roberts<br>lee@urbanairaustin.com | Urban Air Austin | 15407 Long Vista | Austin | TX | 78728 | 214-601-6654 |
| Coppell Urban Air, LLC[1]<br>Hoang Nguyen<br>hoangkn@hotmail.com | Urban Air Coppell | 110 W. Sandy Lake Drive. | Coppell | TX | 75019 | 214-727-9480 |
| Waco Urban Air, LLC<br>Hoang Nguyen<br>hoangkn@hotmail.com | Urban Air Waco | 5701 West Waco Dr. | Waco | TX | 76710 | 214-727-9480 |

## LIST OF FRANCHISEES WITH SIGNED FRANCHISE AGREEMENT BUT
## OUTLET NOT OPEN AS OF DECEMBER 31, 2015

| FRANCHISEE | DBA | ADDRESS | CITY | ST | ZIP | PHONE |
|---|---|---|---|---|---|---|
| Birmingham Urban Air, LLC<br>Tad Duncan<br>Tad.duncan1@gmail.com | Urban Air Birmingham | 800 Greensprings Hwy. | Birmingham | AL | 35209 | 214-507-1431 |
| Oxford Urban Air, LLC<br>Christian Mills<br>christianmills@yahoo.com | Urban Air Oxford | 925 Lapeer Rd. | Oxford Charter Township | MI | 48371 | 908-581-1142 |
| Taraschi Adventures, LLC<br>Paul Taraschi<br>pjtaraschi@hotmail.com | Urban Air Downingtown | 981 East Lancaster Ave. | Downingtown | PA | 19335 | 484-753-1865 |
| Wichita Falls Urban Air, LLC<br>Colby Cates | Urban Air Wichita Falls | 2901 Kemp Blvd. | Wichita Falls | TX | 76308 | 940-337-6912 |
| Humble Urban Air, LLC | Urban Air | 19304 Highway 59 | Humble | TX | 77338 | 817-233-3977 |

| Eric Alstrin | Humble | North | | | | |
|---|---|---|---|---|---|---|
| Garland Urban Air, LLC[1]<br>Hoang Nguyen<br>hoangkn@hotmail.com | Urban Air Garland | 3046 Lavon Road | Garland | TX | 75040 | 214-727-9480 |
| Sugarland Urban Air, LLC<br>Hoang Nguyen<br>hoangkn@hotmail.com | Urban Air Sugarland | 9848 Highway 90 | Sugarland | TX | 77478 | 214-727-9480 |

<u>Note 1</u>: These outlets are owned by one or more of our affiliates. These outlets operate under the same or similar franchise agreement as our other franchisees.

## LIST OF AFFILIATE-OWNED OUTLETS
## AS OF DECEMBER 31, 2015

| FRANCHISEE | DBA | ADDRESS | CITY | ST | ZIP | PHONE |
|---|---|---|---|---|---|---|
| Frisco Urban Air, LLC[1]<br>Peter Naus<br>pjnausmd@gmail.com | Urban Air Frisco | 10570 John W. Elliott Drive, Suite 900 | Frisco | TX | 75033 | 817-879-2043 |
| Mansfield Urban Air, LLC[1]<br>Greg Ackard<br>Gak02@yahoo.com | Urban Air Mansfield | 989 N. Walnut Creek Drive | Mansfield | TX | 76063 | 336-420-2961 |
| Southlake Urban Air, LLC[1]<br>Michael Browning<br>michael@urbanair<br>trampolinepark.com | Urban Air Southlake | 325 Commerce, Suite 110 | Southlake | TX | 76092 | 817-825-0004 |

**EXHIBIT G**
**TO URBAN AIR TRAMPOLINE PARK®**
**FRANCHISE DISCLOSURE DOCUMENT**

**FRANCHISE DISCLOSURE QUESTIONNAIRE**

## FRANCHISE DISCLOSURE QUESTIONNAIRE

As you know, UATP MANAGEMENT, LLC ("we" or "us") and you are preparing to enter into a Franchise Agreement for the operation of a URBAN AIR TRAMPOLINE PARK™ franchise. The purposes of this Questionnaire are to determine whether any statements or promises were made to you that we have not authorized or that may be untrue, inaccurate or misleading, to be certain that you have been properly represented in this transaction, and to be certain that you understand the limitations on claims you may make by reason of the purchase and operation of your franchise. **You cannot sign or date this Questionnaire the same day as the Receipt for the disclosure document but you must sign and date it the same day you sign the Franchise Agreement and pay your franchise fee.** Please review each of the following questions carefully and provide honest responses to each question. If you answer "No" to any of the questions below, please explain your answer on the back of this sheet.

Yes _____ No _____    1.    Have you received and personally reviewed the URBAN AIR TRAMPOLINE PARK™ Franchise Agreement and each exhibit or schedule attached to it?

Yes _____ No _____    2.    Have you received and personally reviewed the URBAN AIR TRAMPOLINE PARK™ disclosure document we provided?

Yes _____ No _____    3.    Did you sign a receipt for the URBAN AIR TRAMPOLINE PARK™ disclosure document indicating the date you received it?

Yes _____ No _____    4.    Do you understand all the information contained in the URBAN AIR TRAMPOLINE PARK™ disclosure document and Franchise Agreement?

Yes _____ No _____    5.    A)    Have you reviewed the URBAN AIR TRAMPOLINE PARK™ disclosure document and URBAN AIR TRAMPOLINE PARK™ Franchise Agreement with a lawyer, accountant or other professional advisor?

Yes _____ No _____          B)    Have you discussed the benefits and risks of operating a URBAN AIR TRAMPOLINE PARK™ franchise with your professional advisor?

Yes _____ No _____          C)    Did you discuss the benefits and risks of operating a URBAN AIR TRAMPOLINE PARK™ franchise with an existing URBAN AIR TRAMPOLINE PARK™ franchisee?

Yes _____ No _____    6.    Do you understand the risks of operating a URBAN AIR TRAMPOLINE PARK™ franchise?

Yes _____ No _____    7.    Do you understand the success or failure of your URBAN AIR TRAMPOLINE PARK™ franchise will depend in large part upon your skills, abilities and efforts and those of the person you employ, as well as many factors beyond your control such as weather, competition, interest rates, the economy, inflation, labor and supply costs, lease terms and the marketplace?

Yes _____ No _____    8.    Do you understand we are not obligated to provide assistance to you in finding and securing a location for your URBAN AIR TRAMPOLINE PARK™ Franchised Business?

Yes _____ No _____    9.    A)    Do you understand all disputes or claims you may have arising out of or relating to the URBAN AIR TRAMPOLINE PARK™ Franchise Agreement must be brought in the judicial district in which our principal place of business is located, if not resolved informally?

Yes _____ No _____          B)    Do you understand the URBAN AIR TRAMPOLINE PARK™ Franchise Agreement provides you can only collect compensatory damages on any claim under or relating to the URBAN AIR TRAMPOLINE PARK™ Franchise Agreement, and not any punitive, exemplary or multiple damages)?

Yes _____ No _____    10.    Do you understand that your Designated Manager must successfully complete our initial training program?

URBAN AIR TRAMPOLINE PARK®                    Franchise Disclosure Questionnaire                    Exhibit G
Franchise Disclosure Document | 2016                                                                            Page 1 of 2

V.5

Yes _____ No _____   11.   Do you understand we do not have to sell you a franchise or additional franchises or consent to your purchase of existing franchises?

Yes _____ No _____   12.   A)  Do you understand that the U.S. Government has enacted anti-terrorist legislation that prevents us from carrying on business with any suspected terrorist or anyone associated directly or indirectly with terrorist activities?

Yes _____ No _____         B)  Is it true that you have never been a suspected terrorist or associated directly or indirectly with terrorist activities?

Yes _____ No _____         C)  Do you understand that we will not approve your purchase of a URBAN AIR TRAMPOLINE PARK™ franchise if you are a suspected terrorist or associated directly or indirectly with terrorist activity?

Yes _____ No _____         D)  Is it true that you are not purchasing a URBAN AIR TRAMPOLINE PARK™ franchise with the intent or purpose of violating any anti-terrorism law, or for obtaining money to be contributed to a terrorist organization?

Yes _____ No _____   13.   Is it true no employee or other person speaking on our behalf made any statement or promise regarding the costs involved in operating a URBAN AIR TRAMPOLINE PARK™ franchise that is not contained in the URBAN AIR TRAMPOLINE PARK™ disclosure document or that is contrary to, or different from, the information contained in the URBAN AIR TRAMPOLINE PARK™ disclosure document?

Yes _____ No _____   14.   Is it true no employee or other person speaking on our behalf made any statement or promise regarding the actual, average or projected profits or earnings, the likelihood of success, the amount of money you may earn, or the total amount of revenue a URBAN AIR TRAMPOLINE PARK™ franchise will generate, that is not contained in the URBAN AIR TRAMPOLINE PARK™ disclosure document or that is contrary to, or different from, the information contained in the URBAN AIR TRAMPOLINE PARK™ disclosure document?

Yes _____ No _____   15.   Is it true no employee or other person speaking on our behalf made any statement or promise or agreement, other than those matters addressed in the URBAN AIR TRAMPOLINE PARK™ Franchise Agreement, concerning advertising, marketing, media support, marketing penetration, training, support service or assistance that is contrary to, or different from, the information contained in the URBAN AIR TRAMPOLINE PARK™ disclosure document?

Yes _____ No _____   16.   Do you understand that the URBAN AIR TRAMPOLINE PARK™ Franchise Agreement contains the entire agreement between us and you concerning the offer of the URBAN AIR TRAMPOLINE PARK™ franchise opportunity, meaning any prior oral or written statements not reflected in the URBAN AIR TRAMPOLINE PARK™ Franchise Agreement will not be binding and that nothing in the agreement or in any related agreement is intended to disclaim the representations we made in the URBAN AIR TRAMPOLINE PARK™ disclosure document?

**Maryland Residents Only**

Such representations are not intended to nor will they act as a release, estoppel or waiver of any liability incurred under the Maryland Franchise Registration and Disclosure Law.

_____
Print Name

_____                    _____
Signature                                                                                        Date

If signing on behalf of a corporation or other entity, please complete the following:

_____                    _____
Name of Entity                                                                                 Title

URBAN AIR TRAMPOLINE PARK®                    Franchise Disclosure Questionnaire                    Exhibit G
Franchise Disclosure Document | 2016                                                                                      Page 2 of 2

V.5

**EXHIBIT H**

**GENERAL RELEAE**
**(SAMPLE FORM ONLY)**

## GENERAL RELEASE (this "Release Agreement")

The undersigned ("**Releasor**") and my heirs, administrators, executors, ancestors, and assigns, (collectively "**Releasor Agent(s)**"), for good and valuable consideration, the receipt of which is hereby acknowledged, hereby remise, release, and forever discharge UATP Management, LLC, a Texas limited liability company ("**UATP**"), with its principal business offices located at 317 Jenkins, Suite C, Grapevine, Texas 76051 and its parent company, Affiliates, and their respective owners, officers, directors, regional directors, managers, shareholders, members, employees, agents, successors and assigns, (collectively, the "**UATP Released Parties**") from any and all claims, whether at law or in equity, and all contracts, controversies, claims, and demands whatsoever, at law or in equity, that Releasor and/or any Releasor Agent ever had, now have, or that any of their respective heirs, administrators, ancestors, executors, and/or assigns may have against the UATP Released Parties including, without limitation, (i) any and all claims arising out of or related to that certain Franchise Agreement between UATP and _____ dated _____, _____, (ii) the offer and sale of the URBAN AIR TRAMPOLINE PARK franchise opportunity, (iii) any and all claims arising under federal, state, and local laws, rules, and ordinances.

I acknowledge that this general release extends to claims which I do not know or suspect to exist in my favor at the time of executing this Release Agreement, which if were known to me may have materially affected my decision to enter into this Release Agreement. I understand that the facts in respect of which this Release Agreement is given may hereafter turn out to be other than or different from the facts in that connection known or believed to be true. I expressly assume the risk of the facts turning out to be so different and agree that this Release Agreement shall be in all respects effective and not subject to termination or rescission by any such difference in facts.

**IN WITNESS WHEREOF**, the parties hereto have executed this Release Agreement as of the date set forth below.

Signature:_____

Name:_____

Date:_____

[This Release Agreement will be modified as necessary for consistency with any state law regulating franchising.]

**EXHIBIT I**

**TO URBAN AIR TRAMPOLINE PARK®**
**FRANCHISE DISCLOSURE DOCUMENT**

**RECEIPT**

## RECEIPT

This disclosure document summarizes certain provisions of the Franchise Agreement and other information in plain language. Read this disclosure document and all agreements carefully.

If UATP MANAGEMENT, LLC offers you a franchise, it must provide this disclosure document to you 14 calendar days before you sign a binding agreement or make a payment with franchisor or an affiliate in connection with the proposed franchise sale.

New York and Rhode Island require that we give you this disclosure document at the earlier of the first personal meeting or 10 business days before the execution of the franchise or other agreement or the payment of any consideration that relates to the franchise relationship. Michigan requires that we give you this disclosure document at least 10 business days before the execution of any binding franchise or other agreement or the payment of any consideration, whichever occurs first.

If UATP MANAGEMENT, LLC does not deliver this disclosure document on time or if it contains a false or misleading statement, or a material omission, a violation of federal and state law may have occurred and should be reported to the Federal Trade Commission, Washington, D.C. 20580 and the appropriate state regulatory agency listed in <u>Exhibit B</u>. Franchisor's agents for service of process are listed in <u>Exhibit C</u>.

Issuance Date: April 5, 2016, as amended July 29, 2016.

The following individual(s) offer the franchise for sale: Mike Browning, Jr. at (800) 960-4778.  I received a disclosure document dated April 5, 2016, as amended July 29, 2016 (or the date reflected on the State Effective Dates Page), that included the following Exhibits:

STATE SPECIFIC APPENDIX
EXHIBIT A        Table of Contents of Manuals
EXHIBIT B        List of State Administrators
EXHIBIT C        List of Agents for Service of Process
EXHIBIT D-1      Site Selection Agreement
EXHIBIT D-2      Franchise Agreement
                              State Specific Amendment to Franchise Agreement
                              <u>Attachment A</u>        Glossary of Additional Terms
                              <u>Attachment B</u>        Approved Location and Protected Territory
                              <u>Attachment C</u>        Franchisee's Owners and Key Personnel
                              <u>Attachment D-1</u>      Undertaking and Guaranty
                              <u>Attachment D-2</u>      Confidentiality and Non-competition Agreement
                              <u>Attachment E</u>        Electronic Debit Authorization
                              <u>Attachment F</u>        Telephone Assignment Agreement
                              <u>Attachment G</u>        Lease Rider
EXHIBIT E        Financial Statements
EXHIBIT F        List of Franchisees
EXHIBIT G        Franchise Disclosure Questionnaire
EXHIBIT H        General Release (Sample form only)
EXHIBIT I        Receipt

_____          _____
Print Name                                      Signature
_____
Date

If signing on behalf of a corporation or other entity, please complete the following:

_____          _____
Name of Entity                                  Title

Keep this copy for your records.

**RECEIPT**

This disclosure document summarizes certain provisions of the Franchise Agreement and other information in plain language. Read this disclosure document and all agreements carefully.

If UATP MANAGEMENT, LLC offers you a franchise, it must provide this disclosure document to you 14 calendar days before you sign a binding agreement or make a payment with franchisor or an affiliate in connection with the proposed franchise sale.

New York and Rhode Island require that we give you this disclosure document at the earlier of the first personal meeting or 10 business days before the execution of the franchise or other agreement or the payment of any consideration that relates to the franchise relationship.

Michigan and Oregon require that we give you this disclosure document at least 10 business days before the execution any binding franchise or other agreement or the payment of any consideration, whichever occurs first.

If UATP MANAGEMENT, LLC does not deliver this disclosure document on time or if it contains a false or misleading statement, or a material omission, a violation of federal and state law may have occurred and should be reported to the Federal Trade Commission, Washington, D.C. 20580 and the appropriate state regulatory agency listed in Exhibit B. Franchisor's agents for service of process are listed in Exhibit C.

Issuance Date: April 5, 2016, as amended July 29, 2016.

The following individual(s) offer the franchise for sale: Mike Browning, Jr. at (800) 960-4778. I received a disclosure document dated April 5, 2016, as amended July 29, 2016 (or the date reflected on the State Effective Dates Page), that included the following Exhibits:

STATE SPECIFIC APPENDIX
EXHIBIT A          Table of Contents of Manuals
EXHIBIT B          List of State Administrators
EXHIBIT C          List of Agents for Service of Process
EXHIBIT D-1        Site Selection Agreement
EXHIBIT D-2        Franchise Agreement
                   State Specific Amendment to Franchise Agreement
                   Attachment A        Glossary of Additional Terms
                   Attachment B        Approved Location and Protected Territory
                   Attachment C        Franchisee's Owners and Key Personnel
                   Attachment D-1      Undertaking and Guaranty
                   Attachment D-2      Confidentiality and Non-competition Agreement
                   Attachment E        Electronic Debit Authorization
                   Attachment F        Telephone Assignment Agreement
                   Attachment G        Lease Rider
EXHIBIT E          Financial Statements
EXHIBIT F          List of Franchisees
EXHIBIT G          Franchise Disclosure Questionnaire
EXHIBIT H          General Release (Sample form only)
EXHIBIT I          Receipt

_____                    _____
Print Name                                         Signature

_____
Date
If signing on behalf of a corporation or other entity, please complete the following:

_____                    _____
Name of Entity                                     Title

Please sign this copy of the receipt, date your signature, and return it by mail to Michael Browning, Jr, 317 S. Jenkins, Suite C, Grapevine, Texas 76051.

EXHIBIT B

**FRANCHISE DISCLOSURE DOCUMENT**



UATP MANAGEMENT, LLC
317 S. Jenkins, Suite C
Grapevine, Texas 76051
Telephone: (800) 908-1383
michael@urbanairtrampolinepark.com
www.urbanairtrampolinepark.com

The franchisee will operate an indoor trampoline and adventure parks featuring wall-to-wall trampolines, foam pits, and related activities under the name URBAN AIR TRAMPOLINE & ADVENTURE PARK.

The total investment necessary to begin operation of an URBAN AIR TRAMPOLINE & ADVENTURE PARK franchised business ranges from $1,534,000 to $2,152,500. This includes a franchise fee of $30,000 that must be paid to franchisor and affiliate.

This disclosure document summarizes certain provisions of your franchise agreement and other information in plain English. Read this disclosure document and all accompanying agreements carefully. You must receive this disclosure document at least 14 calendar days before you sign a binding agreement with, or make any payment to, the franchisor or an affiliate in connection with the proposed franchise sale. **Note, however, that no governmental agency has verified the information contained in this document.**

You may wish to receive your disclosure document in another format that is more convenient for you. To discuss the availability of disclosures in different formats, contact Alix Wren, Vice President Franchise Sales, at 317 S. Jenkins, Suite C, Grapevine, Texas 76051, (972) 965-7327.

The terms of your contract will govern your franchise relationship. Don't rely on the disclosure document alone to understand your contract. Read your entire contract carefully. Show your contract and this disclosure document to an advisor, like a lawyer or an accountant.

Buying a franchise is a complex investment. The information in this disclosure document can help you make up your mind. More information on franchising, such as *"A Consumer's Guide to Buying a Franchise,"* which can help you understand how to use this disclosure document, is available from the Federal Trade Commission. You can contact the FTC at 1-877-FTC-HELP or by writing to the FTC at 600 Pennsylvania Avenue, NW, Washington, D.C. 20580. You can also visit the FTC's home page at *www.ftc.gov* for additional information. Call your state agency or visit your public library for other sources of information on franchising.

There may also be laws on franchising in your state. Ask your state agencies about them.

Issuance Date: April 25, 2017, as amended May 11, 2017

## STATE COVER PAGE

Your state may have a franchise law that requires a franchisor to register or file with a state franchise administrator before offering or selling in your state. REGISTRATION OF A FRANCHISE BY A STATE DOES NOT MEAN THAT THE STATE RECOMMENDS THE FRANCHISE OR HAS VERIFIED THE INFORMATION IN THIS DISCLOSURE DOCUMENT.

Call the state franchise administrator listed in <u>Exhibit B</u> for information about the franchisor, or about franchising in your state.

MANY FRANCHISE AGREEMENTS DO NOT ALLOW YOU TO RENEW UNCONDITIONALLY AFTER THE INITIAL TERM EXPIRES. YOU MAY HAVE TO SIGN A NEW AGREEMENT WITH DIFFERENT TERMS AND CONDITIONS IN ORDER TO CONTINUE TO OPERATE YOUR BUSINESS. BEFORE YOU BUY, CONSIDER WHAT RIGHTS YOU HAVE TO RENEW YOUR FRANCHISE, IF ANY, AND WHAT TERMS YOU MIGHT HAVE TO ACCEPT IN ORDER TO RENEW.

Please consider the following RISK FACTORS before you buy this franchise:

1.  THE FRANCHISE AGREEMENT REQUIRES YOU TO RESOLVE DISPUTES WITH US BY LITIGATION ONLY IN TEXAS. OUT-OF-STATE LITIGATION MAY FORCE YOU TO ACCEPT A LESS FAVORABLE SETTLEMENT FOR DISPUTES. IT MAY ALSO COST YOU MORE TO LITIGATE WITH US IN TEXAS THAN IN YOUR OWN STATE.

2.  THE FRANCHISE AGREEMENT STATES THAT TEXAS LAW GOVERNS THE AGREEMENT, AND THIS LAW MAY NOT PROVIDE THE SAME PROTECTIONS AND BENEFITS AS LOCAL LAW. YOU MAY WANT TO COMPARE THESE LAWS.

3.  YOUR SPOUSE MUST SIGN A DOCUMENT THAT MAKES YOUR SPOUSE LIABLE FOR YOUR FINANCIAL OBLIGATIONS UNDER THE FRANCHISE AGREEMENT, EVEN THOUGH YOUR SPOUSE HAS NO OWNERSHIP INTEREST IN THE BUSINESS. THIS GUARANTEE WILL PLACE BOTH YOUR AND YOUR SPOUSE'S MARITAL AND PERSONAL ASSETS, PERHAPS INCLUDING YOUR HOUSE, AT RISK IF YOUR FRANCHISE FAILS.

4.  THERE MAY BE OTHER RISKS CONCERNING THIS FRANCHISE.

Effective Date:  See State Effective Dates Page

## STATE EFFECTIVE DATES

The following states require that the disclosure document be registered or filed with the state or be exempt from registration: California, Hawaii, Illinois, Indiana, Maryland, Michigan, Minnesota, New York, North Dakota, Rhode Island, South Dakota, Virginia, Washington and Wisconsin.

This disclosure document is registered, on file, or exempt from registration in the following states having franchise registration and disclosure laws, with the following effective dates:

| State | Effective Date |
|---|---|
| California | |
| Illinois | April 25, 2017 as amended May _____, 2017 |
| Indiana | |
| Maryland | |
| Michigan | April 25, 2017 as amended May 11, 2017 |
| Minnesota | |
| New York | |
| Virginia | |
| Wisconsin | |

In all other states, the effective date of this disclosure document is the issuance date of April 25, 2017 as amended May 11, 2017.

# MICHIGAN NOTICE

**THE STATE OF MICHIGAN PROHIBITS CERTAIN UNFAIR PROVISIONS THAT ARE SOMETIMES IN FRANCHISE DOCUMENTS. IF ANY OF THE FOLLOWING PROVISIONS ARE IN THESE FRANCHISE DOCUMENTS, THE PROVISIONS ARE VOID AND CANNOT BE ENFORCED AGAINST YOU:**

(a)     A prohibition on the right of a franchisee to join an association of franchisees.

(b)     A requirement that a franchisee assent to a release, assignment, novation, waiver, or estoppel that deprives a franchisee of rights and protections provided in this act. This shall not preclude a franchisee, after entering into a franchise agreement, from settling any and all claims.

(c)     A provision that permits a franchisor to terminate a franchise before the expiration of its term except for good cause. Good cause shall include the failure of the franchisee to comply with any lawful provision of the franchise agreement and to cure such failure after being given written notice thereof and a reasonable opportunity that in no event need be more than 30 days, to cure such failure.

(d)     A provision that permits a franchisor to refuse to renew a franchise without fairly compensating the franchisee by repurchase or other means for the fair market value at the time of expiration of the franchisee's inventory, supplies, equipment, fixtures, and furnishings. Personalized materials that have no value to the franchisor and inventory, supplies equipment, fixtures, and furnishings not reasonably required in the conduct of the franchise business are not subject to compensation. This subsection applies only if: (i) the term of the franchise is less than 5 years and (ii) the franchisee is prohibited by the franchise or other agreement from continuing to conduct substantially the same business under another trademark, service mark, trade name, logotype, advertising, or other commercial symbol in the same area after to the expiration of the franchise or the franchisee does not receive at least 6 months advance notice of franchisor's intent not to renew the franchise.

(e)     A provision that permits the franchisor to refuse to renew a franchise on terms generally available to other franchisees of the same class or type under similar circumstances. This section does not require a renewal provision.

(f)     A provision requiring that arbitration or litigation be conducted outside this state. This shall not preclude the franchisee from entering into an agreement, at the time of arbitration, to conduct arbitration at a location outside this state.

(g)     A provision that permits a franchisor to refuse to permit a transfer of ownership of a franchise, except for good cause. This subdivision does not prevent a franchisor from exercising a right of first refusal to purchase the franchise. Good cause shall include, but is not limited to:

(i)     The failure of the proposed transferee to meet the franchisor's then current reasonable qualifications or standards.

(ii)     The fact that the proposed transferee is a competitor of the franchisor or subfranchisor.

(iii)     The unwillingness of the proposed transferee to agree in writing to comply with all lawful obligations.

(iv)     The failure of the franchisee or proposed transferee to pay any sums owing to the franchisor or to cure any default in the franchise agreement existing at the time of the proposed transfer.

(h)     A provision that requires the franchisee to resell to the franchisor items that are not uniquely identified with the franchisor. This subdivision does not prohibit a provision that grants to franchisor a right of first refusal to purchase the assets of a franchise on the same terms and conditions as a bona fide third party willing and able to purchase those assets, nor does this

subdivision prohibit a provision that grants the franchisor the right to acquire the assets of a franchise for the market or appraised value of such assets if the franchisee has breached the lawful provisions of the franchise agreement and has failed to cure the breach in the manner provided in subdivision (c).

(i)     A provision that permits the franchisor to directly or indirectly convey, assign, or otherwise transfer its obligations to fulfill contractual obligations to the Franchisee unless provision has been made for providing the required contractual services.

**THE FACT THAT THERE IS A NOTICE OF THIS OFFERING ON FILE WITH THE ATTORNEY GENERAL DOES NOT CONSTITUTE APPROVAL, RECOMMENDATION, OR ENDORSEMENT BY THE ATTORNEY GENERAL.**

Any questions regarding this notice should be directed to: Michigan Department of Attorney General, Consumer Protection Division, Franchise Section, 525 W. Ottawa Street, G. Mennen Williams Building, 1st Floor, Lansing, Michigan 48913 (517) 373-7117.

# FRANCHISE DISCLOSURE DOCUMENT
## TABLE OF CONTENTS

**ITEM**                                                                    **PAGE**

ITEM 1     THE FRANCHISOR AND ANY PARENTS, PREDECESSORS AND AFFILIATES ........ 1
ITEM 2     BUSINESS EXPERIENCE ................................................................................. 2
ITEM 3     LITIGATION ....................................................................................................... 3
ITEM 4     BANKRUPTCY ................................................................................................... 3
ITEM 5     INITIAL FEES .................................................................................................... 3
ITEM 6     OTHER FEES ...................................................................................................... 3
ITEM 7     ESTIMATED INITIAL INVESTMENT ........................................................... 7
ITEM 8     RESTRICTIONS ON SOURCES OF PRODUCTS AND SERVICES ............... 10
ITEM 9     FRANCHISEE'S OBLIGATIONS ..................................................................... 12
ITEM 10    FINANCING ....................................................................................................... 13
ITEM 11    FRANCHISOR'S ASSISTANCE, ADVERTISING, COMPUTER SYSTEMS, AND
           TRAINING ......................................................................................................... 14
ITEM 12    TERRITORY ....................................................................................................... 19
ITEM 13    TRADEMARKS .................................................................................................. 20
ITEM 14    PATENTS, COPYRIGHTS AND PROPRIETARY INFORMATION ............... 22
ITEM 15    OBLIGATION TO PARTICIPATE IN THE ACTUAL OPERATION OF THE
           FRANCHISE BUSINESS ................................................................................... 23
ITEM 16    RESTRICTIONS ON WHAT THE FRANCHISEE MAY SELL .................... 23
ITEM 17    RENEWAL, TERMINATION, TRANSFER AND DISPUTE RESOLUTION THE
           FRANCHISE RELATIONSHIP ......................................................................... 24
ITEM 18    PUBLIC FIGURES ............................................................................................ 28
ITEM 19    FINANCIAL PERFORMANCE REPRESENTATIONS ................................... 28
ITEM 20    OUTLETS AND FRANCHISEE INFORMATION .......................................... 28
ITEM 21    FINANCIAL STATEMENTS ............................................................................. 34
ITEM 22    CONTRACTS....................................................................................................... 34
ITEM 23    RECEIPT .............................................................................................................. 35

**STATE SPECIFIC APPENDIX**

**EXHIBITS**

A          Operations Manual Table of Contents
B          List of State Administrators
C          List of Agents for Service of Process
D-1        Site Selection Agreement
D-2        Franchise Agreement
E          Financial Statements
F          List of Franchisee Locations and Affiliate-Owned Locations
G          Promissory Note and Security Agreement (Sample form only)
H          Franchise Disclosure Questionnaire
I          General Release (Sample form only)
J          Receipt

# ITEM 1
## THE FRANCHISOR AND ANY PARENTS, PREDECESSORS AND AFFILIATES

To simplify the language in this disclosure document, the terms "we" or "us" or "our" mean UATP MANAGEMENT, LLC, the franchisor. The terms "you" and "your" mean the individual, company, corporation, or partnership who buys the franchise, the franchisee. If the franchisee will operate through a corporation or other business entity, "you" does not include the business entity's owners unless otherwise stated. The business that is operated under the franchise agreement is referred to as the "franchise" or the "Franchised Business" and the right to operate granted by the franchise agreement is sometimes referred to as the "license" or "franchise."

### The Franchisor and any Parents, Predecessors and Affiliates

We are a Texas limited liability company, formed on May 31, 2013, and do business only under our corporate name, UATP Management, LLC. Our principal business address is 317 Jenkins, Suite C, Grapevine, Texas 76051. Our agents for service of process are identified in Exhibit C to this disclosure document. We have no predecessors or parent companies.

We grant single-unit and multi-unit franchises for the operation of an indoor trampoline and adventure park featuring wall-to-wall trampolines, foam pits, warrior/ninja courses, soft play, climbing walls, pro zone, ropes, courses, zip lines, coasters, indoor skydiving, dodge ball, rock climbing, digital climbing walls, arcades, bowling, bumper cars, whirley ball, mini golf, laser tag, trampoline volleyball, and related activities under the name URBAN AIR TRAMPOLINE & ADVENTURE PARK ("Brand"). We call this the "Franchised Business." We have never offered franchises in any other line of business.

Our affiliate, UATP Holdings, LLC, a Texas limited liability company, ("UATP Holdings") has operated similar businesses in Texas. UATP Holdings shares our principal business address at 317 Jenkins, Suite C, Grapevine, Texas 76051. UATP Holdings has never offered franchises in any line of business.

Our affiliate, UATP IP, LLC, a Texas limited liability company, ("UAIP"), owns all the trademarks, copyrights, and proprietary information and products related to the operation of URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchised Businesses, and has granted us the exclusive license to offer and sell URBAN AIR TRAMPOLINE & ADVENTURE PARK franchises. None of our affiliates have ever offered franchises in any line of business and, as of the date of these disclosures, none currently provides products or services to our franchisees.

### The Franchise Offered

You will operate your Franchised Business according to the terms and conditions of our standard franchise agreement ("Franchise Agreement," see Exhibit D-2 to this disclosure document) and our operational standards, specifications, policies, and procedures, which we will communicate to you through our confidential operations manual and other written directives (collectively, our "Manual"). As a franchisee, you will have the right to use our proprietary business format and system ("System") and to do business under our trademarks and service marks ("Marks").

Our System includes distinctive interior and exterior design, décor, color scheme, graphics, fixtures, and furnishings ("Indicia"); our proprietary products, merchandise, and offerings which incorporate our trade secrets and proprietary information ("Proprietary Products"); our operation and customer service standards and procedures, our advertising and marketing specifications and requirements, and our other standards, specifications, techniques, and procedures which we designate from time to time for developing, operating, and managing an URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchised Business ("Standards"); all of which we may change, improve, and additionally develop from time to time. A typical URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchised Business will have 25,000 square feet of commercial space in a street front space.

In most cases, you will first sign a Site Selection Agreement (see Exhibit D-1 to this disclosure document) before you sign the Franchise Agreement to help in identifying a proper site for your Franchised Business.

The Site Selection fee is $500. If you request, and if we grant you, the right to develop multiple URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchised Businesses, you will sign a standard Franchise Agreement for each Franchised Business and you will pay us the initial franchise fee of $30,000. We reserve the right to limit the number of Franchised Businesses to be developed based on our sole discretion in evaluating the geographical territory in which you desire to operate your Franchised Businesses.

## Market and Competition

The market for indoor trampoline and adventure parks is quickly developing and has become highly competitive. We are a part of the amusement, recreation and entertainment industry. Your Franchised Business will compete with other trampoline and family fun businesses. Recreational activities are subject to changes in local, regional or national economic conditions, changes in consumer spending, and increases in the number of, and location of competing industries. Various factors can adversely affect the trampoline and adventure park industry, including increases in labor and energy costs, availability and cost of suitable sites, fluctuating insurance and interest rates, local, state and federal regulations and licensing requirements, and the availability of an adequate number of hourly-paid employees.

## Industry Specific Regulations

Among the licenses and permits you may be required to obtain are, without limitation: zoning or land use approvals, Sunday sale permits, sales and use tax permits, fire department permits, food establishment permits, health and safety permits, alarm permits, occupational permits, retail sales licenses, and wastewater discharge permits. There may be other laws, rules, and regulations which could affect your Franchised Business.

You are solely responsible for determining the local, state, and federal laws and regulations to which you will be subject, and you must ensure that you operate your Franchised Business in full compliance with all such laws and regulations at all times. These include local laws, rules, and regulations that apply to business generally, such as the federal and state anti-discrimination laws, federal wage and hour laws, National Labor Relations Act, and the Occupational Safety and Health Act. As such, you should consult an attorney and consider all of these laws and regulations when evaluating your purchase of a franchise.

## ITEM 2
## BUSINESS EXPERIENCE

### Michael Browning, Jr. – Chief Executive Officer

Michael is our co-founder and has served as our Chief Executive Officer since its inception in January 2011. Michael has also served as a Member of UATP IP since its inception in October 2013, and as a Manager of UATP Holdings since 2015.

### Mike Browning, Sr. – Chief Financial Officer

Mike is one of our co-founders and has served as our Chief Financial Officer since January 2011. Mike has also served as a Member of UATP IP since its inception in October 2013, and as a Manager of UATP Holdings since 2015.

### Stephen Polozola – Vice President and General Counsel

Stephen is one of the co-founders and has served as our Vice President and General Counsel since January 2011. He is a practicing attorney in good standing and shareholder of Decker Jones, PC in Fort Worth, Texas, where he has practiced since April 2007. Stephen has also served as a Manager of UATP Holdings since July 2015. The law firm of Decker Jones, PC is not an owner of UATP IP, LLC, UATP Management, LLC, or UATP Holdings, LLC, or a manager, director, or officer of these companies. The only relationship maintained by Decker Jones, PC and these companies is through the attorney-client relationship.

V.2

<u>Alix Wren – Vice President of Franchise Sales</u>

Alix has served as our Vice President of Franchise Sales since January 2015.  She has served as our Special Events Coordinator since January 2014. For the period from May 2013 through January 2015, From January 2012 to December 2014, Ms. Wren was engaged in home-based entrepreneurial sales through Stella & Dot in Frisco, Texas.

## ITEM 3
## LITIGATION

There is no litigation required to be disclosed in this Item.

## ITEM 4
## BANKRUPTCY

No bankruptcy information is required to be disclosed in this Item.

## ITEM 5
## INITIAL FEES

In most cases, we and you will sign a Site Selection Agreement to determine a suitable site for the Franchised Business. You must pay us a $500 Site Selection fee when you sign the Site Selection Agreement. We may terminate the Site Selection Agreement anytime during the 120-day term of this agreement, in which case we will refund all of the $500 to you upon termination.

When you sign a Franchise Agreement, you will pay us a $30,000 initial franchise fee.  Except as described in the "Franchise Fee Discounts" section below, the initial franchise fee is uniform for all franchisees.  The initial franchise fee is considered fully earned by us and nonrefundable upon payment.

We may, in our sole discretion, grant you the right to enter into additional franchise agreements. If you request, and if we grant you, the right to develop more than one URBAN AIR TRAMPOLINE & ADVENTURE PARK franchise, then, upon signing the Franchise Agreement each additional location, you will pay us an additional franchise fee of $30,000 for each additional URBAN AIR TRAMPOLINE & ADVENTURE PARK location we grant you the right to develop.  We reserve the right to limit the number of Franchised Businesses to be developed based on our sole discretion in evaluating the geographical territory in which you desire to operate your Franchised Businesses.  The initial franchise fee for additional locations is also considered fully earned by us and nonrefundable upon payment.

We may offer other reduced or deferred Initial Franchisee Fees in special circumstances, such as to franchisees that commit to and have the ability to develop a large number of parks. And, we may provide exclusivity agreements. Additionally, we may have special incentive officers in certain markets, such as new and developing markets, which include reduced or deferred Initial Franchise Fees. These special incentives may be offered to existing and/or new franchisees. You will be notified by us in advance if any reduced fees are available to you. We reserve the right to cancel or modify any incentive program or discount at any time.

## ITEM 6
## OTHER FEES

| Type of Fee[1] | Amount | Due Date | Remarks |
|---|---|---|---|
| Royalty Fee | 7% of Gross Sales | Monthly on the 15th of the month following performance or sale beginning on the established Opening Date | See Note 2 for a definition of "Gross Sales." Payment is made by automatic electronic funds withdrawal. |

| Type of Fee[1] | Amount | Due Date | Remarks |
|---|---|---|---|
| Local Marketing Fee | Reasonable charge for marketing and promotional material, but not less than 5% of Gross Sales | As incurred. | You must spend this amount monthly for local media advertising.  It is payable to the person providing the services, which may be us. [3] |
| Grand Opening Marketing | At least $15,000 | See Item 11 | You must expend this amount for advertising the Grand Opening.  It is payable to the person providing the services, which may be us. |
| Advertising Cooperative (if established) [4] | Amount determined by majority vote of cooperative | As incurred | We have the right to establish and administer.  We may require you to pay by electronic funds transfer. |
| Initial Training | Currently no additional charge for Designated Manager and one additional person | If applicable, before training | You must attend one week of training.  We will train 2 persons at our facility.  We can charge for additional personnel. |
| Opening Assistance | Reimbursement of our travel, lodging, and dining costs for the trainer(s) who provide opening assistance and, in some cases, our then-current training fee (as published in the Manual) | Upon demand | See Item 11 for more information about our initial training program and training requirements. |
| Additional/Remedial Training | Reimbursement of our travel, lodging, and dining costs for the trainer(s) who provide opening assistance, plus our then-current training fee (as published in the Manual) | Before training | See Item 11 for more information about our initial training program and training requirements. |
| Compliance Review Fee | Actual cost of program | Upon demand | Payable only when we implement a mystery shop, customer satisfaction, or similar program. |
| Alternate Supplier Product Testing Fee | Reimbursement of our product testing | Upon Demand | See Item 8. Payable only if you request to purchase products from an alternative supplier that require testing. |

| Type of Fee[1] | Amount | Due Date | Remarks |
|---|---|---|---|
| Insurance premium | Reimbursement of our cost of the premium plus administrative fee equal to 10% of the annual premium | Upon demand | Payable only if you fail or refuse to maintain required insurance coverage and we procure coverage for you. |
| Franchise Renewal Fee | $3,000 flat fee plus reimbursement of our legal and professional expenses | Submitted with notice of intent to renew | Payable only if you request and we approve a renewal term for your location. |
| Relocation Fee | 25% of our then-current initial franchise fee | Before relocation | Payable only if you request and we approve your relocation. |
| Transfer Fee | 50% of our then-current initial franchise fee, or 25% of our then-current initial franchise fee if transferred to an approved existing franchisee; plus reimbursement of our legal and professional expenses. | Before transfer | Payable before transfer of your franchise. No charge if franchise is transferred to a corporation which you control. |
| Interest/Late Fee | 18% per year or the highest interest rate permitted by the jurisdiction in which the Franchised Businesses located, whichever is less | Upon demand | Payable only if you fail to make payments by the applicable due date. |
| Nonsufficient Funds Fee | $100 per occurrence, not to exceed maximum allowed by applicable law | Upon demand | Payable only if there are insufficient funds in your account to process payment of fees due to us. |
| Audit Costs | Actual cost of audit | 30 days after billing | Payable only if results of audit differ by more than 2% from reported Gross Revenues. |
| Indemnification | An amount equal to the value of all losses and expenses that we incur | Upon demand | You must reimburse the amount of our damages and pay our attorneys' fees and related costs if we are held liable for claims from your operation of the Franchised Business. |

| Type of Fee[1] | Amount | Due Date | Remarks |
|---|---|---|---|
| Public offering or private placement of your securities | Reimbursement of our actual costs and expenses incurred in having our legal and professional counsel review offering materials | 60 days before offering the securities | Payable only if you offer your securities in a public or private offering. |
| Site Evaluation Fee | There is no charge to you for the first site you propose for the Franchised Business, but Franchisor may charge you its then-current Site Evaluation Fee for each additional proposed site, as published in the Manual from time to time. | Upon Demand | Payable only you require us to review multiple site proposals. |
| Administrative Fee[5] | If you receive a party booking from our national call center then we may charge you an administrative fee equal to the pro-rata portion of the hourly call center rate plus a commission per booked party as set out in the Manual. The current commission is $5 per party. | Monthly on the 15th of the month following performance or sale beginning on the established Opening Date | Payable to us. |

Notes:

Note 1.    Unless otherwise noted, all fees in this Item 6 are uniformly imposed by and are payable to us.  All fees are nonrefundable.

Note 2.    "Gross Sales" means the dollar aggregate of: (1) the sales price of all items, goods, wares and merchandise sold, and the charges for all services you perform, whether made for cash, on credit or otherwise, without reserve or deduction for inability or failure to collect, including sales and services (A) originating at the Franchised Business' premises even if delivery or performance is made offsite from the Franchised Business premises, (B) placed by mail, facsimile, telephone, the internet and similar means if received or filled at or from the Franchised Business premises, and (C) that you in the normal and customary course of your operations would credit or attribute to the operation of the Franchised Business; and (2) all monies, trade value or other things of value that you receive from Franchised Business operations at, in, or from the Franchised Business premises that are not expressly excluded from Gross Sales.  Gross Sales does not include: (1) the exchange of merchandise between Franchised Businesses  (if you operate multiple franchises) if the exchanges are made solely for the convenient operation of your business and not for the purpose of depriving us of the benefit of a sale that otherwise would have been made at, in, on or from the Franchised Business premises; (2) returns

to shippers, vendors, or manufacturers; (3) sales of fixtures or furniture after being used in the conduct of the Franchised Business; (4) the sale of gift certificates and stored value cards (the redemption value will be included in Gross Sales at the time of redemption); (5) insurance proceeds; (6) sales to employees at a discount; (7) cash or credit refunds for transactions included within Gross Sales (limited, however, to the selling price of merchandise returned by the purchaser and accepted by you); (8) the amount of any city, county, state or federal sales, luxury or excise tax on such sales that is both (A) added to the selling price or absorbed therein and (B) paid to the taxing authority.

Note 3.    You must pay to us the fees charged in connection with any copying and use of television, radio, and internet web site advertising and commercial tapes furnished by us. We may also charge a reasonable fee for promotional material provided to you.

Note 4.    There are currently no franchisee cooperatives, and no fees imposed by cooperatives.

Note 5.    We operate a national call center that schedules parties for all locations. The center will schedule a party at an Urban Air location based on the proximity to the address of the customer.

## ITEM 7
## ESTIMATED INITIAL INVESTMENT
## YOUR ESTIMATED INITIAL INVESTMENT

| Type of Expenditure | Amount | Method of Payment | When Due | To Whom Payment is to be Made |
|---|---|---|---|---|
| Initial Franchise Fee[1] | $30,000 | Lump sum | When Franchise Agreement is signed | Us |
| Travel and Living Expenses[2] | $1,500-$4000 | As incurred | As Incurred | Airlines, travel, hotel, restaurants |
| Real Estate and Business Licenses[3] | $15,000 – $50,000 | As arranged | As incurred | Landlord, utility providers, licensing authorities, etc. |
| Leasehold Improvements (not including a café) [4] | $650,000 – $850,000 | As arranged | As required | Contractors and third party suppliers |
| Café[5] | $30,000-$50,000 | As arranged | As incurred | Contractors and third party suppliers |
| Signage | $10,000 – $25,000 | As arranged | As incurred | Approved suppliers |
| Furniture and Fixtures | $60,000 – $80,000 | As arranged | As incurred | Approved suppliers |
| Point of Sale and Computer Systems[6] | $15,000 – $25,000 | As arranged | As incurred | Approved suppliers |

| Type of Expenditure | Amount | Method of Payment | When Due | To Whom Payment is to be Made |
|---|---|---|---|---|
| Attraction Equipment (excluding skydiving and go-carts)[7] | $600,000 – $900,000 | As arranged | As incurred | Approved suppliers |
| Professional Fees | $8,000 – $12,000 | As arranged | As incurred | Your accountant, attorney, and other professionals |
| Initial Inventory[8] | $4,000 – $6,000 | As arranged | As incurred | Approved suppliers |
| Insurance[9] | $15,000 – $25,000 | As agent requires | Before opening | Insurance carriers |
| Grand Opening Advertising | $15,000 | Lump sum | Before opening | Third party vendors, and service and media providers |
| Site Selection Fee[10] | $500 | Lump sum | When the Site Selection Agreement is signed | Us |
| Additional Funds (3 months)[11] | $80,000 | As arranged | As incurred | Various |
| Total[12] | $1,534,000 – $2,152,500 | | | |

Notes:

Note 1.  The figures shown for the initial Franchise Fee are for a single franchised location.  This payment is made to us at signing and is not refundable. See Item 5 for more information about the initial franchise fee and available discounts.

Note 2.  For your first Franchised Business, we do not charge a fee for initial training for you or your Designated Manager and up to one of your employees. During the training period, you will be responsible for all transportation, lodging and meals for you and your employees. Low estimates are based on you attending alone (as the Designated Manager) and commuting locally to attending one week of training.  High estimates are based on the Designated Manager and one additional employee traveling by airplane and attending one week of training.  Any salaries for your employees will be your expense and are not included in the estimates.  Payment will be to airlines, hotels and restaurants, and are generally not refundable.  These amounts are payable as incurred to the providers of these services. If that Franchisor provides an on-site evaluation of a proposed location you must reimburse us for any out of pocket costs that it incurs in connection with performing the evaluation, such as travel, lodging, and dining expenses for each individual performing the evaluation.

Note 3.  Real property costs cannot be estimated in a low-high range due to variability in markets. This document presumes a typical franchised location, which occupies 25,000 square feet of leased commercial space.  Security deposits generally are required by utilities, the landlord, and equipment leasing companies.  Amounts will vary depending on the provisions of various leases, utilities' policies, and your credit rating.  The figures in the chart assume a lease security deposit equal to one to two

months' rent and that rental payments will begin after the improvements have been made to the property. Construction and remodeling costs vary widely, depending upon the location, design, configuration and condition of the premises, the condition and configuration of existing services, any existing facilities such as air conditioning, electrical, and plumbing, and the terms of your lease.

Note 4.  Leasehold improvements.  Leasehold improvement costs vary depending on whether a landlord provides an improvement allowance. The cost of purchasing or leasing and developing a site for a franchise will vary considerably depending on the location, size, local real estate market and other factors.

Note 5.  You are not required to have a café as your location may be limited as to size or approvals from local jurisdictions. However, if you choose to include a café, you must operate the café in conformity with the methods and standards as set out in the Manual. The cost of a café will vary considerably depending on the size, build-out requirements, and governmental regulations.

Note 6.  We do not engage in the sale of hardware. Payments will be to third parties and are generally not refundable. The hardware costs include point of sale computers or tablets, the cost of sale will depend on the number of stations your location needs. Hardware includes, up to five desktops, 4 iPad Airs and 6 RCA tablets. The CPU will need to be a quad-core with a 2.4 gigahertz processor, 4 gigs of RM. You will need to secure software licenses for an operating system, Windows 7 is preferred, however we do support Windows 8.1. Additionally, you will have to purchase a cash drawer, acceptable versions are the MMF Val-u Line Series with Epson Interface, M-S Cash Drawer Economy w/ Epson or M-S Cash Drawer EP-102N. A Receipt Printer Epson TM-T20 USB or Epson TM-T88V USB. See Item 11 for more information about computer hardware and software requirements.

Note 7.  This range represents the estimated cost of purchasing required Attraction Equipment. It does not include the cost of acquiring equipment for optional attractions, such as skydiving and go-carts. Based on the total physical space of your Franchised Business, you may elect to offer these additional attractions. The estimated cost of Attraction Equipment for indoor skydiving is approximately $1,500,000.00 and for go-carts is approximately $1,000,000.00. This will increase your total initial costs if you purchase the optional equipment.

Note 8.  Assumes sufficient inventory to operate for 30 days.

Note 9.  See Item 8 for information about minimum insurance requirements.

Note 10.  Payable to us only if you sign the Site Selection Agreement. See Item 11 for information about the Site Selection Agreement.

Note 11.  The Additional Funds estimate includes various expenditures in addition to those otherwise listed in this Item for the first three months including, but not limited to the following:  (a) state and local licensing fees, if any; (b) taxes, such as sales, use and similar taxes levied or required by city, local, county, parish, state or federal laws or regulations by virtue of the operation of a  business; (c) deposits and costs of utilities, telephone; (d) background checks on employees; and (e) uniform costs for employees.  The figures given are estimates and may vary from area to area. There may be other expenditures that are not listed above which may be incurred in certain areas and not others. Payments will be to third parties and are generally not refundable. These estimates do not include managerial salaries or any payment to you.  These estimates also do not take into account finance payments, charges, interest, and related costs you may incur if any portion of the initial investment is financed. These amounts are the minimum recommended levels to cover operating expenses, including your employees' salaries for three months.  However, we cannot guarantee that those amounts will be sufficient. Additional working capital may be required if sales are low or fixed costs are high.  In compiling these estimates, we relied on our franchisees' and our affiliates' experience in operating URBAN AIR TRAMPOLINE & ADVENTURE PARK locations.

Note 12.  Unless otherwise noted, all amounts are non-refundable.

**ITEM 8**
**RESTRICTIONS ON SOURCES OF PRODUCTS AND SERVICES**

To ensure high and uniform standards of service and quality are maintained at all Urban Air businesses, you must operate your franchise in conformity with our methods, standards and specifications and you must purchase services, supplies, fixtures, equipment, merchandise, goods, and inventory only from suppliers which we have approved. Although you are not required to purchase or lease real estate from us or our affiliates, we must approve your location.

<u>**Purchases from Approved or Designated Suppliers; Purchases According to Specifications**</u>

You must purchase the following items from us or from suppliers we designate (each a "Designated Supplier"): (1) fixtures, furniture, equipment, signs, items of décor, and architect services; (2) uniforms, shirts, and all merchandise and items intended for retail sale (whether or not bearing our Proprietary Marks); (3) advertising, point-of-purchase materials, and other printed promotional materials; (4) gift certificates and stored value cards; (5) stationery, business cards, contracts, and forms; (6) bags, packaging, and supplies bearing the Proprietary Marks; (7) insurance from our approved carriers or brokers to the extent permitted by law; and (8) other products and services that we require. See Item 11 for information about our computer system requirements. In addition to Designated Suppliers, we may require you to purchase certain supplies from approved or designated third party distributors ("Designated Distributors"). We may receive money or other benefits, such as rebates or conference sponsorships, from Designated Suppliers and Designated Distributors based on your purchases. UAIP and any person affiliated with us is not an approved supplier. At this time, neither we nor our affiliates are approved suppliers of any products or services.

If you propose to purchase from a previously unapproved source, you must first obtain our approval. Our criteria for supplier approval are not available to franchisees. We may require, as a condition of granting approval, that our representatives be permitted to inspect the supplier's facilities, and that all information, specifications, and samples as we reasonably require be delivered to us or to an independent, certified laboratory for testing. We may require you to pay a fee for the testing, which will not exceed our reasonable testing costs. We will notify you within 120 days of your request as to whether you are authorized to purchase such products from that supplier.

We may prescribe procedures for the submission of requests for approval and impose obligations on approved suppliers, which will be incorporated in a written license agreement with the supplier. Our criteria for approving suppliers are not available to the franchisees. We may obtain from you and/or the supplier reimbursement of actual costs and expenses incurred in the approval process and on-going monitoring of the supplier's compliance with our requirements. We do not act as an agent, representative, fiduciary or other intermediary for you in our relationship with an alternative supplier you propose and we approve. We have the right to monitor the quality of the services provided by approved suppliers in a manner we deem appropriate and may terminate any supplier who does not meet our quality standards and specifications, as may be in effect periodically.

You may purchase from any supplier those items and services for which we have not designated approved suppliers or distributors, if the items and services meet our specifications, which may include brand requirements. If brand requirements have been identified, you may purchase and use only those brands approved by us. Our standards and specifications, and our modifications to our standards and specifications, are communicated to our franchisees in the Manual.

<u>**Location and Lease**</u>

You must acquire a site for the Franchised Business which meets our site selection criteria, as described in the Manual, within 120 days of signing the Site Selection Agreement or, if you did not sign the Site Selection Agreement, within 120 days after the Franchise Agreement has been signed. You may not acquire a site for the Franchised Business until we approve that site. If you occupy the Franchised Business according to a commercial lease, the lease must contain terms we specify. (See Lease Rider attached as

<u>Attachment G</u> to the Franchise Agreement).

## **Insurance**

You must obtain and maintain, at your own expense, the insurance coverage that we periodically require. You must obtain your insurance from our designated provider, unless the laws of your state restrict us from designating an insurance provider. Each insurance policy must name us and our affiliates, and each company's respective officers, directors, shareholders, partners, members, agents, representatives, independent contractors, servants, and employees, as additional insureds and must also include a waiver of subrogation in favor of us and our affiliates, and each company's respective officers, directors, company managers, and partners. All coverages apply per Franchised Business that you operate. Unless otherwise noted, you must maintain general liability insurance that includes the following minimum coverages:

| Limits of Liability | Description |
|---|---|
| $1,000,000 | Per Occurrence |
| $2,000,000 | Annual Aggregate, Other Than Products |
| $2,000,000 | Annual Aggregate, Products & Completed Operations |
| $1,000,000 | Personal and Advertising Injury Aggregate |
| $100,000 | Tenants Legal Liability for damage to the part of the premises you occupy |
| Excluded | Medical Expense Each Claim |
| $1,000,000 | Employee Benefits Liability Annual Aggregate – Retro 12/15/2014 |
| $1,000,000 | Hired & Non Owned Auto Liability |

(*) Workers' Compensation insurance is not required, but is highly recommended, if your Franchised Business is located in a state which does not mandate Workers' Compensation coverage as a matter of law.

We have the right to establish and modify the minimum coverages required, and require different or additional kinds of insurance to reflect inflation, changes in standards of liability, higher damage awards, and other relevant changes in circumstances.

All insurance policies must be written by a carrier who is licensed in the state in which the Franchised Business operates and with an A.M. Best rating of not less than A-VII. All insurance policies must be primary and non-contributory to any insurance we might carry.

You must provide us with a certificate of insurance complying with the stated requirements within 30 days after signing the Franchise Agreement. You must also provide us with a certificate of insurance on each policy renewal date. If you do not comply with the insurance requirements, we reserve the right, but not the duty, to force place insurance on your behalf and charge you the premium due along with any administration fee that is equal to 10% of the annual premium and which will be due immediately to us.

## **Revenue Derived from Required Purchases and Leases**

We and our affiliates may derive revenue from franchisee purchases and leases to the extent that franchisees purchase products or services from us or our affiliates, and we also may receive payments or material benefits from suppliers based on your purchases or leases. We have negotiated a supply contract with a trampoline and adventure park equipment supplier under which the supplier will rebate to us a percentage of the net profits of franchisee purchases. During our fiscal year ending December 31, 2016, we derived $1,266,000 in revenue on account of franchisee purchases or leases, accounting for 33% of our total revenues of $3,833,314.

We offer franchises the opportunity to enter into an outlet management agreement. You are not obligated to enter into a management agreement with us. As of December 31, 2016, we manage 7 outlets. We derive $715,000 per year in revenue from our existing outlet management agreements, which represents 20% of our total revenues of $3,574,066.

V.2

We estimate that the cost of purchasing from approved and designated suppliers and the cost of purchasing according to our specifications will represent 75% to 90% of your total purchases in establishing the business and 25% to 40% of your total purchases during operation of the Franchised Business.

None of our officers currently own an interest in any privately-held supplier, or a material interest in any publicly-held supplier, though our officers may occasionally own non-material interests in publicly-held companies that may be suppliers to our franchise system.

## Purchasing Cooperatives; Supplier Negotiations and Arrangements

There currently are no purchasing or distribution cooperatives in existence connected to our franchise system. We periodically negotiate purchase arrangements with suppliers for the benefit of our franchisees, and we may establish national buying accounts with vendors whose products meet our specifications. We do not provide you any material benefits (such as renewal rights or the right to acquire additional franchises) based on your purchases from approved or designated suppliers.

## Computer Hardware and Software

You must purchase all computer systems we prescribe for use by our franchisees, including point of sale systems, franchise management systems, and general computer equipment, as fully described in Item 11.

## Accounting Systems

You must purchase and utilize the accounting systems we prescribe for use by our franchisees, including third-party accounting services, as fully described in Item 11.

## ITEM 9
## FRANCHISEE'S OBLIGATIONS

**This table lists your principal obligations under the franchise and other agreements. It will help you find more detailed information about your obligations in these agreements and in other items of this disclosure document.**

| Obligation | Sections in agreement | Disclosure Document Items |
|---|---|---|
| a. Site selection and acquisition/lease | Article 4 and Attachment A of the Site Selection Agreement; Section 3 and Attachment G of the Franchise Agreement | Items 6, 11, and 12 |
| b. Pre-opening purchases/leases | Section 4 of the Franchise Agreement | Items 7 and 8 |
| c. Site development and other pre-opening requirements | Sections 4 and 5 of the Franchise Agreement | Item 7 |
| d. Initial and ongoing training | Sections 2.B(3) and 8 of the Franchise Agreement | Item 11 |
| e. Opening | Section 5 of the Franchise Agreement | Item 11 |
| f. Fees | Article 3.1 and Attachment A of the Site Selection Agreement; Section 6 of the Franchise Agreement | Items 5 and 6 |
| g. Compliance with standards and policies/Operating Manual | Sections 9, 10, and 11 of the Franchise Agreement | Item 11 |
| h. Trademarks and proprietary information | Article 5 of the Site Selection Agreement; Sections 9, 13.A, and 14.A of the Franchise Agreement | Items 1, 13, and 14 |
| i. Restrictions on products/services offered | Sections 9, 10, 11.B-11.D of the Franchise Agreement | Items 8 and 16 |

| Obligation | Sections in agreement | Disclosure Document Items |
|---|---|---|
| j.    Warranty and customer service requirements | Section 15.E of the Franchise Agreement | Item 16 |
| k.    Territorial development and sales quota | Section 1.B of the Franchise Agreement | Item 12 |
| l.    Ongoing product/service purchases | Sections 11.B-11.F of the Franchise Agreement | Item 8 and 16 |
| m.    Maintenance, appearance and remodeling requirements | Sections 2.B(2), 10, and 11.B of the Franchise Agreement | Items 7 and 8 |
| n.    Insurance | Section 16 of the Franchise Agreement | Items 6, 7, and 8 |
| o.    Advertising | Section 15 of the Franchise Agreement | Items 6, 7, and 11 |
| p.    Indemnification | Section 20 of the Franchise Agreement | Item 6 |
| q.    Owner's participation/ management/staffing | Sections 11.J-11.K of the Franchise Agreement | Item 15 |
| r.    Records and reports | Section 7 of the Franchise Agreement | Items 6 and 11 |
| s.    Inspections and audits | Sections 4.D, 4.E, 7, and 11.G of the Franchise Agreement | Items 6 and 11 |
| t.    Transfer | Section 17 of the Franchise Agreement | Item 17 |
| u.    Renewal | Section 2.B of the Franchise Agreement | Items 6 and 17 |
| v.    Post-termination obligations | Articles 5 of the Site Selection Agreement; Section 19 of the Franchise Agreement | Item 17 |
| w.    Non-competition covenants | Article 5.4 of the Site Selection Agreement; Sections 14.B-14.F of the Franchise Agreement | Items 15 and17 |
| x.    Dispute resolution | Section 23 of the Franchise Agreement | Item 17 |
| y.    Guaranty | Attachment D-1 of the Franchise Agreement | Item 15 |

## ITEM 10
## FINANCING

We may offer financing for up to $200,000.00 for the purchase of the initial equipment for use in the operation of the Franchised Business according to similar terms and conditions of the promissory note and security agreement attached as Exhibit G. These terms are summarized as follows:

| Item Financed | Initial Equipment Costs |
|---|---|
| Source of Financing | Us |
| Down Payment | 0% |
| Amount Financed | Up to $200,000.00 |
| Term (Years) | Minimum of 120 days, and up to 2 years |
| Interest Rate | Minimum applicable Federal Rate for Short Term Loans |

| Monthly Payment | Varies, depending upon amount financed, but in equal installments up to 24 months (See Note 1) |
|---|---|
| Prepay Penalty | None |
| Security Required | Security interest in equipment |
| Liability Upon Default | Termination of Franchise Agreement; you must pay entire amount due, our attorneys' fees, and court costs in collecting debt. |
| Loss of Legal Right on Default | Waiver of right to jury trial; payment, demand for payment, notice of dishonor, notice of protest, and all other notices or demands in connection with the delivery, acceptance, performance, default, or endorsement. |

Notes:

Note 1.     You must execute an amendment to the Franchise Agreement when you accept the financing terms, which provides that during the term of your loan, you must pay to us an additional 1.5% royalty per month.

Note 2.     Your owners must personally guarantee your obligations under the loan. We also take a Uniform Commercial Code security interest in certain items to secure the loan.

Note 3.     We do not have any past or present practice or intention to sell, assign, or discount to any third party, any note, contract or other instrument signed by you.

Other than the previously mentioned royalty fee increase, we currently do not receive any direct or indirect payments or other consideration for placing financing. We may also develop relationships with preferred lenders or financing sources which we may, when established, make available to you. Neither we nor any of our affiliates will guarantee your lease, note, or other obligations. Additionally, neither we nor our affiliates can predict if you will be able to obtain financing for any part of your investment in the Franchised Business or, if you are able, the terms of such financing.

Third party lenders may assign their rights under their loan documents to us or to any other party. If any third party lender assigns its rights to a party other than us, that third party may be immune under the law to claims or defenses you may have against either the third party lender or us.

We do not know what waivers or other provisions may appear in any other financing that you may arrange with third party lenders. Third party loan documents may include provisions by which you confess judgment or which bar you from asserting a defense against us or our assigns, and may include provisions by which you waive some rights you might have, such as rights to notice or demand, presentment, protest, notice of dishonor, consent to extension of time for payment, rights of marshalling of collateral, bonds and other forms of security relating to repossessed collateral, etc.

**ITEM 11**
**FRANCHISOR'S ASSISTANCE, ADVERTISING,**
**COMPUTER SYSTEMS, AND TRAINING**

**Except as listed below, we are not required to provide you with any assistance.**

Before you begin operating the Franchised Business, we will:

1.     Review your Franchise Site Application and notify you of site approval within 14 days after receiving all requested information. (Site Selection Agreement, Section 4.3; Franchise Agreement, Section 3.B) Factors considered in selection and approval of a site includes, but is not limited to, traffic count, visibility, demographics, competition in the area, and occupancy cost.

2.     Provide to you sample drawings and specifications for a Franchised Business, including requirements for dimensions, design, image, interior layout, décor, fixtures, equipment, signs,

furnishings, storefront, signage, graphics, and color schemes. (Franchise Agreement, <u>Section 4.A</u>) You must have all required construction plans and specifications prepared to suit the shape and dimensions of the Franchised Business and ensure that the plans and specifications comply with applicable ordinances, building codes, permit requirements, and any lease requirements and restrictions.

3.    Conduct a one week initial training program and admit you or your Designated Manager and up to one additional individual (see Item 15) without charge. (Franchise Agreement, <u>Section 8.A</u>)

4.    Loan you one copy of our confidential Manual containing information and knowledge necessary and material to the System. (Franchise Agreement, <u>Section 9</u>) The table of contents for the current version of our Operations Manual is attached as <u>Exhibit A</u>. The current version of our Operations Manual contains a total of 323 pages. We will also lend to you various other training manuals, videos, and materials.

5.    For the first Franchised Business you open, we will provide you with one member of our training team for 5 days of pre-opening assistance and training at your Franchised Business; there is no fee for the service. We may, or at your request will, provide the same pre-opening assistance for subsequent Franchised Businesses you open, in which case we may require you to reimburse us for our training-related expenses, including travel, lodging and dining costs for the individual who provides opening assistance. (Franchise Agreement, <u>Section 8.B</u>)

6.    For all Franchised Businesses you open, we may, or at your request will, provide you with additional members of our training team to provide pre-opening assistance, subject to the availability of personnel, in which case we may require you to pay our then-current training fee (as published in the Manual) and to reimburse us for our training-related expenses, including travel, lodging and dining costs for those additional trainers who provide opening assistance. (Franchise Agreement, <u>Section 8.B</u>)

7.    Provide consultation and advice to you, as we deem appropriate, with regard to the development and operation of the Franchised Business, building layout, furnishings, fixtures, and equipment plans and specifications, employee recruiting, selection and training, purchasing and inventory control, and such other matters as we deem appropriate.

During the operation of the Franchised Business, we will:

1.    Periodically, as we deem appropriate, advise and consult with you in connection with the operation of the Franchised Business. (Franchise Agreement, <u>Section 8.C</u>)

2.    Provide to you our knowledge and expertise regarding the System and pertinent new developments, techniques, and improvements in the areas of management, sales promotion, service concepts, and other areas. We may provide these services through on-site visits, through the distribution of printed or filmed material or electronic information, meetings or seminars, telephone communications, email communications, or other communications. (Franchise Agreement, <u>Section 8.C</u>)

3.    Use good faith efforts to approve or disapprove your proposed promotional and marketing materials within 10 business days after we receive them. (Franchise Agreement, <u>Section 15.A</u>)

## <u>Initial Training Program</u>

We will admit you or your Designated Manager and up to one other of your employees to our initial training program. Our initial training program is offered by our training team before commencing operation on an as needed basis, and is conducted by or under the supervision of Michael Browning, Jr., our President. Mr. Browning has been with the company since its inception in 2011 and has over four years' experience in the industry. He has been involved with developing the procedures and management implemented in all existing locations.

The classroom portion of our initial training program is held at our training facility located in Grapevine, Texas and the on the job training portion is held at one or more of our affiliate-owned locations in North Texas. The Franchised Business Operations portion of our initial training program includes hands-on operations training, and the Franchise Operations portion focuses on business operations. The entire initial training program and is held over a one week period.

The following is a summary of our initial training program:

### TRAINING PROGRAM

| Subject[1] | Hours of Classroom Training | Hours of on the Job Training | Location |
|---|---|---|---|
| Court Maintenance & Monitoring | 2 | 12 | Grapevine, Texas and Designated on-site Location |
| Office Management/ Operations | 4 | 6 | Grapevine, Texas and Designated on-site Location |
| Events (Booking, check-in, hosting) | 4 | 4 | Grapevine, Texas and Designated on-site Location |
| Front Desk, Point of Sale, Waivers | 2 | 3 | Grapevine, Texas and Designated on-site Location |
| Observation/Shadowing | 0 | 18 | Grapevine, Texas and Designated on-site Location |
| Inventory Management/Concessions | 4 | 2 | Grapevine, Texas and Designated on-site Location |
| Cleaning & General Facility Maintenance | 2 | 1 | Grapevine, Texas and Designated on-site Location |
| Sound & Lighting System | 1 | 1 | Grapevine, Texas and Designated on-site Location |
| Marketing | 4 | 4 | Grapevine, Texas and Designated on-site Location |
| Handling an Incident/Report | 2 | 0 | Grapevine, Texas and Designated on-site Location |
| **Totals** | **25** | **51** | |

Note 1: Instruction will be taken from the Manual and other instructional forms.

We do not charge tuition for you or your Designated Manager and up to one other of your employees to attend our initial training program, but you are responsible for all training-related expenses, including travel, lodging, and dining expenses for these individuals and wages and salaries payable during the training period. The initial training is mandatory, and you must successfully complete the initial training to our satisfaction before opening. At your request, we may permit additional individuals to attend the same training program, subject to space availability.

You and your designated employees must successfully complete our initial training program to our satisfaction before you may open your Franchised Business(es).

### Other Training

Your Designated Manager and other personnel also must attend and successfully complete all safety training courses as required by law or as we may periodically require, to the satisfaction of and as may be required by the state and municipality where your franchise is located; you must maintain all required certifications throughout the franchise term. Unless otherwise noted, we may charge a reasonable tuition for all courses and programs that we provide. You are responsible for all training-related expenses, including travel, lodging, and dining expenses for these individuals, as well as any wages and salaries payable during the training period.

We may also require your Designated Manager and other of your employees to attend and complete additional and/or remedial training as we may periodically deem necessary. If we require additional or remedial training, you must pay our then-current training fee (as published in the Manual) and reimburse us for all of our training-related expenses, including travel, lodging and dining costs for the individuals who provide opening assistance. If such training takes place in our training facilities, you are also responsible for travel, lodging, and dining expenses for individuals who attend additional and remedial training, as well as any wages and salaries payable to these individuals during the training period.

We may also conduct, and require you to attend, periodic conferences to discuss System developments, including operational efficiency, personnel training, bookkeeping, account, inventory control, performance standards, advertising programs, and merchandising procedures. Your Designated Manager must attend all mandatory conferences. You are responsible for all conference-related expenses, including travel, lodging, and dining expenses for conference attendees, as well as any wages and salaries payable to these individuals during the conference.

## Site Selection

If you sign a Site Selection Agreement, we will agree on a "Site Selection Area" within which you may locate the Franchised Business. You must secure a lease for an acceptable site for the Franchised Business within 120 days of the Site Selection Agreement being signed. If you sign a Franchise Agreement without having first selected a site for the Franchised Business, a "Site Selection Area" will be identified on the Summary Page of the Franchise Agreement. You must secure a lease for an acceptable site within 120 of the Franchise Agreement being signed.

We will provide you with our standard site selection criteria or an on-site evaluation of your proposed site, as we deem appropriate. We will approve or disapprove your proposed site within 14 business days after we receive all information that we reasonably request. The criteria we use to evaluate the selected site include, but are not limited to, cost, visibility, accessibility, demographics, and local competition. We reserve the right to develop and implement various site-selection technologies, software, or systems, in which case we may charge, and you must pay, our then-current Site Evaluation Fee as published in the Manual periodically. Once a site is secured, you will sign and deliver to us the Franchise Agreement and pay any initial franchise fee owed to us before signing the lease for the site.

Our approval of a proposed site signifies that we are willing to grant a franchise for an Urban Air location at the site. Your location may not be relocated without first obtaining our written consent.

## Typical Time between Signing (or First Payment) and Opening for Business

The typical length of time between the signing of the Franchise Agreement (or your first payment to us, if that occurs first) and the opening of your business ranges from three to seven months, depending on whether the site is known at the time the Franchise Agreement is signed. Factors affecting this range include site availability, city zoning and permitting, and construction time. We can refuse to award you a franchise if you fail to secure a location for the Franchised Business (by purchase or lease) within 120 days after the Site Selection Agreement is signed, or terminate the Franchise Agreement if you fail to open for business within 120 days after securing a location for the Franchised Business.

## Advertising

You will be expected to spend at least 5% of your monthly Gross Sales on local marketing and advertising. Our current advertising program for the products and services offered by Franchised Businesses consists of community and charitable involvement, a web site, and proprietary merchandise. Our advertising materials are currently created primarily in-house, with some graphics assistance from outside agencies. Currently, there is no advertising council composed of franchisees, but we reserve the right to form such council(s) at any time. You may use your own advertising and promotional materials if they conform to our Standards and we have approved them before first publication or use. We will use good faith efforts to approve or disapprove your proposed advertising and promotional materials within 10 business days after we receive them.

**Grand Opening Advertising**

You must conduct Grand Opening advertising and promotional programs for your Franchised Business before opening. You may use your own advertising and promotional materials if they conform to our Standards and we have approved them before first publication or use. We will use good faith efforts to approve or disapprove your proposed advertising and promotional materials within 10 business days after we receive them.

**Advertising Cooperatives**

If we believe that two or more Franchised Businesses may benefit by pooling their advertising dollars, we may form a local or regional advertising cooperative for this purpose. If we form an advertising cooperative for the region in which your Franchised Business is located, you must participate in the advertising cooperative. We have the exclusive right to create, dissolve, and merge advertising cooperatives. We will also have the exclusive right to create and amend their governing documents. No advertising cooperative has yet been created and, therefore, no governing documents are available for your review.

Governing documents will provide that any advertising cooperative created under authority of the Franchise Agreement will (1) operate by majority vote, with each Franchised Business (including our affiliate-owned locations ) being entitled to one vote, (2) entitle us to cast one vote (in addition to any votes we may cast for affiliate-owned locations), (3) permit the members of the advertising cooperative, by majority vote, to determine the amount of required contributions, and (4) provide that any funds left in the advertising cooperative at the time of its dissolution be returned to the members in proportion to their contributions made during the 12-month period immediately preceding dissolution.

**Computer and Cash Register Requirements**

You must acquire and use all computer systems that we prescribe for use by our franchisees, and may not use any computer system or components or software applications that do not conform to the Standards or that we have not approved in writing. Requirements may include, among other things, hook up to remote servers, off-site electronic repositories, and high-speed Internet connections and service. We may require you to update or upgrade computer hardware components and/or software applications as we deem necessary, but not more than three times per calendar year. You must enter into all applicable software license agreements and software maintenance agreements, in the form and manner we prescribe, and pay all fees charged by third party software and software service providers. At our request, you must sign or consent to a "terms of use" agreement regarding all software applications that we designate. We may independently access from a remote location, at any time, all information input to, and compiled by, your computer system or an off-site server, including information concerning sales, purchase orders, inventory, and expenditures. There are no contractual limitations to our right to access the information and data

We require all franchisees to purchase a desktop computer and printer for back of the house needs, and we reserve the right to require all franchisees to acquire and use the same Point of Sale ("POS") system. Neither we nor any of our affiliates or any third party is obligated to provide ongoing maintenance, repairs, upgrades or updates to any computer hardware or software. We estimate that the cost of your required computer systems will be approximately $8,000-$12,000, and the annual cost of optional or required maintenance of the POS system and computer systems to be $2000. See Note 6 to Item 7 for additional information.

We may also require that you connect to a web-based application, such as franchise management software, which enables us to independently access and poll the information on your POS System. There is no contractual limitation on our right to independently access this information. We will not have independent access to the information generated by or stored on your personal computer.

We reserve the right to develop and implement various technologies, software, or systems for the benefit of the System and Franchised Businesses, in which case we may require you to adopt and use such technologies, software, or systems, as published in the Manual periodically. There is no contractual limitation on our right to implement such programs.

Neither we, nor any of our affiliates, nor any third party is required to provide ongoing maintenance repairs, upgrades to the system. You must, at your own expense, maintain your computer systems and network in good repair and working order and properly update and otherwise change your computer hardware and software systems as we may require. You must pay all amounts charged by any licensor of the systems and programs you use, including charges for use, maintenance, support and/or update of these systems or programs. There is no contractual limitation on our ability to require the hardware and any software programs be updated.

You may not register a domain name or operate a website containing the Marks. We have the right to determine the content and use of any website or social media associated with the Marks. Your general conduct on the Internet or other electronic media, including your use of the Marks in advertising, is subject to the terms and conditions of the Franchise Agreement, Manual or other requirements that we may determine from time to time.

## Operations Manual

We will lend to you a copy of our Operations Manual and other materials which contain mandatory and suggested specifications, standards and procedures. We will also lend to you various other training manuals, videos, and materials. The Operations Manual and other materials provided by us are confidential and remain our property and must be kept confidential. We may modify this Manual, on occasion, and you must abide by those modifications (Franchise Agreement Article 9). A copy of the Table of Contents of the complete Operations Manual, as of our most recent fiscal year end which indicates the number of pages devoted to each topic and the total number of pages in the Operations Manual, is attached as Exhibit A to this disclosure document. The Operations Manual has a total of 323 pages.

## ITEM 12
## TERRITORY

## Site Selection Agreement

If you sign the Site Selection Agreement, we and you will identify a Site Selection Area in this agreement. You will focus your site selection activities within the Site Selection Area, as described in the Site Selection Agreement. You only have the right to look for a potential site to be located in the Site Selection Area. The Site Selection Agreement provides no territorial protection or exclusivity, and have no options, rights of first refusal or similar rights for other areas.

After the Site Selection Agreement expires or is terminated, regardless of the reason (even if we and you sign a Franchise Agreement), we and our affiliates may engage, and allow others to engage, in any activities we desire within and outside the Site Selection Area without any restrictions whatsoever, subject only to your rights under franchise agreements with us then in effect. We may not alter your Site Selection Area or territorial rights.

## Approved Location

You will operate one Franchised Business at a location we have approved ("Approved Location"), and may relocate the Franchised Business only with our written consent. If your lease expires or terminates through no fault of yours, or if the Franchised Business premises are destroyed or materially damaged by fire, flood, or other natural catastrophe, we will permit you to relocate to another location within the Protected Area (described below). If we grant relocation rights for this reason, you must open the Franchised Business for business at the new location within 180 days of closing the original location. If we permit you to relocate the Franchised Business for any other reason, then you must open the Franchised Business for business at the new location within thirty business days of closing the original location.

## Protected Area under the Franchise Agreement

After we identify an Approved Location, we will mutually agree on a Protected Area surrounding the Franchised Business, which will be described as a radius surrounding the Franchised Business (or may be

defined by ZIP codes or geographic boundaries). There is no minimum territory. Typically, but not in all cases, available Protected Territories will encompass a population of approximately 250,000 people at the time the Franchise Agreement is executed.  Once established, the boundaries of your Protected Area may be altered only by written consent of the parties.

During the franchise term, subject to your compliance with all agreements, we will neither operate nor grant anyone but you the right to operate another URBAN AIR TRAMPOLINE PARK in the Protected Area. We may operate and grant others the right to operate URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchised Businesses or similar businesses outside the Protected Area, even close to the boundary of your Protected Area. The boundaries of your Protected Area may overlap with or be overlapped by the protected area of other URBAN AIR TRAMPOLINE & ADVENTURE PARK franchisees, affiliates, or corporate stores, meaning that the potential customer base inside the Protected Area may be shared with other businesses. We are not required to compensate you for any sales made in the Protected Area.

We also may offer, grant, and support franchises in similar, competitive, and/or different lines of business under any name other than URBAN AIR TRAMPOLINE & ADVENTURE PARK at any location, including in the Protected Area.

We reserve the right to distribute any and all products and services and/or their components identified by the Proprietary Marks, through alternative channels of distribution, including, mail order, catalog sales, the Internet, World Wide Web or any other form of electronic commerce, both within and outside the Protected Area. You will receive no compensation for our sales through alternative distribution channels.

You must focus your marketing activities within your Protected Area. You may engage in direct marketing activities in the Protected Area (even if it is overlapping with another franchisee's protected area), and may engage in direct marketing activities outside your Protected Area, so long as the activities are not conducted in another franchisee's or licensee's protected area.  For clarity, the term "direct marketing activities" include personal solicitations, direct mailings, sporting event sponsorships and advertising, and school event sponsorships and advertising. The term "direct marketing activities" does not include and, therefore, does not apply to web site advertising or your right to send targeted emails or text messages to your existing customers. We may develop policies and procedures that apply to all types of advertising and marketing efforts, including social media advertising, and you must comply with all policies and procedures that we develop.

 You may not sell products through alternative channels of distribution, such as the Internet, catalog sales, telemarketing, or other direct marketing without our consent.

Continuation of your territorial protection under the Franchise Agreement does not depend on your achieving a certain sales volume, market penetration, or other contingency.

**Additional Franchise Rights**

We do not regularly grant any right of first refusal to obtain additional franchises. If you wish to obtain an additional franchise location, you must enter into a separate Franchise Agreement.  We may offer a right of first refusal in special circumstances, such as to franchisees that commit to and have the ability to develop a large number of facilities, or to franchisees in new and developing markets.

**ITEM 13**
**TRADEMARKS**

Our affiliate, UAIP, owns the following Marks, which have been registered on the Principal Register of the U.S. Patent and Trademark Office.  All required affidavits have been filed.

| Mark | Registration Number | Registration Date | International Class |
|------|---------------------|-------------------|--------------------|
| URBAN AIR TRAMPOLINE PARK (standard character) | 4807427 | September 8, 2015 | 25, 41 |
| GET UP. GET FLY. (standard character) | 4799297 | August 25, 2015 | 41 |

Our affiliate, UAIP, owns and has applied to register the following marks ("Pending Marks") on the Principal Register of the U.S. Patent Trademark Office. All required affidavits have been filed.

| Mark | Serial Number | Application Date |
|------|---------------|------------------|
| ADVENTURE HUB (standard character) | 87348394 | February 24, 2017 |
| SKY RIDER (standard character) | 87348335 | February 24, 2017 |
| URBAN AIR ADVENTURE PARK (standard character) | 87207115 | October 18, 2016 |

We have a federal registration for our principal trademark but do not yet have a federal registration for the Pending Marks. Therefore, the Pending Marks do not have as many legal benefits and rights as federally registered trademarks. If our right to use the Pending Marks trademark is challenged, you may have to change to an alternative trademark, which may increase your expenses.

There is presently no effective determination of the Unites States Patent and Trademark Office ("USPTO"), any trademark trial and appeal board, the trademark administrator of any state or any court, nor any pending infringement, opposition, or cancellation proceeding, nor any pending material litigation involving the Marks which is relevant to their ownership, use, or licensing. There is no pending material federal or state court litigation regarding our use or ownership rights in any trademark. All required affidavits have been filed.

**<u>Use of Marks</u>**

UAIP has granted us the perpetual right to use and sublicense the use of the Marks, including those listed above and those developed in the future, together with other intellectual property critical to the System pursuant to a written license agreement dated March 1, 2014 ("License Agreement"). If the License Agreement terminates, then UAIP will assume all of our rights and obligations under your Franchise Agreement. Except for the License Agreement, there are no agreements currently in effect that significantly limit our rights to use or to license the use of the Marks in any manner material to the Franchised Business. We are not aware of any superior prior rights or infringing uses that could materially affect your use of the Marks in any state. We know of no other agreements currently in effect which significantly limit our rights to use or license the use of the Marks in any manner material to you.

You must use the Marks in full compliance with provisions of the Franchise Agreement and according to the trademark usage guidelines and rules we periodically prescribe. You may not use any Mark as a part of your corporate name or with any prefix, suffix, or other modifying words, terms, designs, or symbols (other than logos licensed by us to you) and you may not use them to incur any obligation or indebtedness on our behalf. You may not use any name or mark associated with the sale of any unauthorized product or services in any other manner not explicitly authorized in writing by us.

You may use only the Marks that we designate, must use them only in the manner that we authorize and permit, and must use them with the symbols, "®", "™", or "SM", as appropriate. You may use the Marks only in connection with the operation and promotion of the Franchised Business, and only in the manner we prescribe. You may not contest ownership or validity of the Marks or any registration of the Marks, or

our right to use or to sublicense the use of the Marks. You must sign all documents that we require in order to protect the Marks and to maintain their validity and enforceability.

**Internet and Social Media Usage**

You may not establish or maintain a web site or other presence or advertise on the World Wide Web portion of the Internet that reflects any of the Marks or our copyrighted works, or that includes the term "URBAN AIR TRAMPOLINE & ADVENTURE PARK" as part of any URL or domain name, or that otherwise states or suggests your affiliation with us or our franchise system. This prohibition includes use of the Marks or any derivative of the Marks as part of any URL, domain name, or unauthorized email addresses, as well as their registration as part of any user name on any gaming website or social media or networking website, including, but not limited to, INSTAGRAM, FACEBOOK, LINKEDIN, FOURSQUARE, YELP, URBANSPOON, or TWITTER, except as we expressly permit or prescribe. Our social media and networking policies will be provided to you in the Manual, and may be modified, amended, or terminated by us at any time.

**Infringement**

If there is any infringement of, or challenge to, your use of any name, mark, or symbol, you must immediately notify us, and we may take any action that we deem appropriate, in our sole discretion. The Franchise Agreement does not require us to take affirmative action if notified of the claim. We have the right to control all administrative proceedings or litigation involving your use of the Marks. The Franchise Agreement does not require us to participate in your defense or to indemnify you for expenses or damages if you are a party to an administrative or judicial proceeding based on your use of the Marks, or if the proceeding is resolved unfavorably to you.

We have the right to designate one or more new, modified or replacement Marks for your use and to require you to use the new, modified or replacement Marks in addition to or in lieu of any previously designated Marks. You must comply with the directive, at your expense, within 60 days following your receipt of written notice of the change.

The Site Selection Agreement does not grant you rights to use the Marks. These rights arise only under the Franchise Agreement.

## ITEM 14
## PATENTS, COPYRIGHTS AND PROPRIETARY INFORMATION

There are no patents or registered copyrights material to the franchise, but we claim copyright protection in many elements of the System including the Manual, the design elements of the Marks, our product packaging, signage our advertising and promotional materials, and the content and design of our web site ("Copyrighted Works").

You and your owners and employees must maintain the confidentiality of all trade secrets, the Standards and all other elements of the System, all customer information, all information contained in the Manual, and any other information that we designate as confidential ("Confidential Information"). Each of your owners must sign the Undertaking and Guaranty Agreement attached as Attachment D-1 to the Franchise Agreement and the Confidentiality and Non-Competition Agreement attached as Attachment D-2 to the Franchise Agreement. All of your employees with access to Confidential Information must also sign a confidentiality and non-competition agreement in the form designated by us.

You must promptly notify us of any apparent infringement of, or challenge to, your use of any of the Copyrighted Works or Confidential Information. We are not required to take affirmative action when notified of a claim, or to participate in your defense or indemnify you for expenses or damages if you are a party to an administrative or judicial proceeding involving any of the Copyrighted Works or Confidential Information, or if the proceeding is resolved unfavorably to you, but will take whatever action we determine to be appropriate under the circumstances. We have the right to control all administrative proceedings or litigation involving the Copyrighted Works and Confidential Information. If we or our affiliate undertakes

the defense or prosecution of any litigation pertaining to any of the Copyrighted Works or Confidential Information, you must sign all documents and perform such acts and things as, in the opinion of our legal counsel, may be necessary to carry out the defense or prosecution.

If you or any of your owners develops any new concept, product, sales technique, or improvement in the operation or promotion of the Franchised Business, you must promptly notify us, and provide to us all necessary related information. By signing the Franchise Agreement, you and each owner permanently and irrevocably assign your respective rights in and to the concept, product, sales technique, or improvement and permit us to use or disclose the information to our affiliates and other URBAN AIR TRAMPOLINE & ADVENTURE PARK franchisees as we determine appropriate, without providing you any compensation.

## ITEM 15
## OBLIGATION TO PARTICIPATE IN THE ACTUAL OPERATION
## OF THE FRANCHISE BUSINESS

Each URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchised Business must be supervised at all times by a Designated Manager, who must attend and complete to our satisfaction our initial training program and all other training that we require, and who must devote substantial full-time and best efforts, in person on a daily basis, to the supervision, operation, and conduct of the Franchised Business. We must approve your Designated Manager. We highly recommend, but do not require, that your Designated Manager own an equity interest in you if you are a corporation, partnership, limited liability company, or other legal entity. If your Designated Manager changes, you must immediately appoint a new Designated Manager, subject to our approval, and he or she must complete all training requirements within 60 days. (See Item 11)

Neither you nor any of your Designated Managers may own, maintain, advise, operate, engage in, be employed by, make loans to, invest in, provide any assistance to, or have any direct or indirect interest in (as owner or otherwise) or relationship or association with, any business that competes with URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchised Businesses or any of the products or services of URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchised Businesses. You also may not disclose any information contained in our Manual or other information proprietary to the System. Each Owner (regardless of the limitation of their ownership percentage in the Franchised Business), Designated Manager, any supervisors, and other key employees having access to our Manual and proprietary information must sign a Confidentiality and Non-competition Agreement substantially in the form of Attachment D-2 to the Franchise Agreement to covenant to us that you will not disclose our proprietary information and that you will conform to the covenant not to compete described in Item 17.

Each Owner of the franchise or the franchisee entity must sign an Undertaking and Guaranty substantially in the form of Attachment D-1 to the Franchise Agreement to personally guarantee to us that you will perform all obligations under the Franchise Agreement in a timely manner according to the respective terms of the Franchise Agreement.

An "Owner" is defined as you and your spouse if you are an individual, or any person with a five percent or greater equity interest in you (regardless of voting rights) if you are a corporation, partnership, limited liability company, or other legal entity.

## ITEM 16
## RESTRICTIONS ON WHAT THE FRANCHISEE MAY SELL

You may offer and sell only the products, goods, and services specifically authorized by us in writing; conversely, you may not offer or sell any products, goods, or services not specifically authorized by us in writing. We may, at any time and in our sole and absolute discretion, add, eliminate, or modify authorized products, goods, and services; there are no contractual limitations on our rights to make such changes.

We reserve the right to establish policies and programs regarding pricing of products and services, including, but not limited to, establishing the maximum and/or minimum retail prices, recommending retail

V.2

prices, advertising specific retail prices for some or all products or services sold at your Franchised Business, and developing and advertising price promotions or package promotions. We may compel you to observe, honor, and participate in any such policies or programs we establish.

The Franchise Agreement gives you the right to operate a single URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchised Business and to offer approved products, goods, and services only at the approved Franchised Business location. To the extent that we, from time to time, expand our service offerings to provide delivery or similar services, you may provide such services in the Protected Area (or other area that we may authorize) according to the Franchise Agreement and our then-current standards, policies, and procedures.

You must participate in and offer to your customers all customer loyalty and reward programs and all contests, sweepstakes, and other prize promotions. We will provide you the details of each program and promotion, and you must promptly display all point-of-sale advertising and promotion-related information at such places within the Franchised Business as we may designate. You must purchase and distribute all coupons, clothing, toys, and other collateral merchandise (and only the coupons, clothing, toys, and collateral merchandise) we designate for use in connection with each such program or promotion.

You may only use marketing and promotional materials that we have approved.

You must focus your marketing activities within your Protected Area. You may engage in direct marketing activities in the Protected Area (even if it is overlapping with another franchisee's protected area), and may engage in direct marketing activities outside your Protected Area, so long as the activities are not conducted in another franchisee's or licensee's protected area. For clarity, the term "direct marketing activities" include personal solicitations, direct mailings, sporting events sponsorships and advertising, and school event sponsorships and advertising. The term "direct marketing activities" does not include and, therefore, does not apply to web site advertising or your right to send targeted emails or text messages to your existing customers. We may develop policies and procedures that apply to all types of advertising and marketing efforts, including social media advertising, and you must comply with all policies and procedures that we develop. Except as described in this Item, you are not limited in the type of customers to whom you may sell approved products or services.

## ITEM 17
## RENEWAL, TERMINATION, TRANSFER AND DISPUTE RESOLUTION
## THE FRANCHISE RELATIONSHIP

**This table lists certain important provisions of the Site Selection and Franchise Agreements. You should read these provisions in the Site Selection Agreement and Franchise Agreement attached to this disclosure document.**

| Provision | Section in agreement | Summary |
|---|---|---|
| a. Length of the franchise term | Section 2.A of the Franchise Agreement | 10 years. |
| b. Renewal or extension of the term | Section 2.B of the Franchise Agreement | If you are in good standing you may elect to continue operating the franchise for up to three additional ten-year successor terms. You must pay us a renewal fee of $3,000 plus reimbursement of our legal and professional expenses. |
| c. Requirements for franchisee to renew or extend | Section 2.B of the Franchise Agreement | Provide notice; may not be in default of the Franchise Agreement or any other agreement; must renovate and modernize the Franchised Business to conform to our then-current image; you and employees must be in compliance with our then-current training requirements; you must have the right to possess the |

| Provision | Section in agreement | Summary |
|---|---|---|
| | | Franchised Business premises or have secured a substitute location; you and all guarantors must sign a release; must have operated substantially in accordance with the Franchise Agreement throughout the term.  If we permit you to renew, you must sign our then-current form of franchise agreement, which may be materially different than the current form and may reflect different royalty fee and advertising obligations. |
| d.   Termination by franchisee | No provision | Not applicable. |
| e.   Termination by franchisor without cause | No provision | Not applicable. |
| f.   Termination by franchisor with cause | Section 18 of the Franchise Agreement | We can terminate only if you are in default. |
| g.   "Cause" defined – curable defaults | Section 18.C of the Franchise Agreement | Your failure to pay monies owed to us or to our affiliates; misuse of the Marks or our copyrighted works or other intellectual property not cured within five days after delivery of written notice; Franchised Business is cited for violation of health, sanitation or safety laws or regulations not cured within five days after receipt of citation; failure to comply with any other provision of the Franchise Agreement, except as described in h, below. |
| h.   "Cause" defined – non-curable defaults | Section 18.A and 18.B of the Franchise Agreement | The Franchise Agreement will terminate automatically without notice and without an opportunity to cure upon the happening of certain bankruptcy or insolvency-related events, or upon foreclosure or lien against the assets of the Franchised Business.<br>We may terminate the Franchise Agreement without providing you an opportunity to cure if you fail to identify a site for the Franchised Business or to open the Franchised Business when required; you abandon the Franchised Business; you have made any false or misleading representations in your franchise application; you or any owner is convicted or pleads no contest to certain types of crimes; you or any owner violates confidentiality obligations; the Franchised Business fails quality assurance inspections; termination of any other franchise agreement between you or your affiliates and us; we deliver to you three or more notices of defaults during any rolling 24-month period, whether or not the defaults describes in the notices ultimately are cured. |
| i.   Franchisee's obligations on termination/nonrenewal | Article 5 of the Site Selection Agreement<br><br>Section 19 of the Franchise Agreement | Under the Site Selection Agreement, you must stop using and maintaining confidentiality of all confidential information; refrain from leasing or otherwise acquiring any real estate identified as a potentially suitable site for your franchise; refrain from diverting or attempting to divert prospective customers of ours to any Competitive Business (as defined in |

| Provision | Section in agreement | Summary |
|---|---|---|
| | | Attachment A to the Franchise Agreement in <u>Exhibit D-2</u>); and refrain from owning, maintaining, advising, operating, engaging in, and being employed by any Competitive Business.<br><br>Under the Franchise Agreement, obligations include ceasing to hold yourself out as a franchisee or former franchisee; canceling fictitious or assumed name; transferring the Franchised Business' telephone number to us; at our option, assigning us your interest in the lease for the Franchised Business premises; sell to us any of the Franchised Business' assets we elect to purchase; and comply with post term obligations (also see r, below). |
| j. Assignment of contract by franchisor | Article 6.1 of the Site Selection Agreement<br><br>Section 17.A of the Franchise Agreement | No restriction on our right to assign our interest in the Site Selection Agreement and the Franchise Agreement, or to transfer any of our assets. |
| k. "Transfer" by franchisee – defined | Section 17.B of the Franchise Agreement | Includes transfer of Franchise Agreement, transfer of the assets of the Franchised Business, and ownership changes. |
| l. Franchisor approval of transfer by franchisee | Section 17.B of the Franchise Agreement | We have the right to approve all transfers but will not unreasonably withhold approval. |
| m. Conditions for franchisor approval of transfer | Section 17.B of the Franchise Agreement | We may condition approval on satisfaction of the following: all monetary obligations must be satisfied; you must be in full compliance with the Franchise Agreement and all other agreements; you and each owner must sign a release; the transferee must meet our criteria for new franchisees; the transferee must sign our then-current form of franchise agreement for the remainder of the franchise term left on your agreement; the transferee must agree to refurbish the Franchised Business; you must agree to remain liable for all pre-transfer obligations; the transferee must comply with our then-current training requirements; the economic terms of the transfer may not, in our opinion, materially and adversely affect the post transfer viability of the Franchised Business. |
| n. Franchisor's right of first refusal to acquire franchisee's business | Section 17.E of the Franchise Agreement | We may match any bona fide offer to purchase your business. |
| o. Franchisor's option to purchase your business | No provision | Not applicable |
| p. Death or disability of franchisee | Section 17.F of the Franchise Agreement | Transfer of interest to his or her spouse or third party within six months of death or incapacity, subject to our approval and right of first refusal. |

| Provision | Section in agreement | Summary |
|---|---|---|
| q. Non-competition covenants during the term of the franchise | Article 5.4 of the Site Selection Agreement<br><br>Section 14 of the Franchise Agreement | Neither you nor any owner may be involved in any Competitive Business. |
| r. Non-competition covenants after the franchise is terminated or expires | Article 5.4 of the Site Selection Agreement; Section 14 of the Franchise Agreement | For a two-year period following termination of the Site Selection Agreement, neither you nor any owner may divert or attempt to divert to any Competitive Business any of our prospective or present customers and you may not be involved with any Competitive Business. For a two-year period following termination or expiration of the franchise, neither you nor any owner may be involved in any Competitive Business located *(1)* at the former Franchised Business location, *(2)* within the former Protected Area, or *(3)* within 25 miles of any other URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchised Business. |
| s. Modification of the agreement | Section 22.B of the Franchise Agreement | The Franchise Agreement may be modified only by a written document signed by both parties. |
| t. Integration/merger clause | Article 7.7 of the Site Selection Agreement<br><br>Section 22.A of the Franchise Agreement | The Site Selection and Franchise Agreements and its Attachments constitute the full and final agreement and are binding (subject to federal law).  Any other promises or statements may not be enforceable.<br>No claim made in any franchise agreement is intended to disclaim the express representations made in this disclosure document. |
| u. Dispute resolution by arbitration or mediation | No provision of the Franchise Agreement | Not applicable. |
| v. Choice of forum | Article 7.2 of the Site Selection Agreement<br><br>Section 23.B of the Franchise Agreement | Litigation must be instituted and maintained in the district courts of Tarrant County, Texas (subject to applicable state law). |
| w. Choice of law | Article 7.2 of the Site Selection Agreement<br><br>Section 23.A of the Franchise Agreement | Texas law applies (subject to applicable state law). |

## ITEM 18
## PUBLIC FIGURES

We do not currently use any public figure to promote the franchise.

## ITEM 19
## FINANCIAL PERFORMANCE REPRESENTATIONS

The FTC's Franchise Rule permits a franchisor to provide information about the actual or potential financial performance of its franchised and/or franchisor-owned outlets, if there is a reasonable basis for the information, and if the information is included in the disclosure document. Financial performance information that differs from that included in Item 19 may be given only if: (1) a franchisor provides the actual records of an existing outlet you are considering buying; or (2) a franchisor supplements the information provided in this Item 19, for example, by providing information about possible performance at a particular location or under particular circumstances.

The following chart reflects financial performance information for the 21 URBAN AIR TRAMPOLINE & ADVENTURE PARK facilities (16 franchised and five operated by us or our affiliate) that were fully open and operational as of December 31, 2016. The following 19 outlets are substantially similar to the franchises being offered.

| Full Year 2016 | Average Gross Annual Revenue[1] | Average Monthly Gross Revenue | EBITDAR[3] | EBITDAR Margin[4] |
|---|---|---|---|---|
| All 21 locations | $1,962,252.79 | $163,521.07 | $508,297.25 | 44.49% |
| 16 franchised locations[2] | $2,040,524.38 | $170,044 | $440,472.96 | 43.9% |

Note 1: Average Gross Annual Revenue reflects only gross sales. They do not reflect royalty fees, operating expenses, or other costs or expenses that must be deducted from gross sales to obtain net income or profit.

Note 2.  These locations are owned by franchisees, but we manage one facility under a management services agreement, as described below.

Note 3: "EBITDAR" is earnings before interest, taxes, depreciation, amortization, and restructuring or rent costs.

Note 4: "EBITDAR to Revenue Ratio" was calculated by dividing EBITDAR by Gross Revenue.

The following chart reflects the historical data for the 21(16 franchised and five operated by us or our affiliate) facilities that were operational for at least 30 days as of December 31, 2016.

**Financial Performance Data[8]**

Corporate Stores:

| Location | Number of Months Open As of 12/31/2016 | Annualized Gross Annual Revenue[1,7] | Gross Revenue[2,6] | Monthly Gross Revenue[3,6] | EBITDAR[4] | EBITDAR to Revenue Ratio[5] |
|---|---|---|---|---|---|---|
| Coppell, TX[7,10] | 11 | $1,269,872.64 | $1,164,049.92 | $105,823 | $386,516.22 | 33.2% |
| Frisco, TX[7] | 36 | $1,954,053.41 | $1,954,053.41 | $162,838 | $998,933.70 | 51.1% |
| Garland, TX[7] | 6 | $2,380,594.40 | $1,190,297.20 | $198,383 | $577,010.95 | 48.5% |
| Mansfield, TX[7] | 34 | $1,686,969.96 | $1,686,969.96 | $140,581 | $808,183.70 | 47.9% |
| Southlake, TX[7] | 62 | $1,423,971.20 | $1,423,971.20 | $118,664 | $720,381.70 | 50.6% |

Franchised Stores:

| Location | Number of Months Open As of 12/31/2016 | Annualized Gross Annual Revenue[1,6] | Gross Revenue[2,6] | Monthly Gross Revenue[3,6] | EBITDAR[4] | EBITDAR to Revenue Ratio[5] |
|---|---|---|---|---|---|---|
| Austin, TX | 17 | $1,203,934.02 | $1,203,934.02 | $100,328 | $489,769.16 | 40.7% |
| Bloomington, IN[11] | 4 | $1,825,379.64 | $608,459.88 | $152,115 | $297,138.75 | 48.8% |
| Downingtown, PA | 5 | $2,934,896.21 | $1,222,873.42 | $244,575 | $475,437.04 | 38.9% |
| Homewood, AL | 3 | $2,450,248.88 | $615,562.22 | $204,187 | $11,981.34 | 2.0% |

| Location | Number of Months Open As of 12/31/2016 | Annualized Gross Annual Revenue[1,6] | Gross Revenue[2,6] | Monthly Gross Revenue[3,6] | EBITDAR[4] | EBITDAR to Revenue Ratio[5] |
|---|---|---|---|---|---|---|
| Humble, TX | 4 | $2,460,272.28 | $820,090.76 | $205,0023 | $403,423.57 | 49.2% |
| NW Houston, TX | 2 | $2,337,894.18 | $389,649.03 | $193,825 | $328,255.64 | 84.2% |
| Overland Park, KS | 17 | $2,091,252.00 | $2,091,252.00 | $174,271 | $936,156.00 | 44.8% |
| Oxford, MI[9] | 5 | $2,109,561.91 | $878,984.13 | $175,797 | $242,422.01 | 26.4% |
| Rockwall, TX[8,9] | 32 | $1,265,859.89 | $1,265,859.89 | $105,488 | $332,398.07 | 26.3% |
| S. Portland, ME | 1 | $3,084,659.28 | $257,054.94 | $257,055 | $109,120.21 | 42.5% |
| Waco, TX[8] | 11 | $2,274,381.27 | $2,084,849.50 | $189,532 | $916,771.93 | 44.0% |
| Waxahachie, TX | 3 | $2,124,717.00 | $531,179.25 | $177,060 | $226,411.64 | 42.6% |
| Wichita, KS[2] | 24 | $1,353,343.00 | $1,353,343.00 | $112,779 | $481,003.00 | 35.5% |
| Wichita Falls, TX | 12 | $1,050,941.76 | $1,050,941.76 | $87,578 | $926,333.03 | 88.1% |

Note 1: "Annualized Gross Annual Revenue" is the total Gross revenue (including sales tax) realized divided by the number of months open during the year ended December 31, 2016, then multiplied by 12. For example, a store that realized $300,000 while open for five months would have an annualized gross annual revenue of $720,000.00 [$300,000 / 5 (12)].

Note 2: "Gross Revenue" is the total gross revenue (including sales tax) actually realized for the months in operation during calendar year ended December 31, 2016.

Note 3: "Monthly Gross Revenue" is the total gross revenue (including sales tax) actually realized divided by the number of months in operation during calendar year ended December 31, 2016.

V.2

Note 4: "EBITDAR" is earnings before interest, taxes, depreciation, amortization, and restructuring or rent costs.

Note 5: "EBITDAR to Revenue Ratio" was calculated by dividing EBITDAR by Gross Revenue.

Note 6: Sales are affected by a number of factors including local demographics (including daytime and residential population and income levels), site characteristics (*i.e.*, visibility, traffic count, ease of ingress and egress, parking availability), seasonality, local competition, brand and product awareness in the geographic area in which the Franchised Business is located, and your individual marketing efforts.

Note 7: This franchised location differs from other locations managed by us because the franchisee owns the real estate and leases to the Franchised Business at above-market rent, and uses company funds for non-franchised-location related expenses.

Note 8. This outlet is substantially similar to the franchises being offered, except that they have entered into a separate management services agreement with us. The management services agreement is an optional agreement entered into for managing the day-to-day operations of the franchise. Under the management services agreement, these facilities pay us a $120,000 annual management fee, which covers management personnel costs. If your franchise will be managed on-premises by a person with an ownership interest in the franchise, it will not pay a third-party management fee, but will compensate the owner for management services. Results will differ for a franchise who is an owner/operator.

Note 9. Franchisee owns the building and is charging above market rent to increase real estate value.

Note 10. Landlord provided $1,000,000 in Tenant Improvement dollars. As a result, the landlord is charging above-market rent. Franchisee only has $200,000 invested.

Note 11. Capital Expenditures associated with the buildout of the facility were removed from profit and loss statement of cash flows.

Written substantiation for this financial performance representation will be made available to prospective franchisees upon reasonable request.

New franchisees are likely to realize financial results that are different from the financial information contained in this Item 19.

Some franchises have earned these amounts. Your individual results may differ. There is no assurance that you will sell as much. We cannot estimate the results of any particular location or event.

Other than the preceding financial performance representation, UATP Management, LLC does not make any financial performance representations. We also do not authorize our employees or representatives to make any such representations either orally or in writing. If you are purchasing an existing outlet, however, we may provide you with the actual records of that outlet. If you receive any other financial performance information or projections of your future income, you should report it to the franchisor's management by contacting Michael Browning, Jr., 317 S. Jenkins, Suite C Grapevine, Texas 76051 (800) 960-4778, the Federal Trade Commission, and the appropriate state regulatory agencies.

**ITEM 20**
**OUTLETS AND FRANCHISEE INFORMATION**

**Table No. 1**
**System-Wide Outlet Summary**
**For Years 2014 to 2016**

| Outlet Type | Year | Outlets at the Start of the Year | Outlets at the End of the Year | Net Change |
|---|---|---|---|---|
| Franchised[1] | 2014 | 0 | 3 | +3 |
| | 2015 | 3 | 4 | +1 |
| | 2016 | 4 | 15 | +11 |
| Company Owned | 2014 | 3 | 3 | 0 |
| | 2015 | 3 | 3 | 0 |
| | 2016 | 3 | 5 | +2 |
| Total Outlets | 2014 | 3 | 6 | +3 |
| | 2015 | 6 | 7 | +1 |
| | 2016 | 7 | 20 | +13 |

Note 1: The Rockwall, Texas franchised location is managed by us under a management services agreement.

**Table No. 2**
**Transfers of Outlets from Franchisee to New Owners (other than the Franchisor)**
**For years 2014 to 2016**

| State | Year | Number of Transfers |
|---|---|---|
| Total | 2014 | 0 |
| | 2015 | 0 |
| | 2016 | 0 |

**Table No. 3**
**Status of Franchised Outlets[1]**
**For Years 2014 to 2016**

| State | Year | Outlets at Start of Year | Outlets Opened | Terminations | Non-Renewals | Reacquired by Franchisor | Ceased Operations-Other Reasons | Outlets at End of the Year |
|---|---|---|---|---|---|---|---|---|
| Alabama | 2014 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2015 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2016 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Kansas | 2014 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2015 | 1 | 1 | 0 | 0 | 0 | 0 | 2 |
| | 2016 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| Indiana | 2014 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2015 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2016 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Maine | 2014 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2015 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2016 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Michigan | 2014 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

| State | Year | Outlets at Start of Year | Outlets Opened | Terminations | Non-Renewals | Reacquired by Franchisor | Ceased Operations-Other Reasons | Outlets at End of the Year |
|---|---|---|---|---|---|---|---|---|
| | 2015 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2016 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Pennsylvania | 2014 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2015 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2016 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Texas | 2014 | 0 | 2 | 0 | 0 | 0 | 0 | 2 |
| | 2015 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| | 2016 | 2 | 6 | 0 | 0 | 0 | 0 | 8 |
| Total | 2013 | 0 | 3 | 0 | 0 | 0 | 0 | 3 |
| | 2014 | 3 | 5 | 0 | 0 | 0 | 0 | 8 |
| | 2015 | 4 | 11 | 0 | 0 | 0 | 0 | 15 |

### Table No. 4
### Status of Company Owned Outlets
### For Years 2014 to 2016

| State | Year | Outlets at Start of Year | Outlets Opened | Outlets Reacquired from Franchisees | Outlets Closed | Outlets Sold to Franchisees | Outlets at End of the Year |
|---|---|---|---|---|---|---|---|
| Texas | 2014 | 3 | 0 | 0 | 0 | 0 | 3 |
| | 2015 | 3 | 0 | 0 | 0 | 0 | 3 |
| | 2016 | 3 | 2 | 0 | 0 | 0 | 5 |
| Total | 2014 | 3 | 0 | 0 | 0 | 0 | 3 |
| | 2015 | 3 | 0 | 0 | 0 | 0 | 3 |
| | 2016 | 3 | 2 | 0 | 0 | 0 | 5 |

### Table No. 5
### Projected Openings
### As of December 31, 2016

| State | Franchise Agreements Signed But Outlet Not Opened | Projected New Franchised Outlets In the Next Fiscal Year | Projected New Company-Owned Outlets in the Next Fiscal Year |
|---|---|---|---|
| Alabama | 0 | 1 | 0 |
| Arkansas | 1 | 1 | 0 |
| Arizona | 0 | 1 | 0 |
| Colorado | 0 | 3 | 0 |
| Florida | 0 | 1 | 0 |
| Georgia | 0 | 1 | 0 |
| Idaho | 0 | 1 | 0 |
| Illinois | 1 | 2 | 0 |
| Indiana | 1 | 1 | 0 |
| Iowa | 0 | 1 | 0 |
| Louisiana | 0 | 1 | 0 |
| Maryland | 1 | 0 | 0 |

| State | Franchise Agreements Signed But Outlet Not Opened | Projected New Franchised Outlets In the Next Fiscal Year | Projected New Company-Owned Outlets in the Next Fiscal Year |
|---|---|---|---|
| Massachusetts | 0 | 1 | 0 |
| Michigan | 0 | 1 | 0 |
| Minnesota | 1 | 0 | 0 |
| Missouri | 0 | 1 | 0 |
| Nebraska | 1 | 0 | 0 |
| North Carolina | 1 | 0 | 0 |
| New Jersey | 2 | 1 | 0 |
| Ohio | 2 | 1 | 0 |
| Oklahoma | 1 | 1 | 0 |
| Pennsylvania | 1 | 1 | 0 |
| Tennessee | 2 | 0 | 0 |
| Texas | 6 | 4 | 1 |
| Total | 21 | 25 | 1 |

See Exhibit F to this disclosure document for a list of our current franchisee locations and current affiliate-owned locations.  No franchisee has had a Franchised Business terminated, cancelled, not renewed or otherwise voluntarily or involuntarily ceased to do business under a Franchise Agreement during the most recently completed fiscal year or has failed to communicate with us within ten weeks of the application date.  If you buy this franchise, your contact information may be disclosed to other buyers when you leave the franchise system.

During the last three fiscal years, we have not signed confidentiality clauses with any current or former franchisee.

We are not aware of any trademark-specific franchisee organization associated with this franchise system.

## ITEM 21
## FINANCIAL STATEMENTS

Attached as Exhibit E are our audited balance sheets as of December 31, 2016, 2015, and 2014, and the related statements of operations and changes in members' equity (deficit), and cash flows for the years then ended.

Also attached as Exhibit E is our unaudited balance sheet as of April 25, 2017, and unaudited income and expense statements for the period January 1, 2017, through April 25, 2017. THESE FINANCIAL STATEMENTS HAVE BEEN PREPARED WITHOUT AN AUDIT. PROSPECTIVE FRANCHISEES OR SELLERS OF FRANCHISES SHOULD BE ADVISED THAT NO INDEPENDENT CERTIFIED PUBLIC ACCOUNTANT HAS AUDITED THESE FIGURES OR EXPRESSED AN OPINION WITH REGARD TO THEIR CONTENT OR FORM.

## ITEM 22
## CONTRACTS

Attached as Exhibit D-1 to this disclosure document is a copy of the Site Selection Agreement and the following attachments to the Site Selection Agreement:

| | |
|---|---|
| Attachment A | Description of the Site Selection Area |
| Attachment B | Franchise Agreement |
| Attachment C | Lease Rider |

V.2

Attached as <u>Exhibit D-2</u> to this disclosure document is a copy of the Franchise Agreement and the following attachments to the Franchise Agreement:

| | |
|---|---|
| <u>Attachment A</u> | Glossary of Additional Terms |
| <u>Attachment B</u> | Approved Location and Protected Area |
| <u>Attachment C</u> | Franchisee's Owners and Key Personnel |
| <u>Attachment D-1</u> | Undertaking and Guaranty |
| <u>Attachment D-2</u> | Confidentiality and Non-Competition Agreement |
| <u>Attachment E</u> | Electronic Debit Authorization |
| <u>Attachment F</u> | Telephone Assignment Agreement |
| <u>Attachment G</u> | Lease Rider |

Attached as <u>Exhibit I</u> to this disclosure document is a sample form of the General Release.

Attached as <u>Exhibit G</u> to this disclosure document is a sample form of the Promissory Note and Security Agreement.

**ITEM 23**
**RECEIPT**

The last two pages of this disclosure document are detachable duplicate Receipts.  Please sign and date both copies of the Receipt.  Keep one signed copy of the Receipt for your file and return to us the other signed copy of the Receipt.  The Receipt page also contains the names, addresses and telephone numbers of our franchise sellers or brokers.

**UATP MANAGEMENT, LLC**

**STATE SPECIFIC APPENDIX**

**FOR THE STATE OF CALIFORNIA**

THE CALIFORNIA FRANCHISE INVESTMENT LAW REQUIRES THAT A COPY OF ALL PROPOSED AGREEMENTS RELATING TO THE SALE OF THE FRANCHISE BE DELIVERED TOGETHER WITH THE DISCLOSURE DOCUMENT.

The California Corporations Code, Section 31125, requires us to give you a disclosure document, in a form containing the information that the commissioner may by rule or order require, before a solicitation of a proposed material modification of an existing franchise.

Item 3 of the disclosure document is supplemented by the following:

> Neither the franchisor nor any person identified in Item 2 of the disclosure document is subject to any current effective order of any national securities association or national securities exchange as defined in the Securities Exchange Act of 1934, U.S.C.A., 78a *et. seq.*, suspending or expelling such persons from membership in such association or exchange.

Item 17 of the disclosure document is supplemented by the following:

> California Business and Professions Code, Sections 20000 through 20043 provides rights to the franchisee concerning transfer, termination or nonrenewal of a franchise. If the Franchise Agreement contains a provision that is inconsistent with the law, the law will control.

> You must sign a general release if you renew or transfer your franchise. California Corporations Code Section 31512 voids a waiver of your rights under the Franchise Investment Law (California Corporations Code Sections 31000 through 31516). Business and Professions Code Section 20010 voids a waiver of your rights under the Franchise Relations Act (Business and Professions Code Sections 20000 through 20043).

> The Franchise Agreement contains a covenant not to compete that extends beyond expiration or termination of the agreement. This provision may not be enforceable under California law.

> The Franchise Agreement provides for termination upon bankruptcy. This provision may not be enforceable under federal bankruptcy law (11 U.S.C.A. § 101 et seq.).

> The Franchise Agreement provides for mediation for certain disputes. The mediation will occur at Los Angeles, California with the costs and expenses, including the compensation and expenses of the mediator (but excluding attorneys' fees incurred by either party) will be borne equally by the parties.

> Prospective franchisees are encouraged to consult private legal counsel to determine the applicability of California and federal laws (such as Business and Professions Code Section 20040.5, Code of Civil Procedure Section 1281, and the Federal Arbitration Act) to any provisions of a franchise agreement restricting venue to a forum outside the State of California.

> While the earnings claims figures do reflect certain costs of goods sold, they do not reflect all operating expenses or other costs or expenses that must be deducted from the gross revenue or gross sales figures to obtain your net income or profit. You should conduct an independent investigation of the costs and expenses you will incur in operating your franchise business. Franchisees or former franchisees, listed in the offering circular, may be one source of this information.

> The indemnification provision in the Franchise Agreement may not be fully enforceable as to punitive damages under California law.

OUR WEBSITE CAN BE FOUND AT www.urbanairtrampolinepark.com. OUR WEBSITE HAS NOT BEEN REVIEWED OR APPROVED BY THE CALIFORNIA DEPARTMENT OF BUSINESS OVERSIGHT. ANY COMPLAINTS CONCERNING THE CONTENT OF THIS WEBSITE MAY BE DIRECTED TO THE CALIFORNIA DEPARTMENT OF BUSINESS OVERSIGHT AT www.dbo.ca.gov.

**FOR THE STATE OF ILLINOIS**

Item 17 is supplemented by the following:

> Section 705/4 of the Illinois Franchise Disclosure Act of 1987 (the "Act") provides that any provision in the Franchise Agreement that designates venue outside of Illinois is void with respect to any cause of action that is otherwise enforceable in Illinois; however, the Agreement may provide for arbitration in a forum outside of Illinois.

> Notwithstanding the provisions of the Franchise Agreement that Texas law shall govern, Illinois law shall apply to and govern any claim between the parties under the Franchise Agreement that alleges violation of the Act.

The conditions under which your franchise can be terminated and your rights on renewal may be affected by Illinois law, 815 ILCS 705/19 and 705/20.

**FOR THE STATE OF MARYLAND**

Item 17 of the disclosure document is supplemented as follows:

> The Franchise Agreement provides for termination upon bankruptcy. These provisions may not be enforceable under federal bankruptcy law.

> Any provisions requiring you to sign a general release of claims against us, including upon renewal, transfer or any amendment of the Franchise Agreement, does not release any claim you may have under the Maryland Franchise Registration and Disclosure Law.

> Any claims arising under the Maryland Franchise Registration and Disclosure Law must be brought within 3 years after the grant of the franchise.

> You may bring a lawsuit in Maryland for claims arising under the Maryland Franchise Registration and Disclosure Law.

> Nothing in this General Release attached as Exhibit I shall operate to release us from any liability under the Maryland Franchise Registration and Disclosure Law.

**FOR THE STATE OF MINNESOTA**

The following is added to the risk factors on the Cover Page:

> PURSUANT TO MINN. STAT. §80C.21 AND MINN. RULE PART 2860.400J, SECTIONS 1 AND 2 ABOVE WILL NOT IN ANY WAY ABROGATE OR REDUCE YOUR RIGHTS AS PROVIDED FOR IN MINNESOTA STATUTES 1984, CHAPTER 80C, INCLUDING THE RIGHT TO SUBMIT MATTERS TO THE JURISDICTION OF THE COURTS OF MINNESOTA.

> WE DO NOT OWN THE MARKS. HOWEVER, OUR AFFILIATE, UATP IP, LLC, HAS LICENSED THE USE OF THE MARKS TO US AS DISCLOSED IN ITEM 13 OF THIS FRANCHISE DISCLOSURE DOCUMENT.

The following sentence supplements Item 13:

> Pursuant to Minnesota Stat. §80C.21, Subj. 1(g), we are required to protect any rights which you have to use our proprietary marks.

Item 17 of the Franchise Disclosure Document is supplemented by the following:

> With respect to franchises governed by Minnesota law, we will comply with Minn. Stat. Sec. 80C.14, Subds. 3, 4 and 5 which require, except in certain specified cases, that (1) a franchisee be given 90 days' notice of termination (with 60 days to cure) and 180 days' notice for non-renewal of the Agreement and (2) that consent to the transfer of the franchise will not be unreasonably withheld.

> Minn. Stat. Sec. 80C.21 and Minn. Rule 2860.4400J prohibit us from requiring litigation to be conducted outside Minnesota. In addition, nothing in the Franchise Disclosure Document or Franchise Agreement can abrogate or reduce any of your rights as provided for in Minnesota Statutes 1984, Chapter 80C, or your rights to any procedure, forum or remedies provided for by the laws of the jurisdiction.

> Any release as a condition of renewal and/or assignment/transfer will not apply to the extent prohibited by applicable law with respect to claims arising under Minn. Rule 2860.4400D.

## FOR THE STATE OF NEW YORK

1.  All references made herein to a Disclosure Document shall be amended to Offering Prospectus.

2.  The following paragraphs are added to the Franchise Disclosure Document Cover Page:

> INFORMATION COMPARING FRANCHISORS IS AVAILABLE. CALL THE STATE ADMINISTRATORS LISTED IN <u>EXHIBIT B</u> OR YOUR PUBLIC LIBRARY FOR SOURCES OF INFORMATION. IF YOU LEARN THAT ANYTHING IN THIS DISCLOSURE DOCUMENT IS UNTRUE, CONTACT THE FEDERAL TRADE COMMISSION AND THE NEW YORK STATE DEPARTMENT OF LAW, BUREAU OF INVESTOR PROTECTION AND SECURITIES, 120 BROADWAY, 23RD FLOOR, NEW YORK, NEW YORK, 10271-0332.

> WE MAY, IF WE CHOOSE, NEGOTIATE WITH YOU ABOUT ITEMS COVERED IN THE PROSPECTUS. HOWEVER, WE CANNOT USE THE NEGOTIATING PROCESS TO PREVAIL UPON A PROSPECTIVE FRANCHISEE TO ACCEPT TERMS WHICH ARE LESS FAVORABLE THAN THOSE SET FORTH IN THIS PROSPECTUS.

> WE REPRESENT THAT THIS PROSPECTUS DOES NOT KNOWINGLY OMIT ANY MATERIAL FACT OR CONTAIN ANY UNTRUE STATEMENT OF A MATERIAL FACT.

3.  Item 3, <u>LITIGATION</u>, of the Disclosure Document is supplemented by the following:

> Neither the franchisor, its predecessor, nor any person identified in Item 2, nor an affiliate offering franchises under the franchisor's principal trademark:

> A.  Has an administrative, criminal, or civil action pending against that person alleging a felony, a violation of a franchise, antitrust or securities law, fraud, embezzlement, fraudulent conversion, misappropriation of property, unfair or deceptive practices or comparable civil or misdemeanor allegations, and there are no pending actions, other than routine litigation incidental to the business, which are significant in the context of the number of franchisees and the size, nature or financial condition of the franchise system or its business operations.

> B.  Has been convicted of a felony or pleaded nolo contendere to a felony charge or, within the ten-year period immediately preceding the application for registration, has been convicted of a or pleaded nolo contendere to a misdemeanor charge or has been the subject of a civil action alleging: violation of any franchise law, antifraud or securities law, fraud, embezzlement,

V. 2

fraudulent conversion, or misappropriation of property, or unfair or deceptive practices or comparable allegations.

C. Is subject to a currently effective injunctive or restrictive order or decree relating to the franchise, or under a Federal, State or Canadian franchise, securities, antitrust, trade regulation, or trade practice law, resulting from a concluded or pending action or proceeding brought by a public agency; or is subject to any currently effective order of any national securities association or national securities exchange, as defined in the Securities and Exchange Act of 1934, suspending or expelling such person from membership in such association or exchange; or is subject to a currently effective injunctive or restrictive order relating to any other business activity as a result of an action brought by a public agency or department, including, without limitation, actions affecting a license as a real estate broker or sales agent.

4.    Item 4, <u>BANKRUPTCY</u>, of the Disclosure Document is supplemented by the following:

Neither the franchisor, its affiliate, its predecessor, nor its officers, or general partner during the 10-year period immediately before the date of the offering circular:

(a) filed as debtor (or had filed against it) a petition to start an action under the U.S. Bankruptcy Code;

(b) obtained a discharge of its debts under the bankruptcy code; or

(c) was a principal officer of a company or a general partner in a partnership that either filed as a debtor (or filed against it) a petition to start an action under the U.S. Bankruptcy Code or that obtained a discharge of its debts under the U.S. Bankruptcy Code during or within 1 year after the officer or general partner of the franchisor held this position in the company or partnership.

5.    Item 17, <u>RENEWAL TERMINATION, TRANSFER AND DISPUTE RESOLUTION</u>, of the Disclosure Document is supplemented by the following:

Item 17, section (d), Termination by franchisee: The franchisee may terminate the agreement on any grounds available by law.

Item 17, section (j), Assignment of contract by franchisor: However, no assignment will be made except to an assignee who, in good faith and judgment of the franchisor, is willing and financially able to assume the franchisor's obligations under the franchise agreement.

Item 17, section (w), Choice of law: The foregoing choice of law should not be considered a waiver of any right conferred upon the franchisor or upon the franchisee by article 33 of the General Business law of the state of New York. The New York Franchises Law requires that New York govern any cause of action which arises under the New York Franchises Law.

The New York General Business Law, Article 33, Sections 680 through 695 may supersede any provision of the Franchise Agreement that is inconsistent with that law.

**FOR THE STATE OF VIRGINIA**

In recognition of the restrictions contained in Section 13.1-564 of the Virginia Retail Franchising Act, Item 17.h. of the Franchise Disclosure Document for UATP Management, LLC is supplemented by the following:

"Under Section 13.1-564 of the Virginia Retail Franchising Act, it is unlawful for a franchisor to cancel a franchise without reasonable cause. If any grounds for default or termination stated in the Franchise Agreement do not constitute "reasonable cause", as that term may be defined in the Virginia Retail Franchising Act or the laws of Virginia, that provision may not be enforceable."

**<u>FOR THE STATE OF WISCONSIN</u>**

ITEM 17 of the Disclosure Document is supplemented by the following:

- For franchisees subject to the Wisconsin Fair Dealership law, CH. 135, Stats., provisions in the Fair Dealership Law supersede any inconsistent provisions of the Franchise Agreement or a related contract.

**EXHIBIT A**

**FRANCHISE DISCLOSURE DOCUMENT**

**OPERATIONS MANUAL TABLE OF CONTENTS**

Table of Contents to Operations Manual

## SECTION A: INTRODUCTION

**WELCOME LETTER FROM THE FOUNDER**                              1
**MISSION STATEMENT**                                            2
**HISTORY OF URBAN AIR**                                         3

**SERVICES PROVIDED TO FRANCHISEES**
Territorial Exclusivity                                         4
Site Selection                                                 5
Initial Training                                               6
Initial Onsite Assistance                                      7
Ongoing Training and Support                                   8
Approved Suppliers                                             9
Advertising Materials and Sales Aids                          10
Ongoing Research and Development                              11

**FRANCHISEE RESPONSIBILITIES**
Responsibilities to Your Customers                            12
Responsibilities to -Your Staff                              13
Responsibilities to Your Fellow Franchisees                  14
Responsibilities to the Franchisor                           15

**VISITS FROM THE CORPORATE OFFICE**                           16

**PAYING OTHER FEES**
Additional Training                                          17
Transfer                                                     18
Audits                                                       19
Late Payments                                                20
Supplier Inspection/Testing                                  21
Indemnification                                              22
Enforcement                                                  23
Replacement Fee for Manual                                   24

## SECTION B: PRE·OPENING PROCEDURES

**PRE-OPENING RESPONSIBILITIES**
Pre-Opening Checklists                                       25

**SITE SELECTION  PROCESS**
Site Select ion Criteria                                    30
Market Analysis                                             31
Gaining Site Selection Approval                             32
Lease Considerations                                        33
**SETTING UP THE TRAMPOLINE & ADVENTURE PARK**
Building Out the Facility                                   34
Construction Specifications                                 35
Selecting a Contractor                                      36

URBAN AIR TRAMPOLINE & ADVENTURE PARK                    Operations Manual Table of Contents
Franchise Disclosure Document | 2017          1                           Exhibit A

V.2

Design Criteria                                      37
Required Equipment, Fixtures, and Furnishings        38
Exterior and Interior Signage Requirements           48

**INITIAL INVENTORY**                               58

**REQUIRED UTILITIES AND SERVICES**                 68

**SETTING UP BANK ACCOUNTS**
Accounts to Open                                     69

**SETTING UP INTERNAL SYSTEMS**
Point Of Sale                                        70
Waiver System                                        71
Online Ticketing                                     72
Marketing Systems                                    73
HR & Payroll                                         74
TV & Internet                                        75
Music Services & Licensing                           76

**PROCURING REQUIRED INSURANCE**                    77

**CONDUCTING YOUR GRAND OPENING**
Selecting A Grand Opening Date                       78
Soft Opening                                         79
Planning                                             80
Pre-Marketing Facility                               81
Grand Opening Specials/Promotions                    82

**SECTION C: HUMAN RESOURCES**

**PROFILE OF IDEAL URBAN AIR EMPLOYEE**

**JOB DESCRIPTIONS**
General Manager                                      83
Park Lead                                            84
Event Coordinator                                    85
Fitness Coordinator                                  86
Court Engineer                                       87
Fitness Instructor                                   88
Front Desk                                           89
Court Monitor
Party Host                                           90
                                                     91

**RECRUITING EMPLOYEES**
Determining Hiring Needs                             92
Getting the Word Out                                 93
Evaluating the Applications                          94
Conducting Interviews                                95
Sample Interview Questions                           96
Testing Procedures                                   97

URBAN AIR TRAMPOLINE & ADVENTURE PARK                Operations Manual Table of Contents
Franchise Disclosure Document | 2017            2             Exhibit A

V.2

Background Reference Checks 98
Job Offer 99

**HIRING ON A TRIAL PERIOD** 100

**COMPLETING NECESSARY PAPERWORK**
Online Paperwork Process 101

**TRAINING EMPLOYEES**
Training Tips 102
Orienting New Employees 103
Initial Training of New Employees 104
Ongoing Training Process 105

**PERSONNEL POLICIES** 106

**TIME TRACKING PROCEDURES**
Time Clock Correction Sheet 107

**UNIFORM AND DRESS CODE** 108

**PERFORMANCE EVALUATIONS**
Evaluation Process 109
Review Meeting 110

**EMPLOYEE DISCIPLINE**
Termination 111
Suspension 112

**SECTION D: SALES PROCEDURES**
**HANDLING INQUIRIES**
Properly Greeting Customers 113
Explanation of What Is Urban Air 114
Trampoline Activity Area Descriptions 115
Frequently Asked Questions and Answers 116

**EXPLAINING URBAN AIR POLICIES**
Waiver Requirement 117
Capacity Restriction 118
Birthday Party Policies 119
-    No outside food or drinks
-    Cancellation policy
-    Counting Of Jumpers
-    Coupon Policy
120
**SELLING OPEN-.JUMP TICKETS**

**SELLING BIRTHDAY PARTIES**
Overview of the Birthday Party Offering 121
Guidelines for Booking Parties 122
Sample Script 123

URBAN AIR TRAMPOLINE & ADVENTURE PARK                    Operations Manual Table of Contents
Franchise Disclosure Document | 2017              3                    Exhibit A

V.2

Follow-up Procedures                                      124
Typical Questions and Their Answers                      125
Handling Objections                                       126
How To Book A Birthday Party                             127

**SELLING FITNESS CLASSES**
Overview of the Classes                                   137
Sample Script                                             138
Follow-up Procedures                                      139
Typical Questions and Their Answers                      140

**SELLING SPECIAL EVENTS**
Overview of the various event types                      141
Pricing Guidelines                                        142
Sample Script                                             152
Follow-up Procedures                                      153
Typical Questions and Their Answers                      154

**SECTION E: DAILY OPERATING PROCEDURES**

**SUGGESTED HOURS OF OPERATION**                         155

**DAILY PROCEDURES**
Opening Procedures & Checklist                            156
On-going Procedures & Checklist                           157
Administrative Procedures & Checklist                     158
Closing Procedures& Checklist                             159

**CUSTOMER SERVICE PROCEDURES**
Urban Air Customer service Philosophy                    160
Maintaining Client Relations                              161
Handling Customer Complaints                              162
   -    Email Script
   -    Phone Script
   -    In Person Script
Handling Refund Requests                                  165
Handling Negative Reviews Online                          166

**PRE-BIRTHDAY PARTY PROCEDURES**
Online Orders Pending Review                              167
Party Confirmations Week Of                               168
Completing Party Sheets                                   169
Completing Party Block Report                             170
Completing Pizza Sheets                                   171

**DAY OF BIRTHDAY PARTY PROCEDURES**
Room/Table set Up                                         172
Check-in Time                                             173
How to Check-In Guests                                    174
   -    Greeting
   -    Check Waiver

URBAN AIR TRAMPOLINE & ADVENTURE PARK                Operations Manual Table of Contents
Franchise Disclosure Document | 2017          4                            Exhibit A

V.2

How to keep tabs on additional items                                 175
How To Checkout a Party                                              176
Party Cleanup                                                        177

**FRONT DESK PROCEDURES**
General Rules For Front Desk Personnel                               178
-    Greeting Customers At The Door
-    Thanking Customers As They Leave
Cash Handling Procedures At Register                                 179
Accepting Checks                                                     180
Accepting Credit and Debit Cards                                     181
Post-transaction Procedures                                          182
Petty Cash Transactions                                             183

POINT OF SALE SYSTEM
How to Log Into POS System                                          184
How to Ring Up Transactions                                          185
-    Cash
-    Credit
-    With Coupons
-    Split Payments: Cash and Credit
-    Using A Gift Card
How To Book A Birthday Party                                         190
How To Checkout  A Birthday Party                                    195
How To Move A Party To A New Date & Time                             200
How to Cancel A Party                                                202
How To Sell A Gift Card                                              204

WAIVER SYSTEM
How to Log Into Waiver System                                        205
How to look up a customer                                            206
How to check-in a customer                                           207
How to verify a customer has a membership                            208

HOW TO REDEEM VOUCHERS
Groupon, Living Social, Alike                                       210
LocBox

**COURT SAFETY**
Daily Trampoline Inspection                                          211
Wristband Requirements                                               212
Rules Signage                                                        213
How To Enforce The Rules                                             220
Court Monitor Responsibilities                                       221
Court Monitor Positioning                                            222

**INCIDENTS**
Dealing with an Incident In the Moment                               223
Reporting Incidents                                                  224
-    Incident Report
-    Waiver

URBAN AIR TRAMPOLINE & ADVENTURE PARK                    Operations Manual Table of Contents
Franchise Disclosure Document | 2017              5                      Exhibit A

V.2

- Video

## SECURITY ISSUES

Unruly Customers                                                      230
Robbery                                                               230
Burglary                                                              230
Bomb Threat                                                           230

### SECTION F: MANAGING AN URBAN AIR

## MANAGING PERSONNEL

Motivating Employees                                                  231
Communicating with Employees                                          232
Hosting Employee Meetings                                             233
Setting Up Employees In HR System                                     234

## SHIFT PLANNING OVERVIEW

Adding and Deactivating Employees                                     236
Efficient Schedule Strategies                                         238
Setting Up A Schedule                                                 245
Publishing A Schedule                                                 246
Managing Time Off Requests                                            247
Managing Trades                                                       248
Time Clock Correction Sheets                                          250

## PAYROLL PROCESSING

Connection Between Shift Planning System & Payroll System             251
Reviewing Schedule                                                    252
Exporting Hours                                                       253
Exporting Tips                                                        254
Payroll Process                                                       255

## MANAGING POINT OF SALE SYSTEM

How to Issue A Refund                                                 256
Hot to add, edit and delete employees from Point Of Sale System       258
How to change staff permission levels                                 260
Features of the POS System                                            262
Reports                                                               264

## MANAGING THE CUSTOMER EXPERIENCE

Communicating with Customers As Manager                               265
Using Customer Service Card                                           266
Recommended Owners Information Policy                                 267
Maintaining Positive Environment                                     268

## INVENTORY MANAGEMENT

Product Ordering Procedures                                           269
Ordering from Approved Suppliers                                      270
Changing Approved Suppliers                                           271
Product Receiving Procedures                                          272
Labeling and Rotating Inventory                                       273

URBAN AIR TRAMPOLINE & ADVENTURE PARK                    Operations Manual Table of Contents
Franchise Disclosure Document | 2017          6                              Exhibit A

V.2

Storing Procedures                                          274
Tracking Inventory                                          275

**OPERATIONAL AND FINANCIAL REPORTING**
Generating All Necessary Reports                            276
Analyzing the Reports                                       277

**LOSS PREVENTION TECHNIQUES**
Change Bag                                                  278
Drop Safe                                                   279
Employee Safe                                               280
Inventory                                                   281

**FRANCHISE REPORTING**
Royalty Payment                                             282
Advertising Contributions                                   283
Required Weekly Reports                                     284
Electronic Funds Transfer                                   285
Financial Statements                                        286

## SECTION G: CLEANING & MAINTENANCE

**CLEANING PROCEDURES**
Recommended Cleaning Products                               287
Daily Procedures                                            288
Weekly Procedures                                           289
Monthly Procedures                                          290
Cleaning Checklists                                         291

**MAINTENANCE PROCEDURES**
Required Maintenance Schedule                               292
Conducting Court and Materials Inspections                  293
Changing Out A Bed                                          294
Fixing A Basketball Rim                                     295
Fixing Holes in Netting                                     296

## SECTION H: MARKETING AND PROMOTION

**DONATIONS PROGRAM**
Goal Of Donations Program                                   297
How To Trade Donations For Sponsorships                     298
Birthday Party Donations                                    299
Family Fun Pack Donations                                   300
Class Fun Pack Donations                                    301

**FUNDRAISERS**                                             302

**INTERNAL MARKETING**
In-Store Signage                                            303
Brochures                                                   304
Audio Files / Announcements                                 305

URBAN AIR TRAMPOLINE & ADVENTURE PARK                    Operations Manual Table of Contents
Franchise Disclosure Document | 2017            7                                 Exhibit A

V.2

**EXTERNAL MARKETING**
Creating A Street Team                                    306
Community Events                                          307
Magazines – Editorial                                     308
Magazines – Coupons                                       309
Email Marketing                                           310
Social Media Marketing                                    311
TV                                                        312
Direct Mail                                               313
Radio                                                     314
Google Ad words                                           315
Search Engine Optimization                                316

**BRAND GUIDELINES**                                      317

**LOGO SPECIFICATIONS**                                   320

**REQUIRED ADVERTISING EXPENDITURES**
Grand Opening Advertising Requirement                     321
Monthly Advertising Requirements                          322

**OBTAINING ADVERTISING APPROVAL**                        323

**ADDENDUM: FORMS**

URBAN AIR TRAMPOLINE & ADVENTURE PARK                    Operations Manual Table of Contents
Franchise Disclosure Document | 2017          8                        Exhibit A

V.2

**EXHIBIT B**
**FRANCHISE DISCLOSURE DOCUMENT**

**LIST OF STATE ADMINISTRATORS**

## LIST OF STATE ADMINISTRATORS

| STATE | STATE ADMINISTRATOR |
|---|---|
| **CALIFORNIA** | Department of Business Oversight<br>320 West 4th Street, Suite 750<br>Los Angeles, California 90013<br>(213) 576-7505<br>(866) 275-2677 |
| **HAWAII** | Commissioner of Securities of the State of Hawaii<br>Department of Commerce and Consumer Affairs<br>Business Registration Division<br>Securities Compliance Branch<br>335 Merchant Street<br>Honolulu, Hawaii 96813<br>(808) 586-2722 |
| **ILLINOIS** | Franchise Bureau<br>Office of the Attorney General<br>500 South Second Street<br>Springfield, Illinois 62706<br>(217) 782-4465 |
| **INDIANA** | Securities Commissioner<br>Indiana Securities Division<br>302 West Washington St., Room E-111<br>Indianapolis, Indiana 46204<br>(317) 232-6681 |
| **MARYLAND** | Office of the Attorney General<br>Securities Division<br>200 St. Paul Place<br>Baltimore, Maryland 21202-2021<br>(410) 576-6360 |
| **MICHIGAN** | Michigan Department of Attorney General<br>Consumer Protection Division<br>Franchise Section<br>525 West Ottawa Street<br>G. Mennen Williams Building, 1st Floor<br>Lansing, Michigan 48909<br>(517) 373-1837 |
| **MINNESOTA** | Minnesota Department of Commerce<br>85 7th Place East, Suite 500<br>St. Paul, Minnesota 55101-2198<br>(651) 296-4026 |
| **NEW YORK** | New York State Department of Law<br>Bureau of Investor Protection and Securities<br>120 Broadway, 23rd Floor<br>New York, New York 10271-0332<br>(212) 416-8000 |
| **NORTH DAKOTA** | North Dakota Securities Department<br>600 East Blvd. Avenue<br>State Capitol, Fifth Floor, Dept. 414<br>Bismarck, North Dakota 58505-0510<br>(701) 328-4712 |

| STATE | STATE ADMINISTRATOR |
|---|---|
| **RHODE ISLAND** | Securities Division<br>Department of Business Regulation<br>1511 Pontiac Avenue<br>John O. Pastore Complex – Building 69-1<br>Cranston, Rhode Island  02920<br>(401) 462-9585 |
| **SOUTH DAKOTA** | Department of Labor and Regulation<br>Division of Securities<br>124 S. Euclid, Suite 104<br>Pierre, South Dakota 57501<br>(605) 773-4823 |
| **VIRGINIA** | State Corporation Commission<br>Division of Securities and Retail Franchising<br>1300 East Main Street, 9th Floor<br>Richmond, Virginia  23219<br>(804) 371-9051 |
| **WASHINGTON** | Department of Financial Institutions<br>Securities Division<br>150 Israel Road SW<br>Tumwater, Washington 98501<br>(360) 902-8760 |
| **WISCONSIN** | Securities and Franchise Registration<br>Wisconsin Securities Commission<br>345 West Washington Street, 4th Floor<br>Madison, Wisconsin  53703<br>(608) 266-3364 |

**EXHIBIT C**
**FRANCHISE DISCLOSURE DOCUMENT**

**LIST OF AGENTS FOR SERVICE OF PROCESS**

## LIST OF AGENTS FOR SERVICE OF PROCESS

| | |
|---|---|
| **CALIFORNIA**<br>Department of Business Oversight<br>Division of Corporations<br>320 W. 4th Street, Suite 750<br>Los Angeles, California 90013<br><br>**ILLINOIS:**<br>Office of the Attorney General<br>500 South Second Street<br>Springfield, Illinois 62706<br><br>**INDIANA:**<br>Indiana Secretary of State<br>302 West Washington Street<br>Room E-111<br>Indianapolis, Indiana 46204<br><br>**MARYLAND:**<br>Securities Commissioner<br>Division of Securities<br>200 St. Paul Place<br>Baltimore, Maryland 21202-2020<br><br>**MICHIGAN:**<br>Michigan Department of Attorney General<br>Consumer Protection Division<br>Franchise Section<br>525 W. Ottawa Street<br>G. Mennen Williams Bldg., 1st Floor<br>Lansing, Michigan 48913 | **MINNESOTA**<br>Minnesota Department of Commerce<br>85 7th Place East, Suite 500<br>St. Paul, Minnesota 55101<br><br>**NEW YORK**<br>New York Secretary of State<br>99 Washington Avenue<br>Albany, New York 12231<br><br>**TEXAS:**<br>Stephen Polozola<br>801 Cherry Street, Unit#46<br>Burnett Plaza, Suite 2000<br>Fort Worth, Texas 76102-6836<br><br>**VIRGINIA**<br>Clerk, State Corporation Commission<br>Tyler Building, 1st Floor<br>1300 Eat Main Street<br>Richmond, Virginia 23219<br><br>**WISCONSIN**<br>Administrator, Division of Securities<br>Department of Financial Institutions<br>345 West Washington Street, 4th Floor<br>Madison, Wisconsin 53703 |

**EXHIBIT D-1**
**FRANCHISE DISCLOSURE DOCUMENT**


**SITE SELECTION AGREEMENT**

# SITE SELECTION AGREEMENT

This SITE SELECTION AGREEMENT is entered into and effective as of this _____ day of _____, _____ ("Effective Date") by and between UATP Management, LLC, a Texas limited liability company, having its principal offices at 317 S. Jenkins St. Suite C Grapevine, TX 76051 ("**Franchisor**"), and _____, having a principal place of business at _____, _____ ("**you**").

## BACKGROUND

A.      Franchisor franchises the right to own and the opportunity to operate an URBAN AIR TRAMPOLINE & ADVENTURE PARK, which is a family entertainment facility that offers a wide variety of physical activities along its wall-to-wall trampoline areas, trampoline runway, foam pit, slam dunk track, and trampoline dodgeball arena.

B.      You have applied for a franchise to operate an URBAN AIR TRAMPOLINE & ADVENTURE PARK in the Site Selection Area identified in Attachment A, and Franchisor desires to grant you a franchise, based on the information contained in your franchise application.

C.      Operating an URBAN AIR TRAMPOLINE & ADVENTURE PARK requires leasing at least 25,000 square feet of space, which the parties understand may not be available in the Site Selection Area, and Franchisor desires to provide certain assistance in connection with this search.

D.      The parties are entering into this Agreement to govern their relationship during the real estate search, with the intention that, if and when an appropriate and desirable site is found, the parties will enter into a franchise agreement for an URBAN AIR TRAMPOLINE & ADVENTURE PARK, in the form attached as Attachment B (the "**Franchise Agreement**").

NOW, THEREFORE, for and in consideration of the mutual promises contained in this Agreement, the parties agree as follows:

## ARTICLE 1
## Definitions

Capitalized words shall have the meanings ascribed to them in the body of this Agreement.

## ARTICLE 2
## Site Selection Rights

2.1     Term. The term of this Agreement begins on the Effective Date and expires one-hundred twenty (120) days after the Effective Date. At your request and at Franchisor's sole discretion, Franchisor may grant an extension of up to sixty (60) days after the expiration of the Term. The term may be extended only by a written agreement signed by both parties.  This Agreement will expire automatically upon execution of the Franchise Agreement by the parties. Expiration, nonrenewal, or termination of this agreement, for any reason, does not affect your obligations under Article 5 below. Franchisor retains the absolute right to terminate this Agreement for convenience.

2.2     No License.  This Agreement is not a franchise or license agreement, and grants you no right to develop or operate an URBAN AIR TRAMPOLINE & ADVENTURE PARK. Such rights may only be granted by a franchise agreement. No territorial protection or exclusivity is granted by this Agreement.

## ARTICLE 3
## Fees

3.1     Site Selection Fee. Upon execution of this Agreement, you shall pay to Franchisor a Site Reservation Fee in the amount of $500, which is fully earned upon payment.

## ARTICLE 4
## Site Selection

4.1    <u>Franchise Site Application</u>.  For each proposed site that you identify, you must submit to Franchisor a Franchise Site Application including such information about the site as Franchisor may reasonably request to perform its evaluation.  This information may include, among other things, a description of the proposed site, demographic characteristics, traffic patterns, parking, character of the neighborhood, competition from other businesses in the area, the proximity to other businesses, the nature of other businesses in proximity to the site, and other commercial characteristics (including the purchase price, rental obligations and other lease terms for the proposed site) and the size, appearance, other physical characteristics and a site plan of the premises.

4.2    <u>Assistance</u>. To assist you with identifying and evaluating proposed sites for your URBAN AIR TRAMPOLINE & ADVENTURE PARK, Franchisor will make available to you demographic reports from its then-current site evaluation software.  There is no charge to you for the first site you propose, but Franchisor may charge you its then-current site evaluation fee for each additional proposed site, as published in the Manual from time to time. Franchisor will also make available to you site feasibility studies from its then-current architectural firm. There is no charge to you for the first site feasibility study, but Franchisor may charge you its then-current site feasibility fee for each additional proposed site, as published in the Manual from time to time.

4.3    <u>Approval</u>.  Franchisor will approve or refuse to approve a proposed site within 14 days after the receipt of these documents and any additional information as Franchisor may reasonably require.  Franchisor's failure to provide notification within this time period shall not be considered either approval or disapproval.  To the extent that Franchisor provides onsite evaluations, you must reimburse Franchisor for any out of pocket costs that it incurs in connection with performing the evaluation, such as travel, lodging, and dining expenses for each individual performing the evaluation.

4.4.    <u>Your Acknowledgments</u>.

(a)    The parties acknowledge and agree that Franchisor's approval of your proposed site DOES NOT AND WILL NOT constitute, directly or implicitly, an assurance that your URBAN AIR TRAMPOLINE & ADVENTURE PARK will achieve a certain sales volume or level of profitability; it means only that the proposed site meets Franchisor's minimum criteria.  Franchisor assumes no liability or responsibility for: (1) evaluation of the site's soil for hazardous substances; (2) inspection of any structure for asbestos or other toxic or hazardous materials; (3) compliance with the Americans With Disabilities Act ("ADA"); or (4) compliance with any other applicable law.  It is your sole responsibility to obtain satisfactory evidence and/or assurances that the site (and any structures thereon) is free from environmental contamination and is in compliance with the requirements of the ADA and other applicable laws.

(b)    Franchisor's operational standards, specifications, policies, and procedures are communicated to URBAN AIR TRAMPOLINE & ADVENTURE PARK franchisees through Franchisor's confidential operations manual and other written directives (collectively, "**Manual**"). You acknowledge you are not a franchisee and that Franchisor may share only certain portions of the Manual with you to aid you in this search for a suitable site. You also acknowledge that only after entering into a Franchise Agreement will you obtain the complete Manual and other confidential information.

(c)    The parties acknowledge and agree that, after the Site Selection Agreement expires or is terminated, regardless of the reason (even if Franchisor and you sign a Franchise Agreement), Franchisor and its affiliates may engage, and allow others to engage, in any activities we desire within and outside the Site Selection Area without any restrictions whatsoever, subject only to your rights under franchise agreements with Franchisor then in effect.

## ARTICLE 5
## Lease

5.1    <u>Execution of Franchise Agreement</u>. You shall sign and deliver to Franchisor the Franchise Agreement, and pay the initial franchise fee due thereunder, prior to signing a lease.

5.2     Franchisor's Approval of Lease Terms. Franchisor must approve the lease for the site before you sign it.  Franchisor will not withhold approval arbitrarily, but may condition its approval on the lease containing any or all of the terms set forth in the Lease Rider attached hereto as Attachment C.  You shall provide to Franchisor a fully executed copy of the lease within 10 days after its execution.

5.3     Acceptance of Lease; Countersignature of Franchise Agreement. Upon Franchisor's acceptance of your lease terms, Franchisor shall countersign the Franchise Agreement and accept payment of the initial franchise fee.  You shall deliver to Franchisor a fully executed copy of your lease within five (5) days after receipt.

5.4     Your Acknowledgment.  The parties acknowledge and agree that Franchisor's approval of a lease does not mean that the economic terms of the lease are favorable; it means only that the lease contains the lease terms that Franchisor requires.

## ARTICLE 5
## Confidentiality, Non-Circumvention, and Non-Competition

5.1     Confidential Information.  You and your owners (if you are a business entity) acknowledge that, during the site selection process, you will receive some of Franchisor's proprietary, confidential, and trade secret information and business strategies, as well as market information concerning the availability of suitable real estate in the Site Selection Area, rental rates, and lease negotiation procedures and strategies (collectively, "**Confidential Information**").

5.2     Confidentiality and Use.  You and your owners (if you are a business entity) agree to maintain the confidentiality of all Confidential Information, and to refrain from disclosing any Confidential Information to any third party. You and your owners (if you are a business entity) shall refrain from using any Confidential Information for any purpose other to search for suitable real estate for your URBAN AIR TRAMPOLINE & ADVENTURE PARK franchised business.  The parties acknowledge and agree that your disclosure of Confidential Information to aid a Competitive Business would constitute an unfair method of competition.

5.3     Non-Circumvention.  For a period of three (3) years from the Effective Date of this Agreement, you and your owners (if you are a business entity) shall refrain from leasing or otherwise acquiring any real estate identified as a potentially suitable site for your URBAN AIR TRAMPOLINE & ADVENTURE PARK. Specifically, but without limiting the generality of the foregoing, you and your owners shall refrain from acquiring, attempting to acquire, or assisting anyone else in acquiring, such real estate for purposes of operating a Competitive Business.

5.4     Covenant Not to Compete.  Neither you nor any of your owners (if you are a business entity) may, directly or indirectly, for yourselves or through, on behalf of, or in conjunction with any person, or legal entity, at any time during the term of this Agreement, or at any time during the uninterrupted two-year period (which will be tolled during any period of noncompliance) after expiration or termination of this Agreement:

(a)     Divert or attempt to divert any present or prospective customer of any URBAN AIR TRAMPOLINE & ADVENTURE PARK business to any Competitive Business, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act that is harmful, injurious, or prejudicial to the goodwill associated with Franchisor or the URBAN AIR TRAMPOLINE & ADVENTURE PARK family of businesses; or

(b)     Own, maintain, advise, operate, engage in, be employed by, make loans to, invest in, provide any assistance to, or have any direct or indirect interest in (as owner or otherwise) or relationship or association with, any Competitive Business.

5.5.    Geographic Scope of Restriction. During the Term of this Agreement, the restrictions contained in Section 5.4(b) shall apply to any location within the United States, its territories or commonwealths, and any other country, province, state, or geographic area in which Franchisor, Franchisor's affiliates, or Franchisor's franchisees have operated or licensed others to operate an indoor or outdoor trampoline park business or any related line of business; after expiration or termination of this

Agreement, this restriction shall apply to any Competitive Business that is or is intended to be located within the Site Selection Area or within a 50-mile radius of URBAN AIR TRAMPOLINE & ADVENTURE PARK business then operating in existence or under development at the time.

5.6.    Reformation. If all or any portion of any covenant contained in this Article 6 is held to be unreasonable or unenforceable by a court or agency having valid jurisdiction in an un-appealed final decision to which Franchisor is a party, you and your owners (if you are a business entity) will be bound by any lesser covenant subsumed within the terms of such covenant which imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Article 6. Notwithstanding the foregoing, Franchisor has the unilateral right, in its sole and absolute discretion, to reduce the scope of any covenant set forth in Section 5.4, or any portion thereof, which reduction will become effective immediately upon delivery of notice of the reduction.

5.7    Survival. This Article 5 shall survive termination or default of this Agreement.

**ARTICLE 6**
**Assignment**

6.1    Assignment by Franchisor. Franchisor may freely assign its rights and interest in this Agreement.

6.2    Assignment by You.  The rights granted under this Agreement are personal to you, and were granted in reliance on the information contained in your franchise application. Therefore, you may not assign your rights or interest in this Agreement without the prior written consent of Franchisor, which may be granted or withheld in Franchisor's discretion.

**ARTICLE 7**
**General Provisions**

7.1    Notices.  Any notices contemplated or required under this Agreement shall be deemed effectively given when personally delivered or when received through certified mail posted to the addresses first listed above, unless other addresses have been designated by written notice in the manner prescribed by this Section 7.1.

7.2    Governing Law.  This Agreement shall be governed by and construed in accordance with the domestic laws of the State of Texas without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any jurisdiction other than the State of Texas.  The exclusive venue for disputes arising out of this Agreement shall be the state or federal, as applicable, district courts situated in Tarrant County, Texas.

7.3    Waiver.  No delay or omission by either party to exercise any right or remedy under this Agreement shall be construed to be either acquiescence or the waiver of the ability to exercise any right or remedy in the future.

7.4    Enforcement.  The prevailing party (being defined as a party that is awarded actual relief in the form of damages, declaratory relief, or injunctive relief, as well as a party that successfully defends a legal action commenced against it) in any litigation will be entitled to recover from the non-prevailing party its all of its costs and expenses, including attorneys' fees.

7.5    Severability.  If any provision of this Agreement is held invalid or unenforceable by a court of competent jurisdiction, then the remainder of this Agreement shall continue to remain valid and enforceable as though the invalid or unenforceable provision had not been included.  If any provision is held invalid or unenforceable, then a suitable and equitable provision shall be substituted for the invalid provision so as to carry out so far as possible the intent and purpose of the invalid or unenforceable provision.  If any provision of this Agreement is susceptible to more than one construction, only one of which would render the provision valid and enforceable, then the provision shall be given the meaning that renders it valid and enforceable.

7.6    Third party Beneficiaries.  There are no intended third parties of this Agreement.

7.7    <u>Entire Agreement</u>.  This Agreement (including its Schedules) constitutes the entire, fully integrated agreement between the parties with regard to the subject matter of this Agreement. Nothing in this agreement or any related agreement is intended to disclaim the representation made in the Franchise Disclosure Document provided to you by Franchisor.

**IN WITNESS WHEREOF**, the undersigned have duly executed this Site Selection Agreement to be effective on the date set forth above.

**UATP MANAGEMENT, LLC,**
a Texas limited liability company.                                      a


By: _____          By: _____
        Michael O. Browning, Jr., President                          , its

**Attachment A**

**Description of Site Selection Area**

**Attachment B**

**Franchise Agreement**

**Attachment C**

**Lease Rider**

**EXHIBIT D-2**
**FRANCHISE DISCLOSURE DOCUMENT**

**FRANCHISE AGREEMENT**

**URBAN AIR TRAMPOLINE & ADVENTURE PARK**
**FRANCHISE AGREEMENT**

**URBAN AIR TRAMPOLINE & ADVENTURE PARK**
**FRANCHISE AGREEMENT**

**SUMMARY PAGES**

**EFFECTIVE DATE:**

**EXPIRATION DATE:**

**FRANCHISEE(S):**

**ADDRESS FOR NOTICES:**

**TELEPHONE NUMBER:**

**E-MAIL ADDRESS:**

**FRANCHISOR:**                 UATP MANAGEMENT, LLC

**ADDRESS FOR NOTICE:**         317 South Jenkins, Suite C, Grapevine, Texas 76051

**SITE SELECTION AREA:**

**INITIAL FRANCHISE FEE:**      $30,000

**ADMINISTRATIVE FEE:**         Pro-rata portion of call centers hourly rate plus a $5.00 commission

**GRAND OPENING**
**ADVERTISING AMOUNT:**         $15,000.00

**MONTHLY ROYALTY FEE:**        7% of weekly Gross Sales

**TRANSFER FEE:**               50% of our then-current initial franchise fee if transferred to a new approved franchisee or 25% of our then-current initial franchise fee if transferred to an approved existing franchisee; plus reimbursement of legal and professional fees and cost incurred by Franchisor in connection with the transfer

**RENEWAL FEE:**                $3,000 plus reimbursement of legal and professional fees and cost incurred by Franchisor in connection with the renewal (option of three 10- year renewals)

**OPENING DATE:**               Three months after the lease is signed

_____                              _____
Franchisor Initial                                     Franchisee Initial

**URBAN AIR TRAMPOLINE & ADVENTURE PARK**
**FRANCHISE AGREEMENT**

**TABLE OF CONTENTS**

1.     GRANT OF FRANCHISE ................................................................................................ 1
   A. Grant. ....................................................................................................................... 1
   B. Protected Area. ......................................................................................................... 2
2.     TERM ............................................................................................................................ 2
   A. Initial Term. ............................................................................................................. 2
   B. Successor Term. ........................................................................................................ 2
3.     DEVELOPMENT PROCEDURES ................................................................................ 4
   A. Site Selection. ........................................................................................................... 4
   B. Franchise Site Application. ....................................................................................... 4
   C. Lease Terms. ............................................................................................................ 4
   D. Relocation. ............................................................................................................... 5
4.     DRAWINGS, CONSTRUCTION, AND RENOVATION ............................................ 5
   A. Specifications and Drawings. .................................................................................... 5
   B. Commencement and Completion of Construction and Build Out. .............................. 5
   C. Acquisition of Necessary Furnishings, Fixtures and Equipment. ............................... 6
   D. Inspection, Cooperation. ........................................................................................... 6
   E. Final Inspection. ....................................................................................................... 6
5.     OPENING ...................................................................................................................... 6
6.     FEES .............................................................................................................................. 7
   A. Initial Franchise Fee. ................................................................................................ 7
   B. Royalty Fee. ............................................................................................................. 7
   C. Administrative Fee. ................................................................................................... 7
   D. Payment of Fees. ...................................................................................................... 7
   E. Interest; Non-Sufficient Funds Charge. ..................................................................... 8
   F. Partial Payments. ...................................................................................................... 8
   G. Collection Costs and Expenses. ................................................................................. 8
7.     RECORDKEEPING AND REPORTS .......................................................................... 8
   A. Recordkeeping. ......................................................................................................... 8
   B. Periodic Reports. ...................................................................................................... 9
   C. Annual Reports. ........................................................................................................ 9
   D. Other Reports. .......................................................................................................... 9
   E. Audit Rights. ............................................................................................................ 9
   F. Accounting Practices. ................................................................................................ 9
8.     TRAINING AND ASSISTANCE ................................................................................ 10
   A. Training. ................................................................................................................. 10
   B. Pre-Opening Assistance. ......................................................................................... 10
   C. Ongoing Assistance. ............................................................................................... 11
   D. Conferences. ........................................................................................................... 11
9.     MANUAL ..................................................................................................................... 11

10.　　　　MODIFICATIONS OF THE SYSTEM ................................................................ 11
11.　　　　PERFORMANCE REQUIREMENTS .............................................................. 12
　　A.　Best Efforts. ......................................................................................................... 12
　　B.　Standards, Specifications and Procedures............................................................. 12
　　C.　Approved Suppliers and Distributors. .................................................................. 13
　　D.　Authorized Products and Services. ....................................................................... 14
　　E.　Computer Systems and Intranet/Extranet Systems. .............................................. 14
　　F.　Non-Cash Payment Systems. ................................................................................ 15
　　G.　Franchisor Inspections. ........................................................................................ 15
　　H.　Upkeep of the Franchised Business. ..................................................................... 16
　　I.　Franchised Business Operations. ........................................................................... 16
　　J.　Management and Personnel. .................................................................................. 16
　　K.　Designated Manager. ............................................................................................ 16
　　L.　Signs and Logos.................................................................................................... 17
　　M.　Entertainment Equipment. ................................................................................... 17
　　N.　Compliance with Laws and Good Business Practices. ........................................... 17
　　O.　Payment of Taxes and Other Indebtedness............................................................ 17
12.　　　　ORGANIZATION OF THE FRANCHISEE ..................................................... 18
　　A.　Representations...................................................................................................... 18
　　B.　Governing Documents. .......................................................................................... 18
　　C.　Ownership Interests. .............................................................................................. 18
　　D.　Restrictive Legend. ............................................................................................... 18
　　E.　Guarantees. ........................................................................................................... 19
13.　　　　PROPRIETARY MARKS AND COPYRIGHTED WORKS............................. 19
　　A.　Acknowledgments. ................................................................................................ 19
　　B.　Modification of the Proprietary Marks and Copyrighted Works............................ 19
　　C.　Use of the Proprietary Marks and Copyrighted Works. ......................................... 19
　　D.　Internet and Social Media Usage. .......................................................................... 19
　　E.　Assignment of Rights. ........................................................................................... 20
　　F.　Infringement; Notice of Claims. ............................................................................ 20
　　G.　Remedies and Enforcement................................................................................... 20
14.　　　　CONFIDENTIALITY OBLIGATIONS AND RESTRICTIVE COVENANTS ....... 20
　　A.　Confidential Information. ...................................................................................... 20
　　B.　Covenants of the Franchisee. ................................................................................ 21
　　C.　Covenants of the Franchisee's Owners. ................................................................. 22
　　D.　Reformation and Reduction of Scope of Covenants............................................... 23
　　E.　Acknowledgments. ................................................................................................ 23
　　F.　No Undue Hardship. .............................................................................................. 23
　　G.　Injunctive Relief. .................................................................................................. 23
15.　　　　BRAND DEVELOPMENT; MARKETING ..................................................... 23
　　A.　General Requirements. .......................................................................................... 23
　　B.　Grand Opening Advertising................................................................................... 24

C.  Advertising Cooperatives. ............................................................................... 24
D.  Restriction Against Internet Advertising. ...................................................... 24
E.  Loyalty Programs, Prize Promotions, and Promotional Literature ................ 25

16.  INSURANCE ........................................................................................................... 25
A.  Obligation to Maintain Insurance. .................................................................. 25
B.  Minimum Insurance Coverage......................................................................... 25
C.  Insurance Policy Requirements. ..................................................................... 26
D.  Delivery of Certificate. ................................................................................... 26
E.  Minimum Insurance Requirements Not a Representation of Adequacy.......... 26
F.  Franchisor's Right to Procure Insurance. ....................................................... 27

17.  TRANSFER .............................................................................................................. 27
A.  Transfer by Franchisor..................................................................................... 27
B.  Transfer by Franchisee. ................................................................................... 27
C.  Security Interest. .............................................................................................. 28
D.  Public and Private Offerings. .......................................................................... 28
E.  Right of First Refusal....................................................................................... 28
F.  Transfer Upon Death or Mental Incapacity. ................................................... 29
G.  Non-Waiver of Claims. .................................................................................... 29

18.  DEFAULT AND TERMINATION ......................................................................... 29
A.  Automatic Termination. ................................................................................... 29
B.  Termination without Opportunity to Cure. ..................................................... 29
C.  Termination with Opportunity to Cure. .......................................................... 30
D.  Other Remedies. .............................................................................................. 30
E.  Step-In Rights. ................................................................................................. 30

19.  OBLIGATIONS UPON EXPIRATION OR TERMINATION ............................ 31
A.  Expiration or Termination of Franchise. ......................................................... 31
B.  Franchisor's Option to Assume Lease and Purchase Assets. ......................... 31
C.  Compliance with Post Term Obligations. ....................................................... 33

20.  INDEPENDENT CONTRACTOR AND INDEMNIFICATION .......................... 33
A.  Independent Contractor. .................................................................................. 33
B.  Indemnification................................................................................................. 33

21.  NOTICES .................................................................................................................. 35

22.  SEVERABILITY AND CONSTRUCTION ........................................................... 35
A.  Entire Agreement. ............................................................................................ 35
B.  Modification. .................................................................................................... 35
C.  Written Consent................................................................................................ 35
D.  No Waiver. ....................................................................................................... 36
E.  Severability. ..................................................................................................... 36
F.  Captions and Headings; References to Gender; Counterparts. ....................... 36
G.  Persons Bound. ................................................................................................ 36
H.  Franchisor's Judgment..................................................................................... 36

23.  GOVERNING LAW AND FORUM SELECTION ................................................ 36
A.  Governing Law. ............................................................................................... 36

B.    Jurisdiction and Venue. ................................................................................. 37

C.    Remedy. ......................................................................................................... 37

D.    Waiver of Jury Trial. ...................................................................................... 37

E.    Contractual Limitations Period. ..................................................................... 37

F.    Waiver of Punitive Damages. ......................................................................... 37

G.    Attorneys' Fees. ............................................................................................. 37

24.        ACKNOWLEDGMENTS ............................................................................... 38

A.    Receipt of Disclosure Document. ................................................................... 38

B.    Receipt of Agreement. .................................................................................... 38

C.    Independent Investigation. .............................................................................. 38

D.    No Representations; No Reliance. ................................................................... 38

E.    No Financial Performance Representations; No Reliance. ................................ 38

F.    No Licensure Representations; No Reliance. ................................................... 39

G.    Reasonable Restrictions. ................................................................................. 39

**STATE SPECIFIC AMENDMENT TO FRANCHISE AGREEMENT**

**ATTACHMENTS**

| | |
|---|---|
| <u>Attachment A</u> | Glossary of Additional Terms |
| <u>Attachment B</u> | Approved Location and Protected Area |
| <u>Attachment C</u> | Franchisee's Owners and Key Personnel |
| <u>Attachment D-1</u> | Undertaking and Guaranty |
| <u>Attachment D-2</u> | Confidentiality and Non-competition Agreement |
| <u>Attachment E</u> | Electronic Debit Authorization |
| <u>Attachment F</u> | Telephone Assignment Agreement |
| <u>Attachment G</u> | Lease Rider |

# URBAN AIR TRAMPOLINE & ADVENTURE PARK
## FRANCHISE AGREEMENT

This FRANCHISE AGREEMENT ("**Agreement**") is made and entered into on the Effective Date reflected in the Summary Pages ("**Effective Date**"), by and between UATP MANAGEMENT, LLC, a Texas limited liability company, with its principal business address at 317 S. Jenkins, Suite C, Grapevine, Texas 76051 ("**we**" or "**Franchisor**") and the Franchisee identified on the Summary Page ("**you**" or "**Franchisee**").

## BACKGROUND

A.    Franchisor and its Affiliates have, as the result of the expenditure of time, skill, effort, and money, developed a distinctive business system relating to the development, establishment, and operation of indoor trampoline and adventure park businesses featuring wall-to-wall trampolines, foam pits, and related activities (each a "**Franchised Business**") under the name URBAN AIR TRAMPOLINE & ADVENTURE PARK ("**Brand**"), which are based on the Proprietary Products, Proprietary Marks, Indicia, and Standards ("**System**").

B.    The distinguishing characteristics of the System include, without limitation, the services, products, and merchandise, which incorporate Franchisor's Proprietary Marks, trade secrets, and proprietary information ("**Proprietary Products**"); distinctive exterior and interior design, decor, color scheme, graphics, fixtures, and furnishings ("**Indicia**"); standards and specifications for products and supplies; service standards; uniform standards, specifications, and procedures for operations; procedures for inventory and management control; training and assistance; and advertising and promotional programs ("**Standards**"); all of which may be changed, improved, and further developed by Franchisor from time to time.

C.    The System is identified and recognized by means of certain trade names, service marks, trademarks, logos, emblems, and indicia of origin, including, but not limited, to the word mark "URBAN AIR TRAMPOLINE & ADVENTURE PARK" and the list of marks set forth in <u>Attachment A</u> to this Agreement, and such other trade names, service marks, trademarks, logos, emblems, and indicia of origin as Franchisor may hereafter designate in writing for use in connection with the System ("**Proprietary Marks**").  Franchisor obtained from its Affiliate, UATP IP, LLC, the right to use and sublicense to others to use the Proprietary Products, Proprietary Marks, Indicia, Standards, and the System.

D.    Franchisor and its Affiliates continue to develop, establish, use, and control the use of the Proprietary Products, Proprietary Marks, Indicia, Standards, and System in order to identify for the public the source of services and products marketed under this Agreement and under the System, and to represent the System's high standards of quality, appearance, and service.

E.    You have applied for the right to operate a Franchised Business using the System and the Proprietary Products, Proprietary Marks, Indicia, and Standards, and Franchisor has approved your application in reliance on the representations contained therein, including those concerning your financial resources, your business experience and interests, and the manner in which the Franchised Business will be owned and operated.

## AGREEMENT

IN CONSIDERATION OF the mutual promises contained in this Agreement, including the recitals set forth above, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

**1.    GRANT OF FRANCHISE**

**A.    Grant.**

Subject to the provisions of this Agreement, Franchisor hereby grants you the exclusive right ("**Franchise**") to continuously operate an URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchised Business at the Approved Location identified (or to be identified) in <u>Attachment B</u> to this Agreement and to use the Proprietary Marks in the operation and promotion of the Franchised Business.  You hereby undertake the obligation and agree to continually operate the Franchised Business during the term hereof and strictly according to the terms and conditions of this Agreement.

B.       **Protected Area.**

During the initial term and all successor terms, and provided that you are in full compliance with this Agreement and all other agreements between you and Franchisor, Franchisor shall neither operate nor grant others the right to operate another URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchised Business in the Protected Area.  The Protected Area may overlap with or be overlapped by the protected area of other franchisees, affiliates, or corporate stores. If there are overlapping protected areas, neither you nor the overlapping franchisee, corporate store, or affiliate will be permitted to open another Franchised Business within the area of overlap.

Franchisor retains for itself and/or its Affiliates all other rights in and to the Proprietary Products, Proprietary Marks, Indicia, and System including, without limitation: (a) the right to own and operate and to grant others the right to own and operate Franchised Businesses at any location outside the Protected Area, regardless of proximity to the Protected Area; and (b) the right to distribute any and all products and services and/or their components identified by the Proprietary Marks, including those used or sold in your Franchised Business, including, without limitation, proprietary merchandise (such as shirts, hats, jackets, etc.) and pre-packaged products, through alternative channels of distribution, including, without limitation, mail order, catalog sales, the Internet, World Wide Web or any other form of electronic commerce, or any other channel of distribution whatsoever except a Franchised Business, whether or not such sales occur within your Protected Area; you are not entitled to compensation for any such sales made in your Protected Area.  Franchisor also may offer, grant and support franchises under any name other than URBAN AIR TRAMPOLINE & ADVENTURE PARK, whether or not in the same, similar, or different line of business as your Franchised Business.

Nothing in this Agreement prohibits or restricts Franchisor or its Affiliates from owning, acquiring, establishing, operating, or granting franchise rights for (a) one or more other businesses at any location outside of the Protected Area under a different trademark or service mark (i.e., a mark other than URBAN AIR TRAMPOLINE & ADVENTURE PARK), whether or not the business is the same as, similar to, or competitive with the Franchised Businesses; or (b) one or more indoor trampoline park businesses featuring wall-to-wall trampolines, foam pits, and related activities under the name URBAN AIR TRAMPOLINE & ADVENTURE PARK or some derivative of the Proprietary Marks at any location outside of the Protected Area.

2.       **TERM**

A.       **Initial Term.**

The initial term of this Agreement ("**Initial Term**") shall begin on the Effective Date and shall expire at midnight on the Expiration Date, unless this Agreement is terminated at an earlier date pursuant to Section 18 of this Agreement.

B.       **Successor Term.**

At the expiration of the Initial Term, you will have an option to remain a franchisee at the Approved Location for up to three additional, 10-year successor terms.  You must give Franchisor written notice of whether or not you intend to exercise your successor term option no less than eight months, nor more than 12 months, before expiration of the then-current term.  Failure to timely provide the required written notice constitutes a waiver of your option to remain a franchisee beyond the expiration of the then-current term.  If you desire to exercise this option, you must comply with all of the following conditions prior to and at the end of the then-current term:

(1)       You may not be in default under this Agreement or any other agreement between you and Franchisor or its Affiliates; you may not be in default beyond the applicable cure period of any real estate lease, equipment lease or financing instrument relating to the Franchised Business; you may not be in default beyond the applicable cure period with any vendor or supplier to the Franchised Business; and, for the 12 months before the date of your notice and the 12 months before the expiration of the then-current term, you may not have been in default beyond the applicable cure period under this Agreement or any other agreements between you and Franchisor or its Affiliates;

(2)     If reasonably deemed necessary by Franchisor, you must renovate and upgrade the Franchised Business premises and all fixtures, furniture, equipment, signage and graphics, at your expense, to reflect the then-current image of an URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchised Business, which renovations may include structural changes, remodeling, redecoration, and modifications to existing improvements;

(3)     You and your employees must be in compliance with Franchisor's then-current training requirements;

(4)     You must have the right to remain in possession of the Franchised Business premises, or have secured other premises acceptable to Franchisor, for the renewal term and all monetary obligations owed to your landlord, if any, must be current;

(5)     You and each Owner shall have executed a general release, in a form satisfactory to Franchisor, of any and all claims against Franchisor and its Affiliates and their respective past and present officers, directors, shareholders, agents, and employees, in their corporate and individual capacity, including, without limitation, claims arising under federal, state, or local laws, rules, or ordinances, and claims arising out of, or relating to, this Agreement, any other agreements between you and Franchisor or its Affiliates and your operation of the Franchised Business and the offer and grant of the URBAN AIR TRAMPOLINE & ADVENTURE PARK franchise opportunity; and

(6)     As determined by Franchisor in its sole discretion, you have operated the Franchised Business in accordance with this Agreement and with the System (as set forth in the Manual or otherwise and as revised from time to time by Franchisor) and that you have operated any other URBAN AIR TRAMPOLINE & ADVENTURE PARK franchises in which you have an interest in accordance with the applicable franchise agreement.

Within four months after Franchisor's receipt of written notice of your desire for a successor term, Franchisor shall advise you whether or not you are entitled to remain a franchisee for the successor term.  If Franchisor intends to permit you to remain a franchisee for the successor term, the notice will contain preliminary information regarding the required renovations and modernizations described in Subsection 2.B(2), above.  If Franchisor does not intend to permit you to remain a franchisee for the successor term, the notice shall specify the reasons for non-renewal.  If Franchisor chooses not to permit you to remain a franchisee for the successor term, it shall have the right to unilaterally extend the then-current term of this Agreement as necessary to comply with applicable laws.

If you are granted successor term rights, Franchisor will deliver to you for execution a new franchise agreement at least one month prior to the expiration of the then-current term.  The form of successor agreement shall be the form then in general use by Franchisor for new URBAN AIR TRAMPOLINE & ADVENTURE PARK franchises (or, if Franchisor is not then granting franchises, then the form of agreement as specified by Franchisor), which may differ from this Agreement and may reflect, among other things, a different royalty fee and marketing obligations. Your Protected Area under the successor agreement will be the same as under this Agreement, and Franchisor will waive any initial franchise fee imposed under the successor agreement, but you must pay Franchisor the Renewal Fee set forth in the Summary Pages.

You must execute the franchise agreement for the successor term and return the signed agreement and payment of the Renewal Fee to Franchisor prior to expiration of the then-current term.  Failure to sign the franchise agreement, pay the Renewal Fee, and to return them to Franchisor within this time shall be deemed a waiver of your successor term option and result in termination of this Agreement and the franchise granted by this Agreement at the expiration of the then-current term.  If you have timely complied with all of the conditions set forth in this Section 2, Franchisor shall execute the successor term franchise agreement and promptly return a fully executed copy to you.

3.       **DEVELOPMENT PROCEDURES**

A.       **Site Selection.**

You must acquire an acceptable site for the Franchised Business (by purchase or lease) within 120 days after the Effective Date of this Agreement. The site must be located within the Site Selection Area identified in the Summary Page, must meet Franchisor's site selection Standards, and must be approved by Franchisor.

B.       **Franchise Site Application.**

For each proposed site that you identify, you must submit to Franchisor a Franchise Site Application including such information about the site as Franchisor may reasonably request to perform its evaluation. This information may include, among other things, a description of the proposed site, demographic characteristics, traffic patterns, parking, character of the neighborhood, competition from other businesses in the area, the proximity to other businesses, the nature of other businesses in proximity to the site, and other commercial characteristics (including the purchase price, rental obligations and other lease terms for the proposed site) and the size, appearance, other physical characteristics and a site plan of the premises.

To assist you with identifying and evaluating proposed sites for the Franchised Business, Franchisor will make available to you its then-current site evaluation software. There is no charge to you for the first site you propose for the Franchised Business, but Franchisor may charge you its then-current Site Evaluation Fee for each additional proposed site, as published in the Manual from time to time.

Franchisor will approve or refuse to approve a proposed site within 14 days after the receipt of these documents and any additional information as Franchisor may reasonably require. Franchisor's failure to provide notification within this time period shall not be considered either approval or disapproval. To the extent that Franchisor provides onsite evaluations, you must reimburse Franchisor for any out of pocket costs that it incurs in connection with performing the evaluation, such as travel, lodging, and dining expenses for each individual performing the evaluation.

**THE PARTIES ACKNOWLEDGE AND AGREE THAT FRANCHISOR'S APPROVAL OF YOUR PROPOSED SITE DOES NOT AND WILL NOT CONSTITUTE, DIRECTLY OR IMPLICITLY, AN ASSURANCE THAT THE FRANCHISED BUSINESS WILL ACHIEVE A CERTAIN SALES VOLUME OR LEVEL OF PROFITABILITY; IT MEANS ONLY THAT THE PROPOSED SITE MEETS FRANCHISOR'S <u>MINIMUM</u> CRITERIA. FRANCHISOR ASSUMES NO LIABILITY OR RESPONSIBILITY FOR: (1) EVALUATION OF THE FRANCHISED BUSINESS LOCATION'S SOIL FOR HAZARDOUS SUBSTANCES; (2) INSPECTION OF ANY STRUCTURE ON THE FRANCHISED BUSINESS LOCATION FOR ASBESTOS OR OTHER TOXIC OR HAZARDOUS MATERIALS; (3) COMPLIANCE WITH THE AMERICANS WITH DISABILITIES ACT ("ADA"); OR (4) COMPLIANCE WITH ANY OTHER APPLICABLE LAW. IT IS YOUR SOLE RESPONSIBILITY TO OBTAIN SATISFACTORY EVIDENCE AND/OR ASSURANCES THAT THE FRANCHISED BUSINESS LOCATION (AND ANY STRUCTURES THEREON) IS FREE FROM ENVIRONMENTAL CONTAMINATION AND IS IN COMPLIANCE WITH THE REQUIREMENTS OF THE ADA AND OTHER APPLICABLE LAWS.**

C.       **Lease Terms.**

Franchisor must approve the Lease for the Franchised Business premises before you sign it. Franchisor will not withhold approval arbitrarily, but may condition its approval on the lease containing any or all of the terms set forth in the Lease Rider attached hereto as <u>Attachment G</u>. You shall provide to Franchisor a fully executed copy of the lease within 10 days after its execution.

**THE PARTIES ACKNOWLEDGE AND AGREE THAT FRANCHISOR'S APPROVAL OF A LEASE DOES NOT MEAN THAT THE ECONOMIC TERMS OF THE LEASE ARE FAVORABLE; IT MEANS ONLY THAT THE LEASE CONTAINS THE LEASE TERMS THAT FRANCHISOR REQUIRES.**

D.    **Relocation.**

You may relocate the Franchised Business within the Protected Area, only with Franchisor's prior written consent. Franchisor will grant its consent if your lease expires or terminates through no fault of yours, or if the Franchised Business premises is destroyed or materially damaged by fire, flood, or other natural catastrophe (an "Innocent Loss or Casualty") and you are not in default of this Agreement or any other agreement between you and Franchisor. Selection of the relocation site and Franchised Business construction, renovation, and opening shall be governed by Sections 3, 4, and 5 of this Agreement; provided that: (i) if the relocation occurred as a result of the loss of an Innocent Loss or Casualty, the Franchised Business must be open for business at the new location within 180 days of closing at the previous location; and (ii) if the relocation occurred for any other reason, the Franchised Business must be open for business at the new location within thirty days of closing at the previous location. You are solely responsible for all relocation costs and expenses, including your payment of Franchisor's then-current Relocation Fee, as published in the Manual from time to time.

**4.    DRAWINGS, CONSTRUCTION, AND RENOVATION**

A.    **Specifications and Drawings.**

You assume all cost, liability, and expense for developing, constructing, and equipping the Franchised Business. Franchisor will furnish to you sample drawings and specifications for an URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchised Business, including requirements for dimensions, design, image, interior layout, décor, fixtures, equipment, signs, furnishings, storefront, signage, graphics, and color schemes. It is your responsibility to have prepared all required construction plans and specifications to suit the shape and dimensions of the Franchised Business, and you must ensure that these plans and specifications comply with applicable ordinances, building codes, and permit requirements, and with lease requirements and restrictions. You shall use only registered architects, registered engineers, and professional and licensed contractors, all or some of which Franchisor may specifically designate or approve from time to time in the Manual.

You shall submit proposed construction plans, specifications, and drawings for the Franchised Business ("**Plans**") to Franchisor and shall, upon Franchisor's request, submit all revised or "as built" Plans during the course of such construction. Franchisor will approve or refuse to approve the Plans and notify you within 30 days after receiving the Plans. Once Franchisor has approved the Plans, the Plans shall not be substantially changed without Franchisor's prior written approval, which shall not unreasonably be withheld. Franchisor shall approve or disapprove Plan changes within 10 business days after receipt.

You may not begin site preparation or construction before Franchisor has approved the Plans. All construction must be in accordance with Plans approved by Franchisor and must comply in all respects with the Standards and with applicable laws, ordinances, local rules, and regulations.

B.    **Commencement and Completion of Construction and Build Out.**

Construction shall be performed or supervised by a general contractor or construction manager of your choice, subject to the requirements of 4.A, above. Once construction has commenced, it shall continue uninterrupted (except for interruption by reason of events constituting Force Majeure) until completed. "Force Majeure" means any act of God, strike, lock-out, or other industrial disturbance, war (declared or undeclared), riot, epidemic, fire, or other catastrophe, act of any government or other third party, and any other cause not within the control of the party affected thereby. If events constituting Force Majeure cause a delay in the commencement of the construction or build out of the Franchised Business, Franchisor shall proportionately extend the Opening Date for the Franchised Business. Notwithstanding the occurrence of any events, except events constituting Force Majeure, construction shall be completed and the Franchised Business shall be furnished, equipped and shall otherwise be ready to open for business in accordance with this Agreement no later than the Opening Date specified in the Summary Page ("**Opening Date**").

You agree, at your sole expense, to do or cause to be done the following, by the Opening Date:

(1)    Obtain and maintain all required building, utility, sign, health, sanitation, business, and other permits and licenses applicable to the Franchised Business;

(2)    Make all required improvements to the Franchised Business location and decorate the exterior and interior of the Franchised Business in compliance with the Plans approved by Franchisor;

(3)    Purchase or lease and install all specified and required fixtures, equipment, furnishings, and interior and exterior signs required for the Franchised Business; and

(4)    Purchase an opening inventory for the Franchised Business of only authorized and approved products and other materials and supplies.

**C.**    **Acquisition of Necessary Furnishings, Fixtures and Equipment.**

You agree to use in the development and operation of the Franchised Business only the fixtures, furnishings, equipment, signs, and items of décor that Franchisor has approved as meeting its specifications and Standards for quality, design, appearance, function, and performance.  You further agree to place or display at the Franchised Business location (interior and exterior) only those signs, emblems, lettering, logos, and display materials that Franchisor has approved in writing from time to time.

You shall purchase or lease approved brands, types, or models of fixtures, furnishings, equipment, and signs only from suppliers designated or approved by Franchisor.  If you propose to purchase, lease or otherwise use any fixtures, furnishings, equipment, signs, or items of décor which have not been approved by Franchisor, you shall first notify Franchisor in writing and shall, at your sole expense, submit to Franchisor upon its request sufficient specifications, photographs, drawings, and/or other information or samples for a determination as to whether those fixtures, furnishings, equipment, and/or signs comply with Franchisor's specifications and Standards. Franchisor will, in its sole discretion, approve or disapprove the items and notify you within 30 days after Franchisor receives the request.

**D.**    **Inspection, Cooperation.**

During the course of construction and/or renovation, you shall (and shall cause your architect, engineer, contractors, and subcontractors to) cooperate fully with Franchisor and its designees for the purpose of permitting Franchisor and its designees to inspect the Franchised Business location and the course of construction or renovation in order to determine whether construction or renovation is proceeding according to the Plans.

**E.**    **Final Inspection.**

You shall notify Franchisor in writing at least 10 days prior to the date you expect construction and/or renovation to be completed and a certificate of occupancy to be issued.  Upon Franchisor's request, you shall submit a copy of the certificate of occupancy to Franchisor.  Franchisor reserves the right, after receiving your notice, to conduct a final inspection of the Franchised Business and its premises to determine your compliance with this Agreement.  You shall not open the Franchised Business for business unless you have satisfied the conditions set forth in Section 5, below.

**5.**    **OPENING**

Franchisor will authorize the opening of the Franchised Business only after all of the following conditions have been met:

(1)    You are not in material default under this Agreement or any other agreements with Franchisor; you are not in default beyond the applicable cure period under any real estate lease, equipment lease, or financing instrument relating to the Franchised Business; and you are not in default beyond the applicable cure period with any vendor or supplier of the Franchised Business;

(2)    You are current on all obligations due to Franchisor;

(3)    Franchisor is satisfied that the Franchised Business was constructed and/or renovated substantially in accordance with approved Plans and with applicable federal, state, and local laws, regulations, and codes;

(4)    If the Franchised Business location is leased, Franchisor has received a copy of the approved and fully executed lease;

V.2

(5)    You have obtained a certificate of occupancy and any other required health, safety, or fire department certificates;

(6)    You have certified to Franchisor in writing that the installation of all items of furnishings, fixtures, equipment, signs, computer terminals, and related equipment, supplies, and other items has been accomplished;

(7)    Your Designated Manager has attended and successfully completed Franchisor's initial training program and your personnel have obtained all required safety training and certifications;

(8)    Franchisor has determined that the Franchised Business has been constructed and/or renovated and equipped substantially in accordance with the requirements of this Agreement and that you have hired and trained personnel in accordance with the requirements of this Agreement; and

(9)    Franchisor has been furnished copies of all insurance policies required by <u>Section 16</u> of this Agreement, and all such insurance is in full force and effect.

## 6.    FEES

### A.    Initial Franchise Fee.

Upon execution of this Agreement, you shall pay Franchisor an Initial Franchise Fee in the amount specified in the Summary Page.  The parties acknowledge and agree that the Initial Franchise Fee is fully earned by Franchisor when paid and is not refundable.

### B.    Royalty Fee.

You shall pay to Franchisor a nonrefundable and continuing Royalty Fee in the amount specified in the Summary Page for the right to use the System and the Proprietary Marks at the Franchised Business location and in connection with the Franchised Business.  If any taxes, fees, or assessments are imposed on Royalty Fee payments by reason of Franchisor's acting as franchisor or licensing the Proprietary Marks under this Agreement, you shall reimburse Franchisor the amount of those taxes, fees, or assessments within 30 days after receive of an invoice from Franchisor.

### C.    Administrative Fee.

You shall pay to Franchisor an administrative fee in the amount specified on the Summary Page for each party or event scheduled at your location by the Franchisor's national call center.

### D.    Payment of Fees.

You must participate in Franchisor's then-current electronic funds transfer program authorizing Franchisor to utilize a pre-authorized bank draft system.  All Royalty Fees and other amounts owed under this Agreement, including interest charges, are payable monthly and must be received by Franchisor or credited to Franchisor's account by pre-authorized bank debit before 5:00 p.m. on the date such payment is due, as specified in the Manuals (the "**Due Date**").  On each Due Date, Franchisor will transfer from your commercial bank operating account ("**Account**") the amount reported to Franchisor by you or as determined by Franchisor by the records contained in the cash registers/computer terminals of the Franchised Business.  If you have not reported to Franchisor Gross Sales for any reporting period, Franchisor will transfer from the Account an amount calculated in accordance with its estimate of the Franchised Business' Gross Sales during the reporting period which estimate may be based on, among other things, historical financial performance of the Franchised Business and/or current and historical performance of other Franchisor.  If, at any time, Franchisor determines that you have underreported Gross Sales or underpaid the Royalty Fee or other amounts due to Franchisor under this Agreement, or any other agreement, Franchisor shall initiate an immediate transfer from the Account in the appropriate amount in accordance with the foregoing procedure, including interest as provided in this Agreement.  Any overpayment will be credited against future Royalty Fees and other payments due under this Agreement.

In connection with the payment by electronic funds transfer, you shall: (1) comply with procedures specified by Franchisor in the Manual or otherwise in writing; (2) perform those acts and sign and deliver those

documents as may be necessary to accomplish payment by electronic funds transfer as described in this <u>Section 6.D</u>; (3) give Franchisor an authorization in the form designated by Franchisor to initiate debit entries and/or credit correction entries to the Account for payments of the Royalty Fee and other amounts payable under this Agreement, including any interest charges; and (4) make sufficient funds available in the Account for withdrawal by electronic funds transfer no later than the Due Date for payment thereof.

Notwithstanding the provisions of this <u>Section 6.D</u>, Franchisor reserves the right to modify, at its option, the method by which you pay the Royalty Fee and other amounts owed under this Agreement, including interest charges, upon receipt of written notice by Franchisor.

Your failure to have sufficient funds in the Account shall constitute a default of this Agreement pursuant to <u>Section 18</u>. You shall not be entitled to set off, deduct, or otherwise withhold any Royalty Fees, interest charges, or other monies payable to Franchisor under this Agreement on grounds of any alleged nonperformance by Franchisor of any of its obligations or for any other reason.

**E.**    **<u>Interest; Non-Sufficient Funds Charge.</u>**

Any payments not received by the Due Date will accrue interest at the rate of 18% per annum or the highest lawful interest rate permitted by the jurisdiction in which the Franchised Business operates, whichever is less. If any check, draft, electronic or otherwise, is returned for nonsufficient funds, you shall pay to Franchisor a nonsufficient funds charge in an amount determined by Franchisor, but not to exceed $100 per transaction or the maximum allowed by applicable law, and shall reimburse Franchisor for all expenses that it incurs on account of such nonsufficient funds.

**F.**    **<u>Partial Payments.</u>**

No payment by you or acceptance by Franchisor of any monies under this Agreement for a lesser amount than due shall be treated as anything other than a partial payment on account. Your payments of a lesser amount than due with an endorsement, statement, or accompanying letter to the effect that payment of the lesser amount constitutes full payment shall be given no effect and Franchisor may accept the partial payments without prejudice to any rights or remedies it may have against you. Acceptance of payments by Franchisor other than as set forth in this Agreement or a waiver by Franchisor of any other remedies or rights available to it pursuant to this Agreement shall not constitute a waiver of Franchisor's right to demand payment in accordance with the requirements of this Agreement or a waiver by Franchisor of any other remedies or rights available to it pursuant to this Agreement or under applicable law. Notwithstanding any designation by you, Franchisor shall have the sole discretion to apply any payments by you to any of your past due indebtedness for Royalty Fees, purchases from Franchisor or its Affiliates, interest or any other indebtedness. Franchisor has the right to accept payment from any other entity as payment by you. Acceptance of that payment by Franchisor will not result in that other entity being substituted as franchisee under this Agreement.

**G.**    **<u>Collection Costs and Expenses.</u>**

You agree to pay Franchisor on demand any and all costs and expenses incurred by Franchisor in enforcing the terms of this Agreement including, without limitation, collecting any monies that you owe to Franchisor. These costs and expenses include, without limitation, costs and commissions due a collection agency, reasonable attorneys' fees, costs incurred in creating or replicating reports demonstrating Gross Sales of the Franchised Business, court costs, expert witness fees, discovery costs, and reasonable attorneys' fees and costs on appeal, together with interest charges on all of the foregoing.

**7.**    **<u>RECORDKEEPING AND REPORTS</u>**

**A.**    **<u>Recordkeeping.</u>**

You agree to use computerized cash and data capture and retrieval systems that meet Franchisor's specifications and to record Franchised Business sales electronically or on tape for all sales at or from the Franchised Business premises. You shall keep and maintain, in accordance with any procedures set forth in the Manual, complete and accurate books and records pertaining to the Franchised Business in the format and using the accounting software that Franchisor requires. Your books and records shall be kept and maintained using generally accepted accounting principles ("**GAAP**"). You shall preserve all of your books, records, and state

and federal tax returns for at least five years after the later of preparation or filing (or such longer period as may be required by any governmental entity) and make them available and provide duplicate copies to Franchisor within five days after Franchisor's written request.

**B.      Periodic Reports.**

At Franchisor's request, you shall, at your expense, submit to Franchisor in the form prescribed by Franchisor a monthly profit and loss statement and balance sheet (both of which may be unaudited). Each statement and balance sheet shall be signed by you, your treasurer, or chief financial officer attesting that it is true, correct, and complete and uses accounting principles applied on a consistent basis which accurately and completely reflects the financial condition of the Franchised Business during the period covered.

**C.      Annual Reports.**

You shall, at your expense, submit to Franchisor no later than April 15th of each year, in the form prescribed by Franchisor, an annual profit and loss statement and balance sheet reviewed by a certified public accountant. The statement and balance sheet shall be signed by you, your treasurer, or chief financial officer attesting that it is true, correct, and complete, and uses accounting principles applied on a consistent basis which accurately and completely reflects the financial condition of the Franchised Business during the period covered. Franchisor also shall have the right, in its reasonable discretion, to require that you, at your expense, submit financial statements that have been reviewed by a certified public accounting firm acceptable to Franchisor for any period or periods of a fiscal year.

**D.      Other Reports.**

You shall submit to Franchisor, for review or auditing, such other forms, reports, records, information, and data as Franchisor may reasonably designate, in the form and at times and places reasonably required by Franchisor, upon request and as specified from time to time in the Manual or otherwise in writing. At Franchisor's request, you shall furnish to Franchisor a copy of all federal and state income tax returns reflecting revenue derived from the operation of the Franchised Business, and copies of all sales tax returns, filed with the appropriate taxing authorities.

**E.      Audit Rights.**

Franchisor or its designee shall have the right at all reasonable times, both during and after the term of this Agreement, to inspect, copy, and audit your books, records, and federal, state, and local tax returns, sales tax returns and such other forms, reports, information, and data as Franchisor reasonably may designate, applicable to the operation of the Franchised Business. If an inspection or audit discloses an understatement of Gross Sales, you shall pay Franchisor, within 10 days after receipt of the inspection or audit report, the deficiency in the Royalty Fees plus interest (at the rate and on the terms provided in Section 6.E) from the date originally due until the date of payment. If an inspection or audit is made necessary by your failure to furnish reports or supporting records as required under this Agreement, or to furnish such reports, records, or information on a timely basis, or if an understatement of Gross Sales for the period of any inspection or audit is determined to be greater than 2%, you also shall reimburse Franchisor for the reasonable cost of the inspection or audit including, without limitation, the charges of attorneys and independent accountants, and the travel expenses, room, board, and compensation of Franchisor's employees or designees involved in the inspection or audit. These remedies shall be in addition to all other remedies and rights available to Franchisor under this Agreement and applicable law.

**F.      Accounting Practices.**

If you fail to comply with any of the reporting requirements described in this Section 7 then Franchisor may require you to engage a bookkeeping service provider, designated or approved by Franchisor, to provide book keeping services for the Franchised Business for such period of time that Franchisor deems appropriate, in its sole discretion.

8.    **TRAINING AND ASSISTANCE**

A.    **Training.**

Franchisor will provide an initial training program at its headquarters or such other location as Franchisor may designate. Your Designated Manager and such other of your employees as Franchisor may reasonably require must attend and successfully complete the initial training program before the Franchised Business may open for business. There is no charge for up to two individuals to attend the initial training program.  At your request, Franchisor may permit additional individuals to attend the same training program, subject to space availability and payment of Franchisor's then-current training fee as published in the Manual from time to time.

Your Designated Manager and other Franchised Business personnel shall attend and successfully complete to Franchisor's satisfaction all safety training courses and programs that Franchisor requires from time to time, including, without limitation, all training that may be required by the state or local municipality where your Franchised Business is located, and shall maintain such certifications at all times throughout the term of this Agreement.  Franchisor may charge, and you agree to pay, a reasonable tuition for all courses and programs that it provides plus, when applicable, reimbursement of Franchisor's out of pocket costs it incurs in connection with providing such training, including travel, lodging, and dining costs for the individual(s) providing such training.

Your Designated Manager shall be responsible for training your employees in all aspects of Franchised Business operations.  Franchisor may, in its sole discretion, develop training and certification programs for your employees. Your Designated Manager shall become familiar with these programs and shall implement and provide instruction and training to your Franchised Business employees.

Franchisor may, in its sole discretion, require your Designated Manager and other of your employees to attend and complete, to Franchisor's satisfaction, such other additional and remedial training as Franchisor may from time to time reasonably deem necessary.  By way of example and not limitation, remedial training may be required if you repeatedly fail to comply with the quality and service standards set forth in the Manual, fail to comply with reporting requirements of this Agreement, experience excessive personnel problems, or receive significant customer complaints.  Franchisor may charge, and you agree to pay, a reasonable fee for each day of additional and/or remedial training provided plus, when applicable, reimbursement of Franchisor's out of pocket costs it incurs in connection with providing such training, including travel, lodging, and dining costs for the individual(s) providing such assistance.

You are responsible for all costs and expenses of complying with Franchisor's training and certification requirements including, without limitation, tuition, fees, and registration costs, as well as salary, travel, lodging, and dining costs for all employees who participate in the training.

B.    **Pre-Opening Assistance.**

Franchisor will provide consultation and advice to you, as Franchisor deems appropriate, with regard to the development and operation of the Franchised Business, building layout, furnishings, fixtures, and equipment plans and specifications, employee recruiting, selection and training, purchasing and inventory control, and such other matters as Franchisor deems appropriate.  If this Agreement is being signed in conjunction with your first Franchised Business, Franchisor will make available one member of Franchisor's training staff to provide you two to three days of on-site Franchised Business opening assistance.  There is no additional fee for such assistance for your first Franchised Business; but if such assistance is given with respect to your second or subsequent Franchised Business(es), Franchisor may charge, and you agree to pay, reimbursement of Franchisor's out of pocket costs it incurs in connection with providing such on-site opening assistance, including travel, lodging, and dining costs for the trainer providing such assistance.  At your request, or if Franchisor deems necessary, Franchisor will provide additional members of its training staff to provide on-site opening assistance, subject to availability of personnel; in such event, Franchisor may charge, and you agree to pay, a reasonable fee for each additional trainer plus, when applicable, reimbursement of Franchisor's out of pocket costs it incurs in connection with providing such on-site opening assistance, including travel, lodging, and dining costs for the trainer(s) providing such assistance.

C.    **Ongoing Assistance.**

Franchisor periodically, as it deems appropriate, will advise and consult with you in connection with the operation of your Franchised Business, and provide to you its knowledge and expertise regarding the System and pertinent new developments, techniques, and improvements in the areas of management, sales promotion, service concepts, and other areas. Franchisor may provide these services through visits by Franchisor's representatives to the Franchised Business, the distribution of printed or filmed material, or electronic information, meetings, or seminars, telephone communications, email communications, or other communications.

D.    **Conferences.**

Franchisor may, in its sole discretion, conduct from time to time conferences to discuss System developments including operational efficiency, personnel training, bookkeeping, accounting, inventory control, performance standards, advertising programs, and merchandising procedures. Attendance at such conferences may be made mandatory by Franchisor, in which event your Designated Manager will be required to attend. You are responsible for all costs and expenses associated with attendance including, without limitation, salary, travel, lodging, and dining costs for conference attendees.

**9.    MANUAL**

Franchisor will loan you one copy of the Manual, which may take the form of one or more of the following: one or more loose-leaf or bound volumes; bulletins; notices; videos; CD-ROMS and/or other electronic media; online postings; e-mail and/or electronic communications; facsimiles; or, any other medium capable of conveying the Manual's contents. Franchisor may supplement, amend, or modify the Manual from time to time by letter, electronic mail, bulletin, CD, DVD, MP3, or other communications concerning the System to reflect changes in the image, specifications, and standards relating to developing, equipping, furnishing, and operating an URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchised Business, all of which will be considered a part of the Manual and will, upon delivery to you, become binding on you as if originally set forth in the Manual. You must keep your copy of the Manual current and up to date with all additions and deletions provided by or on behalf of Franchisor and you must purchase whatever equipment and related services (including, without limitation, a CD/DVD player, and/or MP3 player, computer system, internet service, dedicated phone line, facsimile machine, etc.) as may be necessary to receive these communications. If a dispute relating to the contents of the Manual develops, the master copy maintained by Franchisor at its principal offices shall control. The Manual is material because it will affect the way you operate your Franchised Business, but it will not conflict with or materially alter your rights and obligations under this Agreement.

The Manual contains detailed standards, specifications, instructions, requirements, methods, and procedures for management and operation of the Franchised Business. The Manual may also contain information relating to the selection, purchase, storage, preparation, packaging, service, and sale of all products, and merchandise sold at your Franchised Business; management and employee training; marketing, advertising, and sales promotions; maintenance and repair of the Franchised Business premises; employee dress attire and appearance standards; graphics; and accounting, bookkeeping, records retention, and other business systems, procedures, and operations. You agree to at all times operate your Franchised Business in strict compliance with the Manual (as supplemented, amended, or modified by Franchisor from time to time), to maintain the Manual at the Franchised Business, to not reproduce the Manual or any part of it, to treat the Manual as strictly confidential and proprietary, and to disclose the contents of the Manual only to those employees who have a need to know.

Upon termination or expiration of this Agreement, you shall immediately return the Manual without retaining any copies thereof. If you lose or misplace the Manuals, Franchisor may impose a replacement fee which will not exceed $500 for each volume of the replacement Manual.

**10.    MODIFICATIONS OF THE SYSTEM**

Franchisor may, in its sole discretion, change or modify from time to time the System, any components of this System, and the requirements applicable to you by means of supplements or amendments to the Manual, including, but not limited to, modifications to the Manual, the required equipment, the signage, the building and

premises of the Franchised Business (including the trade dress, décor, and color schemes), the presentation of the Proprietary Marks, and other characteristics to which you are required to adhere (subject to the limitations set forth in this Agreement); adoptions of new administrative forms and methods of report and of payment of any monies owed by Franchisee (including electronic means of reporting and payment); alterations of the products, services, programs, methods, standards, accounting and computer systems, forms, policies and procedures of the System; and additions to, deletions from, or modifications to the products and services which your Franchised Business is authorized and/or required to offer; and additions, changes, improvements, modifications, substitutions to, of, from, or for the Proprietary Marks or copyrighted materials.  You must accept and implement at the Franchised Business any such changes or modifications in the System as if they were a part of the System at the time you executed this Agreement, and you must make such expenditures as the changes or modifications in the System reasonably require.

You may set prices in your discretion; however, because enhancing the Brand's competitive position and consumer acceptance for the Brand's products and services is a paramount goal of Franchisor and its franchisees, and because this objective is consistent with the long-term interest of the System overall, Franchisor may exercise certain rights, to the fullest extent permitted by then-applicable law, with respect to pricing of products and services, including, but not limited to, establishing the maximum and/or minimum retail prices which you may charge customers for the products and services offered and sold at your Franchised Business; recommending retail prices; advertising specific retail prices for some or all products or services sold at your Franchised Business, which Franchisor may compel you to observe and honor; and developing and advertising price promotions or package promotions which may directly or indirectly impact your retail prices, and in which Franchisor may compel you to participate.  Franchisor may engage in any such activity periodically or throughout the term of this Agreement, and may engage in such activity in some geographic areas but not others, or with regard to certain subsets of franchisees but not others.  You acknowledge and agree that any maximum, minimum, or other prices Franchisor prescribes or suggests may or may not optimize the revenues or profitability of your Franchised Business, and you irrevocably waive any and all claims arising from or related to our prescription or suggestion of your Franchised Business' retail prices.

You acknowledge that because uniformity may not be possible or practical under many varying conditions, Franchisor reserves the right to materially vary its standards or franchise agreement terms for any franchisee, based on the timing of the grant of the franchise, the peculiarities of the particular territory or circumstances, business potential, population, existing business practices, other non-arbitrary distinctions, or any other condition which Franchisor considers important to the successful operation of the System.  You have no right to require Franchisor to disclose any variation or to grant the same or a similar variation to you.

If you develop any new concepts, processes, or improvements relating to the System, whether or not pursuant to a test authorized by Franchisor, you must promptly notify Franchisor and provide Franchisor with all information regarding the new concept, process, or improvement, all of which will automatically become the property of Franchisor and its Affiliates, and which Franchisor and its Affiliates may incorporate into the System without any payment to you.  You must promptly take, at your expense, all actions deemed necessary or desirable by Franchisor to vest in Franchisor the ownership of such concepts, processes, or improvements.

## 11.    PERFORMANCE REQUIREMENTS

### A.    Best Efforts.

Your Designated Manager (see Section 11.K below) must use full time and best efforts in the operation of the Franchised Business, and must personally supervise the day-to-day operation of the Franchised Business.

### B.    Standards, Specifications and Procedures.

You agree to comply with all System specifications, standards, and operating procedures (whether contained in the Manual or any other written communication) relating to the appearance, function, cleanliness, and operation of an URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchised Business including, without limitation: (1) type, quality, taste, weight, dimensions, uniformity, pricing, and sale of all products sold at the Franchised Business; (2) sales and marketing procedures and customer service; (3) advertising and promotional programs; (4) layout, décor, and color scheme of the Franchised Business; (5) appearance and dress

of employees; (6) safety, maintenance, appearance, cleanliness, sanitation, standards of service, and operation of the Franchised Business; (7) submission of requests for approval of brands of products, supplies, and suppliers; (8) use and illumination of signs, posters, displays, standard formats, and similar items; (9) use of audio equipment and type and decibel levels of music; (10) use of video equipment and type and decibel level of television broadcasts (including closed captioning requirements); (11) types of fixtures, furnishings, equipment, smallwares, and packaging; and (12) the make, type, location, and decibel level of any game, entertainment, or vending machine. Mandatory specifications, standards, and operating procedures, including upgraded or additional equipment, that Franchisor prescribes from time to time in the Manual or otherwise communicates to you shall constitute provisions of this Agreement as if fully set forth in this Agreement.

All products, merchandise, advertising materials, furniture, fixtures, equipment, smallwares, supplies, and stationery used in connection with the operation of the Franchised Business must meet Franchisor's standards and specifications, as promulgated from time to time. Such specifications may include brand specifications ("**Approved Brands**"), and to the extent that Approved Brands have been identified, you may purchase and use only the Approved Brands. Franchisor may from time to time modify its specifications, and you shall promptly comply with all such modifications.

C.      **Approved Suppliers and Distributors.**

You must purchase those products designated by Franchisor only from suppliers approved and designated by Franchisor ("**Designated Suppliers**"), including, but not limited to: (1) fixtures, furniture, equipment, signs, items of décor; (2) uniforms, shirts, and all merchandise and items intended for retail sale (whether or not bearing our Proprietary Marks); (3) advertising, point-of-purchase materials, and other printed promotional materials; (4) gift certificates and stored value cards; (5) stationery, business cards, contracts, and forms; (6) bags, packaging, and supplies bearing the Proprietary Marks; and (7) other products and services that we require. In addition to Designated Suppliers, Franchisor may require you to purchase certain supplies from approved or designated third party distributors ("**Designated Distributors**"), and you agree to comply with all such requirements.

Franchisor may, in its sole discretion, enter into supply contracts either for all Franchised Businesses or a subset of Franchised Businesses situated within one or more geographic regions (each a "**Systemwide Supply Contract**"). Franchisor may enter into Systemwide Supply Contracts with one or more vendors of products, services, or equipment and may require all company-owned and franchised businesses in a geographic area to purchase from, use, or sell to such vendors. If Franchisor enters into such Systemwide Supply Contracts, then immediately upon notification, you and all Franchised Businesses in the geographic area must purchase the specified product, service, or equipment only from the designated supplier; provided, however, that if, at the time of such notification, you are already a party to a non-terminable supply contract with another vendor or supplier for the designated product, service, or equipment, then your obligation to purchase from Franchisor's designated supplier under the Systemwide Supply Contract will not begin until the scheduled expiration or earlier termination of your pre-existing supply contract. Franchisor makes no representation that it will enter into any Systemwide Supply Contracts or other exclusive supply arrangements or, if it does, that you will not otherwise be able to purchase the same products and/or services at a lower price from another supplier. Franchisor may add to, modify, substitute or discontinue Systemwide Supply Contracts or exclusive supply arrangements in the exercise of its sole discretion and business judgment.

Franchisor may also establish commissaries and distribution facilities owned and operated by Franchisor or its affiliate that Franchisor may deem a Designated Supplier or Designated Distributor. Franchisor may receive money or other benefits, such as rebates or conference sponsorships, from Designated Suppliers and Designated Distributors based on your purchases; you agree that Franchisor has the right to retain and use all such benefits as it deems appropriate, in its sole discretion.

Franchisor may approve one or more suppliers for any goods or materials and may approve a supplier only as to certain goods or materials. Franchisor may concentrate purchases with one or more suppliers or distributors to obtain lower prices and/or the best advertising support and/or services for any group of URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchised Businesses or any other facilities franchised or operated by Franchisor or its Affiliates. Approval of a supplier may be conditioned on requirements relating to

the frequency of delivery, reporting capabilities, standards of service, including prompt attention to complaints, or other criteria, and concentration of purchases, as set forth above, and may be temporary pending a further evaluation of such supplier by Franchisor.

If you propose to purchase from a previously unapproved source, you shall submit to Franchisor a written request for such approval, or shall request the supplier to submit a written request on its own behalf. Franchisor has the right to require, as a condition of its approval, that its representatives be permitted to sample the product and inspect the supplier's facilities, and that such information, specifications, and samples as Franchisor reasonably requires be delivered to Franchisor and/or to an independent, certified laboratory designated by Franchisor for testing prior to granting approval. A charge not to exceed the reasonable cost of the inspection and the actual cost of the test shall be paid by you. Franchisor will notify you within 120 days of your request as to whether you are authorized to purchase such products from that supplier. Franchisor reserves the right, at its option, to re-inspect the facilities and products of any such approved supplier and to revoke its approval of any supplier upon the suppliers' failure to meet Franchisor's criteria for quality and reliability.

**D.      Authorized Products and Services.**

You shall cause the Franchised Business to offer and sell all products and services that Franchisor requires, and only products and services that Franchisor approves for sale by URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchised Businesses. Franchisor may add, modify, and discontinue authorized products and services at any time, in its sole discretion, and you shall promptly comply with all directives. The Franchised Businesses shall begin offering for sale additional or modified products, and cease offering discontinued products, within 10 days of the date you receive written notice of the addition, modification, or discontinuance. All products or services offered for sale in connection with the Franchised Business shall meet Franchisor's Standards.

You shall at all times maintain an inventory of approved goods and materials sufficient in quality and variety to realize the full potential of the Franchised Business. Franchisor may, from time to time, conduct market research and testing to determine consumer trends and the salability of new products and services. You agree to cooperate in these efforts by participating in the URBAN AIR TRAMPOLINE & ADVENTURE PARK customer surveys and market research programs if requested by Franchisor. All customer surveys and market research programs will be at Franchisor's sole cost and expense, unless you have volunteered to participate in the survey or market research and to share your proportionate cost. You may not test any new product or service without Franchisor's prior written consent.

**E.      Computer Systems and Intranet/Extranet Systems.**

You shall acquire and use all cash registers, computer hardware and related accessories, and peripheral equipment ("**Computer Systems**") that Franchisor prescribes for use by Franchised Businesses, and may not use any cash registers or computer hardware, accessories, or peripheral equipment that Franchisor has not approved for use by URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchised Businesses. Requirements may include, among other things, connection to remote servers, off-site electronic repositories, and high speed Internet connections and service.

You shall: (1) use any proprietary software programs, system documentation manuals, and other proprietary materials provided to you by Franchisor in connection with the operation of the Franchised Business; (2) input and maintain in your computer such data and information as Franchisor prescribes in the Manual, software programs, documentation, or otherwise; and (3) purchase new or upgraded software programs, system documentation manuals, and other proprietary materials at then-current prices whenever Franchisor adopts such new or upgraded programs, manuals, and materials system-wide. You shall enter into all software license agreements, "terms of use" agreements, and software maintenance agreements, in the form and manner Franchisor prescribes, and pay all fees charged by third party software and software service providers thereunder.

You acknowledge that Franchisor may independently access from a remote location, at any time, all information input to, and compiled by, your Computer System or an off-site server, including information concerning Gross Sales, purchase orders, inventory and expenditures.

You acknowledge that technology is ever changing and that, as technology or software is developed in

the future, Franchisor may, in its sole discretion, require you to: (1) add to your Computer System memory, ports, and other accessories or peripheral equipment, or additional, new, or substitute software; (2) replace, update or upgrade your Computer System, including but not limited to computer hardware components and software applications as Franchisor prescribes, but not to exceed three times per calendar year.

To ensure full operational efficiency, you agree to keep your Computer System in good maintenance and repair and to make additions, changes, modifications, substitutions, and replacements to your computer hardware, accessories and peripherals, software, telephone and power lines, high speed Internet connections, and other computer-related facilities as directed by Franchisor. Upon termination or expiration of this Agreement, all computer software, disks, tapes, and other magnetic storage media shall be returned to Franchisor in good operating condition, excepting normal wear and tear.

Franchisor may, at its option, establish and maintain an intranet or extranet system through which members of the URBAN AIR TRAMPOLINE & ADVENTURE PARK franchise network may communicate, and through which Franchisor may disseminate updates to the Manual and other Confidential Information. Franchisor will have no obligation to establish or to maintain the intranet indefinitely, and may dismantle it at any time without liability to you. Franchisor may establish policies and procedures for the intranet's use. Franchisor expects to adopt and adhere to a reasonable privacy policy. However, you acknowledge that, as administrator of the intranet, Franchisor can technically access and view any communication that anyone posts on the intranet. You further acknowledge that the intranet facility and all communications that are posted to it will become Franchisor's property, free of any claims of privacy or privilege that you or any other individual may assert. If you fail to pay when due any amount payable to Franchisor under this Agreement, or if you fail to comply with any policy or procedure governing the intranet, Franchisor may suspend your access to any chat room, bulletin board, listserv, or similar feature the intranet includes until such time as you fully cure the breach.

**F.    Non-Cash Payment Systems.**

Within a reasonable period of time following Franchisor's request, you shall accept debit cards, credit cards, stored value cards, or other non-cash systems specified by Franchisor to enable customers to purchase authorized products, and you shall obtain all necessary hardware and/or software used in connection with these non-cash systems. The parties acknowledge and agree that protection of customer privacy and credit card information is necessary to protect the goodwill of businesses operating under the Proprietary Marks and System. Accordingly, you shall cause the Franchised Business to meet or exceed, at all times, all applicable security standards developed by the Payment Card Industry Standards Council or its successor and other regulations and industry standards applicable to the protection of customer privacy and credit card information. You are solely responsible for your own education concerning these regulations and standards and for achieving and maintaining applicable compliance certifications. You shall defend, indemnify, and hold Franchisor harmless from and against all claims arising out of or related to your violation of the provisions of this Section 11.F.

**G.    Franchisor Inspections.**

Franchisor or its designees shall have the right at any reasonable time and without prior notice to you to: (1) inspect the Franchised Business premises; (2) observe, photograph, and record the operation of the Franchised Business for such consecutive or intermittent periods as Franchisor deems necessary; (3) interview Franchised Business personnel; (4) interview customers; and (5) inspect and copy any books, records, and documents relating to the operation of the Franchised Business or, upon request of Franchisor or its designee, require you to send copies thereof to Franchisor or its designee. You shall present to your customers those evaluation forms as are periodically prescribed by Franchisor and shall participate and/or ask your customers to participate in any surveys performed by or on behalf of Franchisor as Franchisor may direct.

You agree to cooperate fully with Franchisor or its designee in connection with any such inspection, observations, recordings, product removal, and interviews. You shall take all necessary steps to immediately correct any deficiencies detected during these inspections including, without limitation, ceasing further sales of unauthorized items and ceasing further use of any equipment, advertising materials, or supplies that do not conform to the standards and requirements promulgated by Franchisor from time to time. Franchisor shall have the right to develop and implement a grading system for inspections and, to the extent such a system is implemented, if the Franchised Business fails to achieve a passing score on any inspection, Franchisor may

require your Key Personnel and other Franchised Business personnel to attend and participate in such additional training as Franchisor deems appropriate. If the Franchised Business fails to achieve a passing score on any two consecutive inspections or if the Franchised Business fails to achieve a passing score three or more times in any 12-month period, Franchisor may terminate this Agreement in accordance with <u>Section 18</u>.

These inspections may take the forms of quality assurance inspections and mystery shops. To the extent Franchisor engages a third party service for conducting quality assurance inspections and mystery shops, you must reimburse Franchisor its actual costs incurred in connection with inspections and mystery shops conducted at your Franchised Business. At Franchisor's request, Franchisor may require you to pay these amounts directly to the applicable services provider.

**H.    Upkeep of the Franchised Business.**

You shall continuously operate the Franchised Business and shall, at all times and at your sole expense, maintain in first class condition and repair (subject to normal wear and tear), in good working order, in accordance with the requirements of the System, and in compliance with all applicable laws and regulations, the interior and exterior of the Franchised Business, including, without limitation, all furniture, fixtures, equipment, furnishings, floor coverings, interior and exterior signage, interior and exterior finishes, and interior and exterior lighting. You shall promptly and diligently perform all necessary maintenance, repairs, and replacements to the Franchised Business premises as Franchisor may prescribe from time to time including periodic interior painting and replacement of obsolete or worn out signage, floor coverings, furnishings, equipment, and décor.

**I.    Franchised Business Operations.**

You shall cause the Franchised Business to be open and operating on the days and during the hours that Franchisor designates, subject to applicable lease and/or local law or licensing limitations. You shall operate and maintain the Franchised Business in conformity with the highest ethical standards and sound business practices and in a manner which will enhance the goodwill associated with the Proprietary Marks.

**J.    Management and Personnel.**

You shall employ a sufficient number of qualified, competent individuals to satisfy the demand for products and services offered by the Franchised Business. You shall hire all employees of the Franchised Business, and be exclusively responsible for the terms of their employment and compensation, and for the proper training of such employees in the operation of the Franchised Business, in human resources and customer relations. You shall employ only suitable individuals of good character and reputation who will at all times conduct themselves in a competent and courteous manner in accordance with the image and reputation of URBAN AIR TRAMPOLINE & ADVENTURE PARK and the System and, while on duty, each employee shall comply with the dress attire, personal appearance and hygiene standards set forth in the Manual. You shall use best efforts to ensure that your employees maintain a neat and clean appearance and render competent and courteous service to all customers and are courteous and respectful to fellow employees. The parties acknowledge and agree that these requirements are necessary to preserve the goodwill identified by the Proprietary Marks. The parties further acknowledge and agree that Franchisor neither dictates nor controls labor or employment matters for you or your employees. You are exclusively responsible for hiring personnel, for determining the number of jobs offered or job vacancies to be filled, for determining and changing employee wages and benefits and work hours, and for disciplining and discharging your employees. You are exclusively responsible for labor relations with your employees.    You shall defend and indemnify Franchisor and its Indemnities (as defined in <u>Section 20.B.</u> below) against any and all proceedings, claims, investigations, and causes of action instituted by your employees or by others that arise from your employment practices.

**K.    Designated Manager.**

You shall designate and retain an individual to serve as your Designated Manager. The Designated Manager as of the date of this Agreement is identified in <u>Attachment C</u> to this Agreement. Unless waived in writing by Franchisor, the Designated Manager shall meet all of the following qualifications:

(1)    He or she, at all times, shall have full control over the day-to-day activities and operations of the Franchised Business and shall devote full time and best efforts to supervising the operation of the Franchised

V.2

Business (and any other URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchised Business that you own and operate pursuant to a franchise agreement with Franchisor) and shall not engage in any other business or activity, directly or indirectly, that requires substantial management responsibility or time commitment;

(3)     He or she shall successfully complete the initial training program and any additional training required by Franchisor; and

(4)     Franchisor shall have approved him or her as meeting its then-current Standards for such position, and not have later withdrawn such approval.

If the Designated Manager ceases to serve in, or no longer qualifies for such position, you shall designate another qualified person to serve as your Designated Manager within 30 days. Your proposed replacement Designated Manager must successfully complete the initial training program and execute a Confidentiality and Noncompete Agreement in the form prescribed by Franchisor before assuming Designated Manager responsibilities.

**L.      Signs and Logos.**

Subject to any applicable local ordinances, you shall prominently display at the Franchised Business premises such interior and exterior signs, logos, and advertising of such nature, form, color, number, location, and size, and containing the content and information that Franchisor may from time to time direct. You shall not display in or about the Franchised Business premises or otherwise in connection with the Proprietary Marks any unauthorized sign, logo, or advertising media of any kind.

**M.      Entertainment Equipment.**

You shall not permit to be installed at the Franchised Business premises any juke box, vending or game machine, gum machine, game, ride, gambling or lottery device, coin or token operated machine, or any other music, film, or video device not authorized by Franchisor.

**N.      Compliance with Laws and Good Business Practices.**

You shall secure and maintain in full force in your name and at your expense all required licenses, permits, and certifications relating to the operation of the Franchised Business. You shall operate the Franchised Business in full compliance with all applicable laws, ordinances, and regulations including, without limitation, all laws or regulations governing or relating to immigration and discrimination, occupational hazards, employment laws (including, without limitation, workers' compensation insurance, unemployment insurance, and the withholding and payment of federal and state income taxes and social security taxes) and the payment of sales taxes. All advertising and promotion for the Franchised Business shall be completely factual and shall conform to the highest standards of ethical advertising. In all dealings with the Franchised Business' customers, suppliers, and the public, you shall adhere to the highest standards of honesty, integrity, fair dealing, and ethical conduct. You shall refrain from any business or advertising practices that may be injurious to the good will associated with the Proprietary Marks or to the business of the URBAN AIR TRAMPOLINE & ADVENTURE PARK Brand, Franchisor or its Affiliates, the System, or other System franchisees.

You shall notify Franchisor in writing within five days after the commencement of: (1) any action, suit, or proceeding, or the issuance of any order, writ, injunction, award, or decree of any court, agency, or other governmental instrumentality, which may adversely affect the operation of the Franchised Business or your financial condition; or (2) any notice of violation of any law, ordinance, or regulation relating to health or sanitation at the Franchised Business.

**O.      Payment of Taxes and Other Indebtedness.**

You shall promptly pay, when due, all taxes levied or assessed by any federal, state, or local tax authority and any and all other indebtedness incurred by you in the operation of the Franchised Business. In the event of any bona fide dispute as to liability for taxes assessed or other indebtedness, you may contest the validity or the amount of the tax or indebtedness in accordance with procedures of the taxing authority or applicable law; provided, however, in no event shall you permit a tax sale or seizure by levy of execution or similar writ or

warrant, or attachment by a creditor, to occur against the premises of the Franchised Business or any improvements thereon.

## 12.    ORGANIZATION OF THE FRANCHISEE

### A.    Representations.

If you are a Business Entity, you make the following representations and warranties: (1) the Business Entity is duly organized and validly existing under the laws of the state of its formation; (2) it is qualified to do business in the state or states in which the Franchised Business is located; (3) execution of this Agreement and the development and operation of the Franchised Business is permitted by its governing documents; and (4) unless waived in writing by Franchisor, its charter documents and its governing documents shall at all times provide that the activities of the Business Entity are limited exclusively to the development and operation of a single URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchised Business.

If you are an individual, or a partnership comprised solely of individuals, you make the following additional representations and warranties: (1) each individual has executed this Agreement; (2) each individual shall be jointly and severally bound by, and personally liable for the timely and complete performance and a breach of, each and every provision of this Agreement; and (3) notwithstanding any transfer for convenience of ownership pursuant to Section 17 of this Agreement, each individual shall continue to be jointly and severally bound by, and personally liable for the timely and complete performance and a breach of, each and every provision of this Agreement.

### B.    Governing Documents.

If you are a corporation, copies of your Articles of Incorporation, bylaws, other governing documents, and any amendments, including the resolution of the Board of Directors authorizing entry into and performance of this Agreement, and all shareholder agreements, including buy/sell agreements, must be furnished to Franchisor.  If you are a limited liability company, copies of your Articles of Organization, operating agreement, other governing documents and any amendments, including the resolution of the Managers authorizing entry into and performance of this Agreement, and all agreements, including buy/sell agreements, among the members must be furnished to Franchisor.  If you are a general or limited partnership, copies of your written partnership agreement, other governing documents and any amendments, as well as all agreements, including buy/sell agreements, among the partners must be furnished to Franchisor, in addition to evidence of consent or approval of the entry into and performance of this Agreement by the requisite number or percentage of partners, if that approval or consent is required by your written partnership agreement or applicable law.  When any of these governing documents are modified or changed, you must promptly provide copies of the modifying documents to Franchisor.

### C.    Ownership Interests.

If you are a Business Entity, you represent that all of your equity interests are owned as set forth on Attachment C to this Agreement.  In addition, if you are a corporation, you shall maintain a current list of all owners of record and all beneficial owners of any class of voting securities of the corporation (and the number of shares owned by each).  If you are a limited liability company, you shall maintain a current list of all members (and the percentage membership interest of each member).  If you are a partnership, you shall maintain a current list of all owners of an interest in the partnership (and the percentage ownership interest of each general and limited partner).  You shall comply with Section 17 of this Agreement prior to any change in ownership interests and shall execute any necessary addenda to Attachment C as changes occur in order to ensure the information contained in Attachment C is true, accurate, and complete at all times.

### D.    Restrictive Legend.

If you are a corporation, you shall maintain stop-transfer instructions against the transfer on your records of any voting securities, and each stock certificate of the corporation shall have conspicuously endorsed upon its face the following statement: "Any assignment or transfer of this stock is subject to the restrictions imposed on assignment by the URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchise Agreement(s) to which the corporation is a party." If you are a limited liability company, each membership or management certificate or

other evidence of interest in the limited liability company shall have conspicuously endorsed upon its face the following statement: "Any assignment or transfer of an interest in this limited liability company is subject to the restrictions imposed on assignment by URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchise Agreement(s) to which the limited liability company is a party." If you are a partnership, your written partnership agreement shall provide that ownership of an interest in the partnership is held subject to, and that further assignment or transfer is subject to, all restrictions imposed on assignment by this Agreement.

**E.    Guarantees.**

If you are a Business Entity, each Owner (and if you are a limited partnership, each of your general partner's Owners) shall execute the Personal Undertaking and Guaranty attached hereto as <u>Attachment D-1</u>.

**13.    PROPRIETARY MARKS AND COPYRIGHTED WORKS**

**A.    Acknowledgments.**

You expressly understand and acknowledge that: (1) as between you and Franchisor, Franchisor is the exclusive owner of all right, title, and interest in and to the Proprietary Marks (and all goodwill symbolized by them) and the Copyrighted Works; (2) the Proprietary Marks are valid and serve to identify the System and those who are licensed to operate a Franchised Business in accordance with the System; (3) your use of the Proprietary Marks and Copyrighted Works pursuant to this Agreement does not give you any ownership interest or other interest in or to them, except the nonexclusive license to use them in accordance with this Agreement and the Standards; (4) any and all goodwill arising from your use of the Proprietary Marks and/or the System shall inure solely and exclusively to Franchisor's benefit, and upon expiration or termination of this Agreement, no monetary amount shall be assigned as attributable to any goodwill associated with your use of the System or the Proprietary Marks; (5) the license and rights to use the Proprietary Marks and Copyrighted Works granted hereunder to you are nonexclusive; (6) Franchisor may itself use, and grant franchises and licenses to others to use, the Proprietary Marks, Copyrighted Works, and the System; (7) Franchisor may establish, develop and franchise other systems, different from the System licensed to you herein, without offering or providing you any rights in, to, or under such other systems; and (8) Franchisor may add to, eliminate, modify, supplement, or otherwise change, in whole or in part, any aspect of the Proprietary Marks or Copyrighted Works.

**B.    Modification of the Proprietary Marks and Copyrighted Works.**

Franchisor reserves the right to add to, eliminate, modify, supplement, or otherwise change any of the Proprietary Marks and Copyrighted Works, in whole or in part. You must promptly take all actions necessary to adopt all new and modified Proprietary Marks and/or Copyrighted Works and discontinue using obsolete Proprietary Marks and/or Copyrighted Works which may include, among other things, acquiring and installing, at your expense, new interior and exterior signage and graphics.

**C.    Use of the Proprietary Marks and Copyrighted Works.**

You shall use only the Proprietary Marks and Copyrighted Works designated by Franchisor and shall use them only in connection with the operation and promotion of the Franchised Business and in the manner required or authorized and permitted by Franchisor. Your right to use the Proprietary Marks and Copyrighted Works is limited to the uses authorized under this Agreement and in the Manual, and any unauthorized use thereof shall constitute an infringement of Franchisor's rights and grounds for termination of this Agreement.

You shall not use the Proprietary Marks as part of your Business Entity or other legal name. You shall comply with all requirements of Franchisor's and applicable state and locals laws concerning use and registration of fictitious and assumed names, and shall execute any documents deemed necessary by Franchisor or its counsel to obtain protection for the Proprietary Marks or to maintain their continued validity and enforceability.

**D.    Internet and Social Media Usage.**

You may not cause or allow all or any recognizable portion of the Proprietary Marks to be used or displayed as all or part of an e-mail address, Internet domain name, uniform resource locator ("**URL**"), or meta-tag, or in connection with any Internet home page, web site, or any other Internet-related activity without Franchisor's express written consent, and then only in a manner and in accordance with the procedures, standards

and specifications that Franchisor establishes. This prohibition includes use of the Proprietary Marks or any derivative of the Proprietary Marks as part of in the registration of any user name on any gaming website or social networking website including, but not limited to, FACEBOOK, MYSPACE, LINKEDIN, FOURSQUARE, YELP, URBANSPOON, or TWITTER. Our social media and networking policies will be provided to you in the Manual, and may be modified, amended, or terminated by us at any time.

**E.    Assignment of Rights.**

To the extent that you or any Owner creates any derivative work based on the Proprietary Marks or Copyrighted Works ("**Derivative Works**"), you and each such Owner hereby permanently and irrevocably assigns to Franchisor all rights, interests, and ownership (including intellectual property rights and interests) in and to the Derivative Works, and agree to execute such further assignments as Franchisor may request. The term "Derivative Works" shall be interpreted to include, without limitation: any and all of the following which is developed by you, or on your behalf, if developed in whole or in part in connection with your Franchised Business: all products or services; all variations, modifications and/or improvements on products or services; your means, manner and style of offering and selling products and services; management techniques or protocols you may develop (or have developed on your behalf); all sales, marketing, advertising, and promotional programs, campaigns, or materials developed by you or on your behalf; and, all other intellectual property developed by you or on behalf of your Franchised Business.

Franchisor may authorize itself, its affiliates, and other Franchised Businesses to use and exploit any such rights assigned by this Section 13.E. The sole consideration for your assignment to Franchisor of the foregoing rights shall be Franchisor's grant of the Franchise conferred to you under this Agreement. You and each Owner shall take all actions and sign all documents necessary to give effect to the purpose and intent of this Section 13.E. You and each Owner irrevocably appoint Franchisor as true and lawful attorney-in-fact for you and each Owner, and authorize Franchisor to take such actions and to execute, acknowledge, and deliver all such documents as may from time to time be necessary to convey to Franchisor all rights granted herein.

**F.    Infringement; Notice of Claims.**

If you become aware of any infringement of the Proprietary Marks or Copyrighted Works or if your use of the Proprietary Marks or Copyrighted Works is challenged by a third party, then you must immediately notify Franchisor. Franchisor shall have the exclusive right to take whatever action it deems appropriate. If Franchisor or its Affiliate undertakes the defense or prosecution of any litigation pertaining to any of the Proprietary Marks or other intellectual property, you must sign all documents and perform such acts and things as, in the opinion of Franchisor's counsel, may be necessary to carry out such defense or prosecution. If it becomes advisable at any time in the sole discretion of Franchisor to modify or discontinue the use of any Mark or Copyrighted Works, or to substitute a new mark or graphic for any Mark or Copyrighted Work, as applicable, you must promptly comply, at your expense (which may include the cost of replacement signage and/or trade dress), with such modifications, discontinuances, or substitutions within 60 days following your receipt of written notice of the change.

**G.    Remedies and Enforcement.**

You acknowledge that in addition to any remedies available to Franchisor under this Agreement, you agree to pay all court costs and reasonable attorneys' fees incurred by Franchisor in obtaining specific performance of, a temporary restraining order and/or an injunction against violation of the provisions of this Section 13.

**14.    CONFIDENTIALITY OBLIGATIONS AND RESTRICTIVE COVENANTS**

**A.    Confidential Information.**

You and each Owner acknowledge that all Confidential Information belongs exclusively to Franchisor. You and each Owner agree to use and permit the use of the Confidential Information only in connection with the operation of your Franchised Business, to maintain the confidentiality of all Confidential Information, to not duplicate any materials containing Confidential Information. You and each Owner further agree that you will not at any time, during the term of this Agreement or after expiration or earlier termination of this Agreement:

(i) divulge any Confidential Information to anyone, except to other franchisees, your employees having a need to know, and your professional advisors having a need to know; (ii) divulge or use any Confidential Information for the benefit of yourself, your owners, or any third party (including any person, business entity, or enterprise of any type or nature), except in the operation of your Franchised Business, and then only in strict compliance with the Manual and System; or (iii) directly or indirectly imitate, duplicate, or "reverse engineer" any of our Confidential Information, or aid any third party in such actions.

Upon the expiration or earlier termination of this Agreement, you will return to Franchisor all Confidential Information which is then in your possession, including, without limitation, customer lists and records, all training materials and other instructional content, all financial and non-financial books and records, the Manual and any supplements to the Manual, and all computer databases, software, and manual. Franchisor reserves the right, upon its specific written request, to require you to destroy all or certain such Confidential Information and to certify such destruction to Franchisor. You specifically acknowledge that all customer lists or information adduced by your Franchised Business is not your property, but is Franchisor's property, and you further agree to never contend otherwise.

You shall cause your Designated Manager and any employee with access to Confidential Information, including information contained in the Manuals, to sign a confidentiality agreement in a form prescribed by Franchisor, which identifies Franchisor as a third-party beneficiary of such agreement and gives Franchisor independent rights of enforcement.

The provisions of this <u>Section 14.A</u> will survive expiration or termination of this Agreement.

**B.      Covenants of the Franchisee.**

You acknowledge that you and your Owners will receive valuable specialized training and Confidential Information, including, without limitation, information regarding the operational, sales, promotional, and marketing methods and techniques and trade secrets of Franchisor and the System.

You covenant and agree that during the term of this Agreement, you will not, either directly or indirectly, for yourself, or through, on behalf of, or in conjunction with any person, or legal entity:

(a)   Divert or attempt to divert any present or prospective customer of any URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchised Business to any Competitive Business, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act that is harmful, injurious, or prejudicial to the goodwill associated with the Proprietary Marks and the System;

(b)   Employ or seek to employ any person who is or has within the previous 60 days been employed by Franchisor or an Affiliate of Franchisor, or otherwise directly or indirectly induce such person to leave his or her employment; or

(c)   Own, maintain, advise, operate, engage in, be employed by, make loans to, invest in, provide any assistance to, or have any interest in (as owner or otherwise) or relationship or association with, any Competitive Business other than an URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchised Business operated by you or your Affiliates pursuant to a then-currently effective Franchise Agreement with Franchisor, at any location within the United States, its territories or commonwealths, or any other country, province, state, or geographic area in which Franchisor or its Affiliates have used, sought registration of, or registered the Proprietary Marks or similar marks, or have operated or licensed others to operate a business under the System or the Proprietary Marks or similar marks; provided that such restriction shall not apply to less than a 5% beneficial interest in any publicly traded corporation.

You further covenant and agree that for a two-year continuous and uninterrupted period (which shall be tolled during any period of noncompliance) commencing upon expiration or termination of this Agreement, regardless of the reason for termination, you will not, either directly or indirectly, for yourself, or through, on behalf of, or in conjunction with any person, or legal entity:

(a)   Divert or attempt to divert any present or prospective customer of any URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchised Business to any Competitive Business, by direct

or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act that is harmful, injurious, or prejudicial to the goodwill associated with the Proprietary Marks and the System;

(b)  Employ or seek to employ any person who is or has within the previous 60 days been employed by Franchisor or an Affiliate of Franchisor, or otherwise directly or indirectly induce such person to leave his or her employment; or

(c)  Own, maintain, advise, operate, engage in, be employed by, make loans to, invest in, provide any assistance to, or have any interest in (as owner or otherwise) or relationship or association with, any Competitive Business other than an URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchised Business operated by you or your Affiliates pursuant to a then-currently effective Franchise Agreement with Franchisor, at any location that (i) is, or is intended to be, located at the location of any former URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchised Business; (ii) is within a 25-mile radius of your former Franchised Business location; or (iii) is within a 25-mile radius of any other URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchised Business operating under the System and Proprietary Marks in existence or under development at the time of such termination or transfer.

This two-year period will be tolled during any period of your noncompliance.

**C.**     **Covenants of the Franchisee's Owners.**

During the term of this Agreement, your Owners will not, either directly or indirectly, for themselves, or through, on behalf of, or in conjunction with any person, or legal entity:

(a)  Divert or attempt to divert any present or prospective customer of any URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchised Business to any Competitive Business, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act that is harmful, injurious, or prejudicial to the goodwill associated with the Proprietary Marks and the System;

(b)  Employ or seek to employ any person who is or has within the previous 60 days been employed by Franchisor or an Affiliate of Franchisor, or otherwise directly or indirectly induce such person to leave his or her employment; or

(c)  Own, maintain, advise, operate, engage in, be employed by, make loans to, invest in, provide any assistance to, or have any interest in (as owner or otherwise) or relationship or association with, any Competitive Business other than an URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchised Business operated by you or your Affiliates pursuant to a then-currently effective Franchise Agreement with Franchisor, at any location within the United States, its territories or commonwealths, or any other country, province, state, or geographic area in which Franchisor or its Affiliates have used, sought registration of, or registered the Proprietary Marks or similar marks, or have operated or licensed others to operate a business under the System or the Proprietary Marks or similar marks; provided that such restriction shall not apply to less than a 5% beneficial interest in any publicly traded corporation.

For a two-year continuous and uninterrupted period (which shall be tolled during any period of noncompliance) commencing upon the earlier of (i) expiration or termination of this Agreement, regardless of the cause for termination, (ii) dissolution of the franchisee entity, or (iii) the transfer or redemption of an Owner's interest in the franchisee entity, your Owners will not, either directly or indirectly, for themselves, or through, on behalf of, or in conjunction with any person, or legal entity:

(a)  Divert or attempt to divert any present or prospective customer of any URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchised Business to any Competitive Business, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act that is harmful, injurious, or prejudicial to the goodwill associated with the Proprietary Marks and the System;

(b)  Employ or seek to employ any person who is or has within the previous 60 days been employed by Franchisor or an Affiliate of Franchisor, or otherwise directly or indirectly induce such person to leave his or her employment; or

V.2

(c) Own, maintain, advise, operate, engage in, be employed by, make loans to, invest in, provide any assistance to, or have any interest in (as owner or otherwise) or relationship or association with, any Competitive Business other than an URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchised Business operated by you or your Affiliates pursuant to a then-currently effective Franchise Agreement with Franchisor, at any location that (i) is, or is intended to be, located at the location of any former URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchised Business; (ii) is within a 25-mile radius of your former Franchised Business location; or (iii) is within a 25-mile radius of any other URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchised Business operating under the System and Proprietary Marks in existence or under development at the time of such termination or transfer.

This two-year period will be tolled during any period of your noncompliance. At Franchisor's request, each Owner shall execute a separate agreement containing the terms contained in this Section 14.C.

**D.    Reformation and Reduction of Scope of Covenants.**

If all or any portion of any covenant contained in this Section 14 is held to be unreasonable or unenforceable by a court or agency having valid jurisdiction in an un-appealed final decision to which Franchisor or its Affiliate is a party, you and the Owners will be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Section 14. Notwithstanding the foregoing, Franchisor has the unilateral right, in its sole and absolute discretion, to reduce the scope of any covenant set forth in this Section 14, or any portion thereof, which reduction will become effective immediately upon delivery of notice of the reduction.

**E.    Acknowledgments.**

The parties and each Owner acknowledge and agree that any claims that you or such Owner may have or allege to have against Franchisor shall not constitute a defense to the enforcement of any covenant contained in this Section 14.

**F.    No Undue Hardship.**

You and each Owner acknowledge and agree that the covenants set forth in this Section 14 are fair and reasonable. You acknowledge and agree that such covenants will not impose any undue hardship on you and that you have other considerable skills, experience, and education affording you the opportunity to derive income from other endeavors. Each Owner acknowledges and agrees that such covenants will not impose any undue hardship on him or her, and that each has other considerable skills, experience, and education affording him or her the opportunity to derive income from other endeavors.

**G.    Injunctive Relief.**

You and each Owner acknowledge that the violation of any covenant contained in this Section 14 would result in immediate and irreparable injury to Franchisor for which there is no adequate remedy at law. The parties acknowledge and agree that, in the event of a violation of any covenant contained in this Section 14, Franchisor shall be entitled to seek injunctive relief to restrain such violation in accordance with the usual equity principles. The party in violation of any foregoing covenant shall reimburse Franchisor for any costs that it incurs (including attorneys' fees) in connection with enforcement of the provisions contained in this Section 14.

**15.    BRAND DEVELOPMENT; MARKETING**

**A.    General Requirements.**

You shall focus your marketing activities within your Protected Area. You may engage in direct marketing activities in the Protected Area (even if it is overlapping with another franchisee's protected area), and may engage in direct marketing activities outside your Protected Area, so long as such activities are not conducted in another franchisee's or licensee's protected area. For purposes of this agreement, "direct marketing activities" include, without limitation, personal solicitations, direct mailings, sporting event sponsorships and advertising, and school event sponsorships and advertising. "Direct marketing activities" does not include web site advertising or targeted emails or text messages to existing customers. Franchisor may develop policies and

procedures that apply to all types of advertising and marketing efforts, including social media advertising, and Franchisee shall comply with such policies and procedures.

All of your promotional and marketing materials shall be presented in a dignified manner and shall conform to Franchisor's standards and specifications related to advertising, marketing, and trademark use. You shall submit to Franchisor samples of proposed promotional and marketing materials, and notify Franchisor of the intended media, before first publication or use. Franchisor will use good faith efforts to approve or disapprove proposed promotional and marketing materials within 10 business days after receipt. You may not use the promotional or marketing materials until Franchisor expressly approves the materials and the proposed media. Once approved, you may use the materials only in connection with the media for which they were approved. Franchisor may disapprove your promotional or marketing materials, or the media for which they were approved, at any time, and you must discontinue using any disapproved materials or media upon your receipt of written notice of disapproval.

**B.      Grand Opening Advertising.**

You agree to spend at least the Grand Opening Advertising Amount in accordance with the Specifications to promote the opening of your Franchised Business. All grand opening advertising and promotional materials shall be submitted to Franchisor for approval pursuant to Section 15.A, above.

**C.      Advertising Cooperatives.**

Franchisor may, from time to time, form local or regional advertising cooperatives ("**Advertising Cooperative**") to pay for the development, placement, and distribution of advertising for the benefit of Franchised Businesses located in the geographic region served by the Advertising Cooperative. Any Advertising Cooperative established by Franchisor will be operated solely as a conduit for the collection and expenditure of Advertising Cooperative fees for the foregoing purposes.

If Franchisor forms an Advertising Cooperative for the region in which the Franchised Business is located, you agree to participate in the Advertising Cooperative pursuant to the terms of this Section 15.C.

Franchisor shall have the exclusive right to create, dissolve, and merge each Advertising Cooperative created, in its discretion, and to create and amend the organizational and governing documents related thereto, provided that such documents shall: (1) operate by majority vote, with each URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchised Business (including those owned by Franchisor or its Affiliates) entitled to one vote; (2) entitle Franchisor to cast one vote (in addition to any votes it may be entitled to on account of its operation of Franchised Businesses in the area served by the Advertising Cooperative); (3) permit the members of the Advertising Cooperative, by majority vote, to determine the amount of required contributions; and (4) provide that any funds left in the Cooperative at the time of dissolution shall be returned to the members in proportion to their contributions during the 12-month period immediately preceding termination.

You agree to be bound by all organizational and governing documents created by Franchisor and, at Franchisor's request, shall execute all documents necessary to evidence or affirm your agreement. The Advertising Cooperative shall begin operating on a date determined in advance by Franchisor.

No advertising or promotional plans or materials may be used by the Advertising Cooperative or furnished to its members without Franchisor's prior approval. All advertising plans and materials must conform to the Standards and must be submitted to Franchisor for approval according to the procedures set forth in Section 15.A of this Agreement.

**D.      Restriction Against Internet Advertising.**

You may not establish or maintain a web site or other presence on the World Wide Web portion of the Internet, including gaming websites or social networking websites such as, but not limited to, FACEBOOK, MYSPACE, LINKEDIN, FOURSQUARE, YELP, URBANSPOON, or TWITTER, which reflects any of the Proprietary Marks or any of Franchisor's copyrighted works, that includes the terms "URBAN AIR TRAMPOLINE & ADVENTURE PARK" as part of its URL or domain name, that otherwise states or suggests your affiliation with URBAN AIR TRAMPOLINE & ADVENTURE PARK or its franchise system, or that uses or displays any collateral merchandise offered at the Franchised Business, without Franchisor's express written

V.2

consent, and then only in a manner and in accordance with the procedures, standards and specifications that Franchisor establishes.  Our social media and networking policies will be provided to you in the Manual, and may be modified, amended, or terminated by us at any time

**E.      Loyalty Programs, Prize Promotions, and Promotional Literature**

You shall participate in and offer to your customers all customer loyalty and reward programs, and all contests, sweepstakes, and other promotions that Franchisor may develop from time to time.  Franchisor will communicate to you in writing the details of each such program and promotion, and you shall promptly display all point-of-sale advertising and promotion-related information at such places within the Franchised Business as Franchisor may designate.  You shall purchase and distribute all coupons, clothing, toys, and other collateral merchandise (and only the coupons, clothing, toys, and collateral merchandise) designated by Franchisor for use in connection with each such program and promotion.

To the extent that Franchisor develops or authorizes the sale of gift certificates and/or stored value cards, you shall acquire and use all computer software and hardware necessary to process their sale and to process purchases made using them.  All proceeds from the sale of all gift certificates and stored value cards belong exclusively to Franchisor, and you shall remit the proceeds of such sales to Franchisor according to the procedures that Franchisor prescribes periodically. Franchisor shall reimburse or credit to you (at Franchisor's option) the redeemed value of gift cards and stored value cards accepted as payment for products and services sold by the Franchised Business.

You also shall display at the Franchised Business all promotional literature and information as Franchisor may reasonable require from time to time.  This may include, among other things, establishing a bulletin board for posting local school and community events and displaying signage or other literature containing information about the URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchised Business franchise offering.

You also agree to honor such credit cards, courtesy cards, and other credit devices, programs, and plans as may be issued or approved by us from time to time.  Any reasonable and customary service charges or discounts from reimbursements charged on such cards or authorizations will be at your sole expense.

**16.      INSURANCE**

**A.      Obligation to Maintain Insurance.**

You shall be responsible for all loss or damage arising from or related to your development and operation of the Franchised Business, and for all demands or claims with respect to any loss, liability, personal injury, death, property damage, or expense whatsoever occurring upon the premises of, or in connection with the development or operation of, the Franchised Business.  You shall procure at your expense and maintain in full force and effect throughout the term of this Agreement that insurance which you determine is necessary or appropriate for liabilities caused by or occurring in connection with the development or operation of the Franchised Business, including the minimum coverages described in Section 16.B below.  Franchisor, and any entity with an insurable interest designated by Franchisor, shall be an additional named insured in such policies to the extent each has an insurable interest.  Franchisor may, from time to time, designate one or more approved insurance carriers or brokers, and Franchisee shall comply with such source requirements, to the extent permitted by applicable law. Franchisee's policies must be primary and non-contributory to any insurance that Franchisor may carry.

**B.      Minimum Insurance Coverage.**

All insurance policies shall be written by an insurance company or companies satisfactory to Franchisor, in compliance with the standards, specifications, coverages, and limits set forth in the Manual or other written directives.  Such policy or policies shall include, at a minimum, the following types of coverages, with minimum limits prescribed by Franchisor: comprehensive general liability insurance, including broad form contractual liability, liquor liability, personal injury, advertising injury, completed operations, products liability, and fire damage coverage; "all risks" property insurance and tenant's liability coverage, including coverage for fire, vandalism, and malicious mischief; personal property coverage; automobile liability coverage for owned and

non-owned vehicles; workers' compensation insurance; spoilage and business interruption insurance; such insurance as may be required by the landlord of the Franchised Business premises; and such insurance as necessary to provide coverage under the indemnity provisions set forth in <u>Section 20.B</u> below. In connection with any construction, renovation, refurbishment, or remodeling of the Franchised Business, you also shall maintain Builder's All Risks insurance, and in connection with new construction or substantial renovation, refurbishment, or remodeling of the Franchised Business, you shall maintain performance and completion bonds in forms and amounts, and written by carrier(s), reasonably satisfactory to Franchisor.

Franchisor shall have the right to establish and modify the minimum required coverages and to require different or additional kinds of insurance to reflect inflation, changes in standards of liability, higher damage awards, or other relevant changes in circumstances. All insurance requirements will be communicated to you via the Manual. You shall receive written notice of any modifications to the insurance requirements and shall take prompt action to secure the additional coverage or higher policy limits. All such insurance policies shall include a waiver of subrogation in favor of Franchisor and its Affiliates, and their respective officers, directors, shareholders, partners, members, agents, representatives, independent contractors, servants, and employees.

You acknowledge that Franchisor's minimum insurance requirements do not constitute advice or a representation that such coverages are necessary or adequate to protect you from losses in connection with the Franchised Business. Nothing in this Agreement prevents or restricts you from acquiring and maintaining insurance with higher policy limits or lower deductibles than Franchisor requires.

**C.**     <u>**Insurance Policy Requirements.**</u>

The following general requirements apply to each insurance policy you are required to maintain under this Agreement:

(1)     Each insurance policy must be specifically endorsed to provide that the coverage must be primary and that any insurance carried by any additional insured will be excess and non-contributory.

(2)     Each insurance policy must name Franchisor and its Affiliates, and their respective partners, officers, subsidiaries, affiliates, shareholders, directors, regional directors, agents, and employees as additional named insureds on a primary non-contributory basis as an Additional Insured Grantor of Franchise Endorsement per form CG2029 (or an endorsement form with comparable wording acceptable to Franchisor).

(3)     No insurance policy may contain a provision that in any way limits or reduces coverage for you in the event of a claim by Franchisor or its Affiliates.

(4)     Each insurance policy must extend to, and provide indemnity for, all of your obligations and liabilities to third parties and all other items for which you are required to indemnify Franchisor under this Agreement.

(5)     Each insurance policy must be written by an insurance company that has received and maintains "A- VII" or better rating by the latest edition of Best's Insurance Rating Service.

(6)     No insurance policy may provide for a deductible amount that exceeds $5,000, unless otherwise approved in writing by Franchisor, and your co-insurance under any insurance policy must be 80% or greater.

**D.**     <u>**Delivery of Certificate.**</u>

No later than 30 days after this Agreement is executed by Franchisor, and on each policy renewal date thereafter, you shall submit evidence of satisfactory insurance and proof of payment therefore to Franchisor. The evidence of insurance shall include a statement by the issuer that the policy or policies will not be cancelled or materially altered without at least 30 days' prior written notice to Franchisor. Upon request, you also shall provide to Franchisor copies of all or any policies, and policy amendments and riders.

**E.**     <u>**Minimum Insurance Requirements Not a Representation of Adequacy.**</u>

You acknowledge that no requirement for insurance contained in the Agreement constitutes advice or a representation by Franchisor that only such policies, in such amounts, are necessary or adequate to protect you from losses in connection with your business under this Agreement. Maintenance of this insurance, and the

performance of your obligations under this <u>Section 16</u>, shall not relieve you of liability under the indemnification provisions of this Agreement.

**F.      Franchisor's Right to Procure Insurance.**

If you fail to procure or maintain at least the insurance required by this <u>Section 16</u>, as revised from time to time pursuant to the Manual or otherwise in writing, Franchisor shall have the immediate right and authority, but not the obligation, to procure such insurance and charge its cost to you, in which case you shall pay Franchisor, immediately upon demand, reimbursement of all out-of-pocket costs incurred by Franchisor in obtaining such insurance on your behalf plus an administrative fee equal to 10% of the annual premium(s) for all insurance policies obtained by Franchisor on your behalf.

**17.      TRANSFER**

**A.      Transfer by Franchisor.**

Franchisor shall have the right, in its sole discretion and without your consent, to assign this Agreement and/or all of its rights and/or obligations hereunder in a related or third party transaction, may sell any or all of its assets (including its rights in and to the Proprietary Marks and the System); may issue new shares through an initial public offering and/or private placement; may merge with and/or acquire other companies, or may merge into or be acquired by another company; and may pledge its assets to secure payment of its financial obligations.

**B.      Transfer by Franchisee.**

You understand and acknowledge that Franchisor has entered into this Agreement in reliance on your business skill, financial capacity, personal character, experience, and demonstrated or purported ability in customer service operations.  Accordingly, you may not sell or transfer your interest in this Agreement or the assets of the Franchised Business (except in the ordinary course of your business) without Franchisor's prior written consent. In addition, if you are a Business Entity, no Owner may transfer or assign his or her equity interest in the Business Entity without Franchisor's prior written consent.  For purposes of this <u>Section 17.B</u> the term "transfer" means and includes an actual assignment, sale, or transfer of an interest, or a collateral assignment or pledge of the interest as security for performance of an obligation.

You must notify Franchisor in writing at least 60 days prior to the date of any such intended transfer. Any purported transfer, by operation of law or otherwise, not having the written consent of Franchisor shall be null and void and shall constitute a material breach of this Agreement.  Franchisor shall not unreasonably withhold its consent to any transfer, but may, in its sole discretion, require any or all of the following as conditions of its consent:

(1)      All of your accrued monetary obligations and all other outstanding obligations to Franchisor and its Affiliates and your suppliers shall be up to date, fully paid, and satisfied;

(2)      You must be in full compliance with this Agreement and any other agreements between you and Franchisor, its Affiliates, and your suppliers;

(3)      You and each Owner shall have executed a general release, in a form satisfactory to Franchisor, of any and all claims against Franchisor and its Affiliates and their respective officers, directors, shareholders, agents, and employees in their corporate and individual capacities, including, without limitation, claims arising under federal, state, and local laws, rules, and ordinances; provided, however, that any release will not be inconsistent with any state statute regulating franchising;

(4)      The transferee shall demonstrate to Franchisor's satisfaction that the transferee meets Franchisor's then-current educational, managerial, and business standards; possesses a good moral character, business reputation, and credit rating; has the aptitude and ability to operate the Franchised Business; and has sufficient equity capital to operate the Franchised Business;

(5)      The transferee shall sign Franchisor's then-current form of franchise agreement for the remaining term (and if the transferee is a Business Entity, then the transferee's Owners shall jointly and severally guarantee your obligations under this Agreement in writing in a form satisfactory to Franchisor), and you shall pay to Franchisor the Transfer Fee in the amount set forth in the Summary Page;

(6)    If deemed necessary by Franchisor, the transferee shall agree to update, remodel, refurbish, renovate, modify, or redesign the Franchised Business, at transferee's sole expense, to conform to Franchisor's then-current standards and specifications for an URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchised Business;

(7)    You agree to remain liable for all direct and indirect obligations to Franchisor in connection with the Franchised Business prior to the effective date of the transfer, shall continue to remain responsible for its obligations of nondisclosure, noncompetition, and indemnification as provided elsewhere in this Agreement, and all other obligations that survive termination, expiration, or transfer and shall execute any and all instruments reasonably requested by Franchisor to further evidence such obligation;

(8)    The transferee shall comply with Franchisor initial training requirements;

(9)    You or the transferor must provide Franchisor with a copy of the agreements of purchase and sale between the transferor and the transferee. The economic terms of the transfer may not materially and adversely affect, in Franchisor's sole judgment, the post-transfer viability of the Franchised Business.

**C.     Security Interest.**

You may grant a security interest in this Agreement or the franchise represented by this Agreement only to the limited extent permitted by Section 9-408 of the Uniform Commercial Code. Any such security interest may only attach to an interest in the proceeds of the operation of the Franchised Business and may not under any circumstances entitle or permit the secured party to take possession of or operate the Franchised Business or to transfer your interest in the franchise without Franchisor's consent.

**D.     Public and Private Offerings.**

If you are a Business Entity and you intend to issue equity interests pursuant to a public or private offering, you shall first obtain Franchisor's written consent, which consent shall not be unreasonably withheld. You must provide to Franchisor for its review a copy of all offering materials (whether or not such materials are required by applicable securities laws) at least 60 days prior to such documents being filed with any government agency or distributed to investors. No offering shall imply (by use of the Proprietary Marks or otherwise) that Franchisor is participating in an underwriting, issuance, or offering of your securities, and Franchisor's review of any offering shall be limited to ensuring compliance with the terms of this Agreement. Franchisor may condition its approval on satisfaction of any or all of the conditions set forth in <u>Section 17.B</u> and on execution of an indemnity agreement, in a form prescribed by Franchisor, by you and any other participants in the offering. For each proposed offering, you shall pay to Franchisor a retainer in an amount determined by Franchisor, which Franchisor shall use to reimburse itself for the reasonable costs and expenses it incurs (including, without limitation, attorneys' fees and accountants' fees) in connection with reviewing the proposed offering.

**E.     Right of First Refusal.**

If you receive a bona fide offer to purchase your interest in this Agreement or all or substantially all of the assets of the Franchised Business, or if any Owner receives a bona fide offer to purchase his or her equity interests in you, and you or such Owner wishes to accept such offer, you or the Owner must deliver to Franchisor written notification of the offer and, except as otherwise provided herein, Franchisor shall have the right and option, exercisable within 30 days after receipt of such written notification, to purchase the seller's interest on the same terms and conditions offered by the third party. If the bona fide offer provides for the exchange of assets other than cash or cash equivalents, the bona fide offer shall include the fair market value of the assets and you shall submit with the notice an appraisal prepared by a qualified independent third party evidencing the fair market value of such assets as of the date of the offer. Any material change in the terms of any offer prior to closing shall constitute a new offer subject to the same right of first refusal by Franchisor as in the case of an initial offer. If Franchisor elects to purchase the seller's interest, closing on such purchase must occur by the later of: (1) the closing date specified in the third party offer; or (2) within 60 days from the date of notice to the seller of Franchisor's election to purchase. Franchisor failure to exercise the option described in this <u>Section 17.E</u> shall not constitute a waiver of any of the transfer conditions set forth in this <u>Section 17</u>.

**F.**     **Transfer Upon Death or Mental Incapacity.**

If any Owner dies or becomes incapacitated, Franchisor shall consent to the transfer of the former Owner's interest in this Agreement or equity interest in the franchisee (as applicable) to his or her spouse or heirs, whether such transfer is made by will or by operation of law, if, in Franchisor's sole discretion and judgment, the transferee meets Franchisor's educational, managerial and business standards; possesses a good moral character, business reputation and credit rating; has the aptitude and ability to conduct the Franchised Business herein; has at least the same managerial and financial criteria required by new franchisees; and has sufficient equity capital to operate the Franchised Business.  If said transfer is not approved by Franchisor, the executor, administrator, or personal representative of such person shall transfer the former Owner's interest to a third party approved by Franchisor within six months after such death, mental incapacity, or disability.  Such transfer shall be subject to Franchisor's right of first refusal and to the same conditions as any *inter vivos* transfer.

**G.**     **Non-Waiver of Claims.**

Franchisor's consent to a Transfer shall not constitute a waiver of any claims it may have against the transferring party, and it will not be deemed a waiver of Franchisor's right to demand strict compliance with any of the terms of this Agreement, or any other agreement to which Franchisor and the transferee are parties, by the transferee.

**18.**     **DEFAULT AND TERMINATION**

**A.**     **Automatic Termination.**

This Agreement will terminate automatically, without notice and without an opportunity to cure, if you become insolvent or make a general assignment for the benefit of creditors; if a petition in bankruptcy is filed by you or such a petition is filed against you and you do not oppose it; if you are adjudicated bankrupt or insolvent; if a bill in equity or other proceeding for the appointment of a receiver or other custodian (permanent or temporary) for you or your business assets, or any part thereof, is filed against you; if any court of competent jurisdiction appoints a receiver or other custodian (permanent or temporary) for you or your business assets, or any part thereof; if proceedings for a composition with creditors under any state or federal law is instituted by or against you; if a final judgment is entered against you and remains unsatisfied or of record for 30 days or longer, unless a *supersedeas* bond is filed; if you are dissolved, voluntarily or involuntarily; if execution is levied against any assets of you or the Franchised Business; if any proceedings to foreclose any lien or mortgage against you, the Franchised Business, or the assets, equipment, or premises of any of the same, is instituted and not dismissed within 30 days; or if the real or personal property of you, the Franchised Business is sold after levy thereupon by any sheriff, marshal, constable, or other authorized law enforcement personnel.

**B.**     **Termination without Opportunity to Cure.**

Franchisor may terminate this Agreement, by delivering to you written notice of termination, upon the occurrence of any of the following events of default:

(1)     You fail to identify a site for the Franchised Business in accordance with <u>Section 3.A</u>, or your failure to open the Franchised Business for business in accordance with <u>Section 4.B</u> and <u>Section 5</u>;

(2)     Your abandonment of the Franchised Business (for purposes of this provision "abandonment" will be deemed to occur if you fail to operate the Franchised Business on three or more consecutive days or if you otherwise convey an intention to close the Franchised Business), or lose the right to possess the Franchised Business premises;

(3)     The making of any false or materially misleading representations in your franchise application or during the franchise application process;

(4)     Your conviction, or any Owner's, conviction of a felony, a crime involving moral turpitude or any other crime which is likely to materially and adversely affect System or the goodwill associated with the Proprietary Marks, or if you or any Owner is held liable in any civil action involving allegations of fraud or unfair trade practices or similar allegations;

(5)      Violation of any confidentiality or non-compete obligations, as described in <u>Section 14</u>, by you or any Owner;

(6)      The Franchised Business fails two consecutive quality assurance inspections during any rolling 12-month period or fails three quality assurance inspections during any rolling 24-month period;

(7)      Termination for cause of any other franchise agreement between Franchisor and you or your Affiliate; or

(8)      Delivery of three or more notices of default during any rolling 24-month period, whether or not the event(s) of default described in such notices ultimately are cured.

**C.      <u>Termination with Opportunity to Cure.</u>**

Franchisor may terminate this Agreement, by delivery of written notice of default, upon the occurrence of any of the following events of default and your failure to take appropriate corrective action during the applicable cure period:

(1)      You fail to pay any monies owed to Franchisor or its Affiliates or your trade creditors within ten (10) days after delivery of written notice of a deficiency;

(2)      You misuse the Proprietary Marks, the Copyrighted Works, or Franchisor's other intellectual property (which includes, without limitation, offering or selling unauthorized products or services under or in conjunction with the Proprietary Marks), and fail to correct the misuse within five (5) days after delivery of written notice;

(3)      The Franchised Business is cited for violation of health, sanitation, or safety laws or regulations, and fails to cure the violation within five (5) days after receiving the citation;

(4)      You fail to comply with any provision of this Agreement (except as otherwise provided in this <u>Section 18</u>) and fail to take appropriate corrective action within thirty (30) days after delivery of written notice of a deficiency; or

(5)      Failure to open to the public a Franchised Business within six months of the Effective Date if the Approved Location is to be located in an existing premises or twelve months if the Approved Location is located in a newly constructed building.

**D.      <u>Other Remedies.</u>**

In addition to its termination rights, Franchisor shall have the right to require the Franchised Business closed during any period in which (1) it is in violation of applicable health, sanitation, or safety laws or regulations, or (2) Franchisor determines, in its sole discretion, that continued operation of the Franchised Business poses a risk to public health or safety.

**E.      <u>Step-In Rights.</u>**

To prevent any interruption of business of the Franchised Business and any injury to the goodwill and reputation thereof which may be caused thereby, you hereby authorize Franchisor, and Franchisor shall have the right, but not the obligation, to operate the Franchised Business for as long as Franchisor deems necessary and practical, and without waiver of any other rights or remedies Franchisor, may have under this Agreement, if you are in default of your obligations under this Agreement.  If Franchisor undertakes to operate the Franchised Business, Franchisor shall have the right to collect and pay from the revenues of the Franchised Business all expenses relating to the operation of the Franchised Business including, without limitation, Royalty Fees, employee salaries, reimbursement of Franchisor's expenses incurred in connection with such operation, and a reasonable management fee.  You shall indemnify and hold Franchisor harmless from any and all claims arising from the alleged acts and omissions of Franchisor and its representatives.

## 19.    OBLIGATIONS UPON EXPIRATION OR TERMINATION

### A.    Expiration or Termination of Franchise.

Upon termination or expiration of this Agreement, you shall have no further right to use the Proprietary Marks, Copyrighted Works or other intellectual property owned and licensed to you by Franchisor. You may no longer hold yourself out as an URBAN AIR TRAMPOLINE & ADVENTURE PARK franchisee, and you shall refrain from representing any present or former affiliation with Franchisor or the URBAN AIR TRAMPOLINE & ADVENTURE PARK franchise System.  You shall immediately pay all sums due and owing to Franchisor and its Affiliates.

You shall immediately take all actions necessary to cancel any assumed or fictitious name containing the Proprietary Marks, and shall do all things necessary to transfer to URBAN AIR TRAMPOLINE & ADVENTURE PARK or its designee the Franchised Business' telephone number(s).  You hereby grant to Franchisor and its representatives power of attorney for the specific purpose of executing all documents and doing all things necessary to effect such cancellations and transfers.

You shall immediately surrender to Franchisor all copies of all materials in your possession including the Manual and all other documentation relating to the operation of the Franchised Business in your possession, and all copies thereof, and shall retain no copy or record of any of the foregoing, excepting only your copy of this Agreement, any correspondence between the parties and any other documents which you reasonably need for compliance with any provision of law.

Further, you agree that, upon termination or expiration of this Agreement, for any reason, you will immediately comply with our then-current debranding checklist, which shall require you to, among other things:

(1)    Remove and destroy all interior and exterior signage, point of sale materials, business forms, and stationery received from us;

(2)    Delete from all computer hard drives all materials, information, communications, manuals, and marketing and promotion materials received from us;

(3)    Remove all decals containing the Urban Air or Urban Air Trampoline & Adventure Park name, the Marks, any slogans, or orange, black, and blue color scheme;

(4)    Repaint or remove all orange, black, and blue colors from all equipment, padding, walls, doors, floors, and other surfaces;

(5)    Promptly instruct all third-party internet sites and telephone directories to remove all listings identifying the location as an Urban Air Trampoline & Adventure Park;

(6)    Return all uniforms, sales materials, operations manuals, and other items that contain any Confidential Information;

(7)    Cancel all fictitious or assumed names or equivalent registrations relating to your use of any of the Proprietary Marks;

(8)    Change your corporate and legal business name, if necessary, so that it does not contain any of the Proprietary Marks; and

(9)    Return to us all signs, sign-faces, sign-cabinets, marketing materials, forms, packaging, and other materials that contain any of the Marks.

### B.    Franchisor's Option to Assume Lease and Purchase Assets.

Upon termination or expiration of this Agreement, Franchisor shall have the option, but not the obligation, to assume your lease for the Franchised Business premises by delivering to you written notice of its election within 30 days after termination or expiration of this Agreement.  If Franchisor exercises its option, it shall also have the right, but not the obligation, to purchase the Franchised Business' furnishings, equipment, graphics, signage, smallwares, and saleable inventory for the Purchase Price.  Franchisor shall also have the right, but not the obligation, to assume any equipment leases and other contracts relating to the operation of the Franchised Business as Franchisor, in its sole discretion, agrees to assume.  Closing on the purchase of assets shall occur no later than 60 days after Franchisor exercises its option.

With respect to the foregoing paragraph, Purchase Price shall be the fair market value, determined in a manner consistent with reasonable depreciation of the equipment, signs, inventory, materials and supplies, provided that the Franchised Business will be valued as an independent business and its value will not include any value for the Franchise or any rights granted by this Agreement, the Proprietary Marks, or participation in the network of Urban Air Trampoline & Adventure Park businesses.  The fair market value will not include the goodwill you developed since your commencement of the operations, the goodwill of the Marks, and the System.  The length of the remaining term of the lease will also be considered in determining the Franchised Business' fair market value.

Franchisor may exclude from the assets purchased hereunder cash or its equivalent and any equipment, signs, inventory, materials, and supplies that are not reasonably necessary (in function or quality to the Franchised Business' operations as determined by Franchisor or that Franchisor has not approved as meeting standards for an Urban Air Trampoline & Adventure Park, and the Purchase Price will reflect such exclusions.

If we are unable to agree on the fair market value of the Franchised Business, the fair market value will be determined by one (1) independent qualified appraiser that Franchisor appoints in our business judgment. Franchisor will appoint the appraiser within fifteen (15) days after the date we determine we are unable to agree on the Franchised Business' fair market value.  Franchisor and Franchisee will share equally the fees and expenses of the appraiser and Franchisor and Franchisee will agree to take reasonable actions to cause the appraiser to complete the appraisal within thirty (30) days after the appraiser's appointment.

The Purchase Price will be paid at the closing of the purchase, which will take place not later than ninety (90) days after determination of the Purchase Price.  Franchisor has the right to set off against the Purchase Price and thereby reduce the Purchase Price by, any and all amounts Franchisee owes Franchisor.

At the closing, Franchisee agrees to deliver instruments transferring (1) good and merchantable title to the assets purchased, free and clear of all liens and encumbrances (other than liens and security interests acceptable to us, if any), with all sales and other transfer taxes paid by Franchisee, (2) all licenses and permits of the Franchised Business which may be assigned or transferred, and (3) the leasehold interest in the premises in which the Franchised Business operates and improvements therein.

If you cannot deliver clear title to all of the purchased assets, or if there are other unresolved issues, the closing of the sale will, at our election, be accomplished through an escrow arrangement with an independent escrow agent selected by Franchisor.

Franchisee and its owners agree to execute general releases, in form satisfactory to Franchisor, of any and all claims against Franchisor or its members, officers, directors, managers, employees, agents, successors and assigns.

If Franchisor elects not to assume your lease for the Franchised Business premises, Franchisor shall have the option to purchase, or may require you to destroy, any graphics, signage, or other materials bearing the Proprietary Marks.  To the extent that Franchisor elects to purchase any such items, the purchase price shall be equal to fully depreciated book value of such items.  You shall immediately remove from the Franchised Business premises all items bearing the Proprietary Marks and Copyrighted Works and modify the trade dress as necessary to distinguish the premises from an URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchised Business.  If you fail or refuse to comply with the requirements of this <u>Section 19.B</u>, Franchisor and its representatives shall have the right to enter on the Franchised Business premises, without liability for trespass or other civil tort, for purposes of making such changes, at your expense, which you shall pay upon demand.

Franchisor shall have the right to offset against the purchase price of any items purchased from you pursuant to this <u>Section 19.B</u> any of the following: (1) amounts that you owe to Franchisor or its Affiliates; (2) lease transfer fees (if any), other costs owed to your landlord, and the costs of renovating the Franchised Business premises so that it meets Franchisor's then-current standards and specifications (if Franchisor elects to assume the lease for the Franchised Business premises); (3) the costs of de-identifying the Franchised Business premises in accordance with this <u>Section 19.B</u>, if you fail to do so (if Franchisor does not elect to assume the lease for the Franchised Business premises); and (4) all costs incurred by Franchisor relating to its purchase of the Franchised Business' assets (including the cost of an independent appraiser, if necessary).

C.  **Compliance with Post Term Obligations.**

You and each Owner shall comply with all covenants and obligations which, by their nature, survive termination of this Agreement including, without limitation, the confidentiality obligations and restrictive covenants set forth and described in Section 14 of this Agreement and the indemnification obligations set forth and described in Section 20.B of this Agreement.

20.  **INDEPENDENT CONTRACTOR AND INDEMNIFICATION**

A.  **Independent Contractor.**

The parties acknowledge and agree that this Agreement does not create a fiduciary relationship between them, that you will operate the Franchised Business as an independent contractor, and that nothing in this Agreement shall be construed to create a partnership, joint venture, agency, employment, fiduciary relationship, master-servant relationship, or legal relationship of any kind.

None of your employees will be considered to be employees of Franchisor or its Affiliates. Neither you nor any of your employees whose compensation you pay may in any way, directly or indirectly, expressly or by implication, be construed to be an employee of Franchisor or its Affiliates for any purpose, including with respect to any mandated or other insurance coverage, tax or contributions, or requirements pertaining to withholdings, levied or fixed by any city, state, or federal governmental agency. Neither Franchisor nor its Affiliates will have the power to hire or fire your employees. You expressly agree, and will never contend otherwise, that Franchisor's authority under this Agreement to certify certain of your employees for qualification to perform certain functions for your Franchised Business does not directly or indirectly vest in Franchisor or its Affiliates the power to hire, fire, or control any such employee. You further acknowledge and agree, and will never contend otherwise, that you alone will exercise day-to-day control over all operations, activities, and elements of your Franchised Business and that under no circumstance shall Franchisor or its Affiliates do so or be deemed to do so. You further acknowledge and agree, and will never contend otherwise, that the various requirements, restrictions, prohibitions, specifications, and procedures of System which you are required to comply with under this Agreement, whether set forth in the Manual or otherwise, do not directly or indirectly constitute, suggest, infer, or imply that Franchisor or its Affiliates controls any aspect or element of the day-to-day operations of your Franchised Business, which you alone control, but constitute only standards to which you must adhere when exercising your control of the day-to-day operations of your Franchised Business.

Except as otherwise expressly authorized by this Agreement, neither party hereto will make any express or implied agreements, warranties, guarantees, or representations or incur any debt in the name of or on behalf of the other party, or represent that the relationship between Franchisor and you are other than that of franchisor and franchisee. Franchisor does not assume any liability, and will not be deemed liable, for any agreements, representations, or warranties made by you which are not expressly authorized under this Agreement, nor will Franchisor be obligated for any damages to any person or property which directly or indirectly arise from or relate to the operation of the Franchised Business.

During the term of this Agreement, you shall identify yourself as the owner of the Franchised Business operating under a franchise granted by Franchisor, and shall apply for all permits, certificates of occupancy, and business licenses in your own name. Additionally, your individual name (if you are an individual) or your corporate name (if you are a Business Entity) must appear prominently on all invoices, order forms, receipts, business stationery, and contracts. You shall not use the Proprietary Marks to incur or secure any obligation or indebtedness on behalf of Franchisor. You shall display at the Franchised Business, in a conspicuous location, a form of notice approved by Franchisor, stating that you are an independent franchised operator of the URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchised Business.

B.  **Indemnification.**

You shall defend at your own cost and indemnify and hold harmless to the fullest extent permitted by law, Franchisor and its Affiliates, and their respective directors, officers, employees, agents, shareholders, designees, and representatives (collectively, the "**Franchisor Indemnitees**") from all Losses and Expenses incurred in connection with any action, suit, proceeding, claim, cause of action, demand, investigation, or formal or informal inquiry (regardless of whether any of the foregoing is reduced to judgment), or any settlement of the

V.2

foregoing, which actually or allegedly, directly or indirectly, arises out of, is based upon, is a result of, or is in any way related to any of the following: (1) any actual or alleged infringement or any other violation or any other alleged violation of any patent, trademark, copyright, or other proprietary right owned or controlled by third parties by you or the Franchised Business or any of their respective the owners, officers, directors, management, employees, agent, servants, contractors, subcontractors, partners, proprietors, affiliates or representatives, or any third party acting on behalf of or at the direction of such persons or entities, whether in connection with the Franchised Business or otherwise; (2) any actual or alleged violation or breach of any contract, federal, state, or local law, regulation, ruling, standard, or directive of any industry standard by you or the Franchised Business or any of their respective the owners, officers, directors, management, employees, agent, servants, contractors, subcontractors, partners, proprietors, affiliates or representatives, or any third party acting on behalf of or at the direction of such persons or entities, whether in connection with the Franchised Business or otherwise; (3) any actual or alleged libel, slander, or any other form of defamation by you or the Franchised Business or any of their respective the owners, officers, directors, management, employees, agent, servants, contractors, subcontractors, partners, proprietors, affiliates or representatives, or any third party acting on behalf of or at the direction of such persons or entities, whether in connection with the Franchised Business or otherwise; (4) any actual or alleged violation or breach of any warranty, representation, agreement, or obligation in this Agreement by you or the Franchised Business or any of their respective the owners, officers, directors, management, employees, agent, servants, contractors, subcontractors, partners, proprietors, affiliates or representatives, or any third party acting on behalf of or at the direction of such persons or entities, whether in connection with the Franchised Business or otherwise;  (5) any and all acts, errors, or omissions engaged in by you or the Franchised Business or any of their respective the owners, officers, directors, management, employees, agent, servants, contractors, subcontractors, partners, proprietors, affiliates or representatives, or any third party acting on behalf of or at the direction of such persons or entities, whether in connection with the Franchised Business or otherwise, arising out of or related to the design, construction, conversion, build out, outfitting, remodeling, renovation, upgrading, or operation of the Franchised Business, whether any of the foregoing was approved by Franchisor; (6) any and all acts, errors, or omissions engaged in by you or the Franchised Business or any of their respective the owners, officers, directors, management, employees, agent, servants, contractors, subcontractors, partners, proprietors, affiliates or representatives, or any third party acting on behalf of or at the direction of such persons or entities, whether in connection with the Franchised Business or otherwise, including, but not limited to, any personal injury, death, or property damage suffered or caused by any delivery person or vehicle serving your Franchised Business; (7) all liabilities arising from or related to your offer, sale, and/or delivery of products and/or services as contemplated by this Agreement; (8) any and all latent or other defects in the Franchised Business, whether or not discoverable by Franchisor or you; (9) the inaccuracy, lack of authenticity, or nondisclosure of any information by any customer of the Franchised Business; (10) your establishment, construction, opening, or operation of your Franchised Business, including, but not limited to, any personal injury, death, or property damage suffered or caused by any customer, visitor, operator, employee, or guest of the Franchised Business; crimes committed on or near any of the premises or facilities of or vehicles used by your Franchised Business; any services or products provided by you at or from the Franchised Business or otherwise related to the operation of the Franchised Business; (11) any services or products provided by any affiliated or nonaffiliated participating entity; (12) any action by any customer, visitor, operator, employee, or guest of the Franchised Business or any other facility of your Franchised Business; and, (13) any damage to the property of you or Franchisor, their agents, or employees, or any third person, firm, or corporation, whether or not such losses, claims, costs, expenses, damages, or liabilities were actually or allegedly caused wholly or in part through the active or passive negligence of Franchisor or any of its agents or employees, or resulted from any strict liability imposed on Franchisor or any of its agents or employees. You agree to take all steps reasonably necessary to insure that all employees of Franchised Business are competent to perform the tasks required of a franchisee and will not intentionally harm others, including, but not limited to appropriate drug and alcohol tests and background checks for criminal, fraudulent and motor vehicle offenses.

**THE INDEMNIFICATION REQUIRED UNDER THIS SECTION 20.B SHALL APPLY TO ALL CLAIMS, <u>INCLUDING THOSE THAT ARISE, OR ARE ALLEGED TO ARISE, AS A RESULT OF FRANCHISOR'S OWN NEGLIGENCE OR GROSS NEGLIGENCE</u>, IF ANY, WHETHER**

**FRANCHISOR'S NEGLIGENCE OR GROSS NEGLIGENCE IS THE SOLE, CONTRIBUTING, OR CONCURRING CAUSE OF SUCH ALLEGED DAMAGES THAT MIGHT BE ASSERTED.**

For purposes of this Agreement, the term "Losses and Expenses" means, without limitation, all claims, losses, liabilities, costs, and expenses including compensatory, exemplary, incidental, consequential, statutory, or punitive damages or liabilities; fines, penalties, charges, expenses, lost profits, attorneys' fees, expert fees, costs of investigation, court costs, settlement amounts, judgments, compensation for damages to Franchisor's reputation and goodwill, costs of or resulting from delays, and financing; travel, food, lodging, and other expenses necessitated by Franchisor's need or desire to appear before, or witness the proceedings of, courts or tribunals (including arbitration tribunals), or governmental or quasi-governmental entities, including those incurred by Franchisor's attorneys or experts to attend any of the same; costs of advertising material and media/time/space, and costs of changing, substituting, or replacing the same; and any and all expenses of recall, refunds, compensation, public notices, and all other amounts incurred by Franchisor in connection with the matters described above. All such Losses and Expenses incurred by Franchisor will be chargeable to and payable by you pursuant to this <u>Section 20.B</u>, regardless of any actions, activities, or defenses undertaken by Franchisor or the subsequent success or failure of such actions, activities, or defenses.

You shall give Franchisor written notice of any event of which you are aware for which indemnification is required within 3 days of your actual or constructive knowledge of such event. At your expense and risk, Franchisor may elect to assume (but under no circumstance is obligated to undertake) the defense and/or settlement thereof, provided that Franchisor will seek your advice and counsel. Any assumption by Franchisor shall not modify your indemnification obligation. Franchisor may, in its sole and absolute discretion, take such actions as it deems necessary and appropriate to investigate, defend, or settle any event, or take other remedial or corrective actions with respect thereof as may be, in Franchisor's sole and absolute discretion, necessary for the protection of the Franchisor Indemnities or the System. Under no circumstances will Franchisor or the Franchisor Indemnities be required to seek recovery from third parties or to otherwise mitigate their losses to maintain a claim against you; in no event will a failure to pursue recovery from third parties or to mitigate loss reduce the amounts recoverable by Franchisor or the Franchisor Indemnities from you. The indemnification obligations provided by this <u>Section 20.B</u> will survive the expiration or termination of this Agreement.

**21.    <u>NOTICES</u>**

All notices, requests, and reports required or permitted under this Agreement must be in writing and must be personally delivered, sent by expedited delivery service or certified or registered mail, return receipt requested, first-class postage prepaid, or by facsimile (provided that the sender confirms the facsimile by sending an original confirmation copy by certified mail or expedited delivery service within five calendar days after transmission) to the respective parties at the addresses reflected in the Summary Page, unless and until a different address has been designated by written notice to the other party. Any notice will be deemed to have been given at the time of personal delivery or receipt; provided, however, that if delivery is rejected, delivery will be deemed to have been given at the time of such rejection.

**22.    <u>SEVERABILITY AND CONSTRUCTION</u>**

**A.     <u>Entire Agreement.</u>**

This Agreement, all attachments to this Agreement, and all ancillary agreements executed contemporaneously with this Agreement constitute the final and fully integrated agreement between the parties with regard to the subject matter of this Agreement and supersede any and all prior negotiations, understandings, representations and agreements. Nothing in this agreement or any related agreement is intended to disclaim the representation made in the disclosure document provided to you by Franchisor.

**B.     <u>Modification.</u>**

This Agreement may be modified only by a written document, signed by both parties.

**C.     <u>Written Consent.</u>**

Whenever this Agreement requires the prior approval or consent of Franchisor, you shall make a timely written request to Franchisor therefore and such approval or consent shall be obtained in writing.

V.2

**D.** **No Waiver.**

No failure of Franchisor to exercise any power reserved to it by this Agreement, or to insist upon strict compliance by you with any obligation or condition hereunder, and no custom or practice of the parties at variance with the terms hereof, shall constitute a waiver of Franchisor's right to demand exact compliance with any of the terms herein. Franchisor's waiver of any particular default by you shall not affect or impair Franchisor's rights with respect to any subsequent default of the same, similar, or different nature, nor shall any delay, forbearance, or omission of Franchisor to exercise any power or right arising out of any breach or default by you of any of the terms, provisions, or covenants hereof affect or impair Franchisor's right to exercise the same, nor shall such constitute a waiver by Franchisor of any right hereunder or the right to declare any subsequent breach or default and to terminate this Agreement prior to the expiration of its term. Subsequent acceptance by Franchisor of any payments due to it hereunder shall not be deemed to be a waiver by Franchisor of any preceding breach by you of any terms, covenants, or conditions of this Agreement.

**E.** **Severability.**

Except as expressly provided to the contrary herein, each section, part, term, and/or provision of this Agreement shall be considered severable, and if, for any reason, any section, part, term, and/or provision herein is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation by a court or agency having valid jurisdiction, such shall not impair the operation of, or have any other effect upon, such other portions, sections, parts, terms and/or provisions of this Agreement as may remain otherwise intelligible, and the latter shall continue to be given full force and effect and bind the parties hereto, and said invalid sections, parts, terms and/or provisions shall be deemed not to be a part of this Agreement; provided, however, that if Franchisor determines that such finding of invalidity or illegality adversely affects the basic consideration of this Agreement, Franchisor, at its option, may terminate this Agreement.

**F.** **Captions and Headings; References to Gender; Counterparts.**

All captions in this Agreement are intended solely for the convenience of the parties, and none of the captions shall be deemed to affect the meaning or construction of any provision hereof. All references herein to the masculine, neuter, or singular shall be construed to include the masculine, feminine, neuter, or plural. This Agreement may be executed in one or more originals, each of which shall be deemed an original.

**G.** **Persons Bound.**

All acknowledgments, promises, covenants, agreements and obligations herein made or undertaken by you shall be deemed jointly and severally undertaken by all of the parties executing this Agreement as franchisee hereunder. As used in this Agreement, the term "you" shall include all persons who succeed to the interest of the original franchisee by transfer or operation of law.

**H.** **Franchisor's Judgment.**

Whenever this Agreement or any related agreement grants, confers, or reserves to Franchisor the right to take action, refrain from taking action, grant or withhold consent, or grant or withhold approval, Franchisor will, unless the provision specifically states otherwise, have the right to engage in such activity at its option taking into consideration its assessment of the long term interests of the System overall. You acknowledge and recognize, and any court or judge is affirmatively advised, that if those activities and/or decisions are supported by Franchisor's business judgment, neither said court, said judge, nor any other person reviewing those activities or decisions will substitute his, her, or its judgment for Franchisor's judgment. When the terms of this Agreement specifically require that Franchisor not unreasonably withhold approval or consent, any withholding of our approval or consent will be considered reasonable if you are in default or breach under this Agreement.

**23.** **GOVERNING LAW AND FORUM SELECTION**

**A.** **Governing Law.**

This Agreement is made in and takes effect upon its acceptance and execution by Franchisor at its headquarters in Fort Worth, Texas. This Agreement shall be and all claims arising out of or related to the relationship created hereby shall be governed by and interpreted and construed under the substantive laws of the

V.2

State of Texas, without regard to it conflicts of laws principles, except to the extent governed by the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. Section 1051 et seq.) and U.S. Copyright Act, 17 U.S.C. Section 101 et seq.).

**B.    Jurisdiction and Venue.**

Except as expressly provided by applicable state law, the parties agree that **ANY DISPUTE ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT AND ANY CLAIM AFFECTING ITS VALIDITY, CONSTRUCTION, EFFECT, PERFORMANCE OR TERMINATION SHALL BE RESOLVED EXCLUSIVELY BY THE STATE DISTRICT COURTS LOCATED IN TARRANT COUNTY, TEXAS, TO THE JURISDICTION OF WHICH THE PARTIES HEREBY IRREVOCABLY SUBMIT.**

The parties hereby waive all questions of personal jurisdiction or venue for the purpose of carrying out this provision.  Notwithstanding the foregoing, you acknowledge and agree that Franchisor may bring and maintain an action against you in any court of competent jurisdiction for injunctive or other extraordinary relief against threatened conduct that will cause it loss or damages, under the usual equity rules, including the applicable rules for obtaining restraining orders, and preliminary and permanent injunctions.

**C.    Remedy.**

Unless otherwise specified in this Agreement, no right or remedy conferred upon or reserved by Franchisor or you by this Agreement is intended and it shall not be deemed to be exclusive of any other right or remedy provided or permitted herein, by law or at equity, but each right or remedy shall be cumulative of every other right or remedy.

You may not under any circumstances make any claim for money damages based on any claim or assertion that Franchisor has unreasonably withheld or delayed any consent or approval under this Agreement, and you hereby waive any such claim for damages, whether by way of affirmative claim, setoff, counterclaim, or defense.  Your sole remedy for any such claim will be an action or proceeding for specific performance of the applicable provision(s) of this Agreement.

**D.    Waiver of Jury Trial.**

**EACH PARTY HEREBY WAIVES TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, INVOLVING FRANCHISOR, WHICH ARISES OUT OF OR IS RELATED IN ANY WAY TO THIS AGREEMENT, THE PERFORMANCE OF ANY PARTY UNDER THIS AGREEMENT, AND/OR THE OFFER OR GRANT OF THE FRANCHISE.**

**E.    Contractual Limitations Period.**

Any and all claims and actions arising out of or relating to this Agreement, the parties' relationship, or the operation of the Franchised Business (including any defenses and any claims of set-off or recoupment), must be brought or asserted before the expiration of the earlier of: (1) the time period for bringing an action under any applicable state or federal statute of limitations; (2) two years after the date upon which a party discovered, or should have discovered, the facts giving rise to an alleged claim; or (3) two years after the first act or omission giving rise to an alleged claim, whichever occurs first; or it is expressly acknowledged and agreed by all parties that such claims or actions shall be irrevocably barred.

**F.    Waiver of Punitive Damages.**

The parties hereby waive to the fullest extent permitted by law any right to or claim of any punitive, exemplary, or multiple damages against the other.

**G.    Attorneys' Fees.**

If either party commences a legal action against the other party arising out of or in connection with this Agreement, the prevailing party shall be entitled to have and recover from the other party its reasonable attorneys' fees and costs of suit; the term "prevailing party" means a party that is awarded actual relief in the form of

damages, declaratory relief, or injunctive relief, as well as a party that successfully defends a legal action commenced against it.

## 24.    ACKNOWLEDGMENTS

### A.    Receipt of Disclosure Document.

You hereby acknowledge that you received from Franchisor its current franchise disclosure document, together with a copy of all proposed agreements related to the sale of the Franchise, at least 14 calendar days prior to the execution of this Agreement or at least 14 days before you paid us any consideration in connection with the sale or proposed sale of the Franchise granted by this Agreement.

**[Please initial to acknowledge that you have read and understand this Section 24.A] _____**

### B.    Receipt of Agreement.

You hereby acknowledge that you received from Franchisor this Agreement with all blanks filled in at least seven calendar days prior to the execution of this Agreement. You represent that you have read this Agreement in its entirety and that you have been given the opportunity to clarify any provisions that you did not understand and to consult with an attorney or other professional advisor. You further represent that you understand the terms, conditions, and obligations of this Agreement and agree to be bound thereby.

**[Please initial to acknowledge that you have read and understand this Section 24.B] _____**

### C.    Independent Investigation.

You acknowledge and represent that you are entering into this Agreement, all attachments hereto, and all ancillary agreements executed contemporaneously with this Agreement, as a result of your own independent investigation of all aspects relating to the Franchised Business, and not as a result of any representations about Franchisor or your reliance on any such representations (if made) by its stakeholders, officers, directors, employees, agents, representatives, independent contractors, or franchisees which are contrary to the terms set forth in this Agreement or any franchise disclosure document required or permitted to be given to you pursuant to applicable law. You have been advised and given the opportunity to independently investigate, analyze, and construe the business opportunity being offered under this Agreement, the terms and provisions of this Agreement, and the prospects for the Franchised Business, using the services of legal counsel, accountants, or other advisers of your own choosing; you have either consulted with these advisors or have deliberately declined to do so. You further recognize that the business venture contemplated by this Agreement involves business risks and that its success will be largely dependent upon your skills and ability as an independent business person. This offering is not a security as that term is defined under applicable federal and state securities laws.

**[Please initial to acknowledge that you have read and understand this Section 24.C] _____**

### D.    No Representations; No Reliance.

You acknowledge and represent that, except for representations made in Franchisor's current franchise disclosure document, neither Franchisor nor its Affiliates, nor any of their respective stakeholders, officers, directors, employees, agents, representatives, independent contractors, has made any representations, warranties, or guarantees, express or implied, as to the potential revenues, profits, expenses, sales volume, earnings, income, or services of the business venture contemplated under this Agreement, and that you have not relied on any such representations (if made) in making your decision to purchase an URBAN AIR TRAMPOLINE & ADVENTURE PARK franchise. You further acknowledge and represent that neither Franchisor nor its representatives have made any statements inconsistent with the terms of this Agreement.

**[Please initial to acknowledge that you have read and understand this Section 24.D] _____**

### E.    No Financial Performance Representations; No Reliance.

You specifically acknowledge that the only financial performance information furnish by Franchisor is set forth in Item 19 of its current franchise disclosure document; that no officer, director, employee, agent, representative or independent contractor of Franchisor is authorized to furnish you with any other financial performance information; that, if they nevertheless do, you will not rely on any such financial performance

information given to you by any such individual; and, that if any such individual attempts to or actually does give you any such financial performance information in contravention of this provision, you will immediately communicate such activity to us. For the purpose of this Section 24.E, "financial performance information" means information given, whether orally, in writing, or visually which states, suggests or infers a specific level or range of historic or prospective sales, expenses and/or profits of franchised or Franchisor-owned facilities.

**[Please initial to acknowledge that you have read and understand this Section 24.E]** _____

**F.    No Licensure Representations; No Reliance.**

You acknowledge that neither Franchisor nor its Affiliates, nor any of their respective stakeholders, officers, directors, employees, agents, representatives, independent contractors, has made any representation or statement on which you have relied regarding your ability to procure any required license, permit, certificate or other governmental authorization that may be necessary or required for you to carry out the activities contemplated by this Agreement

**[Please initial to acknowledge that you have read and understand this Section 24.F]** _____

**G.    Reasonable Restrictions.**

You have carefully considered the nature and extent of the restrictions upon you set forth in this Agreement, including, without limitation, the covenants not to compete, the restrictions on assignment, and the rights, obligations, and remedies conferred upon you under this Agreement. You acknowledge that such restrictions, rights, obligations, and remedies: (a) are reasonable, including, but not limited to, their term and geographic scope; (b) are designed to preclude competition which would be unfair to Franchisor; (c) are fully required to protect Franchisor's legitimate business interests; and, (d) do not confer benefits upon Franchisor that are disproportionate to your detriment.

**[Please initial to acknowledge that you have read and understand this Section 24.G]** _____

IN WITNESS WHEREOF, the undersigned, intending to be legally bound, have executed this Franchise Agreement to be effective on the day and year first written above.


**UATP MANAGEMENT, LLC**
a Texas limited liability company.

By: _____
        MICHAEL BROWNING, JR., President


**FRANCHISEE:**

    ,
a

By: _____
        , its

## UATP MANAGEMENT, LLC

## ILLINOIS AMENDMENT TO FRANCHISE AGREEMENT

For purposes of complying with the requirements of Illinois law, including the Illinois Franchise Disclosure Act of 1987, Ill. Rev. Stat. ch. 815 para. 705/1 – 705/44 (1994) ("**Illinois Franchise Act**"), UATP Management, LLC ("Franchisor"), a Texas limited liability company, and ("**Developer**") hereby amend the Site Selection Agreement between them dated    ,    ("**Agreement**") as follows:

1.    Illinois Law governs the agreements between parties to this franchise. The Illinois Attorney General's Office requires that certain provisions contained in franchise documents be amended to be consistent with Illinois law, including the Franchise Disclosure Act of 1987, 815 ILCS 705/1-44, (collectively, the "**Act**").  To the extent that this Agreement contains provisions that are inconsistent with the following, such provisions are hereby amended:

a.    Section 41 of the Act provides that any condition, stipulation or provision purporting to bind any person acquiring any franchise to waive compliance with the Illinois Franchise Disclosure Act or any other law of Illinois is void.

b.    Any release of claims or acknowledgments of fact contained in the Agreement that would negate or remove from judicial review any statement, misrepresentation or action that would violate the Act, or a rule or order under the Act shall be void and are hereby deleted with respect to claims under the Act.

c.    Section 4 of the Act provides that, if this Agreement requires litigation to be conducted in a forum other than the State of Illinois, the requirement is void with respect to claims.

d.    If this Agreement requires that it be governed by a state's law, other than the State of Illinois, to the extent that such law conflicts with the Illinois Franchise Disclosure Act, Illinois law governing claims arising under the Act will control.

e.    If this Agreement requires a jury trial waiver, to the extent that such provision conflicts with the Illinois Franchise Disclosure Act, the Act will control.

f.    Your rights upon termination and non-renewal of the Agreement are set forth in Sections 19 and 20 of the Act.

2.    Each provision of this Amendment shall be effective only to the extent, with respect to such provision, that the jurisdictional requirements of the Act are met independently without reference to this Amendment.

IN WITNESS WHEREOF, each of the parties hereto has caused this Amendment to be executed by its duly authorized representative as of the date indicated below.

**FRANCHISOR:**                                                    **FRANCHISEE:**
**UATP Management, LLC,**                                    ,
a Texas limited liability company                          a


By: _____                          By: _____

Name: Michael O. Browning, Jr.                          Name:

Title: President                                                   Title:

Date:_____                          Date: _____

## MARYLAND AMENDMENT

## TO URBAN AIR TRAMPOLINE & ADVENTURE PARK FRANCHISE AGREEMENT

The Urban Air Trampoline & Adventure Park Franchise Agreement between      ("**Franchisee**") and UATP Management, LLC ("**Franchisor**") dated        ("**Franchise Agreement**") shall be amended by the addition of the following language, which shall be considered an integral part of the Agreement ("**Amendment**"):

Where and to the extent that any of the provisions of this Amendment are contrary to, in conflict with or inconsistent Maryland Franchise Registration and Disclosure Law, with any provision contained in the Franchise Agreement, the provisions contained in this Amendment shall control. Defined terms contained in the Franchise Agreement shall have the identical meanings in this Amendment.

1.      Any provision requiring you to sign a general release of any and all claims against us shall not apply to claims arising under the Maryland Franchise Registration and Disclosure Law.

2.      Any provision requiring you to bring an action against us in any state other than Maryland shall not apply to claims arising under the Maryland Franchise Registration and Disclosure Law. You may bring an action in Maryland for claims arising under the Maryland Franchise Registration and Disclosure Law.

3.      Section 14-226 of the Maryland Franchise Registration and Disclosure Law, prohibits us from requiring a prospective franchisee to assent to any release, estoppel or waiver of liability as a condition of purchasing a franchise. Any provisions which requires a prospective franchisee to disclaim the occurrence and/or non-occurrence of acts that would constitute a violation of the Maryland Franchise Registration and Disclosure Law, in order to purchase a franchise are not intended to, nor shall they act as a release, estoppel or waiver of any liability incurred under the Maryland Franchise Registration and Disclosure Law.

4.      Notwithstanding anything to the contrary set forth in the Franchise Agreement, any general release the Franchisee is required to assent to is not intended to nor shall it act as a release, estoppel or waiver of any liability we may have incurred under the Maryland Franchise Registration and Disclosure Law.

5.      Section 23.B. of the Franchise Agreement is amended by the addition of the following language to the original language that appears therein:

> "This section shall not in any way abrogate or reduce any of your rights as provided for in Section 14-216(c)(25) of the Maryland Franchise Registration and Disclosure Law, including the right to submit matters to the jurisdiction of the Courts of Maryland."

6.      Notwithstanding anything to the contrary set forth in the Franchise Agreement, any claims arising under the Maryland Franchise Registration and Disclosure Law must be brought within three (3) years after the grant of the franchise.

8.      In the event of any conflict between the terms of this Amendment and the terms of the Franchise Agreement, the terms of this Amendment shall prevail.

9.      Each provision of this Amendment shall be effective only to the extent, with respect to such provision, that the jurisdictional requirements of the Act are met independently without reference to this Amendment.

*(Signature page to follow.)*

**IN WITNESS WHEREOF**, the Franchisee on behalf of itself and its owners acknowledges that it has read and understands the contents of this Amendment, that it has had the opportunity to obtain the advice of counsel, and that it intends to comply with this Amendment and be bound thereby.  The parties have duly executed and delivered this Amendment to the Franchise Agreement on        .

**FRANCHISOR:**                                    **FRANCHISEE:**
**UATP Management, LLC,**                                    ,
a Texas limited liability company                   a

By: _____                   By: _____
Name: Michael O. Browning, Jr.                   Name:
Title: President                   Title:
Date: _____                   Date: _____

## MINNESOTA AMENDMENT

## TO URBAN AIR TRAMPOLINE & ADVENTURE PARK FRANCHISE AGREEMENT

The Urban Air Trampoline & Adventure Park Franchise Agreement between ("**Franchisee**") and UATP Management, LLC ("**Franchisor**") dated ("**Franchise Agreement**") shall be amended by the addition of the following language, which shall be considered an integral part of the Agreement ("**Amendment**"):

Where and to the extent that any of the provisions of this Amendment are contrary to, in conflict with or inconsistent with Minnesota Franchise Registration and Disclosure Law with any provision contained in the Franchise Agreement, the provisions contained in this Amendment shall control. Defined terms contained in the Franchise Agreement shall have the identical meanings in this Amendment.

1.      Franchisor will undertake the defense of any claim of infringement by third parties involving the Urban Air Trampoline & Adventure Park mark, and Franchisee will cooperate with the defense in any reasonable manner required by Franchisor with any direct cost of such cooperation to be borne by Franchisor.

2.      Minnesota law provides franchisees with certain termination and nonrenewal rights. As of the date of this Franchise Agreement, Minn. Stat. Sec. 80C.14, Subd. 3, 4 and 5 require, except in certain specified cases, that a franchisee be given 90 days' notice of termination (with 60 days to cure) and 180 days' notice for nonrenewal of the franchise agreement.

3.      Section 23.E. (Contractual Limitations Period) is amended to provide that any claims arising under the Minnesota Franchise Act must be brought within three years after the date the cause of action accrues.

4.      Section 23.D. (Waiver of Jury Trial) and Section 23.F. (Waiver of Punitive Damages) are hereby deleted.

5.      No Section providing for a general release as a condition of renewal or transfer will act as a release or waiver of any liability incurred under the Minnesota Franchise Act; provided, that this part shall not bar the voluntary settlement of disputes.

6.      Each provision of this Amendment is effective only to the extent, with respect to such provision, that the jurisdictional requirements of Minnesota Statutes Sections 80C.01 to 80C.22 are met independently without reference to this addendum.

IN WITNESS WHEREOF, each of the parties hereto has caused this Amendment to be executed by its duly authorized representative as of the date indicated below.

**FRANCHISOR:**                                          **FRANCHISEE:**
**UATP Management, LLC,**                                      ,
a Texas limited liability company                         a

By: _____                          By: _____

Name: Michael O. Browning, Jr.                          Name:

Title: President                                        Title:

Date:_____                          Date: _____

**URBAN AIR TRAMPOLINE & ADVENTURE PARK
FRANCHISE AGREEMENT**

**ATTACHMENT A**

**GLOSSARY OF ADDITIONAL TERMS**

Capitalized terms will have the following meanings, unless otherwise defined in this Agreement.

"**Advertising Cooperative**" means a group of URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchised Businesses formed to facilitate marketing and advertising placement in a particular geographic area.

"**Affiliate**" means any entity that is wholly or partly owned by another entity, that shares common ownership with another entity, or that has an ownership interest in another entity.

"**Business Entity**" means a corporation, limited liability company, limited partnership, or other entity created pursuant to statutory authority.

"**Competitive Business**" means any business or enterprise that engages in or grants franchises or licenses for the operation of indoor or outdoor trampoline and adventure parks, featuring wall-to-wall trampolines, foam pits, warrior/ninja courses, soft play, climbing walls, pro zone, ropes courses, zip lines, coasters, indoor skydiving, dodge ball, rock climbing, digital climbing walls, arcades, bowling, bumper cars, whirley ball, mini golf, laser tag, trampoline volleyball, or related activities.

"**Confidential Information**" means all information, knowledge, elements, trade secrets, and know-how utilized or embraced by the System, or which otherwise concerns Franchisor's systems of operation, programs, services, products, customers, practices, materials, books, records, financial information, manuals, computer files, databases, or software; including, but not limited to: the Standards and all elements of the System and all products, services, equipment, technologies, policies, standards, requirements, criteria, and procedures which now or in the future are a part of the System; all information contained in the Manual, including supplements to the Manual; Franchisor's standards and specifications for product preparation, packaging, and service; all specifications, sources of supply, all procedures, systems, techniques and activities employed by Franchisor or by you in the offer and sale of products and/or services at or from your Franchised Business; all pricing paradigms established by Franchisor or by you; all of Franchisor's and/or your sources, or prospective sources, of supply and all information pertaining to same, including wholesale pricing structures, the contents of sourcing agreements, and the identity of vendors and suppliers; Franchisor's specifications, and your final plans, for the construction, buildout, design, renovation, décor, equipment, signage, furniture, fixtures and trade dress elements of your Franchised Business; the identify of, and all information relating to, the computer and POS hardware and software utilized by Franchisor and you; all information and data pertaining to Franchisor's and/or your advertising, marketing, promotion, and merchandising campaigns, activities, materials, specifications and procedures; all customer lists and records generated and/or otherwise maintained by your Franchised Business; all internet/web protocols, procedures, and content related to the System and your Franchised Business; Franchisor's training and other instructional programs and materials; all elements of Franchisor's recommended staffing, staff training, and staff certification policies and procedures; all communications between you and Franchisor, including the financial and other reports you are required to submit to Franchisor under this Agreement; additions to, deletions from, and modifications and variations of the components of the System and the other systems and methods of operations which Franchisor employs now or in the future; all other knowledge, trade secrets, or know-how concerning the methods of operation of your Franchised Business which may be communicated to you, or of which you may be apprised, by virtue of operation under the terms of the Franchise Agreement; and all other information, knowledge, and know-how which either Franchisor or its affiliates, now or in the future, designate as "Confidential Information."

"**Franchise Site Application**" means the form of application prescribed by Franchisor, from time to time, and used to evaluate proposed sites for the Franchised Business premises.

"**Gross Sales**" means the dollar aggregate of: means the dollar aggregate of: (1) the sales price of all items, goods, wares and merchandise sold, and the charges for all services you perform, whether made for cash, on

credit or otherwise, without reserve or deduction for inability or failure to collect, including sales and services (A) originating at the Franchised Business premises even if delivery or performance is made offsite from the Franchised Business premises, (B) placed by mail, facsimile, telephone, the internet and similar means if received or filled at or from the Franchised Business premises, and (C) that you in the normal and customary course of your operations would credit or attribute to the operation of the Franchised Business; and (2) all monies, trade value or other things of value that you receive from Franchised Business operations at, in, or from the Franchised Business premises that are not expressly excluded from Gross Sales.  Gross Sales does not include: (1) the exchange of merchandise between Franchised Businesses  (if you operate multiple franchises) if the exchanges are made solely for the convenient operation of your business and not for the purpose of depriving us of the benefit of a sale that otherwise would have been made at, in, or from the Franchised Business premises; (2) returns to shippers, vendors, or manufacturers; (3) sales of fixtures or furniture after being used in the conduct of the Franchised Business; (4) the sale of gift certificates and stored value cards (the redemption value will be included in Gross Sales at the time of redemption); (5) insurance proceeds; (6) sales to employees at a discount; (7) cash or credit refunds for transactions included within Gross Sales (limited, however, to the selling price of merchandise returned by the purchaser and accepted by you); (8) the amount of any city, county, state or federal sales, luxury or excise tax on such sales that is both (A) added to the selling price or absorbed therein and (B) paid to the taxing authority.  A purchase returned to the Franchised Business may not be deducted from Gross Sales unless the purchase was previously included in Gross Sales.

"**Manual**" means the series of documents, publications, bulletins, materials, drawings, memoranda, CDs, DVDs, MP3s, and other media Franchisor may loan you from time to time, which sets forth the System's operating systems, procedures, policies, methods, standards, specifications, and requirements for operating your Franchised Business, and which contains information and knowledge necessary and material to the System, and designated by Franchisor as the mandatory guide for the development and operation of URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchised Businesses, including, without limitation, the URBAN AIR TRAMPOLINE & ADVENTURE PARK confidential and proprietary Operations Manual, as Franchisor may, in its sole discretion, revise, amend, modify, or update from time to time upon notice of such revisions, amendment, modification, or update to you or your Affiliates.

"**Owners**" means you and your spouse if you are an individual, or each individual or entity holding a beneficial ownership in you and/or the franchisee individual(s) or entity(ies) that enter into any Franchise Agreements pursuant to this Agreement if you are a Business Entity.  It includes all officers, directors, and shareholders of a corporation, all managers and members of a limited liability company, all general and limited partners of a limited partnership, and the grantor and the trustee of the trust.  If any Owner is a Business Entity, then the term "Owner" also includes the Owners of that Business Entity.

"**Person**" means an individual (and the heirs, executors, administrators, or other legal representatives of an individual), a partnership, a corporation, a limited liability company, a government, or any department or agency thereof, a trust, and any other incorporated or unincorporated association or organization.

"**Proprietary Marks**" means the trade names, service marks, trademarks, logos, emblems, and indicia of origin as Franchisor may designate in writing for use in connection with the System, including, but not limited to, the collection of trademarks listed in the chart below for the country in which your Franchised Business is located.

"**Protected Area**" means the geographic or other area identified in Attachment B to this Agreement.

"**Site Selection Area**" means the geographical area identified in the Summary Page.

"**Standards**" means the standards, specifications, policies, procedures, and techniques that Franchisor has developed relating to the location, establishment, operation, and promotion of Franchisor's Franchised Businesses, all of which may be changed by Franchisor in its sole discretion.  The Standards include, among other things: required and recommended business practices; product preparation techniques; presentation standards; standards and specifications for Franchised Business design and appearance; customer service standards; sales techniques and procedures; and other management, operational, and accounting procedures.

"**Term**" means a number of years as reflected on the Summary Page.

**URBAN AIR TRAMPOLINE & ADVENTURE PARK**
**FRANCHISE AGREEMENT**

**ATTACHMENT B**

**APPROVED LOCATION AND PROTECTED AREA**


Section 1.A.    The Approved Location is at:

Section 1.B.    The Protected Area is includes the following zip codes:


     IN WITNESS WHEREOF, the undersigned, intending to be legally bound, have executed this Attachment B on the date set forth below to be effective on the day and year first written above.

**FRANCHISOR:**

UATP MANAGEMENT, LLC
a Texas limited liability company.


By:  _____
      MICHAEL BROWNING, JR., President


**FRANCHISEE:**

  ,
a

By:  _____
     , its

**URBAN AIR TRAMPOLINE & ADVENTURE PARK
FRANCHISE AGREEMENT**

**ATTACHMENT C**

**FRANCHISEE'S OWNERS AND KEY PERSONNEL**

A.    The following is a list of all shareholders, partners, members, or other investors owning a direct or indirect interest in the Franchisee, and a description of the nature of their interest, each of whom shall execute the Undertaking and Guaranty substantially in the form set forth in <u>Attachment D-1</u> to the Franchise Agreement:

| NAME, ADDRESS, AND TELEPHONE NUMBER | OWNERSHIP INTEREST IN FRANCHISEE | NATURE OF INTEREST |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

B.    The following is a list of all of Franchisee's Owners and key personnel, each of whom shall execute the Confidentiality Agreement and Non-Competition Agreement substantially in the form set forth in <u>Attachment D-2</u> to the Franchise Agreement:

| NAME, ADDRESS, AND TELEPHONE NUMBER | POSITION |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

C.    Franchisee's Designated Manager is:

Telephone Number:

Email Address:

**URBAN AIR TRAMPOLINE & ADVENTURE PARK**
**FRANCHISE AGREEMENT**

**ATTACHMENT D-1**

**UNDERTAKING AND GUARANTY**

By virtue of executing an URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchise Agreement ("Franchise Agreement") dated _____ ("Franchisee"), has acquired the right and franchise from UATP MANAGEMENT, LLC ("Franchisor") to establish and operate an URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchised Business ("Franchised Business") and the right to use in the operation of the Franchised Business Franchisor's trade names, trademarks, service marks, including the service mark URBAN AIR TRAMPOLINE & ADVENTURE PARK ("Proprietary Marks") and the system developed by Franchisor and/or its affiliates for operation and management of Franchised Businesses ("System"), as they may be changed, improved, and further developed from time to time in Franchisor's sole discretion.

Pursuant to the terms and conditions of the Franchise Agreement, each of the undersigned hereby acknowledges and agrees as follows:

1.      I have read the terms and conditions of the Franchise Agreement and acknowledge that the execution of this Undertaking and Guaranty and the undertakings of the Owners in the Franchise Agreement are in partial consideration for, and a condition to, the granting of the rights under the Franchise Agreement. I understand and acknowledge that Franchisor would not have granted such rights without the execution of this Undertaking and Guaranty and the other undertakings of the Owners in the Franchise Agreement.

2.      I own a beneficial interest in the Franchisee, and I am included within the term "Owner" as defined in the Franchise Agreement.

3.      I, individually and jointly and severally with the other Owners, hereby make all of the covenants, representations, warranties, and agreements of the Owners set forth in the Franchise Agreement, and agree that I am obligated to and will perform thereunder, including, without limitation, the provisions regarding compliance with the Franchise Agreement in Section 11, the use of confidential information in Section 14, the covenants in Section 14, the transfer provisions in Section 17, the choice of law and venue provisions in Section 23, and the indemnification obligations in Section 20.

4.      I, individually and jointly and severally with the other Owners, unconditionally and irrevocably guarantee to Franchisor and its successors and assigns that all obligations of the Franchisee under the Franchise Agreement will be punctually paid and performed.  Upon default by the Franchisee or upon notice from Franchisor, I will immediately make each payment and perform each obligation required of the Franchisee under the Franchise Agreement. Without affecting the obligations of any Owner under this or any other Undertaking and Guaranty, Franchisor may, without notice to any Owner, waive, renew, extend, modify, amend, or release any indebtedness or obligation of the Franchisee or settle, adjust, or compromise any claims that Franchisor may have against the Franchisee.  I waive all demands and notices of every kind with respect to the enforcement of this Undertaking and Guaranty, including notices of presentment, demand for payment or performance by the Franchisee, any default by the Franchisee or any guarantor, and any release of any guarantor or other security for this Undertaking and Guaranty or the obligations of the Franchisee.  Franchisor may pursue its rights against me without first exhausting its remedies against the Franchisee and without joining any other guarantor and no delay on the part of Franchisor in the exercise of any right or remedy will operate as a waiver of the right or remedy, and no single or partial exercise by Franchisor of any right or remedy will preclude the further exercise of that or any other right or remedy.  Upon Franchisor's receipt of notice of the death of any Owner, the estate of the deceased will be bound by the foregoing Undertaking and Guaranty, but only for defaults and obligations under the Franchise Agreement existing at the time of death, and in that event, the obligations of the Owners who survive such death will continue in full force and effect.

V.2

5.      No modification, change, impairment, or suspension of any of Franchisor's rights or remedies shall in any way affect any of my obligations under this Undertaking and Guaranty. If the Franchisee has pledged other security or if one or more other persons have personally guaranteed performance of the Franchisee's obligations, I agree that Franchisor's release of such security will not affect my liability under this Undertaking and Guaranty.

6.      I agree that any notices required to be delivered to me will be deemed delivered at the time delivered by hand; one Business Day after delivery by Express Mail or other recognized, reputable overnight courier; or three Business Days after placement in the United States Mail by Registered or Certified Mail, Return Receipt Requested, postage prepaid and addressed to the address identified on the signature line below. I may change this address only by delivering to Franchisor written notice of the change.

7.      I understand that Franchisor's rights under this Undertaking and Guaranty shall be in addition to, and not in lieu of, any other rights or remedies available to Franchisor under applicable law;

8.      I agree to be bound individually to all of the provisions of the Franchise Agreement including, without limitation, the litigation and dispute resolution provisions set forth in Section 23, and I irrevocably submit to the jurisdiction of the state court situated in Tarrant County, Texas, or the U.S. District Court for the Northern District of Texas, Fort Worth Division; and

9.      **I WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, INVOLVING FRANCHISOR, WHICH ARISES OUT OF OR IS RELATED IN ANY WAY TO THE FRANCHISE AGREEMENT, THE PERFORMANCE OF ANY PARTY UNDER THE FRANCHISE AGREEMENT, AND/OR THE OFFER OR GRANT OF THE FRANCHISE.**

10.     This Agreement shall be construed under the laws of the State of Texas.  The only way this Agreement can be changed is in writing signed by Franchisor.  Any capitalized terms contained in but not defined by this Guaranty and Personal Undertaking shall have the same meaning prescribed to that word in the Franchise Agreement.

IN WITNESS WHEREOF, the undersigned, intending to be legally bound, has executed this Undertaking and Guaranty to be effective on the day and year first written above.

**OWNER**

_____          _____

_____          _____

_____          _____

**URBAN AIR TRAMPOLINE & ADVENTURE PARK**
**FRANCHISE AGREEMENT**

**ATTACHMENT D-2**

**CONFIDENTIALITY AND NON-COMPETITION AGREEMENT**

In consideration of my being a        of        ("Franchisee"), and other good and valuable consideration, the receipt and sufficiency of which is acknowledged, I hereby acknowledge and agree that:

1.    Through an URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchise Agreement dated ("Franchise Agreement"), Franchisee has acquired the right and franchise from UATP MANAGEMENT, LLC ("Franchisor") to establish and operate an URBAN AIR TRAMPOLINE & ADVENTURE PARK franchise facility ("Franchised Business") and the right to use in the operation of the Franchised Business Franchisor's trade names,  trademarks, service marks, including the service mark URBAN AIR TRAMPOLINE & ADVENTURE PARK ("Proprietary Marks") and the system developed by Franchisor and/or its affiliates for operation and management of Franchised Businesses ("System"), as they may be changed, improved, and further developed from time to time in Franchisor's sole discretion.

2.    Franchisor possesses certain proprietary and confidential information, knowledge, elements, and know-how which is utilized in the operation of the System, including, without limitation, the Operations Manual, trade secrets, copyrighted materials, methods, and other techniques and know-how which concerns Franchisor's systems of operation, programs, services, products, customers, practices, materials, books, records, financial information, manuals, computer files, databases, or software, as further defined in the Franchise Agreement ("Confidential Information").

3.    Any and all manuals, trade secrets, copyrighted materials, methods, information, knowledge, know-how, and techniques which Franchisor specifically designates as confidential shall be deemed to be Confidential Information for purposes of this Agreement.

4.    I acknowledge that, as a        of the Franchisee, Franchisor and Franchisee have or will furnish me with valuable specialized training and will disclose Confidential Information to me in furnishing to me the training program and subsequent ongoing training and other general assistance during the term of this Agreement.

5.    I will not acquire any interest in the Confidential Information, other than the right to utilize it in the operation of the Franchised Business during the term hereof, and I acknowledge that the use or duplication of the Confidential Information for any use outside the System would constitute an unfair method of competition.

6.    The Confidential Information is proprietary, involves trade secrets of Franchisor, and is disclosed to me solely on the condition that I agree, and I do hereby agree, that I shall hold in strict confidence all Confidential Information and all other information designated by Franchisor as confidential.  Unless Franchisor otherwise agrees in writing, I will not disclose and/or use the Confidential Information except in connection with the operation of the Franchised Business as a        of the Franchisee, and then only in strict compliance with the Manual and System and only to such employees having a need to know; I will not directly or indirectly imitate, duplicate, or "reverse engineer" any Confidential Information or any other information designated by Franchisor as confidential or aid any third party in such actions; and I will continue not to disclose and/or use any Confidential Information or any other information designated by Franchisor as confidential even after I cease to be in that position unless I can demonstrate that such information has become generally known or easily accessible other than by the breach of an obligation of Franchisee under the Franchise Agreement.

7.    Except as otherwise approved in writing by Franchisor, I will not (either directly or indirectly, for myself or through, on behalf of, or in conjunction with any person, or legal entity) at any time while I am employed by or associated with the Franchisee, or at any time during the uninterrupted two-year period

(which will be tolled during any period of noncompliance) after I cease to be employed by or associated with the Franchisee (or the two-year period after the expiration or earlier termination of the Franchise Agreement, whichever occurs first):

(a)     Divert or attempt to divert any present or prospective customer of any URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchised Business to any Competitive Business, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act that is harmful, injurious, or prejudicial to the goodwill associated with the Proprietary Marks and the System defined and described in the Franchise Agreement;

(b)     Employ or seek to employ any person who is or has within the previous 60 days been employed by Franchisor or an Affiliate of Franchisor, or otherwise directly or indirectly induce such person to leave his or her employment; or

(c)     Own, maintain, advise, operate, engage in, be employed by, make loans to, invest in, provide any assistance to, or have any direct or indirect interest in (as owner or otherwise) or relationship or association with, any Competitive Business other than an URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchised Business operated by Franchisee or its Affiliates pursuant to a then-currently effective Franchise Agreement with Franchisor.  While I am employed by or associated with the Franchisee, this restriction shall apply to any location within the United States, its territories or commonwealths, and any other country, province, state, or geographic area in which Franchisor or its Affiliates have used, sought registration of, or registered the Proprietary Marks or similar marks, or have operated or licensed others to operate a business under the System or the Proprietary Marks or similar marks.  After I cease to be employed by or associated with the Franchisee (or after the expiration or earlier termination of the Franchise Agreement, whichever occurs first), this restriction shall apply to any business that is or is intended to be located at the location of any former URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchised Business or within a 25-mile radius of any other URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchised Business then operating under the System and Proprietary Marks in existence or under development at the time of such termination or transfer.

I acknowledge that for purposes of this Agreement, "Competitive Business" shall mean any business or enterprise that engages in or grants franchises or licenses for the operation of indoor or outdoor trampoline and adventure parks, featuring wall-to-wall trampolines, foam pits, warrior/ninja courses, soft play, climbing walls, pro zone, ropes courses, zip lines, coasters, indoor skydiving, dodge ball, rock climbing, digital climbing walls, arcades, bowling, bumper cars, whirley ball, mini golf, laser tag, trampoline volleyball, or related activities.

8.     I agree that each of the foregoing covenants shall be construed as independent of any other covenant or provision of this Agreement.  If all or any portion of a covenant in this Agreement is held unreasonable or unenforceable by a court or agency having valid jurisdiction in an un-appealed final decision to which Franchisor is a party, I expressly agree to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Agreement.

9.     I understand and acknowledge that Franchisor shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in this Agreement, or any portion thereof, without my consent, effective immediately upon receipt by me of written notice thereof, and I agree to comply forthwith with any covenant as so modified.

10.    Franchisor is a third-party beneficiary of this Agreement and may enforce it, solely and/or jointly with the Franchisee.  I am aware that my violation of this Agreement will cause Franchisor and the Franchisee irreparable harm; therefore, I acknowledge and agree that the Franchisee and/or Franchisor may apply for the issuance of an injunction preventing me from violating this Agreement, and I agree to pay the Franchisee and Franchisor all the costs it/they incur(s), including, without limitation, legal fees and expenses, if this Agreement is enforced against me.  Due to the importance of this Agreement to the

Franchisee and Franchisor, any claim I have against the Franchisee or Franchisor is a separate matter and does not entitle me to violate, or justify any violation of this Agreement.

11.  This Agreement shall be construed under the laws of the State of Texas.  The only way this Agreement can be changed is in writing signed by both the Franchisee and me.  Any capitalized terms contained in but not defined by this Guaranty and Personal Undertaking shall have the same meaning prescribed to that word in the Franchise Agreement.

12.  With respect to all claims, controversies and disputes, I irrevocably consent to personal jurisdiction and submit myself to the jurisdiction of the state courts located in Tarrant County, Texas, and the United States District Court for the Northern District of Texas.  I acknowledge that this Agreement has been entered into in the state of Texas, and that I am to receive valuable information emanating from Franchisor's headquarters in Fort Worth, Texas.  In recognition of the information and its origin, I hereby irrevocably consent to the personal jurisdiction of the state and federal courts of Texas as set forth above.  Notwithstanding the foregoing, I acknowledge and agree that Franchisor may bring and maintain an action against me in any court of competent jurisdiction for injunctive or other extraordinary relief against threatened conduct that will cause it loss or damages, under the usual equity rules, including the applicable rules for obtaining restraining orders and preliminary and permanent injunctions.

13.  **I WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, INVOLVING FRANCHISOR, WHICH ARISES OUT OF OR IS RELATED IN ANY WAY TO THIS AGREEMENT, THE FRANCHISE AGREEMENT, THE PERFORMANCE OF ANY PARTY UNDER THE FRANCHISE AGREEMENT, AND/OR THE OFFER OR GRANT OF THE FRANCHISE**.

IN WITNESS WHEREOF, the undersigned, intending to be legally bound, have executed this Confidentiality and Non-Competition Agreement to be effective on the day and year first written above.

_____          _____

_____          _____

_____          _____

**ACKNOWLEDGED BY FRANCHISEE**

_____ ,

a _____

By: _____
        _____ , its

**URBAN AIR TRAMPOLINE & ADVENTURE PARK**
**FRANCHISE AGREEMENT**

**ATTACHMENT E**

**ELECTRONIC DEBT AUTHORIZATION**

**Authorization Agreement for Direct Payments (ACH Debits)**

I (we) hereby authorize UATP Management, LLC., a Texas limited liability company, hereinafter called Franchisor, to initiate debit entries to my (our) ☐ Checking Account ☐ Savings Account (select one) indicated below at the depository financial institution named below, hereafter called DEPOSITORY, and to debit the same to such account. I (we) acknowledge that the origination of ACH transactions to my (our) account must comply with the provisions of U.S. law.

Depository Name:                     Branch:

City:                State:              Zip:

Routing Number:            Account Number:

This authorization is remain in full force and effect until Franchisor has received written notification from me (or either of us) or its termination in such time and in such manner as to afford Franchisor and DEPOSITOR a reasonable opportunity to act on it.

Name(s):_____         ID Number:
      (Please Print)

Date:_____         Signature:_____

**NOTE: DEBIT AUTHORIZATIONS <u>MUST</u> PROVIDE THAT THE RECEIVER MAY REVOKE THE AUTHORIZATION ONLY BY NOTIFYING THE ORIGINATOR IN THE MANNER SPECIFIED IN THE AUTHORIZATION**

**URBAN AIR TRAMPOLINE & ADVENTURE PARK**
**FRANCHISE AGREEMENT**

**ATTACHMENT F**

**TELEPHONE ASSIGNMENT AGREEMENT**

THIS TELEPHONE ASSIGNMENT AGREEMENT is made on        , by and between        ("Assignor") and UATP MANAGEMENT, LLC or its designee ("Assignee").

**BACKGROUND**

A.      The Assignee has developed and owns the proprietary system ("**System**") for the operation of a facility under the trademark and logo URBAN AIR TRAMPOLINE & ADVENTURE PARK (the "**Franchised Business**");

B.      The Assignor has been granted a license to operate a Franchised Business pursuant to a Franchise Agreement dated      , in accordance with the System;

C.      In order to operate its Franchised Business, the Assignor shall be acquiring one or more telephone numbers, telephone listings and telephone directory advertisements; and

D.      As a condition to the execution of the Franchise Agreement, the Assignee has required that the Assignor assign all of its right, title and interest in its telephone numbers, telephone listings and telephone directory advertisements to the Assignee in the event of a termination of the Franchise Agreement;

**AGREEMENT**

In consideration of the foregoing, the mutual premises herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

1.      Assignment.  In the event of termination of the Franchise Agreement, and in order to secure continuity and stability of the operation of the System, the Assignor hereby sells, assigns, transfers and conveys to the Assignee all of its rights, title and interest in and to certain telephone numbers, telephone listings and telephone directory advertisements pursuant to which Assignor shall operate its Franchised Business in accordance with the terms of the Franchise Agreement; provided, however, such Assignment shall not be effective unless and until the Franchise Agreement is terminated in accordance with the provisions thereof.

2.      Representation and Warranties of the Assignor.  The Assignor hereby represents, warrants and covenants to the Assignee that:

(a)      As of the effective date of the Assignment, all of the Assignor's obligations and indebtedness for telephone, telephone listing services and telephone directory advertisement services shall be paid and current;

(b)      As of the date hereof, the Assignor has full power and legal right to enter into, execute, deliver and perform this Agreement;

(c)      This Agreement is a legal and binding obligation of the Assignor, enforceable in accordance with the terms hereof;

(d)      The execution, delivery and performance of this Assignment does not conflict with, violate, breach or constitute a default under any contract, agreement or instrument to which the Assignor is a party or by which the Assignor is bound, and no consent of nor approval by any third party is required in connection herewith; and

(e)    The Assignor has the specific power to assign and transfer its right, title and interest in its telephone numbers, telephone listings and telephone directory advertisements, and the Assignor has obtained all necessary consents to this Assignment.

3.    <u>Miscellaneous</u>.  The validity, construction and performance of this Assignment shall be governed by the laws of the State of Texas.  All agreements, covenants, representations and warranties made herein shall survive the execution hereof.  All rights of the Assignee shall inure to its benefit and to the benefit of its successors and assigns.

IN WITNESS WHEREOF, the undersigned, intending to be legally bound, have executed this Telephone Assignment Agreement to be effective on the day and year first written above.

**ASSIGNEE:**

UATP MANAGEMENT, LLC
a Texas limited liability company.


By:    _____
       MICHAEL BROWNING, JR., President


**ASSIGNOR:**

       ,
a


By:    _____
          , its

**URBAN AIR TRAMPOLINE & ADVENTURE PARK**
**FRANCHISE AGREEMENT**

## ATTACHMENT G

### LEASE RIDER

THIS AGREEMENT is made and entered into on _____, 20___, by and among UATP MANAGEMENT, LLC, having its principal offices at 317 S. Jenkins, Suite C Grapevine, Texas 76051 ("Franchisor"),          , having its principal offices at          ("Landlord"), and     , having its principal offices at ,     ("Tenant").

### BACKGROUND

A.    Landlord and Tenant have executed a lease agreement dated _____ ("Lease") for the premises located at     ("Leased Premises") for use by Tenant as a business to be opened pursuant to Franchisor's proprietary marks and system in connection with a Franchise Agreement dated     by and between Franchisor and Tenant  ("Franchise Agreement");

B.    A condition to the approval of Tenant's specific location by Franchisor is that the Lease for the Leased Premises designated for the operation of an URBAN AIR TRAMPOLINE & ADVENTURE PARK franchise facility ("Franchised Business") contain the agreements set forth herein;

C.    Landlord acknowledges that Franchisor requires the modifications to the Lease set forth herein as a condition to its approving the Leased Premises as a site for the Franchised Business, and that Landlord agrees to modify and amend the Lease in accordance with the terms and conditions contained herein; and

D.    According to Section 3.C of the Franchise Agreement, all rights, title and interest in and to the Lease must be assigned to Franchisor, at Franchisor's option, upon the termination of the Franchise Agreement;

### AGREEMENT

In consideration of the mutual undertakings and commitments set forth herein, the receipt and sufficiency of which are hereby acknowledged, agree as follows:

1.    Use Clause.  The Leased Premises shall be used solely for the operation of an URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchised Business and identified by the mark URBAN AIR TRAMPOLINE & ADVENTURE PARK or such other name as may be specified by Franchisor. Landlord acknowledges that such use shall not violate any then-existing exclusive rights granted to any existing tenant of Landlord.  Landlord consents to Tenant's use of Franchisor's marks and signs, décor items, color schemes and related components of Franchisor's proprietary system.  Landlord further acknowledges that during the term of this Lease or any extension thereof, Landlord will not lease space to another business operating an indoor trampoline park featuring wall-to-wall trampolines, foam pits, and related activities within the same shopping center in which the Franchised Business is located.

2.    Termination of the Franchise Agreement.  If the Franchise Agreement between Franchisor and Tenant is terminated for any reason during the term of the Lease or any extension thereof,  Tenant, upon the written request of Franchisor, shall assign to Franchisor all of its rights, title and interest in and to the Lease, and Franchisor or any affiliate designated by Franchisor may agree to assume from the date of assignment all of Tenant's obligations remaining under the Lease, and may assume Tenant's occupancy rights, and the right to sublease the premises, for the remainder of the term of the Lease.  If Franchisor elects to accept the assignment of the Lease from Tenant, it shall give Tenant and Landlord written notice of its election to acquire the leasehold interest.  Landlord hereby consents to the assignment of the Lease from Tenant to Franchisor, and shall not charge any fee or accelerate rent under the Lease. Alternatively, in the event of a termination of the Franchise Agreement, Franchisor may elect to enter into a new lease with Landlord containing terms and conditions no less favorable than the Lease.  Upon

Landlord's receipt of written notice from Franchisor advising Landlord that Franchisor elects to enter into a new lease, Landlord shall execute and deliver such new lease to Franchisor for its acceptance. Landlord and Tenant shall deliver possession of the Leased Premises to Franchisor, free and clear of all rights of Tenant or third parties, subject to Franchisor executing an acceptance of the assignment of Lease or new lease, as the case may be.

3.   <u>Tenant's Agreement to Vacate Leased Premises</u>.  Tenant agrees to peaceably and promptly vacate the Leased Premises and, subject to Franchisor's right to acquire any such property pursuant to its Franchise Agreement with Tenant, to remove its personal property therefrom upon the termination of the Franchise Agreement.  Any property not removed or otherwise disposed of by Tenant shall be deemed abandoned.

4.   <u>Delivery of Possession</u>.  If Landlord may not legally obtain possession of the Leased Premises or if Landlord is unable to deliver the Leased Premises to Franchisor within six (6) months from the date Franchisor notifies Landlord of its election to continue the use of the Leased Premises, then Franchisor shall have the right at any time thereafter to rescind its election to acquire a leasehold interest in the Leased Premises and to terminate the Lease or any new lease between it and Landlord for the Leased Premises, and Landlord shall release Franchisor from all of its obligations under the Lease or any new lease.

5.   <u>Entry</u>.  Franchisor may enter the Leased Premises without the consent of Landlord or Tenant to make any modification necessary to protect Franchisor's proprietary system or marks or to cure any default under the Franchise Agreement or under the Lease, without being guilty of trespass or any other crime or tort.

6.   <u>Amendment of Lease</u>.  Landlord and Tenant agree not to amend the Lease in any respect, except with the prior written consent of Franchisor.

7.   <u>Franchisor Not a Guarantor</u>.  Landlord acknowledges and agrees that notwithstanding any terms or conditions contained in this Agreement or any other agreement, Franchisor shall in no way be construed as a guarantor or surety of Tenant's obligations under the Lease.  Notwithstanding the foregoing, in the event Franchisor becomes the tenant by assignment of the Lease in accordance with the terms hereof or enters into a new lease with Landlord, then Franchisor shall be liable for all of the obligations of Tenant on its part to be performed or observed under the Lease or a new lease.

8.   <u>Document to Govern</u>.  The terms and conditions contained herein modify and supplement the Lease. Whenever any inconsistency or conflict exists between this Agreement and the Lease, the terms of this Agreement shall prevail.

9.   <u>Waiver.</u>  Failure of Franchisor to enforce or exercise any of its rights hereunder shall not constitute a waiver of the rights hereunder or a waiver of any subsequent enforcement or exercise of its rights hereunder.

10.  <u>Amendment of Agreement</u>.  This Agreement may be amended only in writing signed by all parties hereto.

11.  <u>Notices.</u>  Landlord shall mail to Franchisor copies of any letters and notices it gives to Tenant related to the Lease or the Leased Premises concurrently with giving such letters and notices to Tenant.  If Tenant fails to cure any default within the period provided in the Lease, if any, Landlord shall give Franchisor immediate written notice of such failure to cure.  All notices shall be delivered by certified mail at the addresses designated in the heading of this Agreement or to such other addresses as the parties hereto may, by written notice, designate.

12.  <u>Binding Effect</u>.  This Agreement shall be binding upon the parties hereto, their heirs, executors, successors, assigns and legal representatives.

13.  <u>Severability</u>.  If any provision of this Agreement or any part thereof is declared invalid by any court of competent jurisdiction, such act shall not affect the validity of this Agreement and the remainder of this Agreement shall remain in full force and effect according to the terms of the remaining provisions or part of provisions hereof.

14. <u>Remedies.</u> The rights and remedies created herein shall be deemed cumulative and no one such right or remedy shall be exclusive at law or in equity of the rights and remedies which Franchisor may have under this or any other agreement to which Franchisor and Tenant are parties.

15. <u>Attorneys' Fees.</u> If any of the parties to this Agreement commences a legal action against another party arising out of or in connection with this Agreement, the prevailing party shall be entitled to have and recover from the other party its reasonable attorneys' fees and costs of suit; the term "prevailing party" means a party that is awarded actual relief in the form of damages, declaratory relief, or injunctive relief, as well as a party that successfully defends a legal action commenced against it.

16. <u>Applicable Law.</u> This Agreement shall be governed by and construed in accordance with the laws of the State of Texas.

17. <u>Certain Acknowledgments.</u> Landlord and Tenant acknowledge and agree that all interior and exterior signage and related items (collectively, the "Leased/Licensed Assets") are the sole property of Franchisor. Tenant shall have no rights to pledge in any manner the Leased/Licensed Assets and Landlord shall have no rights to place any liens on or make any claims to the Leased/Licensed Assets.

IN WITNESS WHEREOF, the undersigned, intending to be legally bound, have executed this Lease Rider to be effective on the day and year first written above.

**UATP MANAGEMENT, LLC**
a Texas limited liability company.


By: _____
        MICHAEL BROWNING, JR., President

**LANDLORD NAME**

a

By: _____
        _____ (name)
        _____ (title)

**TENANT NAME**
        ,
a


By: _____
            , its

**EXHIBIT E**
**TO URBAN AIR TRAMPOLINE & ADVENTURE PARK**
**FRANCHISE DISCLOSURE DOCUMENT**

**FINANCIAL STATEMENTS**

# UATP MANAGEMENT, LLC

## FINANCIAL STATEMENTS

**Years Ended December 31, 2016 and 2015
with Report of Independent Auditors**

# UATP MANAGEMENT, LLC

## FINANCIAL STATEMENTS

### Years Ended December 31, 2016 and 2015

## Table of Contents

Report of Independent Auditors ........................................................................................................... 1

Financial Statements:

    Balance Sheets ........................................................................................................... 2

    Statements of Income and Changes in Members' Equity ........................................... 3

    Statements of Cash Flows ........................................................................................... 4

Notes to Financial Statements ............................................................................................. 5



Fort Worth Office
1400 West 7th Street
Suite 400
Fort Worth, Texas 76102
817.259.9100 Main

whitleypenn.com

# REPORT OF INDEPENDENT AUDITORS

To the Members of
UATP Management, LLC

We have audited the accompanying financial statements of UATP Management, LLC (the "Company"), which comprise the balance sheets as of December 31, 2016 and 2015, and the related statements of income and changes in members' equity, and cash flows for the years ended, and the related notes to the financial statements.

**Management's Responsibility for the Financial Statements**

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

**Auditor's Responsibility**

Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**Opinion**

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2016 and 2015, and the results of its operations and its cash flows for the years then ended in accordance with accounting principles generally accepted in the United States of America.

Whitley Penn LLP

April 17, 2017
Fort Worth, Texas



Dallas                Fort Worth                Houston

**UATP MANAGEMENT, LLC**

**BALANCE SHEETS**

|  | December 31, | |
|---|---|---|
|  | **2016** | **2015** |
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 615,126 | $ 140,308 |
| Accounts receivable | 256,252 | 82,620 |
| Accounts receivable, related party | 66,061 | - |
| Current portion of note receivable | 99,996 | - |
| Other current assets | 26,502 | - |
| Total current assets | 1,063,937 | 222,928 |
| Property and equipment, net | 108,153 | 5,989 |
| Note receivable, net of current portion | 91,671 | - |
| Other assets | 1,850 | 1,850 |
| Total assets | $ 1,265,611 | $ 230,767 |
| **Liabilities and Members' Equity** | | |
| Accounts payable | $ 294,315 | $ 13,540 |
| Accounts payable, member | - | 44,940 |
| Deferred revenue | 140,652 | - |
| Total liabilities | 434,967 | 58,480 |
| Commitments and contingencies | | |
| Members' equity | 830,644 | 172,287 |
| Total liabilities and members' equity | $ 1,265,611 | $ 230,767 |

See accompanying notes to financial statements.

**UATP MANAGEMENT, LLC**

**STATEMENTS OF INCOME AND
CHANGES IN MEMBERS' EQUITY**

|  | Year Ended December 31, | |
|---|---|---|
|  | **2016** | **2015** |
| Revenues | $ 3,833,314 | $ 807,825 |
| Selling, general, and administrative expenses | 1,614,939 | 639,496 |
| Net income | 2,218,375 | 168,329 |
| Members' equity at beginning of year | 172,287 | 3,458 |
| Member contribution | - | 500 |
| Member distributions | (1,560,018) | - |
| Members' equity at end of year | $ 830,644 | $ 172,287 |

See accompanying notes to financial statements.

# UATP MANAGEMENT, LLC

## STATEMENTS OF CASH FLOWS

|  | Year Ended December 31, | |
|  | 2016 | 2015 |
|---|---|---|
| **Operating Activities** | | |
| Net income | $ 2,218,375 | $ 168,329 |
| Adjustment to reconcile net income to net cash | | |
| provided by operating activities: | | |
| Depreciation | 2,995 | 1,105 |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | (173,632) | (82,320) |
| Accounts receivable, related party | (66,061) | - |
| Deposit | - | 1,000 |
| Other assets | (26,502) | (1,850) |
| Accounts payable | 280,775 | 13,540 |
| Accounts payable, member | (44,940) | 44,940 |
| Deferred revenue | 140,652 | - |
| Net cash provided by operating activities | 2,331,662 | 144,744 |
| | | |
| **Investing Activities** | | |
| Purchases of property and equipment | (105,159) | (7,094) |
| Advances on note receivable | (200,000) | - |
| Payments received on note receivable | 8,333 | - |
| Net cash used in investing activities | (296,826) | (7,094) |
| | | |
| **Financing Activities** | | |
| Contribution from member | - | 500 |
| Cash distributions to members | (1,560,018) | - |
| Net cash (used in) provided by financing activities | (1,560,018) | 500 |
| | | |
| Net increase in cash and cash equivalents | 474,818 | 138,150 |
| | | |
| Cash and cash equivalents at beginning of year | 140,308 | 2,158 |
| | | |
| Cash and cash equivalents at end of year | $ 615,126 | $ 140,308 |

See accompanying notes to financial statements.

**UATP MANAGEMENT, LLC**

**NOTES TO FINANCIAL STATEMENTS**

**December 31, 2016 and 2015**

**A.  Nature of Business**

UATP Management, LLC (the "Company") was organized on May 31, 2013 as a Texas limited liability company.  The Company franchises Urban Air Trampoline Park chains.  The liability of the members of the Company is generally limited to the amount of their capital contributions.  The Company has a perpetual duration unless dissolved earlier in accordance with the Company Agreements.  The Company's corporate offices are located in Grapevine, Texas.

**B.  Summary of Significant Accounting Policies**

A summary of the Company's significant accounting policies consistently applied in the preparation of the accompanying financial statements follows.

**Basis of Accounting**

The accounts are maintained and the financial statements have been prepared using the accrual basis of accounting in accordance with accounting principles generally accepted in the United States of America ("GAAP").

**Use of Estimates**

The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect certain reported amounts in the financial statements and accompanying notes.  Actual results could differ from these estimates and assumptions.

**Cash and Cash Equivalents**

The Company considers all highly-liquid investments with a maturity of three months or less when purchased to be cash equivalents.  At December 31, 2016 and 2015, the Company had no such investments.  The Company maintains deposits primarily in one financial institution, which may at times exceed amounts covered by insurance provided by the U.S. Federal Deposit Insurance Corporation ("FDIC").  The Company has not experienced any losses related to amounts in excess of FDIC limits.

**Accounts Receivable**

Accounts receivable generally consist of franchise fee receivables and lease deposit receivables.  Accounts receivable are stated at amounts management expects to collect from outstanding balances.  Credit is extended to customers based upon evaluation of the customer's financial condition, and collateral is not required, excluding the note receivable discussed in Note C.  Management provides for probable uncollectible amounts through a charge to earnings and a credit to a valuation allowance based on its assessment of the current status of individual accounts.  Balances still outstanding after management has used reasonable collection efforts are written off through a charge to the valuation allowance and a credit to accounts receivable.  No allowance for doubtful accounts is considered necessary at December 31, 2016 and 2015.

5

# UATP MANAGEMENT, LLC

## NOTES TO FINANCIAL STATEMENTS *(continued)*

### B.  Summary of Significant Accounting Policies – continued

**Property and Equipment**

Property and equipment are carried at cost.  Depreciation is provided on the straight-line method over the assets' estimated service lives.  Expenditures for maintenance and repairs are charged to expense in the period in which they are incurred, and betterments are capitalized.  The estimated useful life of computers is 3 years, the estimate useful life of furniture and office equipment is 5 years, and the estimated useful life of the used airplane is 10 years.

**Revenue Recognition**

The Company's revenues are currently derived from management fees charged to various Urban Air Trampoline Park locations, franchise fee revenue, and rebate revenue.  The management fees are recognized as revenue when earned from the locations.  As of December 31, 2016 and 2015, the Company was receiving management fees from seven and five locations, respectively.

Franchise fee revenue is also recognized as revenue when earned.  The Company receives an initial franchise fee when the franchise agreement is signed as well as 7% of gross revenues each month. The Company is also reimbursed for various direct expenses by the franchisees for their share of the cost.  This reimbursement is recorded as an offset to selling, general, and administrative expenses.

Finally, rebate revenue is also recognized as revenue when earned.  The Company has an agreement with a third party supplier, whereby the Company receives a percentage of net profits from the sale and installation of the trampoline and adventure park equipment.  During 2016, the Company recognized approximately $1,266,000 in revenue from this agreement.  There was no such revenue recorded for the year ended December 31, 2015.

At December 31, 2016, the Company had unearned rebate revenue and initial franchise fee revenue of approximately $126,000 and $15,000, respectively.  There was no unearned revenue as of December 31, 2015.

**Advertising Costs**

Advertising costs are expensed as incurred, and approximated $28,000 and $7,000 for the years ended December 31, 2016 and 2015, respectively.

**Income Taxes**

The Company is a limited liability company, and therefore is not a taxpaying entity for federal income tax purposes; accordingly, no income tax expense has been recorded in the accompanying financial statements.  Income of the Company is included by the individual members in their respective income tax returns based on their proportionate share of taxable income generated by the Company.

**UATP MANAGEMENT, LLC**

**NOTES TO FINANCIAL STATEMENTS** *(continued)*

**B.  Summary of Significant Accounting Policies – continued**

**Income taxes - continued**

GAAP prescribes a comprehensive model for the financial statement recognition, measurement, presentation and disclosure of uncertain tax positions taken or expected to be taken in income tax returns.  Management must determine whether it is more likely than not that a tax position will be sustained upon examination based on technical merits of the position and management's opinion is that there are no such positions.

The Company files income tax returns in the United States federal jurisdiction and certain states within the United States.  No tax returns are currently under examination by any tax authorities.  The Company has not incurred any penalties or interest.

**C.  Note Receivable**

The Company executed a promissory note and security agreement with the franchisee, South Portland Urban Air, LLC, on May 18, 2016 in the amount of $200,000 for the remaining balance due to the trampoline and adventure attraction equipment manufacturer on trampoline and adventure park equipment sold.  Monthly installments of $8,333 are due on the note receivable beginning on December 1, 2016 and continuing on the first day of each succeeding month until the unpaid principal has been paid in full.  In lieu of interest, the Company is charging a 1% higher monthly royalty on this franchisee's gross sales until the note is paid in full.

Scheduled maturities of the note receivable are as follows at December 31, 2016:

| | |
|---|---:|
| 2017 | $      99,996 |
| 2018 | 91,671 |
| Total | $    191,667 |

**UATP MANAGEMENT, LLC**

**NOTES TO FINANCIAL STATEMENTS** *(continued)*

**D.  Property and Equipment**

Property and equipment at December 31, consisted of the following:

|  | 2016 | 2015 |
|---|---|---|
| Computers | $        3,182 | $        2,060 |
| Furniture and equipment | 8,291 | 5,504 |
| Airplane | 101,250 | - |
|  | 112,723 | 7,564 |
| Less accumulated depreciation | 4,570 | 1,575 |
|  | $    108,153 | $        5,989 |

**E.  Commitments and Contingencies**

The Company leases office space under a non-cancelable operating lease that has an expiration date on March 31, 2017.  The Company can extend the lease at its option.  Expenses associated with this lease approximated $22,000 and $15,000 for the years ended December 31, 2016 and 2015, respectively.

Future minimum annual payments at December 31, 2016 are approximately $5,400 for 2017.

**F.  Related Party Transactions**

At December 31, 2016, the Company had accounts receivable from a franchisee partially owned by two members for approximately $66,000.

At December 31, 2015, the Company had a payable to a member for approximately $45,000.  The amount was repaid by the Company in January 2016.

For 2016 and 2015, approximately $511,000 and $360,000, respectively, of the Company's revenue was received from locations partially owned by two of the Company's members.

The Company incurred legal expenses during 2016 of approximately $40,000 with a law firm.  One of the Company's members is an attorney with the law firm.  There were no legal expenses incurred with this firm in 2015.

The Company pays two entities partially owned by the Company's members for marketing and operations support.  Expenses to these related entities totaled approximately $41,000 for the year ended December 31, 2015.  There were no expenses incurred in 2016.

**UATP MANAGEMENT, LLC**

**NOTES TO FINANCIAL STATEMENTS** *(continued)*

**G.  Subsequent Events**

In preparing the accompanying financial statements, management of the Company has evaluated all subsequent events and transactions for potential recognition or disclosure through April 17, 2017, the date the financial statements were available for issuance.

# UATP MANAGEMENT, LLC

## FINANCIAL STATEMENTS

**Years Ended December 31, 2015 and 2014
with Report of Independent Auditors**

# UATP MANAGEMENT, LLC

## FINANCIAL STATEMENTS

### Years Ended December 31, 2015 and 2014

## Table of Contents

Report of Independent Auditors ........................................................................................................... 1

Financial Statements:

    Balance Sheets ........................................................................................................................... 2

    Statements of Income and Changes in Members' Equity (Deficit) ........................................... 3

    Statements of Cash Flows........................................................................................................... 4

Notes to Financial Statements ............................................................................................................ 5



Fort Worth Office
1400 West 7th Street
Suite 400
Fort Worth, Texas 76102
817.259.9100 Main

whitleypenn.com

# REPORT OF INDEPENDENT AUDITORS

To the Members of
UATP Management, LLC

We have audited the accompanying financial statements of UATP Management, LLC (the "Company"), which comprise the balance sheets as of December 31, 2015 and 2014, and the related statements of income and changes in members' equity (deficit), and cash flows for the years ended, and the related notes to the financial statements.

### *Management's Responsibility for the Financial Statements*

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America ("GAAP"); this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

### *Auditor's Responsibility*

Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

### *Opinion*

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2015 and 2014, and the results of its operations and its cash flows for the years then ended in accordance with GAAP.

*Whitley Penn LLP*

March 28, 2016
Fort Worth, Texas

*An Independent Member of*



**UATP MANAGEMENT, LLC**

**BALANCE SHEETS**

| | | December 31, | | |
|---|---|---|---|---|
| | | **2015** | | **2014** |
| **Assets** | | | | |
| Current assets: | | | | |
|    Cash and cash equivalents | $ | 140,308 | $ | 2,158 |
|    Accounts receivable | | 82,620 | | 300 |
|    Deposit | | - | | 1,000 |
| Total current assets | | 222,928 | | 3,458 |
| | | | | |
| Property and equipment, net | | 5,989 | | - |
| Other assets | | 1,850 | | - |
| | | | | |
| Total assets | $ | 230,767 | $ | 3,458 |
| | | | | |
| **Liabilities and Members' Equity** | | | | |
|    Accounts payable | $ | 13,540 | $ | - |
|    Accounts payable, member | | 44,940 | | - |
| Total liabilities | | 58,480 | | - |
| | | | | |
| Commitments and contingencies | | | | |
| | | | | |
| Members' equity | | 172,287 | | 3,458 |
| | | | | |
| Total liabilities and members' equity | $ | 230,767 | $ | 3,458 |

See accompanying notes to financial statements.

2

**UATP MANAGEMENT, LLC**

**STATEMENTS OF INCOME AND**
**CHANGES IN MEMBERS' EQUITY (DEFICIT)**

|  | Year Ended December 31, | |
|  | 2015 | 2014 |
| --- | ---: | ---: |
| Revenues | $ 807,825 | $ 440,500 |
| Selling, general, and administrative expenses | 639,496 | 425,616 |
| Net income | 168,329 | 14,884 |
| Members' equity (deficit) at beginning of year | 3,458 | (11,426) |
| Member contribution | 500 | - |
| Members' equity at end of year | $ 172,287 | $ 3,458 |

See accompanying notes to financial statements.

**UATP MANAGEMENT, LLC**

**STATEMENTS OF CASH FLOWS**

| | | Year Ended December 31, | | |
|---|---|---|---|---|
| | | 2015 | | 2014 |
| **Operating Activities** | | | | |
| Net income | $ | 168,329 | $ | 14,884 |
| Adjustment to reconcile net income to net cash provided by operating activities: | | | | |
|    Depreciation | | 1,105 | | - |
|    Changes in operating assets and liabilities: | | | | |
|      Accounts receivable | | (82,320) | | (300) |
|      Deposit | | 1,000 | | (1,000) |
|      Other assets | | (1,850) | | - |
|      Accounts payable | | 13,540 | | (12,604) |
|      Accounts payable, member | | 44,940 | | - |
| Net cash provided by operating activities | | 144,744 | | 980 |
| | | | | |
| **Investing Activities** | | | | |
|    Purchases of property and equipment | | (7,094) | | - |
| Net cash used in investing activity | | (7,094) | | - |
| | | | | |
| **Financing Activities** | | | | |
|    Contribution from member | | 500 | | - |
| Net cash provided by financing activity | | 500 | | - |
| | | | | |
| Net increase in cash and cash equivalents | | 138,150 | | 980 |
| | | | | |
| Cash and cash equivalents at beginning of year | | 2,158 | | 1,178 |
| | | | | |
| Cash and cash equivalents at end of year | $ | 140,308 | $ | 2,158 |

See accompanying notes to financial statements.

**UATP MANAGEMENT, LLC**

**NOTES TO FINANCIAL STATEMENTS**

**December 31, 2015 and 2014**

### A.  Nature of Business

UATP Management, LLC (the "Company") was organized on May 31, 2013 as a Texas limited liability company.  The Company franchises Urban Air Trampoline Park chains.  The liability of the members of the Company is generally limited to the amount of their capital contributions.  The Company has a perpetual duration unless dissolved earlier in accordance with the Company Agreements.  The Company's corporate offices are located in Southlake, Texas.

### B.  Summary of Significant Accounting Policies

A summary of the Company's significant accounting policies consistently applied in the preparation of the accompanying financial statements follows.

**Basis of Accounting**

The accounts are maintained and the financial statements have been prepared using the accrual basis of accounting in accordance with accounting principles generally accepted in the United States of America ("GAAP").

**Use of Estimates**

The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect certain reported amounts in the financial statements and accompanying notes.  Actual results could differ from these estimates and assumptions.

**Cash and Cash Equivalents**

The Company considers all highly-liquid investments with a maturity of three months or less when purchased to be cash equivalents.  At December 31, 2015 and 2014, the Company had no such investments.  The Company maintains deposits primarily in one financial institution, which may at times exceed amounts covered by insurance provided by the U.S. Federal Deposit Insurance Corporation ("FDIC").  The Company has not experienced any losses related to amounts in excess of FDIC limits.

**Accounts Receivable**

Accounts receivable generally consist of franchise fee receivables and lease deposit receivables.  No allowance for doubtful accounts is considered necessary.

## UATP MANAGEMENT, LLC

### NOTES TO FINANCIAL STATEMENTS *(continued)*

**B.  Summary of Significant Accounting Policies – continued**

**Property and Equipment**

Property and equipment are carried at cost.  Depreciation is provided on the straight-line method over the assets' estimated service lives.  Expenditures for maintenance and repairs are charged to expense in the period in which they are incurred, and betterments are capitalized.  The estimated useful life of computers is 3 years and the estimate useful life of furniture and office equipment is 5 years.

**Revenue Recognition**

The Company's revenues are currently derived from management fees charged to various Urban Air Trampoline Park locations and franchise fee revenue.  The management fees are recognized as revenue when earned from the locations.  As of December 31, 2015 and 2014, the Company was receiving management fees from six and four locations, respectively.

Franchise fee revenue is also recognized as revenue when earned.  The Company receives an initial franchise fee when the franchise agreement is signed as well as 7% of gross revenues each month. There was no franchise fee revenue for the year ended December 31, 2014.  The Company is also reimbursed for various direct expenses by the franchisees for their share of the cost.  This reimbursement is recorded as an offset to selling, general, and administrative expenses.

**Advertising Costs**

Advertising costs are expensed as incurred, and approximated $7,000 and $2,000 for the years ended December 31, 2015 and 2014, respectively.

**Income Taxes**

The Company is a limited liability company, and therefore is not a taxpaying entity for federal income tax purposes; accordingly, no income tax expense has been recorded in the accompanying financial statements.  Income of the Company is included by the individual members in their respective income tax returns based on their proportionate share of taxable income generated by the Company.

The Company files income tax returns in the United States federal jurisdiction and certain states within the United States.  No tax returns are currently under examination by any tax authorities.  The Company did not incur any penalties or interest during the years ended December 31, 2015 and 2014.

# UATP MANAGEMENT, LLC

## NOTES TO FINANCIAL STATEMENTS *(continued)*

### C. Property and Equipment

Property and equipment at December 31, consisted of the following:

|  | 2015 | 2014 |
|---|---|---|
| Computers | $ 2,060 | $ - |
| Furniture and equipment | 5,504 | 470 |
|  | 7,564 | 470 |
| Less accumulated depreciation | 1,575 | 470 |
|  | $ 5,989 | $ - |

### D. Commitments and Contingencies

The Company leases office space under a non-cancelable operating lease that has an expiration date on March 31, 2017. The Company can extend the lease at its option. Expenses associated with this lease approximated $15,000 for the year ended December 31, 2015.

Future minimum annual payments at December 31, 2015 are approximately as follows:

| 2016 | $ 21,600 |
|---|---|
| 2017 | 5,400 |
| Total | $ 27,000 |

### E. Related Party Transactions

At December 31, 2015, the Company had a payable to a member for approximately $45,000. The amount was repaid by the Company in January 2016.

For 2015 and 2014, approximately $370,000 and $360,000, respectively, of the Company's revenue was received from locations partially owned by a related party.

The Company pays two related entities for marketing and operations support. Expenses to these related entities totaled approximately $41,000 and $47,000 for the years ended December 31, 2015 and 2014, respectively.

### F. Subsequent Events

In preparing the accompanying financial statements, management of the Company has evaluated all subsequent events and transactions for potential recognition or disclosure through March 28, 2016, the date the financial statements were available for issuance.

THESE FINANCIAL STATEMENTS HAVE BEEN PREPARED WITHOUT AN AUDIT. PROSPECTIVE FRANCHISEES OR SELLERS OF FRANCHISES SHOULD BE ADVISED THAT NO INDEPENDENT CERTIFIED PUBLIC ACCOUNTANT HAS AUDITED THESE FIGURES OR EXPRESSED AND OPINION WITH REGARD TO THEIR CONTENT OR FORM.

**UATP Management, LLC**
# Balance Sheet
**As of April 25, 2017**

2:13 PM
04/25/17
Accrual Basis

|  | Apr 25, 17 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| Merchandise Portal -2925 | 88,647.87 |
| Groupon | 43,596.80 |
| compass 2252 | 314,886.76 |
| Gift Card 1892 | 27,255.38 |
| Franchise- 8739 | 173,156.76 |
| Compass #0450-Operating | 3,017.40 |
| Payrolll | 3,055.25 |
| **Total Checking/Savings** | 653,616.22 |
| **Accounts Receivable** | |
| Amuze | 400.00 |
| **Accounts Receivable** | |
| whitemarsh | 28,747.13 |
| **Franchise Fee** | |
| Royalty | 35,430.04 |
| **Total Franchise Fee** | 35,430.04 |
| Coppell | 86,265.19 |
| Mansfield | 57,352.50 |
| Portland Urban Air | 158,333.35 |
| Spring Urban Air | 60,006.04 |
| Sugar Land | 400.00 |
| Accounts Receivable - Other | 1,500.00 |
| **Total Accounts Receivable** | 428,034.25 |
| **Total Accounts Receivable** | 428,434.25 |
| **Other Current Assets** | |
| Lease Deposit | 1,850.00 |
| A/R- Coppell Urban Air | 525.00 |
| **Total Other Current Assets** | 2,375.00 |
| **Total Current Assets** | 1,084,425.47 |
| **Fixed Assets** | |
| Airplane | 101,250.00 |
| Accumulated Depreciation | -1,575.36 |
| **Office Equipment** | |
| Computers | 6,372.58 |
| Furniture | 8,143.21 |
| Office Equipment - Other | 960.39 |
| **Total Office Equipment** | 15,476.18 |
| **Total Fixed Assets** | 115,150.82 |
| **TOTAL ASSETS** | **1,199,576.29** |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Accounts Payable** | |
| Accounts Payable | 55,982.86 |
| **Total Accounts Payable** | 55,982.86 |
| **Other Current Liabilities** | |
| Prepaid Health Insurance | 19,302.00 |
| Prepaid Rent | 7,200.00 |
| Accrued Expense | -1,030.53 |
| Groupon Liability | 36,998.40 |
| Gift Card Liability | 28,900.51 |

2:13 PM

04/25/17

Accrual Basis

# UATP Management, LLC
## Balance Sheet
### As of April 25, 2017

|  | Apr 25, 17 |
|---|---|
| Sugar Land Liability | -850.25 |
| **Total Other Current Liabilities** | 90,520.13 |
| **Total Current Liabilities** | 146,502.99 |
| **Total Liabilities** | 146,502.99 |
| **Equity** | |
| Member  4 Draws - MOBJR LTD | -1,000,000.00 |
| Member 3  Draws- SVMT CO LLC | -505,426.00 |
| Member 1 Draws - MOB SR | -1,027,395.60 |
| Member 1 Equity - MOB SR | 500.00 |
| Member 2 Draws - MOB JR | -27,295.60 |
| Retained Earnings | 2,613,349.59 |
| Net Income | 999,340.91 |
| **Total Equity** | 1,053,073.30 |
| **TOTAL LIABILITIES & EQUITY** | 1,199,576.29 |

**UATP Management, LLC**
# Profit & Loss
January 1 through April 25, 2017

2:15 PM
04/25/17
Accrual Basis

|  | Jan 1 - Apr 25, 17 |
|---|---|
| **Ordinary Income/Expense** | |
| **Income** | |
| Merchandise Portal Income | 90,732.01 |
| R&D | 189,536.19 |
| Initial Franchise Fee | 355,000.00 |
| Market Development Fee | 22,955.00 |
| Duties And Import Fees | 629.58 |
| Franchise Fee | |
| Development Fund | 114,964.29 |
| Royalty | 701,545.14 |
| **Total Franchise Fee** | 816,509.43 |
| Management Income | 239,400.00 |
| **Total Income** | 1,714,762.21 |
| **Expense** | |
| Merchant Fees | 2,184.14 |
| Reimbursement - Milestone | 2,000.00 |
| Conference | 2,867.40 |
| BeenVerified | 78.53 |
| Infusion | 1,704.43 |
| Equipment Financing | -62,615.00 |
| R&D Expense | 205,316.85 |
| website service & development | 468.15 |
| Supplies and Small Tools | |
| Bell | 88.08 |
| Photography | 42.50 |
| Supplies and Small Tools - Other | 2,077.35 |
| **Total Supplies and Small Tools** | 2,207.93 |
| Vaccum | 27.05 |
| Health Insurance Premium | 34,092.76 |
| commission | 435.28 |
| Gift Card Expense | 640.69 |
| Advertising & Prmotion | |
| Fort Worth Texas Magazine | 1,600.00 |
| Zip Recruiter | 3,001.14 |
| Facebook | 6,000.00 |
| Marketing | 1,000.00 |
| 4over Franchisee | |
| 4over | -1,632.25 |
| **Total 4over Franchisee** | -1,632.25 |
| Brand Development | 6,000.00 |
| Advertising & Prmotion - Other | 351.78 |
| **Total Advertising & Prmotion** | 16,320.67 |
| Auto expense | |
| Fuel & Oil | 4,886.48 |
| Tolls | 1,403.51 |
| Auto expense - Other | 660.63 |
| **Total Auto expense** | 6,950.62 |
| Bank Service Fee | 225.63 |
| Contract Labor | |
| Contract Labor - Other | 6,022.05 |
| **Total Contract Labor** | 6,022.05 |
| DUES & Fees | 1,408.80 |
| Entertainment | |
| Meals | -271.54 |
| Entertainment - Other | 565.53 |

**UATP Management, LLC**
# Profit & Loss
### January 1 through April 25, 2017

2:15 PM
04/25/17
Accrual Basis

| | Jan 1 - Apr 25, 17 |
|---|---|
| **Total Entertainment** | 293.99 |
| **Franchise Expense** | |
| Conference/Trade Show | 12,398.04 |
| Demo Fridges | 1,839.17 |
| Map Business Online | 269.95 |
| Travel | 38,521.58 |
| Franchise Expense - Other | 4,125.83 |
| **Total Franchise Expense** | 57,154.57 |
| **Network Expenses** | 217.82 |
| **Office Rent** | 7,200.00 |
| **Office Supplies** | |
| Drop Safe | 125.09 |
| Checks | 165.38 |
| Shirts And Hats | 1,110.00 |
| Coppier | 895.69 |
| Embroidery | 101.50 |
| Postage | 2,529.22 |
| Storage | 563.39 |
| Office Supplies - Other | 5,539.19 |
| **Total Office Supplies** | 11,029.46 |
| **Payroll Expenses** | |
| Alliance Billing Fee | 824.19 |
| Fed unemployment | 560.08 |
| Gross Wages | 324,578.99 |
| Medicare - employer | 5,023.51 |
| OASDI - employer | 21,479.83 |
| Texas SUI | 642.33 |
| **Total Payroll Expenses** | 353,108.93 |
| **Phone-Internet** | 4,292.19 |
| **Professional Services** | |
| Space Plan | 0.00 |
| Consulting Fee | 30,000.00 |
| Accoutning | 12,493.00 |
| Legal | 14,578.78 |
| **Total Professional Services** | 57,071.78 |
| **Repairs & Maintenance** | 1,285.52 |
| **Software Support** | |
| Software Support - Other | 64.92 |
| **Total Software Support** | 64.92 |
| **Travel** | |
| Travel - Other | 12.82 |
| **Total Travel** | 12.82 |
| **Utilities** | |
| Electric | 2,458.42 |
| Internet | 894.90 |
| **Total Utilities** | 3,353.32 |
| **Total Expense** | 715,421.30 |
| **Net Ordinary Income** | 999,340.91 |
| **Net Income** | **999,340.91** |

**EXHIBIT F**
**TO URBAN AIR TRAMPOLINE & ADVENTURE PARK**
**FRANCHISE DISCLOSURE DOCUMENT**

**LIST OF FRANCHISEE LOCATIONS AND AFFILIATE OWNED LOCATIONS**

## LIST OF CURRENT FRANCHISEES
## AS OF DECEMBER 31, 2016

| FRANCHISEE | DBA | ADDRESS | CITY | ST | ZIP | PHONE |
|---|---|---|---|---|---|---|
| Birmingham Urban Air, LLC<br>Tad Duncan<br>Tad.duncan1@gmail.com | Urban Air Homewood | 800 Greensprings Hwy. | Homewood | AL | 35209 | 214-507-1431 |
| Xtreme Air Sports of Bloomington, LLC<br>Debbie Hanna<br>indianahanna@icloud.com | Urban Air Bloomington | 3306 West State Road 46 | Bloomington | IN | 47404 | 812-322-1885 |
| (B2) bouncing Beckers, LLC<br>John Becker<br>jon@urbanairwichita.com | Urban Air Wichita | 8545 W. Irving St. | Wichita | KS | 67209 | 316-300-6176 |
| Overland Park Urban Air, LLC<br>Adam Jones<br>adamjoneszm@gmail.com | Urban Air Overland Park | 14401 Metcalf Ave. | Overland Park | KS | 66223 | 913-220-5307 |
| South Portland Urban Air, LLC<br>Anthony Dill<br>adill@maine.rr.com | Urban Air South Portland | 333 Clark's Pond Parkway | South Portland | ME | 04106 | 207-229-2655 |
| Oxford Urban Air, LLC<br>Christian Mills<br>christianmills@yahoo.com | Urban Air Oxford | 925 Lapeer Rd. | Oxford Charter Township | MI | 48371 | 908-581-1142 |
| Taraschi Adventures, LLC<br>Paul Taraschi<br>pjtaraschi@hotmail.com | Urban Air Downingtown | 981 East Lancaster Ave. | Downingtown | PA | 19335 | 484-753-1865 |
| The Trampoline Park of Rockwall, LLC<br>Darren Rak<br>Drak1112@msn.com | Urban Air Rockwall | 5757 State Highway 205 | Rockwall | TX | 75032 | 972-567-0291 |
| Austin Urban Air, LLC<br>Lee Roberts<br>lee@urbanairaustin.com | Urban Air Austin | 15407 Long Vista | Austin | TX | 78728 | 214-601-6654 |
| Waco Urban Air, LLC<br>Hoang Nguyen<br>hoangkn@hotmail.com | Urban Air Waco | 5701 West Waco Dr. | Waco | TX | 76710 | 214-727-9480 |
| Wichita Falls Urban Air, LLC<br>Colby Cates<br>colby@urbanairwichitafalls.com | Urban Air Wichita Falls | 2901 Kemp Blvd. | Wichita Falls | TX | 76308 | 940-337-6912 |
| Humble Urban Air, LLC<br>Eric Alstrin<br>eric.alstrin@yahoo.com | Urban Air Humble | 19304 Highway 59 North | Humble | TX | 77338 | 817-233-3977 |
| Urban Air Waxahachie, LLC<br>Cody Herndon<br>cherndon00@me.com | Urban Air Waxahachie | 507 N. Hwy 77, Suite 77 | Waxahachie | TX | 75165 | 505-205-4977 |
| NW Houston Urban Air, Inc.<br>Grant Pederson<br>grantpederson@icloud.com | Urban Air NW Houston | 20502 Hempstead Road, Suite 110 | Houston | TX | 77065 | 972-261-8534 |
| FIEP Windsor Park LLC<br>Dale Fedewa<br>dfedewa@midwestrest.com | Urban Air NE San Antonio | 8600 Fourwinds Dr., Suite 8510A | San Antonio | TX | 78239 | 919-357-4240 |

**LIST OF FRANCHISEES WITH SIGNED FRANCHISE AGREEMENT BUT OUTLET NOT OPEN AS OF DECEMBER 31, 2016**

| FRANCHISEE | DBA | ADDRESS | CITY | ST | ZIP | PHONE |
|---|---|---|---|---|---|---|
| Conway Urban Air, LLC Joe Toddy toddyfamily12@hotmail.com | Urban Air Conway | 200 Skyline Dr. | Conway | AR | 72032 | 501-278-9619 |
| Kenayan Corporation Edward Jenkins dr.edjenkins@yahoo.com | Urban Air White Marsh | 11501 Pocomoke Court | Middle River | MD | 21220 | 301-648-0419 |
| Charlotte Urban Air, LLC Chris Fasulka cfasulka@gmail.com | Urban Air Mint Hill | 9108 Lawyers Road | Mint Hill | NC | 28227 | 980-721-9817 |
| Family Adventures North Jersey LLC Ari Moses arihmoses@gmail.com | Urban Air South Hackensack | 69 Wesley St. | S. Hackensack | NJ | 07606 | 914-584-8680 |
| Cordova Urban Air, LLC Tad Duncan tad.duncan1@gmail.com | Urban Air Cordova | 700 N. Germantown Pkwy. | Cordova | TN | 38018 | 214-507-1431 |
| Jett Urban Air Sugar Land, LLC Jennifer Sieracki jenn.jett.sieracki@gmail.com | Urban Air Sugarland | 9848 Highway 90 | Sugarland | TX | 77478 | 281-620-6612 |
| Spring Urban Air, LLC Eric Alstrin eric.alstrin@yahoo.com | Urban Air Spring | 20100 Holzwarth Rd. Suite A. | Spring | TX | 77388 | 817-233-3977 |

Note 1: These outlets are owned by one or more of our affiliates. These outlets operate under the same or similar franchise agreement as our other franchisees.

**LIST OF AFFILIATE-OWNED OUTLETS AS OF DECEMBER 31, 2016**

| FRANCHISEE | DBA | ADDRESS | CITY | ST | ZIP | PHONE |
|---|---|---|---|---|---|---|
| Coppell Urban Air, LLC[1] Hoang Nguyen hoangkn@hotmail.com | Urban Air Coppell | 110 W. Sandy Lake Dr. | Coppell | TX | 75019 | 214-727-9480 |
| Frisco Urban Air, LLC[1] Greg Ackard Gak02@yahoo.com | Urban Air Frisco | 10570 John W. Elliott Drive, Suite 900 | Frisco | TX | 75033 | 336-420-2961 |
| Garland Urban Air, LLC[1] Hoang Nguyen hoangkn@hotmail.com | Urban Air Garland | 3046 Lavon Road | Garland | TX | 75040 | 214-727-9480 |
| Mansfield Urban Air, LLC[1] Greg Ackard Gak02@yahoo.com | Urban Air Mansfield | 989 N. Walnut Creek Drive | Mansfield | TX | 76063 | 336-420-2961 |
| Southlake Urban Air, LLC[1] Michael Browning michael@urbanair trampolinepark.com | Urban Air Southlake | 325 Commerce, Suite 110 | Southlake | TX | 76092 | 817-825-0004 |

**EXHIBIT G**
**TO URBAN AIR TRAMPOLINE & ADVENTURE PARK**
**FRANCHISE DISCLOSURE DOCUMENT**

**PROMISSORY NOTE AND SECURITY AGREEMENT (SAMPLE FORM)**

## FIRST AMENDMENT TO FRANCHISE AGREEMENT

THIS FIRST AMENDMENT TO FRANCHISE AGREEMENT ("Amendment") is effective as of ("Effective Date"), regardless of the actual date of signature, between UATP MANAGEMENT, LLC, a Texas limited liability company, with its principal office in Grapevine, Texas ("Franchisor"), and _("you") and amends that certain Franchise Agreement executed pursuant thereto ("Franchise Agreement") between Franchisor and you.  Franchisor and you are sometimes referred to individually as a "party" or collectively as the "parties."

1. PRECEDENCE AND DEFINED TERMS.  This Amendment is an integral part of, and is incorporated into, the Agreements.  The parties agree to act in good faith to give full force and effect to the negotiated terms and conditions of this Amendment that are by their nature applicable to all of the Agreements (including any extension, renewal or amendment or restatement of one or more of the Agreements).  Nevertheless, this Amendment supersedes any inconsistent or conflicting provisions of the Agreements.  Terms not otherwise defined in this Amendment have the meanings as defined in the Agreements.

2. NEGOTIATED CHANGES.  After negotiations, Franchisor and you have agreed to certain modifications to the Agreements, at your request and for your benefit.  This Amendment contains the agreements between Franchisor and you based on those negotiations.

3. ROYALTY.  Franchisor and you have executed a Promissory Note and Security Agreement ("Note") dated        and until such time as the Note has been paid in full, the Monthly Royalty Fee to be paid by you under the Franchise Agreement shall equal 8.5% of Gross Sales.  Once the Note has been paid in full, the Monthly Royalty Fee to be paid by you under the Franchise Agreement shall equal 7% of Gross Sales.

4. REMAINING TERMS UNAFFECTED.  The remaining terms of the Franchise Agreement are unaffected by this Amendment and remain binding on the parties. This Amendment may only be modified in writing signed by all parties hereto.

5. COUNTERPARTS.  This Amendment may be executed in one or more counterparts, each of which will be deemed an original and all of which together will constitute one and the same instrument.  PDF or facsimile signatures will have the same force and effect as original signatures.


The parties sign and deliver this Amendment to each other as shown below.

"**FRANCHISOR**":                                    "**YOU**":

UATP MANAGEMENT, LLC
a Texas limited liability company              a        limited liability company

By:_____              By:_____
Name: MICHAEL BROWNING, JR.              Name:
Title: President                                        Title:
Date:_____             Date:_____

## PROMISSORY NOTE AND SECURITY AGREEMENT

Date:

Borrower:

Borrower's Mailing Address:

Lender:                                      **UATP Management, LLC**, a Texas limited liability company

Place of Payment:                            317 S. Jenkins Street, Grapevine, Texas 76051

Principal Amount:

Annual Interest Rate:                        Minimum applicable federal interest rate for short term loans at the time this Note is executed.

Maturity Date:                               [maximum two years from date of Note]

Annual Interest Rate on Matured,
Unpaid Amounts:                              The lesser of (i) 18% per annum or (ii) the Maximum Lawful Rate.

Loan Documents:                              This Note and any other documents evidencing, securing and relating to the Principal Amount related hereto.

---

For value received, Borrower promises to pay to the order of Lender according to the terms of this Promissory Note ("Note") at the Place of Payment, or at such other address as Lender shall from time to time specify in writing, the Principal Amount, in legal and lawful money of the United States of America, as set forth below.

1. TERMS OF PAYMENT.  The Principal Amount and interest are due and payable in equal monthly installments of $_____, on the first day of each month, beginning on _____ and continuing on the first day of each succeeding month until the unpaid principal and accrued, unpaid interest have been paid in full.  The unpaid principal sum and all interest accrued thereon shall be due and payable in full on the Maturity Date. All payments under this Note made to Lender shall be made to Lender at such place as the Lender may from time to time designate in writing, in lawful money of the United States of America which shall be legal tender in payment of all debts at the time of payment.  The indebtedness evidenced by this Note is not a revolving credit, and principal borrowed hereunder and repaid may not be reborrowed.

2. SECURITY AGREEMENT.

2.1.     GRANT OF SECURITY INTEREST.  As collateral and security for the payment and performance of the Note and any and all other liabilities of Borrower to Lender, direct or contingent, of any nature whatsoever, including both purchase money and non-purchase money transactions (and specifically including the Loan), Borrower hereby grants to Lender a continuing security interest in the following "Collateral (i) all personal property and equipment (ii) all other personal property and equipment of Borrower hereafter acquired, (iii) all rights of Borrower to the payment of money, including without limitation, insurance proceeds and payments of money received from the sale, transfer or assignment of Borrower's interest in the Collateral identified herein; (iv) all goods, instruments, documents, policies and certificates of insurance, cash or other property of Borrower, (v) all files, records, books, ledger cards (including without limitation, computer programs, tapes and related electronic data processing software) and writings of Borrower or in which it has an interest in any way relating to the foregoing property, and (vi) all additions, substitutions, replacements, accessions, proceeds and products of all of the foregoing, wherever located and whether such property is now owned or existing or is owned, acquired, or arises hereafter, including without limitation, acquisition by contract or by operation of law (all terms used in this Section 10 which are defined in Article 9 of the Texas Uniform Commercial Code ("UCC") shall have the meanings given to such terms in the UCC), including

without limitation, the foregoing described property. Borrower's grant of security interest in and to the Collateral is intended to secure the Principal loaned in accordance with this Note.

2.2.    POWER OF ATTORNEY. Borrower hereby designates and appoints Lender and each of Lender's designees or agents as attorney-in-fact of Borrower, irrevocably and with power of substitution, with authority to take any or all of the following actions upon the occurrence and during the continuance of an Event of Default: (i) commence and prosecute any actions in any court for the purposes of collecting or realizing upon any Collateral and enforcing any other rights in respect thereof, (ii) defend, settle or compromise any action brought and, in connection therewith, give such discharge or release as Lender may deem appropriate, (iii) receive, open and dispose of mail addressed to Borrower and endorse checks, notes, drafts, acceptances, money orders, bills of lading, warehouse receipts or other instruments or documents evidencing payment, shipment or storage of the goods giving rise to any Collateral on behalf of and in the name of Borrower, or securing, or relating to the Collateral, (iv) sell, assign, transfer, make any agreement in respect of, or otherwise deal with or exercise rights in respect of, any Collateral or the goods or services which have given rise thereto, as fully and completely as though Lender were the absolute owner thereof for all purposes, (v) adjust and settle claims under any insurance policy related thereto, and (vii) enter on the premises of Borrower in order to exercise any of its rights and remedies.

2.3.    NO DUTY OF LENDER. Lender shall have no duty as to the collection or protection of the Collateral nor as to the preservation of any rights pertaining thereto. Borrower hereby releases Lender from any claims, causes of action and demands at any time arising out of the Collateral and its use and/or any actions taken by Lender with respect thereto, and Borrower hereby agrees to indemnify Lender and to hold Lender harmless from any and all such claims, causes of action and demands.

2.4.    PERFECTION AND PROTECTION OF LIENS. Borrower hereby irrevocably authorizes Lender to file (and will upon Lender's request execute and deliver to Lender) any financing statements, continuation statements, extension agreements and other documents, properly completed and executed (and acknowledged when required) by Borrower in form and substance satisfactory to Lender, for the purpose of perfecting, confirming, or protecting Lender's rights in the Collateral.

2.5.    NOTICE OF ASSIGNMENT. All instruments, documents and other agreements entered into by Borrower and constituting Collateral shall contain (by way of stamp or other means satisfactory to Lender) the following language: "COLLATERALLY ASSIGNED TO UATP MANAGEMENT, LLC".

3.    PREPAYMENT. Borrower may prepay this Note in any amount at any time before the Maturity Date without penalty or premium. Regardless of whether an Event of Default exists, all payments hereunder, whether designated as payments of principal or interest, shall be applied, in the following order, to unpaid and accrued interest, to the discharge of any expenses or damages for which the Lender may be entitled to receive reimbursement hereunder, or to unpaid principal. Notwithstanding anything expressed or implied in this Note to the contrary, all past due principal and interest on this Note, whether due as the result of acceleration of maturity or otherwise, shall bear interest from the date the payment thereof shall have become due until the same have been fully discharged by payment at the Annual Interest Rate on Matured, Unpaid Amounts.

4.    NO USURY INTENDED. The parties hereto intend to conform strictly to applicable usury laws. All agreements between Borrower and Lender, whether now existing or hereafter arising and whether written or oral, are hereby limited so that in no contingency, whether by reason of demand, prepayment or acceleration of the maturity of this Note, shall the interest contracted for, charged, received, paid or agreed to be paid to Lender (including any other compensation, however denominated, held or deemed to be interest) exceed the maximum amount permitted under applicable federal and Texas law ("Maximum Lawful Rate"). If, from any circumstance whatsoever, interest would otherwise be payable to Lender in excess of the Maximum Lawful Rate, the interest and any such other compensation payable or paid to Lender shall be reduced to the Maximum Lawful Rate; and if from any circumstance Lender shall ever receive interest or anything of value deemed interest by applicable law in excess of the Maximum Lawful Rate, an amount equal to any such excessive interest shall be applied to the reduction of the principal of this Note and not to the payment of interest, or if such excessive interest exceeds the unpaid balance of principal of this Note, such excess shall be refunded to Borrower. All interest (including any other compensation, however denominated, held or deemed to be interest) paid or agreed to be paid to Lender shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread in equal parts during the period of the full stated term of this Note so that the interest

on this Note for such full stated term shall not exceed the Maximum Lawful Rate; and in the event this Note is paid in full by Borrower prior to the end of the full stated term of this Note and the interest (including any other compensation, however denominated or held or deemed to be interest) received for the actual period of the existence of this Note exceeds the Maximum Lawful Rate, Lender shall refund to Borrower the amount of the excess or shall credit the amount of the excess against amounts owing under this Note.

5. <u>DEFAULT</u>.  Upon default by Borrower in the punctual payment of this Note or any part hereof, principal or interest, as the same shall become due and payable and the continuation of such default for ten (10) days after receipt by Borrower of written notice and demand for such payment (an "Event of Default"), the holder of this Note may, at its option, without further notice or demand, (i) declare the outstanding principal balance of and accrued but unpaid interest on this Note at once due and payable, (ii) foreclose all liens securing payment hereof, (iii) pursue any and all other rights, remedies and recourses available to the holder hereof, or (iii) pursue any combination of the foregoing; and in the event default is made in the prompt payment of this Note when due or declared due, and the same is placed in the hands of an attorney for collection, or suit is brought on same, or the same is collected through probate, bankruptcy or other judicial proceedings, then the Borrower agrees and promises to pay all costs of collection, including reasonable attorneys' fees.

6. <u>MISCELLANEOUS</u>.

6.1     If any provision of this Note conflicts with the Franchise Disclosure Document of the same transaction between Lender and Borrower, the provisions of this Note will govern to the extent of the conflict.  This Note only may be modified by written agreement signed by both parties to this agreement.  This Note may not be modified, terminated, or discharged orally.

6.2     Any check, draft, money order or other instrument given in payment of all or any portion hereof may be accepted by Lender and handled in collection in the customary manner, but the same shall not constitute payment hereunder or diminish any rights of the holder hereof except to the extent that actual cash proceeds of such instrument are unconditionally received by the holder and applied to this indebtedness in the manner elsewhere herein provided.

6.3     Time is of the essence in the performance and payment of this Note.

6.4     The remedies of Lender as provided herein shall be cumulative and concurrent and may be pursued singly, successively, or together, at the sole discretion of Lender, and may be exercised as often as occasion therefor shall arise.  No action, omission, or commission by Lender, including specifically, the failure to exercise any right, remedy, or recourse, shall be deemed a waiver or release of the same.  A waiver or release shall exist and be effective only as set forth in a written document executed by Lender, and then only to the extent specifically recited therein.  A waiver or a release with reference to any one event shall not be construed as continuing, or as a bar to, or as a waiver or release of, any subsequent right, remedy, or recourse as to any subsequent event.

7.     <u>**WAIVER.**</u>  **BORROWER AND GUARANTOR OF THIS NOTE SEVERALLY AND EXPRESSLY (A) WAIVE AND RELINQUISH PRESENTMENT FOR PAYMENT, DEMAND, NOTICE OF NONPAYMENT OR NONPERFORMANCE, PROTEST, NOTICE OF PROTEST, NOTICE OF INTENT TO ACCELERATE, NOTICE OF ACCELERATION, GRACE, DILIGENCE IN COLLECTING THIS NOTE OR ENFORCING ANY SECURITY THEREFORE, OR ANY OTHER NOTICES OR ANY OTHER ACTION, AND (B) CONSENT TO ALL RENEWALS, EXTENSIONS, REARRANGEMENTS AND MODIFICATIONS WHICH FROM TIME TO TIME MAY BE GRANTED BY LENDER WITHOUT NOTICE AND TO ALL PARTIAL PAYMENTS HEREON, WHETHER BEFORE OR AFTER MATURITY, WITHOUT PREJUDICE TO LENDER.  LENDER SHALL SIMILARLY HAVE THE RIGHT TO DEAL IN ANY WAY, AT ANY TIME, WITH ONE OR MORE OF THE FOREGOING PARTIES WITHOUT NOTICE TO ANY OTHER PARTY, AND TO GRANT ANY SUCH PARTY ANY EXTENSIONS OF TIME FOR PAYMENT OF ANY OF SAID INDEBTEDNESS, OR TO GRANT ANY OTHER INDULGENCES OR FORBEARANCES WHATSOEVER, WITHOUT NOTICE TO ANY OTHER PARTY AND WITHOUT IN ANY WAY AFFECTING THE PERSONAL LIABILITY OF ANY PARTY HEREUNDER.**

8.     <u>**GOVERNING LAW AND VENUE.**</u>  **THIS NOTE IS EXECUTED AND DELIVERED IN CONNECTION WITH A LENDING TRANSACTION NEGOTIATED AND CONSUMMATED IN DALLAS**

COUNTY, TEXAS, AND SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS.  BORROWER, FOR ITSELF AND ITS SUCCESSORS AND ASSIGNS, HEREBY IRREVOCABLY (A) SUBMITS TO THE NONEXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS IN TEXAS, (B) WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION THAT IT MAY NOW OR IN THE FUTURE HAVE TO THE LAYING OF VENUE OF ANY LITIGATION ARISING OUT OF OR IN CONNECTION WITH THIS NOTE BROUGHT IN THE DISTRICT COURT OF TARRANT COUNTY, TEXAS, (C) WAIVES ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE AS TO THE VENUE OF ANY SUCH ACTION OR PROCEEDING BROUGHT IN SUCH COURT OR THAT SUCH COURT IS AN INCONVENIENT FORUM, AND (D) AGREES THAT ANY LEGAL PROCEEDING AGAINST ANY PARTY HERETO MAY BE BROUGHT IN ONE OF THE FOREGOING COURTS.

9.    **WAIVER OF JURY TRIAL.**  BORROWER AND LENDER, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY KNOWINGLY, INTENTIONALLY, IRREVOCABLY, UNCONDITIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, WAIVE, RELINQUISH AND FOREVER FORGO THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATING TO THIS NOTE, OR ANY CONDUCT, ACT OR OMISSION OF LENDER OR BORROWER, OR ANY OF THEIR DIRECTORS, OFFICERS, PARTNERS, MEMBERS, EMPLOYEES, AGENTS OR ATTORNEYS, OR ANY OTHER PERSONS AFFILIATED WITH LENDER OR BORROWER, OR ANY OF THEIR DIRECTORS, OFFICERS, PARTNERS, MEMBERS, EMPLOYEES, AGENTS OR ATTORNEYS, OR ANY OTHER PERSONS AFFILIATED WITH LENDER OR BORROWER, IN EACH OF THE FOREGOING CASES, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

10.    **NOTICES.**  Any notice or demand required hereunder shall be deemed to be delivered when deposited in the United States mail, postage prepaid, certified mail, return receipt requested, addressed to Borrower or Lender, as the case may be, at the address set out hereinbelow, or at such other address as such party may hereafter deliver in accordance herewith.

**LENDER:**

UATP Management, LLC
317 S. Jenkins Street
Grapevine, Texas 76051
ATTN: Michael O. Browning, Jr.

With a copy to:

Stephen Polozola
Decker Jones, PC
801 Cherry Street, Suite 2000
Fort Worth, Texas 76102

**BORROWER:**

Any other method of delivery or demand shall be effective only when actually received by the recipient thereof. If and when included within the term "Borrower" or "Lender" there is more than one person, all shall jointly arrange among themselves for their joint execution and delivery of a notice to the other specifying some person at some specific address for the receipt of all notices, demands, payments or other documents.  All persons included within the terms "Borrower" or "Lender," respectively, shall be bound by notices, demands, payments and documents given in accordance with the provisions of this paragraph to the same extent as if each had received such notice, demand, payment or document.

11.    **SUCCESSORS AND ASSIGNS.**  This Note and all the covenants, promises and agreements contained herein shall be binding upon and shall inure to the benefit of Borrower and Lender, and their respective successors

and assigns.

        12.      **J**OINT AND **S**EVERAL **L**IABILITY**.**  Should this Note be signed or endorsed by more than one person and/or entity, all of the obligations herein contained shall be considered the joint and several obligations of each maker and endorser hereof.

        13.      **T**ERMINATION**.**  This Note may not be terminated orally, but only by a discharge in writing signed by Lender at the time such discharge is sought.

**BORROWER:**

By:_____

                                                                        _____
                                                                        Date

# GUARANTY AGREEMENT
[INSERT NAME OF GUARANTOR]

[insert date]

1.    FOR VALUE RECEIVED, the undersigned, _____ (collectively, "Guarantor") hereby unconditionally, absolutely, jointly and severally, and irrevocably guarantee the prompt payment when due to UATP Management, LLC, a Texas limited liability company ("Lender"), its successors and assigns, of any and all indebtedness or other liability, fixed or contingent, which _____, a _____limited liability company ("Borrower"), may now or at any time hereafter owe said Lender, including without limitation that certain indebtedness (including all interest or other charges accruing thereon or incurred thereunder) evidenced by that certain Promissory Note and Security Agreement dated of even date herewith ("Note"), in the stated principal amount of $_____, bearing interest and payable as therein provided, executed by Borrower payable to the order of Lender and secured by, among other things, the security agreement set forth within the Note, executed by Borrower for the benefit of Lender.

2.    It is expressly understood and acknowledged that the execution and delivery of this Guaranty is a condition precedent to Lender's obligation to make loans under the Note and is an integral part of the transactions contemplated thereby, and Lender would not extend credit under the Note but for Guarantor's execution and delivery of this Guaranty.  Guarantor is a beneficial owner or affiliate of Borrower or otherwise will materially benefit from Lender's extension of the loan evidenced by the Note to Borrower.  The value of the consideration received or to be received by Guarantor is reasonably worth at least as much as the liability and obligation of Guarantor hereunder, and such liability and obligation may reasonably be expected to benefit Guarantor directly and indirectly.

3.    Guarantor expressly waives diligence on the part of Lender in the collection of any and all of said indebtedness, whether fixed or contingent, and waives presentment, protest, dishonor, notice of acceptance of this Guaranty Agreement ("Guaranty"), notice of non-performance, notice of acceleration, demands for performance and approval of any modifications, renewals or extensions of the indebtedness that may be granted to Borrower.  Lender shall be under no obligation to notify Guarantor of its acceptance of this Guaranty, nor of any advances made or credit extended on the faith hereof, nor of the failure of Borrower to pay said indebtedness as it matures, nor to use diligence in preserving the liability of any entity or person on said indebtedness whether fixed or contingent, nor in bringing suit to enforce collection of said indebtedness, nor of notice of any instrument now or hereafter executed in favor of Lender evidencing or securing said indebtedness.  Guarantor individually and severally further agrees to pay reasonable attorneys' fees and litigation costs should this Guaranty be placed in the hands of an attorney for collection, or should it be collected through any court.

4.    Guarantor agrees that this is a continuing Guaranty and that it may be enforced by Lender without first resorting to or exhausting any security or collateral, or without first having recourse to the Note or its remedies as to any security or as to any of the property covered by the Note through foreclosure proceedings or otherwise. Further, Lender shall not be required to exhaust its remedies against accommodation makers, sureties and endorsers or any other guarantors.  Pursuit by Lender of any of its remedies shall not impair this Guaranty and shall not be deemed an election of remedies.  To the extent permitted by law, Guarantor waives the benefit of any statute of limitation affecting Guarantor's liability hereunder or the manner or mode of enforcement thereof.

5.    Guarantor consents, without affecting Guarantor's liability to Lender hereunder, that Lender may, without notice to or consent of Guarantor, upon such terms as it may deem advisable, (a) extend, in whole or in part, by renewal, modification or otherwise, the time of payment of the indebtedness owing by Borrower to Lender, or held by Lender as security for the indebtedness, (b) settle or compromise any claim of Lender against Borrower, or against any other person, firm or corporation, whose obligation is held by Lender as collateral security for the indebtedness, or (c) offset the full amount of the indebtedness guaranteed hereby without notice, against any accounts or sums of Guarantor held by Lender, as security or otherwise.  Guarantor hereby ratifies and affirms any such extension, renewal, modification, settlement, compromise, or offset; and waives all defenses, counterclaims, or offsets which Guarantor might have by reason thereof.

6.    If all or any part of the indebtedness hereby guaranteed shall be secured, Guarantor agrees that Lender may from time to time, at its discretion, with or without valuable consideration, allow release, surrender,

substitution, exchange, subordination, loss or withdrawal of security or collateral, and should Borrower execute in favor of said Lender any collateral agreement, the exercise by Lender of any right conferred upon it in said agreement shall be wholly discretionary with Lender, and such exercise of, or failure to exercise such right shall not in any manner impair or diminish the obligations of Guarantor hereunder. Lender may, without in any manner impairing or diminishing the obligations of Guarantor hereunder, elect to pursue any available remedy against Borrower or against any security held by Lender, whether or not the exercise by Lender of any such remedy shall result in loss to Guarantor of any right of subrogation or right to proceed against Borrower for reimbursement.

7.    In the event Borrower is a corporation, joint stock association, company or partnership, or is hereafter incorporated, if the indebtedness at any time hereafter exceeds the amount permitted by law, if the indebtedness is at any time hereafter deemed to be usurious, or Borrower is not liable because the act of creating the obligation is *ultra vires*, or the officers or persons creating same acted in excess of their authority, and for any of these reasons the indebtedness to Lender which Guarantor agreed to pay cannot be enforced against the corporation, joint stock association or partnership, such facts shall in no manner affect Guarantor's liability hereunder, but Guarantor shall be liable hereunder, notwithstanding that such corporation, joint stock association or partnership is not liable for such indebtedness, and to the same extent as Guarantor would have been if the indebtedness of Borrower had been enforceable against it.

8.    Guarantor further agrees that this Guaranty shall not be discharged, impaired or affected by (a) the transfer by Borrower of all or any portion of the Warrior Course, trampolines, or softplay, or of any other security or described in the Note or in any other security document, or (b) any defense (other than the full payment of the indebtedness hereby guaranteed in accordance with the terms hereof) that Guarantor may or might have as to Guarantor's respective undertakings, liabilities and obligations hereunder, each and every such defense being hereby waived by the undersigned Guarantor.

9.    Should the status of Borrower change, this Guaranty shall continue and also cover the indebtedness of Borrower under the new status, according to the terms hereof guaranteeing the indebtedness of the original Borrower.

10.    Guarantor waives any defense arising by reason of any disability or other defense of Borrower or by reason of the cessation from any cause whatsoever of the liability of Borrower. Until all indebtedness of Borrower to Lender shall have been paid in full, Guarantor shall have no right of subrogation, and waives any right to enforce any remedy which Lender now has or may hereafter have against Borrower; and Guarantor waives any benefit of, and any right to participate in, any security now or hereafter held by Lender.

11.    This Guaranty shall remain and continue in full force and effect notwithstanding the institution by or against Borrower of bankruptcy, reorganization, readjustment, receivership or insolvency proceedings of any nature, or the disaffirmance of the said indebtedness in any such proceedings, or otherwise.

12.    In the event any payment made by Borrower to Lender is held to constitute a preference under the U.S. Bankruptcy Code, or if for any other reason Lender is required to refund such payment or pay the amount thereof to any other party, such a payment shall not constitute a release of Guarantor from any liability hereunder, but Guarantor agrees to pay such amount to Lender upon demand.

13.    In the event Guarantor is a corporation, Guarantor warrants and represents that it has authority to execute and deliver this Guaranty and agrees that it will do all things necessary to preserve and keep in full force and effect its existence, franchises, rights and privileges as a business or stock corporation under the laws of the state of its incorporation.

14.    To the extent permitted by law, Guarantor expressly waives and relinquishes all rights and remedies of surety, including but not limited to, all rights and remedies provided under Chapter 34 of the Texas Business and Commerce Code, as amended.

15.    To the extent permitted by law, Guarantor expressly waives and relinquishes any and all rights and remedies under Sections 51.003, 51.004 and 51.005 of the Texas Property Code, as amended, including without limitation, the right to seek an offset of any deficiency judgment based on the fair market value of the property

covered by the Note.

16.    This Guaranty is for the benefit of Lender, its successors and assigns, and in the event of an assignment by Lender, its successors or assigns, of the said indebtedness, or any part thereof, the rights and benefits hereunder shall be transferred with such indebtedness without further act on the part of Lender and without notice to Guarantor.

17.    Suit may be brought against Guarantor or against any other guarantor without impairing the rights of Lender, its successors or assigns, against any guarantor, and Lender may compromise or settle with any guarantor for such sum or sums as it may see fit and release such guarantor from all further liability to Lender for such indebtedness without impairing the right of Lender to demand and collect the balance of such indebtedness from other guarantors not so released; but it is agreed, however, that such compromise, settlement and release shall not in any manner impair the rights of the guarantors as among themselves.

18.    In the event of the death of any Guarantor hereunder, the obligation of the deceased shall continue in full force and effect against his or her estate or beneficiaries as to all indebtedness which shall have been created or incurred by Borrower prior to the time when Lender shall have received notice, in writing, of such death; and this Guaranty shall from the date of such death as to all indebtedness created, incurred or arising after such death remain and continue in full force as a Guaranty by any surviving Guarantors.

19.    Guarantor, individually and severally, expressly agrees that this contract is performable in Tarrant County, Texas.

20.    The invalidity or unenforceability in any particular circumstances of any provision of this Guaranty shall not extend beyond such provision or such circumstances, and no other provision of this instrument shall be affected thereby.

21.    Guarantor acknowledges and agrees that Guarantor has received and reviewed a copy of the Note, by and between Borrower and Lender, and all other documents executed in connection with the Note.

22.    Guarantor agrees to furnish to Lender financial statements and tax returns for Guarantor upon the reasonable request of Lender, in such form and detail reasonably acceptable to Lender.  Guarantor shall provide notice, disclose and certify to Lender any material changes in Guarantor's debt or net worth, and upon the reasonable request of Lender, certify that there has been no material change in Guarantor's personal debt or net worth since the previous financial statement delivered to Lender.  Guarantor covenants and agrees that Guarantor shall not, without the prior consent of Lender, transfer assets to any third-party except in the ordinary course of Guarantor's business affairs and in exchange for reasonably equivalent value.

23.    Any notice or demand required hereunder shall be deemed to be delivered when deposited in the United States mail, postage prepaid, certified mail, return receipt requested, addressed to Guarantor or Lender, as the case may be, at the address set out hereinbelow, or at such other address as such party may hereafter deliver in accordance herewith:

**LENDER:**
UATP Management, LLC
317 S. Jenkins Street
Grapevine, Texas 76051
ATTN: Michael O. Browning, Jr.

With a copy to:

Stephen Polozola
Decker Jones, PC
801 Cherry Street, Suite 2000
Fort Worth, Texas 76102

**GUARANTOR:**

Any other method of delivery or demand shall be effective only when actually received by the recipient thereof.  If and when included within the term "Guarantor" or "Lender" there are more than one person, all shall jointly arrange among themselves for their joint execution and delivery of a notice to the other specifying some person at some specific address for the receipt of all notices, demands, payments or other documents.  All persons included within the terms "Guarantor" or "Lender," respectively, shall be bound by notices, demands, payments and documents given in accordance with the provisions of this paragraph to the same extent as if each had received such notice, demand, payment or document.

24.    **GOVERNING LAW AND VENUE.  THIS GUARANTY IS EXECUTED AND DELIVERED IN CONNECTION WITH A LENDING TRANSACTION NEGOTIATED AND CONSUMMATED IN TARRANT COUNTY, TEXAS, AND SHALL BE GOVERNED BY, CONSTRUED, AND PERFORMED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS.  GUARANTOR, FOR ITSELF AND ITS SUCCESSORS AND ASSIGNS, HEREBY IRREVOCABLY (A) SUBMITS TO THE NONEXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS IN TEXAS, (B) WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION THAT IT MAY NOW OR IN THE FUTURE HAVE TO THE LAYING OF VENUE OF ANY LITIGATION ARISING OUT OF OR IN CONNECTION WITH THIS NOTE BROUGHT IN THE DISTRICT COURT OF TARRANT COUNTY, TEXAS, (C) WAIVES ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE AS TO THE VENUE OF ANY SUCH ACTION OR PROCEEDING BROUGHT IN SUCH  COURT OR THAT SUCH COURT IS AN INCONVENIENT FORUM, AND (D) AGREES THAT ANY LEGAL PROCEEDING AGAINST ANY PARTY TO ANY OF THE GUARANTY ARISING OUT OF OR IN CONNECTION WITH ANY OF THE GUARANTY MAY BE BROUGHT IN ONE OF THE FOREGOING COURTS.**

25.    **WAIVER OF JURY TRIAL.  GUARANTOR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY KNOWINGLY, INTENTIONALLY, IRREVOCABLY, UNCONDITIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, WAIVES, RELINQUISHES AND FOREVER FORGOES THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATING TO THIS NOTE OR ANY OF THE LOAN DOCUMENTS, OR ANY CONDUCT, ACT OR OMISSION OF GUARANTOR, OR ANY OF THEIR DIRECTORS, OFFICERS, PARTNERS, MEMBERS, EMPLOYEES, AGENTS OR ATTORNEYS, OR ANY OTHER PERSONS AFFILIATED WITH PAYEE OR GUARANTOR, OR ANY OF THEIR DIRECTORS, OFFICERS, PARTNERS, MEMBERS, EMPLOYEES, AGENTS OR ATTORNEYS, OR ANY OTHER PERSONS AFFILIATED WITH PAYEE OR GUARANTOR, IN EACH OF THE FOREGOING CASES, WHETHER SOUNDING IN**

**CONTRACT, TORT OR OTHERWISE.**

EXECUTED effective as of the date written herein above.


**GUARANTOR:**


_____


## ACKNOWLEDGMENT

STATE OF _____                          §
COUNTY OF _____                       §

This     instrument     was     acknowledged     before     me     on     the     _____     day     of
_____, 2017, by _____, an individual.


                                        _____
                                        Notary Public, State of _____

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
|---|
| B. E-MAIL CONTACT AT FILER (optional) |
| C. SEND ACKNOWLEDGMENT TO:   (Name and Address) |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME:  Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| OR | 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | COUNTRY |

2. DEBTOR'S NAME:  Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| OR | 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY):  Provide only one Secured Party name (3a or 3b)

| OR | 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | COUNTRY |

4. COLLATERAL:  This financing statement covers the following collateral:

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

**FILING OFFICE COPY** — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

**UCC FINANCING STATEMENT ADDENDUM**

Debtor:

Secured Party: UATP MANAGEMENT, LLC, a Texas limited liability company

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

DESCRIPTION OF COLLATERAL:  This Financing Statement covers the following types of collateral owned by Debtor (herein collectively called the "Collateral"):

(a)  As collateral and security for the payment and performance of the Loan and any and all other liabilities of Borrower to Lender, direct or contingent, of any nature whatsoever, including both purchase money and non-purchase money transactions (and specifically including the Loan), Borrower hereby grants to Lender a continuing security interest in the following "Collateral" (i) all personal property and equipment (ii) all other personal property and equipment of Borrower hereafter acquired, (iii) all rights of Borrower to the payment of money, including without limitation, insurance proceeds and payments of money received from the sale, transfer or assignment of Borrower's interest in the Collateral identified herein; (iv) all goods, instruments, documents, policies and certificates of insurance, cash or other property of Borrower, (v) all files, records, books, ledger cards (including without limitation, computer programs, tapes and related electronic data processing software) and writings of Borrower or in which it has an interest in any way relating to the foregoing property, and (vi) all additions, substitutions, replacements, accessions, proceeds and products of all of the foregoing, wherever located and whether such property is now owned or existing or is owned, acquired, or arises hereafter, including without limitation, acquisition by contract or by operation of law (all terms used in this Section 10 which are defined in Article 9 of the Texas Uniform Commercial Code ("UCC") shall have the meanings given to such terms in the UCC), including without limitation, the foregoing described property.  Borrower's grant of security interest in and to the Collateral is intended to secure advances made in accordance with the Promissory Note and Security Agreement of even date herewith, including to secure concurrent and future advances therewith.

**DEBTOR:**

By: _____

- 1 -

**EXHIBIT H**
**TO URBAN AIR TRAMPOLINE & ADVENTURE PARK**
**FRANCHISE DISCLOSURE DOCUMENT**

**FRANCHISE DISCLOSURE QUESTIONNAIRE**

## FRANCHISE DISCLOSURE QUESTIONNAIRE

As you know, UATP MANAGEMENT, LLC ("we" or "us") and you are preparing to enter into a Franchise Agreement for the operation of an URBAN AIR TRAMPOLINE & ADVENTURE PARK franchise.  The purposes of this Questionnaire are to determine whether any statements or promises were made to you that we have not authorized or that may be untrue, inaccurate or misleading, to be certain that you have been properly represented in this transaction, and to be certain that you understand the limitations on claims you may make by reason of the purchase and operation of your franchise.  **You cannot sign or date this Questionnaire the same day as the Receipt for the disclosure document but you must sign and date it the same day you sign the Franchise Agreement and pay your franchise fee.**  Please review each of the following questions carefully and provide honest responses to each question.  If you answer "No" to any of the questions below, please explain your answer on the back of this sheet.

Yes _____ No _____       1.    Have you received and personally reviewed the URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchise Agreement and each exhibit or schedule attached to it?

Yes _____ No _____       2.    Have you received and personally reviewed the URBAN AIR TRAMPOLINE & ADVENTURE PARK disclosure document we provided?

Yes _____ No _____       3.    Did you sign a receipt for the URBAN AIR TRAMPOLINE & ADVENTURE PARK disclosure document indicating the date you received it?

Yes _____ No _____       4.    Do you understand all the information contained in the URBAN AIR TRAMPOLINE & ADVENTURE PARK disclosure document and Franchise Agreement?

Yes _____ No _____       5.    A)  Have you reviewed the URBAN AIR TRAMPOLINE & ADVENTURE PARK disclosure document and URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchise Agreement with a lawyer, accountant or other professional advisor?

Yes _____ No _____             B)  Have you discussed the benefits and risks of operating an URBAN AIR TRAMPOLINE & ADVENTURE PARK franchise with your professional advisor?

Yes _____ No _____             C) Did you discuss the benefits and risks of operating an URBAN AIR TRAMPOLINE & ADVENTURE PARK franchise with an existing URBAN AIR TRAMPOLINE & ADVENTURE PARK franchisee?

Yes _____ No _____       6.    Do you understand the risks of operating an URBAN AIR TRAMPOLINE & ADVENTURE PARK franchise?

Yes _____ No _____       7.    Do you understand the success or failure of your URBAN AIR TRAMPOLINE & ADVENTURE PARK franchise will depend in large part upon your skills, abilities and efforts and those of the person you employ, as well as many factors beyond your control such as weather, competition, interest rates, the economy, inflation, labor and supply costs, lease terms and the marketplace?

Yes _____ No _____       8.    Do you understand we are not obligated to provide assistance to you in finding and securing a location for your URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchised Business?

Yes _____ No _____       9.    A) Do you understand all disputes or claims you may have arising out of or relating to the URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchise Agreement must be brought in the judicial district in which our principal place of business is located, if not resolved informally?

Yes _____ No _____             B)  Do you understand the URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchise Agreement provides you can only collect compensatory damages on any claim under or relating to the URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchise Agreement, and not any punitive, exemplary or multiple damages)?

Yes _____ No _____       10.   Do you understand that your Designated Manager must successfully complete our initial training program?

Yes _____ No _____     11.   Do you understand we do not have to sell you a franchise or additional franchises or consent to your purchase of existing franchises?

Yes _____ No _____     12.   A) Do you understand that the U.S. Government has enacted anti-terrorist legislation that prevents us from carrying on business with any suspected terrorist or anyone associated directly or indirectly with terrorist activities?

Yes _____ No _____        B) Is it true that you have never been a suspected terrorist or associated directly or indirectly with terrorist activities?

Yes _____ No _____        C) Do you understand that we will not approve your purchase of an URBAN AIR TRAMPOLINE & ADVENTURE PARK franchise if you are a suspected terrorist or associated directly or indirectly with terrorist activity?

Yes _____ No _____        D) Is it true that you are not purchasing an URBAN AIR TRAMPOLINE & ADVENTURE PARK franchise with the intent or purpose of violating any anti-terrorism law, or for obtaining money to be contributed to a terrorist organization?

Yes _____ No _____     13.   Is it true no employee or other person speaking on our behalf made any statement or promise regarding the costs involved in operating an URBAN AIR TRAMPOLINE & ADVENTURE PARK franchise that is not contained in the URBAN AIR TRAMPOLINE & ADVENTURE PARK disclosure document or that is contrary to, or different from, the information contained in the URBAN AIR TRAMPOLINE & ADVENTURE PARK disclosure document?

Yes _____ No _____     14.   Is it true no employee or other person speaking on our behalf made any statement or promise regarding the actual, average or projected profits or earnings, the likelihood of success, the amount of money you may earn, or the total amount of revenue an URBAN AIR TRAMPOLINE & ADVENTURE PARK franchise will generate, that is not contained in the URBAN AIR TRAMPOLINE & ADVENTURE PARK disclosure document or that is contrary to, or different from, the information contained in the URBAN AIR TRAMPOLINE & ADVENTURE PARK disclosure document?

Yes _____ No _____     15.   Is it true no employee or other person speaking on our behalf made any statement or promise or agreement, other than those matters addressed in the URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchise Agreement, concerning advertising, marketing, media support, marketing penetration, training, support service or assistance that is contrary to, or different from, the information contained in the URBAN AIR TRAMPOLINE & ADVENTURE PARK disclosure document?

Yes _____ No _____     16.   Do you understand that the URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchise Agreement contains the entire agreement between us and you concerning the offer of the URBAN AIR TRAMPOLINE & ADVENTURE PARK franchise opportunity, meaning any prior oral or written statements not reflected in the URBAN AIR TRAMPOLINE & ADVENTURE PARK Franchise Agreement will not be binding and that nothing in the agreement or in any related agreement is intended to disclaim the representations we made in the URBAN AIR TRAMPOLINE & ADVENTURE PARK disclosure document?

For Maryland Residents Only: Such representations are not intended to nor will they act as a release, estoppel or waiver of any liability incurred under the Maryland Franchise Registration and Disclosure Law.

_____
Print Name

_____        _____
Signature                                                    Date

If signing on behalf of a corporation or other entity, please complete the following:

_____        _____
Name of Entity                                                    Title

**EXHIBIT I**

**GENERAL RELEAE
(SAMPLE FORM ONLY)**

### GENERAL RELEASE (this "Release Agreement")

The undersigned ("**Releasor**") and my heirs, administrators, executors, ancestors, and assigns, (collectively "**Releasor Agent(s)**"), for good and valuable consideration, the receipt of which is hereby acknowledged, hereby remise, release, and forever discharge UATP Management, LLC, a Texas limited liability company ("**UATP**"), with its principal business offices located at 317 Jenkins, Suite C, Grapevine, Texas 76051 and its parent company, Affiliates, and their respective owners, officers, directors, regional directors, managers, shareholders, members, employees, agents, successors and assigns, (collectively, the "**UATP Released Parties**") from any and all claims, whether at law or in equity, and all contracts, controversies, claims, and demands whatsoever, at law or in equity, that Releasor and/or any Releasor Agent ever had, now have, or that any of their respective heirs, administrators, ancestors, executors, and/or assigns may have against the UATP Released Parties including, without limitation, (i) any and all claims arising out of or related to that certain Franchise Agreement between UATP and _____ dated _____, _____, (ii) the offer and sale of the URBAN AIR TRAMPOLINE & ADVENTURE PARK franchise opportunity, (iii) any and all claims arising under federal, state, and local laws, rules, and ordinances.

[If Releasor is domiciled or has his or her principal place of business in the State of California]

### <u>WAIVER OF SECTION 1542 OF THE CALIFORNIA CIVIL CODE</u>.

_____ ("**Releasor**") for myself and on behalf of all persons acting by or through me, acknowledge that I am familiar with <u>Section 1542 of the California Civil Code</u>, which reads as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

With respect to those claims being released, I acknowledge, for myself and on behalf of all persons acting by or through me, which I am releasing unknown claims and waive all rights I have or may have under <u>Section 1542 of the California Civil Code</u> or any other statute or common law principle of similar effect. For purposes of this paragraph, I shall be considered to be creditors of UATP Released Parties, and each of them.

I acknowledge that this general release extends to claims which I do not know or suspect to exist in my favor at the time of executing this Release Agreement, which if were known to me may have materially affected my decision to enter into this Release Agreement. I understand that the facts in respect of which this Release Agreement is given may hereafter turn out to be other than or different from the facts in that connection known or believed to be true. I expressly assume the risk of the facts turning out to be so different and agree that this Release Agreement shall be in all respects effective and not subject to termination or rescission by any such difference in facts.

**IN WITNESS WHEREOF**, the parties hereto have executed this Release Agreement as of the date set forth below.


Signature:_____

Name:_____

Date:_____


[This Release Agreement will be modified as necessary for consistency with any state law regulating franchising.]

**EXHIBIT J**

**TO URBAN AIR TRAMPOLINE & ADVENTURE PARK
FRANCHISE DISCLOSURE DOCUMENT**

**RECEIPT**

## RECEIPT

This disclosure document summarizes certain provisions of the Franchise Agreement and other information in plain language. Read this disclosure document and all agreements carefully.

If UATP MANAGEMENT, LLC offers you a franchise, it must provide this disclosure document to you 14 calendar days before you sign a binding agreement or make a payment with franchisor or an affiliate in connection with the proposed franchise sale.

New York and Rhode Island require that we give you this disclosure document at the earlier of the first personal meeting or 10 business days before the execution of the franchise or other agreement or the payment of any consideration that relates to the franchise relationship. Michigan requires that we give you this disclosure document at least 10 business days before the execution of any binding franchise or other agreement or the payment of any consideration, whichever occurs first.

If UATP MANAGEMENT, LLC does not deliver this disclosure document on time or if it contains a false or misleading statement, or a material omission, a violation of federal and state law may have occurred and should be reported to the Federal Trade Commission, Washington, D.C. 20580 and the appropriate state regulatory agency listed in Exhibit B. Franchisor's agents for service of process are listed in Exhibit C.

Issuance Date: April 25, 2017, as amended May 11, 2017

The following individual(s) offer the franchise for sale: Michael Browning, Jr. at (800) 960-4778.

I received a disclosure document dated April 25, 2017, as amended May 11, 2017 (or the date reflected on the State Effective Dates Page), that included the following Exhibits:

STATE SPECIFIC APPENDIX
EXHIBIT A          Table of Contents of Manuals
EXHIBIT B          List of State Administrators
EXHIBIT C          List of Agents for Service of Process
EXHIBIT D-1       Site Selection Agreement
EXHIBIT D-2       Franchise Agreement
                          State Specific Amendment to Franchise Agreement
                          Attachment A          Glossary of Additional Terms
                          Attachment B          Approved Location and Protected Area
                          Attachment C          Franchisee's Owners and Key Personnel
                          Attachment D-1       Undertaking and Guaranty
                          Attachment D-2       Confidentiality and Non-competition Agreement
                          Attachment E          Electronic Debit Authorization
                          Attachment F          Telephone Assignment Agreement
                          Attachment G          Lease Rider
EXHIBIT E          Financial Statements
EXHIBIT F          List of Franchisees
EXHIBIT G          Promissory Note and Security Agreement (Sample form only)
EXHIBIT H          Franchise Disclosure Questionnaire
EXHIBIT I           General Release (Sample form only)
EXHIBIT J           Receipt

_____          _____
Print Name                                                    Signature

_____
Date
If signing on behalf of a corporation or other entity, please complete the following:

_____          _____
Name of Entity                                               Title

Keep this copy for your records.

**RECEIPT**

This disclosure document summarizes certain provisions of the Franchise Agreement and other information in plain language. Read this disclosure document and all agreements carefully.

If UATP MANAGEMENT, LLC offers you a franchise, it must provide this disclosure document to you 14 calendar days before you sign a binding agreement or make a payment with franchisor or an affiliate in connection with the proposed franchise sale.

New York and Rhode Island require that we give you this disclosure document at the earlier of the first personal meeting or 10 business days before the execution of the franchise or other agreement or the payment of any consideration that relates to the franchise relationship. Michigan and Oregon require that we give you this disclosure document at least 10 business days before the execution any binding franchise or other agreement or the payment of any consideration, whichever occurs first.

If UATP MANAGEMENT, LLC does not deliver this disclosure document on time or if it contains a false or misleading statement, or a material omission, a violation of federal and state law may have occurred and should be reported to the Federal Trade Commission, Washington, D.C. 20580 and the appropriate state regulatory agency listed in <u>Exhibit B</u>. Franchisor's agents for service of process are listed in <u>Exhibit C</u>.

Issuance Date: April 25, 2017, as amended May 11, 2017

The following individual(s) offer the franchise for sale: Michael Browning, Jr. at (800) 960-4778.

I received a disclosure document dated April 25, 2017, as amended May 11, 2017 (or the date reflected on the State Effective Dates Page), that included the following Exhibits:

STATE SPECIFIC APPENDIX
EXHIBIT A          Table of Contents of Manuals
EXHIBIT B          List of State Administrators
EXHIBIT C          List of Agents for Service of Process
EXHIBIT D-1       Site Selection Agreement
EXHIBIT D-2       Franchise Agreement
                         State Specific Amendment to Franchise Agreement
                         <u>Attachment A</u>          Glossary of Additional Terms
                         <u>Attachment B</u>          Approved Location and Protected Area
                         <u>Attachment C</u>          Franchisee's Owners and Key Personnel
                         <u>Attachment D-1</u>       Undertaking and Guaranty
                         <u>Attachment D-2</u>       Confidentiality and Non-competition Agreement
                         <u>Attachment E</u>          Electronic Debit Authorization
                         <u>Attachment F</u>          Telephone Assignment Agreement
                         <u>Attachment G</u>          Lease Rider
EXHIBIT E          Financial Statements
EXHIBIT F          List of Franchisees
EXHIBIT G          Promissory Note and Security Agreement (Sample form only)
EXHIBIT H          Franchise Disclosure Questionnaire
EXHIBIT I           General Release (Sample form only)
EXHIBIT J           Receipt

_____                    _____
Print Name                                                              Signature

_____
Date
If signing on behalf of a corporation or other entity, please complete the following:

_____                    _____
Name of Entity                                                        Title

Please sign this copy of the receipt, date your signature, and return it by mail to
Michael Browning, Jr, 317 S. Jenkins, Suite C, Grapevine, Texas 76051.

V.2

EXHIBIT C

## AMENDMENT TO FRANCHISE AGREEMENT
(MEMBERSHIP PROGRAM)

This Amendment to Franchise Agreement ("Amendment") is entered into on the last date signed below ("Effective Date") between UATP MANAGEMENT, LLC, a Texas limited liability company ("Franchisor" or "we") and _____ ("Franchisee") and amends that certain Franchise Agreement entered into on _____ ("Franchise Agreement").  Franchisor and Franchisee are sometimes referred to individually as a "party" or collectively as the "parties."  Capitalized terms not defined herein shall have the meaning ascribed in the Franchise Agreement.

1.  DEFINITIONS.

1.1  "Direct Costs" shall equal your pro rata share of Franchisor's cost of operating the Membership Program for the benefit of Urban Air Adventure Parks operating in the United States, which costs include, but are not limited to, the following: credit card processing fees, collections management, and hosting (AWS).  For purposes of this definition, your pro rata share will be calculated as follows: (a) ~~total costs included in the definition of~~ Direct Costs incurred in identified month divided by (b) the total number of units in operation at the end of the month when the Direct Costs are identified.

1.2  "Member(s)" shall mean those guests who have executed a Membership Agreement with Franchisor.

1.3  "Membership Agreement" shall mean the executed, written agreement between Franchisor and a guest outlining the terms of the Membership Program.

1.4  "Monthly Membership Fee" shall mean the monthly fee the Member pays to and is collected by Franchisor pursuant to a Membership Agreement (and as may be offset due to charge backs) excluding the Transaction Fee identified in the Membership Agreement (i.e., any one-time processing fees).

1.5  "Membership Program" shall mean the offering to Members of certain rights to access Urban Air Adventure Parks and receive the associated membership benefits in accordance with a Membership Agreement.

1.6  "Membership Program Fee" shall be a continuing, non-refundable monthly fee equal to 2.5% of the monthly Gross Sales attributable to Monthly Membership Fees received for Membership Agreements registered to your Franchised Business.  Once Franchisor has recouped all costs and expenses it incurred in the development of the Membership Program, whether incurred prior to or after the date hereof, the Membership Program Fee shall be reduced to 1.25%.

1.7  "Membership Program Franchisee Payments" shall mean the portion of the Monthly Membership Fees collected by Franchisor and attributable to the Membership Agreements registered to your Approved Location.

1.8  "NAF" shall mean the National Advertising Fund.

1.9  "National Advertising Fund" shall mean a fund managed by Franchisor or its affiliates for the purpose of promoting the Urban Air brand and Membership Program and producing marketing materials for the Urban Air Adventure Parks system.

1.10  "NAF Fee" shall be a continuing, non-refundable, monthly fee equal to 5% of the monthly Gross Sales attributable to only Monthly Membership Fees received for Membership Agreements registered to your Franchised Business.

1.11  "Total Membership Program Fee" shall be a continuing, non-refundable, monthly fee and shall equal the sum of the Membership Program Fee, NAF Fee, and Direct Costs.

2.  MEMBERSHIPS.

2.1  MEMBERSHIP PROGRAM.  Franchisor has implemented a Membership Program offering Members the opportunity to enroll in Membership Agreements in exchange for the Member's payment of the Monthly Membership Fee.  A guest that desires to become a Member shall enter into a Membership Agreement with Franchisor, and Franchisee shall not be a direct party to the Membership Agreement but shall be a third-party beneficiary of certain aspects of each Membership Agreement.  Member benefits under the Membership Program are described in the Manual and at www.urbanairmembership.com in the Membership Agreement (a copy of which will be provided to you upon request). Franchisee agrees to participate in the Membership Program according to the terms set forth herein

and in the Manual.  The Membership Program may be changed, improved, reduced, and further developed by Franchisor from time-to-time consistent with the terms of the Membership Agreements.  Franchisee agrees to comply with the Membership Program as it may be amended from time-to-time and shall grant Members access to the Urban Air Adventure Park operated by Franchisee consistent with the terms of the Members' Membership Agreements and the Membership Program.

2.2  MEMBER & FRANCHISEE PAYMENTS UNDER MEMBERSHIP PROGRAM.

2.2.1  MEMBER PAYMENTS.  Consistent with the Membership Agreements, Members shall pay Franchisor the Monthly Membership Fees. Members shall not pay Monthly Membership Fees to Franchisee, and Franchisee shall not ask or require Members to pay Monthly Membership Fees to Franchisee.

2.2.2  FRANCHISEE PAYMENTS.  Each week during the Membership Program, Franchisor shall collect the Monthly Membership Fees attributable to your Franchised Business.  The Monthly Membership Fees to be paid out weekly shall be calculated from Monday to Sunday of each week.  Franchisor shall remit the Membership Program Franchisee Payment to you via ACH on or about Wednesday of each week.

2.3  MONTHLY FEES.  In connection with Franchisor's administration of the Membership Program, Franchisee agrees to pay the Total Membership Program Fee to Franchisor.  Franchisor will identify to you the Total Membership Program Fee on a monthly basis within your royalty invoice.  You shall pay the Total Membership Program Fee to Franchisor monthly via ACH from the account you designate for the payment of Royalty Fees and according to the same terms as the Royalty Fees are paid to Franchisor per the Franchise Agreement and Manual.

2.4  ACH.  Such that Franchisor may fund to Franchisee the Membership Program Franchisee Payments to you and collect the Total Membership Program Fee, Franchisee shall execute the ACH Authorization Agreement in the form attached hereto.  Franchisor will not accept any other method of funding or paying either the Monthly Membership Fee or Total Membership Program Fee.

2.5  START-UP COSTS.  Franchisee agrees to pay to Franchisor upon demand $1,700, or such other cost as identified by Franchisor, in reimbursement for in-park marketing materials needed to initiate the Membership Program.  Franchisee's purchase of these marketing materials is required to implement the Membership Program.

2.6.  OFFSETS.  Franchisor shall have the right to offset against all or any portion of the Membership Program Franchisee Payments due Franchisee any amounts Franchisee may owe Franchisor, UA Attractions, LLC, or any of their affiliates or subsidiaries under the Franchise Agreement or any other agreement between such parties, including, but not limited to, the Purchase and Installation Agreement or any Promissory Note.  In the event of such offset, Franchisor will advise Franchisee via the monthly royalty invoice the amount and basis for such offset. Notwithstanding the foregoing, failure of Franchisor to provide such advanced notice shall not be a basis to object to such offset.

2.7  SALES TAX.  Franchisor shall collect all sales taxes that are required to be paid on the Membership Program Fee and Transaction Fee and remit same to the applicable taxing authority.

3.  NATIONAL ADVERTISING FUND.

3.1  PROGRAM.  We or our designee will administer the NAF.  You are required to make continuing contributions to the NAF equal to the NAF Fee. By way of example, the NAF Fee will be calculated as follows:

**Flow of Marketing Funds**

~~We reserve the right to raise the NAF Fee above 5% (as well as the Local Marketing Expenditure) or modify the NAF Fee to be based upon the Gross Sales of your Adventure Park (instead of monthly revenue from membership fees), provided the combined contribution to the NAF and Local Marketing Expenditure will not exceed 10% of monthly Gross Sales) in the future by gaining an approval vote by either (i) 66% of all then existing company owned and Franchised Businesses, or (ii) 51% of all then existing Franchised Businesses. Voting will be accomplished through a system of one vote per company owned and eligible franchised Adventure Park. An eligible franchised Adventure Park is an Adventure Park operated pursuant to a Franchise Agreement that is in good standing (i.e. which is not then currently in default in accordance with the terms of such Franchise Agreement). We have no obligation to spend any amount on advertising in an area where each franchisee is located or to ensure that any particular franchisee benefits directly or pro rata from the placement of advertising.~~

The NAF may be used by us at our sole option to satisfy or defray any and all costs of maintaining, administering, directing and preparing <u>national</u> marketing campaigns, promotions and advertising (including without limitation the cost of preparing and conducting television, radio, internet-based, magazine, newspaper, Social Media and other forms of electronic media campaigns); developing, implementing and maintaining an electronic commerce website and/or related strategies; the cost of market research, costs of administering customer loyalty programs, direct mail and outdoor billboard advertising; public relations activities; ~~product and operations related research and development (including without limitation Attractions, technology solutions and food and beverage research and development);~~ employing advertising agencies to assist therein; costs of our personnel and other department costs for advertising that is internally administered or prepared by us; costs associated with gift card programs; <u>and</u> costs of providing other advertising materials to Adventure Parks~~; and costs of maintaining franchisee service telephone numbers if we elect to establish such service~~. <u>While we intend to invest the NAF for the benefit of all franchisees, w</u>~~W~~<u>e have no obligation to spend any amount on advertising in an area where each franchisee is located or to ensure that any particular franchisee benefits directly or pro rata from the placement of advertising.</u>  The NAF will not spend any money on advertising that is principally a solicitation for the sale of new franchises. The NAF owns the rights to all creative concepts and marketing materials created or paid for by the NAF. ~~The NAF has the right to retain a~~<u>A</u>ny commissions received from suppliers of marketing materials or products <u>will be reinvested into the NAF</u>.

The NAF is accounted for separately from our other funds. While our intent is to balance the NAF on an annual basis, periodically the NAF may run at either a surplus or deficit. All disbursements from the NAF will be made first from income <u>received by the NAF</u> and then from contributions. We may spend in any fiscal year an amount greater or less than the aggregate contributions of all Franchised Businesses to the NAF in that year, and the NAF may borrow from ~~us~~ <u>Franchisor</u> or other lenders to cover deficits in the NAF or cause the NAF to invest any surplus for future use by the NAF. <u>(If a loan is issued by Franchisor to the NAF, the</u> ~~-~~<u>outstanding principal balance will bear interest based upon a year of 360 days with interest being charged for each day the principal amount is outstanding including the date of actual payment at the rate which is equal to one percentage points in excess of that rate shown in the Wall Street Journal as the prime rate).</u>  We <u>will make available to you a quarterly, unaudited summary statement of monies collected and costs incurred by the NAF.  Further, we will advise you of our strategy for implementation of the NAF.</u>  ~~are not required to account to franchisees for the way we spend NAF contributions. However, we will prepare annually an unaudited statement of monies collected and costs incurred by the NAF and furnish you a copy upon your written request.~~ <u>In the event there is a surplus in the NAF, Franchisor may, in its absolute and sole discretion, invest such surplus in liquid securities for the benefit of the NAF.</u>  Except as otherwise expressly provided in the Franchise Agreement, we assume no direct or indirect liability or obligation with respect to the maintenance, direction or administration of the NAF. We do not act as a trustee or in any other fiduciary capacity with respect to the NAF. Since we started franchising in 2013, no NAF funds were collected or spent in prior years. We commenced collecting NAF contributions in 2019.  Although the NAF is intended to be of perpetual duration, we may terminate the NAF at our sole option at any time. However, the NAF will not be terminated until all contributions to the NAF have been expended for marketing, advertising and promotional purposes as set forth above or returned to contributing Adventure Parks without interest based upon their respective contributions.

      3.2     PAYMENT OF NAF FEE.  In connection with Franchisor's administration of the NAF, Franchisee agrees to pay the NAF Fee to Franchisor.  Franchisor will identify the NAF Fee on a monthly basis within your monthly royalty invoice.  You shall pay the NAF Fee to Franchisor monthly via ACH from the account you designate for the payment of Royalty Fees and according to the same terms as the Royalty Fees are paid to Franchisor per the Franchise Agreement and Manual.  Franchisor will not accept any other method of paying the NAF Fee.

4.    <u>DISPUTE RESOLUTION</u>.

**4.1    ARBITRATION.  TO THE FULLEST EXTENT PERMITED BY LAW, ANY DISPUTE BETWEEN (A) YOU AND ANY OTHER OWNER AND (B) FRANCHISOR AND ITS AFFILIATES, AND THEIR RESPECTIVE SUBSIDIARIES, DIRECTORS, OFFICERS, EMPLOYEES, AGENTS, SHAREHOLDERS, DESIGNEES, AND REPRESENTATIVES (COLLECTIVELY, THE "FRANCHISOR INDEMNITEES") ARISING UNDER, OUT OF, IN CONNECTION WITH, OR IN RELATION TO (I) ANY CLAIM, (II) THE NEGOTIATION OF THIS AGREEMENT (INCLUDING ANY OTHER AGREEMENT BETWEEN YOU AND FRANCHISOR), (III) THE OFFER AND SALE OF THE FRANCHISE OPPORTUNITY, (IV) REPRESENTATIONS MADE PRIOR TO THE EXECUTION OF THIS AGREEMENT, AND (V) THIS AGREEMENT OR ANY OTHER AGREEMENT BETWEEN YOU AND FRANCHISOR, ANY ATTACHMENTS THERETO, OR THE ENFORCEABILITY OF THIS AGREEMENT MUST BE SUBMITTED TO BINDING ARBITRATION BEFORE A ~~PANEL OF THREE ARBITERS~~ SINGLE ARBITER WITH THE AMERICAN ARBITRATION ASSOCIATION PURSUANT TO ITS COMMERCIAL INDUSTRY RULES IN EFFECT AT THE TIME THE ARBITRATION DEMAND IS FILED.  ANY ARBITRATION DEMAND WILL BE SUBJECT TO THE FEDERAL ARBITRATION ACT. FRANCHISEE, THE OWNERS, AND THE FRANCHISOR INDEMNITIES AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN AN INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING.**

A party who intends to seek arbitration must first send to the other, by certified mail, a written Notice of Dispute ("Notice"). The Notice to Urban Air should be addressed directed to Urban Air Adventure Parks, Attn: General Counsel and delivered to the Notice Address.  During the arbitration, the amount of any settlement offer made by either party shall not be disclosed to the arbitrators.  The AAA rules are available on line at www.adr.org.  The arbitrator may award injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim.

Further, unless all parties agree otherwise, the arbitrator may not consolidate more than one person's claims and may not otherwise preside over any form of a representative, joint, or class proceeding. Unless prohibited by law, the arbitration shall occur in Dallas County, Texas.  If prohibited by law, the arbitration shall occur in the county in which the Approved Location lies.  Except as may be required by law, neither Franchisee, its Owners, nor an arbitrator may disclose the existence, content, or results of any arbitration under this section without the prior written consent of all parties.

The decision of the arbitrator will be final and binding on all parties to the dispute; however, the arbitrator is bound by the terms of this Agreement. The arbitrator will have no authority or power to: (a) stay the effectiveness of any pending termination of this Agreement; (b) assess punitive or exemplary damages; or (c) make any award that extends, modifies or suspends any lawful term of this Agreement or any reasonable standard of business performance set by Franchisor. The arbitrator must also follow the applicable law and may not disregard the law based on principles of justice or equity which are not a specific part of the applicable law.  A judgment may be entered upon the arbitration award in any federal or state court having Jurisdiction and enforced in accordance with the Federal Arbitration Act and applicable rules of arbitration.

4.2  EXCEPTION OF CLAIMS SUBJECT TO ARBITRATION.  Franchisor and Franchisee recognize and agree that certain claims of Franchisor may not be best suited to determination through arbitration and agree that Franchisor, at its sole option, may bring the following types of claims, cases, disputes and causes of action either in court or in arbitration:

4.2.1    Claims seeking injunctive or other equitable relief to enforce provisions of this Agreement, provided however that non-equitable claims joined with any injunctive claims must be heard separately in arbitration, and that regardless of the forum, any injunctive relief may be given without the necessity of Franchisor posting bond or other security and any such bond or other security is hereby waived; further, Franchisee acknowledges that the termination of any litigation for injunctive or other equitable relief will not bar Franchisor from asserting non-equitable claims in an arbitration involving the same parties or causes of action;

4.2.2    Claims seeking relief of any kind with respect to Franchisee's violation of any health or safety law;

4.2.3    Claims seeking relief of any kind with respect to Franchisee's use of the Marks;

4.2.4    Claims seeking relief related to of any of the provisions of Section 14 of the Franchise Agreement, including without limitation for breach of confidentiality and non-competition provisions;

4.2.5    Claims related to unauthorized or improper use or misappropriation of Franchisor's Marks, trade secrets, Confidential Information or any of Franchisor's intellectual property; and/or;

4.2.6    Claims, including claims by an affiliate of Franchisor, seeking recovery or any other remedy based on Franchisee's failure to pay any moneys due under this Agreement, any agreement with an affiliate of Franchisor, or any unpaid invoices owed to an affiliate of Franchisor when due.

4.3    **M**ATERIAL **I**NDUCEMENT FOR **F**RANCHISOR.    **FRANCHISEE ACKNOWLEDGES AND AGREES THAT THIS AMENDMENT IS ENTERED INTO VOLUNTARILY AND IS NOT THE PRODUCT OF COERCION ON THE PART OF FRANCHISOR. THE BINDING ARBITRATION, WAIVER OF CLASS ACTION, AND OTHER PROVISIONS OF THIS SECTION 4 ARE A MATERIAL INDUCEMENT FOR FRANCHISOR TO ENTER INTO THIS AMENDMENT. IF ANY PROVISION OF THIS SECTION 4 IS DEEMED UNENFORCEABLE FOR ANY REASON, THERE WILL HAVE BEEN A FAILURE OF CONSIDERATION DELIVERED BY FRANCHISEE TO FRANCHISOR FOR THIS AMENDMENT, AND THIS AGREEMENT WILL HAVE FAILED OF ITS ESSENTIAL PURPOSE, THEREBY ENTITLING FRANCHISOR TO VOID THIS AMENDMENT AT ITS OPTION.**

5.    ACH A**UTHORIZATION**.    Contemporaneous with the execution of this Amendment, Franchisee shall execute the ACH Authorization Agreement attached hereto, which Franchisee agrees shall, among other things, be used to fund the Membership Program Franchisee Payments to Franchisee via ACH direct deposit.

6.    P**RECEDENCE AND DEFINED TERMS**.    This Amendment is an integral part of, and is incorporated into, the Franchise Agreement. The parties agree to act in good faith to give full force and effect to the negotiated terms and conditions of this Amendment. Nevertheless, this Amendment supersedes any inconsistent or conflicting provisions of the Franchise Agreement. Terms not otherwise defined in this combined addendum have the meanings as defined in the agreements.

7.    N**EGOTIATED CHANGES**.    After negotiations, Franchisor and Franchisee have agreed to certain modifications to the Franchise Agreement, at your request and for your benefit. This Amendment contains the agreements between Franchisor and Franchisee based on those negotiations.

8.    R**EMAINING TERMS UNAFFECTED**.    The remaining terms of the Franchise Agreement are unaffected by this Amendment and remain binding on the parties.

9.    C**OUNTERPARTS**.    This Amendment may be executed in one or more counterparts, each of which will be deemed an original and all of which together will constitute one and the same instrument. Pdf or facsimile signatures will have the same force and effect as original signatures.

10.    C**ONTROLLING DOCUMENT**.    To the extent of a conflict between this Amendment and its Exhibits and the Franchise Agreement, this Amendment and its Exhibits shall control.

The parties sign and deliver this Amendment to each other as shown below.

"**FRANCHISOR**":                                    "**FRANCHISEE**":

UATP MANAGEMENT, LLC
a Texas limited liability company


By: _____        By: _____
    Michael O. Browning, Jr. its CEO

                                                Its: _____

Date: _____        Date: _____



## ACH AUTHORIZATION AGREEMENT

By executing below, Franchisee hereby authorizes UATP Management, LLC, UA Attractions, LLC and their subsidiaries and affiliates (collectively, "Franchisor") to credit or debit the account identified below to pay all fees, charges, and any other amounts owed pursuant to either the Franchise Agreement, as amended, entered into between UATP Management, LLC and Franchisee or such other agreements entered into between Franchisor and Franchisee (including Royalty fees, License Payments, sums due to Franchisor or Franchisee under a membership program, the cost of any products or services purchased from Franchisor and any other amounts owing to Franchisor under the Franchise Agreement or any other agreement with Franchisor, including interest and late fees); and, if necessary, to initiate adjustments for any transactions debited or credited in error. These debits and credits are related to the operation of the Franchised Business and the amount of each debit or credit will vary from month-to-month. This authorization will remain in full force and effect until Franchisor has received written notification from Franchisee of its termination in such time and in such manner as to afford Franchisor a reasonable opportunity to act on it. Termination of this authorization may result in your Franchise Agreement being terminated unless an alternate means of payment acceptable to Franchisor is provided.

### TERMS OF BILLING:

Starting immediately and continuing thereafter until your Franchise Agreement has expired or been terminated or alternate means of payment are approved by Franchisor, Franchisee authorizes Franchisor to initiate either an electronic debit or credit or to create and process a demand draft against my bank account on or about the 15th day of each month for those sums authorized herein.

### BANK INFORMATION:

Bank ABA Number (Routing Number):                                      _____
Bank Account Number (Customer's Account Number):          _____
Bank Account Type (Checking/Savings/Business Checking):   _____
Tax ID Number:                                                                      _____

### FRANCHISEE:

_____

By:_____

Printed Name: _____

Its:_____

Date:_____

# EXHIBIT D



### ACH AUTHORIZATION AGREEMENT

By executing below, Franchisee hereby authorizes UATP Management, LLC, UA Attractions, LLC and their subsidiaries and affiliates (collectively, "Franchisor") to credit or debit the account identified below to pay all fees, charges, and any other amounts owed pursuant to either the Franchise Agreement, as amended, entered into between UATP Management, LLC and Franchisee or such other agreements entered into between Franchisor and Franchisee (including Royalty fees, License Payments, sums due to Franchisor or Franchisee under a membership program, the cost of any products or services purchased from Franchisor and any other amounts owing to Franchisor under the Franchise Agreement or any other agreement with Franchisor, including interest and late fees); and, if necessary, to initiate adjustments for any transactions debited or credited in error. These debits and credits are related to the operation of the Franchised Business and the amount of each debit or credit will vary from month-to-month. This authorization will remain in full force and effect until Franchisor has received written notification from Franchisee of its termination in such time and in such manner as to afford Franchisor a reasonable opportunity to act on it. Termination of this authorization may result in your Franchise Agreement being terminated unless an alternate means of payment acceptable to Franchisor is provided.

**TERMS OF BILLING:**

Starting immediately and continuing thereafter until your Franchise Agreement has expired or been terminated or alternate means of payment are approved by Franchisor, Franchisee authorizes Franchisor to initiate either an electronic debit or credit or to create and process a demand draft against my bank account on or about the 15th day of each month for those sums authorized herein.

**BANK INFORMATION:**

Bank ABA Number (Routing Number):                          _____
Bank Account Number (Customer's Account Number):           _____
Bank Account Type (Checking/Savings/Business Checking):    _____
Tax ID Number:                                             _____

**FRANCHISEE:**

_____

By:_____

Printed Name: _____

Its:_____

Date:_____